```
1                   UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                         SAN JOSE DIVISION

3

      CUC DANG,
4
              PLAINTIFF,              CASE NO.  CV-10-02181-RMW
5
         VS.                          SAN JOSE, CALIFORNIA
6
      SUTTER'S PLACE, INC., DBA BAY   APRIL 30, 2013
7     101 OR BAY 101 CASINO, UNITE
      HERE! LOCAL 19, AND DOES 1      VOLUME 1
8     THROUGH 20, INCLUSIVE,
                                      PAGES 1 - 156
9             DEFENDANTS.

10

11                    TRANSCRIPT OF TRIAL
              BEFORE THE HONORABLE RONALD M. WHYTE
12           UNITED STATES DISTRICT JUDGE AND A JURY

13                   A-P-P-E-A-R-A-N-C-E-S

14    FOR THE PLAINTIFF:   ROBINSON & WOOD, INC.
                           BY:   ANN A.P. NGUYEN
15                         227 NORTH FIRST STREET
                           SAN JOSE, CALIFORNIA 95113
16
      ALSO PRESENT:        ANDRE THOMAS
17
      FOR THE DEFENDANTS:  MCMANIS FAULKNER
18                         BY:   JAMES MCMANIS
                                 JENNIFER MURAKAMI
19                         FAIRMONT PLAZA
                           10TH FLOOR
20                         50 W. SAN FERNANDO STREET
                           SAN JOSE, CALIFORNIA 95113
21
      ALSO PRESENT:        CINDY MCCLELEN
22
      OFFICIAL COURT REPORTERS:   IRENE L. RODRIGUEZ, CSR, CRR
23                                CERTIFICATE NUMBER 8074
                                  LEE-ANNE SHORTRIDGE, CSR, CRR
24                                CERTIFICATE NUMBER 9595

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
              TRANSCRIPT PRODUCED WITH COMPUTER
```

1

2                        INDEX OF PROCEEDINGS

3     OPENING STATEMENT BY MS. NGUYEN              P. 18

4     OPENING STATEMENT BY MR. MCMANIS            P. 26

5

6

7

                        INDEX OF WITNESSES
8     PLAINTIFF'S:

9     RONALD WERNER
          AS-ON CROSS-EXAM BY MS. NGUYEN          P. 48
10        AS-ON DIRECT EXAM BY MR. MCMANIS        P. 82
          AS-ON RECROSS-EXAM BY MS. NGUYEN        P. 147
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXHIBITS

IDENT.        EVIDENCE

PLAINTIFF'S:

| | IDENT. | EVIDENCE |
|---|---|---|
| 1016 | | 51 |
| 1015 | | 55 |
| 1014 | | 59 |
| 523 | | 71 |

DEFENDANT'S:

| | IDENT. | EVIDENCE |
|---|---|---|
| 533 | | 88 |
| 534 | | 89 |
| 535 | | 91 |
| 548 | | 98 |
| 549 | | 101 |
| 550 | | 103 |
| 532 | | 105 |
| 500 | | 114 |
| 504 | | 123 |
| 560 | 126 | 129 |
| 505 | | 130 |
| 506 | | 133 |
| 528 | | 134 |

```
1    SAN JOSE, CALIFORNIA                    APRIL 30, 2013

2                      P R O C E E D I N G S

3         (JURY OUT AT 8:33 A.M.)

4              MS. NGUYEN:  GOOD MORNING.

5              MR. MCMANIS:  GOOD MORNING.

6              THE COURT:  I UNDERSTAND THERE'S AN ISSUE.

7              MS. NGUYEN:  YESTERDAY WHEN WE WERE PROVIDED THE

8    EXHIBITS FOR THE FIRST WITNESS, WE HAD OBJECTIONS THAT WERE

9    LODGED BEFORE, BUT WE NEVER GOT RULINGS ON THEM AND I WANTED TO

10   MAKE SURE WE BROUGHT THIS UP OUT OF THE JURY'S PRESENCE.

11             THE COURT:  WHY IS IT COMING UP NOW?  I THOUGHT I

12   MADE THIS CLEAR YESTERDAY THAT THIS IS JURY TIME.  THIS IS NOT

13   TIME FOR US TO BE TAKING UP ISSUES.

14             MS. NGUYEN:  THIS IS FOR THE CROSS-EXAMINATION OR

15   THE DIRECT/CROSS OF THE FIRST WITNESS.  WE CAN DO IT DURING THE

16   BREAK IF YOU WOULD LIKE.

17        I DIDN'T KNOW ABOUT THE EXHIBITS THAT THE OTHER SIDE WAS

18   GOING TO USE UNTIL AN HOUR AFTER THE TRIAL DAY ENDED YESTERDAY.

19             THE COURT:  WHAT IS THE ISSUE?

20             MS. NGUYEN:  JUST SOME OF THE EXHIBITS.  I HAVE

21   OBJECTIONS TO THEM BASED ON HEARSAY, BASED ON INFORMATION THAT

22   THEY WANT TO BRING IN, THE MEDIATOR'S OPINION.

23        SO THOSE ARE SPECIFIC OBJECTIONS.  SO I CAN GO THROUGH

24   EACH ONE OF THEM RIGHT NOW IF YOUR HONOR WOULD LIKE.

25             THE COURT:  QUICKLY TELL ME.
```

1          MS. NGUYEN:  SO FOR EXHIBIT 500 AND 551 --

2          THE COURT:  THIS IS THE FIRST WITNESS?

3          MS. NGUYEN:  YES, YOUR HONOR.  THAT'S MR. WERNER.

4          THE COURT:  AND WHAT ONE?

5          MS. NGUYEN:  AND 500 IS THE INVESTIGATION REPORT OF

6    CAROLE EDMAN AND IT HAS HEARSAY ON HEARSAY ON HEARSAY, YOUR

7    HONOR.

8          THE COURT:  DO YOU INTEND TO OFFER THE WHOLE REPORT?

9          MS. NGUYEN:  YES, WE DO.  AND WE'RE NOT OFFERING

10   IT -- IT'S NOT HEARSAY.  IT'S NOT GOING TO BE OFFERED FOR THE

11   TRUTH OF ANYTHING STATED IN THERE, BUT TO SHOW WHAT REPORT

12   MR. WERNER AND BAY 101 RECEIVED FROM THE INDEPENDENT

13   INVESTIGATION WHICH GOES TO SHOW THEIR STATE OF MIND IN TERMS

14   OF TERMINATING HER, OR BEFORE THEY TERMINATED HER, ADOPTING A

15   PLAN FOR HER PERFORMANCE IMPROVEMENT.

16       I THINK IT CLEARLY COMES IN SUBJECT TO A LIMITING

17   INSTRUCTION THAT IT'S NOT TO BE SUBJECT TO THE TRUTH OF

18   ANYTHING STATED THEREIN, BUT TO SHOW WHAT MR. WERNER AND

19   BAY 101 RECEIVED AS A RESULT OF THIS INVESTIGATION.

20          THE COURT:  OKAY.  WHAT ELSE IS YOUR CONCERN?  WHAT

21   OTHER EXHIBITS?

22          MS. NGUYEN:  OTHER EXHIBITS, YOUR HONOR, 505, 506,

23   527.  THOSE ARE ALL EMPLOYEE'S WRITTEN STATEMENTS THAT WERE

24   GATHERED BY THE SUPERVISORS AND THEY'RE ALL HEARSAY.

25       IF THOSE EMPLOYEES WANT TO COME AND TESTIFY, THEY CAN.

1      BUT EVERYTHING THEY'RE REPORTING THERE IS HEARSAY AND

2   THEY'RE TRYING TO GET IT ADMITTED FOR THE TRUTH OF THE MATTER,

3   JUST AS THE INVESTIGATOR'S REPORT.

4          MR. MCMANIS:  ONCE AGAIN, THOSE ARE NOT BEING

5   OFFERED FOR THE TRUTH OF THE MATTER STATED, BUT TO SHOW INTENT,

6   STATE OF MIND, KNOWLEDGE.

7      FOR EXAMPLE, IF MR. WERNER RECEIVED A REPORT SAYING THAT

8   THE PLAINTIFF WAS DRUNK ON THE JOB AND WAS TAKING MONEY FROM

9   THE CASH REGISTER -- I'M MAKING THIS UP, BUT TO ILLUSTRATE THE

10  POINT -- HE'S ENTITLED TO RELY ON THOSE REPORTS.

11     HE WILL TESTIFY THAT HE DID RELY ON THOSE REPORTS IN

12  TAKING THE ACTIONS THAT HE DID.  IT ABSOLUTELY REBUTS THE

13  SUGGESTION BY THE PLAINTIFF THAT THIS IS SOMEHOW A

14  DISCRIMINATORY INTENT, RETALIATION, WHAT HAVE YOU.

15         THE COURT:  WHAT ELSE DO YOU HAVE?

16         MS. NGUYEN:  EXHIBIT 530 AND 531, YOUR HONOR, I

17  BELIEVE THEY'RE MEDIATOR'S OPINIONS, THE UNION MEDIATOR'S, AND

18  SO THOSE ARE ALL COVERED UNDER THE MEDIATOR'S PRIVILEGE, AS

19  WELL AS HEARSAY.

20         MR. MCMANIS:  WITH RESPECT TO 530 AND 531, I AGREE

21  WITH COUNSEL.  WE DON'T INTEND TO OFFER THOSE UNLESS SOMETHING

22  COMES UP IN THE PLAINTIFF'S CASE THAT WE THINK IT'S RELEVANT,

23  IN WHICH CASE WE'LL TAKE IT UP WITH THE COURT BEFORE WE MENTION

24  IT TO THE JURY.

25         MS. NGUYEN:  503, 528 AND 548, 549, AND 550.  AGAIN,

1    THOSE ARE ALL HEARSAY, MEMOS AND STATEMENTS BY EMPLOYEES AT

2    BAY 101, YOUR HONOR.

3         IF THEY WANT TO BRING IN THE EMPLOYEES, THEY CAN.

4         BUT THOSE ARE ALL HEARSAY REPORTS BY EMPLOYEES AFTER THE

5    FACT.

6         THE COURT:  THEY'RE HEARSAY IF THEY'RE BEING OFFERED

7    FOR THE TRUTH OF THE MATTER STATED.

8         BUT THE QUESTION IS WHETHER OR NOT BAY 101 HAD JUST CAUSE

9    TO DO WHAT IT DID, AND WHAT THEY WERE TOLD, EVEN THOUGH IT MAY

10   NOT BE TRUE, CERTAINLY AFFECTS THEIR STATE OF MIND AND THE

11   REASONABLENESS OF THEIR ACTION.

12         MR. MCMANIS:  THAT'S RIGHT.

13         MS. NGUYEN:  BUT, YOUR HONOR, THE REPORT CONTAINS

14   ALL OF THE INTERVIEWS AND NOTES AND FILES THAT ARE HEARSAY UPON

15   HEARSAY.

16         THE INVESTIGATOR CAN COME IN AND TALK ABOUT IT.  THE

17   ACTUAL EMPLOYEES CAN COME IN AND TESTIFY.

18         THE COURT:  I THINK, WITH THE PROPER LIMITING

19   INSTRUCTION, THOSE ARE ADMISSIBLE.

20         MR. MCMANIS:  THANK YOU, YOUR HONOR.

21         THE COURT:  ALL RIGHT.  WE'LL TAKE UP ANY THAT WE

22   HAVEN'T REACHED AT THE BREAK BECAUSE I REALLY WANT TO -- THIS

23   IS JURY TIME.

24         MS. NGUYEN:  OKAY, YOUR HONOR.

25         (JURY IN AT 8:41 A.M.)

1          THE COURT:  ALL RIGHT.  GOOD MORNING.

2      I TOLD YOU YESTERDAY THAT WE WOULD START TODAY WITH SOME

3  PRELIMINARY INSTRUCTIONS, WHICH I WILL NOW GIVE TO YOU.

4      LADIES AND GENTLEMEN, YOU ARE NOW THE JURY IN THIS CASE.

5  IT IS MY DUTY TO INSTRUCT YOU ON THE LAW.  THESE INSTRUCTIONS

6  ARE PRELIMINARY INSTRUCTIONS TO HELP YOU UNDERSTAND THE

7  PRINCIPLES THAT APPLY TO CIVIL TRIALS AND HELP YOU UNDERSTAND

8  THE EVIDENCE AS YOU LISTEN TO IT.

9      AT THE END OF THE TRIAL I WILL GIVE YOU A FINAL SET OF

10 INSTRUCTIONS, AND THOSE WILL BE IN WRITING.  IT IS THE FINAL

11 SET OF INSTRUCTIONS WHICH WILL GOVERN YOUR DELIBERATIONS.

12     YOU MUST NOT INFER FROM THESE INSTRUCTIONS OR FROM

13 ANYTHING THAT I MAY SAY OR DO AS INDICATING THAT I HAVE AN

14 OPINION REGARDING THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.

15     IT IS YOUR DUTY TO FIND THE FACTS FROM ALL OF THE EVIDENCE

16 IN THE CASE AND TO THOSE FACTS APPLY TO THE LAW AS I GIVE IT TO

17 YOU.

18     YOU MUST FOLLOW THE LAW AS I GIVE IT TO YOU WHETHER YOU

19 AGREE WITH IT OR NOT.

20     YOU MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR

21 DISLIKES, OPINIONS, PREJUDICES OR SYMPATHY.  THAT MEANS THAT

22 YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE BEFORE YOU.

23     YOU WILL RECALL THAT YOU TOOK AN OATH TO DO SO.

24     IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF THEM

25 AND NOT SINGLE OUT SOME AND IGNORE OTHERS.  THEY ARE ALL

1    IMPORTANT.

2         TO HELP YOU UNDERSTAND WHAT THE TRIAL IS ABOUT, I WILL

3    GIVE YOU A BRIEF SUMMARY OF THE CASE.

4         DEFENDANT SUTTER'S PLACE, DOING BUSINESS AS BAY 101, IS A

5    CARD ROOM IN SAN JOSE.

6         PLAINTIFF CUC DANG IS A VIETNAMESE AMERICAN WOMAN WHO USED

7    TO WORK AT BAY 101 AS A COOK AND, LATER, AS A SERVER.

8         MS. DANG CLAIMS THAT SHE WAS SEXUALLY HARASSED BY A

9    COWORKER SHORTLY AFTER SHE BEGAN WORKING AT BAY 101 IN 2006.

10        BAY 101 DENIES THAT MS. DANG WAS SEXUALLY HARASSED.

11        AFTER SHE SUBMITTED A WRITTEN COMPLAINT REGARDING HER

12   HARASSMENT IN APRIL OF 2007, BAY 101 TRANSFERRED HER TO A

13   DIFFERENT SHIFT.

14        MS. DANG CONTENDS THAT AFTER THE SHIFT TRANSFER, SHE

15   CONTINUED TO EXPERIENCE A HOSTILE WORKING ENVIRONMENT DUE TO

16   DISCRIMINATION AND RETALIATION FROM HER SUPERVISOR.

17        IN OCTOBER 2009, MS. DANG WAS SUSPENDED FOR VIOLATING A

18   COMPANY RULE.

19        SHORTLY AFTER HER SUSPENSION, SHE SENT A LETTER TO BAY 101

20   MANAGEMENT COMPLAINING OF DISCRIMINATION AND RETALIATION DUE TO

21   HER BEING A WOMAN AND VIETNAMESE AND THAT THE DISCIPLINE IN

22   OCTOBER 2009 WAS IN RETALIATION FOR HER PREVIOUS COMPLAINTS.

23        ON DECEMBER 21ST, 2009, MS. DANG'S EMPLOYMENT WAS

24   TERMINATED BY BAY 101.  SHE CONTENDS THAT HER EMPLOYMENT WAS

25   TERMINATED BECAUSE SHE IS FEMALE AND VIETNAMESE AND IN

1    RETALIATION FOR COMPLAINING TO BAY 101 ABOUT DISCRIMINATION,

2    HARASSMENT AND RETALIATION.

3         MS. DANG ALSO CONTENDS THAT SHE SUFFERED HARASSMENT THAT

4    CREATED A HOSTILE ENVIRONMENT.

5         BAY 101 DENIES THAT THERE WAS A HOSTILE WORK ENVIRONMENT

6    AND THAT MS. DANG'S GENDER, RACE, OR NATIONAL ORIGIN OR HER

7    COMPLAINTS ABOUT HARASSMENT WERE A FACTOR IN TERMINATING HER

8    EMPLOYMENT.

9         BAY 101 CONTENDS THAT MS. DANG WAS DISCIPLINED FOR

10   VIOLATING BAY 101 POLICIES AND THAT HER EMPLOYMENT WAS

11   TERMINATED DUE TO INSUBORDINATION.

12        MS. DANG FURTHER CONTENDS THAT SHE WAS NOT ABLE TO TAKE

13   ALL OF HER MEAL AND REST BREAKS AND IS OWED OVERTIME WAGES.

14        BAY 101 CONTENDS THAT IT PROVIDED MEAL BREAKS, AUTHORIZED

15   AND PERMITTED REST BREAKS, AND DENIES THAT IT OWES HER OVERTIME

16   WAGES.

17        IN ORDER TO PREVAIL ON ANY CLAIM, MS. DANG HAS THE BURDEN

18   TO PROVE EACH OF HER CLAIMS BY A PREPONDERANCE OF THE EVIDENCE.

19        THAT MEANS YOU MUST BE PERSUADED BY THE EVIDENCE THAT THE

20   CLAIM IS MORE LIKELY TRUE THAN NOT TRUE.

21        YOU SHOULD BASE YOUR DECISION ON ALL OF THE EVIDENCE,

22   REGARDLESS OF WHICH PARTY PRESENTED IT.

23        THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

24   FACTS ARE CONTESTS OF:

25        1.  THE SWORN TESTIMONY OF ANY WITNESS;

1       2.  THE EXHIBITS WHICH ARE RECEIVED INTO EVIDENCE; AND,

2       3.  ANY FACTS TO WHICH THE LAWYERS HAVE AGREED.

3       IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

4  TESTIMONY AND EXHIBITS RECEIVED INTO EVIDENCE.

5       CERTAIN THINGS ARE NOT EVIDENCE AND YOU MAY NOT CONSIDER

6  THEM IN DECIDING WHAT THE FACTS ARE.  I WILL LIST THEM FOR YOU:

7       1.  ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT EVIDENCE.

8  THE LAWYERS ARE NOT WITNESSES.  WHAT THEY WILL SAY IN THEIR

9  OPENING STATEMENTS AND CLOSING ARGUMENTS AND AT OTHER TIMES IS

10  INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT

11  EVIDENCE.

12       IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE WAY THAT

13  THE LAWYERS HAVE STATED THEM, YOUR MEMORY OF THEM CONTROLS.

14       QUESTIONS BY LAWYERS ARE NOT EVIDENCE, ALTHOUGH YOU NEED

15  TO CONSIDER A LAWYER'S QUESTIONS TO UNDERSTAND THE ANSWERS

16  GIVEN BY THE WITNESS.

17       THE LAWYER'S OBJECTIONS TO QUESTIONS ARE NOT EVIDENCE.

18  ATTORNEYS HAVE A DUTY TO THEIR CLIENTS WHEN THEY BELIEVE A

19  QUESTION IS IMPROPER UNDER THE RULES OF EVIDENCE.  YOU SHOULD

20  NOT BE INFLUENCED BY THE OBJECTION OR THE COURT'S RULING ON IT.

21       TESTIMONY THAT HAS BEEN EXCLUDED OR STRICKEN OR THAT YOU

22  HAVE BEEN INSTRUCTED TO DISREGARD IS NOT EVIDENCE AND MUST NOT

23  BE CONSIDERED.

24       IN ADDITION, SOMETIMES TESTIMONY AND EXHIBITS ARE RECEIVED

25  ONLY FOR A LIMITED PURPOSE.

1          WHEN I GIVE A LIMITING INSTRUCTION, YOU MUST FOLLOW IT.

2          ANYTHING THAT YOU MAY HAVE SEEN OR HEARD WHEN THE COURT

3    WAS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE

4    SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

5          SOME EVIDENCE MAY BE ADMITTED FOR A LIMITED PURPOSE.  WHEN

6    I INSTRUCT YOU THAT AN ITEM OF EVIDENCE HAS BEEN ADMITTED FOR A

7    LIMITED PURPOSE, YOU MUST CONSIDER IT ONLY FOR THAT LIMITED

8    PURPOSE AND FOR NO OTHER.

9          EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

10   IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS ABOUT

11   WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

12         CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM

13   WHICH YOU COULD FIND ANOTHER FACT.

14         BY WAY OF EXAMPLE, IF YOU WAKE UP IN THE MORNING AND YOU

15   SEE THAT THE SIDEWALK IS WET, YOU MAY FIND FROM THAT FACT THAT

16   IT RAINED DURING THE NIGHT.

17         HOWEVER, OTHER EVIDENCE, SUCH AS A TURNED ON GARDEN HOSE,

18   MAY PROVIDE A DIFFERENT EXPLANATION FOR THE PRESENCE OF THE

19   WATER ON THE SIDEWALK.

20         THEREFORE, BEFORE YOU DECIDE THAT A FACT HAS BEEN PROVED

21   BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL OF THE

22   EVIDENCE IN LIGHT OF REASON, EXPERIENCE, AND COMMON SENSE.

23         YOU SHOULD CONSIDER BOTH KINDS OF EVIDENCE.  THE LAW MAKES

24   NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT

25   OR CIRCUMSTANTIAL EVIDENCE.

1     IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY

2     EVIDENCE.

3         THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT CAN BE

4     RECEIVED IN EVIDENCE.

5         WHEN A LAWYER ASKS A QUESTION OR OFFERS AN EXHIBIT INTO

6     EVIDENCE AND THE LAWYER ON THE OTHER SIDE THINKS IT'S NOT

7     PERMITTED BY THE RULES OF EVIDENCE, THAT LAWYER MAY OBJECT.

8         IF I OVERRULE THE OBJECTION, THE QUESTION MAY BE ANSWERED

9     AND THE EXHIBIT RECEIVED.

10        IF I SUSTAIN THE OBJECTION, THE QUESTION CANNOT BE

11    ANSWERED AND THE EXHIBIT CANNOT BE RECEIVED.

12        WHENEVER I SUSTAIN AN OBJECTION TO A QUESTION, YOU MUST

13    IGNORE THE QUESTION AND YOU MUST NOT GUESS WHAT THE ANSWER

14    MIGHT HAVE BEEN.

15        SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN FROM THE

16    RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

17    MEANS THAT WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT

18    CONSIDER THE EVIDENCE THAT I TOLD YOU TO DISREGARD.

19        IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

20    WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

21        YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF IT OR

22    NONE OF IT.

23        IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

24    INTO ACCOUNT:

25        1.  THE OPPORTUNITY AND ABILITY OF THE WITNESS TO SEE OR

1    HEAR OR KNOW THE THINGS TESTIFIED TO;

2         2.  THE WITNESS'S MEMORY;

3         3.  THE WITNESS'S MANNER WHILE TESTIFYING;

4         4.  THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE AND

5    ANY BIAS OR PREJUDICE;

6         5.  WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S

7    TESTIMONY;

8         6.  THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT

9    OF ALL OF THE OTHER EVIDENCE; AND,

10         7.  ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

11         PROOF OF A FACT DOES NOT NECESSARY DEPEND ON THE NUMBER OF

12    WITNESSES WHO TESTIFY ABOUT IT.

13         THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

14    NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT

15    IT.

16         I'LL NOW SAY A FEW WORDS ABOUT YOUR CONDUCT AS JURORS.

17         FIRST, KEEP AN OPEN MIND THROUGHOUT THE TRIAL AND DO NOT

18    DECIDE WHAT THE VERDICT SHOULD BE UNTIL YOU AND YOUR FELLOW

19    JURORS HAVE COMPLETED YOUR DELIBERATIONS AT THE END OF THE

20    CASE.

21         SECOND, BECAUSE YOU MUST DECIDE THE CASE BASED ONLY ON THE

22    EVIDENCE RECEIVED IN THE CASE AND ON MY INSTRUCTIONS AS TO THE

23    LAW THAT APPLIES, YOU MUST NOT BE EXPOSED TO ANY OTHER

24    INFORMATION ABOUT THE CASE OR TO THE ISSUES THAT IT INVOLVES

25    DURING THE COURSE OF YOUR JURY DUTY.

1        THUS, UNTIL THE END OF THE CASE, OR UNLESS I TELL YOU

2    OTHERWISE, DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT

3    LET ANYONE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF

4    THE CASE OR ANYTHING TO DO WITH IT.

5        THIS INCLUDES DISCUSSING THE CASE IN PERSON, IN WRITING,

6    BY PHONE, BY ELECTRONIC MEANS, VIA E-MAIL, TEXT MESSAGING, OR

7    ANY INTERNET CHAT ROOM, BLOG, WEBSITE OR OTHER FEATURE.

8        THIS APPLIES TO COMMUNICATIONS WITH YOUR FELLOW JURORS

9    UNTIL I GIVE YOU THE CASE FOR DELIBERATION, AND IT APPLIES TO

10   COMMUNICATING WITH EVERYONE ELSE, INCLUDING YOUR FAMILY

11   MEMBERS, YOUR EMPLOYER, THE MEDIA OR PRESS, OR THE PEOPLE

12   INVOLVED IN THE TRIAL, ALTHOUGH YOU MAY NOTIFY YOUR FAMILY AND

13   YOUR EMPLOYER THAT YOU HAVE BEEN SEATED AS A JUROR IN THIS

14   CASE.

15       BUT IF YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR

16   JURY SERVICE OR ABOUT ANYTHING TO DO WITH IT, OR ANYTHING ABOUT

17   THE CASE, YOU MUST RESPOND THAT YOU HAVE BEEN ORDERED NOT TO

18   DISCUSS THE MATTER AND REPORT THE CONTACT TO ME.

19       BECAUSE YOU WILL RECEIVE ALL OF THE EVIDENCE AND LEGAL

20   INSTRUCTIONS YOU PROPERLY MAY CONSIDER TO RETURN A VERDICT, DO

21   NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR

22   COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT.

23       DO NOT DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES,

24   SEARCHING THE INTERNET OR USING OTHER REFERENCE MATERIALS, AND

25   DO NOT MAKE ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN

1    ABOUT THE CASE ON YOUR OWN.

2        THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THE PARTIES

3    HAVE A FAIR TRIAL ON THE SAME EVIDENCE THAT EACH PARTY HAS HAD

4    AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES THESE

5    RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THE PROCEEDINGS.

6        IF ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE

7    NOTIFY THE COURT IMMEDIATELY.

8        DURING DELIBERATIONS, YOU WILL HAVE TO MAKE YOUR DECISION

9    BASED ON WHAT YOU RECALL OF THE EVIDENCE.  YOU WILL NOT HAVE A

10   TRANSCRIPT OF THE TRIAL.  I URGE YOU TO PAY CLOSE ATTENTION TO

11   THE TESTIMONY AS IT IS GIVEN.

12       IF AT ANY TIME YOU CANNOT HEAR OR SEE THE TESTIMONY, THE

13   EVIDENCE, QUESTIONS OR ARGUMENTS, LET ME KNOW SO THAT I CAN

14   CORRECT THE PROBLEM.

15       IF YOU WISH, YOU MAY TAKE NOTES TO HELP YOU REMEMBER THE

16   EVIDENCE.  IF YOU DO TAKE NOTES, PLEASE KEEP THEM TO YOURSELF

17   UNTIL YOU AND YOUR FELLOW JURORS GO TO THE JURY ROOM TO DECIDE

18   THE CASE.

19       DO NOT LET NOTE-TAKING DISTRACT YOU.

20       WHEN YOU LEAVE, YOUR NOTES SHOULD BE LEFT IN THE JURY ROOM

21   OR IN THE COURTROOM DURING BREAKS WHILE WE'RE IN SESSION.

22       AT THE CLOSE OF THE DAY I'D LIKE YOU TO TAKE THE NOTES TO

23   THE JURY ROOM.

24       NO ONE WILL READ YOUR NOTES.  THEY WILL BE DESTROYED AT

25   THE CONCLUSION OF THE CASE IF YOU WISH.

1   WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD RELY ON YOUR OWN

2 MEMORY OF THE EVIDENCE.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.

3   LANGUAGES OTHER THAN ENGLISH MAY BE USED DURING THE TRIAL.

4 THE EVIDENCE TO BE CONSIDERED BY YOU IS ONLY THAT PROVIDED

5 THROUGH THE OFFICIAL COURT INTERPRETERS.

6   ALTHOUGH SOME OF YOU MAY KNOW SPANISH OR VIETNAMESE, IT IS

7 IMPORTANT THAT ALL JURORS CONSIDER THE SAME EVIDENCE.

8 THEREFORE, YOU MUST ACCEPT THE ENGLISH INTERPRETATION AND

9 DISREGARD ANY DIFFERENT MEANING.

10   YOU MAY NOT MAKE ANY ASSUMPTION ABOUT A WITNESS OR A PARTY

11 BASED SOLELY UPON THE USE OF AN INTERPRETER TO ASSIST THAT

12 WITNESS OR PARTY.

13   FROM TIME TO TIME DURING THE TRIAL IT MAY BECOME NECESSARY

14 FOR ME TO TALK WITH THE ATTORNEYS OUT OF THE HEARING OF THE

15 JURY, EITHER BY HAVING A CONFERENCE AT THE BENCH WHEN THE JURY

16 IS PRESENT OR BY CALLING A RECESS.

17   PLEASE UNDERSTAND THAT WHILE YOU ARE WAITING, WE ARE

18 WORKING.  THE PURPOSE OF THESE CONFERENCES IS NOT TO KEEP

19 RELEVANT INFORMATION FROM YOU, BUT TO DECIDE HOW CERTAIN

20 EVIDENCE IS TO BE TREATED UNDER THE RULES OF EVIDENCE AND TO

21 AVOID CONFUSION OR ERROR.

22   OF COURSE, WE WILL DO WHAT WE CAN TO KEEP THE NUMBER AND

23 LENGTH OF THESE CONFERENCES TO A MINIMUM.

24   I MAY NOT ALWAYS GRANT AN ATTORNEY'S REQUEST FOR A

25 CONFERENCE.  DO NOT CONSIDER MY GRANTING OR DENYING A REQUEST

1    FOR A CONFERENCE AS ANY INDICATION OF MY OPINION OF THE CASE OR

2    WHAT YOUR VERDICT SHOULD BE.

3         TRIALS PROCEED IN THE FOLLOWING WAY:

4         FIRST, EACH SIDE MAY MAKE AN OPENING STATEMENT.  AN

5    OPENING STATEMENT IS NOT EVIDENCE.  IT IS SIMPLY AN OUTLINE TO

6    HELP YOU UNDERSTAND WHAT THAT PARTY EXPECTS THE EVIDENCE WILL

7    SHOW.  A PARTY IS NOT REQUIRED TO MAKE AN OPENING STATEMENT.

8         THE PLAINTIFF WILL THEN PRESENT EVIDENCE AND COUNSEL FOR

9    THE DEFENDANT MAY CROSS-EXAMINE.

10        THEN THE DEFENDANT MAY PRESENT EVIDENCE AND COUNSEL FOR

11   THE PLAINTIFF MAY CROSS-EXAMINE.

12        AFTER THE EVIDENCE HAS BEEN PRESENTED, I WILL INSTRUCT YOU

13   ON THE LAW THAT APPLIES TO THE CASE AND THE ATTORNEYS WILL MAKE

14   CLOSING ARGUMENTS.

15        AFTER THAT, YOU WILL GO TO THE JURY ROOM TO DELIBERATE ON

16   YOUR VERDICT.

17        MS. NGUYEN, DID YOU WISH TO MAKE AN OPENING STATEMENT?

18             MS. NGUYEN:  YES, YOUR HONOR.

19             THE COURT:  ALL RIGHT.  YOU MAY PROCEED.

20        **(COUNSEL FOR PLAINTIFF GAVE HER OPENING STATEMENT.)**

21             MS. NGUYEN:  GOOD MORNING, LADIES AND GENTLEMEN.

22   THANK YOU VERY MUCH FOR BEING HERE BRIGHT AND EARLY THIS

23   MORNING.

24        I'D LIKE TO INTRODUCE YOU TO SOMEONE WHO WAS NOT HERE

25   YESTERDAY.  THIS IS ANDRE THOMAS.  HE'S A PARALEGAL FROM OUR

1    OFFICE AND HE WILL BE HERE ASSISTING ME WITH THE TRIAL.

2         AS HIS HONOR SAID, THIS OPENING STATEMENT IS REALLY JUST

3    AN OUTLINE OF THE CASE SO I WON'T SPEND TOO MUCH TIME AND I

4    WON'T GO INTO A LOT OF DETAILS.  THE EVIDENCE WILL BE PRESENTED

5    TO YOU THROUGHOUT THE TRIAL.

6         YOU MIGHT BE THINKING RIGHT NOW, WHY DID MY CLIENT,

7    CUC DANG, GET FIRED?  WHAT WAS THE REASON THAT GOT HER

8    TERMINATED FROM BAY 101?

9         YOU'RE GOING TO HEAR FROM BAY 101 LATER.  MR. RON WERNER,

10   HE WAS THE ONE WHO MADE THE DECISION TO FIRE MS. DANG.

11        MR. WERNER IS GOING TO TELL YOU THAT HE FIRED MS. DANG

12   BECAUSE SHE REFUSED TO STAY AFTER WORK TO ATTEND A MEETING IN

13   H.R.  HE CONSIDERED THAT JOB ABANDONMENT.

14        YOU'LL HEAR FROM MS. DANG THAT SHE DIDN'T ABANDON HER JOB.

15        WHAT HAPPENED WAS THAT THEY GAVE HER THREE HOUR'S NOTICE

16   OF THE MEETING IN H.R.  SHE WAS SUPPOSED TO HAVE STAYED AFTER

17   HER SHIFT WAS OVER ON WHAT WAS ESSENTIALLY HER DAY OFF, AND

18   THEY WANTED HER TO STAY WITHOUT LETTING HER KNOW WHAT THE

19   MEETING WAS GOING TO BE ABOUT, HOW LONG THE MEETING WAS GOING

20   TO LAST.  THEY HAD NO INTERPRETER THERE FOR HER AND NO UNION

21   REP.

22        SHE TOLD THEM THAT SHE COULDN'T STAY BECAUSE SHE HAD

23   FAMILY OBLIGATIONS.  SHE HAD TO GO TO A BUS DEPOT TO PICK UP

24   HER DAUGHTER.  SHE HAD TO DRIVE BACK TO SAN FRANCISCO TO HELP

25   HER HUSBAND BE TAKEN TO KAISER FOR SURGERY THAT DAY.

1          SO SHE ASKED THAT THE MEETING BE RESCHEDULED.  SO WHEN SHE

2     LEFT, SHE ASKED THAT THE MEETING BE RESCHEDULED.

3          INSTEAD OF RESCHEDULING THE MEETING, HOWEVER, SHE WAS

4     FIRED.

5          BUT THIS STORY DIDN'T START ON THE DAY THAT SHE WAS FIRED.

6     IT DIDN'T START ON DECEMBER 21ST, 2009.  IT ACTUALLY STARTED

7     BACK IN 2006 WHEN SHE FIRST STARTED WORKING AT BAY 101.

8          MS. DANG WAS HIRED AT BAY 101 TO WORK AS A COOK IN THE

9     KITCHEN IN 2006.  SHE WORKED UNDER CONDITIONS THAT DIDN'T ALLOW

10    HER TO TAKE ALL OF THE REST BREAKS AND THE LUNCH BREAKS THAT

11    SHE WAS ENTITLED TO.

12         SHE HAD COMPLAINED TO HER SUPERVISORS, BUT NOTHING

13    CHANGED.

14         WHAT WAS WORSE, HOWEVER, WAS THAT SHE WAS HARASSED BY A

15    COWORKER BY THE NAME OF LUCIO SUAREZ.  HE ASKED HER OUT ON

16    DATES.  HE BROUGHT HER FLOWERS.  HE WOULD CALL HER ON HER PHONE

17    REPEATEDLY.

18         WHEN SHE RESISTED HIS ADVANCES, HE GOT MAD AT HER.  HE

19    LEFT NASTY MESSAGES ON HER CELL PHONE, AND HE EVEN INJURED HER

20    PHYSICALLY.

21         SHE COMPLAINED TO HER SUPERVISORS.  THE HARASSMENT CEASED

22    FOR A SHORT TIME, BUT IT PICKED UP AGAIN.

23         WHEN THE HARASSMENT CULMINATED IN HER BEING PHYSICALLY

24    INJURED, THAT'S WHEN SHE FELT LIKE SHE HAD TO WRITE A LETTER TO

25    BAY 101'S H.R. TO COMPLAIN.  SHE HAD TO GO GET SOME HELP TO

1    WRITE THAT FORMAL LETTER BECAUSE SHE DIDN'T SPEAK ENGLISH VERY

2    WELL, AND AS A RESULT OF THAT COMPLAINT, BAY 101 TRANSFERRED

3    HER TO A DIFFERENT SHIFT SO SHE DIDN'T HAVE TO WORK IN THE SAME

4    SHIFT AS THE PERSON WHO HARASSED HER.

5         BUT SHE WILL TESTIFY THAT SHE WAS STILL WORKING IN THE

6    KITCHEN AND SHE WAS VERY UNCOMFORTABLE WHEN THEIR SHIFTS

7    OVERLAPPED AND SHE WAS STILL HAVING TO WORK WITH THE MAN WHO

8    SEXUALLY HARASSED HER.

9         MS. DANG WILL ALSO TELL YOU THAT AFTER SHE MADE THIS

10   COMPLAINT ABOUT SEXUAL HARASSMENT, EVEN THOUGH THEY TRANSFERRED

11   HER TO A DIFFERENT SHIFT, HER SUPERVISORS BEGAN RETALIATING

12   AGAINST HER.

13        THEY GAVE HER HARDER TASKS.  THEY PICKED ON HER.  THEY

14   CHANGED HER SCHEDULES AT THE LAST MINUTE.  THEY LOST DOCTOR'S

15   NOTES AND ACCUSED HER OF NOT BRINGING IN DOCTOR'S EXCUSES.

16        THEY ENFORCED RULES AGAINST HER THAT THEY DIDN'T ENFORCE

17   AGAINST OTHER EMPLOYEES.

18        MS. DANG WILL TELL YOU THAT SHE IS A SINGLE MOM.  AT THE

19   TIME SHE WAS CARING FOR NOT ONLY HERSELF, BUT HER YOUNGER

20   DAUGHTER WHO WAS LIVING AT HOME.

21        SO SHE WAS AFRAID OF LOSING HER JOB.  SHE KNEW THAT THEY

22   WERE RETALIATING AGAINST HER, BUT SHE KNEW THAT SHE HAD TO DO

23   WHATEVER SHE COULD TO KEEP HER JOB.

24        AFTER A WHILE, HOWEVER, THAT HOSTILE ENVIRONMENT STARTED

25   TO WEAR HER DOWN.  SHE STARTED TO LOOK FOR WAYS TO GET OUT OF

1      IT.

2          SHE PUT IN A TRANSFER TO GO AND WORK AS A SERVER ON THE

3      FLOOR THINKING THAT IF SHE GETS AWAY FROM THE CONFINES OF THE

4      KITCHEN, THAT SHE WOULD BE LESS SUBJECT TO THE RETALIATION

5      INSIDE OF THE KITCHEN BY HER SUPERVISORS.

6          EVEN HER REQUEST FOR A TRANSFER WAS RESISTED AND SHE HAD

7      TO FIGHT FOR IT.

8          AFTER THEY GAVE HER THE TRANSFER TO BECOME A SERVER, THE

9      DIFFICULT ENVIRONMENT DID NOT STOP.  THE RETALIATION CONTINUED.

10         HER BOSS WAS SETTING HER UP TO FAIL AND TO GIVE THEM A

11     REASON TO FIRE HER.

12         NOW, IN OCTOBER 2009, HER SUPERVISOR, A MAN BY THE NAME OF

13     NICK ORTEGA, AND THE H.R. MANAGER, A WOMAN BY THE NAME OF

14     JENNIFER GILBERT, SUSPENDED HER.

15         THEY ACCUSED HER OF ARGUING WITH A COWORKER.

16         MS. DANG FELT THAT THAT ACCUSATION AND THAT SUSPENSION WAS

17     VERY UNFAIR, THAT IT WAS JUST ANOTHER WAY THAT HER SUPERVISORS

18     WERE RETALIATING AGAINST HER FOR MAKING THE COMPLAINT AND FOR

19     FORCING THEM TO DEAL WITH HER SEXUAL HARASSMENT.

20         SO AT THE TIME SHE HAD HER THEN FIANCE, NOW HUSBAND,

21     JASON SUMMERS, HELP HER TO WRITE LETTERS TO THE OWNERS AT

22     BAY 101 AND MR. RON WERNER TO COMPLAIN ABOUT THE TREATMENTS SHE

23     WAS GETTING FROM HER SUPERVISORS AND FROM H.R.

24         AS A RESULT OF THAT LETTER, MR. WERNER ASKED HIS ATTORNEY

25     TO ORDER AN INDEPENDENT INVESTIGATION INTO THE CASE.

 1          THAT INVESTIGATION WAS SUPPOSED TO HAVE BEEN BY A NEUTRAL

 2    PERSON.  IT WAS SUPPOSED TO HAVE BEEN CONFIDENTIAL.

 3          BUT YOU'LL HEAR, AS PART OF THIS CASE, THAT THE

 4    INVESTIGATION WAS NOT NEUTRAL AND IT WAS NOT CONFIDENTIAL.

 5          AND WHEN THE INVESTIGATION REPORT CAME IN, MR. WERNER WAS

 6    THE ONLY ONE AT BAY 101 WHO REVIEWED THAT INVESTIGATION REPORT.

 7          AFTER HE READ IT, HE WANTED MR. ORTEGA AND MS. GILBERT TO

 8    BE THE ONE TO MEET WITH MS. DANG TO TELL HER ABOUT THE RESULT

 9    OF THE INVESTIGATION, THE RESULT OF THE INVESTIGATION INTO HER

10    COMPLAINT AGAINST THEM.

11          AND IN ADDITION TO TELLING HER ABOUT THE RESULTS OF THE

12    INVESTIGATION, BAY 101 WAS GOING TO PUT MS. DANG ON A TWO-WEEK

13    PERFORMANCE IMPROVEMENT PLAN.

14          SO THIS IS THE MEETING THAT THEY WANTED TO SCHEDULE WITH

15    MS. DANG ON DECEMBER 21ST, 2009.  THIS IS THE MEETING THAT THEY

16    SPRUNG ON HER THREE HOURS BEFORE SHE WAS SUPPOSED TO HAVE

17    STARTED HER WEEKEND, BECAUSE HER WEEK ENDED ON MONDAY MORNING.

18    SHE USUALLY HAS MONDAY OFF AND TUESDAY OFF.

19          AND WHEN SHE TOLD THEM THAT SHE COULDN'T STAY BECAUSE SHE

20    HAD FAMILY OBLIGATIONS, NO ONE TOLD HER THAT THERE WOULD BE

21    CONSEQUENCES TO HER NOT STAYING.

22          HER SUPERVISOR, NICK ORTEGA, EVEN LET HER GO EARLY THAT

23    MORNING.

24          IT WAS ONLY AFTER MR. WERNER FOUND OUT THAT SHE DID NOT

25    COME TO THE MEETING, HE IMMEDIATELY DECIDED TO FIRE HER.  HIS

1    REASON FOR FIRING HER WAS JOB ABANDONMENT.  HE NEVER ASKED WHY

2    SHE COULDN'T STAY FOR THE MEETING.  HE NEVER ASKED WHETHER THE

3    MEETING COULD BE RESCHEDULED OR WHETHER SHE COULD COME BACK

4    SOME OTHER TIME FOR THE MEETING.

5        AT THAT TIME MR. WERNER WAS THE ONLY ONE FROM BAY 101 WHO

6    HAD REVIEWED THE INVESTIGATION REPORT.  HE WAS THE ONLY ONE AT

7    BAY 101 WHO KNEW THE KIND OF TROUBLE THAT MS. DANG HAD CAUSED

8    TO BAY 101 BECAUSE OF HER COMPLAINTS.

9        WHEN MR. WERNER WANTED TO FIRE HER, HE JUST INSTRUCTED

10    JENNIFER GILBERT, THE H.R. MANAGER, TO SEND THE PAPERS TO

11    MS. DANG AT HER HOME.

12        WHEN MS. DANG LEFT THAT MORNING AFTER HER SHIFT ENDED, SHE

13    DIDN'T KNOW SHE HAD BEEN FIRED.  NO ONE BOTHERED TO CALL HER TO

14    LET HER KNOW THAT SHE HAD BEEN FIRED.

15        SHE ACTUALLY DID NOT FIND OUT THAT SHE HAD BEEN FIRED

16    UNTIL SHE CAME BACK TO BAY 101 BECAUSE A COWORKER HAD CALLED

17    HER TO SAY, "HEY, THEY JUST PASSED OUT THE CHRISTMAS BONUS

18    CHECK.  WHY DON'T YOU COME IN AND GET IT?"

19        IT WAS WHEN SHE CAME TO GET HER CHRISTMAS BONUS CHECK THAT

20    SHE WAS TOLD, "THERE IS NO CHRISTMAS BONUS CHECK FOR YOU.  YOU

21    HAVE BEEN FIRED."

22        SHE HAD NO IDEA WHY SHE HAD BEEN FIRED UNTIL SHE WENT HOME

23    TO SAN FRANCISCO AND RECEIVED THE FEDEX PACKAGE IN THE MAIL

24    THAT TOLD HER THAT SHE HAD BEEN FIRED FOR JOB ABANDONMENT.

25        WE EXPECT BAY 101 TO ARGUE THAT IT DIDN'T KNOW OF

1    MS. DANG'S DIFFICULTIES BECAUSE SHE NEVER COMPLAINED, AND THAT

2    AS SOON AS IT FOUND OUT, IT TOOK PROMPT ACTION TO CORRECT THE

3    PROBLEMS.

4        BAY 101 WILL TELL YOU THAT MS. DANG WAS FIRED ONLY BECAUSE

5    SHE COULDN'T STAY FOR THE MEETING.

6        YOU'RE GOING TO HEAR TESTIMONY FROM THE PLAINTIFF'S EXPERT

7    IN MANAGEMENT PRACTICES, MS. JAN DUFFY.  IT IS MS. DUFFY'S

8    OPINION THAT BAY 101 NOT ONLY VIOLATED ITS OWN POLICIES, BUT

9    ALSO VIOLATED THE REASONABLE AND USUAL MANAGEMENT PRACTICES FOR

10   AN EMPLOYER LIKE BAY 101.

11       LADIES AND GENTLEMEN, WHAT HAPPENED TO MS. DANG ON

12   DECEMBER 21ST, 2009, WAS JUST THE LAST STRAW, THE LAST STRAW

13   THAT BROKE THE CAMEL'S BACK.

14       LIKE A CAMEL, MS. DANG HAD TRIED TO CARRY THE HEAVY LOADS

15   THAT LIFE HAD PUT ON HER.  SHE WAS A SINGLE MOM TAKING CARE OF

16   HERSELF AND HER YOUNG DAUGHTER AND EARNING A LIVING MAKING LOW

17   WAGES.

18       ON TOP OF ALL OF THAT, SHE WAS TRYING HER BEST TO ENDURE

19   THE RETALIATION AND HARASSMENT THAT HER BOSS IMPOSED ON HER

20   BECAUSE OF THE COMPLAINTS THAT SHE HAD MADE BEFORE.  SHE JUST

21   COULD NOT AFFORD TO LOSE THE JOB.

22       YET EVEN A STRONG CAMEL HAS A BREAKING POINT.

23       AND YOU WILL HEAR FROM MS. DANG HERSELF AND FROM HER

24   HUSBAND HOW THE WAY THAT BAY 101 FIRED HER BROKE HER.  IT MADE

25   HER ANGRY.  IT MADE HER DESPONDENT.  IT MADE HER HUMILIATED AND

```
1    LOSE FACE WITH FAMILY, COWORKERS AND FRIENDS.  IT TOOK AWAY HER

2    PRIDE, PRIDE THAT SHE ALWAYS HAD TO HOLD DONE DOWN A JOB, TO BE

3    INDEPENDENT AND TAKE CARE OF HERSELF AND HER DAUGHTER.

4         YOU'LL HEAR THAT IT CAUSED HER TO SPIRAL INTO A DEEP

5    DEPRESSION, AND HER SEVERE EMOTIONAL DISTRESS MADE IT HARDER

6    FOR HER TO GO LOOK FOR A NEW JOB.

7         AS OF TODAY, MS. DANG HAS NOT COMPLETELY RECOVERED FROM

8    WHAT HAPPENED TO HER AT BAY 101'S HANDS.

9         BUT SHE HAS IMPROVED.  SHE'S IMPROVED ENOUGH TO BE ABLE TO

10   WORK AGAIN AND TO EARN A LIVING.  SHE'S IMPROVED ENOUGH TO BE

11   HERE TODAY TO TELL YOU, A JURY OF HER PEERS, HER STORY.

12        LADIES AND GENTLEMEN, WE'RE HERE NOW FINALLY, AFTER

13   THREE YEARS SINCE THAT FATEFUL DAY THAT BAY 101 FIRED HER, FOR

14   MS. DANG TO HAVE A CHANCE TO PRESENT HER SIDE OF THE STORY TO

15   YOU.

16        WE THANK YOU FOR YOUR ATTENTION AND YOUR PATIENCE AS WE

17   BRING YOU THE EVIDENCE IN THIS CASE.

18        THANK YOU, YOUR HONOR.

19             THE COURT:  MR. MCMANIS, DO YOU WISH TO MAKE AN

20   OPENING STATEMENT?

21             MR. MCMANIS:  I DO, YOUR HONOR.  THANK YOU VERY

22   MUCH.

23        (COUNSEL FOR DEFENDANT GAVE HIS OPENING STATEMENT.)

24             MR. MCMANIS:  GOOD MORNING.

25             JUROR:  GOOD MORNING.
```

1         MR. MCMANIS:  I'M GLAD THAT THE JUDGE GAVE THOSE

2    PRELIMINARY INSTRUCTIONS AND EMPHASIZED THAT WHAT THE LAWYERS

3    SAY IS NOT THE EVIDENCE.  IT'S WHAT THE LAWYERS ARE

4    INTERPRETING OR ARGUING.

5         WE'RE TALKING ABOUT EVENTS THAT OCCURRED NOW SOME SIX OR

6    SEVEN YEARS AGO.  YOU'RE GOING TO HEAR WITNESSES ABOUT THIS

7    CASE.  YOU'RE GOING TO SEE SOME EXHIBITS AND, OF COURSE, THAT'S

8    THE MATERIAL ON WHICH YOU HAVE TO BASE YOUR VERDICT.

9         I HAVE THE PRIVILEGE OF ADDRESSING YOU ABOUT THE CASE AND

10   TELLING YOU OUR SIDE OF THE STORY AND THAT'S WHAT I'M GOING TO

11   DO.

12        AND I'M GOING TO TAKE A LITTLE MORE TIME THAN MY

13   COLLEAGUE, MY FRIEND DID HERE BECAUSE I THINK IT'S IMPORTANT TO

14   SET THE STAGE FOR THE CASE BECAUSE IT'S NOT THIS SIMPLE ACCOUNT

15   OF A POOR PERSON WHO HAS BEEN VICTIMIZED BY SEXUAL HARASSMENT

16   AND DISCRIMINATED AGAINST AND WHAT HAVE YOU.

17        I THINK YOU'RE GOING TO SEE THAT IT'S A LITTLE MORE

18   COMPLICATED THAN THAT.

19        AND WHAT WE HAVE HERE IS A PERSON THAT HAD A REAL

20   DIFFICULT TIME DOING HER JOB AND HAD A DIFFICULT TIME WITH HER

21   COWORKERS, WITH THE CUSTOMERS, CAUSED QUITE A FEW PROBLEMS FOR

22   BAY 101 AND THAT BAY 101 WAS VERY TOLERANT FOR MANY YEARS UNTIL

23   FINALLY, TO USE MY FRIEND'S ANALOGY, IT WAS KIND OF THE LAST

24   STRAW.

25        I WANT TO TALK A LITTLE BIT FIRST OF ALL ABOUT BAY 101.

1       SOME OF YOU MIGHT NOT BE FAMILIAR WITH IT.

2           BAY 101 IS A CARD ROOM, SOMETIMES CALLED A CASINO.  IT'S

3       ONE OF TWO LICENSED CARD ROOMS IN THE CITY OF SAN JOSE.

4           CAN YOU PUT UP THE PICTURE OF THE CLUB THERE.

5           THIS IS A PICTURE OF THE EXTERIOR OF BAY 101.  IT'S, I

6       THINK, A VERY ATTRACTIVE PLACE.  IT PROVIDES A PLACE FOR PEOPLE

7       TO PLAY CARDS AND OVERSIGHT TO ENSURE THAT THE GAMES ARE FAIR

8       AND LEGAL.

9           UNLIKE LAS VEGAS CASINOS OR INDIAN CASINOS, PATRONS AT

10      BAY 101 DO NOT PLAY AGAINST THE HOUSE.  THEY PLAY AGAINST EACH

11      OTHER AND ESSENTIALLY ARE -- RENT SEATS AT THE TABLE SO THAT

12      THEY CAN DO THAT.

13          CAN YOU PUT UP THE INSIDE SHOT THERE.

14          THESE ARE A COUPLE OF THE GAMING TABLES, CUSTOMERS PLAYING

15      CARDS.

16          AND AS MY FRIEND SAID, MS. DANG STARTED WORKING AT THE

17      CLUB AS A COOK AND LATER BECAME A SERVER INTERACTING WITH THE

18      CUSTOMERS ON THE FLOOR.

19          NOW, BAY 101 OPERATES 24 HOURS A DAY, 7 DAYS A WEEK.  IT'S

20      OPEN ALWAYS.  IT EMPLOYS ABOUT 700 PEOPLE WHO WORK IN THREE

21      SHIFTS TO PROVIDE 24-HOUR COVERAGE.

22          ASIAN EMPLOYEES MAKE UP THE LARGEST GROUP OF EMPLOYEES AT

23      BAY 101, AND THE SUGGESTION THAT SOMEHOW RON WERNER OR THE

24      MANAGEMENT SINGLED OUT MS. DANG BECAUSE SHE WAS ASIAN OR

25      VIETNAMESE IS JUST ABSOLUTELY UNTRUE.

1          BAY 101 DOES NOT KEEP STATISTICS AS TO THE ETHNICITY OF

2     ITS EMPLOYEES, BUT YOU'RE GOING TO HEAR THAT THERE ARE MANY

3     VIETNAMESE EMPLOYEES, AND ALSO MANY VIETNAMESE CUSTOMERS WHO

4     COME TO ENJOY THE ATMOSPHERE PLAYING CARDS.

5          THE EMPLOYEES WHO WORK IN FOOD SERVICE, BOTH COOKS AND

6     SERVERS, ARE BOTH LARGELY ASIAN.  THERE ARE APPROXIMATELY 28

7     COOKS, 27 SERVERS AND 28 PORTERS WHO WORK IN THE WORKPLACE.

8          NOW, BAY 101 HAS TWO SIDES TO ITS CARD ROOM FLOOR, A POKER

9     SIDE AND A CALIFORNIA SIDE.  THE CALIFORNIA GAMES ARE SOMETIMES

10    CALLED ASIAN GAMES.

11         AND HERE YOU KIND OF HAVE A SCHEMATIC OF THE FLOOR PLAN.

12    TO THE RIGHT IS THE POKER GAMES, THE TRADITIONAL POKER, TEXAS

13    HOLD 'EM, THAT TYPED OF THING.

14         TO THE LEFT ARE WHAT THEY CALL CALIFORNIA GAMES OR ASIAN

15    GAMES.

16         AND AS YOU CAN SEE, THERE ARE FACILITIES, RESTROOMS, A

17    DELI AND WHAT HAVE YOU, THE KITCHEN IN THE BACKGROUND WHERE

18    MS. DANG STARTED OUT AS A COOK, AND THEN THERE ARE ALSO PLACES

19    FOR DRINKS AND WHAT HAVE YOU.

20         WHEN CUSTOMERS ARRIVE AT BAY 101, THEY ARE GREETED, THEY

21    ARE SEATED, THEY ARE SHOWN TO WHATEVER TABLE THEY WOULD LIKE

22    FOR WHATEVER GAME THEY WOULD LIKE TO PLAY.

23         EMPLOYEES PROVIDE FOOD AND DRINKS.  OTHERS KEEP THE CLUB

24    CLEAN AND COMFORTABLE.

25         AND THERE'S A SURVEILLANCE DEPARTMENT, REQUIRED BY LAW,

1     THAT OPERATES 24/7 OF THE CLUB FLOOR.

2          SO ONE OF THE VERY IMPORTANT PIECES OF EVIDENCE THAT

3     YOU'RE GOING TO HEAR IN THIS CASE, OR SEE IN THIS CASE, IS THE

4     ACTUAL SURVEILLANCE TAPE OF WHAT HAPPENED THAT LED TO HER

5     DISCIPLINE AND, LATER, TERMINATION.

6          BECAUSE THE CITY OF SAN JOSE, TO BE SURE THE GAMES ARE

7     FAIR AND LEGAL, REQUIRES THAT ALL THE AREA BE VIDEOTAPED AND WE

8     WERE ABLE TO LOOK AT THE VIDEOTAPE AND VERIFY THE COMPLAINTS

9     THAT COWORKERS MADE ABOUT MS. DANG ON OCTOBER 4, 2009.

10         YOU ARE GOING TO HEAR, I BELIEVE, PLAINTIFF INTENDS TO

11    CALL MR. WERNER AS THEIR FIRST WITNESS AND THAT'S GOOD AND YOU

12    WILL GET TO HEAR WHAT HE HAS TO SAY ON THIS SUBJECT.

13         I'D LIKE TO GO RIGHT TO THE INCIDENT THAT LED TO THE

14    INVESTIGATION AND SUBSEQUENT TERMINATION OF MS. DANG.

15         AND CAN YOU PUT UP THAT STILL SHOT, PLEASE.

16         NOW, THIS IS AN ACTUAL FRAME FROM THE SURVEILLANCE CAMERA.

17         AND THE INCIDENT IN QUESTION STARTED AT ABOUT TEN MINUTES

18    TO MIDNIGHT ON OCTOBER 4 AND WENT UNTIL ABOUT 12:40 A.M.,

19    50 MINUTES LATER ON OCTOBER 5TH.

20         AND THE CUSTOMER INVOLVED IN THIS WAS THIS GENTLEMAN

21    SITTING RIGHT HERE AT THIS TABLE (INDICATING).

22         AND YOU'RE GOING TO SEE IN THE VIDEOTAPE AT SOME POINT

23    THAT MS. DANG COMES OUT TO GIVE A DRINK ORDER TO HIM, TAKE A

24    DRINK ORDER, SERVES HIM.  SHE BROUGHT HIM THE WRONG DRINK.

25         HE GESTURED TO ANOTHER SERVER WHO YOU WILL SEE COME OVER

1  TO THE TABLE AND TOLD HER THAT SHE HAD -- MS. DANG HAD BROUGHT

2  HIM THE WRONG DRINK AND ASKED THE OTHER SERVER TO CORRECT THAT,

3  WHICH SHE DID.

4     AND WHEN MS. DANG SAW THIS, SHE BECAME ANGRY AND SHE

5  STARTED ARGUING WITH THE OTHER SERVER ABOUT THIS AND CLAIMED

6  THAT THE OTHER SERVER WAS TRYING TO STEAL HER TIP AND THAT

7  THERE WAS NOTHING WRONG WITH THIS AND CREATING QUITE A BIT OF

8  COMMOTION.

9     THE NEXT THING THAT HAPPENED WAS THAT SHE THEN WENT AND

10  CONFRONTED THE CUSTOMER AND TOLD THE CUSTOMER THAT I -- "THIS

11  IS THE DRINK THAT YOU WANTED" AND YOU'LL SEE HER POINTING TO

12  HER DRINK PAD.

13     THE COMMOTION BECAME SO RUCKUS THAT THIS PERSON RIGHT

14  HERE, ARLENE FONTILLAS, ANOTHER SERVER IN THE CLUB WHO WAS OFF

15  DUTY AND PLAYING CARDS AT THIS TABLE, LOOKED AROUND AND WANTED

16  TO KNOW WHAT IS THE PROBLEM HERE.

17     NOW, BASICALLY, AND FORTUNATELY, THIS RUCKUS GOT MOVED OFF

18  THE FLOOR AND WENT ON INTO THE KITCHEN.

19     IT'S BEEN SUGGESTED THAT BAY 101 DID NOTHING TO

20  INVESTIGATE THIS MATTER AND IT WAS SOME KIND OF A BRUSH OFF.

21     NOTHING COULD BE FURTHER FROM THE TRUTH.

22     BAY 101 OBTAINED STATEMENTS FROM THE TWO SERVERS WHO WERE

23  OUT ON THE FLOOR THAT EVENING, AND I WANT TO TALK ABOUT THOSE.

24     OCTOBER 4, 2009 -- YOU CAN PUT THAT BACK UP IF YOU WOULD,

25  CINDY.

1          OCTOBER 4, 2009, WAS WHEN THIS ALL STARTED.

2          AND THE NAME OF THE SERVER WHO TRIED TO ACCOMMODATE THE

3     CUSTOMER WHOSE DRINK HAD NOT BEEN BROUGHT CORRECTLY WAS

4     LINDA ELIAS.

5          ON OCTOBER 6TH SHE GAVE A STATEMENT TO BAY 101 STATING

6     WHAT HAD HAPPENED AS I DESCRIBED IT, THAT SHE WENT UP TO

7     MS. DANG TO TELL HER WHAT THE PROBLEM HAD BEEN; TOLD HER THAT

8     SHE COULD KEEP HER TIP; AND MS. DANG WAS VERY UPSET AT THIS

9     EXCHANGE, STARTING YELLING AT HER IN THE KITCHEN; WENT OUT TO

10    THE CUSTOMER AND CREATED A SCENE; TOLD THE CUSTOMER IT WAS HIS

11    FAULT; SHOWED THE CUSTOMER THE LIST OF DRINKS THAT SHE HAD

12    HANDWRITTEN.

13         MS. ELIAS, WHO GAVE THIS STATEMENT -- AND YOU'LL GET THIS

14    STATEMENT IN EVIDENCE -- APPROACHED MS. DANG AND TRIED TO CALM

15    HER DOWN AND THE CUSTOMER AS WELL.

16         SHE THEN TURNED AND BEGAN YELLING AT MS. ELIAS,

17    LINDA ELIAS, AND THIS CAUSED ARLENE FONTILLAS, AS I MENTIONED,

18    TO GET UP AND WONDER WHAT WAS GOING ON.

19         AGAIN, FROM THE STATEMENT, THE COOK THEN WENT TO THE

20    KITCHEN AND STARTED YELLING AT KEN, WHO WAS THE COOK.  KEN TOLD

21    HER IF SHE DIDN'T QUIT YELLING HE WOULD SEND HER HOME, AND SO

22    FORTH AND SO ON.

23         AND THAT'S THE STATEMENT OF LINDA ELIAS, OCTOBER 26TH,

24    2009.

25         AND THEN THERE IS ALSO A HANDWRITTEN STATEMENT THAT THE

1    CLUB OBTAINED FROM ARLENE FONTILLAS, THE PERSON WHO TRIED TO

2    CALM PEOPLE DOWN OCTOBER 7, 2009, AND SHE ESSENTIALLY SAID THE

3    SAME THING.

4         AND THEN MR. KEN, THE CHEF IN THE KITCHEN, LET ME GIVE YOU

5    HIS ACCOUNT.  HE HEARD MS. DANG COME INTO THE KITCHEN TALKING

6    LOUDLY AND CUSSING ABOUT AN ARGUMENT.

7         SHE KEPT SAYING -- AND FORGIVE ME FOR SAYING THIS, BUT

8    THIS IS THE REPORT THAT WE RECEIVED -- MS. DANG KEPT SAYING,

9    "THIS IS FUCKING BULLSHIT."

10        THE COOK TOLD HER TO CALM DOWN AND SHE KEPT YELLING, AND

11   SHE KEPT USING THE TERM "FUCKING BULLSHIT."

12        HE FINALLY SAID TO HER, "I CAN'T HAVE THIS ATTITUDE.  NICK

13   IS GOING TO BE HERE IN THE MORNING.  HE'S GOING TO HAVE TO SORT

14   THINGS OUT."

15        HE BASICALLY TOLD HER TO TAKE A WALK AND CALM DOWN.

16        NOW, THIS WAS NOT THE FIRST PROBLEM THAT MS. DANG HAD HAD

17   AT BAY 101 DOING HER JOB AS A SERVER.

18        WHEN SHE WANTED TO BE TRANSFERRED OUT OF THE KITCHEN TO

19   BECOME A SERVER, AS SOON AS THERE WAS AN OPENING, SHE WAS GIVEN

20   THAT OPPORTUNITY, AND THE SUGGESTION THAT SOMEHOW SHE WAS NOT

21   ALLOWED TO MOVE OUT TO BECOME A SERVER WHERE SHE COULD MAKE

22   MORE MONEY AND GET TIPS AND WHAT HAVE YOU IS ABSOLUTELY UNTRUE.

23   THERE WERE NO OPENINGS.

24        WHEN THERE WAS AN OPENING, SHE WAS GIVEN THAT TRANSFER.

25        AND SHE WAS, LIKE EVERY SERVER, HAD TO BE TRAINED BECAUSE

1    THIS IS A VERY --

2         CAN YOU PUT THAT PICTURE UP AGAIN, PLEASE.

3         AS YOU CAN SEE, THERE'S A LOT OF ACTION GOING ON ON THE

4    GAMING FLOOR.  THERE ARE CUSTOMERS PLAYING CARDS, PEOPLE ARE

5    SERVING ALCOHOL, FOOD AND WHAT HAVE YOU, AND IT'S NOT AN EASY

6    JOB.

7         AND SO MS. DANG WAS ASSIGNED TO ANOTHER VIETNAMESE SERVER,

8    ELLIS NG, SPELLED N-G, TO BE TRAINED.

9         AND HERE'S WHAT MS. NG HAD TO SAY ON THE SUBJECT.

10        SHE'S TRAINED FOOD SERVERS OF ALL DIFFERENT NATIONALITIES.

11   SHE HAD A REALLY DIFFICULT TIME TRAINING MS. DANG AND MS. DANG

12   WAS NOT READY TO GO ON THE FLOOR AFTER TWO WEEKS OF TRAINING.

13        QUOTE, "MS. DANG PRETENDS SHE UNDERSTANDS WHEN SHE

14   DOESN'T.  DOES NOT LISTEN TO THE TRAINER OR THE CUSTOMERS.

15   DOES NOT WRITE THINGS DOWN AS MS. NG SUGGESTED SO THAT SHE

16   COULD BRING QUESTIONS BEFORE MAKING MISTAKES.  BROUGHT

17   CUSTOMERS THE WRONG ORDERS.  QUIT TRYING TO LEARN THE BAR

18   DRINKS WHEN GIVEN THE CHANCE TO DO SO.  DOESN'T GET ALONG WITH

19   HER COWORKERS.  TOOK LONGER FOR MS. DANG TO LEARN THIS JOB THAN

20   ANYONE ELSE THAT ELLIS NG HAD EVER TRAINED.  OTHER FOOD SERVICE

21   HAD TRIED TO HELP MS. DANG.  WHEN ASKED, SHE WASN'T INTERESTED

22   IN GETTING ANY HELP.  SHE KNEW IT BETTER."

23        AND THEN THERE'S THE EXAMPLE OF ORDERING JACK DANIELS WITH

24   A MARGARITA WHEN SHE SHOULD HAVE KNOWN THAT WAS A TEQUILA

25   DRINK, ET CETERA, ET CETERA, ET CETERA.

1      NOW -- SO THE INCIDENT THAT OCCURRED WAS INVESTIGATED,

2    STATEMENTS WERE TAKEN, AND IT WAS DETERMINED THAT SHE SHOULD BE

3    SUSPENDED FOR TWO DAYS.

4      IN FACT, SHE WAS, FRANKLY, FORTUNATE THAT SHE WAS NOT

5    TERMINATED RIGHT THERE BECAUSE, AS YOU WILL SEE FROM THE

6    DISCIPLINARY PROCEDURE THAT BAY 101 FOLLOWS, IT'S GROUNDS FOR

7    DISCHARGE IF YOU HARASS, THREATEN, INTIMIDATE ANOTHER EMPLOYEE

8    OR CUSTOMER, AND THAT'S WHAT SHE WAS DOING TO BOTH IN THIS

9    PARTICULAR INSTANCE.

10      SHE WAS WRITTEN UP AND -- NOT ONLY FOR THIS INCIDENT

11    INVOLVING THE EMPLOYEE AND THE COWORKER AND THE COOK YELLING

12    AND CARRYING ON, BUT ALSO FOR A PROBLEM THAT SHE HAD HAD FOR

13    SOME TIME, AND THAT WAS BALANCING HER ENVELOPES.

14      NOW, A CARD CLUB IS BASICALLY A CASH BUSINESS.  THERE'S A

15    LOT OF CASH THERE AND IT'S HIGHLY REGULATED.

16      THERE'S REGULATIONS AT THE FEDERAL LEVEL, STATE LEVEL, AND

17    THE CITY OF SAN JOSE FOR OBVIOUS REASONS.

18      AND SO IT'S VERY IMPORTANT TO BE METICULOUS IN ACCOUNTING

19    FOR CASH, AND EACH SERVER WHO IS DEALING WITH CASH HAS TO

20    FOLLOW THOSE RULES AND REGULATIONS.

21      WELL, SHE HAD A LOT OF PROBLEMS IN THIS REGARD.  AND I'M

22    LOOKING AT A MEMORANDUM -- THIS, AGAIN, IS PART OF THE RECORD

23    THAT YOU'RE GOING TO RECEIVE -- FROM THE COMPLIANCE OFFICER,

24    THE PERSON WHO WAS CHARGED BY LAW TO BE SURE THAT BAY 101

25    COMPLIED WITH ALL OF THESE RULES AND REGULATIONS.

1       AND SHE WAS TALKING ABOUT MS. DANG'S DROP BAGS, THE DROP

2   BAGS BEING THE ENVELOPE WITH THE CASH RECEIPTS AND ACCOUNTING

3   FOR EVERYTHING AND THIS AND THAT --

4       BLESS YOU.

5           THE REPORTER:  THANK YOU.

6           MR. MCMANIS:  THIS IS FROM THE COMPLIANCE OFFICER,

7   KATE KNAPP, TO NICK ORTEGA, MS. DANG'S SUPERVISOR, THE FOOD AND

8   BEVERAGE DIRECTOR.  "THIS SERVER, CUC DANG, SEEMS TO HAVE A

9   PROBLEM WITH CLOSING."

10      THIS IS JUNE 8, 2009, SIX MONTHS BEFORE THIS INCIDENT, OR

11  FOUR MONTHS BEFORE THIS INCIDENT THAT WE LOOKED AT ON THE FLOOR

12  HERE.

13      "THIS SERVER, CUC DANG, SEEMS TO HAVE A PROBLEM WITH

14  CLOSING.  THE SERVER DID NOT RESET ON HER 6-4-09 SHIFT.  THIS

15  CAUSED A DOUBLE ENTRY TO THE FOOD AND BEVERAGE REPORT.  ALSO

16  THERE ARE NO CURRENT SALES, RESET TAPES IN THE BAG.  THE SERVER

17  DOES NOT PUT IN -- PUT THEM IN HER PAPERWORK, CAUSING A GREAT

18  DEAL OF WORK TO BALANCE THE REPORT.  HOURS OF RESEARCH HAVE TO

19  BE DONE TO FIND THE CORRECT FIGURES.  THIS SERVER HAS A PROBLEM

20  ON A REGULAR BASIS.

21      "THE RECOMMENDATION OF THE COMPLIANCE ANALYST IS THAT THE

22  SERVER BE MONITORED AT CLOSING AND A SUPERVISOR MUST BE

23  PRESENT."

24      WELL, THIS IS JUNE 8TH.

25      THERE'S ANOTHER ONE SEPTEMBER 14TH, AND THEN ANOTHER ONE,

1      NOVEMBER 5TH, AFTER THIS INCIDENT.

2            SO THESE WERE JUST PROBLEMS THAT SHE HAD.

3            NOW, AFTER SHE WAS SUSPENDED AND GIVEN A TWO DAY

4      SUSPENSION FOR THE ALTERCATION SHE HAD ON THE FLOOR, YOU'RE

5      GOING TO HEAR THAT SHE FILED A GRIEVANCE WITH THE UNION, WHICH

6      SHE IS ENTITLED TO UNDER THE COLLECTIVE BARGAINING AGREEMENT.

7            AND IT WAS SENT TO A MEDIATION, AND UNDER THE LAW I'M NOT

8      ENTITLED TO GET INTO THE DETAILS OF THE MEDIATION AND WHAT WAS

9      SAID AND WHAT HAVE YOU.

10           SUFFICE IT TO SAY, SHE WALKED OUT OF THE MEDIATION BEFORE

11     THE PROCESS WAS COMPLETE.  SHE HAD ENOUGH OF WHAT WAS GOING ON

12     THERE AND SHE LEFT.

13           THEN WE HAVE THIS LETTER THAT SHE WROTE, AND IT IS --

14     APPARENTLY WE HEARD THIS MORNING HER HUSBAND WROTE, TALKING

15     ABOUT ALL OF THE COMPLAINTS THAT WE HAVE HEARD MY FRIEND

16     MENTION IN OPENING STATEMENT AND DEMANDING THAT THERE BE AN

17     INVESTIGATION AND WHAT HAVE YOU.

18           NOW, BAY 101 TAKES THESE THINGS VERY, VERY SERIOUSLY.  AS

19     I SAID, IT'S A VERY HIGHLY REGULATED COMPANY.  IT HAS A GOOD

20     REPUTATION.  IT PROVIDES A SAFE PLACE TO PLAY CARDS.

21           AND WHEN IT GOT THIS LETTER, APPARENTLY AUTHORED BY HER

22     HUSBAND, IT WENT INTO ACTION TO DO AN INVESTIGATION.

23           AND RON WERNER, THE PERSON WHO WAS THE GENERAL MANAGER AT

24     THE TIME, CONTACTED MY PARTNER, SHARON KIRSCH, WHO WAS HIS

25     OUTSIDE COUNSEL AND SAID "WE HAVE GOT THIS COMPLAINT AND WE

1       NEED TO DO AN INVESTIGATION."

2           AND MS. KIRSCH WENT OUT AND GOT A NEUTRAL INVESTIGATOR, A

3       PERSON NAMED CAROLE EDMAN, WHO DID A COMPREHENSIVE

4       INVESTIGATION.

5           AND THE RESULT OF THIS WAS MS. EDMAN RETURNED IN DECEMBER,

6       TWO MONTHS LATER, WITH WHAT LOOKS TO ME TO BE LIKE 100-PLUS

7       PAGE REPORT.  SHE INTERVIEWED 15 PEOPLE, INCLUDING MS. DANG AND

8       INCLUDING HER SUPERVISING, NICK ORTEGA, FOOD AND BEVERAGE

9       DIRECTOR, INCLUDING JENNIFER GILBERT, THE H.R. PERSON IN

10      CHARGE, AND VARIOUS OTHER SERVERS, COOKS, COMPLIANCE OFFICER

11      AND WHAT HAVE YOU.

12          AND BASICALLY CONCLUDED AT THE END OF THAT PROCESS THAT

13      MOST, IF NOT ALL, OF MS. DANG'S COMPLAINTS WERE UNFOUNDED.

14          NOW, THERE WERE A COUPLE OF THINGS THAT CAME OUT OF THE

15      INVESTIGATION THAT MS. EDMOND REPORTED TO MR. WARNER.

16          ONE, THERE WAS SOME TALK IN THE KITCHEN BETWEEN

17      MR. ORTEGA, WHO IS LATINO, AND A WOMAN NAMED MAMA ANH WHO IS A

18      VIETNAMESE COOK, WHERE THERE WAS SOME BANTER GOING BACK AND

19      FORTH AND ETHNIC JOKES BEING MADE.  YOU KNOW, AND THEY DIDN'T

20      THINK THERE WAS ANY HARM IN THAT.

21          WELL, THAT'S NOT THE WAY YOU'RE SUPPOSED TO TALK THESE

22      DAYS IN THE KITCHEN, OR ANYWHERE ELSE, AND SO THAT WAS

23      SOMETHING THAT THE INVESTIGATOR SAID NEEDS TO BE CORRECTED.

24          THESE JOKES WERE NOT DIRECTED AT CUC DANG.  THEY WERE JUST

25      BASICALLY BACK AND FORTH BETWEEN THESE TWO PEOPLE WHO ARE OLD

1     FRIENDS AND WORKED TOGETHER IN THE KITCHEN FOR A LONG TIME.

2          THEY WERE COUNSELLED ON THAT AND TOLD THAT THEY SHOULD NOT

3     BE TALKING LIKE THAT, HOWEVER INNOCENT THEIR INTENT MIGHT BE.

4          SECONDLY, THE INVESTIGATOR RECOMMENDED TO BAY 101 THAT THE

5     POLICY REGARDING, OR THE PRACTICE REGARDING TRANSFERS NEEDED TO

6     BE CLARIFIED SO THAT THERE WAS NO CONFUSION ABOUT WHEN SOMEONE

7     WAS ELIGIBLE FOR A TRANSFER.  THEY NEEDED TO BE POSTED.  THEY

8     NEEDED TO BE HANDLED IN A MORE METHODICAL WAY.  THIS WAS DONE.

9          AND THEN FINALLY IT WAS SUGGESTED THAT MS. DANG, WHO HAD

10    BEEN HAVING SO MANY OF THESE PROBLEMS, SHOULD BE GIVEN A

11    PERFORMANCE PROGRAM THAT WOULD HELP HER AGAIN TRY TO DO A

12    BETTER JOB.

13         NOW, I WANT TO TALK BRIEFLY ABOUT THIS INCIDENT INVOLVING

14    MR. LUCIO SUAREZ BACK IN APRIL 2007.  THIS IS WHERE MS. DANG

15    MADE HER FIRST COMPLAINT THAT SHE WAS SEXUALLY HARASSED AND

16    THAT SHE'S ALLEGED THAT BAY 101 DIDN'T REALLY CARE OR DIDN'T DO

17    ANYTHING ABOUT IT OR WHAT HAVE YOU.

18         IT IS TRUE THAT IN APRIL 2007, AFTER SHE HAD BEEN WORKING

19    FOR ABOUT A YEAR, SHE MADE A COMPLAINT ABOUT LUCIO SUAREZ, A

20    LATINO COOK IN THE KITCHEN, AND CLAIMED THAT HE HAD BEEN

21    HARASSING HER AND WHAT HAVE YOU.

22         BAY 101 TOOK THAT VERY SERIOUSLY.  HER SUPERVISOR,

23    NICK ORTEGA, AND JENNIFER GILBERT, THE HEAD OF H.R.,

24    INVESTIGATED IT.  THEY TALKED TO MR. SUAREZ.  THEY INTERVIEWED

25    MS. DANG.

1    AND IT TURNED OUT THE RESULT OF THE INVESTIGATION WAS THAT

2    THEY HAD HAD A CONSENSUAL DATING RELATIONSHIP, AS OCCASIONALLY

3    HAPPENS WITH COWORKERS, AND AT SOME POINT SHE WAS NOT

4    INTERESTED ANYMORE AND APPARENTLY HE DIDN'T GET THE MESSAGE AND

5    WAS PERSISTENT.

6         WHEN, AFTER THEIR INVESTIGATION, MS. GILBERT AND

7    MR. ORTEGA TOLD MR. SUAREZ IN NO UNCERTAIN TERMS, "YOU'RE NOT

8    TO BOTHER HER, YOU'RE NOT TO -- THERE'S NOT TO BE ANY FURTHER

9    PROBLEMS HERE AND STAY AWAY FROM HER."  AND THEY SUSPENDED HIM

10   FOR TWO DAYS.

11        THEY THEN OFFERED MS. DANG A CHANGE IN SHIFT SO THAT SHE

12   WOULD NOT BE WORKING AT THE SAME TIME THAT MR. SUAREZ WAS.

13        SHE ACCEPTED THAT CHANGE AND HAS SAID THAT SINCE THAT

14   HAPPENED, SINCE THAT -- IT WAS DEALT WITH IN THAT FASHION, SHE

15   HAD NO MORE PROBLEMS WITH MR. SUAREZ.

16        NOW, I THINK IT'S IMPORTANT TO KEEP IN MIND THE TIMEFRAME

17   HERE.  THE INCIDENT ON THE FLOOR OCCURRED ON OCTOBER 4, 2009.

18        THIS INCIDENT INVOLVING MR. SUAREZ OCCURRED IN APRIL 2007,

19   AT LEAST, THAT'S WHEN IT WAS FIRST REPORTED TO US.  IT HADN'T

20   BEEN REPORTED BEFORE THEN.

21        THERE WERE NO MORE COMPLAINTS FROM MS. DANG ABOUT

22   MR. SUAREZ FOR TWO AND A HALF YEARS.

23        SHE DID NOT COMPLAIN TO HER SUPERVISOR, MR. ORTEGA, SHE

24   DIDN'T COMPLAIN TO H.R., SHE DIDN'T COMPLAIN TO MR. WERNER, SHE

25   DIDN'T COMPLAIN TO THE UNION.

1       THE SITUATION INVOLVING THIS ALLEGED SEXUAL HARASSMENT BY

2   MR. SUAREZ WAS HANDLED PROMPTLY, APPROPRIATELY, AS SOON AS IT

3   WAS BROUGHT TO THE ATTENTION OF BAY 101 AND THERE WERE NO

4   FURTHER PROBLEMS, AT LEAST WE WERE TOLD OF NONE, UNTIL THIS

5   INCIDENT OF OCTOBER 2009.

6       I MENTIONED SHE FILED A GRIEVANCE ABOUT THAT WITH THE

7   UNION AND THEN WALKED OUT OF THE MEDIATION.

8       AND SHE WROTE A LETTER, APPARENTLY WITH HER HUSBAND'S

9   HELP, AND IT WAS IN THAT LETTER AND IN THAT GRIEVANCE THAT

10  SUDDENLY THIS INCIDENT THAT HAPPENED TWO AND A HALF YEARS

11  EARLIER, ABOUT WHICH WE HAD HEARD NOTHING, WAS AN ONGOING

12  PROBLEM AND WAS ANOTHER EXAMPLE OF THE MISTREATMENT THAT SHE

13  SUFFERED AT THE HANDS OF THE CLUB AND WHAT HAVE YOU.

14      YOU'LL DECIDE FOR YOURSELF HOW MUCH WEIGHT TO GIVE THAT

15  CLAIM.

16      NOW, I'M ALMOST DONE HERE.

17      AS I MENTIONED EARLIER, PROBABLY THE VAST MAJORITY OF THE

18  FOOD SERVICE WORKERS AT BAY 101 ARE ASIAN, AND MOST OF THEM ARE

19  VIETNAMESE.  SAME WITH THE MANY, MANY VIETNAMESE CUSTOMERS.

20      NOW, ONE OF THE THINGS THAT SHE HAS CLAIMED IS THAT SHE

21  WAS DISCRIMINATED AGAINST BECAUSE SHE'S VIETNAMESE.  AND SHE

22  TOLD THE INDEPENDENT INVESTIGATOR, CAROLE EDMAN, "THERE IS

23  DISCRIMINATION AGAINST VIETNAMESE HERE."

24      WELL, MS. EDMAN -- SHE MENTIONED TWO PARTICULAR PEOPLE,

25  AND MS. EDMAN -- SHE MENTIONED TWO PARTICULAR PEOPLE THAT SHE

1    CLAIMED HAD BEEN VICTIMIZED BY THIS COOK, SUAREZ.

2         AND WHEN THE INVESTIGATOR TALKED TO THOSE PARTICULAR

3    PEOPLE, THEY DENIED THESE ALLEGATIONS.

4         AND IN LOOKING AT THE NUMBER OF PEOPLE WHO WERE

5    INTERVIEWED HERE, CHI LUONG, AHN HUYNH, NGA NGUYEN, SO NGUYEN,

6    ALBERTA NG, THAT'S ELLIS NG, NONE OF THESE PEOPLE SUPPORTED THE

7    CLAIM THAT THESE PEOPLE WERE DISCRIMINATED AGAINST.

8         AND THE SUGGESTION THAT SHE WAS TERMINATED BECAUSE SHE WAS

9    VIETNAMESE IS JUST ABSOLUTELY FALSE.

10        AND I THINK THE EVIDENCE WILL SHOW -- AND I'M GOING TO GET

11   INTO THE CIRCUMSTANCES SURROUNDING THE TERMINATION NOW AND THEN

12   I'LL BE DONE.

13        AFTER MR. WERNER GOT THIS REPORT, IT'S TRUE HE WAS THE

14   ONLY PERSON WHO READ IT.  HE WAS THE ONLY PERSON WHO KEPT IT.

15   IT WAS A HIGHLY CONFIDENTIAL REPORT.

16        YOU'LL HEAR FROM CAROLE EDMAN ABOUT HOW SHE WENT ABOUT

17   DOING HER WORK.

18        BUT ESSENTIALLY THIS IS A SENSITIVE MATTER AND IT WAS

19   IMPORTANT THAT MR. WERNER KEEP THIS TO HIMSELF.

20        AND HE BASICALLY AGREED OR ACCEPTED THE RECOMMENDATIONS OF

21   THE INVESTIGATOR, WHICH YOU WILL RECALL NUMBER 3 WAS A TWO-WEEK

22   PERFORMANCE TRAINING REGIMEN FOR MS. DANG.

23        HE PREPARED A STATEMENT TO BE READ TO MS. DANG WHEN THEY

24   MET.  HE ARRANGED FOR VINCE SHAW, HIS DIRECT SUBORDINATE,

25   DIRECTOR OF OPERATIONS, TO MEET WITH MS. DANG AND

1    JENNIFER GILBERT, THE H.R. MANAGER, AND NICK ORTEGA, HER

2    SUPERVISOR, TO DISCUSS HOW THEY WERE GOING TO MOVE FORWARD WITH

3    HER.

4         MR. WERNER REMINDED EVERYBODY THAT THERE WAS NO

5    RETALIATION HERE AT BAY 101.  THE MEETING WAS PLANNED TO INFORM

6    THE PLAINTIFF OF THE OUTCOME OF THE INVESTIGATION AND WHAT

7    FURTHER TRAINING AS A SERVER THEY WERE GOING TO GIVE TO TRY TO

8    HELP HER IMPROVE HER PERFORMANCE.

9         IT WAS SCHEDULED FOR 7:00 A.M., WHICH WAS WHEN HER SHIFT

10   ENDED.  THEY WEREN'T GOING TO BRING HER IN OFF DUTY OR ANYTHING

11   ELSE.  IT WAS AT THE END OF HER SHIFT.

12        WHEN THEY TOLD HER ABOUT THIS, SHE SAID THAT -- THIS IS

13   AROUND 4:00 O'CLOCK IN THE MORNING.  KEEP IN MIND SHE'S WORKING

14   THE NIGHT SHIFT -- 4:00 O'CLOCK IN THE MORNING WHEN HER

15   SUPERVISOR TOLD HER THAT "WE'RE GOING TO HAVE A MEETING TO

16   DISCUSS SOMETHING WITH YOU AT 7:00 A.M."

17        SHE SAID SHE WAS TIRED AND HAD, QUOTE-UNQUOTE, "STUFF" TO

18   DO.  SHE DIDN'T EXPLAIN WHAT THAT STUFF WAS OR ANYTHING MORE

19   THAN THAT.

20        SHE WAS TOLD THAT SHE HAD TO BE AT THE MEETING, THAT IT

21   WOULD BE A SHORT MEETING.

22        AND HE DIDN'T GO INTO ANY DETAILS OF THE MEETING BECAUSE

23   HE THOUGHT THAT THAT WAS SOMETHING THAT SHOULD BE PRESENTED TO

24   HER AT THE APPROPRIATE TIME.

25        SHE SAID SHE DIDN'T WANT TO STAY PAST HER 7:00 O'CLOCK

1    QUITTING TIME.

2          THE REASON IT HAD BEEN PLANNED AT 7:00 A.M., OR AT

3    QUITTING TIME, IS SO THAT SHE WOULD BE ABLE TO WORK AND GET HER

4    TIPS AND WHAT HAVE YOU RIGHT UP UNTIL THE END OF HER SHIFT.

5          WHEN SHE SAID SHE WAS TIRED AND HAD "STUFF" TO DO, THEN

6    MR. ORTEGA, HER SUPERVISOR, MADE SOME CALLS TO SEE IF THE

7    MEETING COULD BE MOVED UP AND SO IT COULD BE HELD DURING HER

8    WORK TIME, DURING HER SHIFT SO THAT SHE WOULDN'T BE DETAINED

9    AND SHE COULD GO DO HER, QUOTE-UNQUOTE, "STUFF" AND WHAT HAVE

10   YOU.

11         BEFORE THAT COULD BE ARRANGED, HE RECEIVED A CALL,

12   MR. ORTEGA, THE SUPERVISOR, FROM MS. DANG'S HUSBAND, WHO

13   DEMANDED TO KNOW WHO ORGANIZED THE MEETING, WHAT IT WAS ABOUT.

14         MR. ORTEGA SAID THE MEETING WAS SET UP BY MR. WERNER AND

15   THAT MR. ORTEGA COULD NOT DISCUSS THE DETAILS WITH MS. DANG'S

16   HUSBAND.

17         HE SAID THAT MS. DANG WAS NOT GOING TO BE ATTENDING THE

18   MEETING AND THAT HE WAS GOING TO CONTACT AN ATTORNEY AND IF

19   MR. WERNER WANTED TO SPEAK TO HIM, HE COULD CALL HIM.

20         HE WAS ASKING WHETHER HE WAS REFUSING, ON PLAINTIFF'S

21   BEHALF, TO GO TO THE MEETING AND HE SAID YES.

22         AND THEN HE CALLED THE DIRECTOR OF OPERATIONS AND THE H.R.

23   PERSON AND SAID THERE WAS NOT GOING TO BE A MEETING.

24         SHE THEN CAME TO HIM AND SAID "I'M TIRED AND I WANT TO GO

25   HOME EARLY," AND HE SAID, "WELL, I GUESS IF YOU'RE NOT GOING TO

1    GO TO THE MEETING, YOU CAN GO HOME EARLY."

2        AND THAT'S WHAT HAPPENED.

3        AND WHEN MR. WERNER CAME TO WORK LATER THAT MORNING AND

4    WAS TOLD ABOUT THIS, AND ABOUT HER REFUSAL TO ATTEND THIS

5    MEETING, TO, AGAIN, USE THE METAPHOR MY FRIEND DID, IT WAS THE

6    LAST STRAW.

7        NOW, YOU MAY SAY, WELL, I DON'T KNOW IF IT WAS FAIR OR

8    UNFAIR OR WHAT HAVE YOU.

9        BUT THE POINT HERE IS THAT THIS TRIAL IS ABOUT WAS SHE

10   TERMINATED AS A RESULT OF RETALIATION FOR MAKING THESE

11   COMPLAINTS EARLIER, TWO AND A HALF YEARS EARLIER ABOUT

12   MR. SUAREZ?

13       FOLLOWING THIS INCIDENT ON THE FLOOR ON OCTOBER 4, 2009,

14   IS THAT THE REASON FOR THE TERMINATION AND RETALIATION FOR

15   THOSE?

16       I THINK THE EVIDENCE WILL STRONGLY SHOW IT WAS NOT.

17       THE OTHER GROUNDS SHE HAS IN THIS CASE IS THAT SHE WAS A

18   VICTIM OF DISCRIMINATION AS A VIETNAMESE.  THAT WASN'T THE

19   REASON.

20       AND IF THOSE ARE NOT THE REASONS, THEN THERE'S NO BASIS

21   FOR A VERDICT FOR THE PLAINTIFF IN THIS CASE.

22       NOW, YOU'RE GOING TO HEAR, I GUESS, FROM MS. DANG AND HER

23   HUSBAND ABOUT HOW ALL OF HER PROBLEMS IN LIFE ARE THE RESULT OF

24   HER MISTREATMENT AT BAY 101.

25       AND I HEARD SOMETHING SAID THIS MORNING ABOUT DEPRESSION.

1         THESE ALLEGATIONS WERE MADE IN HER COMPLAINT WHEN SHE

2    FILED THIS LAWSUIT.

3         AND WE ARRANGED FOR AN INDEPENDENT MEDICAL EXAMINATION.

4    THIS IS BY A PSYCHIATRIST THAT EXAMINED MS. DANG AND -- TO

5    DETERMINE WHETHER OR NOT THIS DEPRESSION THAT SHE ASCRIBES TO

6    THIS TREATMENT WAS, IN FACT, THE RESULT OF SOMETHING THAT

7    HAPPENED AT BAY 101.

8         IN FACT, WHAT THE PSYCHIATRIST HAD DETERMINED WAS THAT SHE

9    HAD BEEN SUFFERING FROM DEPRESSION LONG BEFORE ANY OF THESE

10   INCIDENTS, THIS WAS NOT SOMETHING THAT WAS NEW, AND SHE HAD

11   SOME PRETTY SERIOUS MENTAL PROBLEMS.

12        SHE HEARD VOICES.  SHE HAD VOICES TELLING HER THAT SHE

13   COULD FLY FROM A HIGH BUILDING; THAT THERE WAS SOME BLACK

14   SHADOW THAT ENTERED INTO HER; THAT SHE COULD READ PEOPLE'S

15   MINDS AND WHAT HAVE YOU.

16        NOW, SHE DID REPORT TO THE PSYCHIATRIST THAT WHEN SHE TOOK

17   HER MEDICATION, THESE VOICES STOPPED AND THE SHADOW WENT AWAY

18   AND WHAT HAVE YOU.

19        AND THERE IS -- IN CONCLUSION, I THINK THE EVIDENCE IS

20   GOING TO SHOW THAT WE HAVE HERE A VERY TROUBLED PERSON WHO HAD

21   A LEARNING DIFFICULTY, WHETHER IT WAS DUE TO LANGUAGE OR WHAT

22   HAVE YOU, STUBBORN, UNWILLING TO ACCEPT GUIDANCE, AND

23   ESSENTIALLY WHEN SHE FINALLY LOST HER JOB, POINTING THE FINGER

24   AND SAYING, "WELL, YOU KNOW, I'VE BEEN THE VICTIM OF

25   DISCRIMINATION AND RETALIATION AND IT'S ALL SOMEBODY ELSE'S

1    FAULT."

2         I DON'T WANT TO BE HARSH HERE ABOUT THIS PERSON BECAUSE I

3    DON'T THINK THAT'S THE RIGHT THING TO DO.  I THINK SHE'S A

4    PERSON THAT DESERVES SYMPATHY AND I DO NOT BELIEVE THAT SHE

5    DESERVES A VERDICT IN THIS CASE BASED ON THE FACTS AND THE

6    EVIDENCE AS I HAVE OUTLINED THEM FOR YOU.

7         I'M SORRY TO HAVE GONE ON SO LONG, BUT THIS IS A VERY

8    IMPORTANT CASE TO MY CLIENT, AND I APPRECIATE YOUR

9    ATTENTIVENESS THROUGHOUT MY OPENING STATEMENT.

10        AND WE'LL NOW BE GETTING ON TO THE EVIDENCE.

11        THANK YOU VERY MUCH.  -

12             THE COURT:  DO YOU WANT TO CALL YOUR FIRST WITNESS?

13             MS. NGUYEN:  YES, YOUR HONOR.  THE PLAINTIFF WOULD

14    LIKE TO CALL MR. RON WERNER.

15             THE COURT:  ALL RIGHT.

16             THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.

17                       **RONALD WERNER,**

18    BEING CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, HAVING

19    BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

20             THE WITNESS:  I DO.

21             THE CLERK:  THANK YOU.

22        FOR THE RECORD, PLEASE STATE YOUR NAME AND SPELL YOUR LAST

23    NAME.

24             THE WITNESS:  MY NAME IS RONALD ERNST, WERNER,

25    W-E-R-N-E-R.

1          THE CLERK:  THANK YOU.

2                    **AS-ON CROSS-EXAMINATION**

3     BY MS. NGUYEN:

4     Q.   GOOD MORNING, MR. WERNER.

5     A.   GOOD MORNING.

6     Q.   AND MR. WERNER, YOU'RE BAY 101'S VICE PRESIDENT; RIGHT?

7     A.   I AM.

8     Q.   AND YOU HAVE WORKED FOR BAY 101 EVER SINCE IT OPENED FOR

9     BUSINESS YEARS AGO; CORRECT?

10    A.   NOT EXACTLY.  IT OPENED IN '94 AND I STARTED IN DECEMBER

11    OF '95 AS AN EMPLOYEE.

12    Q.   AND YOU'RE ALSO A LICENSED ATTORNEY?

13    A.   I AM.

14    Q.   AND SO AT SOME POINT IN THE PAST YOU HAVE BEEN GENERAL

15    COUNSEL, AN ATTORNEY FOR BAY 101; CORRECT?

16    A.   YES.

17    Q.   AND DURING THE TIME THAT MS. DANG WAS EMPLOYED AT BAY 101

18    BETWEEN 2006 AND 2009, YOU WERE THE GENERAL MANAGER OF BAY 101?

19    A.   YES.

20    Q.   AND AS THE GENERAL MANAGER, YOU MANAGED BAY 101'S

21    OPERATIONS?

22    A.   DURING THAT PERIOD OF TIME, YES.

23    Q.   AND YOU MADE DECISIONS REGARDING HIRING, DISCIPLINING, AND

24    TERMINATION; CORRECT?

25    A.   YES.

1    Q.   AND DO YOU OWN ANY INTEREST IN BAY 101?

2    A.   I DO.

3    Q.   NOW, BETWEEN 2006 AND 2009 WHEN MY CLIENT WAS WORKING AT

4    BAY 101, COOKS AND SERVERS, LIKE MS. DANG, WORKED IN THE FOOD

5    AND BEVERAGE DEPARTMENT?

6    A.   YES.

7    Q.   AND IN 2006 THE DIRECTOR AND EXECUTIVE CHEF OF THE FOOD

8    AND BEVERAGE DEPARTMENT WAS A MAN BY THE NAME OF

9    JOHN ST. CROIX?

10   A.   YES.

11   Q.   AND AT THE TIME NICK ORTEGA WAS THE EXECUTIVE SOU CHEF?

12   A.   YES.

13   Q.   AND MR. ST. CROIX PASSED AWAY IN NOVEMBER OF 2007;

14   CORRECT?

15   A.   YES.

16   Q.   AND SOME TIME AFTER THAT, MR. ORTEGA FILLED IN FOR

17   MR. ST. CROIX AS ACTIVE FOOD AND BEVERAGE DIRECTOR?

18   A.   YES.

19   Q.   AND HE TOOK OVER THE JOB OF MANAGING THE KITCHEN, THE

20   SERVERS AND THE COOKS AND THE SERVERS AND THE PORTERS; CORRECT?

21   A.   YES.

22   Q.   AND AT BAY 101, THE COOKS AND SERVERS AND PORTERS ARE ALL

23   UNION EMPLOYEES?

24   A.   YES.

25   Q.   AND THEY BELONG HERE TO LOCAL UNITE HERE! LOCAL 19?

1    A.   I THINK WITH THE EXCEPTION -- I'M SORRY.  THAT -- YES, THE

2    SECRETARY AND MR. ORTEGA ARE NOT UNION EMPLOYEES.

3    Q.   SO MANAGERS LIKE MR. ORTEGA ARE NOT UNIONIZED?

4    A.   YES.

5              THE COURT:  YES, THAT'S CORRECT?

6              THE WITNESS:  YES, THAT'S CORRECT, THEY'RE NOT

7    UNIONIZED.

8              MS. NGUYEN:  THANK YOU, YOUR HONOR.

9    Q.   MR. WERNER, I'M GOING TO ASK YOU TO TAKE A LOOK AT

10   EXHIBIT 1016.  IT WOULD BE IN THE WHITE BINDER, THE JOINT

11   EXHIBIT BINDERS.

12        HAVE YOU FOUND IT?

13   A.   YES, I HAVE.

14   Q.   AND YOU HAVE SEEN THAT BEFORE, HAVEN'T YOU, MR. WERNER?

15   A.   YES.

16   Q.   AND THAT'S THE LETTER THAT MS. DANG SENT TO YOU IN OCTOBER

17   OF 2009; CORRECT?

18   A.   YES.

19             MS. NGUYEN:  YOUR HONOR, WE WOULD MOVE TO HAVE THAT

20   EXHIBIT ADMITTED INTO EVIDENCE.

21             THE CLERK:  I'M SORRY.  STATE THE EXHIBIT NUMBER

22   AGAIN, PLEASE.

23             MS. NGUYEN:  1016.

24             THE CLERK:  THANK YOU.

25             MR. MCMANIS:  I HAVE NO OBJECTION, YOUR HONOR, TO

1     THIS EXHIBIT COMING IN EVIDENCE.

2          BUT I BELIEVE IT SHOULD COME IN WITH A LIMITING

3     INSTRUCTION.  IT'S PROFFERED TO SHOW WHAT INFORMATION WAS

4     PROVIDED TO MR. WERNER AS OPPOSED TO THE TRUTH OF ANY

5     ACCUSATIONS THAT MS. DANG MAKES IN THE LETTER.

6               THE COURT:  THIS IS WHAT YOU'RE OFFERING IT FOR,

7     ISN'T IT?

8               MS. NGUYEN:  YES, YOUR HONOR.

9               MR. MCMANIS:  THANK YOU.

10              THE COURT:  IT MAY BE RECEIVED WITH THAT LIMITATION.

11    IT'S OFFERED TO SHOW THE COMPLAINT THAT WAS MADE TO MR. WERNER.

12         THE STATEMENTS IN THE LETTER CANNOT BE CONSIDERED FOR

13    THEIR TRUTH.  THAT WOULD HAVE TO COME FROM OTHER TESTIMONY.

14         (PLAINTIFF'S EXHIBIT 1016 WAS RECEIVED IN EVIDENCE.)

15    BY MS. NGUYEN:

16    Q.   MR. WERNER, WITH THIS COMPLAINT, MS. DANG ALSO ATTACHED TO

17    IT COUNSELLING MEMOS, AS WELL AS THE LETTER THAT SHE SENT TO

18    BAY 101 BACK IN APRIL OF 2007 REGARDING THE SEXUAL HARASSMENT

19    CLAIMS; CORRECT?

20    A.   SHE DID.

21    Q.   AND WHEN YOU RECEIVED THIS LETTER IN OCTOBER OF 2009, WAS

22    THAT THE FIRST TIME THAT YOU HAD HEARD ABOUT THE SEXUAL

23    HARASSMENT COMPLAINT BETWEEN -- MADE BY MS. DANG AGAINST

24    MR. SUAREZ?

25    A.   YES, IT WAS.

1    Q.   AND SO PRIOR TO THAT YOU HAD NEVER BEEN TOLD ABOUT THE

2    INVESTIGATION BACK IN 2007?

3    A.   NO, I HAD NOT.

4    Q.   AND IN MS. DANG'S LETTER IN OCTOBER OF 2009, SHE

5    COMPLAINED ABOUT DISCRIMINATION AND RETALIATION BY HER

6    SUPERVISOR AND BY THE H.R. MANAGER, JENNIFER GILBERT; CORRECT?

7    A.   SHE COMPLAINED ABOUT RETALIATION FROM HER SUPERVISOR AND A

8    LACK OF SUPPORT FROM THE HUMAN RESOURCES DEPARTMENT.

9    Q.   AND SHE TALKED ABOUT FEELING THAT SHE WAS BEING BULLIED?

10   A.   SHE SAID THAT MS. GILBERT HAD TOLD HER TO SHUT UP OR BE

11   QUIET.

12   Q.   AND SHE COMPLAINED ABOUT HOW SHE WAS NOT ALLOWED TO GIVE

13   HER SIDE OF THE STORY?

14   A.   I BELIEVE THAT'S THE GENERAL GIST TO BE FORMED FROM THIS,

15   YES.

16   Q.   AND SHE ALSO COMPLAINED ABOUT THE UNFAIR SUSPENSION WITH

17   THE INCIDENT WITH LINDA ELIAS?

18   A.   SHE DID.

19   Q.   AND THEN IN THAT LETTER SHE ALSO COMPLAINED ABOUT, ON THE

20   SECOND PAGE, ABOUT THE RUMORS THAT WERE BEING PASSED AROUND

21   ABOUT HER AND LUCIO SUAREZ; RIGHT?

22   A.   SHE DID.

23   Q.   AND WITH THE LETTER SHE ASKED YOU FOR A COMPLETE

24   INVESTIGATION INTO THE CASE?

25   A.   THAT'S THE THIRD PARAGRAPH, YES, ON THE SECOND PAGE.

1    Q.   AND BEFORE RECEIVING THAT LETTER, YOU DIDN'T KNOW ANYTHING

2    ABOUT HER REQUEST FOR A TRANSFER?

3    A.   I WASN'T AWARE OF THAT, NO.

4    Q.   AND PRIOR TO RECEIVING THAT LETTER, WERE YOU AWARE OF

5    ANYONE ELSE COMPLAINING ABOUT LUCIO SUAREZ AND SEXUAL

6    HARASSMENT?

7    A.   I CAN'T REMEMBER.

8    Q.   WEREN'T THERE COMPLAINTS BY OTHER WOMEN ABOUT LUCIO SUAREZ

9    AND SEXUAL HARASSMENT?

10   A.   NOT THAT I REMEMBER SPECIFICALLY.  I REMEMBER THAT THERE

11   WAS A COMPLAINT ABOUT A COOK IN THE KITCHEN.  I DON'T REMEMBER

12   IF THAT WAS LUCIO, NO.

13   Q.   AND DO YOU KNOW WHETHER THAT WAS INVESTIGATED?

14   A.   YES, IT WAS.

15   Q.   AND DO YOU KNOW WHETHER -- DO YOU KNOW HOW IT WAS

16   RESOLVED?

17   A.   I BELIEVE THE INDIVIDUAL INVOLVED WAS SUSPENDED FOR A

18   PERIOD OF TIME.

19   Q.   AND LUCIO SUAREZ, HE WAS ONE OF THE LEAD COOKS IN THE

20   KITCHEN?

21   A.   LUCIO SOMETIMES SERVED AS A LEAD COOK.  I THINK HE WAS A

22   SUBSTITUTE.  I DON'T THINK THAT WAS HIS JOB TITLE.

23   Q.   AND SO WHEN THERE WERE NOT OTHER SUPERVISORS AROUND, HE

24   WAS THE ONE IN CHARGE; CORRECT?

25   A.   YES, ON THE SWING SHIFT.

1    Q.   NOW, TURNING YOUR ATTENTION TO THE OCTOBER 2009 INCIDENT

2    WITH MS. ELIAS, YOU DIDN'T KNOW ANYTHING ABOUT THAT.  YOU ONLY

3    HEARD ABOUT IT AFTER THE FACT FROM MR. ORTEGA; CORRECT?

4    A.   I HEARD ABOUT IT AFTER IT OCCURRED, YES.

5    Q.   AND THE REASON THAT MR. ORTEGA GAVE YOU TO EXPLAIN THE

6    SUSPENSION WAS THAT MS. DANG ARGUED WITH A COWORKER?

7    A.   AND WITH A CUSTOMER ON THE FLOOR.

8    Q.   BUT YOU WEREN'T THERE AND YOU DIDN'T -- YOU DON'T KNOW

9    ANYTHING FIRSTHAND; CORRECT?

10   A.   I WASN'T PRESENT AT THE TIME, NO.

11   Q.   AND THE DECISION MADE TO SUSPEND MS. DANG, YOU DIDN'T HAVE

12   ANYTHING TO DO WITH THAT DECISION, DID YOU?

13   A.   NO, I DID NOT.

14   Q.   NOW, AFTER YOU RECEIVED THIS LETTER FROM MS. DANG, DID YOU

15   TELL MR. ORTEGA AND MS. GILBERT ABOUT IT?

16   A.   I DID.

17   Q.   AND YOU TOLD THEM NOT TO RETALIATE; CORRECT?

18   A.   YES.

19   Q.   BUT YOU DIDN'T TELL THEM ABOUT WHAT SPECIFIC ACTION

20   CONSTITUTED RETALIATION, DID YOU?

21   A.   I DID NOT.

22   Q.   BECAUSE YOU EXPECTED THEM, AS THE SUPERVISOR AND THE H.R.

23   MANAGER, TO ALREADY KNOW WHAT RETALIATION MEANT; CORRECT?

24   A.   YES.

25   Q.   AND, MR. WERNER, I'M GOING TO ASK YOU TO TAKE A LOOK AT

1      EXHIBIT 1015.

2      A.   YES.

3      Q.   AND I GUESS WHAT YOU HAVE THERE IS THE CD AND NOT THE

4      ACTUAL EXHIBITS.  LET ME GET THEM UP ON THE SCREEN FOR YOU.

5           MR. WERNER, I'M GOING TO DIRECT YOUR ATTENTION TO THE

6      PROJECTION SCREEN.

7           EXHIBIT 1015 IS THE TRAINING MATERIALS THAT BAY 101 USES

8      FOR ITS ANNUAL SEXUAL HARASSMENT TRAINING; CORRECT?

9      A.   IT MAY HAVE BEEN FOR ONE YEAR, YES.

10     Q.   AND YOU'VE SEEN SOMETHING SIMILAR TO THAT BEFORE, HAVEN'T

11     YOU?

12     A.   YES.

13     Q.   AND YOU YOURSELF HAVE ATTENDED TRAININGS LIKE THAT,

14     HAVEN'T YOU?

15     A.   I HAVE.

16          MS. NGUYEN:  YOUR HONOR, WE WOULD MOVE TO HAVE THIS

17     EXHIBIT ADMITTED INTO EVIDENCE.

18          MR. MCMANIS:  NO OBJECTION.

19          THE COURT:  ALL RIGHT.  IT MAY BE RECEIVED.

20          (PLAINTIFF'S EXHIBIT 1015 WAS RECEIVED IN EVIDENCE.)

21     BY MS. NGUYEN:

22     Q.   MR. WERNER, THIS IS PART OF THE TRAINING MATERIALS FROM

23     BAY 101.

24          BAY 101 TAUGHT ITS EMPLOYEES THAT RETALIATION OCCURS WHEN

25     THERE IS ADVERSE EMPLOYMENT ACTION AGAINST AN EMPLOYEE WHO

1    MAKES A CLAIM, CHARGE, TESTIFIED, ASSISTED, OR PARTICIPATED IN

2    ANY MANNER IN AN INVESTIGATION, PROCEEDING OR HEARING.

3        CORRECT?

4    A.   CORRECT.

5    Q.   AND ACCORDING TO BAY 101'S TRAINING MANUALS, RETALIATION

6    WOULD INCLUDE HARASSMENT FROM A COWORKER OR SUPERVISOR; RIGHT?

7    A.   AFTER EITHER MAKING A COMPLAINT OR HAVING PARTICIPATED IN

8    THAT INVESTIGATION REGARDING A COMPLAINT FOR HARASSMENT OR

9    WORKPLACE VIOLENCE, YES.

10   Q.   AND THE RETALIATION WOULD ALSO INCLUDE NEGATIVE

11   EVALUATIONS; UNDESIRABLE ASSIGNMENT OR TOUGH PROJECTS; NEGATIVE

12   ATTITUDE TOWARDS EMPLOYEES; INCREASED DISCIPLINE; SELECTIVE

13   ENFORCEMENT OF RULES; RIGHT?

14   A.   AFTER HAVING MADE A COMPLAINT, YES.

15   Q.   AND YOU WOULD HAVE EXPECTED THAT MR. ORTEGA AND

16   MS. GILBERT WOULD NOT HAVE ENGAGED IN ANY OF THESE ACTIVITIES;

17   CORRECT?

18   A.   I WOULD HAVE, YES.

19   Q.   AFTER YOU RECEIVED THE OCTOBER LETTER AND COMPLAINT FROM

20   MS. DANG, YOU ORDERED AN INVESTIGATION INTO THE COMPLAINT;

21   CORRECT?

22   A.   I ORDERED -- I HAD ONE CONDUCTED, YES.

23   Q.   AND THAT REPORT I BELIEVE COUNSEL REFERRED TO EARLIER WAS

24   DATED DECEMBER 10TH, 2009.  DO YOU RECALL THAT?

25   A.   THAT'S MY RECOLLECTION, YES.

1    Q.   AND YOU RECEIVED THE REPORT AND DISCUSSED IT WITH YOUR

2    COUNSEL; RIGHT?

3    A.   YES.  I RECEIVED THE REPORT AND AFTER READING IT, I

4    BELIEVE I DID DISCUSS IT WITH COUNSEL.

5    Q.   AND YOU READ THE ENTIRE WRITTEN REPORT, OVER 100 PAGES;

6    CORRECT?

7    A.   I DID.

8    Q.   AND WHEN YOU READ THAT REPORT, DIDN'T THAT INDICATE TO YOU

9    THAT THE INVESTIGATOR HAD TO GO THROUGH AND ARRANGE FOR THE

10   INTERVIEW WITH MS. DANG THROUGH HER COUNSEL AT THE TIME?

11   A.   I RECALL THAT SHE HAD COUNSEL PRESENT WHEN AN INTERVIEW

12   WAS CONDUCTED WITH HER; THAT'S MS. DANG HAD COUNSEL PRESENT.

13   Q.   AND BY THAT TIME, SHE HAD ALSO FILED COMPLAINTS WITH THE

14   DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING; CORRECT?

15   A.   SHE DID, YES.

16   Q.   AND AS A RESULT OF THAT REPORT, YOU DECIDED TO SEND

17   MR. ORTEGA TO MORE MANAGEMENT TRAINING?

18   A.   YES.

19   Q.   AND BECAUSE IT WAS REVEALED THAT EMPLOYEES FELT THAT

20   MR. ORTEGA WASN'T SYMPATHETIC OR CONCERNED ABOUT THEIR WELFARE?

21   A.   I WAS CONCERNED WITH HIS MANAGEMENT STYLE.

22   Q.   AND YOU YOURSELF, MR. WERNER, HAVE HAD EMPLOYEES COME AND

23   COMPLAIN ABOUT MR. ORTEGA TO YOU, HAVEN'T YOU?

24   A.   I HAVE NOT HAD THEM COME TO ME, BUT I HAVE HAD EMPLOYEES

25   MENTION THAT THEY FELT UNCOMFORTABLE WITH HIS MANAGEMENT STYLE.

1    Q.   AND SO AFTER YOU RECEIVED MS. EDMAN'S INVESTIGATION

2    REPORT, YOU CALLED A MEETING WITH MS. GILBERT AND MR. ORTEGA

3    AND VINCENT SHAW; CORRECT?

4    A.   YES.

5    Q.   AND THAT MEETING WAS TO PREPARE FOR A MEETING WITH

6    MS. DANG TO LET HER KNOW THE RESULTS OF THE INVESTIGATION?

7    A.   YES.

8    Q.   AND THE MEETING WITH MS. DANG, IN ADDITION TO TELLING HER

9    ABOUT THE RESULTS OF THE INVESTIGATION, WAS ALSO TO GIVE HER

10   HER TWO-WEEK PERFORMANCE IMPROVEMENT PLAN; CORRECT?

11   A.   IT WAS TO DISCUSS HER TRAINING, YES.

12   Q.   OKAY.  AND YOU HAD PREPARED A MEMO TO BE READ TO MS. DANG;

13   CORRECT?

14   A.   I DID.

15   Q.   AND I'M GOING TO DIRECT YOUR ATTENTION TO EXHIBIT 1014,

16   PLEASE.

17        HAVE YOU FOUND IT, MR. WERNER?

18   A.   YES.

19   Q.   AND IS THIS THE MEMO THAT YOU PREPARED FOR THE MEETING

20   WITH MS. DANG TO TELL HER ABOUT THE RESULTS OF THE

21   INVESTIGATION?

22   A.   I BELIEVE IT IS.

23   Q.   AND ALSO ATTACHED TO YOUR MEMO IS THE -- ARE THE TWO

24   COPIES OF THE COUNSELLING MEMOS FOR MS. DANG'S IMPROVEMENT

25   PERFORMANCE PLAN; CORRECT?

```
1    A.   IT WASN'T PART OF WHAT I PREPARED.

2    Q.   HAVE YOU SEEN THE COUNSELLING MEMO BEFORE?

3    A.   YES.

4    Q.   AND THAT COUNSELLING MEMO WAS PREPARED PER YOUR

5    INSTRUCTION; CORRECT?

6    A.   YES.

7         MS. NGUYEN:  YOUR HONOR, THE PLAINTIFF MOVES TO HAVE

8    EXHIBIT 1014 ADMITTED INTO EVIDENCE.

9         MR. MCMANIS:  NO OBJECTION.

10        THE COURT:  IT'S RECEIVED.

11   (PLAINTIFF'S EXHIBIT 1014 WAS RECEIVED IN EVIDENCE.)

12   BY MS. NGUYEN:

13   Q.   AND MR. WERNER, AS SEEN FROM THE FIRST PARAGRAPH OF THIS

14   MEMO, YOU WERE TRYING TO TELL MS. DANG ABOUT THE RESULT OF THE

15   INVESTIGATION INTO HER COMPLAINT; RIGHT?

16   A.   IT WAS MY DESIRE TO TELL HER THE RESULTS OF THE

17   INVESTIGATION.

18   Q.   AND YOU WERE SENDING MS. GILBERT TO READ THIS MEMO TO

19   MS. DANG; CORRECT?

20   A.   ACTUALLY MR. SHAW.

21   Q.   MR. SHAW WAS THE ONE WHO WAS GOING TO READ IT TO HER?

22   A.   THAT WAS MY INTENT, YES.

23   Q.   SO IF MS. GILBERT SAID THAT SHE THOUGHT SHE WAS THE ONE TO

24   BE READING IT TO MS. DANG, SHE WAS WRONG?

25   A.   NO.  I GUESS THAT'S WHAT SHE BELIEVED.
```

1    Q.   THE MEETING WHERE MS. DANG WAS SUPPOSED TO HAVE BEEN READ

2    THIS MEMO, BOTH MR. ORTEGA AND MS. GILBERT WERE GOING TO BE

3    THERE; CORRECT?

4    A.   ALONG WITH MR. SHAW, YES.

5    Q.   AND ACCORDING TO YOUR MEMO, YOU WERE TELLING MS. DANG THAT

6    HER COMPLAINTS WERE UNFOUNDED?

7    A.   YES, THAT MOST OF THEM WERE.

8    Q.   BUT SOME WERE FOUNDED?

9    A.   I DON'T THINK ANY OF THEM WERE FOUNDED EXCEPT PERHAPS

10   CONFUSION REGARDING THE TRANSFER POLICY.

11   Q.   AND WHERE YOU SAID FOR THE MOST PART THEY WERE UNFOUNDED,

12   BESIDES THE TRANSFER POLICY, WERE THERE PARTS THAT THE

13   INVESTIGATOR FOUND THAT WERE FOUNDED?

14   A.   I DON'T THINK SO.

15   Q.   SO THE INVESTIGATOR DIDN'T FIND THAT THERE WERE COMPLAINTS

16   AGAINST MR. ORTEGA?

17   A.   WELL, SHE SAID THAT THERE WERE COMPLAINTS REGARDING -- YOU

18   SEE, I DON'T THINK THAT SHE SAID THAT -- SHE SAID THAT HIS

19   MANAGEMENT STYLE COULD STAND SOME IMPROVEMENT IN HER OPINION

20   AND I AGREED WITH THAT.

21   Q.   AND DID YOU ALSO SEE FROM THE INVESTIGATION REPORT THAT

22   THERE WERE COMPLAINTS ABOUT DISCRIMINATION FROM MS. GILBERT?

23   A.   THAT THERE WERE COMPLAINTS ABOUT MS. GILBERT?

24   Q.   YES.

25   A.   I DIDN'T -- I DON'T RECALL ANY COMPLAINTS REGARDING

1      MS. GILBERT BEING DISCRIMINATING AGAINST ANYBODY.

2           THERE WAS AN ALLEGATION BY MS. DANG THAT PERHAPS

3      MS. GILBERT HAD DISCRIMINATED AGAINST HER IN THIS PROCESS.

4      Q.   YOU DON'T RECALL READING IN MS. EDMAN'S REPORT ABOUT OTHER

5      EMPLOYEES COMPLAINING ABOUT MS. GILBERT?

6      A.   ABOUT DISCRIMINATING AGAINST THEM?

7      Q.   YES.

8      A.   NOT DISCRIMINATION, NO.

9      Q.   AT THIS MEETING THAT YOU WERE PLANNING FOR MS. DANG TO BE

10     THERE, YOU HAD PLANNED TO GET HER ON A TWO-WEEK IMPROVEMENT

11     TRAINING SCHEDULE; CORRECT?

12     A.   I HAD PLANNED TO PROVIDE HER WITH TWO WEEKS OF TRAINING

13     AND THEN, AFTER THE TRAINING, TO EVALUATE HER PROGRESS.  THAT'S

14     WHAT I HAD PLANNED.

15     Q.   AND PART OF THE TRAINING WAS TO HAVE HER ASSIGNED TO A

16     VIETNAMESE SPEAKING SERVER TO HELP HER LEARN BETTER; CORRECT?

17     A.   WELL, TO ENSURE THAT SHE HAD -- IF SHE HAD QUESTIONS, THAT

18     SHE COULD GET INSTRUCTION IN HER NATIVE TONGUE TO CLARIFY ANY

19     MISUNDERSTANDING THAT SHE MAY HAVE IF THE INSTRUCTION WAS GIVEN

20     TO HER IN ENGLISH ONLY.

21     Q.   BECAUSE YOU UNDERSTOOD -- OR YOU WERE AWARE THAT SHE HAD

22     DIFFICULTIES WITH ENGLISH?

23     A.   I WASN'T AWARE THAT SHE HAD DIFFICULTY WITH ENGLISH, BUT

24     SHE HAD BEEN INSISTING ON USING A VIETNAMESE INTERPRETER DURING

25     THE, I THINK, THE COURSE OF THIS INVESTIGATION, AND THAT GAVE

1    ME CONCERN THAT PERHAPS -- IN ORDER TO ENSURE THAT SHE HAD

2    EVERY OPPORTUNITY TO UNDERSTAND INSTRUCTION, THAT IF NECESSARY,

3    SHE SHOULD BE ABLE TO ASK AND RECEIVE ANSWERS IN VIETNAMESE

4    REGARDING HER TRAINING.

5    Q.   OKAY.  AND ARE YOU AWARE, MR. WERNER, THAT IN THE PAST

6    WHEN MS. DANG HAD MEETINGS WITH THE H.R. MANAGER,

7    JENNIFER GILBERT, THAT SHE USUALLY HAD A TRANSLATOR WITH HER?

8    A.   I'M NOT NECESSARILY AWARE OF THAT.

9         WHAT I DO KNOW IS THAT IT IS OFTEN BAY 101 POLICY, IF A

10   PERSON HAS ANOTHER LANGUAGE THAT IS A SECOND LANGUAGE, TO HAVE

11   A PERSON WHO SPEAKS THAT SECOND LANGUAGE PRESENT IN THOSE

12   MEETINGS TO ENSURE THAT EVERYBODY IS GIVEN A FAIR OPPORTUNITY

13   TO EXPRESS THEIR OPINIONS AND MAKE ANY COMMENTS SO THERE'S NO

14   MISUNDERSTANDING.  AT LEAST, THAT'S THE PURPOSE OF IT.

15   Q.   AND SO THIS MEETING THAT YOU HAD WITH MR. SHAW,

16   MS. GILBERT, AND MR. ORTEGA TO PREPARE FOR THE MEETING WITH

17   MS. DANG, THAT OCCURRED A FEW DAYS BEFORE THE MONDAY OF

18   DECEMBER 21ST, 2009; CORRECT?

19   A.   YES.

20   Q.   OKAY.  BUT THE FIRST TIME THAT MS. DANG WAS GIVEN NOTICE

21   OF THE DECEMBER 21ST, 2009 MEETING WAS ABOUT THREE HOURS BEFORE

22   THE END OF HER SHIFT?

23   A.   THAT'S MY UNDERSTANDING.

24   Q.   AND AT THIS MEETING, THERE WAS NOT GOING TO BE ANY UNION

25   REP THERE TO HELP HER?  IS THAT YOUR UNDERSTANDING AS WELL?

1    A.   I DON'T SEE -- I DIDN'T THINK THERE WAS A NEED FOR A UNION

2    REP.

3    Q.   AND THERE WAS NO ARRANGEMENT MADE FOR ANY TRANSLATOR OR

4    INTERPRETER TO HELP HER UNDERSTAND?

5    A.   IF SHE NEEDED AN INTERPRETER, WE COULD HAVE HAD ANOTHER

6    EMPLOYEE BE THERE, YES.

7    Q.   BUT BASED ON YOUR UNDERSTANDING, THERE WASN'T ANYBODY

8    LINED UP FOR IT; CORRECT?

9    A.   I DIDN'T BELIEVE THAT SHE NEEDED AN INTERPRETER.

10   Q.   ALTHOUGH YOU SAID THAT YOU -- IT WAS BAY 101'S POLICY TO

11   ALWAYS HAVE SOMEONE THERE FOR SOMEONE WHOSE LANGUAGE IS NOT --

12   A.   YOU MISSTATED WHAT I SAID.  I SAID IT WAS OFTEN THE

13   PRACTICE, IF WE FELT THAT AN EMPLOYEE NEEDED ONE OR THEY ASKED

14   FOR ONE, TO HAVE AN INTERPRETER PRESENT.

15   Q.   SO FOR THIS PARTICULAR MEETING, YOU DIDN'T FEEL THAT

16   MS. DANG NEEDED ONE?

17   A.   NO, I DIDN'T.

18   Q.   I'D LIKE TO DIRECT YOUR ATTENTION TOWARD THE BOTTOM OF

19   THAT PAGE AND TO THE SECOND PAGE WHERE YOU LISTED ALL OF THE

20   AREAS OF IMPROVEMENT THAT YOU WERE EXPECTING FROM MS. DANG.  DO

21   YOU SEE THAT?

22   A.   YES.

23   Q.   AND, MR. WERNER, DID YOU GET THE INFORMATION FOR THE AREAS

24   THAT YOU'D LIKE TO SEE HER IMPROVE ON BASED ON COUNSELLING

25   MEMOS THAT YOU FOUND IN HER PERSONNEL FILE?

1    A.    NO.  I GOT THEM BASICALLY FROM THE REPORT.

2    Q.    FROM MS. EDMAN'S REPORT?

3    A.    YES.

4    Q.    AND NOT FROM MR. ORTEGA OR ANYONE ELSE AT BAY 101?

5    A.    NO.  I CAME UP WITH A LIST MYSELF I THINK PRIMARILY BASED

6    UPON THE REPORT, AND IT MAY HAVE BEEN BASED ON AN INCIDENT THAT

7    OCCURRED DURING THE INVESTIGATORY PERIOD THAT ALSO I THOUGHT

8    NEEDED TO BE ADDRESSED AND IN THIS LIST.

9    Q.    AND MS. EDMAN'S REPORT IS BASED ON INFORMATION THAT SHE

10   HAS OBTAINED FROM OTHER EMPLOYEES AND THE PERSONNEL FILES;

11   CORRECT?

12   A.    THAT'S MY UNDERSTANDING.

13   Q.    NOW I'D LIKE US TO MOVE TO THE MORNING OF DECEMBER 21ST,

14   2009.

15            THE COURT:  THIS MIGHT BE A GOOD TIME TO TAKE A

16   BREAK.

17            MS. NGUYEN:  SURE, YOUR HONOR.

18            THE COURT:  WE'LL BE IN RECESS FOR ABOUT 15 MINUTES.

19       (RECESS FROM 10:22 A.M. TO 10:36 A.M.)

20       (JURY OUT AT 10:36 A.M.)

21            THE COURT:  I THINK YOU HAD SOME ADDITIONAL EXHIBITS

22   YOU WERE CONCERNED ABOUT BEING USED.

23            MS. NGUYEN:  I THINK, YOUR HONOR, YOU JUST SAID YOU

24   WANTED TO RESERVE ON SOME OF THOSE RULINGS WITH RESPECT TO THE

25   OBJECTIONS ON THE EVIDENCE.

1          THE COURT:  I'M CONFUSED.

2      I THOUGHT THERE WERE A NUMBER THAT YOU WERE CONCERNED

3   ABOUT THAT MR. MCMANIS WAS GOING TO USE ON THE EXAMINATION OF

4   MR. WERNER.  WE WENT OVER A FEW AND I MADE RULINGS, BUT I

5   THOUGHT WE DIDN'T FINISH.

6          MS. NGUYEN:  SO THOSE WERE THE ONES THAT I MENTIONED

7   THIS MORNING, BUT YOU SAID THAT YOU WANTED TO WAIT AND SEE

8   BESIDES THE INVESTIGATION REPORT.

9      I UNDERSTAND THAT THAT COMES IN WITH THE LIMITING

10  INSTRUCTION.

11         THE COURT:  RIGHT.

12         MS. NGUYEN:  BUT THEY WERE THE ONES WITH

13  KATE KNAPP'S MEMO AND THE HEARSAY STATEMENTS BY ALL OF THE

14  EMPLOYEES.

15         THE COURT:  IT SEEMS TO ME -- I THOUGHT I RULED ON

16  THOSE AND BASICALLY SAID THE SAME THING, THAT IF THEY WERE PART

17  OF THE INVESTIGATION OR MATTERS THAT WERE REVIEWED IN BAY 101'S

18  MAKING ITS DECISION, THEY WOULD BE RELEVANT FOR THE PURPOSES OF

19  SHOWING WHAT BAY 101 MADE ITS DECISION ON.

20      WHETHER OR NOT THE ALLEGATIONS OR STATEMENTS CONTAINED IN

21  THE MEMOS ARE TRUE, THEY CAN'T BE CONSIDERED FOR THAT PURPOSE.

22         MR. MCMANIS:  THAT'S EXACTLY WHAT YOU RULED.

23         MS. NGUYEN:  SO WITH THE LIMITING INSTRUCTION THEN,

24  YOUR HONOR?

25         THE COURT:  YES, BUT WERE THERE -- I THOUGHT THERE

1    WERE MORE THAN THE ONES THAT WE HAD -- THAT YOU HAD SHOWED ME

2    THIS MORNING.

3         IF I'M WRONG, THAT'S GREAT.  WE CAN --

4         MS. NGUYEN:  NO.  THOSE ARE ALL OF THE ONES THAT WE

5    WERE TALKING ABOUT, YOUR HONOR.

6         THE COURT:  OKAY.  GREAT.  THANK YOU.

7         MS. NGUYEN:  THANK YOU.

8         THE COURT:  BY THE WAY, JUST SO YOU'LL KNOW BEFORE

9    THE JURY COMES IN, ONE OR MORE OF THE JURORS HAS MENTIONED THAT

10   SHE HAS A BACK PROBLEM AND THAT'S WHY SHE'S STANDING UP AND I

11   HAD GIVEN THEM AUTHORIZATION TO DO THAT.

12        SO THEY'RE NOT BEING DISCOURTEOUS OR RUDE.  THAT'S THE

13   REASON FOR HER STANDING UP.

14        MR. MCMANIS:  I THOUGHT SHE HAD ENOUGH OF MY OPENING

15   STATEMENT AND WAS GETTING READY TO LEAVE.

16        THANK YOU, YOUR HONOR.

17        (JURY IN AT 10:39 A.M.)

18        MS. NGUYEN:  MAY I START, YOUR HONOR?

19        THE COURT:  SURE.

20   BY MS. NGUYEN:

21   Q.   MR. WERNER, BEFORE WE GO TO THE DECEMBER 21ST, 2009 DATE,

22   I'D LIKE TO DRAW YOUR ATTENTION BACK TO EXHIBIT 1016 AND THE

23   LETTER IN APRIL 2007 THAT MS. DANG SENT TO H.R.

24        IN THAT LETTER SHE SAID THAT SHE REPORTED BEING HARASSED

25   BY LUCIO TO HER SUPERVISOR, JOHN ST. CROIX.

```
1              MR. ST. CROIX NEVER TALKED TO YOU ABOUT THAT, DID HE?

2    A.   NO, HE DID NOT.

3    Q.   AND IN THAT LETTER MS. DANG COMPLAINED ABOUT MR. SUAREZ

4    BREAKING INTO HER HOUSE.

5              DO YOU SEE THAT?  THAT'S THE THIRD PARAGRAPH.

6    A.   YES.

7    Q.   WERE YOU AWARE OF THAT?

8    A.   NO.

9    Q.   AND SHE CONTINUED TO TALK ABOUT HOW HE TOUCHED HER, HE

10   TOLD HER HE LOVED HER, HE ASKED HER OUT TO DINNER, AND HE

11   FOLLOWED HER AFTER WORK.

12             ALL OF THOSE ARE CONSIDERED SEXUAL HARASSMENT IF IT'S

13   UNWELCOME; CORRECT?

14   A.   I WOULD ASSUME SO, BOTH IN AND OUTSIDE THE WORKPLACE.

15   Q.   SO WHETHER HE CONDUCTS HIMSELF LIKE THAT INSIDE OF THE

16   WORKPLACE OR WHETHER HE DOES IT OUTSIDE, IT'S STILL SEXUAL

17   HARASSMENT?

18   A.   MY CONCERN WOULD BE INSIDE OF THE WORKPLACE, YES.

19             MY CONCERN WOULD BE WITH INSIDE THE WORKPLACE, YES.

20   Q.   BUT IF IT HAPPENS OUTSIDE OF THE WORKPLACE, THEN IT

21   WOULDN'T BE BAY 101'S CONCERNS?

22   A.   IT MAY BE IF IT INTERFERED WITH HER JOB DUTIES OR IF SHE

23   HAD A RESTRAINING ORDER BASED UPON IT.  SO --

24   Q.   AND SHE ALSO MENTIONED OTHER WOMEN WHO HAVE HAD PROBLEMS

25   WITH MR. SUAREZ.
```

1          I BELIEVE THAT YOU SAID EARLIER THAT YOU DIDN'T KNOW

2     ANYTHING ABOUT THAT; CORRECT?

3     A.   NO.

4     Q.   AND DO YOU RECALL READING MS. EDMAN'S INVESTIGATION REPORT

5     ABOUT OTHER WOMEN WHO ALSO RECEIVED ADVANCES FROM MR. SUAREZ?

6     A.   THERE WERE ALLEGATIONS THAT OTHER WOMEN HAD RECEIVED

7     ADVANCES, YES.

8     Q.   AND WERE THOSE ALLEGATIONS INVESTIGATED?

9     A.   I -- IF THEY WERE MADE, I'M SURE MS. EDMAN INVESTIGATED

10    THEM.

11    Q.   AND THERE WAS AN INCIDENT THAT MS. DANG COMPLAINED OF ON

12    APRIL 12, 2007 IN WHICH MR. SUAREZ ACTUALLY HURT HER WITH A

13    METAL DRAWER.

14         DO YOU REMEMBER THAT?

15    A.   I DON'T REMEMBER THE INCIDENT, NO.

16    Q.   AND WERE YOU AWARE OF THE INCIDENT AT THE TIME?

17    A.   NO.

18    Q.   AND WERE YOU AWARE THAT MR. ST. CROIX AND MS. GILBERT

19    HANDLED THAT INCIDENT?

20    A.   NO.

21    Q.   YOU'VE BEEN TOLD ABOUT THE -- THAT INVESTIGATION AND HOW

22    THEY RESOLVED THE INCIDENT THOUGH; CORRECT?

23    A.   AFTER -- DURING ITS INVESTIGATION, YES.

24    Q.   AND YOU HAD NO EXPECTATION THAT THEY WOULD NOTIFY YOU

25    ABOUT WHAT THEY HAD TO DO IN RESPONSE TO MS. DANG'S APRIL 2007

```
1    LETTER; CORRECT?

2    A.   I'M SORRY.  WHAT?

3    Q.   YOU DIDN'T EXPECT THEM TO LET YOU KNOW ABOUT THE

4    INVESTIGATION?

5    A.   IN 2007?

6    Q.   YES.

7    A.   I MIGHT HAVE -- BACK IN 2007 I MIGHT HAVE EXPECTED THAT I

8    WOULD HAVE BEEN INFORMED.

9    Q.   BUT YOUR TESTIMONY IS THAT YOU WERE NOT INFORMED?

10   A.   I WAS NOT.

11   Q.   BECAUSE MR. ST. CROIX AT THE TIME WAS THE HEAD OF THE FOOD

12   AND BEVERAGE DEPARTMENT?

13   A.   YES.

14   Q.   AND HE AND MS. GILBERT HAD THE AUTHORITY TO CONDUCT AN

15   INVESTIGATION AND RESOLVE THE ISSUE THEMSELVES?

16   A.   YES.

17   Q.   I'M GOING TO ASK YOU TO TAKE A LOOK AT THE LAST PARAGRAPH

18   ON THE FIRST PAGE GOING TO THE NEXT PAGE WHERE MS. DANG

19   COMPLAINED ABOUT ANOTHER EMPLOYEE WHO WAS CAUGHT ON CAMERA

20   PUTTING HIS HAND IN HER SHIRT POCKET.

21       DO YOU SEE THAT?

22   A.   I'M SORRY?  WHICH PARAGRAPH?

23   Q.   IT WOULD BE THE LAST PARAGRAPH GOING OVER TO THE SECOND

24   PAGE WHERE SHE REPORTED ANOTHER EMPLOYEE WHO WAS CAUGHT ON

25   VIDEO PUTTING HIS HAND IN HER SHIRT POCKET?
```

1    A.   YES.

2    Q.   AND WERE YOU AWARE OF THAT INCIDENT?

3    A.   I WAS.

4    Q.   AND DID YOU WATCH THE VIDEO?

5    A.   I MAY HAVE.

6    Q.   AND WAS THAT COMPLAINT MADE DIRECTLY TO YOU?

7    A.   NO.

8    Q.   AND HOW DID YOU BECOME AWARE OF THAT INCIDENT?

9    A.   EITHER THROUGH HUMAN RESOURCES OR KITCHEN MANAGEMENT.

10   Q.   AND DO YOU KNOW HOW THAT WAS RESOLVED?

11   A.   I BELIEVE THE OTHER EMPLOYEE WAS SUSPENDED AND PERHAPS

12   TERMINATED.  I DON'T RECALL.  I'M SURE HE WAS SUSPENDED.

13   Q.   I'D LIKE TO MOVE ON AND ASK YOU TO TAKE A LOOK AT

14   EXHIBIT 523.  IT WOULD BE IN THE BLUE BINDER.

15        PLEASE LET ME KNOW WHAT YOU'VE BEEN ABLE TO FIND IT.

16   A.   I FOUND IT.

17   Q.   AND I'M GOING TO ASK YOU TO TAKE A LOOK AT WHAT IS THE

18   FOURTH PAGE, AND IT HAS THE BATES NUMBER AT THE BOTTOM BAY

19   1924.

20   A.   YES.

21   Q.   AND YOUR NAME IS AT THE BOTTOM AS GENERAL MANAGER UNDER

22   THE INTRODUCTION; CORRECT?

23   A.   YES.

24   Q.   AND THIS IS THE BAY 101'S 2008 EMPLOYEE HANDBOOK; CORRECT?

25   A.   AUGUST 2008.

1           MS. NGUYEN:  YOUR HONOR, THE PLAINTIFF MOVES TO HAVE

2    THIS ADMITTED INTO EVIDENCE.

3           MR. MCMANIS:  NO OBJECTION.

4           THE COURT:  ALL RIGHT.  524 IS RECEIVED -- OR 523.

5           MS. NGUYEN:  523.

6           THE COURT:  SORRY.

7       (PLAINTIFF'S EXHIBIT 523 WAS RECEIVED IN EVIDENCE.)

8    BY MS. NGUYEN:

9    Q.   MR. WERNER, I'M GOING TO ASK YOU TO DIRECT YOUR ATTENTION

10   TO THE PAGE WITH THE BATES NUMBER 1932 STARTING AT THE BOTTOM.

11        DO YOU SEE THE PARAGRAPH UNDER "UNLAWFUL HARASSMENT"?

12   A.   YES.

13   Q.   AND THAT STATES THAT "IT'S BAY 101'S COMMITMENT TO

14   PROVIDING A WORK ENVIRONMENT FREE OF UNLAWFUL HARASSMENT OF ANY

15   KIND."  CORRECT?

16   A.   YES.

17   Q.   AND THAT IT SAYS THAT "IF YOU BELIEVE" -- AND I THINK IT

18   GOES OVER TO THE NEXT PAGE IN THE MIDDLE OF THE PAGE WHERE IT

19   SAYS, "IF YOU BELIEVE THAT YOU HAVE BEEN UNLAWFULLY HARASSED,

20   YOU HAVE TO PROVIDE A WRITTEN COMPLAINT TO YOUR OWN

21   SUPERVISOR."

22        DO YOU SEE THAT?

23   A.   IT SAYS "PROVIDE A WRITTEN COMPLAINT."  IT DOESN'T SAY YOU

24   HAVE TO PROVIDE.

25   Q.   THAT'S THE INSTRUCTION THAT BAY 101 GAVE TO ITS

1    EMPLOYEES --

2    A.   YES.

3    Q.   -- ACCORDING TO THESE; CORRECT?

4    A.   YES.

5    Q.   AND, MR. WERNER, ISN'T IT BAY 101'S POLICY AND PROMISE TO

6    ITS EMPLOYEES THAT IT WOULD PROVIDE AN EFFECTIVE, THOROUGH, AND

7    OBJECTIVE INVESTIGATION INTO ANY COMPLAINTS OF UNLAWFUL

8    HARASSMENT?

9    A.   WELL, THE PARAGRAPH STATES THAT "BAY 101 WILL IMMEDIATELY

10   UNDERTAKE AN EFFECTIVE, THOROUGH, AND OBJECTIVE INVESTIGATION

11   OF THE HARASSMENT ALLEGATIONS."

12        THAT'S BAY 101'S POLICY.

13   Q.   THANK YOU.

14        DID YOU KNOW, MR. WERNER, THAT BACK IN 2006, AT THE

15   BEGINNING OF 2007, THAT MR. ST. CROIX HAD PLANNED ON

16   TERMINATING MS. DANG?

17   A.   YES.

18   Q.   BUT HE DIDN'T GO THROUGH WITH THAT DECISION, DID HE?

19   A.   HE DID NOT.

20   Q.   DO YOU KNOW WHY?

21   A.   NO, I DO NOT KNOW WHY.

22   Q.   NOW I WOULD LIKE TO MOVE TO THE MORNING OF DECEMBER 21ST,

23   2009.

24        MS. DANG WAS WORKING THAT MORNING AND HER SHIFT WAS TO END

25   AT 7:00 O'CLOCK THAT MORNING; CORRECT?

1    A.   HER SCHEDULED SHIFT ENDED AT 7:00, YES.

2    Q.   AND THAT WAS MONDAY MORNING, DECEMBER 21ST, 2009; CORRECT?

3    A.   YES.

4    Q.   AND SHE WAS SUPPOSED TO HAVE THAT MONDAY OFF AND THE

5    TUESDAY OFF BECAUSE THOSE WERE HER DAYS OFF; CORRECT?

6    A.   WELL, AFTER SHE GOT OFF HER SHIFT SHE WAS TO BE OFF, YES.

7    Q.   AND YOU WEREN'T PRESENT WHEN MR. ORTEGA HAD HIS

8    CONVERSATION WITH MS. DANG OR WITH HER HUSBAND; IS THAT RIGHT?

9    A.   I WAS NOT PRESENT.

10   Q.   AND SO EVERYTHING THAT YOU KNOW ABOUT WHAT HAPPENED THAT

11   MORNING CAME FROM MR. ORTEGA?

12   A.   NO.

13   Q.   WHO GAVE YOU THE INFORMATION ABOUT THE CONVERSATION WITH

14   MS. DANG AND MR. SUMMERS THAT MR. ORTEGA HAD WITH THEM?

15   A.   WELL, FIRST I RECEIVED IT FROM VINCENT SHAW, AND THEN I

16   SUBSEQUENTLY SPOKE TO MR. ORTEGA ABOUT IT.

17   Q.   AND WHAT MR. SHAW TOLD YOU WAS WHAT MR. ORTEGA HAD TOLD

18   HIM; CORRECT?

19   A.   THAT'S MY BELIEF.

20   Q.   BECAUSE MR. SHAW DID NOT HAVE ANY DIRECT CONVERSATION WITH

21   MS. DANG OR MR. SUMMERS; CORRECT?

22   A.   HE WASN'T PRESENT FOR THE MEETING WITH -- BETWEEN

23   MR. ORTEGA OR FOR THE CONVERSATION WITH MR. SUMMERS, NO.

24   Q.   AND THE ONLY THING THAT MR. SHAW TOLD YOU WAS THAT THE

25   MEETING HAD NOT TAKEN PLACE?

1    A.   NO.  HE TOLD ME WHAT NICK HAD TOLD HIM AND THAT THE

2    MEETING HAD NOT TAKEN PLACE.

3    Q.   AND DID MR. SHAW TELL YOU THAT HE ALSO TOLD MR. ORTEGA

4    THAT THE MEETING SHOULD JUST BE RESCHEDULED?

5    A.   NO.

6    Q.   DID YOU KNOW THAT HE HAD TOLD MR. ORTEGA THAT?

7              MR. MCMANIS:  I'M GOING TO OBJECT.  IT ASSUMES

8    FACTS.

9              THE COURT:  COULD YOU REPHRASE THE QUESTION?

10   BECAUSE YOUR QUESTION ASSUMES THAT THAT WAS SAID, AND THERE'S

11   NO EVIDENCE ONE WAY OR ANOTHER ON THAT.

12   BY MS. NGUYEN:

13   Q.   MR. WERNER, WERE YOU AWARE THAT THE MEETING COULD HAVE

14   BEEN RESCHEDULED?

15   A.   I WAS -- WAS I AWARE AT ANY TIME?  I WAS AWARE THAT

16   MR. ORTEGA WAS ATTEMPTING TO RESCHEDULE THE MEETING FOR EARLIER

17   THAT DAY WHEN HE RECEIVED THE PHONE CALL FROM MR. SUMMERS.

18   Q.   AND SO YOUR TESTIMONY IS THAT YOU'RE NOT AWARE THAT THERE

19   WAS AN INTENTION TO RESCHEDULE THE MEETING AFTER MS. DANG HAD

20   LEFT?

21   A.   NO.

22   Q.   AND WHEN YOU WENT TO BAY 101, YOU SPOKE WITH MS. GILBERT

23   ABOUT PREPARING THE TERMINATION PAPER; CORRECT?

24   A.   I SPOKE TO MS. GILBERT ABOUT WHAT SHE KNEW ABOUT THE

25   CONVERSATION AND THE MEETING BETWEEN MR. ORTEGA AND MS. DANG,

1    WHETHER OR NOT THE MEETING HAD OCCURRED, AND I ASKED HER TO

2    BEGIN PREPARING TERMINATION DOCUMENTS.

3    Q.   DIDN'T YOU TELL MS. GILBERT YOU WANTED THE TERMINATION

4    PAPER TO BE PREPARED RIGHT AWAY TO BE SENT TO MS. DANG THAT

5    SAME DAY?

6    A.   I TOLD HER, AFTER I TALKED WITH NICK, TO COMPLETE THE

7    TERMINATION DOCUMENTATIONS, INCLUDING MS. DANG'S FINAL

8    PAYCHECK, AND TO SEND THEM TO HER IMMEDIATELY THAT DAY SO THAT

9    SHE COULD RECEIVE THEM OVERNIGHT VIA FEDEX SO SHE WOULD BE

10   INFORMED OF MY DECISION.

11   Q.   AND ISN'T IT TRUE, MR. ORTEGA, THAT YOU HAD MADE THE

12   DECISION TO FIRE MS. DANG AND YOU HAD INSTRUCTED MS. GILBERT TO

13   SEND OUT THE TERMINATION PAPER EVEN BEFORE YOU SPOKE TO

14   MR. ORTEGA?

15   A.   NO.

16          MR. MCMANIS:  EXCUSE ME.  I THINK COUNSEL MISSPOKE.

17   SHE ADDRESSED HIM AS MR. ORTEGA.

18          THE WITNESS:  I'M ASSUMING YOU MEANT MR. WERNER.

19       BUT, NO, I DIDN'T MAKE MY DECISION --

20          MS. NGUYEN:  I'M SORRY.

21          THE WITNESS:  -- TO TERMINATE HER UNTIL AFTER I

22   SPOKE WITH MR. ORTEGA.

23   BY MS. NGUYEN:

24   Q.   DID MR. ORTEGA TELL YOU, MR. WERNER, THAT MS. DANG'S

25   HUSBAND INVITED YOU TO CALL HIM TO RESCHEDULE THE MEETING?

```
 1    A.   I DON'T THINK "INVITE" WAS THE RIGHT WORD.  I WAS TOLD

 2    THAT MR. SUMMERS SAID THAT, "IF MR. WERNER DOESN'T LIKE IT, HE

 3    COULD CALL ME."

 4    Q.   AND BASED ON THE TESTIMONY, OR BASED ON THE INFORMATION

 5    THAT MR. ORTEGA GAVE YOU, IT WAS MR. SUMMERS WHO SUPPOSEDLY

 6    REFUSED FOR MS. DANG TO ATTEND THE MEETING?

 7    A.   IT WAS MY UNDERSTANDING THAT MR. SUMMERS REFUSED, ON

 8    MS. DANG'S BEHALF, TO ATTEND ANY MEETING AT BAY 101 UNLESS HE

 9    WAS PRESENT FOR THAT MEETING.

10    Q.   MR. ORTEGA TOLD YOU, HOWEVER, THAT MS. DANG DIDN'T SAY

11    ANYTHING ABOUT REFUSING TO ATTEND THE MEETING, RIGHT?

12    A.   I DON'T THINK NICK SAID ANYTHING ABOUT WHETHER SHE REFUSED

13    OR DIDN'T REFUSE TO ATTEND THE MEETING.  I DON'T THINK HE SAID

14    ANYTHING ABOUT WHAT SHE SAID, PERIOD, ABOUT THE MEETING.

15    Q.   AND SO THE REFUSAL TO ATTEND THE MEETING YOU DEEMED TO

16    HAVE COME FROM HER HUSBAND ON HER BEHALF?

17    A.   ACTUALLY, I DEEMED THE REFUSAL TO ATTEND THE MEETING FROM

18    THE FACT THAT SHE DID NOT APPEAR AND ATTENDED THE MEETING.

19         I WAITED THAT MORNING -- I GAVE HER AN OPPORTUNITY TO,

20    EVEN THOUGH SHE HAD LEFT, TO ATTEND THE MEETING, TO COME BACK

21    AND ATTEND THE MEETING.

22         WHEN SHE WASN'T THERE, I DEEMED THAT A REFUSAL TO ATTEND

23    THE MEETING.

24         THE FACT THAT SHE DIDN'T COME WAS DEEMED A REFUSAL TO

25    ATTEND THE MEETING.
```

1    Q.   DID YOU CALL HER TO COME BACK?  YOU SAID YOU GAVE HER AN

2    OPPORTUNITY TO COME BACK.

3    A.   I WAITED.  I MEAN, I WAITED, IN FACT, TO SEE IF SHE DID

4    COME BACK FOR THE MEETING.

5         I ASKED MR. SHAW, MS. GILBERT, AND NICK, "WAS THERE A

6    MEETING?  WAS MS. DANG THERE?"

7         THEY TOLD ME NO.  I DEEMED THAT TO BE A REFUSAL TO ATTEND

8    THE MEETING.

9    Q.   DID YOU KNOW THAT MR. ORTEGA EXCUSED HER TO GO HOME EARLY?

10   A.   NO, I DID NOT.

11   Q.   YOU DIDN'T ASK MR. ORTEGA WHAT REASON SHE HAD FOR NOT

12   ATTENDING THE MEETING?

13   A.   I DID NOT.

14   Q.   BECAUSE YOU DIDN'T CARE?

15   A.   IT DIDN'T CROSS MY MIND THAT -- I CARED, YES.  I MEAN, I

16   HAD GONE THROUGH, I THOUGHT, I MEAN, A FAIR AMOUNT OF TROUBLE

17   TO MAKE SURE THAT SHE HAD EVERY OPPORTUNITY TO SUCCEED AT

18   BAY 101.

19        AND I WAS -- SO I DID CARE.

20   Q.   AND SO WHY DIDN'T YOU JUST RESCHEDULE THE MEETING AND HAVE

21   HER COME BACK?

22   A.   BECAUSE I FELT THAT AT THAT TIME WHEN SHE DID -- WHEN SHE

23   DID -- AFTER HER HUSBAND CALLED AND SAID SHE WASN'T GOING TO

24   ATTEND ANY MEETING WITHOUT HIM, AND THEN SHE DIDN'T COME TO ANY

25   MEETING, SHE DIDN'T PROVIDE ME, OR AS FAR AS I KNOW ANYONE

1    ELSE, WITH ANY VALID REASON FOR NOT ATTENDING THE MEETING, THAT

2    SHE HAD QUIT HER JOB, SHE WAS INSUBORDINATE FOR NOT ATTENDING

3    THE MEETING, AND I DEEMED THAT SUFFICIENT CAUSE TO TERMINATE

4    HER.

5    Q.  BUT YOU DIDN'T ASK ANYBODY WHAT REASON SHE HAD TO NOT

6    ATTEND; CORRECT?

7    A.  NONE WAS GIVEN TO ME, NO.

8    Q.  AND YOU DIDN'T ASK?

9    A.  WELL, I THINK I MAY HAVE ASKED, BUT NO ONE GAVE ME ANY

10   REASON.  I THINK I MAY HAVE ASKED.  I DON'T RECALL

11   SPECIFICALLY.

12       BUT WHAT I -- BUT WHEN SHE WASN'T THERE, HER HUSBAND HAD

13   REFUSED ON HER BEHALF, OR AT LEAST A GENTLEMAN CLAIMING TO BE

14   HER HUSBAND HAD REFUSED ON HER BEHALF TO HAVE HER ATTEND THE

15   MEETING.

16       SHE DID NOT SHOW UP TO THE MEETING.  I ACCEPTED THAT AS A

17   REFUSAL TO ATTEND THE MEETING.

18   Q.  AND YOU DIDN'T KNOW WHO HER HUSBAND WAS, DID YOU?

19   A.  I KNEW MR. SUMMERS.  I DID NOT KNOW AT THAT TIME THAT THEY

20   WERE MARRIED.

21   Q.  AND YOU HAD NO IDEA WHAT HIS AUTHORITY WAS TO SPEAK ON HER

22   BEHALF, DID YOU?

23   A.  HE MAY HAVE BEEN HER HUSBAND.  I DON'T THINK HE HAD ANY

24   AUTHORITY OTHER THAN AS HER HUSBAND, PERHAPS, TO CONVEY A

25   MESSAGE.  I DON'T KNOW WHAT HIS AUTHORITY WAS.

1          I ASSUME HE HAD AUTHORITY TO REFUSE TO ATTEND THE MEETING

2     BECAUSE HE DID AND SHE DID NOT SHOW UP.

3     Q.   DID YOU KNOW WHETHER ANYONE COMMUNICATED TO MS. DANG THAT

4     IF SHE DID NOT ATTEND THIS MEETING, THAT THERE WOULD BE

5     CONSEQUENCES?

6     A.   I DO NOT KNOW.

7     Q.   DID YOU KNOW THAT SHE HAD ONLY BEEN GIVEN THREE HOURS

8     NOTICE OF THE MEETING?

9     A.   I INSTRUCTED -- I HADN'T BEEN INSTRUCTED, BUT IT WAS

10    COMMON PRACTICE FOR US AT BAY 101 TO NOT GIVE NOTICE OF

11    MEETINGS MUCH IN ADVANCE OF THE MEETING.

12         USUALLY WE DIDN'T WANT TO UPSET THE EMPLOYEE FOR THEIR

13    ENTIRE SHIFT OR OTHER EMPLOYEES, SO WE NORMALLY COMMUNICATE

14    WITH THE EMPLOYEE TOWARDS THE END OF THEIR SHIFT THAT THERE

15    WOULD BE A MEETING AT THE END OF THEIR SHIFT.

16    Q.   AND --

17    A.   AND THEY WERE EXPECTED TO ATTEND THAT.

18    Q.   AND WHAT HAPPENS IF AN EMPLOYEE HAD ALREADY MADE OTHER

19    PLANS OR HAD OTHER OBLIGATIONS AT THE END OF THEIR SHIFT?

20    A.   TYPICALLY WE MOVE THE MEETING UP SO THAT WE CAN

21    ACCOMMODATE THEM DURING THEIR SHIFT, BEFORE THEIR SHIFT IS

22    OVER.

23    Q.   AND DO YOU KNOW WHETHER IT WAS DONE IN THIS CASE?

24    A.   I THINK SHE REFUSED, HER HUSBAND REFUSED TO HAVE HER

25    ATTEND THE MEETING BEFORE THAT COULD BE DONE.

1    Q.   AND SHE DIDN'T REFUSE, DID SHE?

2    A.   SHE DIDN'T SHOW UP, SO I THINK THAT'S A REFUSAL.

3    Q.   DO YOU KNOW WHETHER ANYBODY TOLD HER ABOUT THE MEETING

4    BEING MOVED UP?

5    A.   I DON'T THINK THEY HAD THE OPPORTUNITY.  I THINK THAT

6    DURING -- BEFORE THAT COULD EVEN BE COMMUNICATED, MY

7    UNDERSTANDING OF THE TIME WAS THAT MR. ORTEGA WAS IN THAT

8    PROCESS WHEN HE RECEIVED THE PHONE CALL FROM MR. SUMMERS SAYING

9    THAT SHE WOULDN'T BE ATTENDING ANY MEETING.

10   Q.   SO MR. ORTEGA TOOK WHAT MR. SUMMERS SAID TO THEN NOT PLAN

11   THE EARLIER MEETING; CORRECT?

12   A.   I GUESS SO.

13   Q.   AND AT THIS MEETING, BESIDES TELLING HER ABOUT THE RESULT

14   OF THE INVESTIGATION, SHE WAS ALSO BEING DISCIPLINED BY GIVING

15   HER THE PERFORMANCE IMPROVEMENT PLAN; CORRECT?

16   A.   NO.

17   Q.   ISN'T PART OF THE MEMO THAT YOU PREPARED, DIDN'T IT SAY

18   THAT SHE HAS TWO WEEKS TO IMPROVE?

19   A.   I WOULD -- SHE WAS BEING GIVEN A TRAINING PROGRAM.  I

20   DON'T AGREE THAT THAT WAS DISCIPLINE.

21   Q.   YOUR MEMO GAVE A DEADLINE, DIDN'T IT?

22   A.   A DEADLINE FOR THE CONDUCT OF THE TWO WEEKS AND A

23   PERFORMANCE REVIEW AT THE END OF THE TWO WEEKS, YES.

24   Q.   OKAY.  SO AT THE END OF THE TWO WEEKS, HER PERFORMANCE

25   WOULD BE REVIEWED AND EVALUATED; CORRECT?

1    A.   CORRECT.

2    Q.   BUT AT THAT MEETING, THERE WAS NOT GOING TO BE ANY UNION

3    REP; CORRECT?

4    A.   NO REQUIREMENT FOR A UNION REP.

5    Q.   AND THERE WAS NOT GOING TO BE ANY INTERPRETER; RIGHT?

6    A.   NO.  I ASSUME IF MS. DANG HAD ASKED FOR ONE, THAT ONE

7    MIGHT HAVE BEEN PROVIDED.  BUT I HADN'T PLANNED ON THEM

8    PROVIDING ONE, IF THAT'S YOUR QUESTION.

9    Q.   AND THIS MEETING WAS TO TAKE PLACE AFTER SHE HAD MADE THE

10   COMPLAINT AGAINST MR. ORTEGA AND MS. GILBERT; CORRECT?

11   A.   IT WAS TO EXPLAIN THE RESULTS OF THAT INVESTIGATION, YES.

12   Q.   AND SO YOU WERE SENDING MS. DANG INTO A MEETING WITH THE

13   TWO INDIVIDUALS AGAINST WHOM SHE MADE THE COMPLAINTS?

14          MR. MCMANIS:  OBJECTION, ARGUMENTATIVE.

15          THE COURT:  I'LL ALLOW THE QUESTION.

16          THE WITNESS:  THE MEETING WOULD HAVE BEEN WITH THE

17   H.R. MANAGER, HER DIRECT SUPERVISOR, AND AN EXECUTIVE,

18   INDEPENDENT EXECUTIVE WHO WAS TO CONDUCT THE MEETING AND

19   EXPLAIN TO HER WHAT WAS BEING DONE.

20      THE REASON TO HAVE THE TWO PEOPLE AND MS. GILBERT PRESENT

21   WAS BECAUSE SHE WAS THE H.R. MANAGER AND SHE WOULD BE

22   RESPONSIBLE FOR THE PAPERWORK INVOLVED IN THAT AND SETTING UP

23   THE TRAINING PROGRAM, ALONG WITH MR. ORTEGA, WHO WAS HER DIRECT

24   SUPERVISOR.

25      THE REASON FOR MR. SHAW TO BE THERE WAS TO ENSURE THAT THE

1    MEETING WAS CONDUCTED APPROPRIATELY AND THAT THERE WAS NOT ANY

2    HOSTILE ENVIRONMENT OR ATMOSPHERE CREATED FOR THE MEETING.

3    BY MS. NGUYEN:

4    Q.   SO MS. DANG WAS SUPPOSED TO GO INTO THAT MEETING ALL BY

5    HERSELF WITH THE TWO INDIVIDUALS AGAINST WHOM SHE MADE THE

6    ACCUSATION AND THE ONE ADDITIONAL PERSON?

7             THE COURT:  YOU'RE GETTING ARGUMENTATIVE.

8             MR. MCMANIS:  OBJECTION.

9             THE COURT:  YEAH.

10            MS. NGUYEN:  I'LL REPHRASE, YOUR HONOR.

11            THE COURT:  OKAY.

12   BY MS. NGUYEN:

13   Q.   MS. DANG WAS GOING INTO THE MEETING ALL BY HERSELF; RIGHT?

14   A.   AS I UNDERSTOOD IT, SHE WOULD BE THERE WITH THE THREE

15   OTHER INDIVIDUALS, YES.

16   Q.   AND DID THAT SEEM FAIR TO YOU?

17   A.   YES.

18            MS. NGUYEN:  I HAVE NO OTHER QUESTIONS RIGHT NOW FOR

19   THIS WITNESS, YOUR HONOR.

20            THE COURT:  ALL RIGHT.  MR. MCMANIS, ANY QUESTIONS?

21            MR. MCMANIS:  YES, YOUR HONOR, THANK YOU.

22                    **AS-ON DIRECT EXAMINATION**

23   BY MR. MCMANIS:

24   Q.   GOOD MORNING, MR. WERNER.

25   A.   GOOD MORNING.

1    Q.   I WANT TO FIND OUT A LITTLE BIT ABOUT YOUR BACKGROUND.

2         YOU HAVE TESTIFIED THAT YOU'RE CURRENTLY THE VICE

3    PRESIDENT OF BAY 101; IS THAT CORRECT?

4    A.   YES.

5    Q.   OKAY.  ARE YOU MARRIED?

6    A.   YES.

7    Q.   HOW LONG HAVE YOU BEEN MARRIED?

8    A.   AS OF THIS MONTH, 41 YEARS AND 8 MONTHS.

9    Q.   OKAY.  AND WHAT IS THE NATIONALITY OF YOUR WIFE?

10   A.   VIETNAMESE.

11   Q.   OKAY.  AND HOW DID YOU AND MRS. WERNER MEET?

12   A.   I MET HER WHILE I WAS IN THE ARMY STATIONED IN VIETNAM.

13   Q.   AND WAS THAT DURING THE VIETNAM WAR?

14   A.   YES.

15   Q.   AND HOW LONG WERE YOU IN VIETNAM?

16   A.   THREE YEARS.

17   Q.   AND COULD YOU BREAK THAT DOWN IN TERMS OF ARMY SERVICE AND

18   OTHER SERVICE?

19   A.   I SPENT 15 MONTHS IN THE MILITARY SERVICE, AND A LITTLE

20   OVER A YEAR AND A HALF IN CIVILIAN SERVICE AS A DEFENSE

21   CONTRACTOR.

22   Q.   AND DURING WHICH OF THOSE TWO TERMS DID YOU MEET

23   MRS. WERNER?

24   A.   DURING THE FIRST TERM.

25   Q.   AND WHEN WERE YOU MARRIED?

```
 1    A.   AFTER I GOT OUT OF THE MILITARY IN AUGUST OF 1971.

 2    Q.   OKAY.  DO YOU AND MRS. WARNER HAVE CHILDREN?

 3    A.   WE DO.

 4    Q.   AND HOW MANY?

 5    A.   THREE.

 6    Q.   AND WOULD YOU PLEASE GIVE US THEIR AGES AND GENDERS?

 7    A.   MY OLDEST CHILD IS MALE, HE'S 41; MY MIDDLE CHILD IS MALE

 8    AND HE'LL BE 38 IN JULY; MY DAUGHTER IS 31 AND SHE'S OBVIOUSLY

 9    A FEMALE.

10    Q.   OKAY.  AND DO YOU HAVE GRANDCHILDREN?

11    A.   I DO.

12    Q.   AND WHAT -- CAN YOU GIVE ME THE ETHNIC COMPOSITION OF THE

13    GRANDCHILDREN IF YOU WOULD, PLEASE?

14    A.   WELL, I'VE GOT A TOTAL OF WHAT WE CALL SIX GRANDCHILDREN,

15    AND TWO ARE BIOLOGICAL AND THEN WE HAVE ONE ON THE WAY, AND

16    THEN I HAVE THREE THAT ARE NOT BIOLOGICAL.

17         MY BIOLOGICAL GRANDCHILDREN WOULD BE FIVE-EIGHTHS

18    VIETNAMESE, ONE-EIGHTH CHINESE, AND THE REST IS ALL AMERICAN

19    HEINZ 57, CAUCASIAN, GERMAN, ENGLISH.

20    Q.   OKAY.  DO YOU HAVE ANY ANIMOSITY TOWARD VIETNAMESE PEOPLE?

21    A.   NO.

22    Q.   OR TOWARDS WOMEN?

23    A.   NO.

24    Q.   AND WHAT IS YOUR EDUCATIONAL BACKGROUND?

25    A.   I GRADUATED FROM HIGH SCHOOL IN PASADENA, TEXAS; I
```

1    ATTENDED ONE YEAR OF COLLEGE IN TOKYO, JAPAN; I HAVE AN A.A.

2    DEGREE FROM SOLANO COMMUNITY COLLEGE IN VALLEJO; I HAVE A

3    BACHELOR'S OF ARTS IN HISTORY FROM THE UNIVERSITY OF

4    WASHINGTON; A BACHELOR OF ARTS IN ECONOMICS FROM THE UNIVERSITY

5    OF WASHINGTON; I HAVE AN MBA FROM CAL STATE UNIVERSITY IN

6    SACRAMENTO; AND I HAVE A JURIS DOCTORATE LAW DEGREE FROM GEORGE

7    SCHOOL OF LAW UNIVERSITY OF PACIFIC.

8         I ATTENDED A POLICE OFFICER'S ACADEMY AT EVERGREEN

9    COLLEGE, AND I HAVE A LEVEL ONE POST CERTIFICATE AS A RESERVE

10   PEACE OFFICER.

11   Q.   AND DO YOU HAVE ANY OTHER CERTIFICATES OR LICENSES?

12   A.   WELL, I WOULD SAY I'M A CERTIFIED PUBLIC ACCOUNTANT; I'M A

13   LICENSED REAL ESTATE BROKER IN THE STATE OF CALIFORNIA; I HAVE

14   A COMMUNITY COLLEGE TEACHING CREDENTIAL IN BUSINESS, ARTS, AND

15   LAW.

16        I'M MISSING SOMETHING.

17   Q.   WELL, LET ME ASK YOU, WITH RESPECT TO BAY 101, ARE YOU

18   REQUIRED TO BE LICENSED AT THE CARD CLUB?

19   A.   YES.  I AM ALSO LICENSED BY THE STATE OF CALIFORNIA AS A

20   GAMBLING ESTABLISHMENT OWNER, AND I'M LICENSED BY THE CITY OF

21   SAN JOSE TO BE A GAMBLING ESTABLISHMENT, KEY EMPLOYEE, AND

22   BUSINESS OWNER.

23   Q.   AND WHAT IS INVOLVED IN THAT LICENSING PROCESS?

24   A.   A PRETTY THOROUGH BACKGROUND CHECK.  THE TOTAL TIME FOR

25   THE BACKGROUND CHECK FOR ME WAS THREE YEARS, OVER THREE YEARS.

1    Q.   NOW, I THINK YOU TESTIFIED THAT YOU WERE FIRST FORMALLY

2    EMPLOYED IN 1995 BY BAY 101; IS THAT RIGHT?

3    A.   YES.

4    Q.   AND WERE YOU INVOLVED IN ITS FORMATION BEFORE THEN?

5    A.   I WAS.

6    Q.   AND HOW FAR BACK DID THAT PROCESS START?

7    A.   IT STARTED IN 1988.

8    Q.   SO SEVEN YEARS?

9    A.   YES.

10   Q.   ALL RIGHT.  AND JUST GIVE US A LIST OF THE POSITIONS THAT

11   YOU HELD AT BAY 101, PLEASE.

12   A.   SPECIAL ASSISTANT TO THE PRESIDENT; SPECIAL ASSISTANT TO

13   THE PRESIDENT AND GENERAL COUNSEL; SPECIAL ASSISTANT TO THE

14   PRESIDENT, GENERAL COUNSEL, AND CHIEF FINANCIAL OFFICER; CHIEF

15   FINANCIAL OFFICER; GENERAL COUNSEL; GENERAL MANAGER; AND

16   GENERAL MANAGER AND CURRENTLY VICE PRESIDENT.

17   Q.   AND YOU'RE CURRENTLY THE VICE PRESIDENT; IS THAT RIGHT?

18   A.   YES.

19   Q.   ALL RIGHT.  AND HOW LONG HAVE YOU HELD THAT POSITION?

20   A.   SINCE JUNE OF 2010.

21   Q.   OKAY.  AND GOING BACK TO DECEMBER OF 2009 WHEN MS. DANG

22   WAS TERMINATED, WHAT WAS YOUR POSITION AT THAT TIME?

23   A.   GENERAL MANAGER.

24   Q.   AND WHAT WERE YOU RESPONSIBLE FOR AS GENERAL MANAGER?

25   A.   I WAS -- AT THAT TIME I WAS RESPONSIBLE FOR THE DAY-TO-DAY

1     OPERATIONS OF THE CASINO AND CARD ROOM.

2     Q.   AND WHO REPORTED TO YOU?

3     A.   REPORTED TO ME WOULD HAVE BEEN THE CASINO MANAGER, CASINO

4     DEPARTMENT, DIRECTOR OF OPERATIONS, SECURITY, SURVEILLANCE,

5     COMPLIANCE, CAGE, ACCOUNT ROOM, HUMAN RESOURCES.

6     Q.   AND WHO DO YOU REPORT TO?

7     A.   I REPORT TO THE PRESIDENT OF THE COMPANY.

8     Q.   AND WHO IS HE?

9     A.   TIMOTHY BUMB.

10    Q.   AND WHEN YOU BECAME VICE PRESIDENT, WHO BECAME GENERAL

11    MANAGER?

12    A.   VINCENT SHAW.

13    Q.   AND VINCENT SHAW WAS THE, I'LL CALL HIM THE NEUTRAL

14    UNINVOLVED EXECUTIVE THAT WAS GOING TO PRESIDE OVER THE MEETING

15    WITH MS. DANG ON DECEMBER 21, 2009; IS THAT RIGHT?

16    A.   YES.

17    Q.   AND WHAT WAS HIS TITLE AT THAT TIME?

18    A.   DIRECTOR OF OPERATIONS.

19    Q.   ALL RIGHT.  AND HE REPORTED TO YOU?

20    A.   TECHNICALLY HE REPORTED TO MARKO TRAPANI AND HE HAD A

21    DOTTED LINE TO ME.

22    Q.   ALL RIGHT.  FAIR ENOUGH.

23         NOW, I MENTIONED IN OPENING STATEMENT A FEW THINGS ABOUT

24    BAY 101.

25         CAN YOU TELL US WHAT IS THE BUSINESS OF BAY 101?  WHAT

1    DOES IT DO?

2    A.   CALIFORNIA -- IT'S A LICENSED CALIFORNIA CARD ROOM, WHICH

3    MEANS THAT IT'S LICENSED BY THE STATE OF CALIFORNIA TO CONDUCT

4    OR CONTROL OR HAVE CONTROL PLAY GAMES, AND CONTROL GAMES ARE

5    STRICTLY CARD GAMES WHICH ARE APPROVED BY THE DEPARTMENT OF

6    JUSTICE OR THE STATE OF CALIFORNIA FOR PLAY INSIDE OF A CARD

7    ROOM OR A CASINO.

8    Q.   AND HOW DOES A CARD ROOM IN CALIFORNIA DIFFER FROM LIKE,

9    SAY, LAS VEGAS STYLE GAMBLING?

10    A.   WELL, FIRST, IT'S NOT HOUSE BANK.  PLAYERS PLAY AGAINST

11    EACH OTHER, AND IN A GAME LIKE BLACKJACK IT'S LIKE PLAYING AT

12    HOME WHERE EVERYBODY GETS A TURN TO ACT AS THE PLAYER BANKER.

13        SECONDLY, CALIFORNIA CARD ROOMS DO NOT HAVE SLOT MACHINES,

14    WE DO NOT HAVE CRAP TABLES OR ROULETTE TABLES.

15        THOSE ARE PROBABLY THE TWO MAIN DIFFERENCES.

16    Q.   OKAY.  CAN YOU PUT UP EXHIBIT 533, PLEASE.

17        THIS WAS SHOWN IN OPENING STATEMENT.  CAN YOU IDENTIFY

18    THAT, PLEASE?

19    A.   THAT'S THE FRONT EXTERIOR VIEW AT NIGHTTIME OF BAY 101.

20        MR. MCMANIS:  ALL RIGHT.  I'LL FORMALLY MOVE THAT

21    INTO EVIDENCE, YOUR HONOR.

22        MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

23        THE COURT:  ALL RIGHT.  533 IS RECEIVED.

24    (DEFENDANT'S EXHIBIT 533 WAS RECEIVED IN EVIDENCE.)

25        MR. MCMANIS:  THANK YOU.

1    Q.   DOES THAT ACCURATELY SHOW THE FRONT OF THE CLUB?

2    A.   YES, IT DOES.

3    Q.   LET'S GET THE FLOOR PLAN UP, 534, PLEASE.

4         NOW, IS THIS AN ACCURATE DEPICTION OF THE FLOOR PLAN OF

5    THE INTERIOR OF THE CLUB?

6    A.   IT'S THE LAYOUT THAT WE USE IN OUR HANDBOOKS AND IN OUR

7    EMERGENCY EXIT SIGNS.  SO IT DEPICTS THE GENERAL LAYOUT OF THE

8    BUILDING.

9         IT'S NOT TO SCALE PER SE, BUT --

10   Q.   IT'S A SCHEMATIC?

11   A.   SCHEMATIC.

12            MR. MCMANIS:  I'LL MOVE THAT IN, YOUR HONOR.

13            MS. NGUYEN:  NO OBJECTION.

14            THE COURT:  ALL RIGHT.  534 IS RECEIVED.

15       (DEFENDANT'S EXHIBIT 534 WAS RECEIVED IN EVIDENCE.)

16   BY MR. MCMANIS:

17   Q.   NOW, I NOTICE TO THE RIGHT SIDE OF THIS EXHIBIT IS THE

18   WORD "POKER" AND TO THE LEFT SIDE IT'S "CAL GAMES."

19       COULD YOU TELL US, PLEASE, WHAT IS THE DIFFERENCE BETWEEN

20   THOSE TWO DESIGNATIONS?

21   A.   WELL, THE TYPES OF CARD GAMES THAT ARE PLAYED ARE

22   DISTINGUISHED BY HOW THEY ARE PLAYED.

23       SO POKER GAMES ARE WHAT WE CALL RING GAMES.  THEY'RE WHERE

24   EVERY PLAYER PLAYS POKER, LIKE STUD OR HOLD 'EM.

25       CALIFORNIA GAMES ARE BANKER GAMES WHERE YOU HAVE A SINGLE

1     PLAYER, OR MAYBE TWO PLAYERS OR THREE, THAT WILL ACT AS THE

2     BANK IN A SPECIFIC HAND AND THAT IS -- THOSE ARE GAMES LIKE

3     BLACKJACK, THREE CARD POKER, BACCARAT, DOUBLE HAND.

4          SO IT'S THE WAY THE GAME IS PLAYED.  ONE HAS PLAYER AS

5     BANKER AND ONE IS EVERY PLAYER PLAYS AGAINST EVERY OTHER

6     PLAYER.

7     Q.   NOW, ARE THE CAL GAMES SOMETIMES CALLED THE ASIAN GAMES?

8     A.   THEY ARE, YES.

9     Q.   AND WHAT IS THE DIFFERENCE BETWEEN CALIFORNIA GAMES AND

10    ASIAN GAMES?  WHY DO WE HAVE CAL GAMES INSTEAD OF ASIAN GAMES?

11    A.   WELL, I THINK IT -- IT PROBABLY UNFAIRLY DENOTES A CERTAIN

12    GROUP OF PEOPLE AS ASIANS ONLY PLAYING THOSE GAMES AND THAT'S

13    NOT TRUTHFUL.  THAT'S ACTUALLY -- THOSE GAMES ARE PLAYED BY ALL

14    ETHNICITIES.

15         I THINK IN CALIFORNIA WE BELIEVE IT'S FAR MORE APPROPRIATE

16    TO CALL IT CALIFORNIA GAMES THAN ASIAN GAMES.

17    Q.   BUT THE FACT THAT THERE'S A PERCEPTION THAT THOSE ARE

18    GAMES FAVORED BY ASIANS?

19    A.   YES.

20    Q.   ALL RIGHT.  FAIR ENOUGH.

21         NOW, JUST TO COMPLETE THE HOUSEKEEPING HERE, WOULD YOU PUT

22    535 UP, PLEASE.

23         IS THIS A PHOTOGRAPH OF THE PEOPLE PLAYING THESE VARIOUS

24    GAMES AT BAY 101?

25    A.   THREE SEPARATE PHOTOGRAPHS I BELIEVE, YES.

1          MR. MCMANIS:  ALL RIGHT.  I'LL MOVE THAT INTO

2    EVIDENCE, PLEASE.

3          MS. NGUYEN:  NO OBJECTION.

4          THE COURT:  535 IS IT?

5          MR. MCMANIS:  535, YOUR HONOR, THANK YOU.

6          THE COURT:  IT'S ADMITTED.

7          (DEFENDANT'S EXHIBIT 535 WAS RECEIVED IN EVIDENCE.)

8    BY MR. MCMANIS:

9    Q.   AND ARE THESE ALL PHOTOGRAPHS OF POKER GAMES AS OPPOSED TO

10   THE ASIAN GAMES OR NOT?

11   A.   IT APPEARS THAT THEY ARE -- IT'S HARD TO TELL THE

12   DIFFERENCE, BUT THE ONE IN THE UPPER LEFT-HAND CORNER, THAT IS

13   AN ASIAN STYLE GAME.

14   Q.   OKAY.

15   A.   THE ONE IN THE UPPER RIGHT-HAND CORNER APPEARS TO BE A

16   POKER GAME.

17   Q.   YOU'RE NOT SURE ABOUT THE BOTTOM ONE?

18   A.   I WANT TO LOOK CLOSER AT IT BECAUSE I CAN'T SEE.

19   Q.   THAT'S ALL RIGHT.

20   A.   BUT THEY'RE BOTH STYLES OF GAMES, I BELIEVE.

21   Q.   ALL RIGHT.  WOULD YOU PUT 534 BACK UP, PLEASE.

22        IN ANY EVENT, THE GAMES ARE SEGREGATED GENERALLY ON THE

23   POKER SIDE ON THE RIGHT OF THIS SCHEMATIC, AND SOMETIMES THE

24   CAL GAMES OR ASIAN GAMES ARE ON THE LEFT?

25   A.   CORRECT.

1    Q.   AND NOW I SEE ON THIS CHART THERE ARE TWO AREAS THAT ARE

2    DESIGNATED "CAGE."  COULD YOU TELL US WHAT THE CAGE MEANS?

3    A.   CAGE IS THE AREA WHERE THE CASHIERS ARE AND IT'S WHERE

4    PEOPLE WILL EXCHANGE MONEY FOR CHIPS OR CHIPS FOR MONEY, AND

5    THEY DO CHECK CASHING THERE OR CREDIT CARD TRANSACTIONS AS

6    WELL.

7        BUT THAT'S WHERE THE MONEY IS HANDLED.

8    Q.   OKAY.  NOW, WE HAVE HEARD THAT MS. DANG WAS ORIGINALLY A

9    COOK IN THE KITCHEN AND THAT'S HOW SHE STARTED IN 2006.

10       IS THAT THE AREA SHOWN AS THE KITCHEN AT THE TOP THERE?

11   A.   YES, THAT'S THE BACK OF THE BUILDING.

12   Q.   ALL RIGHT.  AND THEN ONCE SHE BECAME A SERVER, WHERE WOULD

13   HER DUTIES TAKE HER ON THE FLOOR HERE?

14   A.   WELL, SHE WAS A POKER SERVER, SO HER DUTIES WOULD HAVE

15   BEEN PRIMARILY ON THE POKER SIDE.

16   Q.   OKAY.

17   A.   BUT SHE ALSO, AS PART OF HER DUTIES, WOULD GO TO THE

18   KITCHEN TO FILL HER FOOD ORDERS OR SHE WOULD GO TO THE BACK OF

19   SUTTER'S, WHICH IS THE BAR, TO FILL HER DRINK ORDERS.

20   Q.   OKAY.  SO IF SHE'S GETTING FOOD FOR CUSTOMERS IN THE POKER

21   AREA HERE, SHE WOULD GET THAT FROM THE KITCHEN?

22   A.   CORRECT.

23   Q.   AND IF SHE'S GETTING DRINKS, SHE GETS IT FROM THE BAR

24   AREA, WHICH IS DESIGNATED SUTTER'S?

25   A.   YES.

1    Q.   AND THERE'S A LOT OF INTERACTION BACK AND FORTH ON THE

2    FLOOR IS THERE?

3    A.   YES.

4    Q.   OKAY.  AND QUITE A BIT OF CASH INVOLVED IN THIS BUSINESS?

5    A.   YES.

6    Q.   AND THIS, I THINK YOU HAVE ALREADY TESTIFIED, IS VERY

7    REGULATED BUSINESS; IS THAT RIGHT?

8    A.   A HIGHLY REGULAR PLATED BID.

9    Q.   AND HOW MANY EMPLOYEES CURRENTLY WORKING AT BAY 101?

10   A.   AROUND 700.

11   Q.   AND WAS THAT ALSO APPROXIMATELY THE NUMBER AROUND THE FALL

12   AND WINTER OF 2009?

13   A.   WE HAD PROBABLY A LITTLE MORE THAN 700 EMPLOYEES BACK

14   THEN.

15   Q.   OKAY.  AND HOW MANY OF THOSE EMPLOYEES IN THE FALL/WINTER

16   OF 2009 WERE INVOLVED OR WORKED IN FOOD AND BEVERAGE?

17   A.   100 TO 120.

18   Q.   AND OF THOSE -- OF THAT NUMBER, HOW MANY WERE SERVERS?

19   A.   APPROXIMATELY 30.

20   Q.   OKAY.  AND WHAT OTHER PEOPLE WOULD BE COMPREHENDED BY FOOD

21   AND BEVERAGE IN TERMS OF OCCUPATIONAL CATEGORIES BESIDES THE 30

22   SERVERS?

23   A.   WE WOULD HAVE HAD THE PORTERS, KITCHEN COOKS, DELI COOKS,

24   EXPEDITER, UTILITY WORKERS, BARTENDERS.

25   Q.   OKAY.  WHEN YOU SAY "PORTERS," WHAT IS A PORTER?

1    A.   A PORTER IS PRIMARILY LIKE A BUS PERSON.  THEY WOULD CLEAN

2    UP THE TABLES, MOVE THE TRAYS IN AND OUT AND MAKE SURE THAT THE

3    FOOD STUFF IS PICKED UP AFTERWARDS, THAT THE SERVICE AREAS ARE

4    STOCKED, COFFEE IS MADE.

5         THEY MAY BRING COFFEE OR DRINKS TO CUSTOMERS OR EMPLOYEES

6    ON THE FLOOR.

7         BUT A BUS PERSON IS PROBABLY A GOOD DESCRIPTION.

8    Q.   NOW, WHEN MS. DANG WAS WORKING AS A COOK, I TAKE IT THAT

9    SHE WOULD HAVE BEEN LOCATED HERE IN THE KITCHEN (INDICATING)?

10   A.   YES.

11   Q.   AND WOULD THERE HAVE BEEN ANYTHING ABOUT HER DUTIES AS A

12   COOK THAT WOULD HAVE REQUIRED HER TO GO OUT ON THE FLOOR AND TO

13   WORK WITH CUSTOMERS AND THE OTHER SERVERS OUT HERE?

14   A.   ACTUALLY, SHE WOULD HAVE BEEN PROHIBITED FROM GOING OUT ON

15   THE FLOOR.

16   Q.   WHY IS THAT?

17   A.   BECAUSE COOKS ARE NOT BADGED FOR THE -- IN ORDER TO BE ON

18   THE GAMING FLOOR, YOU NEED TO BE BADGED, HAVE A WORK PERMIT TO

19   WORK ON THE GAMING FLOOR.

20        COOKS IN THE KITCHEN TYPICALLY ARE NOT BADGED AND,

21   THEREFORE, ARE NOT ALLOWED TO BE ON THE GAMING FLOOR DURING

22   WORKING HOURS.

23   Q.   OKAY.  AND BY CONTRAST, ONCE SHE BECAME A SERVER, I TAKE

24   IT SHE WOULD BE OUT IN THE FLOOR QUITE A BIT, AS WELL AS GOING

25   TO THE KITCHEN AND THE BAR?

1    A.   YES.

2    Q.   ALL RIGHT.  AND WHEN YOU TALK ABOUT BADGING, THAT IS

3    BASICALLY SOMETHING THAT THE CITY OF SAN JOSE OVERSEES?

4    A.   IF -- THE CITY OVERSEES IT IN SAN JOSE.  IF THE CITY

5    DOESN'T DO IT, THEN THE STATE WOULD DO IT.

6    Q.   ALL RIGHT.  NOW, YOU KNOW THE PLAINTIFF IN THIS CASE,

7    MS. DANG?

8    A.   YES.

9    Q.   ALL RIGHT.  AND HOW WELL WOULD YOU SAY THAT YOU KNOW HER?

10   A.   NOT WELL.

11   Q.   OKAY.  WERE YOU AWARE OF ANY PERFORMANCE PROBLEMS THAT SHE

12   HAD BEFORE OCTOBER 2009?

13   A.   YES.

14   Q.   AND HOW DID YOU BECOME AWARE OF THOSE PROBLEMS?

15   A.   I HAD HAD A CONVERSATION WITH HER SUPERVISOR, OR

16   CONVERSATIONS WITH HER SUPERVISOR, JOHN ST. CROIX, PRIMARILY

17   REGARDING ATTENDANCE ISSUES AND I BELIEVE INTERRELATIONSHIP

18   WITH COWORKERS IN THE KITCHEN.

19        I'VE HAD CONVERSATIONS WITH HER SUPERVISOR, NICK ORTEGA,

20   AND THE COMPLIANT ANALYST, KATE KNAPP, REGARDING HER ISSUES

21   WITH BALANCING HER END-OF-DAY REPORTS.

22        AND I BELIEVE I HAD A CONVERSATION WITH ONE OF HER

23   COWORKERS REGARDING AN INSTANCE WHERE THEY HAD ARGUED ABOUT A

24   DRINK ORDER.

25   Q.   OKAY.  AND THESE WERE REPORTS THAT YOU HAD RECEIVED ABOUT

1       MS. DANG?

2       A.   YES.

3       Q.   OKAY.  YOU MENTIONED KATE KNAPP, THE COMPLIANCE OFFICER.

4       WHAT IS THE COMPLIANCE OFFICER AND WHAT DOES MS. KNAPP DO AS

5       SUCH?

6       A.   WELL, MS. KNAPP'S JOB WAS TO ENSURE THAT OUR EMPLOYEES

7       FOLLOWED BAY 101'S MINIMUM INTERNAL CONTROL PROCEDURES TO

8       ENSURE THAT WE WERE IN COMPLIANCE WITH FEDERAL, STATE, AND

9       LOCAL REGULATORY LAWS AND ORDINANCES.

10          SHE WOULD SPECIFICALLY REVIEW CASH HANDLING, END-OF-DAY

11      REPORTS, AND SOMETIMES THEIR PROCEDURES REGARDING THEIR JOBS

12      AND CASH HANDLING AS IT RELATED TO MINIMUM INTERNAL CONTROL

13      STANDARDS.

14      Q.   WERE YOU AWARE, WITH RESPECT TO MS. KNAPP'S INVOLVEMENT

15      WITH MS. DANG, IF THERE HAD BEEN ANY ISSUES THERE?

16      A.   YES, I WAS AWARE THAT THERE WERE ISSUES THERE.

17      Q.   AND WHAT DID YOU -- TELL ME HOW YOU BECAME AWARE OF THOSE

18      ISSUES.

19      A.   MS. KNAPP CAME TO ME ON I BELIEVE TWO SEPARATE OCCASIONS

20      ESSENTIALLY TO COMPLAIN ABOUT THE AMOUNT OF TIME THAT SHE WAS

21      SPENDING TRYING TO ASSIST MS. DANG IN BALANCING HER ENVELOPES

22      AND COMPLETING HER END-OF-DAY REPORTS.

23      Q.   ALL RIGHT.  I'M GOING TO ASK YOU TO TAKE A LOOK AT THREE

24      EXHIBITS:  548, 550, AND 551.

25          TELL ME WHEN YOU HAVE THE FIRST ONE UP, PLEASE.

1    A.   I HAVE 548.

2    Q.   AND WHAT IS THE DATE OF EXHIBIT 548?

3    A.   JUNE 8TH, 2009.

4    Q.   AND SOME FOUR MONTHS BEFORE THIS OCTOBER 2009 INCIDENT?

5    A.   YES.

6    Q.   AND THIS IS A -- WELL, CAN YOU IDENTIFY WHAT THIS IS FOR

7    US?

8    A.   WELL, THIS IS A REPORT FROM KATE KNAPP, COMPLIANCE

9    ANALYST, REGARDING SERVERS NOT IN COMPLIANCE WITH BAY 101

10   PROCEDURES.

11        ESSENTIALLY THIS IS -- THIS HAS TO DO WITH END-OF-DAY

12   REPORTS AND MEAL REPORTS.

13   Q.   BALANCING THE CASH AND WHAT HAVE YOU, AMONG OTHER THINGS?

14   A.   YES.

15   Q.   ALL RIGHT.  AND THIS IS A REPORT FROM MS. KNAPP,

16   KATE KNAPP, TO WHOM?

17   A.   NICK ORTEGA, THE F&B DIRECTOR AT THE TIME.

18   Q.   AND DOES THIS REFLECT WHAT YOU HAD HEARD FROM MS. KNAPP

19   ABOUT HER CONCERNS ABOUT MS. DANG?

20   A.   YES.

21   Q.   ALL RIGHT.

22        I'LL MOVE THIS INTO EVIDENCE, YOUR HONOR, FOR THE LIMITED

23   PURPOSE OF WHAT INFORMATION MR. WERNER HAD BEFORE HIM AT THE

24   TIME THAT HE MADE THE DECISION TO TERMINATE MS. DANG?

25             MS. NGUYEN:  NO OBJECTION WITH RESPECT TO THAT

```
1        LIMITED INSTRUCTION, YOUR HONOR.

2                THE COURT:  OKAY.  I WILL ADMIT IT.

3        IT CAN BE CONSIDERED FOR THE PURPOSES OF SHOWING WHAT

4    INFORMATION MR. WERNER --

5        HAVE YOU ESTABLISHED THAT HE SAW THIS MEMO?

6                MR. MCMANIS:  YES, I THINK WE HAVE.  HAVE WE?

7                THE COURT:  WHY DON'T YOU DO THAT TO SATISFY ME?

8    BY MR. MCMANIS:

9    Q.   DID YOU SEE THIS MEMORANDUM, SIR, BEFORE YOU TERMINATED --

10   A.   YES.

11               THE COURT:  IT CAN BE CONSIDERED FOR THE PURPOSES OF

12   SHOWING WHAT MR. WERNER SAW BEFORE HE TERMINATED MS. DANG AND

13   WHAT --

14               MR. MCMANIS:  THANK YOU, YOUR HONOR.

15               THE COURT:  -- AND WHAT FACTS HE CONSIDERED.

16       BUT IT CANNOT BE CONSIDERED FOR WHETHER OR NOT THESE

17   ALLEGATIONS IN THE -- OR STATEMENTS IN THE REPORT ARE TRUE.

18               MR. MCMANIS:  THANK YOU.

19       (DEFENDANT'S EXHIBIT 548 WAS RECEIVED IN EVIDENCE.)

20   BY MR. MCMANIS:

21   Q.   WOULD YOU PUT THE FIRST PAGE OF EXHIBIT 548 ON THE SCREEN,

22   PLEASE.

23       CAN YOU BLOW THAT UP AT ALL, CINDY?

24       I THINK WE HAVE ALREADY ESTABLISHED THAT THIS IS A

25   MEMORANDUM FROM KATE KNAPP, THE COMPLIANCE OFFICER OR ANALYST
```

1    AS SHE IS DESCRIBED HERE BY MR. ORTEGA.

2         F&B DIRECTOR STANDS FOR?

3    A.   FOOD AND BEVERAGE.

4    Q.   AND WAS THAT THE SUPERVISOR OF MS. DANG?

5    A.   YES.

6    Q.   AND DATED JUNE 8, 2009.

7         AND THE FIRST CAPTION IS "SERVERS NOT IN COMPLIANCE WITH

8    BAY 101."

9         NUMBER 1 REFERS TO COPIES OF THE DROP BAGS.  ARE THESE THE

10   ENVELOPES THAT -- WHERE YOU HAVE TO BALANCE YOUR RECEIPTS, YOUR

11   CASH, YOUR TICKETS, AND YOUR THIS AND THAT?

12   A.   A SUMMARY, YES.

13   Q.   ALL RIGHT.  AND GOING TO PARAGRAPH 2, IT SAYS THE SERVER

14   NUMBER 3324, CUC DANG, SEEMS TO HAVE A PROBLEM WITH CLOSING.

15        3324, IS THAT HER EMPLOYEE NUMBER?

16   A.   YES.

17   Q.   AND AGAIN, THE SERVER DID NOT RESET ON THE 6-4-2009 SHIFT

18   AND THIS CAUSED A DOUBLE ENTRY IN THE FOOD AND BEVERAGE REPORT,

19   AND ALSO THERE ARE NO SERVER SALES AND THE SERVER DOES NOT PUT

20   THEM IN HER PAPERWORK CAUSING A GREAT DEAL OF WORK TO BALANCE

21   THE REPORT.  HOURS OF RESEARCH HAS TO BE DONE TO FINALLY

22   CORRECT FIGURES.

23        IS THIS ALL CONSISTENT WITH VERBAL REPORTS THAT MS. KNAPP

24   HAD GIVEN YOU?

25   A.   YES.

1    Q.   AND THE SERVER HAS A PROBLEM ON A REGULAR BASIS, AND SO ON

2    AND SO FORTH.

3         NOW, I'D LIKE YOU TO TURN TO EXHIBIT 550.

4         EXCUSE ME.  I APOLOGIZE.  I MISSPOKE.

5         EXHIBIT 549, THE NEXT EXHIBIT IN ORDER.

6         AND IS THIS ANOTHER MEMORANDUM FROM MS. KNAPP TO

7    MR. ORTEGA, THE FOOD AND BEVERAGE DIRECTOR?

8    A.   YES.

9    Q.   AND WHAT IS THE DATE ON THAT ONE?

10   A.   SEPTEMBER 14TH, 2009.

11   Q.   AND DOES THERE ALSO APPEAR ON THE FACE OF THIS DOCUMENT

12   WHAT APPEARS TO BE A WRITTEN RESPONSE FROM MR. ORTEGA TO

13   MS. KNAPP?

14   A.   YES.

15   Q.   AND WAS THIS SOMETHING THAT YOU REVIEWED OR LOOKED AT

16   BEFORE YOU TERMINATED MS. DANG?

17   A.   YES.

18   Q.   ALL RIGHT.  DID IT INFORM YOUR DECISION IN PART?

19   A.   YES.

20         MR. MCMANIS:  ALL RIGHT.  I'M GOING TO MOVE THIS IN,

21   AGAIN, FOR THE LIMITED PURPOSE, YOUR HONOR, TO SHOW WHAT

22   INFORMATION THAT HE HAD BEFORE HIM WHEN HE DECIDED TO TERMINATE

23   HER.

24         THE COURT:  OKAY.  AGAIN, IT CAN BE RECEIVED FOR

25   THAT PURPOSE, AND WHETHER THE STATEMENTS IN THE REPORT ARE TRUE

1    CANNOT BE CONSIDERED.

2           (DEFENDANT'S EXHIBIT 549 WAS RECEIVED IN EVIDENCE.)

3              MR. MCMANIS:  THANK YOU.  WOULD YOU PUT UP, PLEASE,

4    549.

5    Q.   ALL RIGHT.  AGAIN, WE HAVE THE KNAPP MEMORANDUM DATED THIS

6    SEPTEMBER 14TH, 2009.  THAT WOULD HAVE BEEN ABOUT A MONTH

7    BEFORE THE INCIDENT OF OCTOBER 24TH OF 2009; IS THAT RIGHT?

8    A.   YES.

9    Q.   AND IT'S TO NICK FROM KATE.

10          ATTACHED COPIES OF BAGS.  THIS SERVER MAKES THESE KINDS OF

11   MISTAKES OFTEN.  SHE FORGETS TO CARRY THE ONE IN THE TENS

12   COLUMN, THESE $0.10 ERRORS ADD UP IN A YEAR.  SHE'S NOT THE

13   ONLY ONE WITH THIS PROBLEM, BUT SHE'S MORE CONSISTENT.  AND

14   PLEASE HELP ME IN TRYING TO FIND A WAY AND WHAT HAVE YOU.

15          DO YOU SEE THAT?

16   A.   YES.

17   Q.   NOW, "TO NICK" IS CROSSED OUT AND IT SAYS "FROM," AND THEN

18   BELOW IT'S FROM KATE IS NOW TO KATE, AND CAN YOU READ FOR THE

19   RECORD WHAT IS WRITTEN DOWN HERE AT THE BOTTOM?

20   A.   "SPOKE WITH SERVER.  SHE WILL BE MORE CAREFUL IN THE

21   FUTURE AND I TOLD HER IF SHE WANTS SHE CAN USE ADDING MACHINE."

22   AND THEN INITIALS.

23   Q.   OKAY.  AND THAT'S MR. ORTEGA?

24   A.   I BELIEVE SO.

25   Q.   ALL RIGHT.  NOW, THIS MEMORANDUM THAT WE HAVE UP ON THE

1     SCREEN, SEPTEMBER 14TH, THAT WAS THREE MONTHS AFTER THE

2     PREVIOUS EXHIBIT, JUNE 8TH; IS THAT RIGHT?

3     A.   YES.

4     Q.   NOW, IF YOU'D LOOK FINALLY AT EXHIBIT 550.  TELL ME WHEN

5     YOU HAVE IT BEFORE YOU.

6     A.   I HAVE IT.

7     Q.   AND WHAT IS THE DATE OF THAT ONE?

8     A.   NOVEMBER 5TH, 2009.

9     Q.   AND IS THAT ALSO FROM MS. KNAPP?

10    A.   YES, IT IS.

11    Q.   TO MR. ORTEGA?

12    A.   IT IS.

13    Q.   GENERALLY THE SAME SUBJECT MATTER?

14    A.   YES.

15    Q.   AND, AGAIN, WAS THAT SOMETHING THAT YOU REVIEWED BEFORE

16    YOU TERMINATED HER?

17    A.   I READ IT.

18    Q.   AND DID THAT INFORM YOUR DECISION IN MAKING OR DECIDING TO

19    TERMINATE HER?

20    A.   IT'S PART OF IT, YES.

21         MR. MCMANIS:  I'LL MOVE THIS IN, AGAIN, YOUR HONOR,

22    FOR THE LIMITED PURPOSE.

23         THE COURT:  ALL RIGHT.  IT CAN BE RECEIVED WITH THE

24    LIMITED INSTRUCTION.

25         MR. MCMANIS:  THANK YOU.

 1          (DEFENDANT'S EXHIBIT 550 WAS RECEIVED IN EVIDENCE.)

 2     BY MR. MCMANIS:

 3     Q.   NOW, I THINK YOU SAID THAT THIS WAS ONE OF THE PROBLEMS

 4     THAT YOU WERE AWARE THAT MS. DANG HAD WITH HER PERFORMANCE.

 5          I WANT TO ADDRESS WHETHER SHE HAD PROBLEMS GETTING ALONG

 6     WITH HER COWORKERS.

 7          DO YOU HAVE THAT IN MIND?

 8     A.   YES.

 9     Q.   AND WHAT WERE YOU TOLD IN THAT REGARD?

10     A.   WELL, I'D BEEN TOLD BY MR. ST. CROIX THAT SHE HAD ISSUES

11     FOLLOWING INSTRUCTIONS FROM HER SUPERVISOR, MAMA ANH, AND THAT

12     THEY SOMETIMES ARGUED AND CURSED AT EACH OTHER IN THE KITCHEN.

13     I BELIEVE THAT WAS IN 2006 OR 2007.

14          I WAS -- OR I KNEW OR HAD BEEN TOLD OF AN INCIDENT BY ONE

15     OF THE BARTENDERS THAT THEY HAD A CURSING AND SHOUTING MATCH.

16          AND THEN THERE WAS ANSWER INCIDENT DURING THE

17     INVESTIGATION THAT I BECAME AWARE OF WITH MS. ELIAS.

18     Q.   NOW, YOU MENTIONED MAMA ANH.  IS THIS THE SAME PERSON AS

19     ANH HUYNH?

20     A.   YES.

21     Q.   AND I'M GOING TO SPELL THIS.  ANH BEING A-N-H AND HUYNH

22     BEING H-U-Y-N-H.  IS THAT YOUR UNDERSTANDING?

23     A.   YES.

24     Q.   AND WHAT WAS MAMA ANH AS SHE WAS CALLED IN THE KITCHEN,

25     WHAT WAS HER JOB?

1     A.   SHE WAS THE LEAD VIETNAMESE COOK.

2     Q.   AND YOU HAD BEEN TOLD THAT SHE AND MS. DANG HAD GOTTEN

3     INTO AN ARGUMENT AND THERE HAD BEEN SOME CURSING AND WHAT HAVE

4     YOU?

5     A.   YES.

6     Q.   AND DO YOU KNOW IF MS. DANG WAS PUNISHED FOR THAT

7     INCIDENT?

8     A.   I DON'T KNOW.

9     Q.   AND REGARDING COWORKERS, WHILE MS. DANG WAS A FOOD SERVER,

10    HAD THERE BEEN ANY INCIDENTS THAT WERE REPORTED TO YOU OF HER

11    YELLING AT COWORKERS AND THAT TYPE OF THING?

12    A.   I GUESS.

13    Q.   WERE YOU AWARE THAT MS. DANG WAS SUSPENDED IN OCTOBER OF

14    2009?

15    A.   I BECAME AWARE THAT SHE WAS SUSPENDED IN OCTOBER 2009.

16    Q.   AND TELL ME HOW YOU BECAME AWARE.

17    A.   I WAS INFORMED THAT THERE WAS GOING TO BE A MEDIATION

18    BETWEEN BAY 101 AND THE UNION BECAUSE MS. DANG HAD GRIEVED A

19    SUSPENSION.

20    Q.   TAKE A LOOK, PLEASE, IF YOU WOULD AT EXHIBIT 532.

21         DO YOU HAVE THAT IN FRONT OF YOU?

22    A.   I DO.

23    Q.   COULD YOU IDENTIFIED WHAT THIS IS, MR. WERNER?

24    A.   THIS IS A GRIEVANCE FORM FROM THE H.R. RE:  LOCAL 19.

25    Q.   AND WHAT IS THE DATE OF THIS FORM?

1    A.   OCTOBER 8TH, 2009.

2    Q.   AND DOES IT BEAR MS. DANG'S SIGNATURE AT THE BOTTOM?

3    A.   IT SAYS -- I ASSUME THAT'S HER SIGNATURE.

4    Q.   ALL RIGHT.  AND IS THIS -- AND THIS WAS A DOCUMENT THAT

5    SHE SERVED OR HAD DELIVERED TO BAY 101; IS THAT CORRECT?

6    A.   TO THE HUMAN RESOURCES DEPARTMENT, YES.

7    Q.   ALL RIGHT.  AND AT SOME POINT DID YOU REVIEW THAT?

8    A.   I DON'T HAVE A SPECIFIC RECOLLECTION OF IT, BUT I BELIEVE

9    I DID.

10             MR. MCMANIS:  I'M GOING TO MOVE THIS IN, YOUR HONOR,

11   AGAIN, NOT FOR THE TRUTH OF THE VARIOUS CLAIMS THAT MS. DANG

12   MAKES IN IT, BUT AS THE GRIEVANCE FORM THAT SHE FILED AFTER HER

13   SUSPENSION AFTER THE OCTOBER 2009 INCIDENT.

14             MS. NGUYEN:  NO OBJECTION.

15             THE COURT:  ALL RIGHT.  532 IS ADMITTED.

16        (DEFENDANT'S EXHIBIT 532 WAS RECEIVED IN EVIDENCE.)

17             MR. MCMANIS:  WOULD YOU PUT THAT UP, PLEASE, CINDY?

18   Q.   NOW, FIRST OF ALL, MR. WERNER, THIS SAYS GRIEVANCE FORM,

19   HOTEL EMPLOYEES, RESTAURANT EMPLOYEES, UNION LOCAL 19, AFL-CO.

20        IS THIS THE FORM THAT AN EMPLOYEE, IF SHE BELIEVES SHE HAS

21   A GRIEVANCE, THAT SHE CAN USE TO BRING THAT UP?

22   A.   YES.  I THINK SHE FILES IT AT THE UNION OFFICE THOUGH.

23   Q.   OKAY.  AND THIS YOU HAVE ALREADY TESTIFIED WAS FILED

24   OCTOBER 8TH, 2009.

25        THIS WAS AFTER THE INCIDENT ON OCTOBER 4TH AND THE

1    DISCIPLINE WHICH WAS IMPOSED ON MS. DANG AS A RESULT; IS THAT

2    RIGHT?

3    A.   YES.

4    Q.   AND YOU SAY THIS LED TO A MEDIATION ARRANGED THROUGH THE

5    AUSPICES OF THE UNION OR THE FEDERAL MEDIATOR OR THAT KIND OF

6    THING?

7    A.   A LOCAL MEDIATOR, YES.

8    Q.   NOW, WE CANNOT, UNDER THE LAW, GET INTO WHAT WAS SAID AT

9    THE MEDIATION, BUT DID YOU GET A REPORT ON MS. DANG'S -- WITH

10   RESPECT TO MS. DANG'S PARTICIPATION IN THAT PROCEEDING?

11   A.   I DID.

12   Q.   AND WHAT WERE YOU TOLD?

13           MS. NGUYEN:  OBJECTION, YOUR HONOR.  MEDIATION

14   PRIVILEGE.

15           MR. MCMANIS:  NOT, NOT --

16           THE COURT:  I THINK THE QUESTION IS NOT DIRECTED AT

17   WHAT WAS SAID DURING THE MEDIATION.

18       I THINK IT WAS DIRECTED AT WHETHER OR NOT MS. DANG HAD

19   ATTENDED THE MEDIATION, AND FOR THAT LIMITED PURPOSE I'LL LET

20   HIM ANSWER.

21           MR. MCMANIS:  THANK YOU.

22           THE COURT:  BUT NOT BEYOND THAT.

23   BY MR. MCMANIS:

24   Q.   GO AHEAD, MR. WERNER.  WHAT WERE YOU TOLD IN THAT REGARD?

25   A.   I WAS TOLD THAT --

 1            MS. NGUYEN:  OBJECTION.  HEARSAY.

 2            MR. MCMANIS:  IT'S NOT BEEN OFFERED FOR THE TRUTH OF

 3     THE MATTER.  IT'S WHAT WAS REPORTED.

 4            THE COURT:  I'LL OVERRULE THAT OBJECTION.

 5     BY MR. MCMANIS:

 6     Q.   YOU CAN ANSWER THE QUESTION.

 7     A.   I WAS TOLD THAT MS. DANG AND MR. SUMMERS HAD LEFT THE

 8     MEDIATION IN THE MIDDLE OF IT, HALFWAY THROUGH IT, AND THAT THE

 9     MEDIATION WASN'T COMPLETED.

10     Q.   OKAY.  AND THIS GRIEVANCE FORM AND THE RESULTING MEDIATION

11     IS AN EFFORT, IS IT NOT, SIR, TO ALLOW EMPLOYEES AND MANAGEMENT

12     TO WORK OUT THEIR DIFFERENCES?

13     A.   YES.

14     Q.   AND APPARENTLY THAT DIDN'T HAPPEN HERE.  AM I RIGHT?

15     A.   YES.

16     Q.   NOW, A COUPLE OF DAYS LATER --

17            AND I THINK EXHIBIT 1016 IS IN EVIDENCE.  AM I CORRECT ON

18     THAT, MADAM CLERK?

19            THE CLERK:  CORRECT.

20            MR. MCMANIS:  ALL RIGHT.  WOULD YOU PUT 1016 UP,

21     PLEASE.

22     Q.   A COUPLE OF DAYS LATER YOU GET THIS LETTER DATED 10-13-09,

23     OCTOBER 13TH, 2009, ADDRESSED TO YOU.

24            AND THIS IS A VERY DETAILED LETTER WITH A LOT OF

25     ALLEGATIONS AND WHAT HAVE YOU; IS THAT RIGHT?

1    A.    YES.

2    Q.    ALL RIGHT.  LET'S LOOK AT THE SECOND PAGE SO WE HAVE THE

3    FORMAT OF IT.  IT'S A TWO-PAGE LETTER PURPORTEDLY SIGNED BY

4    CUC DANG.

5         I DON'T MEAN TO BE RACING AHEAD OF YOU HERE.

6    A.    IT'S GOT HER NAME AND A SIGNATURE ABOVE IT.

7    Q.    OKAY.  AND THEN THE THIRD PAGE IS -- LET'S GO TO THE THIRD

8    PAGE.

9         THIS IS THE MEMORANDUM THAT SHE WAS GIVEN WHEN SHE WAS

10   SUSPENDED FOR TWO DAYS UNDER SUPPORTING -- IT SAYS SUBJECT:

11   ARGUING WITH A CUSTOMER AND A COWORKER ON THE CASINO FLOOR.

12        SUPPORTING DETAILS:  ON OCTOBER 24TH AROUND MIDNIGHT YOU

13   BROUGHT THE WRONG DRINK TO A CUSTOMER.  WHEN HE ASKED YOU TO

14   BRING THE CORRECT DRINK, YOU STARTED ARGUING WITH HIM, AND WHEN

15   ANOTHER SERVER CAME OVER TO HELP, YOU STARTED ARGUING WITH HER

16   ALSO.

17        UNDER SUPERVISOR'S COMMENTS:  IT'S AGAINST COMPANY POLICY

18   TO ARGUE WITH THE CUSTOMER AT ANY TIME AND AGAINST POLICY TO

19   ARGUE WITH A COWORKER ON THE CASINO FLOOR IN VIEW OF CUSTOMERS,

20   AND YOU'RE BEING SUSPENDED THURSDAY AND FRIDAY, OCTOBER 8 AND

21   9, YOU WILL RETURN TO WORK ON SATURDAY, OCTOBER 10.  FUTURE

22   VIOLATIONS OF THIS NATURE WILL RESULT IN MORE SEVERE

23   DISCIPLINARY ACTION, UP TO AND INCLUDING TERMINATION OF YOUR

24   EMPLOYMENT.

25        DO YOU SEE THAT?

1      A.   YES.

2      Q.   AND THEN DOWN HERE WE HAVE HER SUPERVISOR'S SIGNATURE,

3      MR. ORTEGA, AND THE DATE.

4      A.   YES.

5      Q.   AND THIS WAS ONE OF THE MEMORANDA THAT SHE GRIEVED WITH

6      THE UNION; IS THAT RIGHT?

7      A.   YES.

8      Q.   OKAY.  NOW, LET'S GO TO THE NEXT PAGE OF THE EXHIBIT.

9           THIS IS NOT A SUSPENSION, BUT A WARNING.  WE HAVE HER NAME

10     AND EMPLOYEE NUMBER UP HERE; IS THAT RIGHT?

11     A.   YES.

12     Q.   AND THE SAME DATE, SAME SIGNATURE, MR. ORTEGA; CORRECT?

13     A.   YES.

14     Q.   HERE THE SUBJECT, JOB PERFORMANCE, SUPPORTING DETAILS:

15     YOU ARE NOT BALANCING YOUR ENVELOPE CORRECTLY AT THE END OF THE

16     SHIFT.

17          SUPERVISOR'S COMMENTS:  I TRIED HELPING YOU WITH YOUR

18     BALANCING ON NUMEROUS OCCASIONS AND YOU STILL ARE NOT BALANCING

19     YOUR ENVELOPE CORRECTLY.  IF THIS CONTINUES, YOU WILL FACE MORE

20     SEVERE DISCIPLINARY ACTION, UP TO AND INCLUDING TERMINATION OF

21     YOUR EMPLOYMENT.

22          THE COMPANY MAY HAVE THE -- MAY HAVE -- MAY BE ABLE TO

23     OFFER YOU A POSITION IN THE KITCHEN OR YOU WILL NOT BE ABLE TO

24     KEEP YOUR SENIORITY.

25          IS THIS BALANCING AND THE ENVELOPE REFERENCE, IS THAT WHAT

1     THESE VARIOUS MEMORANDA FROM KATE KNAPP WERE ABOUT?

2     A.   YES.

3     Q.   AND THE REPORTS THAT YOU RECEIVED FROM MS. KNAPP ABOUT THE

4     PROBLEMS THAT MS. DANG WAS HAVING IN THAT AREA?

5     A.   YES.

6     Q.   OKAY.  AND THAT WAS PART OF THE GRIEVANCE PROCEEDING AS

7     WELL, WASN'T IT?

8     A.   YES.

9     Q.   AND PART OF THE MEDIATION SHE WALKED OUT ON?

10    A.   THAT'S MY UNDERSTANDING.

11    Q.   OKAY.  NOW, LET'S GO TO THE NEXT PAGE OF HER LETTER.

12         NOW, THIS IS SOMETHING THAT SHE INCLUDED IN THE LETTER,

13    WHICH I THINK IS A PAGE FROM YOUR EMPLOYEE MANUAL OR YOUR

14    HARASSMENT POLICY, SOMETHING OF THAT SORT?

15    A.   I THINK IT'S A PAGE OUT OF THE WORKBOOK THAT WOULD HAVE

16    BEEN PROVIDED IN ANNUAL TRAINING ON THE SUBJECT OF WORKPLACE

17    VIOLENCE AND HARASSMENT.

18    Q.   OKAY.  DOES BAY 101 CONDUCT ANNUAL TRAININGS ON THOSE

19    SUBJECTS?

20    A.   YES.

21    Q.   FOR ALL EMPLOYEES?

22    A.   YES.

23    Q.   INCLUDING YOU?

24    A.   YES.

25    Q.   AND DO YOU KNOW, THIS EXAMPLE OF RETALIATION AND SO FORTH

1   THAT WAS CIRCLED, DO YOU KNOW HOW THAT GOT CIRCLED?

2   A.   NO, I DON'T.

3   Q.   BUT THAT WAS PART OF HER PACKAGE?

4   A.   YES.

5   Q.   AND LET'S GO TO THE NEXT PAGE.

6        NOW, THIS IS THE LETTER THAT SHE SENT TWO AND A HALF YEARS

7   EARLIER INVOLVING MR. SUAREZ AND SHE ENCLOSED THAT WITH HER

8   COMPLAINT; IS THAT RIGHT?

9   A.   YES.

10  Q.   AND JUST SO WE'RE CLEAR ON THIS, LET'S LOOK AT THE SECOND

11  PAGE.

12       HERE WE'VE GOT HER SIGNATURE 4-19-07.

13       LET'S GO BACK TO THE FIRST PAGE.  I THINK THAT YOU

14  TESTIFIED, CORRECT ME IF I'M WRONG, THAT YOU WERE NOT AWARE OF

15  THE EARLIER MATTER INVOLVING MR. SUAREZ; IS THAT CORRECT?

16  A.   I WAS NOT AWARE OF IT, NO.

17  Q.   AND DID YOU LATER LEARN THAT THAT WAS HANDLED BY

18  JENNIFER GILBERT, YOUR H.R. PERSON, AND NICK ORTEGA, HER

19  SUPERVISOR?

20  A.   ACTUALLY I THINK IT WAS HANDLED BY JOHN ST. CROIX AND

21  MS. GILBERT.

22  Q.   I APOLOGIZE.  THAT'S BEFORE MR. ST. CROIX PASSED AWAY?

23  A.   YES.

24  Q.   BUT IT WAS MR. ST. CROIX WHO WAS AT THAT TIME THE HEAD OF

25  FOOD AND BEVERAGE AND MS. GILBERT OF H.R.?

1      A.   YES.

2      Q.   BUT NOT BEING AWARE OF THAT AT THE TIME, YOU DID SEE THIS

3      LETTER BECAUSE IT WAS PART OF THE PACKAGE I TAKE IT?

4      A.   YES.

5      Q.   ALL RIGHT.  AND IN -- WAS THIS -- ALL OF THE ALLEGATIONS

6      SHE MADE IN HER LETTER TWO AND A HALF YEARS EARLIER AND HER

7      LETTER THAT IS IN THIS EXHIBIT DATED OCTOBER 13TH, 2009, WAS

8      ALL OF THIS THE SUBJECT OF CAROLE EDMAN'S INVESTIGATION?

9      A.   YES.

10     Q.   AND NOW, IF I COULD HIGHLIGHT THIS PARAGRAPH STARTING WITH

11     "I BELIEVE," WITH REFERENCE TO MR. SUAREZ.

12          THIS IS MS. DANG WRITING, "I BELIEVE HE," REFERRING TO

13     SUAREZ, "HAS BEEN REPORTED BY OTHER WOMAN AT WORK, TOO, BUT

14     CONTINUED TO BEHAVE THE SAME.  I HAVE HEARD COMPLAINTS FROM

15     NGA, SO, AND OTHER FEMALE WORKERS, ALL WHO WORK IN THE

16     KITCHEN."

17          DO YOU SEE THAT?

18     A.   YES.

19     Q.   ALL RIGHT.  NOW, I'M GOING TO JUMP AHEAD JUST A MINUTE

20     HERE TO THE REPORT THAT MS. EDMAN PREPARED AND I'D LIKE YOU TO

21     TURN TO, PLEASE, TO EXHIBIT 500.

22          TELL ME WHEN YOU HAVE THAT BEFORE YOU.

23     A.   OKAY.

24     Q.   NOW, IN HER LETTER OF OCTOBER 13TH, 2009, EXHIBIT 1016,

25     MS. DANG DEMANDED AN INVESTIGATION OF THIS MATTER; IS THAT

1    RIGHT?

2    A.   YES.

3    Q.   OKAY.  AND DID YOU RETAIN CAROLE EDMAN TO CONDUCT THAT

4    INVESTIGATION?

5    A.   WELL, ACTUALLY, I ASKED COUNSEL TO RETAIN MS. --

6    Q.   MS. KIRSCH, MY ESTEEMED PARTNER SITTING OUT THERE?

7    A.   YES.

8    Q.   ALL RIGHT.  AND IS IT YOUR UNDERSTANDING THAT SHE ENGAGED

9    CAROLE EDMAN AND MS. EDMAN PREPARED THIS REPORT?

10   A.   YES.

11   Q.   AND IS EXHIBIT 500 MS. EDMAN'S REPORT?

12   A.   YES.

13   Q.   DID YOU RECEIVE THAT ON OR ABOUT THE DATE THAT IT'S SHOWN,

14   DECEMBER 10, 2009?

15   A.   I THINK SLIGHTLY AFTER THE DATE, BUT IT COULD HAVE BEEN ON

16   THE 10TH, BUT I THINK THE 11TH.

17   Q.   DID YOU READ IT?

18   A.   I DID.

19   Q.   CAREFULLY?

20   A.   I DID.

21   Q.   AND DID IT INFORM YOUR DECISION ABOUT TERMINATION IN THIS

22   CASE?

23   A.   WELL, IT INFORMED MY DECISION ABOUT A MEETING WITH

24   MS. DANG TO IMPROVE HER JOB PERFORMANCE, AND THEN WHEN SHE

25   DIDN'T APPEAR FOR THAT MEETING, IT WOULD HAVE BEEN AN

1    UNDERLYING BASIS FOR MY DECISION TO TERMINATE HER.

2    Q.   OKAY.  VERY, VERY LAWYER-LIKE.  THANK YOU.

3         IN ANY EVENT, YOU GOT THE REPORT?

4    A.   YES.

5    Q.   YOU READ IT?

6    A.   YES.

7    Q.   AND YOU CONSIDERED IT?

8    A.   YES.

9    Q.   AND YOU BASED THE SUBSEQUENT ACTIONS YOU TOOK WITH RESPECT

10   TO HER ON IT?

11   A.   YES.

12        MR. MCMANIS:  I'LL MOVE IT IN, YOUR HONOR, SUBJECT

13   TO THAT -- FOR THAT LIMITED PURPOSE.

14        THE COURT:  I'LL RECEIVE IT ON THAT SAME BASIS, THAT

15   IT CAN BE CONSIDERED FOR THE PURPOSES OF EXPLAINING THE

16   INFORMATION THAT MR. --

17        MR. MCMANIS:  THANK YOU, YOUR HONOR.

18        THE COURT:  I'M SORRY.  I DIDN'T FINISH.

19     -- THAT THE WITNESS CONSIDERED IN MAKING HIS -- OR IN

20   TAKING THE ACTION THAT HE TOOK.

21     BUT IT CANNOT BE CONSIDERED FOR WHETHER OR NOT THE

22   STATEMENTS OR ALLEGATIONS MADE IN THE REPORT ARE TRUE.

23        MR. MCMANIS:  THANK YOU.

24     (DEFENDANT'S EXHIBIT 500 WAS RECEIVED IN EVIDENCE.)

25        MR. MCMANIS:  WOULD YOU PUT 1016 BACK UP BEFORE WE

1    PUT UP 500, PLEASE?

2         AND WOULD YOU GO, PLEASE, TO BATES STAMP 2180, AND THEN

3    HIGHLIGHT OR BLOW UP THIS PARAGRAPH THAT WE HAD BEFORE.

4    Q.   WE HAVE GONE OVER THIS.  THIS WAS AN ALLEGATION THAT

5    MS. DANG MADE ABOUT MR. SUAREZ AND HE'S BEEN REPORTED BY OTHER

6    WOMEN AND CONTINUES TO BEHAVE THE SAME, AND I HAVE HEARD

7    COMPLAINTS FROM NGA, SO, AND OTHER FEMALE WORKERS, ALL OF WHO

8    WORK IN THE KITCHEN.

9         DO YOU RECALL THAT?

10   A.   YES.

11   Q.   AND WAS THAT ONE OF THE MATTERS THAT MS. EDMAN

12   INVESTIGATED?

13   A.   YES.

14   Q.   AND LET'S PUT UP THAT REPORT, PLEASE, 500.

15        I HOPE THIS IS NOT SOME SORT OF CHEAP ADVERTISEMENT FOR

16   TOSHIBA.

17        I'LL TELL YOU WHAT, YOUR HONOR.  I KNOW YOU TAKE A SECOND

18   BREAK.  I WONDER IF THIS MIGHT BE AN APPROPRIATE TIME WHILE SHE

19   WORKS OUT THE PROBLEM?

20             THE COURT:  SURE.  THAT'S FINE.  WE'LL TAKE A

21   15-MINUTE RECESS.

22             MR. MCMANIS:  THANK YOU.

23        (RECESS FROM 11:56 A.M. UNTIL 12:18 P.M.)

24             THE COURT:  WE'RE MISSING SOMEBODY I THINK.

25             THE CLERK:  OH, OKAY.  I THOUGHT I HAD EVERYONE IN.

1          THE COURT:  COUNSEL, SHE SHARED THE NOTE WITH YOU?

2          MR. MCMANIS:  I DID, AND I'LL CORRECT THAT.

3          THE COURT:  OKAY.

4          MR. MCMANIS:  THANK YOU.

5      (PAUSE IN PROCEEDINGS.)

6          THE COURT:  ALL SET?  YOU MAY CONTINUE, MR. MCMANIS.

7          MR. MCMANIS:  THANK YOU, YOUR HONOR.

8      I UNDERSTAND THAT THERE'S BEEN A REQUEST THAT WE BLOW UP

9   THESE EXHIBITS A LITTLE MORE, AND I APOLOGIZE FOR NOT HAVING

10  DONE SO AND WE'RE GOING TO FIX THAT GOING FORWARD.  OKAY?

11      LET'S GO BACK TO 1016, IF YOU WOULD, PLEASE, CINDY.  I'LL

12  AGAIN WANT TO LOOK AT THIS ONE.

13      THIS IS A REFERENCE IN MS. DANG'S REPORT OF APRIL 2007,

14  THAT LUCIO SUAREZ HAS BEEN REPORTED BY OTHER WOMEN AT WORK TOO,

15  AND CONTINUED TO BE THE SAME, AND I HAVE HEARD COMPLAINTS FROM

16  NGA, SO, AND OTHER FEMALE WORKERS ALL WHO WORK IN THE KITCHEN.

17      IS THAT LEGIBLE MORE OR LESS?  OKAY?

18          JUROR:  WHEN YOU PUT THE WHOLE ONE, THAT'S THE ONE I

19  CAN'T SEE.

20          MR. MCMANIS:  WE UNDERSTAND.  WE'LL TRY AND FOCUS ON

21  SPECIFIC PARAGRAPHS.

22  Q.  ANYWAY, THIS WAS PART OF MS. DANG'S COMPLAINT IN APRIL OF

23  2007 THAT YOU LEARNED ABOUT FOR THE FIRST TIME WHEN SHE SENT

24  YOU THE LETTER IN OCTOBER OF 2009; IS THAT RIGHT?

25  A.  YES.

1    Q.   ALL RIGHT.  AND WAS THIS SOMETHING THAT YOU ASKED

2    MS. EDMAN TO INVESTIGATE, OR SOMEBODY ASKED MS. EDMAN TO

3    INVESTIGATE?

4    A.   YES.

5    Q.   ALL RIGHT.  NOW LET'S GO TO HER REPORT OF HER

6    INVESTIGATION, AND THAT'S EXHIBIT 500 IN EVIDENCE WITH A

7    LIMITING INSTRUCTION.

8         CAN YOU BLOW THIS UP A LITTLE MORE, CINDY.

9         ALL RIGHT.  THIS IS THE INVESTIGATION REPORT PREPARED BY

10   CAROLE EDMAN, SUBMITTED TO OUR LAW FIRM DECEMBER 10, 2009,

11   SUMMARY OF KEY FINDINGS OF INVESTIGATION.

12        LET'S TURN TO THE NEXT PAGE, PLEASE.

13        CAN YOU BLOW IT UP A LITTLE BIT?

14        NOW, THIS SUMMARIZES -- AND BY THE WAY, THESE EXHIBITS

15   WILL ALL BE COMING INTO THE JURY ROOM FOR DELIBERATIONS SO

16   YOU'LL HAVE THEM TO ACTUALLY STUDY.

17        BUT THIS SUMMARIZES THE SUMMARY OF INVESTIGATION AND

18   INTERVIEWS AND IT LISTS THE PEOPLE INTERVIEWED AND FINAL

19   SUMMARY AND CONCLUSIONS AND WHAT HAVE YOU.

20        DO YOU RECALL RECEIVING THIS REPORT FROM MS. EDMAN?

21   A.   YES.

22   Q.   AND LET'S TURN TO THE TWO PEOPLE NAMED BY MS. DANG AS

23   VICTIMS OF SEXUAL HARASSMENT, IF YOU WILL, BY MR. LUCIO SUAREZ.

24        ONE IS MS. NGA NGUYEN, AND THE OTHER IS SO NGUYEN.

25        CINDY, LET'S TURN TO PAGE 42 TO SEE WHAT THE INVESTIGATOR

1       REPORTED ABOUT MS. NGA NGUYEN.

2           ALL RIGHT.  SO THIS WAS A FORMER EMPLOYEE NO LONGER

3       WORKING AT BAY 101.

4           LET'S GO TO THE NEXT PAGE, PLEASE.

5           AND IF YOU COULD START DOWN HERE WHERE IT SAYS

6       "MS. NGA NGUYEN STATED THAT SHE HAD HAD ONLY ONE INCIDENT WITH

7       LUCIO SUAREZ, AND EXPLAINED THAT THE ONLY COMPLAINT SHE HAD

8       FILED AGAINST MR. SUAREZ WAS RELATED TO FOOD AND MEAL TICKETS.

9           SHE STATED THAT IT HAD NOTHING TO DO WITH SEXUAL

10      HARASSMENT, NOTHING TO DO WITH HER BEING VIETNAMESE.

11          MS. NGA NGUYEN TALKED TO MR. ORTEGA ABOUT THE FOOD ISSUE

12      AND MR. ORTEGA STRAIGHTENED IT OUT WITH MR. SUAREZ.

13          MS. NGUYEN STATED THAT MR. SUAREZ DID HIS JOB AND SHE DID

14      HERS AND AFTER THAT SHE HAD NO PROBLEMS WITH MR. SUAREZ?"

15          AND LET'S GO TO THE NEXT PARAGRAPH, PLEASE.  BLOW UP THE

16      FIRST FIVE LINES.

17          "WHEN THE INVESTIGATOR TOLD MS. NGA NGUYEN THAT IT HAD

18      BEEN REPORTED THAT MS. NGA NGUYEN HAD FILED SEVERAL COMPLAINTS

19      OF HARASSMENT AGAINST MR. SUAREZ, AND ASKED WHETHER SHE

20      RECALLED EVER DOING SO, MS. NGA NGUYEN REPLIED NO AND AGAIN

21      SAID NO, SHE DID NOT BELIEVE THAT SHE HAD EVER DONE THAT," AND

22      WHAT HAVE YOU.

23          AND NOW LET'S TURN TO THE OTHER PERSON THAT MS. DANG HAD

24      SAID WAS THE VICTIM OF SEXUAL HARASSMENT, AND THAT WOULD BE,

25      CINDY, MS. SO NGUYEN, NUMBER 13.

1        SHE APPARENTLY HAD BEEN HIRED BY THE COMPANY MARCH 8TH,

2   1995 AS AN ASIAN COOK.  LIKES THE JOB AND NO PROBLEMS.

3   INTERVIEWED" AND SO FORTH AND SO ON.

4        GO ON TO THE NEXT PAGE, PLEASE.  THE BOTTOM OF THE PAGE

5   STARTING WITH THE LAST THREE LINES, "WHEN THE INVESTIGATOR."

6   THERE YOU GO.

7        "WHEN THE INVESTIGATOR ASKED WHETHER MS. SO NGUYEN KNEW OF

8   ANY FEMALE EMPLOYEES ASKING LUCIO TO STOP BOTHERING THEM, OR

9   STOP ASKING THEM FOR DATES OR CALLING THEM MIJO OR ME-HA SHE

10  RESPONDED: 'YES, THAT'S HOW HE ADDRESSED CUC AND NO ONE ELSE.

11  HONEY-HONEY HE SAID TO CUC."

12       WOULD YOU GO TO THE NEXT PAGE?

13            MS. NGUYEN:  I WOULD OBJECT TO THIS LINE, YOUR

14  HONOR.  MR. MCMANIS IS TESTIFYING.  THERE'S NO QUESTION FOR THE

15  WITNESS.

16            THE COURT:  HE'S READING FROM THE REPORT.  IF HE

17  EDITORIALIZES OR DOES ANYTHING BUT READ, I WOULD AGREE THAT'S A

18  PROBLEM.

19       BUT THE EXHIBIT IS IN EVIDENCE AND HE CAN READ FROM IT.

20            MR. MCMANIS:  THANK YOU, YOUR HONOR.

21       AND LET'S HIGHLIGHT THE TWO TOP PARAGRAPHS, CINDY, PLEASE.

22       "CUC ALSO ADDRESSED HIM," MR. SUAREZ, "AS HONEY-HONEY; AND

23  SHE SAID IT TO JOSE AND TO NICK.  SHE SAYS IT TO NICK AND JOSE

24  EVEN UNTIL NOW AND PREVIOUSLY TO LUCIO.  NO ONE CALLS ME THAT;

25  EVERYONE CALLS ME MAMA SO; THAT'S OKAY WITH ME; NO PROBLEM.

1       "WHEN ASKED WHETHER SHE KNEW OF ANYONE WHO WAS AFRAID OF

2     LUCIO IN THE LAST 3 YEARS, SHE LAUGHED AND SAID, 'NO - THEY

3     MIGHT DISLIKE HIM BUT WOULDN'T BE AFRAID OF HIM.'  WHEN ASKED

4     WHY THEY MIGHT DISLIKE HIM, SHE STATED, 'HE'S VERY SERIOUS

5     ABOUT HIS COOKING AND HE WANTS OTHER PEOPLE TO FOLLOW SUIT.'

6     HE WANTS PEOPLE TO COOK THE WAY HE WANTS.  IT'S RIGHT.  HE'S

7     FOLLOWING THE RULES.  MS. SO NGUYEN STATED SHE'S NEVER HEARD

8     ANYONE COMPLAIN ABOUT HEARING LUCIO USE DIRTY WORDS AND HAS NOT

9     HEARD THEM HERSELF."

10    Q.  MY QUESTION, MR. WERNER, DID YOU READ THESE REPORTS OF THE

11    INVESTIGATOR AS TO MS. NGA NGUYEN AND MS. SO NGUYEN?

12    A.  YES.

13    Q.  AND DID YOU SEE ANYTHING IN THOSE REPORTS THAT SUPPORTED

14    THE CLAIM THAT MS. DANG HAD MADE ABOUT THEM BEING VICTIMS OF

15    SEXUAL HARASSMENT?

16    A.  NO.

17    Q.  NOW, WHILE WE'RE ON THIS REPORT, I'D LIKE YOU TO TURN,

18    PLEASE, CINDY TO PAGE 53 WHERE WE HAVE THE INTERVIEW OF

19    MS. NGA.

20       AND HERE WE -- YEAH, HERE WE GO.

21       THIS IS MS. NG WHO WAS INTERVIEWED BY THE INVESTIGATOR,

22    ALSO KNOWN AS ELLIS NG, HIRED ON JANUARY 15TH, 1997 AS A SERVER

23    AND STATED "SHE HAS ALSO BEEN ASKED TO TRAIN NEW FOOD SERVERS

24    FOR A NUMBER OF YEARS AND ESTIMATED THAT SHE PROBABLY HAS

25    TRAINED 90 PERCENT OF THE CURRENT SERVERS."

1        AND THEN IF WE GO TO THE NEXT PAGE, THIS IS UNDER THE

2   HEADING --

3        CAN WE BLOW THAT UP SO WE CAN GETTING THE HEADING?

4   IT'S -- I'M SORRY.  IT'S MS. DANG'S CLAIM OF NEGATIVE

5   EVALUATIONS?

6        IT'S ABOUT IN THE MIDDLE OF THE PAGE.

7            MS. MCCLELLAN:  JUST THE PARAGRAPH; CORRECT?

8            MR. MCMANIS:  JUST THE PARAGRAPH.

9   Q.   THIS IS THE HEADING "MS. DANG'S CLAIM OF NEGATIVE

10  EVALUATIONS RELATED TO BALANCING ENVELOPES."

11       AND MS.  NG STATED THAT BALANCING ENVELOPES IS VERY

12  STRAIGHTFORWARD AND THAT IF BALANCES ARE OFF, A REPORT COMES

13  FROM MS. KNAPP.  MS. NG CONFIRMED THAT THIS IS NOT A PROBLEM

14  THAT COMES FROM MR. ORTEGA."

15       AND THEN I WANT TO GO DOWN FIVE LINES WHERE MS. NG SAYS

16  SHE HAS TRAINED FOOD SERVERS OF ALL NATIONALITIES.

17       HIGHLIGHT "MS. NG STATED SHE HAS TRAINED SERVERS OF ALL

18  NATIONALITIES" TO THE END OF THE PARAGRAPH, PLEASE.  YEAH.

19       MR. WERNER, AGAIN, FROM EXHIBIT 500, QUOTE, "MS. NG HAS

20  STATED THAT SHE HAS TRAINED FOOD SERVERS OF ALL DIFFERENT

21  NATIONALITIES; THAT SHE HAD A REALLY DIFFICULT TIME TRAINING

22  MS. DANG; AND THAT MS. DANG WAS NOT READY TO GO ON THE FLOOR

23  AFTER 2 WEEKS OF TRAINING FOR MANY REASONS.  MS. NG GAVE HER

24  OPINIONS THAT SOME OF THE REASONS WERE THAT MS. DANG PRETENDS

25  SHE UNDERSTANDS BUT DOESN'T; THAT MS. DANG DOES NOT LISTEN TO

1    THE TRAINER OR THE CUSTOMERS; THAT MS. DANG DID NOT WRITE

2    THINGS DOWN AS MS. NG SUGGESTED SO THAT MS. DANG COULD BRING

3    QUESTIONS TO MS. NG BEFORE MAKING MISTAKES; THAT MS. DANG

4    BROUGHT CUSTOMERS THE WRONG ORDERS BECAUSE OF THIS; THAT

5    MS. DANG QUIT TRYING TO LEARN THE BAR DRINKS WHEN GIVEN THE

6    CHANCE TO DO SO; THAT MS. DANG DOESN'T SAY WHEN SHE DOESN'T

7    UNDERSTAND WHAT A CUSTOMER WANTS; AND THAT MS. DANG DID NOT GET

8    ALONG WELL WITH HER COWORKERS.

9        "MS. NG GAVE HER PERCEPTION THAT MS. DANG HAD MORE VOIDS

10   THAN ANYONE ELSE HAD HAD IN THE PAST AND THAT IT TOOK LONGER

11   FOR MS. DANG TO LEARN THIS JOB THAN ANYONE IN ELSE IN THE PAST.

12   MS. NG FELT THAT OTHER FOOD SERVERS HAD TRIED TO HELP MS. DANG

13   WHEN ASKED.  MS. NG GAVE TWO EXAMPLES OF THE PROBLEMS STILL

14   OCCURRING.

15       MS. NG GAVE TWO EXAMPLES OF PROBLEMS STILL OCCURRING AND

16   THAT MS. DANG HAD HAD ANOTHER INCIDENT WITH A BARTENDER

17   RECENTLY IN FRONT OF CUSTOMERS RELATING TO ORDERING JACK

18   DANIELS WITH A MARGARITA AND WHEN SHE SHOULD KNOW BY NOW THAT

19   TEQUILA GOES INTO A MARGARITA, NOT JACK DANIELS, AND ANOTHER

20   SITUATION WITH ANOTHER EMPLOYEE WAS RELATED TO ASKING A PORTER

21   TO ORDER ALCOHOL AFTER THE LEGAL CUT OFF TIME."

22       DID YOU READ THAT PASSAGE, MR. ORTEGA?

23   A.   YES, I DID.

24   Q.   DID YOU DO THAT IN MAKING YOUR DECISION TO TERMINATE THIS

25   EMPLOYEE?

1    A.   YES, I DID.

2    Q.   I'D LIKE TO HAVE YOU TAKE A LOOK AT EXHIBIT 504, PLEASE.

3    TELL ME WHEN YOU'VE GOT IT.

4    A.   I HAVE IT.

5    Q.   ALL RIGHT.  LET'S IDENTIFY THIS.

6         FIRST OF ALL, THIS IS A REPORT FROM LILIBETH LICONA TO

7    NICK ORTEGA, THE FOOD AND BEVERAGE DIRECTOR; IS THAT RIGHT?

8    A.   YES.

9    Q.   AND THIS IS DATED SEPTEMBER 20TH, 2009?

10   A.   YES.

11   Q.   AND SHORTLY BEFORE YOU TERMINATED MS. DANG?

12   A.   YES.

13   Q.   AND HAD YOU READ AND CONSIDERED THIS REPORT BEFORE YOU

14   TERMINATED HER?

15   A.   YES.

16   Q.   AND BASED YOUR ACTIONS IN PART ON THIS?

17   A.   YES.

18        MR. MCMANIS:  ALL RIGHT.  MOVE THAT IN EVIDENCE,

19   AGAIN, WITH THE LIMITING INSTRUCTION, YOUR HONOR.

20        THE COURT:  ALL RIGHT.  IT CAN BE RECEIVED FOR

21   INDICATING THE INFORMATION THAT MR. WERNER HAD AT THE TIME HE

22   MADE THE DECISION AND TOOK THE ACTION, AND IT CANNOT BE

23   CONSIDERED FOR THE TRUTH OF THE STATEMENTS IN THEM, IN THE

24   LETTER.

25        (DEFENDANT'S EXHIBIT 504 WAS RECEIVED IN EVIDENCE.)

1              MR. MCMANIS:  WOULD YOU PUT THAT UP, CINDY?

2       Q.   NOW, WE SAW THIS IS A LETTER DATED DECEMBER 17TH, 2009

3       FROM MR. ORTEGA FROM LILIBETH LICONA.

4            IS SHE ALSO KNOWN AS BETH?

5       A.   YES.

6       Q.   AND WHAT IS BETH LICONA'S JOB AT BAY 101?

7       A.   SHE'S A BARTENDER.

8       Q.   AND MS. LICONA REPORTED TO MR. ORTEGA ON DECEMBER 17TH,

9       2009, "I'M WRITING THIS LETTER TO JUST INFORM YOU OF WHAT

10      HAPPENED SOME TIME LAST MONTH AT APPROXIMATELY PAST 11:00 P.M.

11      BETWEEN ME AND CUC DANG, 3224.

12           "SHE HAD A TICKET FOR A VIRGIN MARGARITA THAT NIGHT AND

13      THEN MADE ANOTHER ONE STATING 'SEE ME.'  I DID NOT MAKE HER

14      ORDER BECAUSE I WAS WAITING FOR HER, AND WHEN SHE CAME SHE SAID

15      THAT SHE WILL ORDER THE REGULAR MARGARITA INSTEAD OF THE

16      PREVIOUS ORDER.

17           "I TOLD HER THAT THE REGULAR HAS A DIFFERENT PRICE THAN

18      THE VIRGIN ONE.  SHE IN EXISTED THAT IT'S THE SAME, BUT I TOLD

19      HER THAT IT'S NOT.

20           'SHE WENT TO THE KITCHEN WITHOUT CLARIFYING WHAT MARGARITA

21      SHE WANTED, AND WHEN SHE CAME BACK, SHE WAS MAD BECAUSE I DID

22      NOT MAKE HER ORDER.

23           'I TOLD HER TO MAKE A TICKET FIRST FOR THE REGULAR

24      MARGARITA SO I COULD MAKE ONE INSTEAD OF THE VIRGIN MARGARITA.

25           "I CALLED THE SHIFT MANAGER MIKE WILSON AND TOLD HIM ABOUT

1    HER ORDER.  I EXPLAINED TO THE SHIFT MANAGER ABOUT THE MATTER

2    AND SHE TOLD MR. WILSON THAT I AM A LIAR.

3        "I WAS LOOKING FOR THE TICKET THAT SHE MADE, BUT I CANNOT

4    FIND IT ANYWHERE.  I PRESUMED SHE HAD IT WITH HER IF I'M NOT

5    MISTAKEN OR SHE DESTROYED IT.

6        "I JUST WANT TO EXPLAIN MY SIDE REGARDING THIS MATTER.

7        SINCERELY, LILIBETH LICONA, 3076."

8        ALL RIGHT.  NOW, IT'S BEEN SUGGESTED, MR. WERNER, THAT

9    AFTER THE INCIDENT OF OCTOBER 4, 2009, THAT BAY 101 JUST JUMPED

10   ON HER WITHOUT AN INVESTIGATION AND WHAT HAVE YOU.

11       AND I'D LIKE YOU NOW, PLEASE, TO TURN TO EXHIBIT 505, IF

12   YOU WOULD.

13   A.   YES.

14   Q.   AND CAN YOU IDENTIFY THAT, PLEASE?

15   A.   THIS WOULD BE THE STATEMENT OF LINDA ELIAS REGARDING THE

16   INCIDENT THAT OCCURRED ON OCTOBER 4TH AND 5TH.

17   Q.   ALL RIGHT.  BEFORE WE GET INTO THIS STATEMENT, I WANT TO

18   SET THE STAGE.

19       CAN YOU PUT UP THAT SCREEN SHOT UP ON THE SECURITY VIDEO,

20   PLEASE?

21       DO WE HAVE THIS MARKED AS AN EXHIBIT.  IT'S PART OF

22   ANOTHER EXHIBIT, I THINK.

23           MS. MCCLELLAN:  IT'S ONLY BEEN USED -- NEXT IN ORDER

24   WOULD BE 560.

25           MR. MCMANIS:  I'M GOING TO ASK THAT THIS BE MARKED,

```
 1        YOUR HONOR, 560 FOR IDENTIFICATION.

 2            I'LL HAVE THE WITNESS IDENTIFY IT.

 3                MS. NGUYEN:  NO OBJECTION.

 4                THE COURT:  JUST A SCREEN SHOT OF THE ONE?

 5                MR. MCMANIS:  YES.  I DON'T GET DOWN HERE THAT

 6    OFTEN.  DO I HAVE TO GIVE THIS TO THE CLERK TO MARK OR IS IT

 7    SUFFICIENT --

 8                THE COURT:  YOU CAN MARK IT.

 9                MR. MCMANIS:  I MAY MARK IT?

10                THE COURT:  YES.

11                MR. MCMANIS:  OH, THANK YOU.

12        WHAT WAS THAT NUMBER AGAIN?

13                MS. MCCLELLAN:  560.

14                MR. MCMANIS:  560, OKAY.

15        (DEFENDANT'S EXHIBIT 560 WAS MARKED FOR IDENTIFICATION.)

16                MR. MCMANIS:  MAY I APPROACH THE WITNESS, YOUR

17    HONOR?

18                THE COURT:  YES.

19    BY MR. MCMANIS:

20    Q.   I'M GOING TO SHOW YOU EXHIBIT 560 AND IT'S BEEN MARKED FOR

21    IDENTIFICATION.

22        AND COULD YOU TELL ME FROM LOOKING AT THE LEGEND FROM THE

23    BOTTOM OF THE PICTURE AND THE PICTURE GENERALLY WHAT THIS IS.

24    A.   THIS IS AN OVERVIEW OF THE -- FROM OUR SURVEILLANCE SYSTEM

25    OF THE PORTION OF APPROXIMATELY HALF OF THE POKER FLOOR FACING
```

1    FROM THE MAIN ENTRANCE, FROM WHAT WE CALL THE POKER ENTRANCE,

2    AND IT SHOWS PRIMARILY THE CAGE, THE BOARD, AND THE HIGH LIMIT

3    SECTION OF OUR POKER ROOM.

4    Q.   OKAY.  JUST -- LET'S GO BACK, IF I COULD QUICKLY, TO THAT

5    SCHEMATIC.

6         SO WHAT WE LOOKED AT WITH THAT EXHIBIT, 560 FOR

7    IDENTIFICATION, IS A PORTION OF THIS POKER AREA; IS THAT RIGHT?

8    A.   YES.

9    Q.   ALL RIGHT.  IF YOU WOULD GO BACK TO 560?

10        IS THIS -- WHAT CAN YOU TELL US FROM THE LEGEND AT THE

11   BOTTOM OF THAT PICTURE?

12   A.   I CAN -- FROM THIS I CAN TELL YOU WHICH SURVEILLANCE

13   SERVER IT'S ON, WHICH CAMERA IS BEING USED.  I CAN TELL YOU

14   THAT IT'S ON THE POKER FLOOR.  I CAN TELL YOU THAT IT'S THE

15   DATE AND TIME.  I CAN TELL YOU ALSO WHAT THE FRAME RATE OR

16   IMAGES PER SECOND IS AND THE AMOUNT OF STORAGE THAT IT IS

17   USING.

18   Q.   HOW MANY SERVERS OR SURVEILLANCE CAMERAS DOES THE CLUB

19   HAVE ON THE FLOOR AS A PART OF ITS OPERATION?

20   A.   WELL, WE PREFER TO KEEP THE TOTAL NUMBER CONFIDENTIAL, BUT

21   WE HAVE --

22   Q.   WELL, I DON'T WANT TO INTRUDE.  IS IT MORE THAN ONE?

23   A.   IT'S OVER 100.

24   Q.   OVER 100?

25   A.   MORE THAN 200.

1    Q.   OKAY.  NOW, JUST SO THAT WE DON'T THINK THAT I HAVE BIG

2    BROTHER HERE ON THE STAND OR SOMETHING, COULD YOU TELL ME,

3    PLEASE, WHY IS IT THAT YOU HAVE ALL OF THESE 200 PLUS CAMERAS

4    SURVEILLING ALL OF THESE AREAS OF THE CLUB?

5    A.   WE'RE REQUIRED BY THE STATE OF CALIFORNIA AND THE CITY OF

6    SAN JOSE TO HAVE CAMERA COVERAGE OF ALL PORTIONS OF THE CARD

7    ROOM, ALL PORTIONS OF THE CARD ROOM.

8    Q.   ALL RIGHT.

9    A.   AND SPECIFIC REQUIREMENTS FOR THE GAMING FLOOR.

10   Q.   SO IF YOU WANT TO HAVE A CARD CLUB IN SAN JOSE, YOU HAVE

11   TO HAVE THIS SURVEILLANCE SYSTEM?

12   A.   THAT'S CORRECT.

13   Q.   ALL RIGHT.  AND DO THE POLICE OCCASIONALLY WANT TO SEE THE

14   FILM?

15   A.   NOT ONLY DO THEY WANT TO SEE IT, THEY HAVE THEIR OWN

16   PORTION OF OUR SYSTEM AT THE POLICE STATION IN A VIEWING

17   STATION SEPARATE JUST FOR THEM AT OUR CARD ROOM.

18   Q.   AND SO SOME OFFICER DOWN AT THE SAN JOSE POLICE DEPARTMENT

19   HEADQUARTERS COULD ACTUALLY VIEW THAT IF HE WANTED?

20   A.   YES.

21   Q.   ALL RIGHT.  AND I THINK YOU TOLD US THAT YOU CAN TELL THE

22   DATE OF THIS PARTICULAR SHOT.

23        WHAT IS THE DATE?

24   A.   IT'S THE 4TH OF OCTOBER, 2009.

25   Q.   AND WHAT IS THE TIME?

1    A.   THE TIME IS 23:48 MINUTES AND 56 SECONDS.  SO 11:48 P.M.

2    ROUGHLY.

3    Q.   AND 56 SECONDS.  I GUESS IT'S ALMOST 11:49?

4    A.   ALMOST.

5    Q.   ELEVEN MINUTES BEFORE MIDNIGHT?

6    A.   ROUGHLY.

7    Q.   ALL RIGHT.  AND CAN YOU TELL US IF THIS WAS PART OF THE

8    SURVEILLANCE VIDEO THAT WAS EXAMINED IN DISCIPLINING MS. DANG?

9    A.   YES, IT WAS.

10        MR. MCMANIS:  ALL RIGHT.  I'LL MOVE THAT INTO

11   EVIDENCE, PLEASE.

12        THE COURT:  I'M SORRY.  THE SCREEN SHOT?

13        MR. MCMANIS:  YES, 560.

14        THE COURT:  ALL RIGHT.  IT'S ADMITTED.

15   (DEFENDANT'S EXHIBIT 560 WAS RECEIVED IN EVIDENCE.)

16        MR. MCMANIS:  THANK YOU.

17   Q.   NOW, WHEN YOU REVIEWED THE INCIDENT OF OCTOBER 4TH, '09,

18   THE DISCIPLINE, THE SUSPENSION, MINDFUL OF THE MEDIATION THAT

19   THE UNION HAD ARRANGED WITH THE FEDERAL MEDIATOR, ET CETERA, ET

20   CETERA, DID YOU DETERMINE WHETHER YOUR MANAGEMENT PEOPLE HAD,

21   IN FACT, LOOKED AT THIS VIDEO?

22   A.   YES.

23   Q.   AND WHO SPECIFICALLY EXAMINED IT?

24   A.   IT WOULD HAVE BEEN NICK ORTEGA AND JENNIFER GILBERT, AND

25   SURVEILLANCE PERSONNEL AS WELL.

1    Q.   ALL RIGHT.  I'M NOW GOING TO ASK -- AND DID YOU DETERMINE

2    THAT THEY TOOK STATEMENTS, OR GOT STATEMENTS I SHOULD SAY, FROM

3    THE INVOLVED PEOPLE?

4    A.   YES.

5    Q.   ALL RIGHT.  AND I'M GOING TO ASK YOU, PLEASE, TO LOOK AT

6    EXHIBIT 505.

7    A.   OKAY.

8    Q.   AND CAN YOU IDENTIFY THIS STATEMENT FOR THE RECORD,

9    PLEASE.

10   A.   THIS WOULD BE MS. ELIAS'S, LINDA ELIAS'S STATEMENT

11   REGARDING HER INTERACTION WITH -- OR REGARDING THE INCIDENT.

12   Q.   ALL RIGHT.  AND WHAT IS THE DATE OF THAT?

13   A.   OCTOBER 6TH, 2009.

14   Q.   AND WAS THAT SOMETHING THAT YOU REVIEWED AND CONSIDERED

15   BEFORE TERMINATING MS. DANG?

16   A.   YES.

17            MR. MCMANIS:  I'LL MOVE THAT IN EVIDENCE WITH THAT

18   LIMITED PURPOSE THAT WE HAVE HAD, YOUR HONOR.

19            THE COURT:  ALL RIGHT.  AGAIN, IT CAN BE CONSIDERED

20   FOR INFORMATION THAT MR. WERNER HAD AT THE TIME HE MADE HIS

21   DECISIONS.

22       IT CANNOT BE CONSIDERED FOR WHETHER OR NOT THE STATEMENTS

23   MADE BY MS. ELIAS ARE TRUE.

24       (DEFENDANT'S EXHIBIT 505 WAS RECEIVED IN EVIDENCE.)

25            MR. MCMANIS:  WOULD YOU PUT UP EXHIBIT 505, PLEASE,

1    SUBJECT TO THAT LIMITATION, AND BLOW IT UP IF YOU WOULD,

2    PLEASE, CINDY?

3    Q.   ALL RIGHT.  NOW, AGAIN, JUST SO WE'RE CLEAR, LINDA ELIAS,

4    3332, THAT'S HER EMPLOYEE NUMBER?

5    A.   YES.

6    Q.   AND IT'S DATED OCTOBER 6TH, 2009, A COUPLE OF DAYS AFTER

7    THE INCIDENT?

8    A.   WELL, YES.

9    Q.   OKAY.  AND IT APPEARS TO BE SIGNED?

10   A.   YES.

11   Q.   IT REFERS TO OCTOBER 4TH, 2009.  AROUND MIDNIGHT ON TABLE

12   31, SEAT 1, A CUSTOMER CALLED ME OVER AND HE WANTED TO ORDER A

13   REMY WITH A SODA BACK, AND WHEN I RETURNED WITH HIS DRINK HE

14   THANKED ME BECAUSE CUC HAD SERVED HIM THE WRONG DRINK, A DOUBLE

15   JIM BEAM WHEN HE WANTED A REMY.  I ASSURED HIM THAT I WOULD

16   RETURN THE DRINK AND GIVE HIM HIS MONEY BACK.

17        I WENT UP TO CUC AND TOLD HER THE PROBLEM AND IT WAS OKAY

18   TO KEEP THE TIP AND RETURNED THE MONEY FOR THE DRINK TO HIM.

19   SHE WAS VERY UPSET AND STARTED YELLING AT ME IN THE KITCHEN.

20        AFTER I RETURNED THE MONEY, CUC WENT TO THE CUSTOMER AND

21   CREATED A SCENE.  SHE TOLD HIM IT WAS HIS FAULT AND SHE SHOWED

22   HIM THE LIST OF DRINKS THAT SHE HAD HANDWRITTEN.

23        I THEN APPROACHED CUC AND THE CUSTOMER AND ASSURED HIM

24   THAT EVERYTHING WAS TAKEN CARE OF.

25        SHE THEN TURNED AND BEGAN TO YELL AT ME ON THE FLOOR.

1          ARLENE FONTILLAS, 881, WAS PLAYING ON THE NEXT TABLE AND

2     WAS WITNESS TO THE INCIDENT.

3          IS THAT HER NUMBER, 881, ARLENE FONTILLAS?

4     A.   I BELIEVE IT IS.

5     Q.   AND WHAT IS HER JOB AT BAY 101?

6     A.   SHE'S ALSO A FOOD SERVER AND WAS A TRAINER AS WELL.

7     Q.   OKAY.  AND WHEN IT SAYS IS THAT ARLENE FONTILLAS WAS

8     PLAYING ON THE NEXT TABLE AND WAS WITNESS TO THE INCIDENT, ARE

9     STAFF PERMITTED TO PLAY CARDS AT THE CLUB?

10    A.   WHEN THEY'RE OFF DUTY.

11    Q.   ALL RIGHT.  SO WHEN THEY FINISH THEIR SHIFT, THEY CAN SIT

12    DOWN AND PLAY THEMSELVES?

13    A.   FOR A WHILE, YES.

14    Q.   ALL RIGHT.  CUC WENT TO THE KITCHEN AND STARTED YELLING AT

15    KEN MEAKCHAROON -- I DON'T KNOW IF THIS IS MR. MENUDO OR NOT --

16    BUT KEN MEAKCHAROON, THAT'S HIS NUMBER, 2833?

17    A.   I BELIEVE SO.

18    Q.   KEN TOLD HER IF SHE DIDN'T QUIT YELLING HE WOULD SEND HER

19    HOME.  I TOLD KEN SHE WAS YELLING ON THE FLOOR.  SHE CONTINUED

20    YELLING AT KEN AND SO FORTH AND SO ON.

21         ALL I WAS TRYING TO DO WAS DIFFUSE THE SITUATION.

22         ALL RIGHT.  I'D LIKE YOU TO NOW TURN TO EXHIBIT 506,

23    PLEASE.

24    A.   605?

25    Q.   506.  DO YOU HAVE THAT?

1    A.   YES.

2    Q.   ALL RIGHT.  JUST AGAIN TO IDENTIFY IT, IS THIS A

3    HANDWRITTEN STATEMENT?

4    A.   YES.

5    Q.   AND DATED?

6    A.   OCTOBER 7TH, 2009.

7    Q.   AND SUBMITTED BY WHOM?

8    A.   ARLENE FONTILLAS, ID 881.

9    Q.   ALL RIGHT.  AND THIS IS THE PERSON REFERENCED IN

10   LINDA ELIAS'S STATEMENT?

11   A.   YES.

12   Q.   AND DID YOU RECEIVE AND READ THIS BEFORE TERMINATING

13   MS. DANG?

14   A.   I DID.

15   Q.   AND DID THAT INFORM YOUR DECISION IN DOING SO?

16   A.   IT HELPED.

17          MR. MCMANIS:  ALL RIGHT.  I'M GOING TO MOVE THIS IN

18   ALSO FOR THE LIMITED PURPOSE, YOUR HONOR.

19          THE COURT:  ALL RIGHT.  506 MAY BE RECEIVED AGAIN

20   WITH THE SAME LIMITING INSTRUCTION.

21      (DEFENDANT'S EXHIBIT 506 WAS RECEIVED IN EVIDENCE.)

22   BY MR. MCMANIS:

23   Q.   OKAY.  AND IF YOU WOULD LOOK AT EXHIBIT 528, PLEASE.  TELL

24   ME WHEN YOU HAVE IT BEFORE YOU.

25   A.   YES.

1    Q.   IS THIS ANOTHER STATEMENT CONCERNING THIS INCIDENT?

2    A.   YES.

3    Q.   AND WHAT IS THE DATE OF THIS STATEMENT?

4    A.   OCTOBER 8TH, 2009.

5    Q.   ALL RIGHT.  AND WHO IS THIS STATEMENT GIVEN BY?

6    A.   WELL, IT SAYS PHONGPHUN MEAKCHAROON, BUT WE CALL HIM KEN.

7    HE'S A CHEF IN THE KITCHEN.

8    Q.   ALL RIGHT.  AND THIS IS HIS REPORT OF WHAT HAPPENED THAT

9    NIGHT INVOLVING CUC DANG AND SO FORTH AND SO ON; IS THAT RIGHT?

10   A.   YES.

11   Q.   AND DID YOU READ THIS BEFORE YOU TERMINATED HER?

12   A.   YES.

13   Q.   AND DID THIS INFORM YOUR DECISION IN PART AND IN THE

14   ACTION YOU TOOK?

15   A.   YES.

16        MR. MCMANIS:  I'LL MOVE THAT IN ALSO, YOUR HONOR,

17   WITH THE LIMITING INSTRUCTION.

18        THE COURT:  ALL RIGHT.  IT WILL BE RECEIVED WITH THE

19   SAME LIMITATION.

20        MR. MCMANIS:  THANK YOU.

21   (DEFENDANT'S EXHIBIT 528 WAS RECEIVED IN EVIDENCE.)

22   BY MR. MCMANIS:

23   Q.   NOW, TO YOUR KNOWLEDGE, MR. WERNER, I THINK -- UNLESS I'M

24   MISTAKEN, MS. EDMAN INTERVIEWED MR. MEAKCHAROON AS WELL, AND

25   I'M GOING TO ASK YOU TO TURN BACK TO EXHIBIT 500.

```
 1        HE WAS THE ELEVENTH WITNESS INTERVIEWED AND HIS INTERVIEW

 2    APPEARS AT PAGE 47.

 3        IF WE CAN TURN TO PAGE 47, PLEASE?  AND, CINDY, WOULD YOU

 4    PUT THAT UP ON THE SCREEN?

 5        NOW, THIS IS MR. MEAKCHAROON'S INTERVIEW.  AGAIN, WE HAVE

 6    HEADINGS AND MS. DANG'S ALLEGATION THAT THERE WAS NO

 7    INVESTIGATION OF THE OCTOBER 4TH, '09 COMPLAINT.

 8        WE HAVE SEEN THE THREE STATEMENTS.

 9        YOU'VE TOLD US THAT THE TAPE WAS REVIEWED --

10            THE COURT:  LET'S NOT TESTIFY YOURSELF.

11            MR. MCMANIS:  I KNOW, YOUR HONOR.  I APOLOGIZE.

12    Q.  NOW, THIS SUMMARY, FROM READING FROM THE REPORT, HE HEARD

13    MS. DANG COME INTO THE KITCHEN TALKING LOUDLY AND CUSSING AND

14    AN ARGUMENT BETWEEN MS. DANG AND MS. ELIAS.

15        MR. MEAKCHAROON'S STATEMENTS WERE CONSISTENT WITH THE FILE

16    MEMO ABOUT THE ACCOUNT AND THAT INCLUDED MORE DETAILS ABOUT

17    MS. DANG'S COMMENTS.  WHEN ASKED HE STATED, QUOTE, "MS. DANG

18    STATED THIS IS F...ING B...S..."  AND SHE HAS WHOLE WORDS.

19        I SAID, CALM DOWN.  SHE WAS TRYING TO EXPLAIN.  SOMETIMES

20    SHE'S VERY HARD TO UNDERSTAND.  LEARNED SHE HAD AN ARGUMENT

21    WITH LINDA.  LINDA WAS BEHIND HER.  CUC KEPT YELLING AND WAS

22    MAD AND F...ING B...S....  I SAID I CAN'T HAVE THAT ATTITUDE.

23    I SAID, I'M THE REFERRE, NOT THE JUDGE.

24        NICK WILL BE HERE IN THE MORNING.  IT'S HIS DECISION.

25    RIGHT NOW YOU HAVE TO CALM DOWN OR NO CHOICE BUT TO SEND YOU
```

1      HOME.

2          SO THAT WAS MR. MEAKCHAROON'S STATEMENT GIVEN TO THE

3      INVESTIGATOR; IS THAT RIGHT?

4      A.   YES.

5      Q.   NOW, WOULD YOU TURN TO PAGE 523, PLEASE?

6          DID I SAY PAGE 523 OR EXHIBIT 523?

7      A.   YOU SAID PAGE 523, BUT I UNDERSTOOD EXHIBIT.

8      Q.   IT'S OKAY.  I MISSPOKE.  EXHIBIT 523.

9      A.   I HAVE IT.

10     Q.   OKAY.  THANK YOU.

11         CAN YOU IDENTIFY WHAT THIS REPRESENTS?  THIS IS A PAGE

12     FROM SOMETHING, I BELIEVE.

13     A.   THIS IS THE TABLE OF CONTENTS FOR OUR EMPLOYEE MANUAL

14     EFFECTIVE AUGUST 2008.

15     Q.   WELL, I'M LOOKING AT PAGE 43 OF 56.  IS THAT IN THERE?

16     A.   43 OF 56?

17     Q.   YOU'VE GOT THE WHOLE MANUAL?

18     A.   I'VE GOT THE WHOLE MANUAL.

19     Q.   AND WOULD YOU LOOK AT PAGE 43 OF 56?  IT'S BATES STAMPED

20     1963?

21     A.   YES.

22     Q.   NOW, THIS IS HEADED --

23         IS THIS IN EVIDENCE?

24             MS. MCCLELLAN:  IT IS.

25             MS. NGUYEN:  YES.

1      MR. MCMANIS:  ALL RIGHT.  WELL, LET'S PUT IT UP ON

2   THE SCREEN, PLEASE.

3        AND IF YOU'LL BLOW IT UP, CINDY.

4   Q.   MAJOR RULES, DISCIPLINARY PROCEDURE.  VIOLATION OF THE

5   FOLLOWING RULES CAN RESULT IN EITHER DISCHARGE OR SUSPENSION.

6        AND IT GOES ON TO EXPLAIN IT'S BASED ON THE SEVERITY OF

7   THE VIOLATION.  BAY 101 HAS A RIGHT TO INVESTIGATE, IS UNDER NO

8   OBLIGATION TO NOTIFY THE EMPLOYEE UNTIL IT'S COMPLETED;

9   RESERVES THE RIGHT TO REDUCE THE LEVEL OF DISCIPLINARY ACTION

10  AND SO FORTH AND SO ON.

11       LET'S GO DOWN.  THESE ARE THE ITEMS THAT, UNDER THIS

12  MANUAL, WOULD ENTITLE BAY 101 TO EITHER SUSPEND AN EMPLOYEE OR

13  DISCHARGE AN EMPLOYEE; IS THAT RIGHT?

14  A.   YES.

15  Q.   AND LET'S GO DOWN TO NUMBER 8.

16       COULD YOU BLOW THAT UP, PLEASE?

17       "HARASSING, THREATENING, INTIMIDATING, OR COERCING ANOTHER

18  EMPLOYEE OR CUSTOMER WHILE ON OR OFF DUTY."

19       DO YOU SEE THAT, MR. WERNER?

20  A.   YES, I DO.

21  Q.   AND DID YOU THINK THAT THAT DID OR DID NOT APPLY TO THE

22  INCIDENT OF OCTOBER 4TH?

23  A.   I THOUGHT IT APPLIED TO THE INCIDENT ON OCTOBER 4TH.

24  Q.   ALL RIGHT. NOW, MR. WERNER, WAS MS. DANG EVER CONSIDERED

25  FOR TERMINATION BEFORE DECEMBER 20, 2009?

1    A.   YES.

2    Q.   AND HOW DO YOU KNOW THAT?

3    A.   BECAUSE I WAS INVOLVED IN A CONVERSATION WITH

4    JOHN ST. CROIX.

5    Q.   AND MR. ST. CROIX WAS THE FOOD AND BEVERAGE MANAGER AND

6    EXECUTIVE CHEF UNTIL HE PASSED AWAY IN NOVEMBER 2007?

7    A.   YES.

8    Q.   AND HE WAS MS. DANG'S SUPERVISOR?

9    A.   YES.

10   Q.   AND WHAT DID MR. ST. CROIX TELL YOU -- AND AGAIN, I'M

11   ASKING THIS TO OFFER AN EXPLANATION FOR WHAT YOU WERE GIVEN

12   ABOUT HER EMPLOYMENT?

13   A.   MR. ST. CROIX HAD A COUPLE OF CONCERNS PRIMARILY RELATED

14   TO HER ATTENDANCE ISSUES.  HE WAS ALSO CONCERNED WITH LANGUAGE

15   IN THE WORKPLACE, SPECIFICALLY CURSING, AND WHAT I THOUGHT WAS

16   SOME INABILITY TO GET ALONG WITH HER COWORKERS.

17   Q.   OKAY.  WELL, LET'S EXAMINE THOSE.

18        FIRST, ATTENDANCE ISSUES, ABSENTEEISM AND WHAT HAVE YOU.

19   WHEN DID MR. ST. CROIX TELL YOU THAT THOSE HAD OCCURRED?

20   A.   AT THE TIME OF THE CONVERSATION, I BELIEVE, AROUND THAT

21   TIME.

22   Q.   OKAY.  DO YOU RECALL WHETHER HIS CONCERN ABOUT THESE

23   ISSUES AND HIS CONTEMPLATION OF TERMINATING HER OCCURRED BEFORE

24   OR AFTER SHE MADE HER COMPLAINT ABOUT LUCIO SUAREZ IN APRIL OF

25   2007?

1    A.   I THINK THEY WERE BEFORE.

2    Q.   OKAY.  AND WITH RESPECT TO THE CURSING AND WHAT HAVE YOU,

3    WHAT DO YOU RECALL THAT HE TOLD YOU ABOUT THAT?

4    A.   THAT SHE FREQUENTLY CURSED AT HER COWORKER, MS. HUYNH,

5    ANH HUYNH, MAMA AHN.

6    Q.   NOW, DO YOU RECALL WHAT IT WAS THAT HE REPORTED TO YOU

7    ABOUT CURSING MAMA AHN WITH RESPECT TO MAKING VIETNAMESE SOUP?

8    A.   YEAH, THAT THEY HAD AN ARGUMENT OVER HOW TO MAKE

9    VIETNAMESE SOUP.  THE RECIPE THAT WAS SUPPOSED TO BE FOLLOWED

10   WAS THE RECIPE THAT MAMA ANH HAD.  SHE WAS THE VIETNAMESE COOK,

11   BUT MS. NGUYEN APPARENTLY HAD HER --

12   Q.   MS. DANG?

13   A.   I'M SORRY.  APPARENTLY MS. DANG HAD HER OWN RECIPE THAT

14   SHE PREFERRED TO FOLLOW AND THAT CAUSED AN ARGUMENT BETWEEN THE

15   TWO OF THEM.

16   Q.   WAS THERE SOME COMPLAINT ABOUT HER RECIPE?

17   A.   I HAD SEVERAL COMPLAINTS FROM EMPLOYEES AND CUSTOMERS

18   ABOUT THE BROTH IN THE VIETNAMESE SOUPS ON MS. DANG'S SHIFT.

19   Q.   AND WHAT WAS WRONG WITH IT?

20   A.   IT TASTED LIKE WATER.

21   Q.   NOW, DO YOU KNOW WHY MR. ST. CROIX DID NOT TERMINATE

22   MS. DANG IN JANUARY AND FEBRUARY, WHENEVER IT WAS, BEFORE HER

23   COMPLAINT OF APRIL 2007?

24   A.   I DON'T KNOW WHY HE MADE THAT DECISION.  OUR DISCUSSION

25   REVOLVED AROUND HIS DESIRE TO TERMINATE HER.

1        I ASKED HIM IF HE HAD -- IF HE FELT THAT HE HAD GIVEN HER

2    EVERY OPPORTUNITY TO IMPROVE HER WORK PERFORMANCE, IF SHE HAD

3    BEEN COUNSELLED ABOUT THE CURSING AND HER RELATIONSHIP WITH HER

4    COWORKERS.

5        BUT I DON'T KNOW WHY HE MADE HIS DECISION.

6    Q.   LET'S GO UP -- MY QUESTION -- I STARTED OUT THIS PART OF

7    THE EXAMINATION BY ASKING IF THERE HAD BEEN ANY CONSIDERATION

8    OF TERMINATING HER BEFORE DECEMBER 21, 2009.

9        LET'S FAST FORWARD TO THE INCIDENT OF OCTOBER 2009.

10       WE HAVE SEEN THAT THAT, UNDER THE MANUAL, IS GROUNDS FOR

11   DISCHARGE.

12       DID YOU CONSIDER DISCHARGING HER ON THAT OCCASION?

13   A.   FOR THE OCTOBER 24TH INCIDENT?

14   Q.   YES.

15   A.   I CONSIDERED IT, YES.

16   Q.   AND WHY IS THAT?

17   A.   WELL NOT TO SECOND GUESS MR. ORTEGA AND MS. GILBERT,

18   MR. ORTEGA AND MS. GILBERT, I FELT THAT THAT WAS INEXCUSABLE

19   AND INAPPROPRIATE, NOT TO ARGUE WITH A FELLOW WORKER OR

20   ESPECIALLY AN EMPLOYEE ON THE FLOOR.

21   Q.   OKAY.

22   A.   IT SET A BAD EXAMPLE.

23   Q.   AND WHAT ABOUT THE CUSTOMER?

24   A.   AND THE CUSTOMER.  I'M SORRY, AND A CUSTOMER, TOO.  I

25   MISSPOKE.  AND THE CUSTOMER WITH THE EMPLOYEE ON THE FLOOR.

1    Q.   AND HOW ABOUT WHEN SHE WALKED OUT OF THE MEDIATION THAT

2    THE UNION AND THE FEDERAL MEDIATOR HAD ARRANGED?  DID THAT --

3    HAD THAT THOUGHT OCCURRED TO YOU ABOUT TERMINATION IN THAT

4    CONTEXT?

5    A.   IT DID.  I THOUGHT THAT THAT'S AN INSTANCE OF HER WALKING

6    OFF THE JOB.  THAT'S PART OF HER JOB WAS TO ATTEND THAT

7    MEDIATION.

8         AND I WAS UNHAPPY WITH THAT, BUT IT WAS MY DECISION THAT,

9    YOU KNOW, THE UNION GRIEVANCE AND HER WORKPLACE PERFORMANCE

10   SHOULD BE TREATED SEPARATELY AND I THOUGHT THAT THAT, YOU

11   KNOW -- I THOUGHT I COULD UNDERSTAND HER BEING UPSET IF THAT

12   WAS NOT GOING HER WAY.

13        IT DIDN'T EXCUSE IT, BUT I COULD UNDERSTAND IT.

14   Q.   ALL RIGHT.  IN ANY EVENT, SHE WASN'T TERMINATED EITHER

15   EARLIER BY MR. ST. CROIX OR AROUND THE TIME OF THE INCIDENT AND

16   THE MEDIATION BY YOU; IS THAT RIGHT?

17   A.   THAT'S CORRECT.

18   Q.   OKAY.  NOW, I THINK YOU TESTIFIED THAT WHEN SHE WAS

19   TERMINATED, YOU FEDEX'D THE NOTICE OF TERMINATION WITH HER

20   FINAL CHECK TO HER; IS THAT RIGHT?

21   A.   FEDEX'D OR OVERNIGHT MAIL, I BELIEVE, YES.

22   Q.   SOME METHOD DESIGNED TO GET THAT INFORMATION AND THE CHECK

23   TO HER THE NEXT DAY?

24   A.   YES.

25   Q.   ALL RIGHT.  DO YOU KNOW IF THERE ARE ANY REQUIREMENTS

1    UNDER THE LAW WHEN YOU TERMINATE AN EMPLOYEE TO BE SURE THAT

2    THEY GET PAID PROMPTLY?

3    A.   YES.

4    Q.   AND WHAT IS THE -- YOUR UNDERSTANDING ABOUT THAT?

5    A.   AT THE TIME OF THEIR TERMINATION, THE EMPLOYER IS TO

6    PROVIDE THEM WITH ANY PAY THAT IS DUE TO THEM AND ANY ACCRUED

7    VACATION, AND IF THEY -- IF YOU PAY SICK, THEN YOU'RE SUPPOSED

8    TO PAY THE SICK AS WELL AND OTHER BENEFITS THAT ARE DUE.

9        YOU'RE ALSO SUPPOSED TO PROVIDE SOME NOTICE REGARDING

10   THEIR ABILITY TO DO -- THEIR RIGHT TO GO SEEK UNEMPLOYMENT

11   BENEFITS, AS WELL AS PROVIDING, IF YOU HAVE IT, COBRA COVERAGE.

12   Q.   NOW, I THINK THE REPORT THAT MS. EDMAN DID AND SUBMITTED

13   TO YOU AND YOU READ AND RELIED ON IN YOUR APPROACH SUGGESTED

14   THREE THINGS:

15       ONE, SOME BANTERING AS IT WAS CALLED --

16           MS. NGUYEN:  YOUR HONOR, LEADING.

17           THE COURT:  SUSTAINED.

18   BY MR. MCMANIS:

19   Q.   DO YOU RECALL THE THREE THINGS THAT THE REPORT

20   RECOMMENDED?

21   A.   I DO.

22   Q.   AND WHAT IS THE FIRST ONE?

23   A.   WELL, THERE'S THE ISSUE OF BANTERING BETWEEN A SUPERVISOR

24   AND AN EMPLOYEE, SPECIFICALLY MAMA ANH AND NICK ORTEGA.

25       THERE'S A CONCERN STATED ABOUT THE CONFUSION THAT MAY BE

1        CREATED ABOUT THE TRANSFER POLICY.

2            AND THEN THERE'S A RECOMMENDATION REGARDING MS. DANG'S JOB

3        PERFORMANCE.

4        Q.   UH-HUH.  AND WHAT DID BAY 101 DO WITH RESPECT TO ITEM 1,

5        THE BACK AND FORTH BETWEEN MAMA ANH AND MR. ORTEGA?

6        A.   THEY WERE BOTH COUNSELLED AND TOLD IT WASN'T APPROPRIATE

7        FOR THE WORKPLACE AND INSTRUCTED TO STOP IT.

8        Q.   AND THE CIRCUMSTANCES OF THAT BANTERING AND MAMA ANH AND

9        MR. ORTEGA BACK AND FORTH WERE DISCUSSED BY THE INVESTIGATOR?

10       A.   YES.

11       Q.   ALL RIGHT.  NOW, THE SECOND POINT, THE ISSUE OF

12       TRANSFERRING, WHAT DID YOU UNDERSTAND THE INVESTIGATOR

13       RECOMMENDED WITH RESPECT TO THAT?

14       A.   WELL, THAT SHE RECOMMENDED CLARIFYING THE PROCEDURES FOR

15       WHEN A PERSON COULD SEEK A TRANSFER AND THE STEPS TO BE TAKEN

16       IN OBTAINING A TRANSFER.

17           SHE WAS CONCERNED -- I THINK THE CONCERN, AT LEAST MY

18       CONCERN WAS THAT IT WASN'T CLEAR TO PEOPLE WHEN THEY COULD

19       APPLY FOR A TRANSFER OR WHEN A TRANSFER WOULD BE GRANTED.

20           AND WE TOOK STEPS TO CHANGE THAT POLICY TO CLARIFY IT SO

21       THAT -- WELL, THE JOB HAD TO BE AVAILABLE, ONE, AND IT HAD TO

22       BE POSTED BEFORE A PERSON COULD APPLY FOR IT.

23           THERE'S A WRITTEN PROCEDURE TO APPLY FOR THE POLICY.

24       TRANSFER IS APPROVED BY BOTH THE OUTGOING SUPERVISOR AND THE

25       INCOMING SUPERVISOR, AND THAT ALL OF THE TRANSFERS WERE ROUTED

1     AND MAINTAINED THROUGH THE HUMAN RESOURCES DEPARTMENT SO THAT

2     THE NECESSARY EMPLOYMENT STEPS, AS WELL AS WORK PERMIT STEPS

3     COULD BE TAKEN TO MAKE SURE WE HAD ADEQUATE RECORDS TO SUPPORT

4     THE TRANSFER.

5     Q.   AND THEN THE FINAL -- SO THAT WAS IMPLEMENTED?

6     A.   YES.

7     Q.   AND THEN THE FINAL COMMENT THAT THE INVESTIGATOR MADE WAS

8     THAT -- SUGGESTING A TRAINING PERIOD, EVALUATION OF PERFORMANCE

9     AND WHAT HAVE YOU; IS THAT RIGHT?

10    A.   YES, AND ALSO PART OF THE FIRST STEP I THINK SHE SUGGESTED

11    WE DO SOME SUPERVISOR TRAINING FOR NICK ORTEGA, WHICH WE ALSO

12    DID.

13    Q.   OKAY.

14    A.   BUT THE THIRD STEP WAS PROVIDE SOME TRAINING FOR MS. DANG

15    SO THAT SHE UNDERSTOOD HER JOB.

16    Q.   OKAY.  AND THE PURPOSE OF THE MEETING THAT SHE WAS TO HAVE

17    WITH MR. SHAW, MS. GILBERT AND MR. ORTEGA WAS WHAT?

18    A.   ONE, TO INFORM HER OF THE RESULTS OF THE REPORT; AND TWO,

19    TO INFORM HER OF THE TRAINING PROGRAM THAT WAS GOING TO BE

20    IMPLEMENTED TO ASSIST HER IN SUCCEEDING AT HER JOB AT BAY 101.

21    Q.   OKAY.  THIS WAS THE INVESTIGATION THAT BAY 101 HAD

22    UNDERTAKEN IN RESPONSE TO HER DEMAND OF OCTOBER?

23    A.   YES.

24    Q.   WHY WAS IT SCHEDULED FOR 7:00 A.M. WHEN SHE WAS GOING OFF

25    SHIFT?

1    A.   MOST OF OUR WORKERS MAKE THEIR LIVING FROM THE TIPS THAT

2    THEY RECEIVE, NOT FROM THE WAGE THAT THEY'RE PAID BY THE

3    EMPLOYER.

4         MS. DANG IS ONE OF THOSE EMPLOYEES.  HER MAIN INCOME COMES

5    FROM HER TIPS.

6         WE TYPICALLY SCHEDULE MEETINGS WITH OUR TIPPED EMPLOYEES

7    TOWARDS THE END OF THEIR SHIFT OR AFTER THEIR SHIFT IS OVER SO

8    THAT THEY DO NOT LOSE OUT OF THEIR INCOME POTENTIAL DURING THE

9    SHIFT TIME.

10        OVER THE YEARS OTHER EMPLOYEES HAD COMPLAINED THAT BEING

11   COUNSELLED DURING THE MIDDLE OF THEIR SHIFT CREATED A HARDSHIP

12   NOT ONLY BECAUSE OF THE COUNSELLING, BUT BECAUSE THEY

13   WEREN'T -- THEY WERE TOO NERVOUS TO WORK AFTERWARDS SOMETIMES.

14        BUT ALSO IT INTERFERED WITH THEIR ABILITY TO EARN THEIR

15   TIPS WHEN THEY'RE AT WORK, AND THEIR PREFERENCE WAS TO DO THE

16   COUNSELLING AT THE END OF THE SHIFT.

17        SO THAT BECAME OUR POLICY OR PRACTICE.

18   Q.   AND WHAT WAS REPORTED TO YOU ABOUT MS. DANG'S RESPONSE TO

19   THE REQUEST THAT SHE MEET WITH MANAGEMENT AT THE END OF HER

20   SHIFT?

21   A.   WELL, WHAT WAS REPORTED TO ME WAS THAT HER HUSBAND CALLED

22   AND SAID SHE WOULDN'T BE ATTENDING ANY MEETING UNLESS HE WAS

23   PRESENT.

24   Q.   AND DID YOU HAVE ANY INFORMATION AS TO WHETHER ANYONE HAD

25   ATTEMPTED TO MOVE THE MEETING UP SO THAT SHE COULD DO IT BEFORE

1    HER SHIFT ENDED IF THAT WAS HER DESIRE?

2    A.   I WAS TOLD THAT NICK WAS IN THE PROCESS OF DOING THAT WHEN

3    MR. SUMMERS CALLED HIM.

4    Q.   OKAY.  AND HE SAID SHE'S NOT COMING?

5    A.   YES.

6    Q.   I THINK YOU MENTIONED IN YOUR TESTIMONY THAT YOU KNEW

7    MR. SUMMERS, OR KNEW OF HIM?

8    A.   I HAD MET HIM ON A COUPLE OF OCCASIONS ON THE CARD ROOM

9    FLOOR, SO I KNEW HIM AS A PLAYER.  I DIDN'T REALIZE INITIALLY

10   THAT HE HAD A RELATIONSHIP WITH MS. DANG, AND I THINK I LEARNED

11   THAT AT THE TIME OF THEIR MEDIATION, THAT THEY HAD SOME TYPE OF

12   RELATIONSHIP.

13        AND I'M TALKING ABOUT THE SUSPENSION MEDIATION BECAUSE HE

14   HAD APPEARED AT THAT -- HE ATTENDED THAT MEDIATION WITH HER.

15   Q.   OKAY.  AND THAT'S THE ONE THAT SHE WALKED OUT OF?

16   A.   RIGHT.  I THOUGHT THEY WERE JUST MAYBE BOYFRIEND AND

17   GIRLFRIEND OR SOMETHING LIKE THAT.

18   Q.   ALL RIGHT.  DID THE TERMINATION OF MS. GANG HAVE ANYTHING

19   TO DO WITH HER BEING VIETNAMESE?

20   A.   NO.

21   Q.   AND WITH HER BEING A WOMAN?

22   A.   NO.

23   Q.   AND WAS IT IN RETALIATION FOR THE COMPLAINT THAT SHE MADE

24   ABOUT MR. SUAREZ TWO AND A HALF YEARS LATER?

25   A.   NO.

1    Q.   AND WAS IT IN RETALIATION FOR THE ACTION SHE TOOK IN

2    OCTOBER, THREE MONTHS EARLIER, FILING A GRIEVANCE, MAKING A

3    COMPLAINT AGAINST THE CLUB, DEMANDING AN INVESTIGATION, THAT

4    SORT OF THING?

5    A.   NO.

6            MR. MCMANIS:  OKAY.  THANK YOU, YOUR HONOR.  THAT'S

7    ALL I HAVE AT THIS TIME.

8            THE COURT:  ALL RIGHT.  ANYTHING FURTHER?

9            MS. NGUYEN:  YOUR HONOR, I'LL HAVE MORE THAN

10   15 MINUTES.  BUT ARE WE BREAKING AT 1:30?

11           THE COURT:  RIGHT.

12           MS. NGUYEN:  THANK YOU, YOUR HONOR.

13                    **AS-ON RECROSS-EXAMINATION**

14   BY MS. NGUYEN:

15   Q.   MR. WERNER, YOU STATED EARLIER THAT MR. ST. CROIX, WHO HAS

16   PASSED AWAY, TOLD YOU ABOUT MS. DANG'S ISSUES WITH COWORKERS;

17   CORRECT?

18   A.   RIGHT.

19   Q.   AND YOU SAID THAT HE TOLD YOU ABOUT THAT PRIOR TO HER

20   APRIL 2007 LETTER TO H.R. TO COMPLAIN ABOUT MR. SUAREZ; IS THAT

21   RIGHT?

22   A.   YES.

23   Q.   AND YOU WERE AWARE THAT MR. ST. CROIX WANTED TO TERMINATE

24   MS. DANG BACK IN JANUARY OF 2007?

25   A.   OR BEFORE, YES.

```
1    Q.   AND WERE YOU AWARE, MR. WERNER, THAT MR. ST. CROIX HAD

2    BEEN TOLD ABOUT THE SEXUAL HARASSMENT BY MR. SUAREZ AGAINST

3    MS. DANG SINCE 2006?

4              MR. MCMANIS:  I'M GOING TO OBJECT.  ASSUMES FACTS.

5              THE COURT:  WOULD YOU REPHRASE THE QUESTION?  IT

6    ASSUMES SOME FACTS WERE TRUE OR THE CASE.

7         YOU CAN REPHRASE THE QUESTION.

8              MS. NGUYEN:  I WILL, YOUR HONOR.

9    Q.   MR. WERNER, DID YOU KNOW THAT THERE HAD BEEN COMPLAINTS BY

10   MS. DANG AGAINST MR. SUAREZ BEFORE JANUARY 2007?

11   A.   NO.

12   Q.   AND DID YOU KNOW THAT MR. ST. CROIX HAD ACTUALLY TALKED TO

13   MR. SUAREZ ABOUT MS. DANG'S COMPLAINT?

14   A.   NO.

15   Q.   AND DID YOU KNOW, MR. WERNER, THAT MR. ST. CROIX WANTED TO

16   GET RID OF MS. DANG BECAUSE SHE WAS MAKING A COMPLAINT AGAINST

17   HIS FRIEND, MR. SUAREZ?

18             MR. MCMANIS:  YOUR HONOR, I'M GOING TO OBJECT TO THE

19   FORM OF THE QUESTION.  THIS ASSUMES ALL KINDS OF THINGS ABOUT A

20   DEAD MAN.

21             THE COURT:  WELL, THAT DOESN'T MATTER.

22        BUT I THINK THE QUESTION IS -- THE QUESTION ASSUMES THAT

23   THAT ACTION TOOK PLACE AND THIS WITNESS CERTAINLY HASN'T SAID

24   THAT AND WE HAVEN'T HEARD TESTIMONY THAT IT DID.

25        IF YOU WANT TO SAY, "DID YOU HEAR WHETHER OR NOT SOMETHING
```

1      HAPPENED," YOU CAN ASK IT THAT WAY.

2          BUT YOU CAN'T ASSUME THAT IT DID TAKE PLACE BY THE

3      QUESTION.

4              MS. NGUYEN:  I'LL REPHRASE, YOUR HONOR.  THANK YOU.

5      Q.   MR. WERNER, ARE YOU AWARE THAT MR. SUAREZ WAS FRIENDS WITH

6      MR. ORTEGA?

7              THE COURT:  REPHRASE THE QUESTION.  ARE YOU AWARE

8      WHETHER OR NOT THERE WAS A FRIENDSHIP?  THAT DOESN'T ASSUME

9      THAT THERE WAS.

10             MS. NGUYEN:  I WILL, YOUR HONOR.  THANK YOU.

11     Q.   MR. WERNER, ARE YOU AWARE WHETHER OR NOT MR. SUAREZ IS

12     FRIENDS WITH MR. ORTEGA?

13     A.   MR. SUAREZ WORKED FOR MR. ST. CROIX.  I WASN'T AWARE

14     WHETHER THEY WERE FRIENDS OR NOT.

15     Q.   WHAT ABOUT MR. ORTEGA?  IS HE FRIENDS WITH MR. ORTEGA?

16     A.   WHO?

17     Q.   MR. SUAREZ.

18     A.   AGAIN, THEY'RE COWORKERS.  I DON'T KNOW THAT THEY'RE

19     FRIENDS.  I DON'T KNOW THAT THEY SOCIALIZE AFTER WORK OR

20     ANYTHING ELSE.

21     Q.   DO YOU KNOW OF ANY REASON WHY MR. ST. CROIX WOULD WANT TO

22     PROTECT MR. SUAREZ?

23             MR. MCMANIS:  AGAIN, I'M GOING TO OBJECT.  IT

24     ASSUMES THAT HE WOULD.

25             THE COURT:  WELL, I'M NOT SURE THAT THAT DOES.  I

1       THINK SHE SAID WHETHER OR NOT.

2               THE WITNESS:  I'M SORRY.  I DON'T THINK I UNDERSTOOD

3       THE QUESTION.

4               THE COURT:  THE QUESTION DOESN'T ASSUME ANYTHING, SO

5       I'LL LET THE QUESTION GO.

6               MR. MCMANIS:  COULD WE HAVE THE QUESTION FOR THE

7       WITNESS, PLEASE?

8               THE COURT:  SURE.

9          "DO YOU KNOW OF ANY REASON WHY MR. ST. CROIX WOULD WANT TO

10      PROTECT MR. SUAREZ?"

11              THE WITNESS:  NO.

12      BY MS. NGUYEN:

13      Q.   I'M GOING TO ASK YOU TO TAKE A LOOK AT EXHIBIT 550.  I

14      THINK COUNSEL REFERRED TO IT EARLIER TODAY, AND IT HAS BEEN

15      ADMITTED AS AN EXHIBIT IN EVIDENCE.

16      A.   OKAY.

17      Q.   THIS IS THE NOVEMBER 5TH, 2009 MEMO FROM MS. KNAPP TO

18      MR. ORTEGA; CORRECT?

19      A.   YES.

20      Q.   AND DO YOU SEE THE VERY BEGINNING OF THE MEMO WHERE SHE

21      SAID "MY DOCUMENTATION OF THE ERRORS FOR MS. DANG IS ABOUT THE

22      SAME FOR ANY OTHER SERVER"?

23      A.   YES.

24      Q.   WOULD YOU SCROLL DOWN, PLEASE?

25              AND THE LAST PARAGRAPH WHERE SHE SAYS, "THIS SERVER HAS

1    THE POTENTIAL TO BE VERY GOOD" -- I'M SORRY.  I'M STARTING TO

2    LOSE MY VOICE.

3        "THIS SERVER HAS THE POTENTIAL TO BE VERY GOOD AT HER

4    JOB."

5        DO YOU SEE THAT, MR. WERNER?

6    A.   YES.

7    Q.   AND "SHE ONLY NEEDS TO BE ABLE TO ASK FOR HELP AND NOT TO

8    FEEL AS IF SHE IS SINGLED OUT."

9    A.   YES.

10   Q.   AND DO YOU HAVE ANY REASON TO BELIEVE WHETHER OR NOT

11   MS. DANG FELT LIKE SHE WAS BEING SINGLED OUT?

12   A.   OTHER THAN HER COMPLAINT?  ARE YOU TALKING ABOUT NOW,

13   TODAY?  OTHER THAN THE COMPLAINT SHE MADE, THE LETTER THAT SHE

14   WROTE TO ME?

15   Q.   AT THE TIME.

16   A.   I DON'T KNOW WHY SHE WOULD HAVE HAD ANY REASON TO FEEL

17   LIKE SHE WAS BEING SINGLED OUT ANY DIFFERENTLY THAN ANY OTHER

18   EMPLOYEE BEFORE SHE FILED HER COMPLAINT AND IT WAS

19   INVESTIGATED.

20       SO I'M NOT SURE IF THE ANSWER TO YOUR QUESTION IS YES OR

21   NO, BUT I DON'T KNOW OF ANY REASON WHY SHE SHOULD HAVE FELT

22   SINGLED OUT.

23   Q.   AND THE REASON I ASK, MR. WERNER, IS I THINK YOU TESTIFIED

24   EARLIER THAT YOU TALKED TO MS. KNAPP.

25   A.   YES.

1   Q.   AND DID MS. KNAPP SAY ANYTHING ABOUT WHY MS. DANG WOULD

2   FEEL AS IF SHE WAS BEING SINGLED OUT?

3   A.   I THINK MS. KNAPP SPENT A LOT OF TIME FREQUENTLY WITH

4   MS. DANG AND THAT MS. DANG -- THE FREQUENCY OF THAT AND THE

5   NUMBER OF ERRORS WAS SUCH THAT MS. DANG MAY HAVE HAD THE

6   PERCEPTION THAT MS. KNAPP WAS ONLY TALKING TO HER AND NOT TO

7   OTHER SERVERS REGARDING HER ERRORS.

8        I HAD THE IMPRESSION THAT MS. KNAPP'S INTERACTION OVER

9   MS. DANG'S INABILITY TO BALANCE AT THE END OF THE DAY WAS AN

10  ALMOST DAILY OCCURRENCE AND IT WAS -- MS. KNAPP FELT IT WAS TOO

11  MUCH FOR HER.  IT WAS -- IT TOOK TOO MUCH OF HER TIME AND SHE

12  DIDN'T WANT TO BE RESPONSIBLE FOR DOING IT ANYMORE AND MAYBE

13  THAT'S WHAT SHE MEANT.

14  Q.   EVEN THOUGH HER FIRST SENTENCE SAYS THAT THE DOCUMENTATION

15  OF MS. DANG'S ERRORS WERE ABOUT THE SAME AS FOR ANY OTHER

16  SERVER?

17  A.   I THINK THE DOCUMENT THAT SHE PUT TOGETHER FOR EACH SERVER

18  WAS CONSISTENT AS TO IF THEY MADE AN ERROR, HER DOCUMENTATION

19  OF THOSE ERRORS WOULD HAVE BEEN THE SAME.

20       I DON'T THINK SHE'S TALKING ABOUT THE FREQUENCY OF THE

21  ERRORS.  I THINK SHE'S TALKING ABOUT HOW SHE DOCUMENTS.

22  Q.   MR. WERNER, I'M GOING TO ASK YOU TO GO TO THE PAGE WITH

23  THE BATES STAMP BAY 1535, PLEASE, THE SAME EXHIBIT.

24  A.   OKAY, YES.

25  Q.   THAT'S THE PRINT OUT THAT MS. KNAPP USES TO DOCUMENT THE

1    ERRORS MADE BY THE SERVERS; CORRECT?

2    A.   FOR THAT DAY, YES.

3    Q.   AND YOU SEE TOWARDS THE BOTTOM WHERE IT SHOWS FOR CUC DANG

4    THAT HER DISCREPANCY FOR THE DAY IS ABOUT $20.60?

5    A.   YES.

6    Q.   AND THAT THERE ARE MANY OTHER SERVERS FOR THAT SAME DAY

7    WITH SIMILAR OR MORE DISCREPANCIES?

8    A.   YOU'RE TALKING ABOUT THE OVER/SHORT COLUMN?

9    Q.   THE VERY LAST COLUMN.

10   A.   YES.

11   Q.   AND THE SAME EXHIBIT IF YOU CAN KEEP GOING TO PAGE 1538.

12   A.   OKAY.

13   Q.   DO YOU SEE THERE THAT MS. DANG'S DISCREPANCY FOR THE DAY

14   TOTALS $3.41?

15   A.   I'M SORRY.  I'M LOOKING FOR MS. DANG'S NAME.

16   Q.   IT'S TOWARD THE BOTTOM.

17   A.   I SEE IT.  OKAY.

18   Q.   AND THAT FOR THE SAME DAY, MANY OF THE OTHER SERVERS HAD

19   SIMILAR DISCREPANCIES OR EVEN MORE?

20   A.   YES.

21   Q.   I'M GOING TO ASK YOU NOW, MR. WERNER, TO GO BACK TO

22   EXHIBIT 1016, AND THE THIRD PAGE OF EXHIBIT 1016 IS THE

23   COUNSELLING MEMO.  DO YOU SEE THAT?

24   A.   YES.

25   Q.   THAT'S THE COUNSELLING MEMO DATED OCTOBER 8TH, 2009 ABOUT

1    THE ARGUMENT WITH THE CUSTOMER AND THE COWORKER?

2    A.   YES.

3    Q.   AND YOU TESTIFIED EARLIER, I BELIEVE, THAT YOU RELIED ON

4    THIS AS ONE OF THE FACTORS FOR TERMINATING MS. DANG; CORRECT?

5    A.   IT WAS A FACTOR, YES.

6    Q.   AND EVERYTHING THAT IS REPORTED IN THIS COUNSELLING

7    MEMO -- I'D LIKE TO REPHRASE THAT QUESTION.

8        MR. ORTEGA IS THE ONE WHO PREPARED THIS COUNSELLING MEMO;

9    CORRECT?

10   A.   I'M NOT SURE IF HE PREPARED IT OR SOMEONE ELSE DID.  IT

11   HAS HIS SIGNATURE ON IT.

12   Q.   AND FOR THE INCIDENT OF OCTOBER 4TH, 2009, WHERE EARLIER

13   WE LOOKED AT THE VIDEO, THE SURVEILLANCE VIDEO, DID YOU

14   YOURSELF REVIEW THE ENTIRE SURVEILLANCE VIDEO?

15   A.   NO.

16   Q.   DID YOU REVIEW ANY OF IT?

17   A.   NO.

18   Q.   DID YOU TALK TO ANY OF THE EMPLOYEES, THE OTHER COWORKERS

19   OF MS. DANG WHO SUBMITTED STATEMENTS?

20   A.   I BELIEVE I DID.

21   Q.   AND WHICH EMPLOYEE?

22   A.   I BELIEVE I TALKED WITH MS. FONTILLAS -- WE'RE TALKING

23   ABOUT THE EMPLOYEES WHO SUBMITTED STATEMENTS -- AND I MAY HAVE

24   TALKED WITH MS. ELIAS.

25   Q.   YOU TESTIFIED EARLIER THAT YOU RELIED UPON THE WRITTEN

1    STATEMENTS THAT WERE SUBMITTED; CORRECT?

2    A.   THAT'S CORRECT.

3    Q.   AND THOSE WRITTEN STATEMENTS WERE OBTAINED BY MR. ORTEGA?

4    A.   OR HUMAN RESOURCES.  SOMEONE OBTAINED THEM.

5    Q.   BUT YOU YOURSELF DIDN'T TALK TO THOSE WITNESSES TO GET

6    THOSE STATEMENTS; CORRECT?

7    A.   NO.

8    Q.   THAT'S CORRECT?

9    A.   THAT'S CORRECT, I DID NOT TALK TO THEM TO OBTAIN THE

10   STATEMENTS.

11   Q.   THANK YOU.

12        THE COURT:  ALL RIGHT.  THIS IS PROBABLY A GOOD

13   POINT TO BREAK.

14        MS. NGUYEN:  YES, YOUR HONOR.

15        THE COURT:  ALL RIGHT.  WE'LL -- THAT WILL CONCLUDE

16   US FOR TODAY.  WE'LL SEE YOU TOMORROW MORNING AT 8:30.

17        PLEASE REMEMBER NOT TO DISCUSS THE CASE WITH ANYBODY AND

18   HAVE A GOOD REST OF THE DAY.

19        (JURY OUT AT 1:28 P.M.)

20        THE COURT:  I JUST WANT TO CONFIRM THAT THERE ARE NO

21   ANTICIPATED EVIDENTIARY PROBLEMS TOMORROW.

22        MR. MCMANIS:  NOT TO MY KNOWLEDGE.

23        MS. NGUYEN:  NO, YOUR HONOR.  I THINK WE DEALT WITH

24   IT TODAY.

25        SOME OF THE WITNESSES THAT WE ANTICIPATED FOR TODAY WILL

1          BE THE ONES GOING TOMORROW.

2                    THE COURT:  OKAY.  THANK YOU.

3            (COURT CONCLUDED AT 1:29 P.M.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Irene Rodriguez*

*Lee-Anne Shortridge*

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     IRENE RODRIGUEZ, CSR, CRR
     CERTIFICATE NUMBER 8076
17

18

19   _____
     LEE-ANNE SHORTRIDGE, CSR, CRR
     CERTIFICATE NUMBER 9595
20

21       DATED:  APRIL 30, 2013

22

23

24

25