1    UNITED STATES DISTRICT COURT

     FOR THE NORTHERN DISTRICT OF CALIFORNIA

2              SAN JOSE DIVISION

3

     CUC DANG,

4

              PLAINTIFF,            CASE NO.  CV-10-02181-RMW

5         VS.

                                    SAN JOSE, CALIFORNIA

6    SUTTER'S PLACE, INC., DBA BAY

     101 OR BAY 101 CASINO, UNITE    MAY 1, 2013

7    HERE! LOCAL 19, AND DOES 1

     THROUGH 20, INCLUSIVE,          VOLUME 2

8

              DEFENDANTS.           PAGES 157 - 312

9

10

                    TRANSCRIPT OF TRIAL

11         BEFORE THE HONORABLE RONALD M. WHYTE

           UNITED STATES DISTRICT JUDGE AND A JURY

12

                  A-P-P-E-A-R-A-N-C-E-S

13

     FOR THE PLAINTIFF:   ROBINSON & WOOD, INC.

14                        BY:   ANN A.P. NGUYEN

                          227 NORTH FIRST STREET

15                        SAN JOSE, CALIFORNIA 95113

16   ALSO PRESENT:        ANDRE THOMAS

17    FOR THE DEFENDANTS:  MCMANIS FAULKNER

                          BY:   JAMES MCMANIS

18                               JENNIFER MURAKAMI

                          FAIRMONT PLAZA

19                        10TH FLOOR

                          50 W. SAN FERNANDO STREET

20   ALSO PRESENT:        SAN JOSE, CALIFORNIA 95113

                          CINDY MCCLELEN

21

     OFFICIAL COURT REPORTERS:   IRENE L. RODRIGUEZ, CSR, CRR

22                               CERTIFICATE NUMBER 8074

                                 LEE-ANNE SHORTRIDGE, CSR, CRR

23                               CERTIFICATE NUMBER 9595

24       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,

              TRANSCRIPT PRODUCED WITH COMPUTER

25

INDEX OF WITNESSES

PLAINTIFF'S:

**PHONGPHUN (KEN) MEAKCHAROON**
    AS-ON CROSS-EXAM BY MS. NGUYEN         P. 160
    AS-ON DIRECT EXAM BY MR. MCMANIS     P. 191

**RONALD WERNER**
    FURTHER AS-ON RECROSS-EXAM BY MS. NGUYEN  P. 191
    AS-ON REDIRECT BY MR. MCMANIS       P. 210
    FURTHER AS-ON RECROSS EXAM BY MR. NGUYEN  P. 228

**JENNIFER GILBERT**
    AS-ON CROSS-EXAM BY MS. NGUYEN         P. 230
    AS-ON DIRECT EXAM BY MS. MURAKAMI    P. 284

INDEX OF EXHIBITS

| | IDENT. | EVIDENCE |
|---|---|---|
| PLAINTIFF'S: | | |
| 30 | 164 | 164 |
| 1002 | | 185 |
| 1 | | 233 |
| 2 | | 234 |
| 1001 | | 239 |
| 1011 | | 242 |
| 1012 | | 245 |
| 1013 | | 249 |
| 1004 | | 280 |
| | | |
| DEFENDANT'S: | | |
| 509 | | 286 |
| 522 | | 288 |
| 507 | | 289 |
| 514 | | 290 |
| 508 | | 291 |
| 1005 | | 292 |
| 511 | | 295 |
| 512 | | 295 |
| 513 | | 296 |
| 515 | | 296 |
| 516 | | 297 |
| 517 | | 297 |
| 518 | | 298 |
| 1006 | | 300 |
| 526 | | 305 |
| 1007 | | 306 |
| 1008 | | 308 |

1    SAN JOSE, CALIFORNIA                    MAY 1, 2013

2              P R O C E E D I N G S

3        (JURY IN AT 8:35 A.M.)

4              MR. MCMANIS:  YOUR HONOR, I HAVE ONE THING THAT I'D

5    LIKE TO APPROACH SIDE-BAR.  IT HAS NOTHING TO DO WITH THIS

6    TRIAL AND IT HAS TO DO WITH SOME VISITORS THAT MAY BE COMING TO

7    THE TRIAL THIS MORNING.

8        MAY I APPROACH?

9              THE COURT:  SURE.

10             MR. MCMANIS:  THANK YOU.

11       (SIDE-BAR DISCUSSION OFF THE RECORD.)

12             THE COURT:  ALL RIGHT.  DO YOU WANT TO CONTINUE YOUR

13   CROSS?

14             MS. NGUYEN:  ACTUALLY, YOUR HONOR, WE'RE CALLING A

15   WITNESS OUT OF ORDER TO ACCOMMODATE BAY 101'S WITNESS.  I THINK

16   HE EITHER HAS TO GO BACK TO WORK OR HE'S COMING FROM WORK.

17             MR. MCMANIS:  ACTUALLY, YOUR HONOR, HE JUST GOT OFF

18   WORK.  HE SPENT THE NIGHT AT WORK.

19             THE COURT:  OKAY.

20             MR. MCMANIS:  THIS IS THE CHEF KEN AND HE'S GOT

21   TO -- HE LIVES IN THE VALLEY, SO I APPRECIATE COUNSEL'S

22   COURTESY.

23       THANK YOU.

24             THE COURT:  ALL RIGHT.  SO WE'LL TAKE A WITNESS OUT

25   OF ORDER IN THE SENSE THAT WE'LL TAKE HIM BEFORE SHE FINISHES

1    HER EXAMINATION OF MR. WERNER JUST TO ACCOMMODATE HIM.

2            MR. MCMANIS:  THANK YOU.

3            MS. NGUYEN:  YOUR HONOR, WE WOULD LIKE TO CALL

4    MR. KEN MEAKCHAROON.

5            THE CLERK:  COME FORWARD, PLEASE, AND I'LL SWEAR YOU

6    IN RIGHT HERE.

7        **(PLAINTIFF'S WITNESS, PHONGPHUN MEAKCHAROON, WAS SWORN.)**

8            THE WITNESS:  I DO.

9            THE CLERK:  YOU DO?

10           THE WITNESS:  YES.

11           THE CLERK:  TAKE THE STAND, PLEASE.

12       FOR THE RECORD, IF YOU COULD PLEASE STATE YOUR FULL NAME

13   AND SPELL YOUR LAST NAME.

14           THE WITNESS:  MY NAME IS --

15           THE CLERK:  GO AHEAD AND PULL THAT MIKE DOWN.  THANK

16   YOU.

17           THE WITNESS:  MY NAME IS PHONGPHUN MEAKCHAROON.

18   LAST NAME IS M-E-A-K-C-H-A-R-O-O-N.

19           THE CLERK:  WILL YOU SPELL YOUR FIRST NAME, TOO,

20   PLEASE?

21           THE WITNESS:  FIRST NAME IS P-H-O-N-G-P-H-U-N.

22           THE CLERK:  THANK YOU.

23                   **AS-ON CROSS-EXAMINATION**

24   BY MS. NGUYEN:

25   Q.   GOOD MORNING, MR. MEAKCHAROON.

1   A.   GOOD MORNING.

2   Q.   THANK YOU.  WHAT IS YOUR CURRENT POSITION AT BAY 101 RIGHT

3   NOW?

4   A.   I'M THE LEAD COOK IN CHARGE OF THE GRAVEYARD SHIFT.

5   Q.   YOU MIGHT WANT TO PULL THE MICROPHONE CLOSER TO YOU A

6   LITTLE BIT SO WE CAN HEAR YOU BETTER.

7   A.   OKAY.  BETTER?

8   Q.   THANK YOU.

9        AND HOW LONG HAVE YOU WORKED AT BAY 101?

10  A.   THE LAST TIME I APPLIED WAS 2007, AND BEFORE THAT WOULD BE

11  AROUND 2002 OR 2003.

12  Q.   AND SO WHEN YOU CAME BACK TO BAY 101 IN 2007 --

13  A.   YES.

14  Q.   -- HAVE YOU SINCE THEN BEEN THE LEAD COOK ON THE GRAVEYARD

15  SHIFT?

16  A.   YES, I AM.

17  Q.   AND DID YOU WORK WITH MY CLIENT, CUC DANG, WHILE SHE WAS

18  STILL AT BAY 101?

19  A.   YES, I HAVE.

20  Q.   AND YOU WERE HER SUPERVISOR DURING THE GRAVEYARD SHIFT?

21  A.   YES.

22  Q.   AND AT THE TIME SHE WAS WORKING AS A SERVER UNDER YOU;

23  CORRECT?

24  A.   YES.

25  Q.   MR. MEAKCHAROON, YOUR EMPLOYEES IN THE FOOD AND BEVERAGE

1    DEPARTMENT, THEY'RE REQUIRED TO FILL OUT WHAT IS CALLED A DAILY

2    TRACKING SHEET; IS THAT RIGHT?

3    A.   YES.

4    Q.   SO WHEN YOU COME INTO WORK, YOU FILL IT OUT, AND FOR THE

5    DAY YOU FILL OUT THE TIME THAT YOU COME IN, THE BREAKS, THE

6    LUNCHES, AND THE SECOND BREAKS AND THE TIME THAT YOU LEAVE?

7    A.   YES.

8    Q.   AND IN THE PAST HAVE YOU AT TIMES ALLOWED OTHER PEOPLE TO

9    FILL OUT THE DAILY TRACKING SHEET FOR YOU?

10   A.   IT WAS, YES.

11   Q.   AND SO IN THE PAST YOU'VE HAD -- I BELIEVE YOU HAVE

12   TESTIFIED -- I'M SORRY.

13        I BELIEVE YOU HAVE MENTIONED IN THE PAST THAT YOU HAVE HAD

14   ANOTHER SUPERVISOR BY THE NAME OF GEORGE CASTILLO FILL OUT YOUR

15   DAILY TRACKING SHEET FOR YOU.

16   A.   YES.

17   Q.   BECAUSE AT THE TIME IT WASN'T REALLY A FORMAL WAY OF

18   KEEPING TRACK OF AN EMPLOYEE'S TIME?

19   A.   YES.

20   Q.   AND THOSE SHEETS THEN WERE NOT TAKEN VERY SERIOUSLY?

21   A.   THEY WERE, BUT AT THAT TIME WITH OUR HANDWRITING, LET'S

22   SAY IF I WAS BUSY COOKING AT THE LINE, I WOULD SAY, "GEORGE,

23   CAN YOU JUST PUNCH IT OUT FOR ME?  I'M GOING ON MY 10.  I'M

24   GOING ON MY 30."

25        AND WE WOULD SIGN FOR IT.  WE WOULD BE THE PERSON UNDER

1    THE NAME OF WHOEVER IS THE BREAK SHEET AT THE END.

2    Q.   OKAY.  I'D LIKE YOU TO TAKE A LOOK AT -- I THINK WE HAVE

3    THE EXHIBITS IN FRONT OF YOU.  IF YOU CAN LOCATE EXHIBIT 1000.

4    IT WOULD BE PROBABLY TO YOUR LEFT AND IT'S ONE OF THE WHITE

5    BINDERS.

6    A.   OKAY.

7    Q.   EXHIBIT 1000.

8    A.   I'VE GOT IT.  LET'S SEE, 1000.

9    Q.   ARE THOSE DAILY TRACKING SHEETS THAT YOU SEE?

10   A.   1000 IS NOT THE SHEET.

11          MS. NGUYEN:  YOUR HONOR, MAY I APPROACH TO HELP THE

12   WITNESS?

13          THE COURT:  SURE.

14          THE WITNESS:  1000 IS NOT THE SHEET.  IT'S DARK.

15   BY MS. NGUYEN:

16   Q.   THIS IS THE CD.  OKAY.  LET ME DO THIS.

17       MR. MEAKCHAROON, WHAT I HAVE SHOWN YOU IS EXHIBIT 2 OF

18   YOUR DEPOSITION WHEN WE LAST SPOKE IN 2011.

19   A.   OKAY.

20   Q.   AND I'M GOING TO ASK YOU TO TAKE A LOOK AT THAT, AND HAVE

21   YOU SEEN THOSE DOCUMENTS BEFORE TODAY?

22   A.   YES, I HAVE.

23   Q.   AND THOSE ARE THE DAILY TRACKING SHEETS THAT WERE USED AT

24   BAY 101 WHEN YOU WERE WORKING THERE?

25   A.   YES, IT WAS.

1    Q.  AND THESE LOOK LIKE SHEETS FROM APRIL OF 2006; RIGHT?

2    A.  THEY'RE FROM APRIL TO -- YES.  YEP.  YES.

3    Q.  AND THIS IS A LIST OF ALL OF THE EMPLOYEES IN DEPARTMENT

4    20, FOOD AND BEVERAGE DEPARTMENT?

5    A.  YES, WHOEVER WAS ASSIGNED OR SCHEDULED TO WORK ON THAT

6    DAY.

7          MS. NGUYEN:  YOUR HONOR, WE WOULD MOVE TO HAVE THIS

8    ADMITTED AS AN EXHIBIT.

9          MR. MCMANIS:  HAS THIS BEEN MARKED BEFORE AS PART OF

10   OUR TRIAL EXHIBITS?

11         MS. NGUYEN:  NO.  THAT'S WHY BECAUSE OUR --

12         MR. MCMANIS:  THAT'S FINE.  I HAVE NO OBJECTION.  I

13   GUESS WE'LL JUST MARK IT AND WE HAVE NO OBJECTION.

14         THE COURT:  NEXT IN ORDER.

15         MS. NGUYEN:  30.

16         MR. MCMANIS:  PARDON ME?

17         MS. NGUYEN:  PLAINTIFF'S EXHIBIT 30.

18         MR. MCMANIS:  THANK YOU.

19      (PLAINTIFF'S EXHIBIT 30 WAS MARKED FOR IDENTIFICATION.)

20         THE COURT:  30 IS RECEIVED.

21         MS. NGUYEN:  THANK YOU, YOUR HONOR.

22      (PLAINTIFF'S EXHIBIT 30 WAS RECEIVED IN EVIDENCE.)

23   BY MS. NGUYEN:

24    Q.  AND, MR. MEAKCHAROON, ARE YOU AWARE THAT SOMETIMES

25   EMPLOYEES WOULD JUST FILL OUT THESE TRACKING SHEETS AT ALL ONCE

1    BEFORE THEY START THEIR SHIFT?

2    A.   I HAVEN'T SEEN THOSE, BUT I'M NOT SURE SOMETIMES THEY DID

3    OR SOMETIMES THEY DIDN'T.

4         BUT NORMALLY WHEN WE GO AN HOUR 10, WE PUT IT AN HOUR 10.

5    WE PUT IT ON OURSELF, AND THAT WAY WE CAN KEEP TRACKING AND WE

6    DON'T GO OVER THE BREAK TIME.

7    Q.   AND RIGHT NOW DO THESE DAILY TRACKING SHEETS, ARE THEY

8    STILL USED AT BAY 101?

9    A.   WE STILL -- WE USE THE BREAKING SHEET THAT IS A LITTLE BIT

10   DIFFERENT THAN THIS ONE.

11   Q.   OKAY.  AND BACK IN 2006/2007, IF EMPLOYEES DIDN'T FILL

12   THESE OUT, THEY WOULD GET WRITTEN UP; RIGHT?

13   A.   FIRST THEY WOULD GET THE VERBAL WARNING AND THEN THEY

14   WOULD GO PROCESSING BY CORRECTIONS AND ALL OF THIS TO FOLLOW IF

15   YOU KEEP FORGETTING.

16        SO IT MIGHT BE A VERBAL WARNING, AND AFTER A VERBAL

17   WARNING YOU MIGHT HAVE -- GET WRITTEN UP IF YOU KEEP FORGETTING

18   THE TIME.

19             THE COURT:  COULD YOU PULL THAT MICROPHONE A LITTLE

20   BIT CLOSER TO YOU AND KEEP YOUR VOICE UP?

21             THE WITNESS:  I'LL MOVE THE CHAIR.

22             THE COURT:  IT'S HARD TO HEAR YOU.

23   BY MS. NGUYEN:

24   Q.   AND EMPLOYEES CAN ALSO BE SUSPENDED AFTER SO MANY TIMES --

25   A.   YES.

1    Q.   -- FOR NOT FILLING IT OUT?

2        NOW, YOU KNOW MY CLIENT, CUC DANG, FROM WHEN SHE WORKED

3    WITH YOU AT BAY 101, RIGHT?

4    A.   YES, I DO.

5    Q.   AT BAY 101, IS 1:00 O'CLOCK IN THE MORNING THE CUT OFF

6    TIME WHEN YOU CAN'T ORDER ALCOHOL ANYMORE?

7    A.   YES.

8    Q.   AND DO YOU REMEMBER SOME INCIDENT WHEN SOMEONE ACCUSED

9    MS. DANG OF PUTTING IN AN ALCOHOL ORDER FOR AFTER HOURS?

10   A.   I DON'T REMEMBER.

11   Q.   AND IS IT YOUR UNDERSTANDING THAT SOMETIMES ORDERS COME IN

12   A LITTLE BIT AFTER 1:00 BECAUSE IT'S ACCIDENTALLY PUT IN OR

13   BECAUSE THERE WAS A LITTLE BIT OF A DELAY IN THE ORDER?

14   A.   THAT WOULD BE OUR JOB, THE LEAD COOK, TO TAKE CARE -- TO

15   MAKE SURE THAT THAT IS NOT GOING TO HAPPEN BECAUSE THAT'S A

16   VERY STRICT RULE ABOUT, ESPECIALLY WITH ALCOHOL, 1:00 O'CLOCK,

17   AND EVEN 1:00 O'CLOCK AND ONE MINUTE, WE'RE NOT SERVING ANY

18   CUSTOMER ALCOHOL AFTER THAT AT ALL.

19   Q.   BUT SOMETIMES IT HAPPENS, AND I BELIEVE THAT YOU HAVE

20   STATED IN THE PAST THAT IT HAPPENS TO EVERYBODY, TO ALL OF THE

21   SERVERS.   RIGHT?

22   A.   I DON'T REMEMBER IT HAPPENED TO WHO OR SOMETIME OR SOME OF

23   THOSE BEFORE.

24       BUT WHEN I'M THERE, I'M PRETTY SURE IF I KNOW THAT THEY

25   COME AND ASK ME, THIS IS THE LAST ORDER, OR THE CUSTOMER

1    ORDERED LATE AND I FORGOT, I WOULD VOID A TICKET FOR THAT

2    INSTEAD OF GIVING OUT ALCOHOL TO CUSTOMER AFTER 1:00 O'CLOCK.

3              MR. MCMANIS:  I'M SORRY, "VOID A TICKET"?

4              THE WITNESS:  YES.

5    BY MS. NGUYEN:

6    Q.   AND OTHER THAN MS. DANG, YOU KNOW OF OTHER EMPLOYEES THAT

7    HAVE HAD THE TICKET VOIDED BECAUSE THE ALCOHOL ORDER CAME IN

8    AFTER 1:00 O'CLOCK, DON'T YOU?

9    A.   SOMETIMES, YES.

10   Q.   HOW MANY SERVERS DO YOU HAVE WORKING UNDER YOU?

11   A.   AROUND SIX TO EIGHT SERVERS PER SHIFT.

12   Q.   AND THEN YOU ALSO HAVE COOKS WORKING UNDER YOU?

13   A.   YES.

14   Q.   AND PORTERS, TOO?

15   A.   YES.

16   Q.   SO I BELIEVE IN THE PAST YOU HAVE DESCRIBED TO ME THAT

17   SOMETIMES, HAVING A LOT OF WOMEN WORKING IN AN ENVIRONMENT LIKE

18   THAT, YOU HAVE LITTLE DISAGREEMENTS AND ARGUMENTS, RIGHT?

19   A.   I THINK WE ALL KNOW THAT, DON'T WE?  YES, OKAY.

20   Q.   AND IT'S PART OF YOUR JOB TO MANAGE THAT AND REFEREE THAT,

21   ISN'T IT?

22   A.   YES.

23   Q.   WHEN MS. DANG WAS WORKING AT BAY 101, WAS LUCIO SUAREZ ONE

24   OF THE LEAD COOKS?

25   A.   HE WAS A FILL IN.  WHEN THE LEAD COOKS ON SWING SHIFT

1  TAKING A DAY OFF, SO HE WOULD FILL IN WHOEVER IS ON THE LEAD ON

2  SWING SHIFT.

3  Q.  SO WHEN THE LEAD COOK FOR THAT SHIFT IS OFF, HE ACTS LIKE

4  THE LEAD COOK?

5  A.  YES.

6  Q.  AND HE IS THE ONE THEN SUPERVISING THE EMPLOYEES IN THE

7  FOOD AND BEVERAGE DEPARTMENT FOR THAT SHIFT ON THAT DAY?

8  A.  YES.

9  Q.  AND DO YOU KNOW IF MS. DANG HAD COMPLAINED ABOUT

10 MR. SUAREZ IN THE PAST?

11 A.  SHE HADN'T COMPLAINED ABOUT LUCIO TO ME.  I DON'T RECALL

12 THAT AT ALL.

13 Q.  AND IN THE PAST YOU HAVE NEVER SEEN MS. DANG ACT IN ANY

14 WAY TO SHOW THAT SHE HAD ANY KIND OF GIRLFRIEND/BOYFRIEND KIND

15 OF RELATIONSHIP WITH MR. SUAREZ, HAVE YOU?

16 A.  BY THE TIME SHE'S WORKING WITH ME, HER SCHEDULE IS 11:00

17 TO 7:00 IN THE MORNING.  LUCIO, HIS SHIFT IS DONE BY 10:00

18 O'CLOCK AT NIGHT.

19     SO BY THE TIME SHE COMES IN, HE HAS ALREADY WENT HOME, SO

20 I HAVEN'T SEEN ANY OF THOSE ACTIVITIES OR WHAT YOU ARE SAYING.

21 Q.  HAVEN'T THERE BEEN TIMES WHEN MS. DANG CAME TO WORK AND

22 MR. SUAREZ WAS STILL THERE?

23 A.  IT MIGHT HAPPEN SOMETIMES.  IF IT'S BUSY, WE MIGHT HAVE

24 KEEP THE LINE FOR A LITTLE BIT LONGER, HALF AN HOUR,

25 45 MINUTES.

1    Q.  AND HAVEN'T YOU MENTIONED IN THE PAST THAT YOU KNEW THAT

2    MS. DANG WAS UNCOMFORTABLE WHEN SHE CAME TO WORK AND MR. SUAREZ

3    WAS STILL THERE?

4    A.  IT MIGHT HAPPEN, BUT I DON'T REMEMBER IT.

5    Q.  LET ME SEE IF I CAN HELP YOU REMEMBER, OKAY?

6    A.  OKAY.

7    Q.  IN THIS CASE YOUR DEPOSITION WAS TAKEN BACK IN 2011,

8    MAY 23RD, 2011.  DO YOU REMEMBER THAT?

9    A.  ASK ME WHAT I HAD FOR BREAKFAST YESTERDAY.

10   Q.  BUT YOU REMEMBER MY QUESTIONING YOU AT SOME TIME DURING

11   THIS TRIAL; CORRECT?

12   A.  NOT REALLY, BUT, OKAY, I'LL TRY MY VERY BEST.

13   Q.  I'M NOT VERY MEMORABLE?

14        MR. MCMANIS:  WELL, I DISAGREE WITH THAT.

15        MS. NGUYEN:  CAN YOU GET MR. MEAKCHAROON'S

16   DEPOSITION, PLEASE?

17   Q.  I'M GOING TO TRY TO HELP YOU REMEMBER WHAT YOU TOLD ME

18   BACK --

19        THE COURT:  BEFORE YOU GET TO THAT, LET ME EXPLAIN

20   TO THE JURORS WHAT A DEPOSITION IS IN CASE THEY DON'T KNOW.

21        A DEPOSITION IS THE SWORN TESTIMONY OF A WITNESS TAKEN

22   BEFORE TRIAL.

23        THE WITNESS IS PLACED UNDER OATH TO TELL THE TRUTH AND

24   LAWYERS FOR EACH PARTY MAY ASK THE WITNESS QUESTIONS.

25        QUESTIONS AND ANSWERS ARE RECORDED IN A BOOKLET FORM.

1      AND THE DEPOSITION TESTIMONY, IF SOME IS PRESENTED HERE,

2    CAN BE CONSIDERED IN THE SAME WAY AS IF THE WITNESS WAS

3    TESTIFYING LIVE INSOFAR AS YOU CAN DO THAT.

4      OBVIOUSLY THERE'S A DIFFERENCE BETWEEN SOMETHING THAT IS

5    WRITTEN IN A TRANSCRIPT AND LIVE TESTIMONY.  YOU DON'T OBSERVE

6    THE PERSON AS THEY GIVE THE TESTIMONY.

7      BUT TO THE EXTENT POSSIBLE, YOU SHOULD TREAT THAT

8    TESTIMONY JUST AS YOU WOULD TREAT IT IF YOU HEARD IT IN COURT.

9        MS. NGUYEN:  PAGE 148, PLEASE.  THANK YOU.

10   Q.  MR. MEAKCHAROON, THIS WAS FROM YOUR DEPOSITION BACK IN MAY

11   OF 2011.  I KNOW THAT YOU SAID THAT YOUR MEMORIES ARE NOT VERY

12   GOOD, BUT BACK IN MAY OF 2011, YOU GAVE ME YOUR BEST

13   RECOLLECTION AT THAT TIME; CORRECT?

14   A.  I THINK I HAVE, YES.

15   Q.  AND YOU KNEW THAT YOU WERE TESTIFYING UNDER OATH UNDER

16   PENALTY OF PERJURY; CORRECT?

17   A.  YES, I HAVE.

18   Q.  AND SO IF YOU LOOK AT LINE 15, DO YOU SEE THAT QUESTION

19   WHERE IT ASKS YOU, "HAVE YOU SEEN CUC ACT IN ANY WAY TO

20   INDICATE THAT SHE IS GIRLFRIEND AND BOYFRIEND WITH LUCIO?"

21      DO YOU SEE THAT?

22   A.  YES.

23   Q.  AND YOUR ANSWER WAS "NO."

24   A.  OKAY.

25   Q.  AND IS THAT STILL YOUR RECOLLECTION NOW?

1    A.   YES.  I HAVEN'T SEEN THEM TOGETHER.  I HAVEN'T.

2    Q.   OKAY.  AND I ALSO ASKED YOU ABOUT WHETHER YOU KNEW THAT

3    MS. DANG WAS UNCOMFORTABLE WHEN SHE CAME TO WORK AND LUCIO WAS

4    AROUND AND YOU SAID THAT YOU DIDN'T RECALL.

5         SO LET ME HELP YOU WITH THAT.

6         PAGE 152, PLEASE, LINE 9.

7              THE COURT:  IN GENERAL I WOULD ASK THAT EITHER SIDE,

8    IF THEY'RE GOING TO READ FROM A DEPOSITION, THAT THEY GIVE THE

9    PAGE AND LINE NUMBERS BEFORE IT'S PUT UP ON THE BOARD SO THAT

10   THE OPPOSING COUNSEL CAN LOOK AND SEE AND MAKE SURE THEY DON'T

11   HAVE ANY OBJECTION.

12             MS. NGUYEN:  ALL RIGHT, YOUR HONOR.  THANK YOU.

13        IT'S 152, LINE 4 TO 9.

14             MR. MCMANIS:  I DON'T HAVE A PROBLEM WITH THIS, YOUR

15   HONOR, BUT I'M NOT SURE THAT WE SHOULD HAVE IT ON THE SCREEN

16   UNTIL WE LOOK AT IT.

17             THE COURT:  YEAH, I AGREE.

18   BY MS. NGUYEN:

19   Q.   MR. MEAKCHAROON, I ASKED AND YOU ANSWERED, "CUC DANG CAME

20   TO ME ONE TIME.  UM, I DON'T KNOW WHAT HAPPENED BETWEEN THEM,

21   BUT WHAT SHE TOLD ME WAS THAT SHE DOESN'T FEEL COMFORTABLE BY

22   THE TIME SHE COMES INTO WORK AND LUCIO IS STILL AROUND.

23        "SOMETIMES HE GOES TO TALK TO HER AND ASKS HER ALL THOSE

24   KIND OF STUFF.  SO I HAVE, UH, TO LET MR. ORTEGA KNOW ABOUT

25   THAT."

1      DO YOU SEE THAT?

2   A.   YES, I SAW IT.

3   Q.   AND SO DOES THAT REFRESH YOUR RECOLLECTION THAT YOU DID

4   TALK TO MR. ORTEGA REGARDING MS. DANG BEING UNCOMFORTABLE WHEN

5   LUCIO WAS STILL THERE WHEN SHE CAME TO WORK?

6   A.   ANY INCIDENT THAT HAPPENED I ALWAYS LET MR. ORTEGA KNOW

7   ABOUT IT.  SO I'M PRETTY SURE IF THAT HAPPENED AS I REMEMBER AT

8   THAT TIME THAT WE DID THE DEPOSITION, SO IT MIGHT HAVE

9   HAPPENED.

10  Q.   YOU JUST DON'T REMEMBER NOW?

11  A.   I DON'T REMEMBER.

12  Q.   BUT YOU REMEMBERED AT THE TIME; CORRECT?

13  A.   TWO OR THREE YEARS AGO I MIGHT HAVE, YES.

14  Q.   OKAY.  NOW, WHEN YOU TOLD MR. ORTEGA ABOUT MS. DANG BEING

15  UNCOMFORTABLE WITH MR. SUAREZ, DID HE DO ANYTHING?

16  A.   I DID NOT FOLLOW WHAT HIS ACTION WAS ABOUT ALL OF THE

17  INCIDENT THAT HAPPENED.

18      MY JOB IS TO REPORT TO HIM AND HE'S THE ONE TO DECIDE WHAT

19  ACTION IS HE GOING TO BE TAKEN.

20      SO MOSTLY I JUST MADE THE REPORT.  I REALLY DON'T FOLLOW

21  WHAT IS HAPPENING AFTER.

22  Q.   AND HE DIDN'T COME BACK TO LET YOU KNOW WHETHER HE HAD

23  TAKEN ANY ACTION; CORRECT?

24  A.   SOMETIMES HE DOES.  SOMETIMES HE FORGOT.

25          MS. NGUYEN:  SO, COUNSEL, I'D LIKE TO READ FROM PAGE

1    153:1 TO 154:16.

2            MR. MCMANIS:  I DON'T KNOW IF WE'RE GOING TO HAVE A

3    PROBLEM WITH THIS ON THE SCREEN BEFORE WE HAVE A CHANCE TO LOOK

4    AT IT.

5            MS. NGUYEN:  YEAH, IT'S NOT GOING TO GO.

6            THE COURT:  IT'S NOT ON THE SCREEN.

7            MR. MCMANIS:  WELL, SOMETHING IS ON THE SCREEN.

8            THE COURT:  OKAY.  SO JUST TELL US WHEN YOU HAVE A

9    CHANCE TO LOOK.

10           MR. MCMANIS:  THANK YOU.  COULD I HAVE THE REFERENCE

11   AGAIN, PLEASE.

12           MS. NGUYEN:  153:1 TO 154:16.

13       (PAUSE IN PROCEEDINGS.)

14           MR. MCMANIS:  I'M GOING TO OBJECT TO THIS, YOUR

15   HONOR.  THERE'S NOTHING INCONSISTENT WITH THE WITNESS'S

16   TESTIMONY THAT HE'S GIVEN TODAY.

17           THE COURT:  OKAY.  I AGREE.  LET'S MOVE ON.

18           MS. NGUYEN:  YOUR HONOR, HE SAID HE DIDN'T REMEMBER

19   SO I'D LIKE TO REMIND HIM.

20           THE COURT:  THAT'S WHAT HE SAYS.

21           MS. NGUYEN:  I CAN NARROW IT DOWN TO 154:6 -- I'M

22   SORRY, 154:10 TO 12.

23           MR. MCMANIS:  AGAIN, YOUR HONOR, IT'S PERFECTLY

24   PERMISSIBLE.

25           THE COURT:  I AGREE.  I THINK IT'S TOTALLY

1    CONSISTENT.

2             MR. MCMANIS:  THANK YOU.  TOTALLY CONSISTENT.

3    BY MS. NGUYEN:

4    Q.   MR. MEAKCHAROON, YOU DON'T KNOW WHETHER MR. ORTEGA DID

5    ANYTHING WITH THE REPORT YOU MADE; CORRECT?

6    A.   NO, I HAVEN'T.

7    Q.   AND -- BUT ON YOUR PART YOU TRIED TO KEEP AN EYE OUT FOR

8    MS. DANG WHEN LUCIO WAS AROUND, DIDN'T YOU?

9    A.   THAT'S MY JOB WHEN SHE'S ON THE CLOCK, YES.

10   Q.   AND YOU DID THAT SPECIFICALLY BECAUSE YOU KNEW THAT SHE

11   WAS UNCOMFORTABLE AROUND MR. SUAREZ?

12   A.   SOMETIMES I MIGHT HAVE, YES.

13   Q.   I THINK YOU TOLD ME BACK IN 2011 THAT IF YOU SAW HIM

14   COMING CLOSE, YOU WOULD TELL HIM TO STEP AWAY FROM HER.

15        DO YOU REMEMBER THAT?

16   A.   I DON'T REMEMBER THAT I EVER SAID THAT TO HIM BUT LIKE THE

17   LAST QUESTION, I ALWAYS KEEP AN EYE ON WHENEVER ANY OTHER --

18   SAME THING WITH ANY OTHER EMPLOYEE, THAT THEY DON'T DO

19   COMFORTABLE WITH WHATEVER IT IS THAT PERSON IS, I ALWAYS KEEP

20   AN EYE ON HIM.

21            MR. MCMANIS:  I'M SORRY.  COULD I HAVE THAT ANSWER

22   REREAD?  I COULDN'T HEAR IT.

23            THE COURT:  HE SAYS HE ALWAYS KEEP AN EYE ON HIM.

24            MR. MCMANIS:  SAME WITH ANY OTHER EMPLOYEE.

25   BY MS. NGUYEN:

1    Q.   AND EVEN THOUGH MS. DANG WORKED OUT AS A SERVER BACK THEN,

2    SHE WAS STILL REQUIRED TO GO PICK UP FOOD TO BRING OUT TO SERVE

3    THE CUSTOMERS, RIGHT?

4    A.   YES.

5    Q.   AND SO IF SHE HAD TO GO BACK TO THE KITCHEN AND MR. SUAREZ

6    WAS THERE COOKING, SHE WOULD HAVE TO FACE HIM; ISN'T THAT TRUE?

7    A.   LIKE I SAID, BOTH OF THEM ARE ON A DIFFERENT SHIFT.  HE

8    GOES HOME AT 10:00 O'CLOCK.

9    Q.   BUT YOU RECALL THAT YOU HAD TO WATCH OUT FOR HER WHEN HE

10   WAS AROUND?

11   A.   YES.

12   Q.   AND WERE THERE TIMES THAT HE WORKED OVERTIME AND STAYED

13   LATE?

14   A.   I DON'T REMEMBER HOW MANY TIMES OR HOW OFTEN HE STAYED

15   LATE, BUT MY CREW'S GRAVEYARD SHIFT ALWAYS COME ON TIME AT

16   11:00 O'CLOCK.  WHEN THEY'RE HERE, I DON'T REALLY NEED ANYBODY

17   TO STAY OVER TIME AFTER 11:00 O'CLOCK.

18   Q.   AND, MR. MEAKCHAROON, YOU ALSO RECEIVED A COMPLAINT FROM

19   ANOTHER FEMALE EMPLOYEE ABOUT MR. SUAREZ, DIDN'T YOU?

20   A.   YES.

21   Q.   AND WAS THAT FROM AN EXPEDITER BY THE NAME OF NINA NGUYEN?

22   A.   YES.

23   Q.   AND HER VIETNAMESE NAME WAS NGA, N-G-A?

24   A.   I REALLY DON'T KNOW HER VIETNAMESE NAME.  WE ALWAYS GO BY

25   NINA.

1    Q.   AND SHE TOLD YOU THAT MR. SUAREZ ACTED INAPPROPRIATELY

2    TOWARD HER AND SHE DIDN'T LIKE IT; CORRECT?

3    A.   AS I REMEMBER ONE TIME.

4    Q.   AND YOU REPORTED THAT COMPLAINT TO MR. ST. CROIX, THE HEAD

5    OF THE FOOD AND BEVERAGE DEPARTMENT AT THAT TIME?

6    A.   YES, I HAVE.

7    Q.   AND THIS WAS BACK IN THE 2003, 2004 TIMEFRAME; CORRECT?

8    A.   I BELIEVE SO, YES, A LONG TIME AGO.

9    Q.   SO YOU HAVE REALLY GOOD LONG-TERM MEMORY?

10   A.   WELL, THAT WAS MY FIRST REPORT, YOU KNOW, SO I REMEMBER

11   THAT ONE REALLY WELL BECAUSE --

12   Q.   AND DID MR. ST. CROIX DO ANYTHING ABOUT YOUR REPORT OF

13   MR. SUAREZ ACTING INAPPROPRIATELY?

14   A.   I DID NOT KNOW WHAT HAS HE DONE TO THE PERSON NINA HAS

15   COMPLAINED, BUT LIKE I SAID, ALL I DID WAS AN EMPLOYEE COME AND

16   COMPLAINS TO ME, I REPORT TO MY BOSS AND THEN LET HIM TAKE THE

17   ACTION SO I REALLY DON'T KNOW WHAT ACTION MR. ST. CROIX DO BUT

18   I --

19   Q.   BUT YOU SAID THE PERSON THAT MADE THE COMPLAINT OF, THAT

20   WAS LUCIO SUAREZ, WASN'T IT?

21   A.   YES, IT WAS.

22   Q.   AND I BELIEVE YOU TOLD ME IN THE PAST THAT YOU KEEP AN EYE

23   ON THE WOMEN BECAUSE YOU DIDN'T FEEL IT WAS RIGHT FOR THEM TO

24   HAVE TO DEAL WITH UNWELCOMED HARASSMENT.  IS THAT HOW YOU FEEL?

25   A.   THAT'S 99.9 PERCENT OF THE SERVERS ARE WOMEN.  SO WE ONLY

1    HAVE ONE GUY, AND I DON'T REALLY WORRY ABOUT HIM AND I KEEP AN

2    EYE ON EVERYBODY.

3    Q.   PLEASE TAKE A LOOK AT THE OCTOBER 2009 STATEMENT THAT YOU

4    MADE IN THIS CASE, AND IT WOULD BE IN THAT BLUE BINDER THERE,

5    EXHIBIT 528.

6    A.   528?

7    Q.   YES.

8         AND I BELIEVE, YOUR HONOR, IT WAS ALREADY ADMITTED

9    YESTERDAY.

10        MR. MEAKCHAROON, IS THAT THE STATEMENT THAT YOU PROVIDED

11   TO BAY 101 FOR THE OCTOBER 2009 INCIDENT BETWEEN MS. DANG AND

12   LINDA ELIAS?

13   A.   I DIDN'T HAVE THE OTHER REPORT THAT I SIGNED AND GAVE TO

14   MR. ORTEGA.  THAT WOULD BE EXACTLY THE THING THAT HAPPENED.

15        YOU KNOW, THIS IS JUST TO -- HOW AM I GOING TO PUT IT?  I

16   WILL CONFIRM IT 100 PERCENT WHEN I SEE MY SIGNATURE ON THE

17   PAPER THAT I HAVE WROTE DOWN.

18   Q.   SO THE STATEMENT THAT YOU PROVIDED TO MR. ORTEGA WAS A

19   HANDWRITTEN STATEMENT; CORRECT?

20   A.   IT WAS, YES.

21   Q.   AND YOU SIGNED THAT STATEMENT?

22   A.   YES, I HAVE.

23   Q.   NOW, DO YOU SEE YOUR NAME AT THE BOTTOM OF THIS TYPED

24   WRITTEN STATEMENT?

25   A.   YES, IT IS.

1    Q.    BUT YOUR SIGNATURE ISN'T THERE, IS IT?

2    A.    NO.

3    Q.    AND BACK IN OCTOBER OF 2009, MR. ORTEGA CAME TO YOU AND

4    ASKED YOU TO WRITE A STATEMENT ABOUT WHAT HAPPENED BETWEEN

5    MS. DANG AND MS. ELIAS?

6    A.    I DON'T REMEMBER IF HE TOLD ME OR NOT, BUT EVERY INCIDENT

7    THAT HAPPENED WE ARE REQUIRED TO WRITE DOWN.

8    Q.    AND YOU DON'T RECALL THAT IN THIS CASE IT WAS MR. ORTEGA

9    WHO INSTRUCTED YOU TO PREPARE A WRITTEN REPORT?

10   A.    IT'S A DAILY ROUTINE FOR EACH LEAD COOK, ANYTHING THAT

11   HAPPENS ON THE SHIFT, THEY HAVE TO WRITE IT DOWN AND MAKE SURE

12   AND GIVE IT TO MR. ORTEGA SO THAT HE CAN HAVE A LOOK AND KNOW

13   EXACTLY WHAT IS GOING ON AND WHAT HAPPENED.

14   Q.    THE DAILY ROUTINE REPORTS, DON'T THOSE GO INTO A RED DIARY

15   BOOK?

16   A.    MOST OF THAT ONE, YES.

17         THE OTHER ONE, IF IT'S LIKE DETAILS OR LONG-TERM, YOU

18   KNOW, KIND OF INCIDENT, WE NORMALLY JUST WRITE IT DOWN ON

19   ANOTHER PIECE OF PAPER AND GIVE IT TO HIM.

20   Q.    AND DO YOU RECALL THAT THE INCIDENT BETWEEN MS. DANG AND

21   MS. ELIAS OCCURRED ON OCTOBER 4TH, 2009?

22   A.    I DON'T REMEMBER WHAT DATE, BUT I JUST REMEMBER PART OF

23   IT.

24   Q.    AND DO YOU RECALL THAT YOU KNEW AT THE TIME THAT

25   MR. ORTEGA WAS GOING TO HAVE BETSY, HIS ASSISTANT, TYPE UP YOUR

1     STATEMENT?

2     A.   MY JOB IS JUST TO GIVE HIM MY REPORTS.  I DON'T REALLY

3     KNOW WHAT HE'S GOING TO BE USING IT FOR OR HOW HE'S GOING TO DO

4     ANYTHING WITH IT.

5     Q.   AND I UNDERSTAND THAT THIS HAPPENED A LONG TIME AGO SO

6     WE'RE JUST ASKING YOU FOR YOUR BEST RECOLLECTION.

7     A.   OKAY.

8     Q.   BUT IF YOU CAN'T RECALL, I DO HAVE THE DEPOSITION

9     TRANSCRIPT FROM 2011.

10         YOUR HONOR, I'D LIKE TO READ FROM MR. MEAKCHAROON'S

11    DEPOSITION TRANSCRIPT, PAGE 115, LINE 15 UP TO LINE 22.

12             THE COURT:  I'M SORRY.  WOULD YOU GIVE ME THE PAGE

13    AGAIN?

14             MS. NGUYEN:  115, LINE 15 TO LINE 22.

15             THE COURT:  MY COPY DOESN'T HAVE THOSE PAGES IN IT.

16             MS. NGUYEN:  IT'S THE CONFIDENTIAL PORTION SO THERE

17    SHOULD BE TWO SEPARATE ENVELOPES.

18             THE COURT:  OKAY.  LET ME SEE IF -- OKAY.  I HAVE

19    IT.  115.

20             MS. NGUYEN:  LINE 15 TO 22, YOUR HONOR.

21             MR. MCMANIS:  IT SEEMS CONSISTENT WITH HIS

22    TESTIMONY.

23             THE COURT:  I'LL LET HER READ IT.

24             MR. MCMANIS:  OKAY.  FINE.  THANK YOU.

25    ///

1    BY MS. NGUYEN:

2    Q.   MR. MEAKCHAROON, BACK IN MAY OF 2011 I ASKED YOU THE

3    QUESTION, "AND DID YOU KNOW THAT YOUR HANDWRITTEN NOTE WAS

4    GOING TO BE TYPED UP?"

5         AND YOU ANSWERED, "HE TOLD YOU."

6         I ASKED YOU, "WHO TOLD YOU?"

7         AND YOU SAID, "NICK.  THAT HE WAS GOING TO HAVE A PERSON

8    DO THIS AND TYPE IT UP."

9         DOES THAT REFRESH YOUR RECOLLECTION THAT NICK TOLD YOU

10   THAT HE WAS GOING TO HAVE SOMEBODY TYPE IT UP?

11   A.   MY TESTIMONY AT THAT TIME MIGHT BE A BETTER MEMORY THAN

12   NOW SO.

13   Q.   THANK YOU.  LET ME GO BACK TO YOUR STATEMENT WHICH IS

14   EXHIBIT 528, OR AT LEAST THE TYPEWRITTEN STATEMENT THAT WAS

15   SUBMITTED BY BAY 101 IN THIS CASE?

16   A.   OKAY.

17   Q.   IT SAYS THAT, ACCORDING TO THIS STATEMENT, THAT YOU HEARD

18   BOTH LINDA AND CUC ARGUING.

19        DO YOU SEE THAT?

20   A.   YES.

21   Q.   AND CUC EXPLAINED TO HER THAT LINDA WAS GIVING HER A HARD

22   TIME AND LINDA CLAIMED THAT SHE WAS TRYING TO HELP, RIGHT?

23        DO YOU RECALL THAT?

24   A.   ABOUT THE REASON I DON'T REALLY REMEMBER, WHAT THEY WERE

25   ARGUING ABOUT OR WHAT WERE THEY.

1 Q. IT'S RIGHT IN FRONT OF YOU IF IT MAKES IT EASIER FOR YOU

2 TO SEE.

3 A. IT'S BLURRY AND THIS ONE IS EASIER. I JUST REMEMBER THAT

4 THEY WERE HAVING AN ARGUMENT, BUT I DON'T REMEMBER EXACTLY WHAT

5 THE REASON THAT THEY WERE ARGUING.

6 Q. NOW, BACK IN 2011 WHEN YOU SPOKE TO ME, YOU SAID THAT YOU

7 WERE NOT SURE WHETHER THIS TYPEWRITTEN STATEMENT ACCURATELY

8 SHOWS OR ACCURATELY REFLECTS THE HANDWRITTEN STATEMENT THAT YOU

9 HAD SUBMITTED.

10 DO YOU REMEMBER THAT?

11 A. I DON'T REMEMBER. I REALLY DON'T.

12 Q. YOU DON'T REMEMBER TELLING ME THAT YOU DON'T REMEMBER

13 WRITING SOME OF THESE STATEMENTS THAT WE SEE ON THIS DOCUMENT?

14 A. THE PART THAT I SAID -- I REMEMBER THE PART THAT I SAID

15 THAT I DON'T REMEMBER IF CUC DANG YELL AT ME OR NOT, BUT I

16 DON'T THINK SHE DID.

17 Q. BECAUSE ISN'T IT YOUR TESTIMONY, MR. MEAKCHAROON, THAT

18 MS. DANG HAS NEVER YELLED AT YOU?

19 A. YES, SHE NEVER YELLED AT ME.

20 Q. AND THAT SHE HAS NEVER CUSSED AT YOU?

21 A. NO.

22 Q. CORRECT? I'M SORRY.

23 A. YES.

24 Q. WE HAVE A TRANSCRIPT AND I JUST NEED TO MAKE SURE THAT

25 THAT IS THERE.

1      A.   OKAY.

2      Q.   AND I BELIEVE THAT YOU TOLD ME BACK IN 2011 THAT YOU HAVE

3      NEVER SEEN MS. DANG YELL OR CUSS AT ANY SUPERVISOR; ISN'T THAT

4      TRUE?

5      A.   SUPERVISOR, BY THAT MEANING IT WOULD BE ME.  SO -- SHE

6      NEVER YELLED AT ME AND SHE NEVER CUSSED AT ME.

7      Q.   SO THAT STATEMENT THAT IS TYPED IN THERE THAT "ABOUT

8      FIVE MINUTES LATER CUC WAS STILL RAISING HER VOICE TO ME ABOUT

9      THE INCIDENT AND USING A COUPLE OF BAD WORDS."

10          THAT WOULD NOT HAVE BEEN YOUR STATEMENT; CORRECT?

11     A.   IN MY STATEMENT THE THING THAT EXACTLY WHAT HAPPENED HAS

12     MY SIGNATURE ON IT.  SO I DON'T REALLY REMEMBER.

13     Q.   BUT --

14     A.   BUT ONE THING IS FOR SURE IS THAT SHE DIDN'T YELL AT ME.

15     Q.   AND ISN'T IT TRUE, AND I BELIEVE YOU TOLD ME THIS BACK IN

16     2011, THAT YOU HAVE NEVER SEEN MS. DANG YELL AT ANY CUSTOMER?

17     A.   I DON'T REMEMBER THAT.

18     Q.   OKAY.  LET ME REMIND YOU.

19     A.   OKAY.

20          MS. NGUYEN:  PAGE 112.  I THINK THIS IS THE REGULAR

21     PORTION OF THE TRANSCRIPT.

22          MR. MCMANIS:  LINE REFERENCE, PLEASE.

23          MS. NGUYEN:  1 TO 11.

24          MR. MCMANIS:  AGAIN, YOUR HONOR, IF THAT REFRESHES

25     HIS RECOLLECTION, I DON'T HAVE A PROBLEM WITH HIM LOOKING AT

1     IT.  I DON'T SEE ANY INCONSISTENCY HERE.

2           MS. NGUYEN:  YOUR HONOR, HE SAYS HE DOESN'T RECALL.

3     I WOULD LIKE TO BE ABLE TO READ THAT.

4           THE COURT:  I'D LET YOU READ IT IF YOU WANT.

5     BY MS. NGUYEN:

6     Q.  MR. MEAKCHAROON, THIS IS FROM YOUR DEPOSITION TRANSCRIPT

7     BACK IN 2011.  I HAD ASKED YOU WHETHER CUC HAD EVER YELLED AT

8     YOU OR CUSSED AT YOU, AND YOU CLARIFIED THAT I WAS TALKING

9     ABOUT YOU?  AND YOU SAID NO.

10     DO YOU SEE THAT?

11     A.  YES.

12     Q.  AND I ALSO ASKED IF YOU HAVE SEEN HER YELL OR CUSS AT ANY

13     OTHER SUPERVISOR?  AND YOU SAID NO.

14     A.  OKAY.

15     Q.  AND I HAVE ASKED WHETHER YOU HAVE SEEN HER YELL AT ANY

16     CUSTOMER.  AND YOU SAID NO.

17     A.  OKAY.

18     Q.  AND WHETHER SHE HAD CUSSED AT ANY CUSTOMER.  AND YOU SAID

19     NO.

20     DOES THAT NOW REFRESH YOUR RECOLLECTION AS TO WHAT YOU

21     TESTIFIED BACK IN 2011?

22     A.  MY JOB IS A LEAD COOK, SO MY EIGHT HOUR SHIFT I STAY IN

23     THE KITCHEN AND MAKE SURE THE FOOD COMES OUT FOR SEVEN HOURS.

24     I HAVE A HALF AN HOUR TO WALK AROUND TO MAKE SURE THE

25     PORTER STATION IS FINE, AND MOST OF THE TIME I DON'T REALLY SEE

1    ANY DETAILS WHEN THEY ARE TALKING TO CUSTOMER.

2         BUT EVERY TIME WE HAVE A PROBLEM WITH THE CUSTOMER AND THE

3    CUSTOMER MAKE A COMPLAINT, I ALWAYS WILL BE NOTIFIED OF.

4    Q.   RIGHT.  AND BASED ON YOUR TESTIMONY BACK IN 2011, YOU HAD

5    NEVER RECEIVED ANY NOTIFICATION ABOUT MS. DANG YELLING OR

6    CUSSING AT ANY CUSTOMER; RIGHT?

7    A.   IF I SAID NO, I MIGHT NOT HAVE.

8    Q.   YOU MIGHT NOT HAVE SEEN IT?

9    A.   I MIGHT NOT HAVE SEEN IT.

10   Q.   BECAUSE ACCORDING TO YOUR TESTIMONY YOU DIDN'T KNOW OF

11   ANY?

12   A.   YES.

13   Q.   AND YOUR JOB WAS TO ALSO SUPERVISE THE SERVERS; RIGHT?

14   A.   YES.

15   Q.   AND THE SERVERS GO OUT TO THE FLOOR AND THEY SERVE THE

16   CUSTOMERS OUT THERE; CORRECT?

17   A.   YES.

18   Q.   HAS MR. ORTEGA EVER TOLD YOU WHY HE DIDN'T USE YOUR

19   WRITTEN STATEMENT AND WHY HE DIDN'T HAVE YOUR WRITTEN STATEMENT

20   TYPED UP?

21   A.   I DIDN'T ASK.

22   Q.   HAVE YOU SEEN YOUR WRITTEN STATEMENT?  AFTER YOU TURNED IT

23   IN.  I'M SORRY.

24   A.   NO, I HAVEN'T.

25   Q.   LET'S MOVE ON TO DECEMBER -- I'M SORRY.  LET'S MOVE ON TO

1    DECEMBER 21ST, 2009.  THAT WAS THE DATE THAT MS. DANG WAS

2    TERMINATED.

3        DO YOU REMEMBER THAT?

4    A.   I DON'T REMEMBER THE DATE.

5    Q.   I'M GOING TO ASK YOU TO TAKE A LOOK AT EXHIBIT 1002.  IT

6    WOULD BE IN THE WHITE BINDER.

7    A.   1002?

8    Q.   YES.  DO YOU SEE THAT?

9    A.   YES.

10   Q.   AND THAT WAS YOUR STATEMENT IN 2010 REGARDING WHAT

11   HAPPENED ON DECEMBER 21ST, 2009; CORRECT?

12   A.   YES.

13        MS. NGUYEN:  YOUR HONOR, THE PLAINTIFF MOVES TO HAVE

14   THAT EXHIBIT ENTERED INTO EVIDENCE.

15        THE CLERK:  WHAT NUMBER WAS THAT?

16        MS. NGUYEN:  1002.

17        MR. MCMANIS:  I HAVE NO OBJECTION TO THAT.

18        THE COURT:  ALL RIGHT.  1002 IS ADMITTED.

19        MS. NGUYEN:  THANK YOU, YOUR HONOR.

20        (PLAINTIFF'S EXHIBIT 1002 WAS RECEIVED IN EVIDENCE.)

21   BY MS. NGUYEN:

22   Q.   MR. MEAKCHAROON, THAT STATEMENT HAS YOUR SIGNATURE ON THE

23   BOTTOM, DOESN'T IT?

24   A.   YES, IT HAS.

25   Q.   BECAUSE IT WAS GIVEN BACK TO YOU TO SIGN?

1    A.   I DON'T REMEMBER HOW OR WHEN THAT I SIGNED, BUT EVERY

2    SINGLE STATEMENT THAT HAS MY SIGNATURE ON IT, THAT'S EXACTLY

3    WHAT HAPPENED.

4    Q.   BUT YOU DIDN'T TYPE IT UP, DID YOU?

5    A.   I DON'T REMEMBER THAT I HAVE TYPED THIS ONE UP MYSELF OR

6    NOT.

7    Q.   HAVE YOU IN THE PAST TYPED UP STATEMENTS THAT YOU

8    SUBMITTED TO MR. ORTEGA?

9    A.   SOMETIMES.

10   Q.   SO THIS ONE, IT SAYS THAT AT 4:00 O'CLOCK ON DECEMBER 21ST

11   YOU WERE WITH MR. ORTEGA WHEN HE SPOKE WITH MS. DANG ABOUT

12   GOING TO H.R. FOR A MEETING AT 7:00 O'CLOCK.

13        DO YOU REMEMBER THAT?

14   A.   YES, I REMEMBER THAT.

15   Q.   AND YOU SAID THAT ALL YOU HEARD HER SAY WAS THAT SHE WAS

16   TIRED AND SHE ALREADY HAS PLAN AFTER WORK AND THAT SHE COULDN'T

17   STAY.

18        DO YOU REMEMBER HEARING HER SAY THAT TO HIM?

19   A.   YES, I HAVE.

20   Q.   AND YOU SAID THAT'S ALL YOU HEARD HER SAY AND THEN HALF AN

21   HOUR LATER YOU WENT HOME?

22   A.   YES.

23   Q.   AND SO THAT WAS ALL YOU HEARD HER SAY TO MR. ORTEGA,

24   RIGHT?

25   A.   YES.

1   Q.   AND DID YOU HEAR HIM SAY ANYTHING BACK TO HER?

2   A.   WHILE I WAS THERE I HAVEN'T HEAR ANYTHING.  I HAVEN'T

3   HEARD IF HE SAY ANYTHING BACK TO HER.

4   Q.   SO MR. ORTEGA DID NOT TELL MS. DANG WHO WAS GOING TO BE AT

5   THE MEETING, DID HE?

6           MR. MCMANIS:  I --

7           THE COURT:  GO AHEAD.

8           THE WITNESS:  I DON'T REMEMBER IF HE TOLD HER

9   ANYTHING OR NOT.

10  BY MS. NGUYEN:

11  Q.   AND YOU DIDN'T HEAR HIM SAYING ANYTHING ABOUT WHAT THE

12  MEETING WAS GOING TO BE ABOUT, RIGHT?

13  A.   I WAS COOKING AT THAT TIME ALSO, SO I REALLY DIDN'T PAY

14  CLOSE ATTENTION WHILE HE WAS TALKING TO HER OR NOT AND THAT'S

15  ALL I HEARD THERE AT THAT TIME.

16  Q.   AND, WELL, YOU SAID THAT YOU WERE COOKING.  I RECALL YOU

17  SAYING THAT HE ACTUALLY PULLED YOU AWAY FROM WHAT YOU WERE

18  DOING SO THAT YOU CAN GO OVER THERE TO BE A WITNESS TO HIS

19  CONVERSATION WITH MS. DANG.

20      DO YOU RECALL THAT?

21  A.   WHEN HE ASKED HER TO GO TO HUMAN RESOURCE AFTER 7:00

22  O'CLOCK.

23  Q.   AND YOU WERE THERE AS A WITNESS; RIGHT?

24  A.   AT THAT TIME, AT THAT SENTENCE, YEAH, THAT'S IT.

25  Q.   AND DURING THAT CONVERSATION WHEN SHE TOLD HIM SHE

1     COULDN'T STAY BECAUSE SHE HAD PLANS, HE DIDN'T SAY ANYTHING TO

2     HER ABOUT WHAT THE MEETING WAS GOING TO BE ABOUT, RIGHT?

3     A.   NO, HE HADN'T.

4     Q.   AND AT THAT SAME TIME DURING THAT CONVERSATION WHILE YOU

5     WERE THERE, YOU DIDN'T HEAR HIM SAY ANYTHING TO HER ABOUT HOW

6     LONG THE MEETING WAS GOING TO LAST, DID YOU?

7     A.   NO, I HAVEN'T.

8     Q.   AND YOU DIDN'T HEAR MR. ORTEGA SAY ANYTHING TO MS. DANG

9     ABOUT ANY CONSEQUENCES TO HER NOT STAYING FOR THE MEETING, DID

10    YOU?

11    A.   NO, I HAVEN'T.

12    Q.   AND SO WHEN YOU LEFT THAT MORNING, YOUR UNDERSTANDING WAS

13    THAT MS. DANG WAS STILL WORKING, RIGHT?

14    A.   MY SCHEDULE IS 10:00 TO 6:00.  SO BY 6:00 O'CLOCK I GO

15    HOME.

16    Q.   AND HER SHIFT ENDED AT 7:00 O'CLOCK?

17    A.   YES.

18    Q.   AND SO WHEN YOU LEFT, SHE WAS STILL WORKING?

19    A.   YES.

20    Q.   AND YOU ONLY FOUND OUT LATER THAT SHE HAD BEEN FIRED,

21    CORRECT?

22    A.   YES.

23    Q.   AND WERE YOU TOLD THAT SHE WAS FIRED BECAUSE SHE DIDN'T

24    STAY FOR THE H.R. MEETING?

25    A.   I DIDN'T KNOW WHETHER SHE WAS FIRED OR IF SHE WAS

1    SUSPENDED OR ANYTHING.  I JUST KNOW THAT SHE HADN'T SHOWN UP TO

2    WORK FOR THE NEXT COUPLE OF DAYS.  THAT WAS ALL.

3    Q.   AS A SUPERVISOR, SOMETIMES YOU HAVE TO ASK PEOPLE TO STAY

4    TO WORK OVERTIME WHEN THINGS ARE REALLY BUSY, RIGHT?

5    A.   YES.

6    Q.   AND WHEN YOU NEED SOMEONE TO WORK OVERTIME WITH YOU, YOU

7    TRY TO GIVE THEM AS MUCH ADVANCE NOTICE AS POSSIBLE?

8    A.   YES.

9    Q.   SO THAT THEY CAN MAKE ARRANGEMENTS IF THEY HAD OTHER

10   OBLIGATIONS?

11   A.   YES.

12   Q.   BUT IF THEY TELL YOU THAT THEY CAN'T STAY BECAUSE THEY

13   HAVE PRIOR COMMITMENTS, THEN YOU TRY TO FIND SOMEBODY ELSE?

14   A.   YES.

15   Q.   AND I BELIEVE YOU TOLD ME IN THE PAST THAT YOU DON'T HOLD

16   IT AGAINST THEM IF THEY HAVE PRIOR COMMITMENTS AND THEY CAN'T

17   STAY; CORRECT?

18   A.   NO.

19   Q.   I JUST NEED YOU TO GO BACK TO THE STATEMENT OF

20   OCTOBER 2009 FOR A LITTLE BIT.  THAT'S 528.  528.

21   A.   OKAY.

22   Q.   AND I KNOW THAT YOU HAVE ALREADY SAID THAT YOU WEREN'T

23   SURE ABOUT THE STATEMENTS THAT ARE IN THIS TYPED UP DOCUMENT,

24   BUT DO YOU RECALL THAT YOU SENT MS. DANG AND TOLD HER TO GO AND

25   CALM DOWN IN ABOUT FIVE MINUTES?

1    A.   YES, I HAVE.

2    Q.   AND WHEN YOU LEFT THAT MORNING, OCTOBER 4TH, 2009,

3    EVERYTHING WAS FINE?

4    A.   ALL I REMEMBER WAS THAT I TOLD HER TO TAKE HER TEN AND

5    CALM DOWN AND COME BACK TO WORK, AND I DON'T REMEMBER WHAT

6    HAPPENED AFTER I LEFT AFTER THAT.

7    Q.   AND YOU RECALL THAT DURING THAT INCIDENT YOU HEARD BOTH

8    MS. DANG AND MS. ELIAS ARGUING WITH EACH OTHER?

9    A.   YES, THEY WERE.

10   Q.   AND THEY WERE ARGUING IN THE KITCHEN NEAR THE EXPEDITER

11   STATION?

12   A.   YES.

13   Q.   SO THAT'S AWAY FROM THE FLOOR WHERE THE CUSTOMERS ARE;

14   RIGHT?

15   A.   YES.

16   Q.   AND YOU FOUND OUT AFTERWARDS THAT MS. DANG HAD BEEN

17   SUSPENDED FOR THAT INCIDENT, RIGHT?

18   A.   I DON'T REMEMBER IF SHE GOT SUSPENDED OR SHE GOT WRITTEN

19   UP.  I DON'T REMEMBER.

20   Q.   YOU DON'T REMEMBER COMING BACK TO WORK AND BEING TOLD THAT

21   SHE WAS SUSPENDED AND THAT SHE WOULDN'T BE COMING INTO WORK FOR

22   A FEW DAYS?

23   A.   I DON'T REMEMBER THAT.

24   Q.   DO YOU RECALL THAT MS. ELIAS DID NOT RECEIVE ANY

25   SUSPENSION?

1    A.   I DON'T REMEMBER EITHER.

2              MS. NGUYEN:  THAT'S ALL OF THE QUESTIONS THAT I HAVE

3    AT THIS TIME.

4              THE COURT:  ANY QUESTIONS?

5              MS. NGUYEN:  THANK YOU, MR. MEAKCHAROON.

6              MR. MCMANIS:  I JUST HAVE ONE QUESTION BUT IT'S VERY

7    IMPORTANT.

8              THE COURT:  WELL, LET'S NOT EDITORIALIZE.  JUST ASK

9    YOUR QUESTION.

10             MR. MCMANIS:  THANK YOU.

11                    **AS-ON DIRECT EXAMINATION**

12   BY MR. MCMANIS:

13   Q.   ARE YOU THE GUY THAT MAKES THE MENUDO?

14   A.   SOMETIMES.

15             MR. MCMANIS:  THANK YOU, YOUR HONOR.  THAT'S ALL I

16   HAVE.

17             THE COURT:  YOU'RE EXCUSED.

18             MS. NGUYEN:  THE PLAINTIFF WOULD LIKE TO RECALL

19   MR. WERNER TO FINISH.

20             THE COURT:  ALL RIGHT.

21             THE CLERK:  REMEMBER, YOU'RE STILL UNDER OATH.

22        (PLAINTIFF'S WITNESS, RONALD WERNER, PREVIOUSLY SWORN.)

23               **FURTHER AS-ON RECROSS-EXAMINATION**

24   BY MS. NGUYEN:

25   Q.   GOOD MORNING, MR. WERNER.

1    A.   GOOD MORNING.

2    Q.   I'M GOING TO ASK YOU TO PULL OUT EXHIBIT 1016.

3         THIS WAS ADMITTED ALREADY YESTERDAY, YOUR HONOR.

4         SO IF WE CAN GET IT UP ON THE SCREEN, PLEASE?

5    A.   YES.

6    Q.   IN THIS LETTER MS. DANG WAS COMPLAINING TO YOU ABOUT HOW

7    SHE WAS TREATED AFTER THE OCTOBER 4TH INCIDENT WITH MS. ELIAS,

8    RIGHT?

9    A.   I THINK THAT'S IN THE LETTER, YES.

10   Q.   AND I THINK YESTERDAY YOU TESTIFIED THAT YOU HAD NEVER

11   REVIEWED THE VIDEO SURVEILLANCE TAPE FROM THAT INCIDENT; RIGHT?

12   A.   I DIDN'T REVIEW IT BEFORE I MADE THE DECISION TO TERMINATE

13   MS. DANG, BUT I HAVE SEEN THE VIDEOTAPE.

14   Q.   AND YOU DIDN'T REVIEW IT PRIOR TO TERMINATING HER?

15   A.   NO, I DID NOT.

16   Q.   AND AT THE TIME THAT YOU TERMINATED MS. DANG, YOU WERE

17   RELYING ON MR. ORTEGA'S AND MS. GILBERT'S EXPLANATION TO YOU

18   ABOUT WHAT HAPPENED WITH RESPECT TO THE OCTOBER 4TH, 2009

19   INCIDENT BETWEEN MS. DANG AND MS. ELIAS?

20   A.   AS WELL AS THE WRITTEN STATEMENTS AND THE REPORT FROM

21   MS. EDMAN.

22   Q.   AND THE WITNESS STATEMENT, I BELIEVE YESTERDAY YOU SAID

23   THAT THEY WERE FROM MS. FONTILLAS AND MS. ELIAS?

24   A.   I THINK THERE WAS ONE FROM KEN AS WELL.

25   Q.   OKAY.  AND YOU WERE HERE EARLIER.  YOU HEARD

1    MR. MEAKCHAROON TESTIFY REGARDING HIS RECOLLECTION OF THAT

2    EVENT; CORRECT?

3    A.   I DID.

4    Q.   AND SO THOSE WERE THE THREE WITNESS STATEMENTS THAT YOU

5    REVIEWED AND RELIED UPON?

6    A.   THOSE WERE THREE STATEMENTS THAT I RECALL REVIEWING.  I

7    DON'T REMEMBER IF I SPOKE WITH OTHERS REGARDING THAT INCIDENT

8    SEPARATELY BUT BEFORE I TERMINATED HER.

9    Q.   DID YOU ASK MS. DANG ABOUT HER VERSION OF WHAT HAPPENED?

10   A.   SHE WASN'T THERE.

11   Q.   HAVE YOU EVER ASKED HER ABOUT HER VERSION OF WHAT

12   HAPPENED?

13   A.   I HAVEN'T HAD THE OPPORTUNITY, BUT THE ANSWER IS NO.

14   Q.   AND YOU HAVE NEVER SEEN ANY WRITTEN STATEMENT FROM HER

15   ABOUT WHAT HAPPENED; CORRECT?

16   A.   WELL, I HAVE.  I HAVE READ HER LETTER AND I HAVE SEEN THE

17   MATERIALS THAT HAVE BEEN PRESENTED DURING THE COURSE OF THIS

18   TRIAL.

19   Q.   AND SO THAT LETTER THAT YOU'RE LOOKING AT, THAT'S THE

20   FIRST TIME THAT YOU SAW ANY STATEMENT FROM HER; CORRECT?

21   A.   I DON'T REMEMBER.

22   Q.   AND THE STATEMENTS THAT YOU REVIEWED, AS WELL AS THE

23   REPORT FROM THE INVESTIGATOR --

24   A.   YOU KNOW, I'M SORRY.  THERE MAY HAVE BEEN SOMETHING THAT

25   WAS PRESENTED DURING THE COURSE OF THE MEDIATION THAT I MIGHT

1    HAVE LOOKED AT AFTER THE MEDIATION OR -- BUT I JUST DON'T

2    RECALL.

3    Q.   OKAY.  AND SO YOU SAID, THOUGH, THAT YOU RELIED ON THE

4    STATEMENTS BY MS. FONTILLAS, MS. ELIAS, MR. MEAKCHAROON, AND

5    THE REPORT MADE BY THE INVESTIGATOR; CORRECT?

6    A.   AS PART OF WHAT I DECIDED HAPPENED DURING MY PERCEPTION OF

7    WHAT HAPPENED DURING THAT INCIDENT, YES, THAT'S PART OF WHAT

8    HELPED MAKE MY PERCEPTION.

9    Q.   I'M SORRY TO INTERRUPT.

10   A.   I'M SORRY.  I'M DONE.

11   Q.   AND YOU ASSUMED THAT WHAT IS WRITTEN IN THOSE STATEMENTS

12   WERE CORRECT?

13   A.   YES.

14   Q.   AND ACCURATE?

15   A.   FOR THE MOST PART, YES.

16   Q.   AND YOU ASSUMED THAT THOSE WITNESSES WERE ALL TRUTHFUL?

17   A.   YES.

18   Q.   AND SINCE MAKING THE DECISION TO TERMINATE MS. DANG, HAVE

19   YOU YOURSELF REVIEWED THE VIDEO SURVEILLANCE TAPE FROM

20   OCTOBER 2009?

21   A.   YES.

22   Q.   AND HAVE YOU SEEN ANYTHING FROM YOUR REVIEW OF THAT TAPE

23   THAT IS DIFFERENT FROM WHAT HAD PREVIOUSLY BEEN REPORTED TO

24   YOU?

25   A.   I DON'T THINK SO.

1    Q.   I'D LIKE FOR YOU TO GO TO, I THINK IT'S THE SECOND OR

2    THIRD PAGE, IT'S THE COUNSELLING MEMO THAT MS. DANG ATTACHED TO

3    THIS LETTER.

4    A.   YES.

5    Q.   ACCORDING TO THIS COUNSELLING MEMO, MS. DANG BROUGHT A

6    WRONG DRINK TO A CUSTOMER?

7    A.   THAT'S WHAT THE COUNSELLING MEMO SAYS.

8    Q.   AND DO YOU KNOW WHO PROVIDED THAT INFORMATION?

9    A.   I'M NOT SURE WHO TYPED IT UP.  IT'S GOT NICK ORTEGA'S

10   SIGNATURE AT THE BOTTOM OF IT.

11   Q.   AND DO YOU SEE THERE, TOO, MR. WERNER, THAT IT ACCUSED

12   MS. DANG OF ARGUING WITH THE CUSTOMER?

13   A.   YES.

14   Q.   AND THE VIDEO SURVEILLANCE -- THE SURVEILLANCE VIDEO THAT

15   YOU SAW, IT DOESN'T HAVE ANY AUDIO, DOES IT?

16   A.   THE SURVEILLANCE TAPE HAS NO AUDIO.

17   Q.   WELL, I'D LIKE YOU TO FLIP TO THE NEXT PAGE.  IT'S THE

18   SECOND COUNSELLING MEMO.

19        AND THIS ONE IS SUPPOSEDLY COUNSELLING MS. DANG WITH

20   RESPECT TO BALANCING HER ENVELOPES.

21        DO YOU SEE THAT?

22   A.   IT SAYS "YOU ARE NOT BALANCING YOUR ENVELOPE CORRECTLY AT

23   THE END OF YOUR SHIFT."

24   Q.   AND BASED ON WHAT YOU TOLD US YESTERDAY, THAT'S BASED ON

25   THE INFORMATION THAT MS. KNAPP SENT DOWN REGARDING HER NOT

1     BALANCING HER ENVELOPES?

2     A.   WHAT I UNDERSTAND?

3     Q.   YES.

4     A.   I UNDERSTAND THAT FROM BOTH MS. KNAPP AND FROM MR. ORTEGA

5     AND I THINK FROM ONE OF HER TRAINERS.

6     Q.   AND DO YOU SEE THERE THAT IT SAYS THAT SHE MIGHT FACE MORE

7     SEVERE DISCIPLINARY ACTION AND THAT THE COMPANY MAY HAVE TO BE

8     ABLE TO OFFER -- MAY OFFER HER A POSITION BACK IN THE KITCHEN?

9         DO YOU SEE THAT?

10    A.   IT SAYS IT MAY BE ABLE TO OFFER.  I WOULD ASSUME THAT IS

11    MAY BE OFFERED.

12    Q.   AND SO DOES THAT MEAN THAT IF SHE WAS TERMINATED FROM HER

13    SERVER POSITION, THAT SHE MIGHT GET A JOB BACK IN THE KITCHEN?

14    A.   IT MIGHT BE THAT IT WAS POSSIBLE.  I HAD A 90-DAY POLICY

15    THAT IF A PERSON TRANSFERRED FROM ONE JOB OR ONE DEPARTMENT TO

16    ANOTHER DEPARTMENT AND THEY WERE NOT SUCCESSFUL IN THAT NEW

17    POSITION THAT THEY COULD BE RETURNED TO THEIR OLD DEPARTMENT

18    WITHIN THAT 90-DAY PERIOD, AND I DON'T KNOW IF SHE WAS WITHIN

19    THAT 90-DAY PERIOD OR NOT AT THE TIME THAT THIS COUNSELLING

20    MEMO WAS DONE.

21    Q.   AND WOULDN'T SENDING HER BACK INTO THE KITCHEN BE SENDING

22    HER BACK TO WORK WITH LUCIO SUAREZ?

23    A.   NO.

24    Q.   HE WORKED IN THE KITCHEN AS A COOK, DIDN'T HE?

25    A.   WELL, SHE COULD BE WORKING ON A DIFFERENT SHIFT.  THEY

1   DON'T HAVE TO WORK ON THE SAME SHIFT.  IF THEY'RE NOT THERE ON

2   THE SAME SHIFT OR DON'T GENERALLY OVERLAP IN TIMES, I DON'T SEE

3   WHY THAT'S HAVING TO WORK -- THERE'S NO REQUIREMENT THAT SHE

4   WORK WITH LUCIO.

5   Q.   AND YOU WERE HERE EARLIER WHEN MR. MEAKCHAROON TESTIFIED

6   THAT HE TRIED TO WATCH OUT FOR HER WHEN LUCIO WAS AROUND.

7        DO YOU RECALL THAT?

8   A.   I THINK HE TESTIFIED THAT LUCIO GENERALLY WAS NOT THERE

9   AND HE WATCHED OUT FOR ALL OF THE SERVERS, BUT THAT'S MY

10  PERCEPTION.  IT MAY BE DIFFERENT FROM YOURS.

11  Q.   AND HE RECEIVED A REPORT FROM MS. DANG THAT SHE WAS

12  UNCOMFORTABLE AROUND LUCIO WHEN SHE SAW HIM THERE AT WORK?

13  A.   I DON'T KNOW IF HE DID OR HE DIDN'T.

14  Q.   YOU WERE HERE WHEN HE TESTIFIED?

15  A.   I HEARD HIM TESTIFY.

16  Q.   DO YOU REMEMBER EVER RECEIVED A SIMILAR REPORT ABOUT

17  MS. DANG BEING UNCOMFORTABLE AROUND LUCIO SUAREZ?

18  A.   ONLY WHEN I RECEIVED THE LETTER IN OCTOBER DID I LEARN

19  THAT.

20  Q.   YESTERDAY YOU STATED THAT YOU RELIED A LOT ON THE

21  INVESTIGATOR'S REPORT.  I'D LIKE YOU TO TAKE A LOOK AT THAT.  I

22  THINK IT WAS MARKED AS EXHIBIT 500.

23       IT'S THE BLUE BINDER.  IT'S THE FIRST ONE.  AND IF YOU

24  COULD FIND PAGE 18, 19.  IT'S PAGE 18 OF THE REPORT ITSELF.

25  A.   OKAY.

1    Q.   DO YOU SEE THE VERY LAST PARAGRAPH THERE ABOUT WHAT

2    NICK ORTEGA TOLD THE INVESTIGATOR?

3              MR. MCMANIS:  I'M SORRY.  WHAT PAGE IS THIS?

4              MS. NGUYEN:  IT'S PAGE 18 AND 19 OF THE REPORT.

5              MR. MCMANIS:  18?

6              MS. NGUYEN:  YES, 18, THE BOTTOM OF THE PAGE.

7    Q.   IT TALKS ABOUT WHAT NICK ORTEGA TOLD THE INVESTIGATOR.

8         AND IF YOU GO OVER TO PAGE 19 OF THE SAME PARAGRAPH WHERE

9    HE TOLD THE INVESTIGATOR THAT -- GO TO PAGE 19, PLEASE.

10             JUROR:  CAN WE SEE 18 FIRST?

11             MS. NGUYEN:  I'M SORRY.  GO DOWN TO 18 FIRST.

12   Q.   DO YOU SEE THAT MR. ORTEGA TOLD THE INVESTIGATOR THAT ONE

13   OF THE TRAINERS FOR MS. DANG GIVES HIM A PROGRESS REPORT ON

14   MS. DANG?

15   A.   YES.

16   Q.   CAN YOU SCROLL UP TO THE NEXT PAGE?  NEXT PAGE, PLEASE.

17        AND THAT HE HAS BEEN TRAINING MS. DANG SINCE SEPTEMBER AND

18   THAT SINCE THEN SHE HAS NOT HAD BALANCING MISTAKES INPUT TO

19   ACCOUNTING, BUT STILL HAS A LOT OF VOIDS AND MISTAKES WITH

20   CUSTOMERS.

21        SO IT SAYS THAT SHE DIDN'T HAVE ANY BALANCING MISTAKES

22   SINCE SEPTEMBER.  DO YOU SEE THAT?

23   A.   YES.

24   Q.   EVEN THOUGH IN OCTOBER OF 2009 HE WROTE HER UP WITH A

25   COUNSELLING MEMO FOR BALANCING MISTAKES?

1       I'M GOING TO ASK YOU TO KEEP LOOKING AT THAT REPORT

2   BECAUSE YESTERDAY YOU TESTIFIED THAT YOU RELIED A LOT ON

3   MS. EDMAN'S REPORT, PAGE 5 AND 6 OF THE REPORT.

4       LET'S GO TO PAGE 5 TOWARD THE BOTTOM.  THAT PARAGRAPH

5   TALKS ABOUT MS. DANG'S ALLEGATIONS THAT "MR. ORTEGA BLAMED

6   THINGS ON THE VIETNAMESE AND HAD SAID THAT THE VIETNAMESE, THEY

7   ARE BAD."

8       DO YOU SEE THAT?

9   A.   YES.

10  Q.   AND THE INVESTIGATOR THEN INTERVIEWED MS. NGUYEN, THAT'S

11  MAMA ANH HUYNH; CORRECT?

12  A.   YES.

13  Q.   AND DO YOU SEE THERE AT THE VERY TOP, FIRST LINE SAYS

14  "MS. HUYNH ALSO SAID THAT MANY EMPLOYEES OF ALL RACES AND

15  NATIONALITIES DID NOT LIKE MR. ORTEGA AND FELT THAT HE COULD BE

16  UNFAIR."

17      DID YOU CONSIDER THAT AS PART OF THE FACTORS IN MAKING

18  YOUR TERMINATION DECISION?

19  A.   I'M SORRY.  DID I CONSIDER MS. HUYNH'S STATEMENT --

20  Q.   YES.

21  A.   -- IN DECIDING TO TERMINATE CUC DANG?  NO.

22  Q.   DID YOU READ THAT WHEN YOU READ THE INVESTIGATOR'S REPORT?

23  A.   I READ THE ENTIRE REPORT.

24  Q.   AND FROM THE REPORT YOU KNEW THAT MS. GILBERT AND

25  MR. ORTEGA MADE COMMENTS IN THE WORKPLACE; RIGHT?

1    A.   IT SAYS ONCE.  I FELT IT WAS INAPPROPRIATE IN THE

2    WORKPLACE AND IT SHOULD BE ADDRESSED WITH BOTH EMPLOYEES AND I

3    DID SO.

4    Q.   AND DID YOU SEE FROM MS. EDMAN'S REPORT THAT ANOTHER

5    EMPLOYEE HAD DISCUSSED INAPPROPRIATE TOUCHING BY MR. SUAREZ?

6    A.   BY MR. SUAREZ?  WE'RE TALKING ABOUT THE CANDY INCIDENT?

7    Q.   WAS THAT MR. SUAREZ?

8    A.   I'M NOT CERTAIN.  IS THAT THE INCIDENT THAT YOU'RE

9    REFERRING TO?

10   Q.   LET ME POINT YOU TO PAGE 37, 38 OF THE REPORT.

11        LET'S GO TO PAGE 38.  DOWN A LITTLE BIT, PLEASE.

12        THIS IS WHAT MS. CHI LUONG -- SHE WAS A PBS OPERATOR

13   WORKING AT BAY 101.

14        THIS IS WHAT SHE TOLD THE INVESTIGATOR:  "THAT MR. SUAREZ

15   HAD ASKED HER FOR DATES ABOUT THREE TIMES."

16        DO YOU SEE THAT?

17   A.   YES.

18   Q.   AND THAT ON OCCASIONS WHEN HE WAS ASKING HER FOR DATES, HE

19   WOULD STAND CLOSE TO HER AND RUB UP THE SIDE OF HIS UPPER ARM

20   AGAINST THE SIDE OF HER UPPER ARM?

21   A.   THAT'S WHAT IT SAYS.

22   Q.   AND THAT HE LIKES WOMEN AND FLIRTING?

23   A.   "MS. LUONG STATED THAT 'HE'S A VERY NICE PERSON OTHER THAN

24   HE LIKES WOMAN AND FLIRTING.'"

25   Q.   CAN YOU SCROLL DOWN, ANDRE?

1          AND DO YOU SEE THE INVESTIGATOR SAYS HERE THAT SHE WAS

2     MORE INCLINED TO BELIEVE MS. LUONG'S ACCOUNT AS OPPOSED TO

3     MR. SUAREZ'S DENIAL OF ASKING ANYONE ELSE FOR DATES SINCE

4     APRIL 2007?

5          DO YOU RECALL READING THAT MR. SUAREZ DENIED EVER ASKING

6     ANYONE FOR DATES AFTER APRIL OF 2007?

7     A.   YES.

8     Q.   AND DO YOU RECALL ALSO READING THAT THE INVESTIGATOR SAID

9     THAT SHE DIDN'T BELIEVE HIM?

10    A.   I THINK WHAT THE INVESTIGATOR SAID WAS THAT SHE BELIEVED

11    MS. LUONG'S ACCOUNT OVER MR. SUAREZ'S ACCOUNT.  I DON'T KNOW IF

12    SHE SAID SHE DIDN'T BELIEVE HIM, BUT SHE ACCEPTED MS. LUONG AS

13    BEING THE MORE CREDIBLE PERSON.

14    Q.   OKAY.  SO SHE -- I'D LIKE YOU TO TAKE A LOOK AT PAGE --

15    BACK TO PAGE 37, SO THE FIRST PAGE WHERE THE INVESTIGATOR NOTED

16    HER INTERVIEW WITH MS. LUONG.

17         TOWARD THE END OF THIS PARAGRAPH WHERE THE INVESTIGATOR

18    WAS ASKING ABOUT MS. DANG'S ALLEGATIONS WITH RESPECT TO THE

19    TRANSFER REQUEST:  IT WAS MS. LUONG'S IMPRESSION FROM TALKING

20    WITH OTHER EMPLOYEES THAT IT DOESN'T MATTER WHAT YOU KNOW, IT'S

21    WHO YOU KNOW THAT MATTERS TO GETTING HIRED AND TRANSFERRED AT

22    BAY 101.

23         IS THAT YOUR UNDERSTANDING OF WHAT GOES ON AT BAY 101?

24    A.   NO, BUT THAT'S MS. LUONG'S IMPRESSION.  THAT'S NOT WHAT

25    HAPPENS.

1    Q.   LET'S GO TO THE NEXT PAGE, PLEASE, 38 WHERE THE

2    INVESTIGATOR ASKED MS. LUONG ABOUT MS. DANG'S CLAIM ABOUT

3    SELECTIVE ENFORCEMENT OF RULES.

4         SCROLL DOWN A LITTLE BIT MORE.

5         HERE IT SAYS THAT MS. LUONG RELAYED SOME EXPERIENCES WITH

6    COWORKERS, COMMUNICATIONS WITH NICK ORTEGA AND COMMUNICATIONS

7    WITH JENNIFER GILBERT, WHO WAS HER MANAGER, THAT RESULTED IN

8    MS. LUONG FEELING THAT SHE WAS TREATED DIFFERENTLY THAN HER

9    COWORKERS.

10        DO YOU SEE THAT?

11   A.   WE'RE TALKING ABOUT MS. LUONG NOW?

12   Q.   YES.

13   A.   YES.

14   Q.   AND MS. LUONG ALSO FELT THAT THEY FAVOR THEIR OWN KIND AND

15   THAT NICK ORTEGA TREATS DIFFERENT PEOPLE DIFFERENTLY.

16        MS. LUONG ALSO REPORTED TO THE INVESTIGATOR THAT SHE WAS

17   NOT COMFORTABLE SPEAKING UP TO JENNIFER GILBERT OR NICK ORTEGA.

18        SHE ALSO SAID THAT SHE FELT THAT EMPLOYEES WERE AFRAID OF

19   LOSING THEIR JOBS AND THAT'S WHY THEY COULDN'T SPEAK UP.

20        SHE ALSO SAID THAT SHE DID NOT FEEL THAT MS. GILBERT WAS

21   VERY APPROACHABLE, AND SHE ACTUALLY GAVE EXAMPLES OF WHEN

22   MS. GILBERT DIDN'T SEEM TO LISTEN TO HER POINT OF VIEW.

23        DID YOU CONSIDER THIS WHEN YOU WERE MAKING YOUR DECISION

24   TO TERMINATE MS. DANG?

25   A.   I CONSIDERED THE REPORT AND THE CONTENTS OF THE REPORT.

1      WHEN I READ THIS, I UNDERSTOOD THIS TO RELATE PRIMARILY TO

2      MS. LUONG'S CONCERNS ABOUT HER POSITION AND HER JOB AND HER

3      SUPERVISOR SINCE THAT HAD BEEN PART OF THE -- I CONSIDERED THAT

4      IN TERMS OF, PERHAPS, THE COMPLAINTS AGAINST BOTH MR. ORTEGA

5      FOR DISCRIMINATION AND MS. GILBERT FOR DISCRIMINATION OR

6      TREATMENT.

7      I DID NOT CONSIDER THIS AS A FACTOR IN MY DECISION TO

8      TERMINATE MS. DANG.

9      I DID NOT CONSIDER THIS AS A CAUSE OR REASON TO TERMINATE

10     MS. DANG, IF THAT'S YOUR QUESTION.

11     Q.   SO WHAT WAS -- WHAT DID YOU CONSIDER IN THE REPORT AS A

12     REASON FOR TERMINATING MS. DANG?

13     A.   AS I SAID EARLIER, THE REPORT I USED TO SUPPORT THE

14     MATERIAL I PUT INTO THE JOB PERFORMANCE GOALS THAT I THOUGHT

15     MS. DANG SHOULD MEET IN ORDER TO ASSURE HER SUCCESS AT BAY 101.

16     I CONSIDERED THE TOTALITY -- THE TOTAL OF ALL OF THE

17     CIRCUMSTANCES, IN THE BACK OF MY MIND I'M SURE OF EVERYTHING I

18     KNEW ABOUT MS. DANG AND HER EMPLOYMENT AT BAY 101 WHEN SHE WAS

19     TERMINATED.

20     BUT THE REASON I TERMINATED HER WAS BECAUSE SHE -- THE

21     LAST ITEM, SHE FAILED TO REPORT TO THAT MEETING ON THAT DATE

22     WHEN SHE HAD BEEN INSTRUCTED TO DO SO.

23     AND AS FAR AS I KNEW, THE ONLY REASON THAT WAS GIVEN TO ME

24     FOR HER NOT ATTENDING THAT MEETING WAS SHE WOULD HAVE NO

25     MEETINGS WITH BAY 101 MANAGEMENT, WHICH INCLUDED MYSELF, HER

1    IMMEDIATE SUPERVISOR, H.R., UNLESS HER HUSBAND WAS PRESENT.

2    HE'S NOT AN EMPLOYEE, HE HAS NO RELATIONSHIP WITH HER, NOR IS

3    HE HER UNION AGENT.

4         AND THAT'S WHAT I UNDERSTOOD.  THAT'S WHAT I USED AND THAT

5    WAS MY THOUGHT PROCESS AT THE TIME I TERMINATED HER.

6    Q.   AND THAT REFUSAL, AS FAR AS YOU UNDERSTAND, CAME FROM HER

7    HUSBAND, NOT FROM HER; CORRECT?

8    A.   I UNDERSTAND THAT THAT REFUSAL WAS STATED BY HER HUSBAND

9    ON HER BEHALF, AND SHE DID NOT ATTEND THE MEETING.

10        I THINK IF YOU LOOK AT THAT AS A WHOLE, THAT REFUSAL, EVEN

11   THOUGH THE WORDS CAME OUT OF HER HUSBAND'S MOUTH, WAS, IN FACT,

12   HER ACTION.

13        SHE DID NOT SHOW UP AT THE MEETING.  SHE REFUSED TO SHOW

14   UP AT THE MEETING.  IT WAS VOICE TO MR. ORTEGA BY HER HUSBAND

15   AND SHE DID NOT COME.

16        WHETHER HE WAS ACTING AS HER HUSBAND OR HER LAWFUL AGENT

17   AT THAT TIME BECAUSE HE'S HER HUSBAND, THAT'S BETWEEN THE TWO

18   OF THEM.

19        AS FAR AS I WAS CONCERNED, SHE REFUSED TO COME TO THE

20   MEETING AND SHE DID NOT COME TO THE MEETING.

21   Q.   AND YOU, I THINK, IN THE MEMO THAT YOU WERE PREPARED TO

22   READ TO MS. DANG THE RESULTS OF THE INVESTIGATION REPORT, YOU

23   SAID THAT HER ALLEGATIONS ABOUT MR. ORTEGA AND MS. GILBERT WERE

24   UNFOUNDED.

25        DO YOU RECALL THAT?

1    A.   YES.

2    Q.   AND DID YOU CONSIDER ALL OF MS. LUONG'S IMPRESSIONS AND

3    REPORTS TO THE INVESTIGATOR WHEN YOU WROTE THAT MS. DANG'S

4    ALLEGATIONS WERE UNFOUNDED?

5    A.   YES.

6    Q.   DID YOU ALSO SEE THIS PORTION WHERE MS. LUONG STATED THAT

7    EVEN THOUGH SHE REALLY LIKED MS. GILBERT AND HER JOB, SOME OF

8    HER INTERACTIONS WITH MS. GILBERT LEFT HER FEELING THAT

9    SOMETIMES IT FEELS LIKE DISCRIMINATION?

10   A.   I READ THAT.

11   Q.   AND DID YOU NOTE THAT THE INVESTIGATOR ACTUALLY BELIEVED

12   THAT MS. LUONG WAS CREDIBLE AND SINCERE DURING HER INTERVIEWS?

13   A.   SHE ALSO FELT THAT MS. LUONG'S IMPRESSION ABOUT HOW SHE

14   WAS TREATED WAS NOT DISCRIMINATORY.

15   Q.   DESPITE WHAT MS. LUONG TOLD HER?

16   A.   JUST BECAUSE YOU BELIEVE -- YOU CAN BELIEVE WHAT PEOPLE

17   ARE TELLING YOU.  I'M SURE SHE BELIEVED THAT THAT'S HOW

18   MS. LUONG FELT ABOUT HOW SHE WAS BEING TREATED.

19        IT DOESN'T MEAN THAT SHE WAS BEING TREATED IN A

20   DISCRIMINATORY MATTER.  YOU MAY BELIEVE THAT WHAT PEOPLE ARE

21   TELLING YOU IS HOW SHE SAID SHE FELT.  THAT IS HOW MS. LUONG

22   SAID THAT IS HOW SHE FELT.

23        I HAVE NO REASON TO DISBELIEVE THAT MS. LUONG MAY NOT HAVE

24   FELT THAT SHE WAS BEING TREATED IN A DISCRIMINATORY MATTER.

25        THE INVESTIGATOR DETERMINED THAT SHE WAS NOT BEING TREATED

1    IN A DISCRIMINATORY MANNER.

2        I HAVE NO REASON TO DISBELIEVE THAT.

3    Q.   I'D LIKE FOR YOU TO, PLEASE, TURN TO PAGE 47 OF THE

4    INVESTIGATOR'S REPORT.

5        THIS IS THE REPORT FROM THE INVESTIGATOR ABOUT HER

6    INTERVIEW WITH MR. MEAKCHAROON, WHO WAS ON THE STAND A LITTLE

7    BIT EARLIER HERE TODAY; RIGHT?

8    A.   YES.  EXCUSE ME.  YES.

9    Q.   AND YOU HEARD MR. MEAKCHAROON TESTIFY THAT HE HAD NEVER

10   BEEN CUSSED AT OR YELLED AT BY MS. DANG?

11   A.   YES.

12   Q.   AND YOU HEARD HIM, TOO, TESTIFYING THAT HE HAD NEVER SEEN

13   MS. DANG YELL OR CUSS AT ANY CUSTOMER?

14   A.   I'M SORRY.  HE HAS HEARD WORDS IN THE KITCHEN, NOT OUT ON

15   THE FLOOR.

16   Q.   AND HE IS IN CHARGE OF THE SERVERS ON THE FLOOR?

17   A.   WELL, THERE'S A BIG DISTANCE FROM THE FLOOR AND THE

18   KITCHEN.  THERE ARE WALLS -- THERE'S NO -- YOU CANNOT SEE THE

19   FLOOR FROM THE KITCHEN.

20   Q.   AND I THINK HE ALSO TESTIFIED THAT HE HAD NOT SEEN HER

21   YELL OR CUSS AT ANY SUPERVISORS?

22   A.   THAT'S WHAT HE TESTIFIED TO.

23   Q.   SO HERE IN MS. EDMAN'S REPORT SHE TALKED ABOUT WHAT

24   MR. MEAKCHAROON TOLD HER ABOUT WHAT HAPPENED ON OCTOBER 4TH,

25   2009.

1          HE DIDN'T SAY ANY OF THAT IN HIS STATEMENT EARLIER TODAY,

2     DID HE?

3     A.   NO.

4     Q.   AND YOU WERE HERE AND YOU WERE SURE WHEN HE WAS PRESENTED

5     WITH THAT TYPED UP STATEMENT THAT BAY 101 HAS PRESENTED TO US,

6     RIGHT?

7     A.   YES.

8     Q.   AND WAS THAT THE STATEMENT THAT YOU SAID THAT YOU READ AND

9     RELIED UPON?

10    A.   I BELIEVE IT WAS.

11    Q.   IF YOU GO BACK ONE PAGE, PLEASE, TO PAGE 46.

12         THIS IS THE INVESTIGATOR'S REPORT OF HER INTERVIEW WITH

13    ANOTHER EMPLOYEE AT BAY 101.

14         TOWARD THE MIDDLE OF THE PAGE THERE'S A SECTION WHERE

15    SHE'S TALKING ABOUT MS. DANG'S CLAIM OF DISCRIMINATORY BEHAVIOR

16    BY NICK ORTEGA, AND MS. RUBE STATED THAT OTHER EMPLOYEES HAVE

17    TOLD HER WHEN SHE WAS FIRST HIRED THAT THEY FELT THAT

18    NICK ORTEGA DISCRIMINATED AGAINST VIETNAMESE EMPLOYEES.

19         DO YOU RECALL SEEING THAT?

20    A.   YES, I READ THAT.

21    Q.   WAS MR. WILSON STILL ONE OF THE CASINO SHIFT MANAGERS AT

22    BAY 101?

23    A.   YES, HE IS.

24    Q.   AND ISN'T IT TRUE THAT AFTER THIS INVESTIGATION STARTED

25    THAT HE CAME TO YOU TO APOLOGIZE FOR NOT LETTING YOU KNOW IN

1     ADVANCE ABOUT HIS RELATIONSHIP WITH MS. DANG?

2     A.   HE DID.

3     Q.   AND HE TOLD YOU THAT HE HAD BEEN OUT TO DINNER WITH

4     MS. DANG AND HER FAMILY?

5     A.   HE DID.

6     Q.   AND HE ALSO TOLD YOU THAT HE HAD ONCE TAKEN MS. DANG TO

7     THE HOSPITAL?

8     A.   HE DID.

9     Q.   BUT, OF COURSE -- DESPITE ALL OF THOSE INTERACTIONS, HE

10    TOLD YOU THAT HE DENIED EVER DATING MS. DANG?

11    A.   HE DID.

12    Q.   OKAY.  AND DO EMPLOYEES --

13    A.   I DON'T KNOW IF HE DENIED DATING HER.  HE SAID THEY WERE

14    NOT BOYFRIEND OR GIRLFRIEND OR FIANCE OR ANYTHING LIKE THAT.

15         I DON'T THINK HE CONSIDERED THOSE DATES.

16    Q.   SO THE DINNERS THAT HE WENT OUT WITH HER, HE DID NOT

17    CONSIDER THEM DATES?

18    A.   NOT IN THE -- I THINK HE CONSIDERED THEM A SOCIAL DATE,

19    NOT A BOYFRIEND/GIRLFRIEND KIND OF DATE IF THAT'S HOW YOU MEAN

20    IT.

21    Q.   AND WHY DID YOU THINK THAT HE HAD TO APOLOGIZE TO YOU FOR

22    NOT LETTING YOU KNOW ABOUT HIS FRIENDSHIP?

23    A.   I DON'T KNOW WHY HE FELT THAT HE HAD TO APOLOGIZE TO ME.

24    HE CERTAINLY DIDN'T NEED TO.

25    Q.   AND I THINK YOU TESTIFIED YESTERDAY AND EARLIER TODAY THAT

1    THE REASON YOU TERMINATED MS. DANG WAS BECAUSE SHE REFUSED TO

2    STAY FOR THE MEETING; CORRECT?

3    A.   YES.

4    Q.   AND THAT YOU ALSO CONSIDERED SOME OF HER OTHER PERFORMANCE

5    ISSUES?

6    A.   THAT WASN'T THE FACTOR -- YOU KNOW, THOSE FACTORS ARE

7    GOING TO BE IN THE BACK OF MY MIND.  THEY ARE THERE.  YOU CAN'T

8    ERASE WHAT YOU KNOW ABOUT SOMETHING AT THE TIME THAT YOU MAKE A

9    DECISION, BUT MY DECISION TO TERMINATE HER WAS BASED UPON HER

10   REFUSAL TO ATTEND THE MEETING AND NOT ATTENDING THE MEETING.

11        I FELT THAT SHE WAS INSUBORDINATE AND HAD LEFT HER JOB.

12   Q.   BECAUSE THE JOB ABANDONMENT WAS THE REASON THAT YOU GAVE

13   TO MS. GILBERT TO BE USED FOR THE TERMINATION PAPER; CORRECT?

14   A.   I ACTUALLY TOLD HER -- I TOLD HER INSUBORDINATION AND JOB

15   ABANDONMENT, BUT PLEASE PUT DOWN JOB ABANDONMENT.

16        I'M SURE I TALKED TO HER ABOUT BOTH, AS WELL AS NICK, AS

17   WELL AS VINCE, BUT I FELT THAT SHE HAD WALKED OFF THE JOB.  SHE

18   HAD QUIT HER JOB BY NOT ATTENDING THAT MEETING WHEN SHE HAD

19   BEEN INSTRUCTED TO DO SO.

20   Q.   I'D LIKE TO HAVE YOU TAKE A LOOK AT EXHIBIT 10?

21   A.   10?

22   Q.   IT WOULD BE IN THE YELLOW BINDER.  AND THAT'S THE

23   TERMINATION REPORT THAT MS. GILBERT AND MR. ORTEGA PREPARED?

24   A.   IT APPEARS TO BE.

25   Q.   AND ON THAT REPORT THE ONLY REASON FOR THE TERMINATION WAS

1    JOB ABANDONMENT?

2    A.   THAT'S THE BOX THAT IS CHECKED.

3            MS. NGUYEN:  THANK YOU.  I HAVE NO FURTHER QUESTIONS

4    FOR THIS WITNESS.

5            THE COURT:  ALL RIGHT.  LET'S TAKE OUR FIRST RECESS

6    FOR ABOUT 15 MINUTES AND THEN WE'LL RESUME.

7        (RECESS FROM 10:06 A.M. UNTIL 10:22 A.M.)

8            THE COURT:  ALL RIGHT.  COULD I SEE COUNSEL FOR JUST

9    A SECOND.

10       (SIDE-BAR CONFERENCE OFF THE RECORD.)

11           THE COURT:  I JUST WANTED TO CONFIRM WITH COUNSEL

12   THAT THEY WILL MAKE SURE THAT THE TWO QUESTIONS SUBMITTED WILL

13   GET ANSWERED.  SO THEY WILL GET ANSWERED.

14           MR. MCMANIS:  AND WE'RE GOING TO DEAL WITH THAT

15   RIGHT NOW.  THANK YOU, YOUR HONOR.

16                   **AS-ON REDIRECT EXAMINATION**

17   BY MR. MCMANIS:

18   Q.   MR. WERNER, WE HAVE TWO QUESTIONS FROM THE JURY AND I'LL

19   I'M GOING TO READ THE FIRST QUESTION TO YOU.

20       I DON'T THINK I NEED TO READ THE PERSON WHO SUBMITTED IT,

21   DO I?

22           THE COURT:  NO.

23   BY MR. MCMANIS:

24   Q.   HERE'S THE QUESTION:  WHEN A NEW POSITION IS OPENED, HOW

25   IS THE TRANSFER GIVEN?  IS IT BASED ON SENIORITY,

1    QUALIFICATION, RECOMMENDATION, OR PERFORMANCE?

2        AND IF YOU CAN ANSWER THAT QUESTION, I THINK THERE MAY BE

3    A TIME ASPECT TO IT.  I KNOW THAT ONE OF THE CONCERNS THAT THE

4    INVESTIGATOR REPORTED TO YOU WAS THE POLICY AT BAY 101 ABOUT

5    TRANSFERS WITH --

6            MS. NGUYEN:  OBJECTION, YOUR HONOR.  LEADING.

7            THE COURT:  I THINK -- YOU CAN ASK IF IT CHANGED

8    OVER TIME.

9    BY MR. MCMANIS:

10   Q.   LET ME ASK THIS:  DID THE INVESTIGATOR EXPRESS A CONCERN

11   ABOUT THE TRANSFER POLICY AT THE TIME THAT SHE SUBMITTED HER

12   REPORT TO YOU?

13   A.   YES, SHE DID.

14   Q.   AND WHAT WAS THAT CONCERN?

15   A.   WELL, SHE HAD SEVERAL CONCERNS, BUT SHE THOUGHT THAT

16   THE -- IT WAS NOT CLEARLY STATED AS TO WHEN A PERSON COULD

17   APPLY FOR A TRANSFER, THAT PEOPLE WOULD PUT IN FOR TRANSFERS

18   EVEN THOUGH JOBS WERE NOT OPEN OR THERE WASN'T A POSITION

19   AVAILABLE.

20       THERE WAS A CONCERN ABOUT THE AMOUNT OF TIME IT TOOK FOR

21   PERSONS TO GET A RESPONSE TO A TRANSFER REQUEST.

22       THERE WAS CONCERN THAT THE HUMAN RESOURCES DEPARTMENT

23   WASN'T ADEQUATELY INVOLVED IN THE TRANSFER PROCESS FROM THE

24   TIME THAT A POSITION BECAME AVAILABLE AND UNTIL THE POSITION

25   WAS FILLED.

1        I THINK THOSE WERE GENERALLY THE CONCERNS.

2        THERE APPEARED TO BE SOME CONFUSION AMONGST THE EMPLOYEES

3   AS TO HOW THEY APPLY FOR A POSITION AND WHAT THE PROCESS WAS.

4   Q.   OKAY.  NOW, AS A RESULT OF THAT REPORT THAT THE

5   INVESTIGATOR GAVE YOU EXPRESSING HER CONCERNS, DID BAY 101 TAKE

6   ANY ACTION?

7   A.   YES, WE DID.

8   Q.   AND WHAT DID BAY 101 DO?

9   A.   WELL, WE REVISED THE TRANSFER POLICY AND PUT IT IN WRITING

10  AND COMMUNICATED IT TO ALL OF THE EMPLOYEES THAT IN ORDER TO

11  APPLY FOR A POSITION, A POSITION HAD TO BE AVAILABLE AND IT HAD

12  TO BE POSTED.

13       BEFORE THAT TIME, PEOPLE WOULD JUST APPLY FOR A POSITION

14  EVEN THOUGH THERE WASN'T A POSITION AVAILABLE, AND SO THEIR

15  APPLICATIONS WOULD LANGUISH FOR A LONG PERIOD OF TIME UNTIL THE

16  POSITION BECAME AVAILABLE.

17       SO WITH THE CHANGE, PEOPLE NOW KNEW WHEN IT WAS AVAILABLE

18  AND IT WAS POSTED SO ALL EMPLOYEES HAD AN EQUAL OPPORTUNITY TO

19  APPLY FOR THE POSITION.

20       ONCE THEY APPLIED FOR THE POSITION, THEY WOULD FILL OUT A

21  FORM TO APPLY FOR THE POSITION, WHICH THEY PICKED UP IN THE

22  HUMAN RESOURCES DEPARTMENT.

23       THAT FORM WOULD BE GIVEN TO THEIR SUPERVISOR.  THE

24  SUPERVISOR WOULD STATE THEIR REASONS FOR APPROVING THE PERSON

25  FOR THE TRANSFER OR NOT APPROVING THEM.

1          GENERALLY IF THERE'S A NONAPPROVAL, IT WAS ON THE BASIS

2     THAT THEY NEEDED TIME TO FILL THE POSITION OF THE PERSON WHO

3     WANTED THE TRANSFER.

4          THEN IT WOULD GO TO THE DEPARTMENT THAT HAD THE OPENING

5     AND THAT SUPERVISOR WOULD CONDUCT THEIR OWN INTERVIEW PROCESS

6     TO DETERMINE THE PERSON'S QUALIFICATIONS FOR THE JOB, REVIEW

7     ANY RECOMMENDATIONS THAT THEY HAD FROM THE -- FROM A PRIOR

8     SUPERVISOR AND PERHAPS COWORKERS.

9          SENIORITY IS ALWAYS AN ISSUE IN A UNION POSITION.  IT'S

10    NOT IN NON-UNION POSITIONS.

11         PRIMARILY IN NON-UNION POSITIONS, A PERSON'S ABILITY TO DO

12    THE JOB AND THE QUALIFICATIONS AND PAST EXPERIENCE WERE MORE

13    IMPORTANT THAN SENIORITY.

14         AND UNION POSITIONS, THERE WASN'T MUCH OPTION.  IT WAS

15    PRIMARILY SENIORITY BASED.  IF A UNION MEMBER WANTED A CERTAIN

16    SHIFT OR A CERTAIN JOB THAT WAS IN THE UNION, THEN THEY WOULD

17    TRANSFER.  THEY WOULD LOSE THEIR SENIORITY FOR THAT PARTICULAR

18    POSITION, BUT THEY DIDN'T LOSE THEIR SENIORITY AS FAR AS HOW

19    LONG THEY WOULD BE A BAY 101 EMPLOYEE IF THAT MAKES SENSE.

20         AND THEN WHEN A POSITION WAS FILLED, H.R. WOULD THEN

21    COMPLETE THE NECESSARY PAPERWORK FOR THE REGULATORY AUTHORITIES

22    AND IN-HOUSE.

23         AND THAT WAS THE CHANGE TO THE POLICY, AND HOPEFULLY IT

24    MADE IT CLEAR TO EVERYBODY, AND THE JOB POSTING WOULD BE TAKEN

25    DOWN BECAUSE THE POSITION WAS FILLED.

1    Q.   SO JUST BY WAY OF FOLLOW-UP, SUBJECT TO WHAT YOU JUST

2    SAID, IS SENIORITY A FACTOR IN UNION JOBS?

3    A.   YES.

4    Q.   AND QUALIFICATIONS?

5    A.   YES.

6    Q.   A RECOMMENDATION, A FAVORABLE RECOMMENDATION OR

7    UNFAVORABLE?

8    A.   YES.

9    Q.   AND PERFORMANCE?

10   A.   YES.

11        THE COURT:  AND DID THAT CHANGE OVER TIME?

12        THE WITNESS:  I THINK THOSE HAVE ALWAYS BEEN THE

13   CRITERIA, JUST NOT ARTICULATED, PERHAPS, CLEARLY ENOUGH FOR

14   EVERYBODY TO UNDERSTAND WHAT THE CRITERIA WAS AND WHAT THE

15   PROCESS WAS.

16        THE COURT:  ALL RIGHT.

17        MR. MCMANIS:  THANK YOU.

18   Q.   NOW, THE OTHER QUESTION, THERE WAS A MENTION OF THE

19   PERSON -- WELL, I'LL READ THE QUESTION:  WHO WAS THE PERSON

20   THAT WENT TO THE DINNER WITH DANG AND TOOK HER TO THE HOSPITAL?

21   CAN YOU STATE THAT PERSON'S NAME?

22   A.   THAT PERSON WAS MICHAEL WILSON.

23   Q.   AND MICHAEL WILSON, AT THE TIME THAT HE WAS WORKING AT

24   BAY 101, WHAT WAS HIS JOB TITLE?

25   A.   CASINO SHIFT MANAGER.

1    Q.   OKAY.  AND WHOM DID HE SUPERVISE?

2    A.   HE WOULD HAVE SUPERVISED ALL OF THE EMPLOYEES IN THE

3    CASINO DEPARTMENT, IN CARD CONTROL DEPARTMENT ON HIS SHIFT, AND

4    HE WOULD HAVE BEEN THE RESPONSIBLE KEY EMPLOYEE ON DUTY FOR THE

5    CASINO OR THE CARD ROOM ON HIS SHIFT IF THERE WAS NOT A

6    SUPERIOR EMPLOYEE ON THE PREMISES.

7    Q.   OKAY.  I'VE GOT A LOT OF OTHER QUESTIONS, BUT THOSE ARE

8    THE TWO QUESTIONS.

9         THE COURT:  ALL RIGHT.  REMEMBER THAT RECROSS HAS

10   ONLY TO BE ON ISSUES THAT WERE BROUGHT UP ON REDIRECT.

11        MR. MCMANIS:  THANK YOU FOR REMINDING ME, YOUR

12   HONOR.  I THINK I KNOW THAT RULE.

13        THE COURT:  WELL, SOMETIMES IT'S NOT FOLLOWED.

14        MR. MCMANIS:  I UNDERSTAND.

15   Q.   YOU WERE ASKED ON MY FRIEND'S EXAMINATION ABOUT THE

16   STATEMENT THAT KEN -- I KNOW IT'S NOT MEAKCHAROON --

17   MEAKCHAROON?

18   A.   MEAKCHAROON.

19   Q.   -- MEAKCHAROON GAVE.

20        FIRST OF ALL, WHAT WAS THE DATE OF THIS INCIDENT THAT LED

21   TO MS. DANG'S DISCIPLINE?

22   A.   I BELIEVE IT WAS OCTOBER OF 2009.

23   Q.   ALL RIGHT.  NOW, WE HEARD, I THINK, SOMETHING REFERENCED

24   THAT HE GAVE A DEPOSITION IN MAY OF 2011, ALMOST TWO YEARS

25   LATER, AND WE'RE NOW -- WELL, I GUESS NOW TODAY IS MAY 1ST,

1    2013, TWO YEARS AFTER THAT.

2         I'D LIKE YOU FIRST TO PLEASE TURN TO EXHIBIT 500, THE

3    INTERVIEW THAT MY FRIEND QUESTIONED YOU ABOUT IN THE EDMAN

4    REPORT, PAGE 47.

5         AND IF YOU CAN BLOW UP THE TOP.

6         THIS IS MR. MEAKCHAROON, THE SHIFT SUPERVISOR WHO WE HEARD

7    TESTIMONY FROM.  BACKGROUND.

8         NOW, INTERVIEW DATES.  THE INVESTIGATOR INTERVIEWED

9    MR. MEAKCHAROON ON NOVEMBER 13TH, 2009.  DO YOU SEE THAT?

10   A.   YES.

11   Q.   SO THAT WOULD HAVE BEEN ABOUT A MONTH AND A HALF AFTER THE

12   EVENTS IN QUESTION?

13   A.   YES.

14   Q.   AND I'M NOT GOING TO GO OVER ALL OF THESE DETAILS.

15        BUT IF YOU WOULD MOVE THIS UP A LITTLE BIT, CINDY.  AND

16   BLOW UP THE SUMMARY.  CAN YOU BLOW IT UP ANY BIGGER?

17        IT'S COMING UP.  THANK YOU.

18        MEAKCHAROON PROVIDED THE INVESTIGATOR WITH DETAILS.

19   MS. DANG CAME INTO THE KITCHEN.

20        NOW, MR. MEAKCHAROON'S STATEMENTS WERE CONSISTENT WITH THE

21   FILE MEMO ACCOUNT.

22        WHAT DID YOU BELIEVE THAT THAT REFERENCED?

23   A.   MR. MEAKCHAROON'S STATEMENT THAT WAS ON FILE.

24   Q.   THE STATEMENT THAT WE SAW THIS MORNING THAT DID NOT BEAR

25   HIS SIGNATURE?

1    A.   YES.

2    Q.   ALL RIGHT.  DO YOU KNOW WHERE HIS HANDWRITTEN STATEMENT

3    WENT?

4    A.   NOT FOR CERTAIN.

5    Q.   AND WHAT IS YOUR BELIEF?

6    A.   WELL, THE PRACTICE IS THAT EMPLOYEES IN THE FOOD AND

7    BEVERAGE DEPARTMENT WILL MAKE HANDWRITTEN STATEMENTS; THEY'RE

8    GIVEN TO THE F&B SECRETARY, WHO THEN TYPES THEM UP AND THEN

9    RETURNED TO THE EMPLOYEE FOR THEIR SIGNATURE.

10        SOMETIMES THE F&B SECRETARY KEEPS THE STATEMENT AND

11   SOMETIMES SHE MISPLACES THEM OR EVEN SHREDS THEM.

12   Q.   OKAY.  SO, IN ANY EVENT, SHE, MS. EDMAN, IN HER REPORT

13   SAYS THAT MR. MEAKCHAROON'S STATEMENTS WERE CONSISTENT WITH THE

14   FILE MEMO ABOUT THE ACCOUNT AND INCLUDED MORE DETAILS ABOUT

15   MS. DANG'S COMMENTS WHEN ASKED.

16        AND THEN WE HAVE IN QUOTES, MS. DANG SAID AND SO FORTH,

17   SAID CALM DOWN, KEPT YELLING, WAS MAD REPEATED AND SAID I CAN'T

18   HAVE THAT ATTITUDE.  NICK WILL BE HERE IN THE MORNING.  YOU

19   HAVE TO CALM DOWN.

20        AND SO ON AND SO FORTH.

21        IN MAKING YOUR DECISION TO TERMINATE WHEN YOU DID, DID YOU

22   RELY IN PART ON THIS DETAILED ACCOUNT THAT WAS GIVEN ABOUT A

23   MONTH AFTER THE INCIDENT IN QUESTION?

24   A.   IT WAS IN MY MIND, YES.

25   Q.   OKAY.  NOW, WITH RESPECT TO -- LET'S GO BACK TO THE TABLE

1    OF CONTENTS OF THIS, PLEASE.

2         COULD YOU BLOW THAT UP, PLEASE.

3         NOW, THE JURY IS GOING TO GET THIS IN THEIR DELIBERATIONS,

4    BUT IN TERMS OF LOOKING AT THE TABLE OF CONTENTS AND THE

5    ORGANIZATION OF MS. EDMAN'S REPORT, IT APPEARS, DOES IT NOT --

6    WELL, TELL ME HOW MANY WITNESSES IT APPEARS THAT SHE TALKED TO.

7    A.   WELL, IN ALL I THINK SHE TALKED WITH 15.

8    Q.   AND THEY'RE LISTED HERE?

9    A.   YES.

10   Q.   AND THEIR INTERVIEWS APPEAR AT THE PAGES SHOWN?

11   A.   YES.

12   Q.   AND SO, FOR EXAMPLE, MR. MEAKCHAROON, THE STATEMENT TO THE

13   INTERVIEW, OR TO THE INVESTIGATOR, THAT WE JUST LOOKED AT IS

14   NUMBER 11 AND HIS INTERVIEW IS AT PAGE 47 AND 48?

15   A.   YES.

16   Q.   OKAY.  NOW, DID THIS -- DID THE INVESTIGATOR TALK TO

17   MS. DANG TO GIVE HER AN OPPORTUNITY TO TELL HER SIDE OF THE

18   STORY?

19   A.   YES.

20   Q.   ALL RIGHT.  AND EXPAND ON HER GRIEVANCE, HER LETTER TO

21   MANAGEMENT, HER COMPLAINT TO THE DEPARTMENT OF FAIR EMPLOYMENT

22   AND HOUSING, ET CETERA?

23   A.   THAT'S MY UNDERSTANDING, YES.

24   Q.   ALL RIGHT.  AND WAS THAT -- WHERE DOES THAT APPEAR?

25   A.   THAT'S NUMBER 1.

1     Q.   AND THAT RUNS FOR HOW MANY PAGES?

2     A.   I THINK 26 PAGES OR 27 PAGES.

3     Q.   ALL RIGHT.  SO THE NEXT PERSON INTERVIEWED AFTER THE

4     INTERVIEW OF MS. DANG WAS JENNIFER GILBERT AT PAGE 28;

5     NICK ORTEGA, PAGE 30; AND LUCIO SUAREZ AT PAGE 34.  IS THAT

6     RIGHT?

7     A.   YES.

8     Q.   AND LET'S SEE WHAT TIME THE PROCESS STARTED WITH MS. DANG.

9          WOULD YOU PUT UP PAGE 2 SO WE CAN SEE THE START OF HER

10    STATEMENT?  GO BACK TO PAGE 1.  I DON'T KNOW.

11         WHY DON'T YOU BLOW UP THIS PART RIGHT HERE (INDICATING),

12    THE INITIAL ENGAGEMENT AND SCOPE OF PROJECT.

13         WHAT IS THE DATE THAT MS. KIRSCH CONTACTED MS. EDMAN

14    ACCORDING TO THE INVESTIGATOR'S REPORT?

15         DO YOU HAVE PAGE 2 IN FRONT OF YOU?

16    A.   I DO.

17    Q.   IT'S RIGHT UNDER INITIAL ENGAGEMENT AND SCOPE OF PROJECT?

18    A.   OH, I'M SORRY.  PAGE 1 OR PAGE 2?  MONDAY, MAY 19TH -- I'M

19    SORRY.  OCTOBER 19TH, 2009.

20    Q.   AND THEN THERE ARE MORE DATES.  OCTOBER 20TH, MS. KIRSCH

21    AND EDMAN CONFIRMED THE AGREEMENT AND MET WITH MS. KIRSCH ON

22    OCTOBER 21ST AND THE AGREEMENT WAS SIGNED.

23         AND THEN WE HAVE THE BEGINNING OF HER INVESTIGATION, IF

24    YOU GO TO THE NEXT PAGE, PLEASE.

25         AND THAT STARTS WITH MS. DANG'S INTERVIEW, WHICH I THINK

1    YOU SAID BEGAN RUNNING FROM PAGE 2 TO 28?

2    A.   YES.

3    Q.   NOW, I THINK THERE WAS A SUGGESTION IN THE EXAMINATION

4    YESTERDAY THAT MR. SUAREZ AND MR. ORTEGA WERE FRIENDS, OR CLOSE

5    TO EACH OTHER OR SOME SUCH THING.

6         DO YOU RECALL QUESTIONS TO YOU ABOUT THAT SUBJECT?

7    A.   YES.

8    Q.   ALL RIGHT.  DO YOU RECALL WHETHER THE INVESTIGATOR

9    EXAMINED THAT ALLEGATION?

10   A.   I THINK SHE DID.

11   Q.   ALL RIGHT.  LET'S TAKE A LOOK AT PAGE 34, WHICH IS

12   MR. SUAREZ'S REPORT OR INTERVIEW.

13        IF YOU COULD BLOW THAT UP, PLEASE.

14        "THE INVESTIGATOR INTERVIEWED MR. SUAREZ ON NOVEMBER 11TH,

15   2009.  THERE WERE NO WITNESSES PRESENT."

16        DO YOU RECALL, MR. WERNER, AS YOU READ THROUGH THAT

17   REPORT, GENERALLY MS. EDMAN'S PRACTICE IN TERMS OF INTERVIEWING

18   THESE 15 PEOPLE, IN TERMS OF WHETHER SHE HAD OTHERS SITTING IN

19   ON THOSE?

20   A.   I THINK THEY WERE ALL PRIVATE AND CONFIDENTIAL.

21   Q.   ALL RIGHT.

22   A.   WITH THE EXCEPTION OF MS. DANG.  I BELIEVE SHE HAD HER

23   ATTORNEY AND AN INTERPRETER PRESENT.

24   Q.   OKAY.  SO WITH THE EXCEPTION OF MS. DANG, THE OTHER

25   INTERVIEWS WERE CONDUCTED PRIVATELY, CONFIDENTIALLY,

1    ONE-ON-ONE?

2    A.   THAT'S MY UNDERSTANDING, YES.

3    Q.   AND MS. DANG HAD HER LAWYER AND HER INTERPRETER PRESENT?

4    A.   YES.

5    Q.   ALL RIGHT.  DO YOU KNOW IF THAT WAS MY FRIEND

6    MS. ANN NGUYEN HERE?

7    A.   NO, IT WAS NOT.  IT WAS A MALE ATTORNEY UP IN

8    SAN FRANCISCO, STEVEN NGO I THINK WAS HIS NAME.

9    Q.   AND FOR THE REPORTER, THAT'S SPELLED N-G-O?

10   A.   YES.

11   Q.   AT ANY RATE, GOING BACK TO SUAREZ.

12        LET'S LOOK AT THIS CLAIM THAT WAS MADE ABOUT UNFAIR

13   TREATMENT BASED ON THIS ALLEGED FRIENDSHIP.

14        IF YOU COULD BLOW THAT UP, CINDY, PLEASE.

15             MS. MCCLELEN:  THAT'S THE WRONG ONE.

16             MR. MCMANIS:  PARDON ME?  ARE YOU TALKING TO

17   YOURSELF AGAIN?

18             MS. MCCLELEN:  UH-HUH.

19             MR. MCMANIS:  OKAY.

20   Q.   "CLAIM OF UNFAIR TREATMENT BASED ON FRIENDSHIP BETWEEN

21   LUCIO SUAREZ AND NICK ORTEGA; MR. SUAREZ STATED THAT HE DID NOT

22   KNOW MR. ORTEGA BEFORE WORKING HERE; THAT HE SOMETIMES HAS HAD

23   A HARD TIME WORKING WITH MR. ORTEGA, ALTHOUGH HE RECOGNIZED

24   THAT MR. ORTEGA HAS A JOB THAT COULD BE STRESSFUL; THAT THEY DO

25   NOT HAVE A PERSONAL FRIENDSHIP OUTSIDE WORK; AND NO PROMISES OF

1    JOB SECURITY OR FUTURE PROMOTIONS HAD BEEN GIVEN TO HIM BY

2    MR. ORTEGA.  MR. ORTEGA CONFIRMED THAT MR. ORTEGA HAS CONTINUED

3    TO REMIND HIM TO STAY AWAY FROM MS. DANG AND OTHER FEMALE

4    EMPLOYEES."

5         DID YOU READ THAT ACCOUNT?

6    A.   YES, I DID.

7    Q.   AND THAT WAS WITH RESPECT TO MS. DANG'S CLAIM THAT SHE HAD

8    BEEN TREATED UNFAIRLY BECAUSE THESE TWO WERE PALS OR SOMETHING?

9    A.   YES.

10   Q.   NOW, WE ALSO HEARD SOME EXAMINATION ABOUT WHETHER

11   MR. ORTEGA HAD A PROBLEM WITH VIETNAMESE AND TREATED THEM

12   UNFAIRLY AND WHAT HAVE YOU.

13        I'D LIKE TO LOOK AT WHAT THE INVESTIGATOR FOUND IN THAT

14   REGARD WHEN HE INTERVIEWED MS. ANYH HUYNH, SOMETIMES KNOWN AS

15   MAMA ANH.

16        COULD YOU PLEASE PUT THAT UP, CINDY, PAGE 39.  AND IF YOU

17   COULD MOVE IT DOWN SO WE CAN SEE WHEN THE INVESTIGATOR

18   INTERVIEWED MS. HUYNH?  CAN YOU BLOW UP INTERVIEW DATES,

19   PLEASE.

20        ALL RIGHT.  SHE WAS HIRED IN 1994 AND IN CHARGE OF DAYTIME

21   OPERATIONS OF VIETNAMESE FOOD PREPARATION.  HAPPY EVERY DAY AND

22   SO ON AND SO FORTH.

23        AND NICK ORTEGA, HER DIRECT MANAGER, AND OTHER EMPLOYEES

24   CALL HER MAMA ANH.

25        AND INTERVIEWED ON NOVEMBER 11TH, 2009.  NO WITNESSES

1    PRESENT.

2        DO YOU SEE THAT?

3    A.   YES.

4    Q.   AND LET'S GO TO MS. DANG'S CLAIM OF UNFAIR TREATMENT BASED

5    ON BEING VIETNAMESE.  IF YOU COULD BLOW THAT UP, PLEASE.

6        STATED SHE WORKED WITH NICK ORTEGA FOR A LONG TIME, SHE

7    UNDERSTOOD HIM, HAD NO PROBLEMS WITH HIM.  SOMETIMES PEOPLE DID

8    NOT LIKE NICK ORTEGA, EVEN BEFORE JOHN ST. CROIX DIED TWO YEARS

9    AGO.  THIS HAS IMPROVED RECENTLY.  A LOT OF PEOPLE TALK WITH

10   MR. ORTEGA NOW, ALTHOUGH MS. HUYNH FELT THAT MANY OF THE

11   VIETNAMESE EMPLOYEES STILL DO NOT LIKE HIM AND STILL SAY HE'S

12   NOT FAIR.

13       MS. HUYNH FELT SOME OF THE PROBLEM IS THAT BECAUSE

14   MR. ORTEGA TALKED FAST AND HAS A LOUD VOICE AND UNLIKE

15   MR. ST. CROIX, BECAUSE HE WAS QUIETER, BUT SHE HAS NO PROBLEM

16   WITH MR. ORTEGA AND FELT THAT THE EMPLOYEES, AND THAT THAT'S

17   MR. ORTEGA'S JOB TO TELL THEM THE RULES.

18       MS. HUYNH STATED THAT SHE'S VIETNAMESE AND SHE DOES NOT

19   AGREE AND THAT SHE DON'T UNDERSTAND THAT HE'S THE SAME TO ALL

20   INSTANCE.  EVERYBODY IS REQUIRED TO HAVE A TICKET FOR FOOD AND

21   HE SAID THE SAME THING TO ALL, AND THEN THERE'S A MENTION OF

22   AL RUBE.

23       AND IF WE CAN GO TO AL RUBE'S STATEMENT, I THINK YOU WERE

24   ASKED ABOUT THAT STATEMENT AS WELL.  PAGE 41.

25       WHOOPS.  WRONG PAGE, SORRY.

1          OKAY.  I MISSPOKE.  I APOLOGIZE.

2          I'D LIKE TO ASK YOU A COUPLE OF QUESTIONS ABOUT THE

3     INTERVIEW THAT THE INVESTIGATOR DID WITH CHI LUONG.

4          IF YOU COULD PUT THAT UP, PLEASE, PAGE 37.  AND IF YOU

5     BLOW UP THE FIRST PART, THE BACKGROUND AND INTERVIEW DATES.

6          HIRED AS A PBX OPERATOR?

7               THE COURT:  DO YOU HAVE A QUESTION?  YOU SEEM TO BE

8     READING FROM THE REPORT AT THIS POINT.

9               MR. MCMANIS:  I APOLOGIZE, YOUR HONOR.

10    Q.   WHEN WAS MS. LUONG INTERVIEWED?

11    A.   NOVEMBER 22ND, 2009.

12    Q.   AND THAT SAYS A FOLLOW-UP CALL?

13    A.   NOVEMBER 10TH AND NOVEMBER 14TH, ACTUALLY.  TWO SEPARATE

14    DAYS.

15    Q.   ALL RIGHT.  AND IF YOU WOULD GO, PLEASE, TO THE NEXT PAGE,

16    PLEASE, CINDY, PAGE 38 UNDER MS. DANG'S CLAIM OF SELECTIVE

17    ENFORCEMENT OF THE RULES, AND HIGHLIGHT THIS LINE:  MS. LUONG

18    DID NOT MAKE ANY STATEMENTS TO INDICATE THAT ISSUES WERE

19    RELATED TO RACE OR ETHNICITY.

20         WOULD YOU BLOW THAT UP, PLEASE.

21         LET'S START WITH MS. LUONG SAID THAT SHE FELT THAT PEOPLE

22    WERE NOT COMFORTABLE SPEAKING UP TO JENNIFER GILBERT OR

23    NICK ORTEGA AND FELT THAT THIS MIGHT BE BECAUSE EMPLOYEES WERE

24    AFRAID OF LOSING THEIR JOBS.  SHE SAID THAT SHE DID NOT FEEL

25    THAT MS. GILBERT WAS VERY APPROACHABLE AND GAVE EXAMPLES.

1    AND IN THIS STATEMENT RIGHT HERE, MR. WERNER, MS. LUONG

2    DID NOT MAKE ANY STATEMENTS TO INDICATE THAT ISSUES WITH

3    MS. GILBERT OR MR. ORTEGA WERE RELATED TO RACE OR ETHNICITY.

4    DID YOU READ THAT?

5    A.   YES, I DID.

6    Q.   ALL RIGHT.  WHAT WERE THE PROBLEMS THAT YOU UNDERSTOOD

7    THAT THE INVESTIGATOR REPORTING TO YOU ABOUT MR. ORTEGA AND HIS

8    MANAGEMENT STYLE AND WHAT STEPS YOU TOOK TO ADDRESS THAT?

9    A.   MS. LUONG'S STATEMENTS?

10   Q.   NO.  AS I UNDERSTAND IT, THERE WERE THREE THINGS THAT THE

11   INVESTIGATOR, CAROLE EDMAN, ADDRESSED IN HER REPORT.

12   ONE HAD TO DO WITH, WAS IT MR. ORTEGA?

13   A.   YES, HIS MANAGEMENT STYLE.

14   Q.   YES.  WHAT WAS THE UPSHOT OF THAT?

15   A.   I THINK THAT THERE ARE A COUPLE OF POINTS THAT I TOOK

16   AWAY.  FIRST WAS THAT HE WAS VERY SHORT OR GRUFF WITH

17   EMPLOYEES.  HE APPEARED NOT TO PAY ATTENTION -- HE WOULD TRY TO

18   MULTITASK AND HE WOULD APPEAR NOT TO BE PAYING ATTENTION TO

19   WHAT THEY WERE SAYING OR THEIR COMPLAINTS, AND THEN HE WOULD

20   GIVE THEM SHORT GRUFF ANSWERS.

21   ALSO I THINK THAT HE WAS VERY DIRECT WITH HIS SUBORDINATES

22   AND HIS MANAGEMENT STYLE, PERHAPS, CAME ACROSS A LITTLE

23   DICTATORIAL AS OPPOSED TO MORE FRIENDLY.

24   I THINK HE WAS A BUSY -- WHAT I REALLY THINK IS THAT HE'S

25   A VERY BUSY PERSON AND IT APPEARED THAT HE JUST DIDN'T SEEM TO

1          PROVIDE ENOUGH OPPORTUNITY FOR HIS INSUBORDINATIONS TO TALK

2          FREELY WITH HIM OR EXPRESS THEIR FULL COMPLAINT.

3               HE WAS TRYING TO HURRY THEM ON AND GET THEM OUT THE DOOR

4          WAS THEIR IMPRESSION AND NOT LISTEN TO THEM.

5               THAT'S PRIMARILY WHAT I TOOK AWAY FROM MS. EDMAN'S

6          COMPLAINT.

7          Q.   AND WHAT DID --

8          A.   I'M SORRY, MS. EDMAN'S REPORT.

9          Q.   AND WHAT DID BAY 101 DO TO ADDRESS THAT CONCERN?

10         A.   WE SET UP A SERIES OF ONE-ON-ONE TRAINING CLASSES WITH AN

11         INDEPENDENT TRAINER TO TRY AND COACH MR. ORTEGA IN WHAT I

12         THOUGHT WAS A BETTER MANAGEMENT STYLE, OR AT LEAST IN MY

13         OPINION IT WAS A BETTER MANAGEMENT STYLE.

14         Q.   NOW, THERE WAS SOME TESTIMONY ABOUT MS. NGUYEN,

15         NINA NGUYEN, AND IF YOU COULD LOOK AT WHAT THE INVESTIGATOR

16         REPORT TOLD YOU ABOUT THAT, PAGE 43, STARTING WITH

17         MS. NGA NGUYEN STATED.

18              "IF NGUYEN HAD ANY PROBLEMS WITH NICK ORTEGA BEING

19         VIETNAMESE OR IF MR. ORTEGA TREATED PEOPLE WITH VIETNAMESE

20         DESCENT DIFFERENT THAN OTHER EMPLOYEES."

21              DID YOU READ THAT, MR. WERNER?

22         A.   YES.

23         Q.   AND THIS WAS SOMEONE WHO I BELIEVE -- WELL, LET ME ASK THE

24         QUESTION JUST SO WE CAN PUT IT IN CONTEXT.

25              LET'S GO BACK TO THE PREVIOUS PAGE, PAGE 42 IN TERMS OF

1      MS. NGUYEN'S BACKGROUND.

2          DO YOU RECALL WHETHER SHE QUIT OR WAS TERMINATED?

3      A.   I BELIEVE SHE WAS -- I THINK SHE WAS TERMINATED, BUT IT

4      WAS A COMBINATION OF THE TWO IS WHAT I REMEMBER.

5      Q.   YOU CAN'T FIRE ME, I QUIT?

6      A.   I THINK SHE WAS A LITTLE UNHAPPY AT THE TIME SHE QUIT, AND

7      THEN SHE WISH SHE HADN'T.

8      Q.   AND THEN THE BOTTOM PARAGRAPH HERE, MS. NGA NGUYEN'S

9      RESPONSE OF HOW SHE FELT ABOUT HER JOB AND WORKING AT BAY 101.

10     QUOTE, "I HAD NO PROBLEM AT BAY 101, GOT ALONG WITH EVERYONE.

11     REALLY WANT TO GO BACK.  I WAS SO STUPID AND EXPLAINED

12     SITUATION ON LEAVING AND I LEARNED MY LESSON.  I LOVED TO WORK

13     THERE.  THE DAY I LEFT WAS ALL MY FAULT."

14         DID YOU -- CAN YOU TELL US ANYTHING MORE ABOUT THE

15     SITUATION ON LEAVING?

16     A.   I THINK SHE WAS BEING -- ACTUALLY I THINK NICK WAS TALKING

17     TO HER ABOUT SOMETHING THAT SHE HAD DONE AND I THINK SHE

18     DIDN'T, DIDN'T WANT TO BE COUNSELLED OR TALKED TO ABOUT IT.

19     SHE FELT SHE WASN'T WRONG AND SO SHE QUIT AND WALKED OUT THE

20     DOOR.

21     Q.   AND THEN GOING TO THE NEXT MIDDLE PARAGRAPH, MS. NGUYEN

22     STATED THAT SHE HAD ONLY ONE INCIDENT WITH LUCIO SUAREZ.  THE

23     ONLY COMPLAINT WAS RELATED TO FOOD AND MEAL TICKETS, NOTHING TO

24     DO WITH SEXUAL HARASSMENT, VIETNAMESE?

25             THE COURT:  WHAT IS YOUR QUESTION?

1    BY MR. MCMANIS:

2    Q.   DID YOU READ THAT IN THE REPORT?

3    A.   YES, I DID.

4    Q.   ALL RIGHT.  MR. WERNER, FINALLY, YOU SAID OR MADE A

5    STATEMENT ON EXAMINATION BY OPPOSING COUNSEL THAT YOU HAD A LOT

6    OF THINGS IN THE BACK OF YOUR MIND AT THE TIME YOU TERMINATED

7    MS. DANG.

8         WHAT DID YOU MEAN BY THAT?

9    A.   WELL, YOU KNOW, I JUST RECALL IN -- AT THAT TIME WITH

10   EVERYTHING THAT WAS GOING ON IN THE INVESTIGATION, I HAD -- YOU

11   KNOW, I -- YOU KNOW, I WAS THINKING, OR AT LEAST IN THE BACK OF

12   MY MIND WERE THE ISSUES THAT WE HAD WITH HER, CURSING WHEN SHE

13   WORKED THERE; THE ISSUES OVER THE NOT BEING ABLE TO FOLLOW THE

14   DIRECTIONS IN HOW TO PREPARE RECIPES; OR RELATIONSHIPS, OR WHAT

15   I THOUGHT WAS A POOR RELATIONSHIP WITH THE LEAD VIETNAMESE

16   SUPERVISOR; JOHN ST. CROIX'S DESIRE TO TERMINATE HER BECAUSE

17   SHE APPARENTLY HAD VERY POOR JOB ATTENDANCE.

18        AND I'M NOT SURE WHAT ELSE.  THE FACT THAT SHE HAD BEEN IN

19   AT LEAST TWO ARGUMENTS WITH COWORKERS AND A THIRD ONE DURING

20   THE TIME THAT THE INVESTIGATION WAS ONGOING, THAT'S NOT

21   REPORTED IN HERE; THE FACT THAT SHE OFTEN USED PROFANITY AND

22   CURSED WITH OR AT COWORKERS; THE TROUBLE SHE HAD BALANCING HER

23   TICKETS AND THE EFFORT THAT THE COMPANY HAD GONE THROUGH AND

24   WAS CONTINUING TO GO THROUGH TO TRY AND MAKE SURE SHE SUCCEEDED

25   AT THE JOB.

1          AND I JUST WAS -- WITH ALL OF THAT GOING ON, AND THEN FOR

2     HER TO WALK OUT OR REFUSE TO ATTEND A MEETING WITH HER BOSS AND

3     THE HUMAN RESOURCES MANAGER, ALL OF THOSE THINGS TOGETHER I'M

4     SURE TEMPERED MY DECISION TO TERMINATE HER FOR NOT ATTENDING

5     THE MEETING.

6     Q.   DID YOU TERMINATE HER BECAUSE SHE WAS VIETNAMESE?

7     A.   NO.

8     Q.   BECAUSE SHE WAS A WOMAN?

9     A.   NO.

10    Q.   BECAUSE SHE HAD FILED A COMPLAINT BACK IN OCTOBER?

11    A.   NO.

12    Q.   OKAY.  THANK YOU.

13         THAT'S ALL I HAVE.

14              MS. NGUYEN:  VERY BRIEFLY, YOUR HONOR.

15              THE COURT:  OKAY.  IT'S GOT TO BE LIMITED TO WHAT HE

16    BROUGHT UP.

17                   **FURTHER AS-ON RECROSS-EXAMINATION**

18    BY MS. NGUYEN:

19    Q.   MR. WERNER, YOU JUST TESTIFIED THAT YOU HAD IN THE BACK OF

20    YOUR MIND THAT MR. ST. CROIX HAD CONSIDERED TERMINATING

21    MS. DANG, AND YOU SAID IT WAS DUE TO HER POOR ATTENDANCE.

22         AND WAS THAT THE REASON THAT MR. ST. CROIX HAD GIVEN YOU

23    FOR HIS CONSIDERATION OF TERMINATING HER?

24    A.   I RECALL THAT IS ONE OF THE REASONS, YES.

25    Q.   AND EARLIER WHEN WE WERE TALKING ABOUT NGA NGUYEN, THE

1    PERSON WHO WAS, I THINK YOU STATED, QUIT AND THEN FELT SOME

2    REGRETS ABOUT IT AND SHE WANTED TO GO BACK TO BAY 101.

3         DID YOU REMEMBER THAT WHEN MR. MCMANIS WAS SHOWING YOU

4    THAT ON THE SCREEN?

5    A.   YES.

6    Q.   AND DO YOU RECALL ALSO READING THAT THE INVESTIGATOR

7    REPORTED THAT MS. NGUYEN HAD RECENTLY INITIATED A REQUEST TO BE

8    REHIRED BY BAY 101 AND HAD TALKED WITH MR. ORTEGA ABOUT THIS

9    BEFORE THE INVESTIGATION STARTED?

10   A.   YES.

11   Q.   AND ISN'T IT TRUE, MR. WERNER, THAT SHE PROBABLY NEEDED TO

12   GET ON MR. ORTEGA'S GOOD SIDE TO GET BACK TO BAY 101?

13   A.   IT MIGHT BE.  I MEAN, HE WOULD HAVE BEEN HER SUPERVISOR IF

14   SHE WAS REHIRED.

15   Q.   AND HE WAS THE ONE WHO WOULD HAVE MADE THE DECISION ON

16   WHETHER OR NOT TO REHIRE HER, CORRECT?

17   A.   HE WOULD HAVE BEEN IN THE DECISION MAKING PROCESS, YES.

18   Q.   THANK YOU.

19        THAT'S ALL I HAVE.

20             THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

21             MS. NGUYEN:  DID YOU WANT TO TAKE A BREAK OR DID YOU

22   WANT ME TO KEEP GOING?

23             THE COURT:  NO.  KEEP GOING.

24             MS. NGUYEN:  YOUR HONOR, AT THIS TIME THE PLAINTIFF

25   WOULD LIKE TO CALL JENNIFER GILBERT.

1          THE COURT:  LADIES AND GENTLEMEN, YOU MIGHT NOTICE

2    THAT WE HAVE SOME VISITORS.  I THINK THEY'RE FROM CHINA AND

3    THEY'RE JUST OBSERVING THE COURT PROCEEDINGS AND THEY HAVE COME

4    TO WATCH A LITTLE BIT OF THIS TRIAL.

5        SO WELCOME AND HOPEFULLY YOU'LL ENJOY YOUR STAY HERE.

6          MR. MCMANIS:  THANK YOU, YOUR HONOR.

7          THE CLERK:  LET ME SWEAR YOU IN.

8    **(PLAINTIFF'S WITNESS, JENNIFER GILBERT, WAS SWORN.)**

9          THE WITNESS:  I DO.

10         THE CLERK:  THANK YOU.  TAKE THE STAND, PLEASE.

11       PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR

12   THE RECORD.

13         THE WITNESS:  JENNIFER JANE GILBERT, G-I-L-B-E-R-T.

14         THE CLERK:  THANK YOU.

15               **AS-ON CROSS-EXAMINATION**

16   BY MS. NGUYEN:

17   Q.   GOOD MORNING, MS. GILBERT.

18   A.   GOOD MORNING.

19   Q.   AND WHAT IS YOUR POSITION AT BAY 101?

20   A.   I'M HUMAN RESOURCES MANAGER.

21   Q.   AND HOW LONG HAVE YOU HELD THAT POSITION?

22   A.   SINCE OCTOBER OF 2000.

23   Q.   AND PBX OPERATORS WORK UNDER YOUR SUPERVISION, CORRECT?

24   A.   YES, THEY DO.

25   Q.   AND IN YOUR DEPARTMENT?

1    A.   YES.

2    Q.   AND THE DEPARTMENT YOU'RE IN CHARGE OF IS THE PART THAT

3    KEEPS THE EMPLOYEE FILES AND RECORDS?

4    A.   THAT'S CORRECT.

5    Q.   AND COUNSELLING MEMOS FOR EMPLOYEES ALSO GO INTO HIS OR

6    HER FILES?

7    A.   CORRECT.

8    Q.   AND DOCTOR'S NOTES AND MEDICAL VISIT VERIFICATIONS I

9    BELIEVE GO INTO A SEPARATE MEDICAL FILE?

10   A.   CORRECT.  WE HAVE TWO FILES FOR EACH EMPLOYEE.

11   Q.   AND WORKER'S CLAIM FORMS ALSO GO IN A SEPARATE FILE?

12   A.   YES.  IF THERE'S A WORKER'S COMP CLAIM FILED, THERE'S A

13   SEPARATE FILE.

14   Q.   I'D LIKE TO HAVE YOU TAKE A LOOK AT EXHIBIT 117.

15        AND, YOUR HONOR, I'VE BEEN ASKED TO HELP THIS WITNESS

16   BECAUSE SHE HAS JUST HAD CARPAL TUNNEL.

17        AND SO MAY I APPROACH?

18            THE COURT:  SURE.

19            MR. MCMANIS:  I'M SORRY, YOUR HONOR.  MAYBE I

20   MISSED.  IS IT 117?

21            MS. NGUYEN:  IT'S 1, AND THEN PAGE 17 OF 1.

22            MR. MCMANIS:  OKAY.  THANK YOU.

23   BY MS. NGUYEN:

24   Q.   HAVE YOU FOUND PAGE 17 OF EXHIBIT 1, SO AT THE BOTTOM IT

25   SAYS 1 AND THEN 17?

1    A.   OH, OKAY.  OKAY.

2    Q.   MS. GILBERT, THIS WAS A DOCUMENT THAT WAS PROVIDED BY

3    BAY 101 TO US AND IT APPEARS TO BE SOMETHING THAT CAME FROM

4    MS. DANG'S FILES.

5         DO YOU RECOGNIZE THAT AS SOMETHING THAT WOULD HAVE BEEN IN

6    HER MEDICAL VISIT VERIFICATIONS FILE?

7    A.   YES.  IT HAS HER NAME AT THE TOP.  AND DO YOU WANT ME TO

8    READ?

9              MS. NGUYEN:  NOT YET.

10        YOUR HONOR, THE PLAINTIFF MOVES TO HAVE THAT ADMITTED AS

11   AN EXHIBIT.

12             MR. MCMANIS:  NO OBJECTION.

13             THE COURT:  ALL RIGHT.  IT MAY BE RECEIVED.

14        (PLAINTIFF'S EXHIBIT 1 WAS RECEIVED IN EVIDENCE.)

15             MS. NGUYEN:  THANK YOU, YOUR HONOR.

16   Q.   MS. GILBERT, IF YOU TAKE A LOOK AT THE BOTTOM OF THAT

17   PAGE.  WOULD YOU PLEASE SCROLL DOWN?

18   A.   I CAN'T HEAR YOU.

19   Q.   I'M SORRY.  THE BOTTOM OF THE PAGE, CAN YOU SEE THE DATE

20   OF THAT MEDICAL VISIT VERIFICATION?

21   A.   IT SAYS PREPARED THURSDAY, JANUARY 11TH, 2007, AT 3:47

22   P.M.

23   Q.   OKAY.  AND IF YOU CAN SCROLL BACK UP, PLEASE.

24        AND ACCORDING TO THAT, THE DOCTOR IS HAVING MS. DANG STAY

25   OUT UNTIL MONDAY, JANUARY 17TH -- I'M SORRY, JANUARY 15TH,

1    2007; CORRECT?

2    A.   IT SAYS THE PATIENT MAY RETURN TO WORK WITHOUT RESTRICTION

3    ON MONDAY, JANUARY 17TH -- I MEAN 15TH.  SORRY.

4    Q.   I'M GOING TO ASK YOU TO FLIP TO EXHIBIT 2, PAGE 2 OF THAT

5    EXHIBIT.

6    A.   OKAY.

7    Q.   THAT IS A WORKER'S CLAIM FORM?

8    A.   IT'S A WORKER'S COMP CLAIM FORM, CORRECT.

9    Q.   I'M SORRY.  IT'S A WORKER'S COMP CLAIM FORM.

10   A.   I'M SORRY.  WHEN YOU'RE NOT FACING ME, I HAVE A REALLY

11   HARD TIME HEARING YOU.

12   Q.   I'M SORRY.  DO YOU SEE THAT THIS CLAIM FORM WAS FOR AN

13   INJURY THAT MS. DANG HAD AT BAY 101 ON JANUARY 10TH, 2007?

14   A.   YES.

15   Q.   AND THIS SAYS THAT IT WAS FILLED OUT BY SECURITY?

16   A.   WELL, THE TOP PORTION IS FILLED OUT BY THE EMPLOYEE.

17        THE SECOND PORTION IS FILLED OUT BY THE SECURITY OFFICE.

18   Q.   AND THIS WOULD HAVE BECOME A PART OF MS. DANG'S FILES IN

19   YOUR OFFICE?

20   A.   IT WOULD HAVE BEEN PART OF HER WORKER'S COMP CLAIM FILE.

21        MS. NGUYEN:  YOUR HONOR, THE PLAINTIFF MOVES TO HAVE

22   THIS ADMITTED AS AN EXHIBIT.

23        MR. MCMANIS:  NO OBJECTION.

24        THE COURT:  ALL RIGHT.  2 IS ADMITTED.

25        (PLAINTIFF'S EXHIBIT 2 WAS RECEIVED IN EVIDENCE.)

1    BY MS. NGUYEN:

2    Q.   MS. GILBERT, WERE YOU AWARE THAT ON JANUARY 10TH, 2007,

3    THAT MS. DANG HAD AN ACCIDENT AT BAY 101?

4    A.   THE FORMS WERE LEFT IN MY BOX FROM THE SECURITY OFFICE.

5    Q.   AND ACCORDING TO THIS, SHE HAD SOME BOWL FALL ON HER FACE?

6    A.   CORRECT.

7    Q.   WOULD IT HAVE BEEN YOUR OFFICE THAT WOULD HAVE HANDLED THE

8    WORKER'S COMP CLAIM?

9    A.   WELL, WE HAVE A WORKER'S COMP COMPANY THAT HANDLES IT

10   THEMSELVES.

11   Q.   AND WHEN YOU HAVE A FORM, YOU SUBMIT IT TO THE COMPANY?

12   A.   YEAH.  IT WAS FILLED OUT AND SUBMITTED.

13   Q.   AND YOU WOULD HAVE LEARNED OF THE ACCIDENT BECAUSE THE

14   CLAIM FORMS GO THROUGH YOUR OFFICE?

15   A.   YES.

16   Q.   I'M GOING TO ASK YOU TO TAKE A LOOK AT EXHIBIT 1001.

17            THE COURT:  WHILE COUNSEL IS GETTING THE DOCUMENT

18   READY, LET ME SPEND A MINUTE, IF YOU DON'T MIND, TO EXPLAIN TO

19   THE STUDENTS WHO ARE HERE HOW THIS COURT FUNCTIONS AND WHAT JOB

20   EACH OF US HAS IN THE COURTROOM.

21            SITTING AT THE TABLE ON MY RIGHT ARE THE LAWYERS THAT ARE

22   REPRESENTING THE PERSON WHO IS BRINGING A CLAIM, AND THE LADY

23   THAT IS BRINGING THE CLAIM IS SEATED AT THE END OF THE TABLE.

24            ON MY LEFT IS THE ATTORNEY THAT IS REPRESENTING THE PERSON

25   WHO IS BEING SUED AND HIS ASSISTANT AND --

1          MR. MCMANIS:  EXCUSE ME, NOT MY ASSISTANT.  MY

2     COLLEAGUE, YOUR HONOR.

3          THE COURT:  ALL RIGHT.  YOUR COLLEAGUE.

4          MR. MCMANIS:  STAND UP AND TAKE A BOW.

5          THE COURT:  AND IN THE BACK OF THE ROOM IS THE

6     REPRESENTATIVE OF THE COMPANY THAT IS AGAINST THE LAWSUIT THAT

7     IS BEING BROUGHT.

8          AND THEN WE HAVE A COURT REPORTER THAT IS SEATED JUST

9     BELOW ME ON MY RIGHT WHO TAKES DOWN EVERYTHING THAT WAS SAID SO

10    THAT IF THERE'S LATER AN ISSUE AS TO WHETHER SOMETHING WAS DONE

11    PROPERLY OR NOT DONE PROPERLY IN THIS COURT, THERE'S A RECORD

12    OF THE PROCEEDINGS.

13         ON MY LEFT IS THE COURT CLERK.  SHE KEEPS TRACK OF ALL OF

14    THE EVIDENCE THAT'S INTRODUCED AND BASICALLY IS IN CHARGE OF

15    ATTENDING TO THE NEEDS OF THE JURORS WHO I'LL INTRODUCE YOU TO

16    IN A MINUTE.

17         BASICALLY THEY ARE RESPONSIBLE FOR MAKING SURE THAT ALL OF

18    US ARE DOING OUR JOBS RIGHT.

19         AND THEN WE HAVE THE JURY.  THE JURY IS A GROUP OF

20    CITIZENS WHO ARE CALLED IN TO HEAR A CASE AND THEY LISTEN TO

21    THE PRESENTATIONS OF THE PARTIES AND THEN THEY, AFTER THE

22    PRESENTATIONS ARE COMPLETED, THEY GO AND TALK ABOUT THE CASE

23    AND THEN REACH A DECISION AS TO WHO SHOULD WIN IN THE LAWSUIT.

24         APPEARING ON THE WITNESS STAND IS ONE OF THE WITNESSES WHO

25    IS TESTIFYING IN THE CASE.

1          AND EACH TIME A WITNESS IS CALLED, THEY PROMISE TO TELL

2     THE TRUTH AND THEY TAKE THE WITNESS STAND AND ARE QUESTIONED BY

3     BOTH SIDES AS TO WHAT THEY KNOW ABOUT THE SUBJECT MATTER OF THE

4     PROCEEDINGS.

5          MY JOB IS TO MAKE SURE THAT PROPER EVIDENCE IS PRESENTED.

6     IN OTHER WORDS, IF ONE SIDE FEELS THAT EVIDENCE IS NOT PROPERLY

7     OFFERED TO THE JURY, AND THEN MAKE A DECISION AS TO WHAT SHOULD

8     BE OR NOT BE.

9          AND SIMILARLY, IF THERE ARE QUESTIONS AS TO WHETHER OR NOT

10    QUESTIONS THAT ARE ASKED ARE PROPER, I MAKE DECISIONS AS TO

11    WHETHER OR NOT THOSE QUESTIONS ARE PROPER.

12         AT THE END OF THE CASE I EXPLAIN TO THE JURY WHAT THE LAW

13    IS AND THEY THEN DO WHAT WE CALL IS DELIBERATION, WHICH MEANS

14    TO DISCUSS THE CASE AMONGST THEMSELVES, AND THEY APPLY THE LAW

15    AS I HAVE TOLD THEM IT IS TO THE FACTS AS THEY FIND THEM.

16         THEY MAKE THE FINAL DECISION AS TO WHAT HAPPENED.

17         I MAKE THE FINAL DECISION AS TO WHAT LAWS APPLY AND THEN

18    THEY REACH A DECISION.

19         SO THAT'S A VERY SHORT SUMMARY OF WHAT THE LAWSUIT IS

20    ABOUT AND WHO THE VARIOUS PARTICIPANTS ARE.

21         EACH SIDE HAS A TECHNICAL PERSON WHO HELPS PRESENT THE

22    EVIDENCE, EITHER PROJECTING DOCUMENTS ON THE SCREEN OR LOCATING

23    PHOTOGRAPHS, IF THERE ARE PHOTOGRAPHS THAT ARE IMPORTANT, AND

24    PUBLISHING THEM ON THE SCREEN SO EVERYBODY CAN SEE THEM.

25         SO HOPEFULLY THAT TELLS YOU A LITTLE BIT.

1          AND WE'LL NOW RESUME WITH THE TRIAL.

2              MR. MCMANIS:  YOUR HONOR, COULD I ASK THE FOUR

3     CHILDREN FROM CHINA TO STAND UP AND JUST TAKE A BOW?

4              THE COURT:  SURE.

5              MR. MCMANIS:  LET'S HAVE THE FOUR CHILDREN FROM

6     CHINA STAND UP, PLEASE, JUST THE CHINA PEOPLE.

7          ALL RIGHT.  THANK YOU VERY MUCH.  NOW YOU CAN HAVE A SEAT.

8          AND THEN LET'S HAVE THE FOUR CHILDREN FROM SAN JOSE STAND

9     UP.

10         OKAY.  AND THEN MR. FONG, DO YOU WANT TO STAND UP AND TAKE

11    A BOW AS THE PERSON WHO BROUGHT THESE PEOPLE FROM CHINA AND

12    INTRODUCE YOUR FRIEND?

13             MR. FONG:  THIS IS AMY FROM THE ELEMENTARY SCHOOL IN

14    CHINA, AND SHE WAS BRAVE ENOUGH TO COME WITH ME AND BRING THESE

15    FOUR CHILDREN HERE.

16             MR. MCMANIS:  THANK YOU.  THANK YOU, YOUR HONOR.

17             MS. NGUYEN:  MAY I RESUME?

18             THE COURT:  ABSOLUTELY.

19    BY MS. NGUYEN:

20    Q.   MS. GILBERT, DO YOU HAVE IN FRONT OF YOU EXHIBIT 1001?

21    A.   YES.

22    Q.   AND I'D LIKE TO DIRECT YOUR ATTENTION TO THE PAGE NUMBER

23    AT THE BOTTOM BAY 3101?

24    A.   OKAY.

25    Q.   THAT'S A COUNSELLING MEMO DATED JANUARY 18TH, OR

1    JANUARY 17TH, 2007.

2        DO YOU SEE THAT?

3    A.   YES.

4    Q.   AT THE -- NEXT TO MR. ORTEGA'S SIGNATURE?

5    A.   YES, IT'S DATED 1-17-07.

6    Q.   AND THAT WOULD HAVE BEEN PART OF MS. DANG'S PERSONNEL

7    FILE?

8    A.   CORRECT.

9            MS. NGUYEN:  YOUR HONOR, THE PLAINTIFF ASKS TO MOVE

10   THAT IN AS AN EXHIBIT.

11           MR. MCMANIS:  NO OBJECTION.

12           THE COURT:  ALL RIGHT.  THEN THE EXHIBIT IS

13   ADMITTED.

14       GIVE ME THE NUMBER AGAIN.  I'M SORRY.

15           MS. NGUYEN:  IT IS EXHIBIT 1001, BATES STAMP BAY

16   1341.

17           THE COURT:  OKAY.

18       (PLAINTIFF'S EXHIBIT 1001 WAS RECEIVED IN EVIDENCE.)

19   BY MS. NGUYEN:

20   Q.   MS. GILBERT, THIS SHOWS THAT MS. DANG WAS SUSPENDED TWO

21   DAYS BECAUSE SHE DID NOT CALL IN AND DID NOT SHOW UP FOR WORK

22   FOR THREE DAYS.

23       DO YOU SEE THAT?

24   A.   IT'S ACTUALLY -- IT SAYS THREE DAYS UP AT THE TOP.

25   Q.   YES, THREE DAYS, JANUARY 12TH, 13TH, AND 14TH.

1      A.   THOSE ARE THE DAYS THAT SHE DIDN'T SHOW UP.

2      Q.   AND EARLIER WE LOOKED AT THE MEDICAL VISIT VERIFICATIONS

3      THAT SHOWED THAT THE DOCTOR GAVE HER OFF UNTIL THE 15TH OF

4      2007, JANUARY 15TH.  DO YOU RECALL THAT?

5      A.   YES.

6      Q.   AND DO YOU RECALL THAT THAT WAS -- THE MEDICAL VISIT

7      VERIFICATION FORM WAS DATED JANUARY 11TH, 2007?

8      A.   I DON'T REMEMBER THE DATE IT WAS DATED, BUT DO YOU WANT ME

9      TO TURN BACK?

10     Q.   IT WAS DATED JANUARY 11TH, 2007.

11          AND THAT WAS THE DAY AFTER MS. DANG HAD THE ACCIDENT AT

12     BAY 101; CORRECT?

13     A.   CORRECT.

14     Q.   AND DID BAY 101 NOT KNOW THAT SHE HAD GONE TO THE HOSPITAL

15     AND HAD TO BE OUT BECAUSE OF THAT ACCIDENT?

16     A.   NO.  IT'S COMPANY POLICY THAT IF EMPLOYEES ARE REFERRED TO

17     THE EMERGENCY ROOM, WHICH MS. DANG WAS, THAT THEY NEED TO

18     FOLLOW UP WITH OUR OCCUPATIONAL CLINIC THE NEXT BUSINESS DAY.

19          SO SHE WAS TOLD IN SECURITY THAT SHE NEEDED TO FOLLOW UP

20     WITH ALLIANCE OCCUPATIONAL THE NEXT BUSINESS DAY.

21          SO I DON'T KNOW WHAT DAY OF THE WEEK THAT WAS.

22          AND WHEN SHE FOLLOWED UP WITH ALLIANCE, THEY RETURNED HER

23     TO WORK.

24     Q.   OKAY.

25     A.   SO THE --

1    Q.   BUT AT THE DOCTOR'S OFFICE AT O'CONNOR, THEY GAVE HER A

2    NOTE THAT SAYS THAT SHE HAD TO BE OUT UNTIL THE 15TH, RIGHT?

3    YOU SAW THAT EARLIER?

4    A.   THE EMERGENCY ROOM, YES.

5    Q.   ALL RIGHT.  MS. GILBERT, DURING THE TIME PERIOD OF 2006 TO

6    2009 WHEN MS. DANG WAS WORKING AT BAY 101, YOU WERE NOT

7    INVOLVED WITH THE HIRING PROCESS FOR THE FOOD AND BEVERAGE

8    DEPARTMENT, WERE YOU?

9    A.   THE HIRING PROCESS?  MEANING INTERVIEWING AND --

10   Q.   YEAH, AND SEARCHING FOR CANDIDATES, INTERVIEWING AND

11   HIRING?

12   A.   NO, I WAS NOT.

13   Q.   AND THOSE DECISIONS WERE LEFT UP TO THE FOOD AND BEVERAGE

14   DIRECTOR; CORRECT?

15   A.   CORRECT.

16   Q.   OKAY.  AND ALSO DURING THAT PERIOD OF TIME, THE DEPARTMENT

17   SUPERVISORS WERE THE ONES WHO HANDLED THE TRANSFER REQUESTS BY

18   THE EMPLOYEES?

19   A.   YES.

20   Q.   AND IS IT TRUE THAT H.R. DIDN'T GET INVOLVED WITH ANY

21   TRANSFER REQUEST UNTIL THE SUPERVISORS HAD APPROVED THE

22   TRANSFER?

23   A.   YES.

24   Q.   AND IF THE SUPERVISORS DID NOT WANT TO APPROVE THE

25   TRANSFERS, H.R. WOULD NEVER HAVE KNOWN ABOUT IT?

1    A.   IT'S POSSIBLE, YES.

2    Q.   I THINK IT'S THE SAME BINDER.  I'M GOING TO ASK YOU TO

3    TAKE A LOOK AT EXHIBIT 1011.

4         MS. GILBERT, DO YOU REMEMBER LOOKING AT THIS DOCUMENT

5    CALLED THE SUPPLEMENTAL REPORT?

6    A.   YES.

7    Q.   AND IT WAS SOMETHING THAT CAME TO YOUR OFFICE IN H.R.?

8    A.   YES, IT DID.

9              MS. NGUYEN:  YOUR HONOR, THE GOVERNMENT MOVES TO

10   HAVE THIS EXHIBIT MOVED INTO EVIDENCE.

11             MR. MCMANIS:  NO OBJECTION.

12             THE COURT:  EXHIBIT 1011 IS ADMITTED.

13        (PLAINTIFF'S EXHIBIT 1011 WAS RECEIVED IN EVIDENCE.)

14   BY MS. NGUYEN:

15   Q.   MS. GILBERT, PRIOR TO RECEIVING -- I'M SORRY.  LET ME

16   START WITH THIS.

17        THERE'S A DATE AT THE TOP OF THIS EXHIBIT.  IT LOOKS AS IF

18   IT SAYS APRIL 20TH, 2007.

19        DO YOU SEE THAT?

20   A.   YES, I DO.

21   Q.   IS THAT ABOUT THE TIME WHEN THIS REPORT CAME TO YOUR

22   OFFICE?

23   A.   NO.  I BELIEVE IT CAME DOWN EARLIER THAN THAT.

24   Q.   DO YOU KNOW WHEN IT CAME TO YOUR OFFICE?

25   A.   I BELIEVE IT WAS ATTACHED TO THE INJURY REPORT THAT IS

1    NOTED IN THIS REPORT.

2    Q.  AND THIS SUPPLEMENTAL REPORT, PRIOR TO RECEIVING THIS, DID

3    YOU HAVE ANY KNOWLEDGE OF MS. DANG'S COMPLAINT AGAINST

4    MR. LUCIO SUAREZ?

5    A.  NO, I DID NOT.

6    Q.  THIS WAS THE FIRST TIME THAT YOU HAD HEARD ANYTHING?

7    A.  YES.

8    Q.  AND MR. SUAREZ AT THE TIME SOMETIMES ACTED AS THE LEAD

9    COOK?

10   A.  I'M NOT AWARE WHETHER HE WAS ACTING AS THE LEAD OR NOT.

11   Q.  YOU JUST DON'T HAVE INFORMATION ON THAT?

12   A.  EXCUSE ME?

13   Q.  YOU JUST DON'T RECALL ANY INFORMATION ABOUT HIS POSITION

14   AT THE TIME?

15   A.  I KNOW THAT HE WORKED IN THE KITCHEN AS A COOK.

16   Q.  YOU DIDN'T KNOW THAT SOMETIMES HE FILLED IN AS A

17   SUPERVISOR?

18   A.  NO, I DID NOT.

19   Q.  AND ACCORDING TO THIS EXHIBIT, MS. DANG MADE A REPORT

20   ABOUT MR. SUAREZ BOTHERING HER ABOUT THE LINE COOK AREA.

21       DO YOU SEE THAT?

22   A.  YES.

23   Q.  AND SHE REPORTED THAT HE BECAME IRATE AND OPENED A METAL

24   DOOR IN AN UNSAFE MANNER THAT HIT THE BACK OF HER RIGHT FOOT.

25       DO YOU SEE THAT?

1      A.    YES, I SEE THAT.

2      Q.    AND THAT SUPERVISOR JORGE CAME INTO THE SECURITY OFFICE

3      WITH HER TO MAKE THE REPORT?

4      A.    I SEE THAT.

5      Q.    AND SUPERVISOR JORGE, IS THAT GEORGE RODRIGUEZ CASTILLO?

6      A.    YES.

7      Q.    HE GOES BY "GEORGE" AT BAY 101?

8      A.    YES.

9      Q.    ON THE SECOND PAGE OF THAT EXHIBIT --

10            ANDRE, WOULD YOU PLEASE.

11            -- IT REFERENCES AN ATTACHED DOCUMENT WITH ALL OF THE

12     DATES OF THE PHONE CALLS THAT MR. SUAREZ MADE TO MS. DANG.

13            DO YOU SEE THAT?

14     A.    YES.

15     Q.    AND IS THAT THE THIRD PAGE HERE?

16     A.    YES, IT IS.

17     Q.    AND THAT SHOWS THE NUMEROUS PHONE CALLS THAT MR. SUAREZ

18     MADE TO MS. DANG?

19     A.    YES.

20     Q.    AND AFTER YOU RECEIVED THIS REPORT, DID YOU CONDUCT AN

21     INVESTIGATION?

22     A.    I -- YES, I DID.

23     Q.    AND THIS REPORT THAT MS. DANG MADE, SHE MADE IT WITH THE

24     HELP OF ANOTHER PERSON TO HELP TRANSLATE FOR HER?

25     A.    THAT'S WHAT THE LETTER INDICATES, OR THE REPORT INDICATES.

1     Q.   I'D LIKE FOR YOU NOW TO PLEASE TURN TO EXHIBIT 1012.  IT'S

2     JUST THE NEXT ONE IN ORDER.

3     A.   OKAY.

4     Q.   AND THIS LOOKS TO BE YOUR NOTES FROM APRIL 2007; CORRECT?

5     A.   CORRECT.

6          MS. NGUYEN:  YOUR HONOR, THE PLAINTIFF MOVES TO HAVE

7     THIS ADMITTED AS AN EXHIBIT.

8          MR. MCMANIS:  NO OBJECTION.

9          THE COURT:  OKAY.  1012 IS ADMITTED.

10    (PLAINTIFF'S EXHIBIT 1012 WAS RECEIVED IN EVIDENCE.)

11    BY MS. NGUYEN:

12    Q.   AND WAS THIS WHAT YOU DID -- OR THE NOTES INDICATE WHAT

13    YOU DID AFTER YOU RECEIVED THE REPORTS THAT WE SAW AS

14    EXHIBIT 1011?

15    A.   THEY'RE NOTES AND I DON'T -- THEY DON'T ENCOMPASS

16    EVERYTHING I DID, BUT --

17    Q.   AND WHY DID YOU WRITE DOWN NOTES?

18    A.   I TYPICALLY TAKE NOTES.

19    Q.   AND WHAT WOULD YOU INCLUDE IN THE NOTES AND WHAT WOULDN'T

20    YOU INCLUDE IN THE NOTES?

21    A.   I MEAN, IT REALLY DEPENDS ON THE SITUATION.

22    Q.   THE IMPORTANT INFORMATION YOU INCLUDED IN THE NOTES?

23    A.   I TRIED TO, YES.

24    Q.   AND SO ACCORDING TO THIS, IT LOOKED AS THOUGH YOU RECEIVED

25    THE INJURY PAPERWORK ON APRIL 12TH, 2007; CORRECT?

1      A.   I BELIEVE I RECEIVED IT THE FOLLOWING MORNING.

2      Q.   AND THE NEXT DAY YOU SPOKE WITH MR. ORTEGA?

3      A.   THE NEXT DAY AFTER RECEIVING THE REPORT?

4      Q.   WELL, ACCORDING TO YOUR NOTES ON FRIDAY, APRIL 13TH, YOU

5      SPOKE TO MR. ORTEGA?

6      A.   RIGHT.  I'M JUST INDICATING THAT I RECEIVED -- THE 4-12,

7      THAT'S THE DATE THAT IT'S INDICATING THAT MS. DANG WENT TO THE

8      SECURITY OFFICE TO REPORT THE INJURY.

9      Q.   SO YOU DID NOT RECEIVE IT UNTIL FRIDAY THE 13TH?

10     A.   I BELIEVE MS. DANG WORKED A DIFFERENT SHIFT, SO IT WOULD

11     HAVE BEEN PREPARED THE EVENING OF THE 12TH AND IT WAS IN MY BOX

12     ON FRIDAY THE 13TH WHEN I CAME TO WORK.

13     Q.   OKAY.  AND ACCORDING TO YOUR NOTES, YOU AND MR. ORTEGA

14     CALLED MS. DANG AT HOME?

15     A.   YES.

16     Q.   AND YOU ASKED HER ABOUT WHAT HAPPENED?

17     A.   YES.

18     Q.   WAS THERE ANY TRANSLATOR TO HELP HER COMMUNICATE WITH YOU?

19     A.   NO.

20     Q.   AND AT THAT TIME, BY THE TIME THAT YOU AND MR. ORTEGA

21     CALLED MS. DANG, WHAT KIND OF INVESTIGATION HAD YOU DONE INTO

22     THE MATTER?

23     A.   MR. ORTEGA AND I HAD CALLED MR. SUAREZ AND QUESTIONED HIM

24     WHETHER HE HAD MADE THE PHONE CALLS AND HE SAID HE HAD.

25          AND WE ASKED HIM IF HE HAD BEEN BOTHERING MS. DANG, AND HE

1    INDICATED THAT THEY HAD BEEN DATING, OR HAD DATED, AND THAT HE

2    WAS TRYING TO RECONCILE WITH HER.  THAT WAS THE PURPOSE OF THE

3    PHONE CALLS.

4    Q.   WHAT DID HE SAY ABOUT HER ALLEGATIONS THAT HE HURT HER

5    FOOT WITH THE METAL DOOR?

6    A.   HE SAID THAT IT WAS AN ACCIDENT, THAT HE DIDN'T INTEND TO

7    HIT HER WITH THE DOOR.

8    Q.   AND BESIDES TALKING TO HIM, DID YOU DO ANY OTHER

9    INVESTIGATION BEFORE YOU CALLED MS. DANG?

10   A.   NO.  WELL, THAT'S NOT TRUE.  I DID CALL THE SECURITY

11   OFFICER WHO COMPLETED THE REPORT THAT HAD BEEN ATTACHED TO AN

12   INJURY REPORT.

13       THAT IS NOT THE NORMAL COURSE OF HOW I WOULD RECEIVE A

14   REPORT LIKE THIS, SO I CALLED TO ASK HIM HOW THIS CAME ABOUT,

15   WHY IT WAS ATTACHED TO AN INJURY REPORT.

16   Q.   AND WHEN YOU SPOKE TO MR. SUAREZ, DID HE TELL YOU THAT

17   MS. DANG HAD BROKEN OFF THE RELATIONSHIP AND THAT HE WANTED TO

18   GET BACK WITH HER?

19   A.   I BELIEVE HIS WORDS WERE THAT THEY HAD DATED AND THAT HE

20   WAS TRYING -- THAT SHE HAD CALLED IT OFF AND THAT HE WAS TRYING

21   TO RECONCILE.

22   Q.   BUT YOUR NOTES HERE DON'T HAVE ANYTHING ABOUT YOUR

23   CONVERSATION WITH MR. LUCIO SUAREZ?

24   A.   NO, THEY DON'T.

25   Q.   WHY DIDN'T YOU PUT ANYTHING ABOUT THAT CONVERSATION IN

1     YOUR NOTES?

2     A.   I DON'T KNOW.

3     Q.   AND DID YOU DO ANYTHING ELSE TO INVESTIGATE BEFORE YOU

4     CALLED MS. DANG?

5     A.   NO.

6     Q.   AND THEN YOU CALLED MS. DANG AND TOLD HER THAT MR. SUAREZ

7     WAS BEING SUSPENDED FOR THREE DAYS?

8     A.   YES, WE DID.

9     Q.   WAS MR. SUAREZ COUNSELLED OR ADVISED REGARDING WHAT HE

10    SHOULD OR SHOULD NOT DO GOING FORWARD?

11    A.   YES.  WE HAD HIM COME IN BEFORE HIS SHIFT THAT AFTERNOON

12    AND NICK AND I MET WITH HIM AND HE WAS TOLD TO MAKE NO MORE

13    PHONE CALLS TO MS. DANG AND TO NOT SPEAK TO HER AND NOT TO

14    BOTHER HER.

15    Q.   AND THIS WAS IN APRIL OF 2007.  MR. ST. CROIX WAS STILL

16    ALIVE; CORRECT?

17    A.   CORRECT.

18    Q.   AND WHY WAS IT THAT IT WAS NICK AS OPPOSED TO

19    MR. ST. CROIX WHO DID THE INVESTIGATION?

20    A.   MR. ST. CROIX DID NOT WORK ON FRIDAYS.

21    Q.   AND BEFORE YOU CALLED MS. DANG TO LET HER KNOW OF YOUR

22    INVESTIGATION, HAD YOU TALKED TO GEORGE, THE SUPERVISOR?

23    A.   NO, I HAD NOT.

24    Q.   AT THE BOTTOM OF YOUR NOTES THERE, YOU REFER TO A LETTER

25    THAT YOU RECEIVED FROM MS. DANG ON APRIL 20TH.

1          DO YOU SEE THAT?

2     A.   CORRECT.

3     Q.   IS THAT THE LETTER THAT IS EXHIBIT 1013, WHICH IS THE NEXT

4     IN ORDER?

5     A.   YES, IT IS.

6          MS. NGUYEN:  YOUR HONOR, THE PLAINTIFF MOVES TO HAVE

7     EXHIBIT 1013 ADMITTED INTO EVIDENCE.

8          MR. MCMANIS:  NO OBJECTION.

9          THE COURT:  1013 IS ADMITTED.

10    (PLAINTIFF'S EXHIBIT 1013 WAS RECEIVED IN EVIDENCE.)

11         MR. MCMANIS:  I THINK, YOUR HONOR, WHEN WE ADMITTED

12    THIS PREVIOUSLY, IT CAME IN WITH A LIMITING INSTRUCTION, AND I

13    ASK THAT THERE BE A SIMILAR INSTRUCTION BE GIVEN HERE.

14         IN OTHER WORDS, NOT FOR THE TRUTH OF THE STATEMENTS THAT

15    MS. DANG MADE, BUT THE FACT THAT SHE MADE THEM AND WHETHER THEY

16    WERE COMMUNICATED TO BAY 101.

17         MS. NGUYEN:  I DON'T RECALL THE LIMITING INSTRUCTION

18    WITH RESPECT TO THIS ONE.

19         THE COURT:  I THINK IT WAS GIVEN IN THIS ONE AND I

20    THINK IT'S APPROPRIATE.

21         MS. NGUYEN:  THAT'S FINE, YOUR HONOR.

22         THE COURT:  ALL RIGHT.  SO THIS LETTER FROM MS. DANG

23    CAN BE CONSIDERED FOR THE INFORMATION THAT SHE ADVISED BAY 101

24    ABOUT.

25         WHETHER OR NOT THE STATEMENTS IN THE LETTER ARE TRUE OR

1    CORRECT, THAT WILL HAVE TO COME FROM OTHER TESTIMONY.

2              MR. MCMANIS:  THANK YOU, YOUR HONOR.

3    BY MS. NGUYEN:

4    Q.   MS. GILBERT, AFTER YOU GOT THIS LETTER FROM MS. DANG, YOU

5    REVIEWED IT IN ITS ENTIRETY; RIGHT?

6    A.   CORRECT.

7    Q.   AND IS IT TRUE THAT YOU PULLED THE PERSONNEL FILES OF THE

8    TWO WOMEN THAT MS. DANG NAMED IN THAT LETTER?

9    A.   YES, I DID.

10   Q.   AND THAT WOULD HAVE BEEN NGA NGUYEN AND SO?

11   A.   CORRECT.

12   Q.   AND ISN'T IT TRUE THAT WHEN YOU PULLED THE PERSONNEL FILE,

13   YOU FOUND THAT MS. NGA NGUYEN HAD IN HER FILE A COMPLAINT ABOUT

14   LUCIO AND WORKING PROCEDURES?

15   A.   YES.

16   Q.   AND DID YOU FIND ANYTHING IN THE PERSONNEL FILE OF SO?

17   A.   NO, I DID NOT.

18   Q.   ISN'T IT TRUE THOUGH, THAT MR. ST. CROIX TALKED TO SO?

19   A.   THE FOLLOWING MONDAY, YES.

20   Q.   AND HE ASKED HER ABOUT WHAT MS. DANG ALLEGED IN HERE?

21   A.   I WASN'T PRESENT SO I DON'T KNOW THE EXACT QUESTION HE

22   ASKED.

23   Q.   BUT AS PART OF YOUR INVESTIGATION, THAT WAS WHAT HE WAS

24   DOING?

25   A.   YES.

1    Q.   AND DO YOU RECALL THAT MR. ST. CROIX LEARNED FROM SO THAT

2    LUCIO HAD ASKED HER OUT A FEW TIMES?

3    A.   CORRECT.

4    Q.   NOW, I'D LIKE TO DIRECT YOUR ATTENTION TO THE SECOND

5    PARAGRAPH OF THAT LETTER WHERE IT STARTS, "LAST YEAR IN JULY

6    AND AUGUST AFTER I STARTED WORKING AT BAY 101, I REPORTED THAT

7    I WAS BEING SEXUALLY HARASSED BY A COWORKER NAMED LUCIO.  JOHN

8    SPOKE TO HIM AND FOR A SHORT PERIOD OF TIME LUCIO STOPPED

9    BOTHERING ME."

10        DO YOU SEE THAT?

11   A.   YES, I DO.

12   Q.   AND JOHN IS REFERRING TO MR. ST. CROIX?

13   A.   CORRECT.

14   Q.   AND AFTER YOU READ THIS LETTER, ISN'T IT TRUE THAT YOU

15   SPOKE TO MR. ST. CROIX ABOUT HAVING RECEIVED MS. DANG'S

16   COMPLAINT?

17   A.   I ASKED HIM IF SHE HAD EVER COMPLAINED TO HIM.

18   Q.   PARDON?

19   A.   I ASKED HIM IF SHE HAD EVER COMPLAINED TO HIM.

20   Q.   AND HE CONFIRMED FOR YOU THAT SHE DID?

21   A.   HE SAID THAT SHE REPORTED SHORTLY AFTER HER STARTING WORK

22   AT BAY 101 THAT LUCIO HAD BEEN BOTHERING HER.

23   Q.   AND DO YOU KNOW WHAT KIND OF INVESTIGATION HE MADE INTO

24   THAT COMPLAINT?

25   A.   I BELIEVE THAT HE SPOKE TO LUCIO AND SAID THAT MS. DANG

1    DIDN'T WANT HIM BOTHERING HER AND TOLD HIM TO LEAVE HER ALONE.

2    Q.   AND DO YOU KNOW WHETHER ANYTHING ELSE WAS DONE TO

3    INVESTIGATE MS. DANG'S COMPLAINT?

4    A.   NO.

5    Q.   YOU DON'T KNOW OR NOTHING ELSE WAS DONE?

6    A.   I DON'T KNOW.

7    Q.   AND IN THIS LETTER, MS. DANG ALSO INFORMED YOU THAT

8    MR. SUAREZ HAD BROKEN INTO HIS HOUSE -- OR HER HOUSE AND HER

9    BEDROOM; CORRECT?

10   A.   YES.  THE THIRD PARAGRAPH RELATES TO THAT.

11   Q.   AND SHE ALSO ADVISED YOU THAT HE CONTINUED TO BOTHER HER

12   NOW AT THE TIME OF THE LETTER?

13   A.   SHE SAID IN THE FOURTH PARAGRAPH THAT HE HAS CONTINUED TO

14   BOTHER HER.

15   Q.   BECAUSE HE CONTINUES TO TOUCH HER?

16   A.   YES, IT SAYS THAT.

17   Q.   AND TELL HER THAT HE LOVED HER?

18   A.   IT SAYS THAT.

19   Q.   AND ASKED HER TO GO OUT FOR DINNER?

20   A.   YES.

21   Q.   AND FOLLOWED HER DURING WORK?

22   A.   CORRECT.

23   Q.   AND THAT HE ALSO FOLLOWED HER IN HIS CAR?

24   A.   YES, IT SAYS THAT.

25   Q.   AND SHE COMPLAINED TO YOU THAT HIS CONDUCT MADE HER FEEL

1    VERY UNCOMFORTABLE AND IT'S SEXUAL IN NATURE?

2    A.   CORRECT.

3    Q.   AND THEN SHE REFERRED TO THE INCIDENT OF APRIL 12, 2007,

4    TOWARD THE BOTTOM OF THAT LETTER.

5        DO YOU SEE THAT?

6    A.   YES.

7    Q.   AND ACCORDING TO THAT, SHE WAS CALLED INTO HUMAN RESOURCES

8    AND GIVEN A WARNING FOR NOT SPEAKING -- FOR SPEAKING WITH

9    LUCIO.

10        WHAT WAS THAT ALL ABOUT?

11   A.   I DON'T KNOW.  I MEAN --

12   Q.   DID ANYONE IN HUMAN RESOURCES CALL HER IN?

13   A.   NO.

14   Q.   BECAUSE --

15   A.   GO AHEAD.

16   Q.   I'M SORRY.

17   A.   I BELIEVE SHE WAS REFERRED TO GOING TO SECURITY TO FILL

18   OUT THE INJURY REPORT.

19   Q.   BECAUSE AFTER YOU RECEIVED THE SECURITY INJURY REPORT,

20   WHAT YOU DID WAS CALL HER ON THE PHONE; CORRECT?

21   A.   WELL, NO.  FIRST I SPOKE TO THE SECURITY LEAD THAT FILLED

22   OUT THE INJURY REPORT.

23   Q.   AND THEN WHEN YOU SPOKE TO MS. DANG, IT WAS BY PHONE?

24   A.   REGARDING THIS LETTER OR THE JANUARY 12TH LETTER?

25   Q.   AFTER YOU RECEIVED THE INJURY REPORT.

1    A.   I SPOKE TO THE SECURITY LEAD.  I SPOKE TO NICK.  NICK AND

2    I SPOKE TO LUCIO, AND THEN WE CALLED MS. DANG.

3    Q.   YOU DIDN'T HAVE ANY FACE-TO-FACE MEETING WITH MS. DANG IN

4    THE H.R. DEPARTMENT AS A RESULT OF THE INJURY OF APRIL 12TH,

5    DID YOU?

6    A.   DID WE MEET WITH HER ON THE 13TH?

7    Q.   YES.

8    A.   NO, WE DID NOT.

9    Q.   AND IN MS. DANG'S LETTER, EXHIBIT 1013, ON THE SECOND PAGE

10   IT REFERS TO A REPORT SHE MADE ABOUT ANOTHER EMPLOYEE WHO WAS

11   CAUGHT PUTTING HIS HAND IN HER SHIRT POCKET.

12       DO YOU SEE THAT?

13   A.   YES, I DO.

14   Q.   YOU WERE AWARE OF THAT INCIDENT, WEREN'T YOU?

15   A.   YES.

16   Q.   NOW, AFTER YOU RECEIVED THIS LETTER FROM MS. DANG,

17   EXHIBIT 1013, WHAT KIND OF INVESTIGATION WAS CONDUCTED?

18   A.   I CALLED MR. ST. CROIX AND IT WAS -- THE 20TH, I BELIEVE,

19   WAS ALSO A FRIDAY, SO HE WAS NOT AT WORK, AND WE DECIDED TO

20   TALK ON MONDAY WHEN HE WAS BACK AT WORK.

21       SO I MET WITH HIM ON MONDAY MORNING AND WE DECIDED TO HAVE

22   MR. ST. CROIX TALK, AND I BELIEVE NGA ALSO.

23       AND HE REPORTED BACK TO ME ON TUESDAY MORNING.

24   Q.   AND PLEASE TAKE A LOOK AT THE SECOND PAGE OF EXHIBIT 1012.

25   THAT'S THE SECOND PAGE OF YOUR HANDWRITTEN NOTES.

1    A.   OKAY.

2    Q.   THE NOTES SEEM TO REFLECT A MEETING THAT YOU HAD WITH

3    MS. DANG ON APRIL 24TH, 2007; CORRECT?

4    A.   CORRECT.

5    Q.   AND AT THAT MEETING YOU HAD JOHN ST. CROIX AND BOB PRYOR

6    IN ATTENDANCE?

7    A.   YES.

8    Q.   AND BOB PRYOR WAS SOMEBODY FROM SECURITY?

9    A.   HE WAS THE SECURITY MANAGER.

10   Q.   AND ALSO IN ATTENDANCE WAS A MINH VU TO TRANSLATE?

11   A.   CORRECT.

12   Q.   AND YOU HAD SOMEBODY THERE TO TRANSLATE BECAUSE YOU WANTED

13   TO MAKE SURE THAT MS. DANG COULD COMMUNICATE WITH YOU AND YOU

14   COULD COMMUNICATE WITH HER; CORRECT?

15   A.   CORRECT.

16   Q.   AND ACCORDING TO YOUR NOTES, SHE WAS TOLD THAT IF SHE HAD

17   ANY PROBLEMS WITH LUCIO OUTSIDE OF WORK, THAT THAT HAD TO BE

18   HANDLED BY THE POLICE?

19   A.   NO.  WHAT I TOLD HER WAS THAT IF SOMETHING HAPPENED

20   OUTSIDE OF WORK, THAT SHE NEEDED TO CONTACT THE POLICE, AND SHE

21   ALSO NEEDED TO INFORM BAY 101.

22   Q.   AND ACCORDING TO YOUR NOTES, MR. ST. CROIX OFFERED TO

23   CHANGE HER SHIFT TO THE MORNING SHIFT?

24   A.   YES, YES, HE DID.

25   Q.   AFTER RECEIVING THIS LETTER FROM MS. DANG, DID ANYONE ASK

1    MR. SUAREZ ABOUT THE INCIDENT WHERE HE BROKE INTO HER HOUSE?

2    A.   YES, JOHN AND I SPOKE WITH HIM.

3    Q.   AND WHAT DID HE SAY ABOUT THAT?

4    A.   HE SAID THAT HE HAD NEVER BEEN IN MS. DANG'S HOUSE.

5    Q.   AND, AGAIN, AFTER YOU RECEIVED THIS LETTER FROM MS. DANG,

6    DID YOU TALK TO THE SUPERVISOR GEORGE?

7    A.   NO, I DID NOT.

8    Q.   NOT PART OF YOUR INVESTIGATION?

9    A.   NO.

10   Q.   DIDN'T YOU THINK IT WAS IMPORTANT TO FIND OUT FROM HIM

11   WHAT HAPPENED IF HE WAS THE SUPERVISOR IN CHARGE WHEN MS. DANG

12   WAS INJURED BY THE METAL DOOR?

13   A.   WELL, HE -- TYPICALLY SHE WORKED SWING SHIFT AND HE WORKED

14   GRAVEYARD, SO HE WASN'T NORMALLY HER SUPERVISOR.

15   Q.   BUT ACCORDING TO THE SECURITY REPORT, HE WAS THE ONE WHO

16   BROUGHT HER INTO THE SECURITY OFFICE WHEN SHE WAS INJURED;

17   CORRECT?

18   A.   CORRECT.

19   Q.   BUT YOU NEVER FOLLOWED UP TO ASK HIM WHAT HAPPENED?

20   A.   I NEVER SPOKE TO MR. CASTILLO ABOUT THAT, NO.

21   Q.   I'D LIKE NOW TO DIRECT YOUR ATTENTION TO EXHIBIT 510.

22   THAT WOULD BE THE BLUE.

23       MS. GILBERT, THIS WAS AN ACKNOWLEDGEMENT OF TRAINING FORM

24   WITH RESPECT TO HARASSMENT AND SEXUAL HARASSMENT TRAINING AT

25   BAY 101 FOR 2006; CORRECT?

1    A.   CORRECT.

2    Q.   AND AT THE BOTTOM IT INDICATED THAT THE TRAINING WAS BEING

3    PRESENTED BY SHARON KIRSCH?

4    A.   CORRECT.

5    Q.   AND THAT'S THE SAME ATTORNEY WHO IS SITTING BACK THERE AND

6    SHE'D THE OUTSIDE ATTORNEY FOR BAY 101?

7    A.   CORRECT.

8    Q.   I'M GOING TO ASK YOU NOW TO GO TO EXHIBIT 1015, AND I'LL

9    HELP YOU WITH THAT.

10        EXHIBIT 1015 WAS ALREADY ADMITTED AS EVIDENCE YESTERDAY.

11        MS. GILBERT, THIS WAS PART OF THE TRAINING MATERIALS THAT

12   BAY 101 USED TO TRAIN THEIR EMPLOYEES WITH RESPECT TO SEXUAL

13   HARASSMENT; CORRECT?

14   A.   YES.

15   Q.   I AM GOING TO ASK THAT WE LOOK ALTHOUGH PAGE 1719, BATES

16   STAMP 1719?

17        MR. THOMAS:  1719?

18        MS. NGUYEN:  I'M SORRY, 1797.  TWO MORE PAGES DOWN.

19   Q.   MS. GILBERT, ACCORDING TO BAY 101'S TRAINING MATERIALS FOR

20   ITS EMPLOYEES, SEXUAL HARASSMENT IS ANY KIND -- SEXUAL

21   HARASSMENT -- I'M SORRY.  HARASSMENT OF ANY KIND IS BOTHERSOME,

22   DEMEANING, IRRITATING, AND ANNOYING AND IS A FORM OF

23   INTENTIONAL DISCRIMINATION.

24   A.   YES.

25   Q.   DO YOU SEE THAT?

1    A.   YES, I DO.

2    Q.   AND THAT WAS SOMETHING THAT BAY 101'S EMPLOYEES WERE

3    TAUGHT?

4    A.   THIS IS NOT FROM 2006.  I DON'T KNOW IF THAT IS RELEVANT

5    OR NOT, BUT --

6    Q.   DO YOU KNOW WHAT YEAR THAT WAS?

7    A.   WELL, PROGRESSIVE BENEFIT STARTED DOING THE PRESENTATION

8    IN 2007.

9    Q.   OKAY.

10   A.   OKAY.  SO IT COULD BE FROM 2007 OR IT COULD BE ANY YEAR

11   AFTER THAT.

12   Q.   OKAY.  SO FROM 2007 ON?

13   A.   CORRECT.

14   Q.   BUT THIS WAS PART OF THE TRAINING FOR BAY 101'S EMPLOYEES,

15   RIGHT?

16   A.   CORRECT.

17   Q.   AND BAY 101'S SUPERVISORS AND MANAGERS ALSO UNDERWENT THE

18   SAME TRAINING?

19   A.   YES.

20   Q.   AND ACCORDING TO THAT, SEXUAL HARASSMENT IS A FORM OF

21   DISCRIMINATION BASED ON BEHAVIOR OF A SEXUAL NATURE AND/OR

22   GENDER; CORRECT?

23   A.   CORRECT.

24        MS. NGUYEN:  ANDRE, WOULD YOU PLEASE MOVE TO THE

25   NEXT PAGE, PLEASE?

1    Q.   AND SEXUAL HARASSMENT INCLUDES ANYTHING THAT IS UNWELCOME,

2    SUCH AS SEXUAL ADVANCES, REQUESTS FOR SEXUAL FAVORS.

3         DO YOU SEE THAT?

4    A.   YES.

5    Q.   AND YOU AGREE WITH THAT, DON'T YOU?

6    A.   YES.

7    Q.   AND THE NEXT PAGE, PLEASE.  ACTUALLY, 90 --

8              MR. THOMAS:  8?

9              MS. NGUYEN:  1804.

10   Q.   AND A HOSTILE WORK ENVIRONMENT IS SOMETHING THAT

11   UNREASONABLY INTERFERES WITH AN INDIVIDUAL'S JOB PERFORMANCE.

12        DO YOU SEE THAT?

13   A.   YES, I DO.

14   Q.   AND THAT IT CAN BE CREATED BY ANYONE IN THE WORKPLACE?

15   A.   CORRECT.

16   Q.   AND ACCORDING TO MS. DANG'S LETTER COMPLAINING TO H.R. IN

17   APRIL OF 2007, DID THAT INDICATE TO YOU THAT SHE WAS

18   COMPLAINING OF A HOSTILE WORK ENVIRONMENT?

19   A.   I DON'T BELIEVE SHE USED THAT WORD IN HER LETTER.  I

20   DON'T -- I GUESS I'M NOT REALLY CLEAR ON WHAT YOU'RE ASKING ME.

21   Q.   WELL, SHE TALKED ABOUT BEING OFFENDED BY WHAT MR. SUAREZ

22   DID?

23   A.   CORRECT.

24   Q.   AND SHE TALKED ABOUT ALL OF THE PHONE CALLS THAT HE HAD

25   MADE TO HER; CORRECT?

1    A.   IN HER LETTER I DON'T BELIEVE SHE --

2    Q.   OH.  IT WAS ATTACHED TO THE SECURITY REPORT?

3    A.   IN THAT REPORT, YES.

4    Q.   AND THEN SHE TALKED ABOUT WHEN HE BROKE INTO HER HOUSE;

5    RIGHT?

6    A.   CORRECT.

7            MS. NGUYEN:  NEXT PAGE, ANDRE.

8    Q.   AND ACCORDING TO THAT PAGE, REPEATED REQUESTS FOR DATES

9    ARE, ACCORDING TO THIS, A HOSTILE WORK ENVIRONMENT; CORRECT?

10   A.   THAT'S WHAT IT SAYS.

11   Q.   AND YOU AGREE WITH THAT, DON'T YOU?

12   A.   YES, I DO.

13           MS. NGUYEN:  1807, ANDRE.

14   Q.   AND THAT THE USE OF CELL PHONES, LEAVING A LOT OF MESSAGES

15   ON CELL PHONES IS AN EXAMPLE OF HOSTILE WORK ENVIRONMENT?

16   A.   THAT'S EXAMPLES OF HOSTILE WORK ENVIRONMENT, ELECTRONIC,

17   AND IT INDICATES CELL PHONES.

18   Q.   AND SO WOULD YOU AGREE THAT LEAVING A LOT OF MESSAGES ON A

19   PERSON'S CELL PHONE CAN BE SOMETHING THAT CREATES A HOSTILE

20   WORK ENVIRONMENT?

21   A.   IT COULD BE, YES.

22   Q.   1809, PLEASE.

23       AND, AGAIN, ACCORDING TO THIS, ANOTHER EXAMPLE OF A

24   HOSTILE WORK ENVIRONMENT IS PHYSICAL ASSAULTS?

25   A.   YES, IT SAYS THAT.

1    Q.   AND SO IF IT HAD NOT BEEN AN ACCIDENT AND IF MR. SUAREZ

2    HAD ACTUALLY TRIED TO HURT MS. DANG BY PULLING OUT THE DRAWERS,

3    THAT WOULD BE SOMETHING THAT WOULD CONSTITUTE A HOSTILE WORK

4    ENVIRONMENT IN YOUR OPINION?

5    A.   IT COULD, YES.

6    Q.   YES?

7    A.   YES.

8    Q.   1809.  HOW ABOUT 1811, PLEASE.  THIS IS GOOD.  THANK YOU.

9         ACCORDING TO THIS, WHICH WAS SOMETHING THAT WAS TAUGHT TO

10   BAY 101'S EMPLOYEES, "INTENT IS NOT RELEVANT IN DETERMINING

11   WHETHER OR NOT A BEHAVIOR IS SEXUAL HARASSMENT."

12        DO YOU SEE THAT?

13   A.   YES, I DO.

14   Q.   AND THAT "WHAT REALLY MATTERS IS THE IMPACT OF THE

15   BEHAVIOR ON THE PERSON OR THE WORK ENVIRONMENT."

16        DO YOU SEE THAT?

17   A.   YES.

18   Q.   AND SO WHETHER OR NOT MR. SUAREZ HAD ANY INTENTION OF

19   HURTING MS. DANG OR HARASSING HER, THAT DIDN'T MATTER AS MUCH

20   AS HOW IT AFFECTED MS. DANG; CORRECT?

21   A.   ACCORDING TO THAT, YES.

22   Q.   AND YOU WOULD AGREE WITH THAT, WOULDN'T YOU?

23   A.   YES.

24   Q.   NEXT PAGE, PLEASE, ANDRE.

25        AND DO YOU SEE, MS. GILBERT, THE FIRST EXAMPLE WHERE THE

1    EXAMPLE IS THAT "I DIDN'T MEAN ANYTHING BY IT"?  THAT IS NOT A

2    VALID DEFENSE THAT HE DIDN'T REALLY MEAN IT?

3    A.   YES, I SEE THAT.

4    Q.   AND YOU WOULD AGREE?

5    A.   YES.

6    Q.   AND WOULDN'T YOU AGREE, MS. GILBERT, THAT SEXUAL

7    HARASSMENT COULD OCCUR WHETHER IT OCCURS AT WORK OR OFF WORK

8    HOURS?

9    A.   YES.

10   Q.   WHETHER IT'S ON WORK PREMISES OR OFF WORK PREMISES?

11   A.   YES.

12   Q.   AND THAT IF IT'S SEXUAL HARASSMENT BY A SUPERVISOR OR

13   COWORKER, WHETHER IT'S OFF WORK PREMISES, IT'S STILL SOMETHING

14   THAT THE EMPLOYER SHOULD HANDLE?

15   A.   HANDLE IN WHAT WAY?

16   Q.   SHOULD INVESTIGATE.

17   A.   WELL, IT DEPENDS ON THE SITUATION.

18   Q.   SO IF AN EMPLOYEE TELLS YOU THAT SHE WAS BEING HARASSED BY

19   A COWORKER OUTSIDE OF WORK, WOULD YOU FOLLOW UP?

20   A.   SHE REPORTED SOMETHING THAT HAPPENED EIGHT MONTHS PRIOR.

21   I ASKED HER IF SHE FILED A POLICE REPORT AND SHE TOLD ME NO.

22   SHE SAID SHE NO LONGER LIVED AT THAT RESIDENCE.

23       I DON'T KNOW WHAT FURTHER INVESTIGATION YOU WANTED ME TO

24   DO.

25   Q.   I'M JUST ASKING IN GENERAL --

1     A.   OKAY.

2     Q.   -- THAT IF YOU RECEIVED A REPORT FROM AN EMPLOYEE

3     REGARDING AN ACTION THAT OCCURRED OFF PREMISES AND OUTSIDE OF

4     WORK HOURS, BUT BY ANOTHER COWORKER, WOULD THAT BE SOMETHING

5     THAT YOU WOULD FOLLOW UP ON?

6     A.   IF IT WAS POSSIBLE FOR ME TO FOLLOW UP ON IT, YES.

7          MS. NGUYEN:  SO, ANDRE, 1823, PLEASE.  1823.

8     Q.   AND ACCORDING TO BAY 101'S TRAINING MATERIALS, THERE ARE

9     REASONS WHY AN EMPLOYEE MIGHT NOT COMPLAIN PROMPTLY REGARDING

10    SEXUAL HARASSMENT; CORRECT?

11    A.   YES.

12    Q.   AND SOME OF THOSE REASONS ARE FEAR OF RETALIATION; RIGHT?

13    A.   IT COULD BE, YES.

14    Q.   AND FEAR OF JOB LOSS?  AND THE FEAR THAT THEY WOULD BE THE

15    ONE BLAMED FOR THE ACTION; CORRECT?

16    A.   YES, IT COULD BE.

17    Q.   AND EMBARRASSMENT, SHAME, AND NOT UNDERSTANDING THE

18    COMPANY'S COMPLAINT PROCEDURES.

19         YOU WOULD AGREE WITH ALL OF THAT, WOULDN'T YOU?

20    A.   THEY ARE ALL POSSIBLE, YES.

21    Q.   AND THERE WAS INFORMATION THAT WAS TAUGHT TO BAY 101'S

22    SUPERVISORS AND MANAGERS?

23    A.   ALL EMPLOYEES.

24    Q.   CAN WE HAVE 1817, PLEASE.

25         AND AGAIN, WE'RE STILL REFERRING TO THE TRAINING MATERIAL.

1       ACCORDING TO THIS, THE QUESTION ASKS, HOW MUCH IS TOO

2   MUCH?

3       AND THE ANSWER IS, EVEN ONE INCIDENT OF SEXUAL HARASSMENT

4   IS ONE TOO MANY.

5       AND IT TALKED ABOUT A COURT CASE WHERE A SINGLE INSTANCE

6   OF CONDUCT IS CONSIDERED SEXUAL HARASSMENT.

7       IN THIS CASE YOU WERE AWARE THAT MR. SUAREZ HAD COMPLAINTS

8   AGAINST HIM BY OTHER WOMEN OTHER THAN MS. DANG; CORRECT?

9   A.   I WAS AWARE OF COMPLAINTS BY NGA NGUYEN, BUT THAT HAD TO

10  DO WITH WORK PROCEDURE.  IT WAS NOT REGARDING SEXUAL

11  HARASSMENT.

12  Q.   AND WHAT ABOUT SO?

13  A.   AND SO TOLD JOHN THAT MR. SUAREZ HAD ASKED HER FOR DATES.

14      THIS SLIDE IS REFERENCING PHYSICAL CONTACT.

15  Q.   AND IT ALSO REFERENCES AN INSTANCE OF INDECENT AND

16  DISGRACEFUL CONDUCT?

17  A.   I'M SORRY.  I CAN'T HEAR YOU.

18  Q.   I'M SORRY.  IT ALSO REPRESENTS AN INCIDENT OF DISGRACEFUL

19  AND INDECENT CONDUCT.

20      DO YOU SEE THAT?

21  A.   YES, I DO.

22  Q.   SO THE COWORKER WHO PUT HIS HAND IN MS. DANG'S FRONT

23  POCKET TOUCHING HER BREAST, YOU WOULD CONSIDER THAT SOMETHING

24  THAT IS INDECENT AND DISGRACEFUL?

25  A.   IT DEPENDS ON THE SITUATION.

1    Q.   YOU'RE AWARE OF THE SITUATION THAT HAPPENED WITH MS. DANG;

2    CORRECT?

3    A.   I'M SORRY.  WHAT ARE WE REFERRING TO?

4    Q.   THE SITUATION WHERE THE COWORKER PUT HIS HAND IN THE

5    POCKET.

6    A.   THE COWORKER, YES.

7    Q.   BECAUSE I BELIEVE YOU REVIEWED THE SURVEILLANCE VIDEOTAPE

8    OF THAT AND YOU SAW THAT; CORRECT?

9    A.   CORRECT.  I BELIEVE MS. DANG USUALLY KEPT CANDY IN HER

10   POCKET.

11   Q.   I'M NOW GOING TO MOVE ON TO THE OCTOBER 2009 INCIDENT.

12   A.   OKAY.

13   Q.   YOU RECALL THAT MS. DANG WAS SUSPENDED IN OCTOBER OF 2009?

14   A.   YES.

15   Q.   OKAY.  AND THAT YOU AND MR. ORTEGA WERE THE ONES WHO MADE

16   THE DECISION TO SUSPEND MS. DANG?

17   A.   YES, WE DID.

18   Q.   AND I BELIEVE THAT YOU BASED YOUR DECISION ON, ONE,

19   REVIEWING THE SURVEILLANCE VIDEO?

20   A.   CORRECT.

21   Q.   AND ALSO ON WRITTEN STATEMENTS BY ARLENE FONTILLAS?

22   A.   CORRECT.

23   Q.   AND LINDA ELIAS?

24   A.   CORRECT.

25   Q.   THERE WAS ALSO A STATEMENT BY KEN MEAKCHAROON; CORRECT?

1    A.   YES, THERE WAS.

2    Q.   BUT I BELIEVE THAT YOU HAD NOT SEEN THE STATEMENT BY KEN

3    AT THE TIME THAT THE SUSPENSION DECISION WAS MADE; IS THAT

4    CORRECT?

5    A.   THAT'S CORRECT.

6    Q.   SO THE DECISION WAS MADE BASED ON THE SURVEILLANCE

7    VIDEOTAPE, MS. ARLENE FONTILLAS'S STATEMENT, AND LINDA ELIAS'S

8    STATEMENT; CORRECT?

9    A.   THAT'S CORRECT.

10   Q.   AND AFTER YOU MADE THAT DECISION, YOU SET UP A MEETING

11   WITH MS. DANG AND CALLED HER INTO YOUR OFFICE TO LET HER KNOW

12   THAT SHE WAS BEING SUSPENDED?

13   A.   YES.

14   Q.   AND AT THAT MEETING THERE WAS NO UNION REP FOR HER;

15   CORRECT?

16   A.   NO, THERE WASN'T.

17   Q.   AND NO INTERPRETER FOR HER, CORRECT?

18   A.   CORRECT.

19   Q.   AND AT THE TIME YOU CALLED THAT MEETING AND SHE CAME TO

20   THE MEETING, YOU HAD ALREADY PREPARED THE COUNSELLING MEMO TO

21   BE GIVEN TO HER; CORRECT?

22   A.   YES.

23   Q.   AND SO PRIOR TO CALLING HER IN TO GIVE HER THE COUNSELLING

24   MEMO AND LET HER KNOW THAT SHE HAS BEEN SUSPENDED, DID YOU TALK

25   TO HER ABOUT WHAT HAPPENED ON OCTOBER 4TH, 2009?

1    A.   NO.

2    Q.   OKAY.  DO YOU KNOW WHETHER MR. ORTEGA SPOKE TO HER TO GET

3    HER SIDE OF THE STORY OF OCTOBER 4TH, 2009?

4    A.   I DON'T KNOW THAT.

5    Q.   AND AT THE MEETING, SHE DIDN'T REALLY HAVE A CHANCE TO

6    TELL YOU WHAT HAPPENED ON OCTOBER 4TH, 2009, DID SHE?

7    A.   SHE HAD A CHANCE TO SPEAK, YES.

8    Q.   AND YOU DIDN'T HAVE AN INTERPRETER THERE FOR HER TO SPEAK?

9    A.   NO, I DID NOT.

10   Q.   I'M GOING TO ASK YOU TO TAKE A LOOK AT EXHIBIT 1001.

11   THESE ARE THE COUNSELLING MEMOS.  I BELIEVE THEY MAY HAVE

12   ALREADY BEEN ADMITTED.

13   A.   1001?

14   Q.   YES.

15   A.   OKAY.

16   Q.   MAYBE NOT.

17        MR. THOMAS:  YEAH, THEY WERE ADMITTED.

18   BY MS. NGUYEN:

19   Q.   I'M GOING TO ASK YOU TO TAKE A LOOK AT THE COUNSELLING

20   MEMO DATED OCTOBER 5TH, 2009, THAT WOULD BE THE BAY 1001

21   DOCUMENT.

22        AND MADAM CLERK, WOULD YOU CLARIFY FOR ME, THIS WAS

23   ADMITTED YESTERDAY, CORRECT?  1001?

24        THE CLERK:  I DON'T HAVE THAT.  YOU KNOW WHAT?  IT

25   WAS TODAY.  YOU ADMITTED IT TODAY.

1              THE WITNESS:  YES.

2      BY MS. NGUYEN:

3      Q.   AND THIS COUNSELLING MEMO WAS PREPARED BY YOU OR

4      MR. ORTEGA?

5      A.   IT WAS PREPARED BY ME.

6      Q.   AND YOU BASED THE INFORMATION ON THE COUNSELLING MEMO ON

7      THE STATEMENTS BY ARLENE AND LINDA?

8      A.   AND REVIEWING THE SURVEILLANCE TAPE.

9      Q.   AND THE SURVEILLANCE TAPE DOESN'T HAVE ANY AUDIO; CORRECT?

10     A.   NO, IT DOES NOT.

11     Q.   AND ACCORDING TO THE MEMO, YOU STATED THAT ON OCTOBER 4TH

12     MS. DANG BROUGHT THE WRONG DRINK TO A CUSTOMER.  WAS THAT BASED

13     ON WHAT LINDA SAID IN HER STATEMENT?

14     A.   THE CUSTOMER SAID THAT HE HAD BEEN BROUGHT THE WRONG

15     DRINK.

16     Q.   DID YOU SPEAK TO THE CUSTOMER?

17     A.   NO, I DID NOT.

18     Q.   AND SO YOUR INFORMATION IS BASED ON WHAT LINDA REPORTED;

19     CORRECT?

20     A.   AND WHAT I OBSERVED ON THE VIDEO.

21     Q.   AND AGAIN, THE VIDEO DIDN'T HAVE THE CUSTOMER SPEAKING.

22     YOU COULDN'T HEAR ANYTHING; CORRECT?

23     A.   CORRECT.

24     Q.   DID MS. DANG EVER TELL YOU THAT LINDA WAS TRYING TO STEAL

25     HER TIPS AND HER CUSTOMER?

1      A.   NO.

2      Q.   MS. GILBERT, IT'S TRUE, ISN'T IT, THAT MS. DANG HAS NEVER

3      USED FOUL LANGUAGE TOWARD YOU?

4      A.   TOWARD ME?

5      Q.   YES.

6      A.   THAT'S CORRECT.

7      Q.   OKAY.  AND THAT YOU HAVE NEVER WITNESSED MS. DANG USING

8      FOUL LANGUAGE TOWARD ANY OTHER EMPLOYEE?

9      A.   I HAVE NOT, NO.

10     Q.   AT SOME POINT IN OCTOBER 2009, YOU WERE TOLD BY MR. WERNER

11     THAT MS. DANG HAD LEVELLED SOME COMPLAINTS AND ALLEGATIONS

12     AGAINST YOU AND MR. ORTEGA; CORRECT?

13     A.   THAT'S CORRECT.

14     Q.   AND AFTER THAT, MR. WERNER HAD BAY 101'S COUNSEL HIRE AN

15     INVESTIGATOR; CORRECT?

16     A.   CORRECT.

17     Q.   AND YOU WORKED WITH THAT INVESTIGATOR AS PART OF THE

18     INVESTIGATION?

19     A.   I DID NOT WORK WITH HER.

20     Q.   LET ME REPHRASE THAT.  YOU PROVIDED HER WITH PERSONNEL

21     FILES; CORRECT?

22     A.   I PULLED FILES THAT SHE REQUESTED, YES.

23     Q.   AND YOU HELPED HER TO ARRANGE FOR MEETINGS WITH EMPLOYEES

24     THAT SHE WANTED TO INTERVIEW?

25     A.   SHE WOULD TELL ME WHO SHE WANTED TO MEET WITH AND I WOULD

```
1    CALL THE EMPLOYEE AND SET UP THE MEETING, YES.

2    Q.   SO YOU KNEW ALL OF THE EMPLOYEES WHO WERE GOING TO BE

3    INTERVIEWED BY THE INVESTIGATOR; CORRECT?

4    A.   YES.

5    Q.   AND THEY KNEW THAT YOU WERE THE ONE MAKING THE

6    ARRANGEMENTS FOR THEM TO COME TALK TO THE INVESTIGATOR?

7    A.   WELL, I CALLED THEM.

8    Q.   DO YOU REMEMBER AN EMPLOYEE BY THE NAME OF CHI LUONG,

9    L-U-O-N-G?

10   A.   YES.

11   Q.   AND SHE WAS A PBX OPERATOR WHO WORKED IN YOUR DEPARTMENT?

12   A.   THAT'S CORRECT.

13   Q.   AND I BELIEVE THAT WHEN YOU SPOKE WITH THE INVESTIGATOR,

14   YOU SAID THAT YOU HAD NO PROBLEMS WITH HER PERFORMANCE;

15   CORRECT?

16   A.   THAT'S CORRECT.

17   Q.   I'M NOW GOING TO ASK YOU TO TAKE A LOOK AT EXHIBIT 1014.

18   I BELIEVE IT'S BEEN PREVIOUSLY ADMITTED.

19       MS. GILBERT, IS THIS THE MEMO THAT MR. WERNER PREPARED FOR

20   YOU TO READ TO MS. DANG ON DECEMBER 21ST, 2009?

21   A.   IT WAS NOT A MEMO.  IT WAS JUST AN OUTLINE OF THE

22   DISCUSSION THAT I WAS TO HAVE WITH HER.

23   Q.   AND -- BUT THE INSTRUCTION FROM MR. WERNER WAS JUST FOR

24   YOU TO READ IT, RIGHT?

25   A.   I DON'T REMEMBER.
```

1    Q.   DID YOU HAVE PLANS TO HAVE ANY DISCUSSION WITH MS. DANG?

2    A.   YES.  MR. SHAW, MR. ORTEGA AND I WERE GOING TO MEET WITH

3    MS. DANG.

4    Q.   AND WHAT TYPE OF DISCUSSIONS OR WHAT TOPICS WERE YOU GOING

5    TO DISCUSS WITH MS. DANG?

6    A.   THE TOPICS CONTAINED IN THIS OUTLINE.

7    Q.   SO YOU WOULD HAVE READ THIS OUTLINE TO MS. DANG FIRST?

8    A.   CORRECT.

9    Q.   AND THEN TALKED TO HER ABOUT WHAT IS CONTAINED IN THE

10   OUTLINE?

11   A.   WELL, THE PURPOSE OF THE MEETING WAS TO GO OVER WHAT WAS

12   IN THIS OUTLINE.

13   Q.   SO WHAT IS IN THE OUTLINE, THE FIRST PART OF IT, IS THE

14   RESULTS OF THE INVESTIGATION; CORRECT?

15   A.   CORRECT.

16   Q.   AND YOU WERE TO DISCUSS THE RESULTS OF THE INVESTIGATION

17   WITH MS. DANG?

18   A.   WE WERE TO READ THIS TO HER.

19   Q.   AND BESIDES READING IT, WAS IT ADDITIONAL -- WERE THERE

20   ADDITIONAL DISCUSSIONS THAT YOU WERE GOING TO HAVE WITH

21   MS. DANG REGARDING THE RESULTS OF THE INVESTIGATION?

22   A.   NO.

23   Q.   AND THE SECOND PART OF IT HAS TO DO WITH A PLAN FOR HER TO

24   IMPROVE HER PERFORMANCE; CORRECT?

25   A.   CORRECT.

1    Q.   AND ACCORDING TO THAT, SHE HAD UNTIL JANUARY 15TH, SO

2    ABOUT TWO -- A LITTLE MORE THAN TWO WEEKS TO IMPROVE?

3    A.   I BELIEVE IT WOULD HAVE BEEN THREE.

4    Q.   OKAY.  SO UNTIL JANUARY 15TH TO IMPROVE?

5    A.   CORRECT.

6    Q.   AND PART OF THE PLAN WAS TO HAVE HER BE TRAINED BY A

7    VIETNAMESE SERVER?

8    A.   THERE WERE PLANS TO HAVE HER TRAINED BY TWO DIFFERENT

9    SERVERS.

10   Q.   AND ONE --

11   A.   AT LEAST ONE OF THEM WAS VIETNAMESE.

12   Q.   JUST SO THAT SHE COULD UNDERSTAND BETTER?

13   A.   CORRECT.

14   Q.   I'M GOING TO TURN YOUR ATTENTION TO THE COUNSELLING MEMO

15   THAT IS ATTACHED TO THAT OUTLINE.

16          THE COURT:  WHY DON'T WE TAKE A BREAK AND YOU CAN

17   RESUME AFTER WE FINISH THE BREAK?

18       SO WE'LL TAKE 15 MINUTES AND COME BACK.

19          MR. MCMANIS:  THANK YOU, YOUR HONOR.

20       (RECESS FROM 12:15 P.M. UNTIL 12:33 P.M.)

21          THE COURT:  MS. NGUYEN, YOU MAY CONTINUE.

22          MS. NGUYEN:  THANK YOU, YOUR HONOR.

23   Q.   MS. GILBERT, I'M GOING TO ASK YOU TO TAKE A LOOK AT

24   EXHIBIT 1014, AND THE THIRD PAGE OF THAT WHICH IS THE

25   COUNSELLING MEMO THAT YOU PREPARED.

1            DO YOU HAVE THAT IN FRONT OF YOU?

2     A.   YES.

3     Q.   AND I BELIEVE THAT YOU STATED THAT YOU -- THE INFORMATION

4     THAT IS ON THE COUNSELLING MEMO YOU TOOK DIRECTLY FROM

5     MR. WERNER'S OUTLINE; CORRECT?

6     A.   YES.

7     Q.   AND ALL OF THE AREAS OF IMPROVEMENT UNDER SUPERVISOR'S

8     COMMENTS, YOU TOOK THAT DIRECTLY FROM HIS OUTLINE?

9     A.   I BELIEVE SO, YES.

10    Q.   AND DO YOU KNOW WHETHER HE TOOK SOME OF THOSE AREAS OF

11    IMPROVEMENTS FROM COUNSELLING MEMOS IN MS. DANG'S PERSONNEL

12    FILES?

13    A.   I DON'T KNOW WHERE HE TOOK THESE FROM.

14    Q.   AND HE NEVER DISCUSSED WITH YOU HOW HE CAME UP WITH THESE

15    AREAS OF IMPROVEMENT?

16    A.   SPECIFIC AREAS, I DON'T BELIEVE SO.

17    Q.   AND THIS COUNSELLING MEMO IS MARKED A WARNING.

18           DO YOU SEE THAT?

19    A.   YES, IT IS.

20    Q.   AND THAT MS. DANG WOULD HAVE A PERFORMANCE REVIEW AT THE

21    END OF THE TWO WEEKS TRAINING.

22           DO YOU SEE THAT?

23    A.   THAT'S WHAT IT SAYS.

24    Q.   THAT WAS THE PLAN, CORRECT?

25    A.   CORRECT.

1   Q.   NOW, ON THAT DAY, DECEMBER 21ST, 2009, YOU ARRIVED AT WORK

2   SHORTLY BEFORE YOUR SHIRT STARTED AT 7:00 O'CLOCK IN THE

3   MORNING; IS THAT CORRECT?

4   A.   YES.  I BELIEVE I ARRIVED AROUND 6:35.

5   Q.   AND YOU HEARD FROM MR. ORTEGA THAT THERE WAS NOT GOING TO

6   BE A MEETING WITH MS. DANG; CORRECT?

7   A.   I CALLED MR. ORTEGA WHEN I ARRIVED AND HE TOLD ME THAT

8   THERE WAS NOT GOING TO BE A MEETING AND THAT HE HAD LEFT ME A

9   VOICEMAIL ON MY CELL PHONE, BUT I NEVER CHECK MY PHONE SO I

10  DIDN'T GET THAT.

11  Q.   AND THEN YOU MET WITH MR. WERNER -- I'M SORRY.

12       YOU RECEIVED A PHONE CALL FROM MR. WERNER AFTER THAT?

13  A.   I DON'T REMEMBER WHETHER I MET WITH HIM IN PERSON OR IF IT

14  WAS A PHONE CALL.

15  Q.   BUT THE NEXT TIME THAT YOU SPOKE WITH MR. WERNER THAT

16  MORNING, HE INSTRUCTED YOU TO PREPARE TERMINATION PAPERWORK FOR

17  MS. DANG?

18  A.   YES, HE DID.

19  Q.   AND DO YOU RECALL HIM TELLING YOU THAT HE WAS WANTING THE

20  TERMINATION PAPERWORK TO STATE THAT SHE WAS BEING TERMINATED

21  FOR JOB ABANDONMENT?

22  A.   YES.

23  Q.   AND THAT HE DIDN'T GIVE ANY OTHER REASON FOR THE

24  TERMINATION; CORRECT?

25  A.   I BELIEVE HE FELT HER NOT ATTENDING THE MEETING WAS JOB

1    ABANDONMENT.

2    Q.   AND THAT WAS THE ONLY REASON THAT HE GAVE YOU?

3    A.   YES.

4    Q.   OKAY.  SO YOU WENT AHEAD AND PREPARED THE PAPERWORK?

5    A.   YES, I DID.

6    Q.   AND I BELIEVE YOU ALSO CALLED MR. ORTEGA TO ASK HIM TO DO

7    THE FINAL COUNSELLING MEMO FOR THE TERMINATION; CORRECT?

8    A.   YES, I DID.

9    Q.   AND THAT WAS WHEN MR. ORTEGA FOUND OUT THAT MS. DANG WAS

10   BEING TERMINATED?

11   A.   I DON'T KNOW WHETHER HE ALREADY KNEW OR NOT.  I DON'T KNOW

12   IF HE HAD ALREADY SPOKEN TO MR. WERNER OR NOT.

13   Q.   AND DID MR. ORTEGA ASK YOU DURING THAT CONVERSATION FOR

14   THE REASON WHY MS. DANG WAS BEING TERMINATED?

15   A.   WELL, I TOLD HIM IT WAS FOR NOT ATTENDING THE MEETING.

16   Q.   AND THEN YOU OVERNIGHTED THE TERMINATION PAPER TO

17   MS. DANG?

18   A.   YES, ALONG WITH THE FINAL PAYCHECK.

19   Q.   AND THAT WAS PER MR. WERNER'S INSTRUCTIONS?

20   A.   YES.

21   Q.   NOW, DO YOU KNOW WHEN MS. DANG ACTUALLY FOUND OUT THAT SHE

22   HAD BEEN TERMINATED?

23   A.   NO, I DO NOT.

24   Q.   AND YOU HEARD AFTER THE FACT -- I'M SORRY.

25        YOU HEARD LATER THAT MS. DANG CAME TO BAY 101 THE

1    FOLLOWING DAY TO GET HER BONUS CHECK, DIDN'T YOU?

2    A.   I BELIEVE SHE DID COME IN, YES.

3    Q.   AND THAT WAS THE DAY OF BAY 101'S CHRISTMAS PARTY?

4    A.   I BELIEVE SO, YES.

5    Q.   BECAUSE THAT'S WHEN THE BONUS CHECKS ARE PASSED OUT?

6    A.   CORRECT.

7    Q.   AND DID YOU KNOW THAT MS. DANG DID NOT KNOW THAT SHE HAD

8    BEEN FIRED WHEN SHE CAME IN TO GET HER BONUS CHECK?

9    A.   I HEARD THAT, YES.  I WAS NOT PRESENT AT THE TIME.

10   Q.   AND AS FAR AS YOU KNOW, NO ONE CALLED HER TO LET HER KNOW

11   THAT SHE HAD BEEN FIRED; CORRECT?

12   A.   THAT'S CORRECT.

13   Q.   MS. GILBERT, YOU -- ARE YOU AWARE THAT IN JANUARY OF 2007

14   MR. ST. CROIX HAD CONSIDERED TERMINATING MS. DANG?

15   A.   I BELIEVE HE WAS CONSIDERING IT, YES.

16   Q.   AND DID HE TELL YOU ABOUT IT?

17   A.   I BELIEVE HE SAID HE WAS HAVING SOME PERFORMANCE ISSUES

18   WITH HER.

19   Q.   ISN'T IT TRUE, MS. GILBERT, THAT YOU DIDN'T KNOW THE

20   REASON MR. ST. CROIX WANTED TO TERMINATE MS. DANG AT THAT TIME?

21   A.   AT WHAT TIME?

22   Q.   IN JANUARY OF 2007?

23   A.   I'M SORRY.  MAYBE I'M NOT UNDERSTANDING THE QUESTION.

24   Q.   DO YOU RECALL THAT YOUR DEPOSITION WAS TAKEN IN THIS CASE?

25   A.   YES, IT WAS.

1    Q.   AND IT WAS BACK IN OCTOBER OF 2011 OR SO?

2    A.   I BELIEVE SO, YES.

3    Q.   AND DO YOU RECALL TELLING ME THAT YOU DID NOT KNOW THE

4    REASON MR. ST. CROIX WANTED TO TERMINATE MS. DANG BACK IN

5    JANUARY OF 2007?

6    A.   AND WHAT WAS THE NEXT QUESTION THAT YOU ASKED ME AT THAT

7    TIME?

8    Q.   OKAY.  LET'S DO THAT.

9         YOUR HONOR, WE WOULD LIKE TO READ FROM MS. GILBERT'S

10   DEPOSITION TRANSCRIPT, PAGE 202.

11            THE COURT:  DO YOU HAVE A COPY FOR ME?

12            THE CLERK:  CAN I HAVE IT, PLEASE?

13            MS. NGUYEN:  I'M SORRY.  I THOUGHT YOU DID.

14            THE CLERK:  YOU'RE GOING TO HAVE TO GIVE ME A

15   MINUTE, OKAY?

16            MS. NGUYEN:  NO PROBLEM.

17         (PAUSE IN PROCEEDINGS.)

18            MR. NGUYEN:  YOUR HONOR, I'D LIKE TO START WITH PAGE

19   202 JUST TO GIVE SOME BACKGROUND TO IT.

20         ACTUALLY, I'D LIKE TO ASK A QUESTION.

21   Q.   MS. GILBERT --

22            MR. MCMANIS:  WELL, EXCUSE ME.  I THINK I NEED THE

23   LINE REFERENCE.

24            THE COURT:  I DON'T THINK SHE'S READING FROM THE

25   DEPOSITION YET.

1          MR. MCMANIS:  OH, OKAY.  FINE.

2      I THOUGHT YOU WERE READING FROM THE DEPOSITION.

3   BY MS. NGUYEN:

4   Q.  MS. GILBERT, BACK IN JANUARY OF 2007, DID MR. ST. CROIX

5   ALREADY START THE PAPERWORK TO TERMINATE MS. DANG?

6   A.  I DON'T KNOW WHETHER HE HAD OR NOT.

7   Q.  AND DO YOU REMEMBER THAT HE HAD ALREADY FAXED SOME LETTER

8   TO THE UNION ABOUT THE TERMINATION?

9   A.  THAT HE HAD FAXED?

10  Q.  OR THAT HE HAD HAD FAXED -- SOMEBODY FAXED TO THE UNION A

11  LETTER REGARDING THE TERMINATION?

12  A.  IT'S STANDARD PROCESS TO FAX TERMINATIONS.

13  Q.  AND DO YOU RECALL THAT MR. ST. CROIX WITHDREW THAT AND

14  DECIDED NOT TO TERMINATE MS. DANG?

15  A.  I DON'T BELIEVE I WAS AT WORK WHEN THAT HAPPENED, SO DO I

16  RECALL?

17  Q.  DO YOU RECALL THAT THAT WAS THE DECISION MADE?

18  A.  I SAW THE PAPER AFTER THE FACT.  I WAS NOT THERE WHEN THAT

19  OCCURRED.

20  Q.  AND I THINK EARLIER YOU TESTIFIED THAT YOU THOUGHT THAT IT

21  WAS A PERFORMANCE REASON THAT HE HAD FOR TERMINATING HER, OR

22  FOR WANTING TO TERMINATE HER?

23  A.  I WAS REFERENCING A FEW CONVERSATIONS THAT I HAD HAD WITH

24  JOHN PRIOR TO THAT REGARDING THE STAY.

25  Q.  BUT BACK IN 2011 AT YOUR DEPOSITION, YOU SAID THAT YOU

1    DIDN'T REMEMBER THE CIRCUMSTANCES SURROUNDING THE TERMINATION?

2    A.   WELL, I WASN'T THERE WHEN THE TERMINATION HAPPENED.

3    Q.   BUT NOW YOU'RE SAYING THAT IT WAS PERFORMANCE REASONS?

4    A.   NO.  I'M REFERENCING CONVERSATIONS I HAD WITH JOHN PRIOR

5    TO JANUARY REGARDING THE STAY.

6    Q.   BUT WITH RESPECT TO THE TERMINATION ITSELF, DID YOU HAVE

7    ANY CONVERSATION WITH MR. ST. CROIX FOR THE DECISION THAT HE

8    MADE TO TERMINATE HER?

9    A.   NO, BECAUSE I WAS NOT AT WORK AT THE TIME.

10   Q.   SO YOU DON'T KNOW WHAT REASON HE HAD FOR TERMINATING?

11   A.   FOR HIS FINAL DECISION, NO, I DO NOT.

12   Q.   THANK YOU.

13        YOUR HONOR, I DON'T NEED TO READ THAT AFTER ALL.

14        I'M GOING TO ASK YOU NOW TO TAKE A LOOK AT SOME TIMECARD

15   REPORTS, EXHIBIT 1004.

16   A.   OKAY.

17   Q.   DO YOU RECOGNIZE WHAT EXHIBIT 1004 IS?

18   A.   IT LOOKS LIKE MS. DANG'S TIMECARD REPORT FROM JULY 2006

19   THROUGH DECEMBER OF 2009.

20   Q.   AND THIS SHOWS WHEN SHE CLOCKED IN AND OUT FOR WORK?

21   A.   CORRECT.

22   Q.   AND STARTING FROM MARCH 27TH, 2007, IT ALSO SHOWS WHEN SHE

23   CLOCKED OUT AND BACK IN FOR LUNCH?

24   A.   YES.

25             MS. NGUYEN:  YOUR HONOR, WE WOULD LIKE TO HAVE THIS

1    ENTIRE EXHIBIT 2000 -- I'M SORRY -- 1004 ADMITTED INTO

2    EVIDENCE.

3              MR. MCMANIS:  NO OBJECTION.

4              THE COURT:  ALL RIGHT.  1004 IS ADMITTED.

5         (PLAINTIFF'S EXHIBIT 1004 WAS RECEIVED IN EVIDENCE.)

6    BY MS. NGUYEN:

7    Q.   MS. GILBERT, I'M GOING TO ASK FOR YOU TO TAKE A LOOK AT

8    THAT FIRST PAGE FOR THE DATES OF MARCH 27TH, 2007.

9    A.   OKAY.

10   Q.   DO YOU SEE THE COLUMN THAT SAYS LUNCH DEDUCTION?

11   A.   YES.

12   Q.   SO IS IT TRUE THAT BEFORE MARCH 27TH OF 2007 THAT

13   EMPLOYEES DID NOT CLOCK OUT AND BACK IN FOR LUNCH?

14   A.   THAT'S CORRECT.

15   Q.   AND THAT JUST THE 30-MINUTE LUNCH IS AUTOMATICALLY

16   DEDUCTED FROM THEIR TIME WORKED?

17   A.   CORRECT.

18   Q.   AND SO -- EVEN IF THEY DIDN'T TAKE A LUNCH OR THEY

19   COULDN'T WORK AN UNINTERRUPTED LUNCH TIME, THE 30 MINUTES IS

20   STILL DEDUCTED FROM THEIR TIME?

21   A.   THE TIME CLOCK WOULD -- YES, THE TIME SYSTEM WOULD

22   AUTOMATICALLY DEDUCT IT.

23        HOWEVER, IF THE SITUATION ARISED WHERE SOMEONE WAS NOT

24   ALLOWED TO TAKE A LUNCH, PAPERWORK WOULD BE SUBMITTED TO H.R.,

25   THE PAYROLL ADJUSTMENT.

1    Q.   AND WHO IS SUPPOSED TO SUBMIT THE PAPERWORK?

2    A.   THE FOOD AND BEVERAGE DEPARTMENT IF THE EMPLOYEE WORKED IN

3    THAT DEPARTMENT.

4    Q.   AND IF YOU LOOK AT THIS WEEK RIGHT HERE OF MARCH 13TH --

5    A.   OKAY.

6    Q.   -- THROUGH MARCH 18TH?

7    A.   OKAY.

8    Q.   WE HAVE HIGHLIGHTED IT HERE.

9         MS. DANG WORKED MORE THAN EIGHT HOURS A DAY; CORRECT?

10   A.   YES.

11   Q.   AND IF THE 30-MINUTE LUNCH TIME HAD NOT BEEN DEDUCTED,

12   THEN SHE WOULD HAVE BEEN OWED OVERTIME; CORRECT?

13   A.   CORRECT.

14   Q.   AND SO IF SHE SAID THAT SHE WASN'T ABLE TO TAKE A LUNCH,

15   THEN SHE SHOULD HAVE BEEN PAID OVERTIME ON THOSE DAYS; CORRECT?

16   A.   IF SHE WAS UNABLE TO TAKE A LUNCH, YES.

17   Q.   AND DOWN HERE STARTING WITH MARCH 27TH, EMPLOYEES WERE

18   REQUIRED TO START CLOCKING OUT AND BACK IN FOR LUNCH; RIGHT?

19   A.   CORRECT.

20   Q.   AND ISN'T IT TRUE, MS. GILBERT, THAT IF THEY CLOCKED OUT

21   FOR LUNCH LESS THAN 30 MINUTES, THAT THEY'RE WRITTEN UP?

22   A.   YES.  THAT WAS POLICY.

23   Q.   SO IF YOU CLOCK OUT FOR LUNCH FOR 29 MINUTES, YOU'RE

24   WRITTEN UP; CORRECT?

25   A.   CORRECT.

1    Q.   BUT THE COMPANY DOESN'T HAVE ANY PROBLEM IF THE EMPLOYEES

2    CLOCK OUT FOR 45 MINUTES FOR LUNCH?  ARE THEY WRITTEN UP FOR

3    THAT?

4    A.   THAT WOULD BE UP TO THE DEPARTMENT.  IF AN EMPLOYEE WAS

5    TAKING LONGER LUNCHES THAN ALLOWED, IT WOULD BE UP TO THE

6    DEPARTMENT TO WRITE THEM UP.

7    Q.   BUT IF THEY GO UNDER 30 MINUTES, THEN IT'S A COUNSELLING

8    MEMO FROM YOUR DEPARTMENT?

9    A.   YES, MY DEPARTMENT WAS DOING THAT.

10   Q.   AND THE TIME THAT THEY CLOCK OUT FOR LUNCH, WHETHER IT'S

11   40 MINUTES OR 50 MINUTES, IT'S THEIR OWN TIME.  THEY DON'T GET

12   PAID FOR THAT; CORRECT?

13   A.   WELL, IF THEY'RE A UNION EMPLOYEE, THEY GET PAID A UNION

14   MEAL SO THEY GET PAID FOR A HALF HOUR BECAUSE THEY'RE UNION

15   EMPLOYEES.

16   Q.   AT THEIR REGULAR RATE?

17   A.   CORRECT.

18   Q.   FOR 30 MINUTES?

19   A.   CORRECT.

20   Q.   AND SO IF, FOR EXAMPLE, SOMEONE CLOCKS OUT FOR 38 MINUTES,

21   SHE WOULD STILL ONLY BE PAID FOR 30 MINUTES; CORRECT?

22   A.   FOR THE UNION MEAL TIME?  YES.

23   Q.   AND MS. GILBERT, IS IT YOUR UNDERSTANDING THAT EMPLOYEES

24   ARE SUPPOSED TO TAKE THEIR LUNCH BEFORE THE END OF THE SIXTH

25   HOUR OF WORK?

1    A.   YES.

2    Q.   AND IF THEY ARE NOT ABLE TO TAKE A LUNCH BEFORE THEN, THAT

3    THEY ARE ENTITLED TO A PREMIUM TO BE PAID BY THE EMPLOYER?

4    A.   ARE WE REFERRING TO 2007?

5    Q.   YES.

6    A.   YES.

7    Q.   SO, MS. GILBERT, IT MIGHT BE EASIER FOR YOU TO LOOK ON

8    YOUR DOCUMENT, BUT FOR THE DATE OF MARCH 27TH, 2007 --

9    A.   OKAY.

10   Q.   -- IT SHOWS THAT MS. DANG CLOCKED IN FOR WORK AT ABOUT

11   ALMOST 17:00, SO SHORTLY BEFORE 5:00 P.M.; CORRECT?

12   A.   CORRECT.

13   Q.   AND THEN SHE CLOCKED OUT FOR LUNCH AT ABOUT 11:30 P.M.?

14   A.   CORRECT.

15   Q.   AND THEN SHE CAME BACK FROM LUNCH AT 11:55 P.M.?

16   A.   CORRECT.

17   Q.   AND THEN SHE CLOCKED OUT FOR THE DAY AT ABOUT 1:00 O'CLOCK

18   IN THE MORNING?

19   A.   1:02, YES.

20   Q.   AND SO FROM 5:00 O'CLOCK TO 11:30, THAT'S OVER SIX HOURS;

21   CORRECT?

22   A.   YES.

23   Q.   SO UNDER THE LAW, SHE WAS ENTITLED TO A PREMIUM BECAUSE

24   SHE COULDN'T TAKE HER LUNCH BREAK BEFORE THE END OF THE SIXTH

25   HOUR; CORRECT?

1    A.   YES.

2    Q.   AND IN YOUR DEPARTMENT, WAS THERE A PROCEDURE FOR THAT TO

3    BE ADDED TO HER PAYCHECK?

4    A.   YES.

5    Q.   AND DO YOU KNOW WHETHER THAT WAS DONE IN THIS CASE?

6    A.   NO, I DO NOT.

7         I WILL SAY THAT THAT'S RIGHT WHEN IT STARTED.  IT TOOK A

8    LITTLE WHILE FOR MY EMPLOYEES TO GET UP TO SPEED.  THERE WAS AN

9    AWFUL LOT OF EMPLOYEES.

10   Q.   AND AT THE BEGINNING WHEN YOU STARTED USING THE CLOCKING

11   OUT AND BACK IN FOR LUNCH SYSTEM, A LOT OF EMPLOYEES WERE

12   HAVING PROBLEMS WITH MAKING SURE THAT THEY CLOCKED OUT FOR THE

13   30 MINUTES REQUIRED; CORRECT?

14   A.   I THINK THERE WAS A LEARNING CURVE.

15   Q.   AND SO YOU SENT OUT A LOT OF COUNSELLING MEMOS, DIDN'T

16   YOU?

17   A.   YES, WE DID.

18   Q.   BUT THAT HAPPENED WITH A LOT OF EMPLOYEES, NOT JUST

19   MS. DANG, CORRECT?

20   A.   CORRECT.

21        MS. NGUYEN:  THAT'S ALL OF THE QUESTIONS I HAVE FOR

22   THIS WITNESS AT THIS TIME, YOUR HONOR.

23        THE COURT:  ALL RIGHT.  MR. MCMANIS?

24        MR. MCMANIS:  MY COLLEAGUE, MS. MURAKAMI, WILL DO

25   THE HONORS, YOUR HONOR.

 1                    THE COURT:  ALL RIGHT.

 2                **AS-ON DIRECT EXAMINATION**

 3     BY MS. MURAKAMI:

 4     Q.   GOOD AFTERNOON, MS. GILBERT.

 5     A.   HELLO.

 6     Q.   WHEN A PERSON IS HIRED AT BAY 101, DOES HE OR SHE GO

 7     THROUGH AN ORIENTATION?

 8     A.   YES.

 9     Q.   AND IS HUMAN RESOURCES INVOLVED IN THAT ORIENTATION?

10     A.   YES.  MY H.R. CLERK DOES ALL OF THE ORIENTATIONS.

11     Q.   AND WHAT IS THE TYPICAL LENGTH OF AN ORIENTATION?

12     A.   IT'S A FULL DAY.

13     Q.   WHICH BINDER DO YOU HAVE IN FRONT OF YOU RIGHT NOW?

14     A.   I CAN'T HEAR YOU.

15     Q.   WHICH BINDER DO YOU HAVE IN FRONT OF YOU RIGHT NOW?

16     A.   JOINT TRIAL EXHIBITS 1000 THROUGH 1025.

17              MS. MURAKAMI:  OKAY.  YOUR HONOR, MAY I APPROACH THE

18     WITNESS?

19              THE COURT:  SURE.

20     BY MS. MURAKAMI:

21     Q.   TAB 509, ARE YOU THERE?

22     A.   YES.

23     Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

24     A.   YES.

25     Q.   AND WHAT IS THIS DOCUMENT?

1     A.   IT'S A NEW EMPLOYEE ORIENTATION CHECKLIST.

2     Q.   DOES THAT BELONG -- IS THAT THE CHECKLIST OF A PARTICULAR

3     EMPLOYEE?

4     A.   YES.  IT'S CUC DANG.

5     Q.   AND WHAT IS THE DATE ON THAT DOCUMENT?

6     A.   7-6-06.

7     Q.   AND IS THIS THE TYPE OF DOCUMENT THAT TYPICALLY WOULD HAVE

8     BEEN SIGNED THE SAME DAY OF THE ORIENTATION?

9     A.   YES.

10    Q.   AND IS THIS DOCUMENT MAINTAINED IN THE H.R. OFFICE?

11    A.   YES.

12         MS. MURAKAMI:  YOUR HONOR, I MOVE THIS INTO

13    EVIDENCE.

14         MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

15         THE COURT:  ALL RIGHT.  WHAT IS THE NUMBER AGAIN?

16         THE CLERK:  I'M SORRY.  WHAT IS THE NUMBER?

17         MS. MURAKAMI:  509.

18         THE COURT:  509 IS ADMITTED.

19    (DEFENDANT'S EXHIBIT 509 WAS RECEIVED IN EVIDENCE.)

20         MS. MURAKAMI:  CINDY, COULD YOU PLEASE PUT IT UP AND

21    BLOW IT UP A LITTLE BIT?

22    Q.   AT THE BOTTOM THERE, HOW MANY HOURS WAS THE LENGTH OF THIS

23    ORIENTATION?

24    A.   IT SAYS EIGHT HOURS.

25    Q.   AND WHAT DO THESE VARIOUS LINE ITEMS REPRESENT WHERE THE

1    CHECK MARKS ARE?

2    A.   ALL OF THE DIFFERENT POLICIES THAT THE H.R. CLERK REVIEWS

3    WITH THE NEW HIRES.

4    Q.   AND WHAT DO THESE DIFFERENT CHECK MARKS MEAN?

5    A.   THE NEW HIRES ARE INSTRUCTED TO CHECK NEXT TO THE ITEM

6    AFTER IT'S BEEN REVIEWED.

7    Q.   AND IS THE HARASSMENT POLICY AT BAY 101 REVIEWED WITH THE

8    EMPLOYEE AT THIS ORIENTATION?

9    A.   YES, IT IS.

10   Q.   IS THAT INDICATED ON THIS DOCUMENT?

11   A.   YES.  IT'S THE SECOND ITEM UNDER GENERAL POLICIES.

12   Q.   CINDY, COULD YOU HIGHLIGHT THAT?

13        NOW, DO NEW EMPLOYEES RECEIVE ANY DOCUMENTS AT THE NEW

14   HIRE ORIENTATION?

15   A.   YES.

16   Q.   AND WHAT TYPE OF DOCUMENTS DO THEY RECEIVE?

17   A.   THEY RECEIVE A PAMPHLET ON SEXUAL HARASSMENT.

18   Q.   ANYTHING ELSE?

19   A.   I BELIEVE THEY ALSO GET A WORKER'S COMP PAMPHLET AND THEY

20   GET A BAY 101 HANDBOOK.

21   Q.   OKAY.  COULD YOU PLEASE TURN TO TAB 522?

22   A.   OKAY.

23   Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

24   A.   YES.  IT'S THE FIRST PAGE OF THE EMPLOYEE HANDBOOK.

25   Q.   AND ARE YOU FAMILIAR WITH THE CONTENTS OF THIS HANDBOOK?

1    A.   YES.

2    Q.   AND DOES EVERY EMPLOYEE RECEIVE A COPY OF THE HANDBOOK AT

3    THE ORIENTATION?

4    A.   YES, THEY DO.

5          MS. NGUYEN:  YOUR HONOR, I MOVE THIS INTO EVIDENCE.

6          MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

7          THE COURT:  ALL RIGHT.  IT'S RECEIVED.

8    (DEFENDANT'S EXHIBIT 522 WAS RECEIVED IN EVIDENCE.)

9    BY MS. MURAKAMI:

10   Q.   COULD YOU PLEASE TURN TO TAB 507?

11   A.   07?

12   Q.   YES.

13   A.   OKAY.

14   Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

15   A.   YES.  IT'S THE EMPLOYEE HANDBOOK ACKNOWLEDGEMENT FORM.

16   Q.   AND IS THIS THE ACKNOWLEDGEMENT FORM OF A PARTICULAR

17   EMPLOYEE?

18   A.   YES, CUC DANG.

19   Q.   AND WHAT IS THE DATE ON THIS DOCUMENT?

20   A.   JULY 6TH, 2006.

21   Q.   AND WAS THIS THE SAME DAY AS MS. DANG'S NEW HIRE

22   ORIENTATION?

23   A.   YES, IT WAS.

24   Q.   AND IS THAT MS. DANG'S SIGNATURE AT THE BOTTOM?

25   A.   YES.

1    Q.   WOULD MS. DANG HAVE RECEIVED THE 2001 VERSION OF THE

2    HANDBOOK IF SHE STARTED WORKING IN 2006?

3    A.   YES.

4         MS. MURAKAMI:  YOUR HONOR, I MOVE THIS INTO

5    EVIDENCE.

6         MS. NGUYEN:  WHICH NUMBER?

7         MS. MURAKAMI:  507.

8         MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

9         THE COURT:  507 IS ADMITTED.

10        (DEFENDANT'S EXHIBIT 507 WAS RECEIVED IN EVIDENCE.)

11   BY MS. MURAKAMI:

12   Q.   COULD YOU PLEASE TURN TO TAB 514?

13   A.   514.  OKAY.

14   Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

15   A.   YES.  THIS IS ALSO AN EMPLOYEE HANDBOOK ACKNOWLEDGEMENT

16   FORM.

17   Q.   AND DOES THIS ACKNOWLEDGEMENT FORM BELONG TO A CERTAIN

18   EMPLOYEE?

19   A.   YES, MS. DANG.

20   Q.   AND WHAT IS THE DATE ON THIS FORM?

21   A.   AUGUST 18TH, 2008.

22   Q.   AND WHY DID MS. DANG SIGN AN ACKNOWLEDGEMENT FORM FOR A

23   DIFFERENT HANDBOOK THAN THE ONE THAT SHE RECEIVED AT HER

24   ORIENTATION?

25   A.   AT ANNUAL TRAINING IN 2008, WHICH WAS HELD IN AUGUST,

1      EVERY EMPLOYEE WAS GIVEN A REVISED VERSION OF THE HANDBOOK.

2              MS. MURAKAMI:  YOUR HONOR, I OFFER THIS INTO

3      EVIDENCE.

4              MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

5              THE COURT:  ALL RIGHT.  IT MAY BE RECEIVED.

6              MS. MURAKAMI:  THANK YOU.

7          (DEFENDANT'S EXHIBIT 514 WAS RECEIVED IN EVIDENCE.)

8      BY MS. MURAKAMI:

9      Q.   SO ACCORDING TO THE LANGUAGE ON THIS FORM, WHAT IS

10     MS. DANG GENERALLY ACKNOWLEDGING BY SIGNING THIS FORM?

11     A.   THAT SHE HAS RECEIVED A COPY OF THE EMPLOYEE HANDBOOK

12     WHICH INCLUDES GENERAL INFORMATION SECTIONS, A BENEFIT SECTION,

13     AND A POLICY AND PROCEDURE AND SAFETY SECTION.

14     Q.   THANK YOU.  COULD YOU PLEASE TURN TO TAB 508?

15     A.   OKAY.

16     Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

17     A.   YES.

18     Q.   AND WHAT IS THIS DOCUMENT?

19     A.   IT'S A NEW HIRE ACKNOWLEDGEMENT FORM.

20     Q.   AND WHAT IS THE EMPLOYEE ACKNOWLEDGING IN THIS FORM?

21     A.   THAT THEY HAVE RECEIVED AND UNDERSTAND THE BROCHURE, NO

22     SEXUAL HARASSMENT ALLOWED, AND THE PAMPHLET TITLED "FACTS ABOUT

23     WORKER'S COMPENSATION."

24     Q.   AND WHAT IS THE DATE ON THIS FORM?

25     A.   JULY 6TH, 2006.

1    Q.   AND WHO SIGNED THIS FORM?

2    A.   MS. DANG.

3    Q.   WAS JULY 6TH, 2006, THE SAME DAY AS MS. DANG'S NEW HIRE

4    ORIENTATION?

5    A.   YES, IT WAS.

6         MS. MURAKAMI:  YOUR HONOR, I WOULD LIKE TO OFFER

7    THIS INTO EVIDENCE.

8         MS. NGUYEN:  NO OBJECTION.

9         THE COURT:  ALL RIGHT.  IT MAY BE RECEIVED.

10   (DEFENDANT'S EXHIBIT 508 WAS RECEIVED IN EVIDENCE.)

11   BY MS. MURAKAMI:

12   Q.   COULD YOU PLEASE TURN TO TAB 1005, PLEASE.

13   A.   OKAY.

14   Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

15   A.   YES.

16   Q.   AND WHAT IS THIS DOCUMENT?

17   A.   IT'S A MEMO FROM MR. WERNER, AND THE SUBJECT IS

18   "INSUBORDINATION POLICY, NO CALL, NO SHOW POLICY, CALL IN RULE

19   FOR ABSENCE AND TARDINESS AND BUSSING YOUR DISHES IN THE

20   CAFETERIA AND DELI."

21   Q.   AND IS THIS SIGNED BY A PARTICULAR EMPLOYEE?

22   A.   YES, MS. DANG.

23   Q.   AND WHAT IS THE DATE ON THIS DOCUMENT?

24   A.   JULY 6TH, 2006.

25   Q.   DID MS. DANG RECEIVE THIS AT HER NEW HIRE ORIENTATION?

1    A.   YES, SHE DID.

2    Q.   AND DO ALL NEW EMPLOYEES RECEIVE THIS MEMO AT THEIR

3    ORIENTATION?

4    A.   YES, THEY DO.

5         MS. MURAKAMI:  YOUR HONOR, I WOULD LIKE TO OFFER

6    THIS INTO EVIDENCE, EXHIBIT 1005.

7         MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

8         THE COURT:  ALL RIGHT.  1005 IS ADMITTED.

9    (DEFENDANT'S EXHIBIT 1005 WAS RECEIVED IN EVIDENCE.)

10   BY MS. MURAKAMI:

11   Q.   DO YOU RECOGNIZE THE INSUBORDINATION POLICY LISTED THERE?

12   A.   YES.

13   Q.   AND COULD YOU PLEASE READ IT FOR THE JURY?

14   A.   "INSUBORDINATION POLICY:  INSUBORDINATION INCLUDES, BUT

15   NOT LIMITED TO, REFUSAL OF ASSIGNED WORK OR REFUSAL TO PERFORM

16   DUTIES IN A MANNER PRESCRIBED BY THE SUPERVISOR, ARGUING

17   PUBLICLY WITH YOUR SUPERVISOR, NAME CALLING, THROWING OBJECTS,

18   AND OTHER OBVIOUS SIGNS OF CONTEMPT AND/OR DISRESPECT."

19   Q.   THANK YOU.  WAS THIS POLICY IN EFFECT IN DECEMBER OF 2009?

20   A.   YES, IT WAS.

21   Q.   AND IS THIS POLICY STILL IN EFFECT TODAY?

22   A.   YES, IT IS.

23   Q.   IN ADDITION TO THE NEW EMPLOYEE TRAINING, DO EMPLOYEES

24   RECEIVE ANY OTHER KIND OF TRAINING REGARDING BAY 101'S

25   POLICIES?

1      A.   THEY RECEIVE ANNUAL TRAINING EACH YEAR.

2      Q.   AND WHEN DOES THE ANNUAL TRAINING USUALLY TAKE PLACE?

3      A.   TYPICALLY IN AUGUST OR SEPTEMBER.

4      Q.   AND WHAT TYPES OF TOPICS ARE COVERED AT THE ANNUAL

5      TRAININGS?

6      A.   IT VARIES FROM YEAR TO YEAR, BUT --

7      Q.   WHAT ABOUT -- OH, I'M SORRY.

8           WHAT ABOUT BETWEEN 2006 AND 2009?

9      A.   OKAY.  IT WAS DISASTER PREPAREDNESS, WORKPLACE SAFETY,

10     SEXUAL HARASSMENT, TITLE 31 TRAINING, AND I BELIEVE WE HAD A

11     PRESENTATION ON THE LUNCH POLICY AND PUNCHING IN AND OUT, AND

12     THEN MR. WERNER USUALLY GIVES A SPEECH REGARDING CUSTOMER

13     SERVICE AND THAT TYPE OF THING.

14     Q.   COULD YOU PLEASE TAKE A LOOK AT TABS 510 THROUGH 518,

15     PLEASE.

16     A.   WOULD YOU LIKE ME TO REVIEW ALL OF THEM?

17     Q.   YES, PLEASE.

18     A.   OKAY.  AND YOU SAID 518?

19     Q.   YES.

20     A.   OKAY.

21     Q.   OKAY.  AND WE HAVE ALREADY TALKED ABOUT 514, BUT AS

22     THROUGH EXHIBITS 510 THROUGH 513 AND 515 THROUGH 518, DO YOU

23     RECOGNIZE THOSE DOCUMENTS?

24     A.   YES.

25     Q.   AND WHAT ARE THOSE DOCUMENTS?

1      A.   THEY'RE ACKNOWLEDGEMENTS OF TRAINING AND THE

2      ACKNOWLEDGEMENT OF THE HANDBOOK.

3      Q.   OKAY.  AND WHAT IS -- OKAY.  WHAT IS EXHIBIT 510?

4      A.   IT'S THE 2006 ACKNOWLEDGEMENT OF HARASSMENT AND SEXUAL

5      HARASSMENT TRAINING.

6      Q.   AND IS THIS SIGNED BY A PARTICULAR EMPLOYEE?

7      A.   MS. DANG.

8      Q.   AND WHAT IS THE DATE OF HER SIGNATURE?

9      A.   AUGUST 22ND, 2006.

10          MS. MURAKAMI:  YOUR HONOR, I WOULD MOVE THIS INTO

11     EVIDENCE.

12          MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

13          THE COURT:  ALL RIGHT.  IT MAY BE RECEIVED.

14          MS. MURAKAMI:  510.

15          THE CLERK:  THANK YOU.

16       (DEFENDANT'S EXHIBIT 510 WAS RECEIVED IN EVIDENCE.)

17     BY MS. MURAKAMI:

18     Q.   COULD YOU PLEASE TAKE A LOOK AT 511?

19     A.   OKAY.

20     Q.   AND WHAT IS THIS DOCUMENT?

21     A.   IT'S THE 2006 ACKNOWLEDGEMENT OF WORKPLACE VIOLENCE

22     TRAINING.

23     Q.   AND IS IT SIGNED BY AN EMPLOYEE?

24     A.   MS. DANG.

25     Q.   AND WHAT IS THE DATE OF THE SIGNIFICANT?

1     A.   AUGUST 22ND, 2006.

2          MS. MURAKAMI:  YOUR HONOR, I WOULD MOVE THIS INTO

3     EVIDENCE.

4          MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

5          THE COURT:  IT'S RECEIVED.

6          MS. MURAKAMI:  THANK YOU.  EXHIBIT 511.

7          (DEFENDANT'S EXHIBIT 511 WAS RECEIVED IN EVIDENCE.)

8     BY MS. MURAKAMI:

9     Q.   COULD YOU PLEASE TELL ME WHAT EXHIBIT DOCUMENT NUMBER 512

10    IS, PLEASE?

11    A.   IT'S THE 2007 ACKNOWLEDGEMENT OF HARASSMENT AND SEXUAL

12    HARASSMENT TRAINING.

13    Q.   AND WHO IS IT SIGNED BY?

14    A.   MS. DANG.

15    Q.   AND WHAT IS IT DATED?

16    A.   AUGUST 6TH, 2007.

17         MS. MURAKAMI:  YOUR HONOR, I MOVE DOCUMENT

18    EXHIBIT 512 INTO EVIDENCE.

19         MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

20         THE COURT:  IT'S RECEIVED.

21         (DEFENDANT'S EXHIBIT 512 WAS RECEIVED IN EVIDENCE.)

22    BY MS. MURAKAMI:

23    Q.   AND WHAT IS EXHIBIT 513?

24    A.   IT'S THE 2007 ACKNOWLEDGEMENT OF WORKPLACE VIOLENCE

25    TRAINING.

1    Q.   AND WHO WAS IT SIGNED BY?

2    A.   MS. DANG.

3    Q.   AND WHAT IS THE DATE?

4    A.   AUGUST 6TH, 2007.

5              MS. MURAKAMI:  YOUR HONOR, I MOVE IT INTO EVIDENCE.

6              MS. NGUYEN:  NO OBJECTION.

7              THE COURT:  ALL RIGHT.  IT'S RECEIVED.

8         (DEFENDANT'S EXHIBIT 513 WAS RECEIVED IN EVIDENCE.)

9    BY MS. MURAKAMI:

10   Q.   AND WHAT IS EXHIBIT 515?

11   A.   IT'S THE 2008 ACKNOWLEDGEMENT OF HARASSMENT AND SEXUAL

12   HARASSMENT TRAINING.

13   Q.   AND WHO IS IT SIGNED BY?

14   A.   MS. DANG.

15   Q.   AND WHAT IS THE DATE OF THE SIGNIFICANT?

16   A.   8-18-2008.

17             MS. MURAKAMI:  YOUR HONOR, I MOVE IT INTO EVIDENCE.

18             THE COURT:  IT MAY BE RECEIVED.

19        (DEFENDANT'S EXHIBIT 515 WAS RECEIVED IN EVIDENCE.)

20   BY MS. MURAKAMI:

21   Q.   AND WHAT IS?

22   A.   THIS IS THE 2008 ACKNOWLEDGEMENT OF WORK VIOLENCE

23   TRAINING.

24   Q.   AND WHO SIGNED THIS DOCUMENT?

25   A.   MS. DANG.

1     Q.   AND WHAT IS THE DATE OF HER SIGNATURE?

2     A.   8-18-2008.

3          MS. MURAKAMI:  YOUR HONOR, I MOVE EXHIBIT 516 INTO

4     EVIDENCE.

5          THE COURT:  IT MAY BE RECEIVED.

6     (DEFENDANT'S EXHIBIT 516 WAS RECEIVED IN EVIDENCE.)

7     BY MS. MURAKAMI:

8     Q.   MS. GILBERT, WHAT IS EXHIBIT 517?

9     A.   IT'S THE 2009 ACKNOWLEDGEMENT OF HARASSMENT AND SEXUAL

10    HARASSMENT TRAINING.

11    Q.   AND WHO SIGNED THIS DOCUMENT?

12    A.   MS. DANG.

13    Q.   AND WHAT IS THE DATE OF HER SIGNATURE?

14    A.   SEPTEMBER 15TH, 2009.

15         MS. MURAKAMI:  YOUR HONOR, I MOVE EXHIBIT 517 INTO

16    EVIDENCE.

17         THE COURT:  IT'S RECEIVED.

18    (DEFENDANT'S EXHIBIT 517 WAS RECEIVED IN EVIDENCE.)

19    BY MS. MURAKAMI:

20    Q.   SORRY.  I'M ALMOST DONE.

21         AND CAN YOU PLEASE TELL ME WHAT EXHIBIT 518 IS?

22    A.   IT'S THE 2009 ACKNOWLEDGEMENT OF WORKPLACE VIOLENCE

23    TRAINING.

24    Q.   AND WHO SIGNED THIS DOCUMENT?

25    A.   MS. DANG.

1      Q.   AND WHAT IS THE DATE OF HER SIGNATURE?

2      A.   SEPTEMBER 15TH, 2009.

3           MS. MURAKAMI:  YOUR HONOR, I MOVE EXHIBIT 518 INTO

4      EVIDENCE.

5           THE COURT:  IT'S RECEIVED.

6      (DEFENDANT'S EXHIBIT 518 WAS RECEIVED IN EVIDENCE.)

7           MS. MURAKAMI:  THANK YOU.

8      Q.   NOW, DID THE BAY 101 EMPLOYEE HANDBOOKS IN EFFECT BETWEEN

9      2006 AND 2009 CONTAIN PROVISIONS RELATING TO HARASSMENT?

10     A.   YES, THEY DO.

11     Q.   AND COULD YOU PLEASE TURN TO EXHIBIT 522?

12     A.   OKAY.

13     Q.   AND COULD YOU PLEASE FIND THE SECTIONS RELATED TO

14     HARASSMENT?

15     A.   IT'S ON BAY 1683.

16     Q.   AND ARE THESE PROVISIONS THE SAME IN BOTH THE 2001 AND

17     2008 HANDBOOKS?

18     A.   YES, THEY ARE.

19     Q.   AND ARE EMPLOYEES EXPECTED TO BE FAMILIAR WITH THESE

20     PROVISIONS?

21     A.   YES, THEY ARE.

22     Q.   IS THERE A SECTION ON HOW EMPLOYEES SHOULD REPORT ANY

23     COMPLAINTS OF HARASSMENT?

24     A.   YES, THERE IS.

25     Q.   AND WHERE IS THAT?

1    A.   THERE'S A PROBLEM SOLVING PROCESS ON PAGE 8, WHICH IS BAY

2    1682.

3    Q.   UH-HUH.

4    A.   AND THEN THERE'S ALSO A SEXUAL HARASSMENT COMPLAINT

5    PROCEDURE AT THE BOTTOM OF BAY 1684.

6    Q.   AND ARE THESE PROVISIONS THE SAME IN THE 2001 HANDBOOK AS

7    THEY ARE IN THE 2008 HANDBOOK?

8    A.   YES.

9    Q.   I'M GOING TO JUST SWITCH TOPICS.

10        DO EMPLOYEES RECEIVE INFORMATION REGARDING BAY 101'S MEAL

11   BREAK POLICIES?

12   A.   YEAH.

13   Q.   AND WHEN DO THEY RECEIVE THIS INFORMATION?

14   A.   THEY'RE INFORMED AT NEW HIRE ORIENTATION.

15   Q.   OKAY.  COULD YOU PLEASE TURN TO TAB 1006, PLEASE?

16   A.   1006?

17   Q.   YES.

18   A.   OKAY.

19   Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

20   A.   YES.

21   Q.   AND WHAT IS THIS DOCUMENT?

22   A.   THIS IS A POWERPOINT ENTITLED MEAL BREAKS, RULES AND

23   WAIVERS.

24   Q.   AND DO YOU KNOW THE DATE OF THIS DOCUMENT?

25   A.   IT WAS PRESENTED AT THE 2007 ANNUAL TRAINING.

1      Q.   AND DID YOU SAY YOU CREATED THIS PRESENTATION?

2      A.   YES, I DID.  AND ACTUALLY I THINK IT WAS 2006 ANNUAL

3      TRAINING.

4           MS. MURAKAMI:  YOUR HONOR, I MOVE THIS INTO

5      EVIDENCE, EXHIBIT 1006.

6           MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

7           THE COURT:  1006 IS RECEIVED.

8           MS. MURAKAMI:  THANK YOU.

9      (DEFENDANT'S EXHIBIT 1006 WAS RECEIVED IN EVIDENCE.)

10     BY MS. MURAKAMI:

11     Q.   NOW, WHAT IS THIS PRESENTATION GENERALLY ABOUT?

12     A.   TO EXPLAIN PUNCHING IN AND OUT TO THE EMPLOYEES AND WHAT

13     THE RULES, THE CALIFORNIA RULES WERE REGARDING MEALS AND LUNCH

14     BREAKS.

15     Q.   OKAY.  CAN WE GO TO THE NEXT ONE?

16     A.   EXCUSE ME.  REST BREAKS.

17     Q.   SO COULD YOU PLEASE READ THE DIFFERENT BULLET POINTS YOU

18     HAVE ON THIS SLIDE?

19     A.   "CALIFORNIA MEAL BREAK RULES:  ANY SHIFT YOU WORK OVER

20     6 HOURS, BUT LESS THAN 10 HOURS, YOU MUST TAKE ONE 30-MINUTE

21     MEAL BREAK.

22        "YOUR MEAL BREAK MUST BE TAKEN AFTER YOU HAVE WORKED THREE

23     AND A HALF HOURS AND MUST BE STARTED BY YOUR FIFTH HOUR OF

24     WORK.

25        "IF YOU WORK OVER 12 HOURS, YOU MUST TAKE TWO 30-MINUTE

1   MEAL BREAKS.  YOUR SECOND 30-MINUTE MEAL BREAK MUST BE TAKEN BY

2   YOUR 10TH HOUR OF WORK."

3   Q.   THANK YOU.  AND I THINK YOU SAID THE PRESENTATION WAS FROM

4   2006?

5   A.   I THINK SO.

6   Q.   AND IS THIS STILL THE LAW THAT YOU TEACH BAY 101

7   EMPLOYEES?

8   A.   WELL, I BELIEVE THE LAW NOW STATES THAT EMPLOYERS MUST

9   ALLOW AND MAKE MEALS AVAILABLE TO EMPLOYEES, BUT THEY DON'T

10  HAVE TO ENSURE THAT THEY TAKE IT.

11  Q.   COULD YOU PLEASE READ THIS SLIDE.

12  A.   "MEAL BREAKS.  EXAMPLES:  IF YOUR SHIFT STARTS AT 8:00

13  A.M., YOU MUST TAKE YOUR LUNCH BETWEEN 11:30 A.M. AND 1:00 P.M.

14  IF YOU GET OFF AT 2:00 P.M., YOU COULD WAIVE YOUR MEAL BREAK.

15  HOWEVER, IF YOU GET OFF AT 2:15 P.M. YOU CANNOT WAIVE THE MEAL

16  BREAK.  SO TO BE SAFE, ANYONE SCHEDULED TO WORK AN 8-HOUR SHIFT

17  MUST TAKE A 30-MINUTE MEAL BREAK."

18  Q.   AND IS THIS INFORMATION THAT YOU PRESENTED TO THE BAY 101

19  EMPLOYEES?

20  A.   YES.

21  Q.   AT THE ANNUAL TRAINING?

22  A.   YES.

23  Q.   COULD YOU PLEASE READ THIS ONE?

24  A.   "MEAL BREAKS.  EXAMPLES:  IF YOU CLOCK IN AT 7:50, YOU

25  WOULD NEED TO ADJUST YOUR MEAL BREAK WINDOW BY 10 MINUTES.

1    YOUR NEW WINDOW WOULD BE 11:20 A.M. TO 12:50 P.M."

2    Q.   AND IS THIS WHAT YOU PRESENTED TO EMPLOYEES AT THE ANNUAL

3    TRAINING?

4    A.   YES.

5    Q.   COULD YOU PLEASE READ THIS SLIDE?

6    A.   "MEAL BREAKS WAIVERS."

7         THE FIRST ONE, "I DO NOT WISH TO WAIVE MY MEAL BREAK.

8         "I WISH TO WAIVE MY MEAL BREAK WHEN:

9         "I WORK AT LEAST 5 HOURS BUT NOT MORE THAN 6 HOURS.

10   APPLIES ONLY WHEN YOU ARE SCHEDULED FOR 6 HOURS OR LESS.

11        "I WORK 10 HOURS BUT LESS THAN 12, I AGREE TO WAIVE MY

12   SECOND MEAL BREAK.

13        "I UNDERSTAND THAT I MAY REVOKE THIS WAIVER AT ANY TIME.

14   I MUST NOTIFY THE BAY 101 HUMAN RESOURCES OFFICE IN WRITING

15   WHEN I WISH TO REVOKE THIS WAIVER."

16   Q.   SO IN SHORT WHEN ARE EMPLOYEES ABLE TO WAIVER MEAL BREAKS?

17   A.   WHEN THEY WORK LESS THAN 6 HOURS FOR THE FIRST MEAL BREAK

18   AND LESS THAN 10 HOURS FOR THEIR SECOND MEAL BREAK.

19   Q.   AND IS THIS INFORMATION THAT YOU PRESENTED TO THE

20   EMPLOYEES AT THE ANNUAL TRAINING?

21   A.   YES.

22   Q.   COULD YOU PLEASE READ THIS SLIDE?

23   A.   "BAY 101 MEAL BREAK RULES.

24        "ALL HOURLY EMPLOYEES MUST CLOCK OUT AND BACK IN FOR

25   LUNCH.

1            "ALL HOURLY EMPLOYEES WHO ARE SCHEDULED TO WORK AN 8-HOUR

2    SHIFT MUST TAKE A MEAL BREAK REGARDLESS OF THE ACTUAL HOURS

3    WORKED.

4            "PENALTIES.  EACH MEAL BREAK VIOLATION WILL BE RECORDED.

5    WHEN AN EMPLOYEE REACHES FOUR VIOLATIONS, THEY WILL BE

6    SUSPENDED FOR ONE DAY.

7            "EMPLOYEES RECEIVING MULTIPLE SUSPENSIONS MAY FACE

8    TERMINATION."

9    Q.   AND IS THIS INFORMATION PRESENTED TO THE EMPLOYEES AT THE

10   ANNUAL TRAINING?

11   A.   YES.

12   Q.   AND IS THIS THE POLICY STILL IN EFFECT AT BAY 101?

13   A.   WE HAVE A MORE RELAXED STANDARD OF TRACKING IT.  THEY HAVE

14   MORE THAN FOUR.

15   Q.   THEY HAVE MORE THAN FOUR?

16   A.   WELL, THAT WAS FOR, YOU KNOW, IN A PERIOD.  NOW I BELIEVE

17   WE'RE LOOKING AT MONTHS.

18   Q.   FOR VIOLATIONS?

19   A.   YEAH, FOUR IN A MONTH WOULD CAUSE US -- A COUNSELLING MEMO

20   TO BE DONE.

21   Q.   WHAT IS THE IMAGE ON THIS SLIDE?

22   A.   DO I ALSO HAVE THIS IN THE BINDER?

23   Q.   YES.

24   A.   IT WOULD BE EASIER.

25            THE COURT:  WHAT IS THE NUMBER?

1              MS. MURAKAMI:  IT'S BAY 1454.

2              THE WITNESS:  OKAY.  THIS IS SOMETHING THAT I

3    PREPARED AND PUT BACK BY THE TIME CLOCKS TO GIVE EMPLOYEES THE

4    WINDOW.

5              SO BASED ON THE TIME THEY CLOCKED IN, THAT WAS THE WINDOW

6    THAT THEY NEEDED TO TAKE THEIR BREAK, THEIR MEAL BREAK BETWEEN.

7    BY MS. MURAKAMI:

8    Q.   OKAY.  SO YOU SAID THIS IS PLACED BY THE TIME CLOCK?

9    A.   YES.

10   Q.   TO HELP EMPLOYEES?

11   A.   IT WAS SUPPOSED TO BE A GUIDE TO HELP THEM.

12   Q.   OKAY.  AND COULD YOU PLEASE EXPLAIN TO THE JURY BRIEFLY

13   HOW EMPLOYEES CLOCK IN AND OUT FOR THEIR LUNCH BREAK TODAY?

14   A.   TODAY?  WE HAVE SWIPE BADGES SO THE TIME CLOCK HAS A SWIPE

15   BAR ON THE SIDE AND THEY SWIPE IN AND OUT.

16   Q.   AND SO IT'S NOT A PIECE OF PAPER THAT THEY'RE PUNCHING

17   INTO A MACHINE?

18   A.   NO.

19   Q.   OKAY.  COULD YOU PLEASE TURN TO TAB 526.

20   A.   ALL RIGHT.

21   Q.   DO YOU RECOGNIZE THIS DOCUMENT?

22   A.   YES.

23   Q.   AND WHAT IS THIS DOCUMENT?

24   A.   IT'S A MEAL TIME WAIVER.

25   Q.   WHO IS THIS SIGNED BY?

1    A.    MS. DANG.

2    Q.    AND WHAT IS THE DATE OF HER SIGNATURE?

3    A.    AUGUST 6TH, 2007.

4          MS. MURAKAMI:  YOUR HONOR, I MOVE EXHIBIT 526 INTO

5    EVIDENCE.

6          MS. NGUYEN:  NO OBJECTION.

7          THE COURT:  ALL RIGHT.  IT'S RECEIVED.

8    (DEFENDANT'S EXHIBIT 526 WAS RECEIVED IN EVIDENCE.)

9    BY MS. MURAKAMI:

10   Q.    WOULD MS. DANG HAVE SIGNED THIS AFTER SEEING YOUR

11   PRESENTATION ON THE MEAL AND REST BREAKS?

12   A.    YES.

13   Q.    NOW, DOES BAY 101 ALSO GIVE EMPLOYEES REST BREAKS?

14   A.    YES.

15   Q.    AND WHAT IS THE POLICY FOR REST BREAKS?

16   A.    WHEN THEY TAKE THEIR REST BREAKS THEY'RE SUPPOSED TO SIGN

17   IN AND OUT SHEETS THAT ARE AVAILABLE FOR THEM IN THEIR

18   DEPARTMENT.

19   Q.    HOW MANY REST BREAKS ARE THEY ALLOWED TO TAKE AND HOW MANY

20   OF THEM -- STRIKE THAT.

21         HOW LONG IS THE REST BREAK THAT THEY'RE ALLOWED TO TAKE?

22   A.    THEY'RE ALLOWED TWO, 10-MINUTE REST BREAKS PER DAY.

23   Q.    AND WHEN ARE THE EMPLOYEES INFORMED ABOUT THE REST BREAK

24   POLICY?

25   A.    THEY'RE TOLD IN ORIENTATION AND ALSO AT THE ANNUAL

1    TRAINING.

2    Q.   AND ARE REST PERIODS DEDUCTED FROM THE EMPLOYEE'S WAGES?

3    A.   NO, THEY'RE NOT.

4    Q.   ARE ALL EMPLOYEES REQUIRED TO TAKE THEIR 10-MINUTE REST

5    BREAK?

6    A.   YES, THEY ARE.

7    Q.   AND WHAT HAPPENS TO AN EMPLOYEE WHO FAILS TO TAKE THEIR

8    10-MINUTE BREAK?

9    A.   THEY CAN BE DISCIPLINED OR RECEIVE A COUNSELLING MEMO.

10   Q.   OKAY.  COULD YOU PLEASE TURN TO TAB 1007?

11   A.   ALL RIGHT.

12   Q.   DO YOU RECOGNIZE THIS DOCUMENT?

13   A.   YES.

14   Q.   AND WHAT IS THIS DOCUMENT?

15   A.   IT'S A MEMO I PREPARED IN MARCH OF 2007 INFORMING ALL

16   UNION EMPLOYEES MUST PUNCH IN AND OUT FOR LUNCH.

17   Q.   AND WHOSE INITIALS ARE ON THIS MEMO?

18   A.   MINE.

19        MS. MURAKAMI:  YOUR HONOR, I MOVE 1007 INTO

20   EVIDENCE.

21        MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

22        THE COURT:  ALL RIGHT.  1007 IS ADMITTED.

23   (DEFENDANT'S EXHIBIT 1007 WAS RECEIVED IN EVIDENCE.)

24   BY MS. MURAKAMI:

25   Q.   OKAY.  AND WAS THIS MEMORANDUM DISTRIBUTED TO EMPLOYEES?

1    A.   IT WAS POSTED AROUND THE BUILDING.

2    Q.   SO PRIOR TO THIS DATE, WHAT WAS THE POLICY REGARDING GOING

3    OUT FOR LUNCH?

4    A.   EMPLOYEES WERE SUPPOSED TO TAKE THEIR LUNCH BUT THEY WERE

5    NOT REQUIRED TO PUNCH IN OR OUT.

6    Q.   HOW DID EMPLOYEES RECORD THE TIMES OR DID EMPLOYEES RECORD

7    THE TIMES?

8    A.   THE TIMES ARE NOT RECORDED.

9    Q.   IT WAS NOT RECORDED IN ANY WAY?

10   A.   AT SOME POINT WE STARTED DOING THE MANUAL IN AND OUT SHEET

11   IN THE DEPARTMENTS.  I DO NOT REMEMBER THE DATE THAT WE STARTED

12   DOING THAT.

13   Q.   OKAY.  COULD YOU PLEASE TURN TO EXHIBIT 1000 IN THAT

14   BINDER.

15   A.   OKAY.

16   Q.   DO YOU RECOGNIZE THIS DOCUMENT?

17   A.   THE BINDER ONLY HAS A DISK.

18   Q.   OKAY.  LET'S MOVE ON.

19   A.   THERE IS A SHEET LAYING UP HERE.

20   Q.   NO, DON'T WORRY ABOUT IT.

21        COULD YOU PLEASE TURN TO TAB 1008.

22   A.   OKAY.

23   Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

24   A.   YES.

25   Q.   AND WHAT IS THIS DOCUMENT?

1    A.   IT'S AN EMPLOYEE I WROTE -- EXCUSE ME.  IT'S A MEMO I

2    WROTE TO ALL EMPLOYEES IN JANUARY OF 2008.

3    Q.   AND WHOSE INITIALS ARE ON THIS MEMO?

4    A.   MINE.

5         MS. MURAKAMI:  YOUR HONOR, I OFFER EXHIBIT 1008 INTO

6    EVIDENCE.

7         MS. NGUYEN:  NO OBJECTION.

8         THE COURT:  IT MAY BE RECEIVED.

9    (DEFENDANT'S EXHIBIT 1008 WAS RECEIVED IN EVIDENCE.)

10   BY MS. MURAKAMI:

11   Q.   OKAY.  AND WHAT IS THE PURPOSE OF THIS MEMO?

12   A.   IT WAS TO INFORM THE EMPLOYEES OF THE NEW LUNCH PUNCH

13   POLICY.

14   Q.   BY A "NEW LUNCH PUNCH POLICY," WHICH POLICY ARE YOU

15   REFERRING TO?

16   A.   THE COUNSELLING MEMO POLICY.

17   Q.   FROM --

18   A.   THE VIOLATION POLICY ON THE LUNCH PUNCH.

19   Q.   WAS THAT FROM MARCH OF 2007?

20   A.   RIGHT.

21   Q.   OKAY.  AND YOU SAID YOU WROTE THIS MEMO?

22   A.   YES.

23   Q.   AND SO IT SAYS, "BAY 101'S LUNCH PUNCH POLICY HAS BEEN

24   INEFFECTIVE" -- I THINK YOU MEAN IN EFFECT?

25   A.   RIGHT.

1    Q.   "FOR OVER SIX MONTHS AND IN THAT TIME THE PUNCH VIOLATIONS

2    HAVE IMPROVED.  HOWEVER, THE LUNCH PUNCH PENALTIES IMPOSED BY

3    THE STATE ARE STILL ADDING UP.  FOR THE PAY PERIOD ENDING

4    1-27-08 THERE ARE 128 EMPLOYEES WITH ONE OR MORE LUNCH PUNCH

5    VIOLATIONS.  THE COST TO THE COMPANY IS TOO HIGH AND IT HAS TO

6    STOP!"

7         DO YOU REMEMBER WRITING THAT?

8    A.   YES.

9    Q.   AND WHY WOULD EMPLOYEE'S LUNCH PUNCH POLICIES COST BAY 101

10   MONEY?

11   A.   BECAUSE WE WERE REQUIRED TO PAY ONE HOUR FOR EACH LUNCH

12   THAT WAS EITHER NOT TAKEN, WAS TAKEN SHORT OF 30 MINUTES OR NOT

13   TAKEN WITHIN THE 6-HOUR WINDOW.

14   Q.   NOW, IS THERE A TERM FOR THIS TYPE OF PENALTY?

15   A.   EXCUSE ME?

16   Q.   A TERM FOR THIS PENALTY?

17   A.   IT WAS A LUNCH PUNCH VIOLATION.

18   Q.   OKAY.  AND WAS THIS MEMORANDUM DISTRIBUTED TO EMPLOYEES?

19   A.   IT WAS POSTED AROUND THE BUILDING AND DISTRIBUTED TO

20   DEPARTMENTS.

21   Q.   AND DOES BAY 101 PAY UNION EMPLOYEES FOR THEIR MEAL

22   BREAKS?

23   A.   YES, WE DO.

24            MS. MURAKAMI:  YOUR HONOR, IS THIS A GOOD STOPPING

25   POINT?

1           THE COURT:  YEAH, THIS IS FINE.  ALL RIGHT.  WE'LL

2    ADJOURN FOR THE DAY.

3         PLEASE REMEMBER NOT TO TALK ABOUT THE CASE WITH ANYONE AND

4    WE'LL SEE YOU TOMORROW MORNING.

5         HAVE A GOOD REST OF THE DAY.

6           THE WITNESS:  SO IT'S OKAY FOR ME TO GO?

7           THE COURT:  YEAH.

8           THE WITNESS:  OKAY, THANK YOU.

9       (JURY OUT AT 1:28 P.M.

10          THE COURT:  I JUST WANTED TO MENTION SOMEONE ASKED

11   FOR TIME TOTALS, I'LL DO THEM THIS AFTERNOON AND SEND THEM TO

12   YOU.

13          MR. MCMANIS:  THANK YOU, YOUR HONOR.

14          MS. NGUYEN:  THANK YOU, YOUR HONOR.

15          THE COURT:  WHAT IS THE SCHEDULE FOR TOMORROW?

16          MS. NGUYEN:  I THINK WE'LL BE FINISHING WITH

17   MS. GILBERT.  WE HAVE MR. ORTEGA COMING, AND I WAS GOING TO

18   TALK TO COUNSEL BECAUSE WE HAVE A VIETNAMESE INTERPRETER LINED

19   UP.  WE ARE SHARING THE COST OF IT, BUT I'M NOT SURE THAT WE'RE

20   GOING TO BE ABLE TO GET TO MY CLIENT TOMORROW.

21          THE COURT:  OKAY.

22          MS. NGUYEN:  BUT I DO HAVE SOMETHING TO BRING UP.

23       YOUR HONOR, YESTERDAY WHEN WE TALKED ABOUT THE

24   INVESTIGATION REPORT, I DIDN'T REALIZE THAT THERE ARE MENTIONS

25   IN THE REPORT OF THE UNION MEDIATIONS AND THE INVESTIGATOR

1    ACTUALLY WROTE OUT THE RESULTS OF THE MEDIATION.  AND MY

2    UNDERSTANDING IS THAT MEDIATIONS, THEY AREN'T REALLY DECISIONS

3    BUT SHE NOTED THEM AS DECISIONS OF THE MEDIATOR IN SEVERAL

4    LOCATIONS.

5                    THE COURT:  HAVE YOU TALKED TO MCMANIS ABOUT IT YET?

6                    MS. NGUYEN:  NOT YET.

7                    MR. MCMANIS:  SHE HASN'T, BUT I'M SURE SHE WILL AND

8    IF WE CAN'T WORK IT OUT, WE'LL BRING IT UP WITH YOU.

9                    MS. NGUYEN:  SO WE MIGHT NEED A LITTLE BIT OF TIME

10   TOMORROW MORNING TO DEAL WITH IT.

11                   THE COURT:  YOU'RE NOT GOING TO BE LOOKING AT

12   ANYTHING WHERE THEY WOULD SEE THAT IN THE MORNING?  SO COULDN'T

13   WE DO IT AFTER WE NEED TO AFTER TOMORROW MORNING RATHER THAN --

14                   MR. MCMANIS:  YEAH.

15                   MS. NGUYEN:  I'LL MEET AND CONFER WITH MR. MCMANIS

16   TODAY AND THEN WE'LL JUST BRING IT UP TOMORROW.  I JUST WANTED

17   TO ALERT YOUR HONOR TO THAT.

18                   MR. MCMANIS:  AND MAY I SUGGEST THAT IF YOU SIMPLY

19   ALERT ME TO WHAT YOU WANT REDACTED AND IF I HAVE NO PROBLEM

20   WITH THAT WE CAN REDACT IT.

21        AND IF WE DO, WE CAN TAKE IT UP AFTER TOMORROW'S SESSION.

22                   THE COURT:  SOUNDS GOOD.

23                   MS. NGUYEN:  THANK YOU, YOUR HONOR.

24                   MR. MCMANIS:  THANK YOU, YOUR HONOR.

25                   THE COURT:  OKAY.

1             MR. MCMANIS:  AND, YOUR HONOR, THANK YOU VERY MUCH.

2    THAT WAS VERY NICE THE WAY YOU TREATED THE KIDS.

3             THE COURT:  I'M NOT SURE THEY ABSORBED VERY MUCH

4    BUT.

5             MR. MCMANIS:  NO, THEY DID AND IT WAS REPORTED TO ME

6    WHAT ONE OF THEM SAID "WHAT A NICE MAN."

7         AND COMING FROM THE PEOPLE'S REPUBLIC OF CHINA WHERE THE

8    JUDICIAL SYSTEM IS A LITTLE DIFFERENT, I THINK IT'S REALLY A

9    TRIBUTE TO OUR -- THIS COURT AND YOUR HONOR THAT WE WERE ABLE

10   TO DO THAT.

11        THANK YOU.

12            THE COURT:  OKAY.

13        (COURT CONCLUDED AT 1:31 P.M.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTERS

4

5

6

7            WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11           THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     IRENE RODRIGUEZ, CSR, CRR
     CERTIFICATE NUMBER 8076
17

18   _____

19   LEE-ANNE SHORTRIDGE, CSR, CRR
     CERTIFICATE NUMBER 9595
20

21           DATED:  MAY 1, 2013

22

23

24

25