```
1              UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                   SAN JOSE DIVISION


3
     CUC DANG,
4
          PLAINTIFF,              CASE NO.  CV-10-02181-RMW
5
       VS.                        SAN JOSE, CALIFORNIA
6
     SUTTER'S PLACE, INC., DBA BAY    MAY 2, 2013
7    101 OR BAY 101 CASINO, UNITE
     HERE! LOCAL 19, AND DOES 1      VOLUME 3
8    THROUGH 20, INCLUSIVE,
                                    PAGES 313 - 476
9          DEFENDANTS.

10

11                   TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE RONALD M. WHYTE
12        UNITED STATES DISTRICT JUDGE AND A JURY

13                A-P-P-E-A-R-A-N-C-E-S

14    FOR THE PLAINTIFF:   ROBINSON & WOOD, INC.
                          BY:   ANN A.P. NGUYEN
15                              BONNIE MARGARET ROSS
                          227 NORTH FIRST STREET
16                        SAN JOSE, CALIFORNIA 95113

17    ALSO PRESENT:        ANDRE THOMAS

18    FOR THE DEFENDANTS:  MCMANIS FAULKNER
                          BY:   JAMES MCMANIS
19                              JENNIFER MURAKAMI
                          FAIRMONT PLAZA
20                        10TH FLOOR
                          50 W. SAN FERNANDO STREET
21    ALSO PRESENT:        SAN JOSE, CALIFORNIA 95113
                          CINDY MCCLELEN
22
     OFFICIAL COURT REPORTERS:   IRENE L. RODRIGUEZ, CSR, CRR
23                               CERTIFICATE NUMBER 8074
                                 LEE-ANNE SHORTRIDGE, CSR, CRR
24                               CERTIFICATE NUMBER 9595

25       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
            TRANSCRIPT PRODUCED WITH COMPUTER
```

INDEX OF PROCEEDINGS

FOR THE PLAINTIFF:

**JENNIFER GILBERT**
    AS-ON DIRECT EXAM BY MS. MURAKAMI      P. 316
    (RESUMED)
    AS-ON RECROSS EXAM BY MS. NGUYEN      P. 358
    AS-ON REDIRECT BY MS. MURAKAMI        P. 373
    FURTHER AS-ON RECROSS BY MR. NGUYEN   P. 374

**NICHOLAS ORTEGA**
    AS-ON CROSS-EXAM BY MS. NGUYEN       P. 375
    AS-ON DIRECT EXAM BY MS. MURAKAMI     P. 413
    AS-ON RECROSS-EXAM BY MR. NGUYEN    P. 441

**MICHAEL WILSON**
    AS-ON CROSS-EXAM BY MS. NGUYEN       P. 447
    AS-ON DIRECT EXAM BY MR. MCMANIS     P. 454
    AS-ON RECROSS-EXAM BY MS. NGUYEN    P. 467

INDEX OF EXHIBITS

|  | IDENT. | EVIDENCE |
|---|---|---|

PLAINTIFF'S:

| 32 | 370 | 372 |

DEFENDANTS':

| 502 | | 317 |
| 520 | | 318 |
| 521 | | 318 |
| 1000 | | 319 |
| 1009 | | 322 |
| 1010 | | 325 |
| 1017 | | 330 |
| 552 - 559 | | 332 |
| 11 | | 353 |
| 10 | | 355 |
| 551 | | 423 |
| 503 | | 428 |
| 1003 | | 440 |

1    SAN JOSE, CALIFORNIA                        MAY 2, 2013

2                    P R O C E E D I N G S

3     (JURY IN AT 8:32.)

4              THE COURT:  ALL RIGHT.  IS EVERYBODY READY TO

5    PROCEED?

6              MR. MCMANIS:  YES, YOUR HONOR.

7              MS. MURAKAMI:  YES, YOUR HONOR.

8              THE COURT:  ALL RIGHT.  PLEASE DO.

9      (PLAINTIFF'S WITNESS, JENNIFER GILBERT, PREVIOUSLY SWORN.)

10             **AS-ON DIRECT EXAMINATION (RESUMED)**

11   BY MS. MURAKAMI:

12   Q.   GOOD MORNING, MS. GILBERT.

13   A.   GOOD MORNING.

14             MS. MURAKAMI:  YOUR HONOR, MAY I CONTINUE TO

15   APPROACH THE WITNESS TO HELP HER WITH THE BINDERS?

16             THE COURT:  SURE.

17             MS. MURAKAMI:  THANK YOU.

18   Q.   COULD YOU PLEASE TURN TO TAB 502?

19   A.   OKAY.

20   Q.   DO YOU RECOGNIZE THIS DOCUMENT?

21   A.   YES.  IT'S AN APPLICATION FOR EMPLOYMENT FOR BAY 101.

22   Q.   AND IS IT THE APPLICATION OF A PARTICULAR EMPLOYEE?

23   A.   YES, MS. DANG.

24   Q.   THANK YOU.  AND WHAT IS THE DATE ON THAT DOCUMENT?

25   A.   JUNE 19TH, 2006.

1      Q.   AND IS -- ARE EMPLOYMENT APPLICATIONS MAINTAINED BY YOUR

2      AGENT OFFICE?

3      A.   YES, THEY ARE.

4           MS. MURAKAMI:  YOUR HONOR, WE OFFER EXHIBIT 502 INTO

5      EVIDENCE.

6           MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

7           THE COURT:  502 IS RECEIVED.

8           MS. MURAKAMI:  THANK YOU.

9           (DEFENDANT'S EXHIBIT 502 WAS RECEIVED IN EVIDENCE.)

10     BY MS. MURAKAMI:

11     Q.   AND JUST TO CLOSE SOME LOOPS ON A COUPLE OF TOPICS WE

12     TALKED ABOUT YESTERDAY, COULD YOU PLEASE TURN TO 520 IN THAT

13     BINDER?

14     A.   520?

15     Q.   YES.

16     A.   ALL RIGHT.

17     Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

18     A.   YES.  IT'S A SIGN-IN SHEET FOR ANNUAL TRAINING.

19     Q.   AND WHAT IS THE DATE ON THAT FORM?

20     A.   IT'S MONDAY, AUGUST 6TH, 2007.

21     Q.   AND DO YOU SEE MS. DANG'S NAME ON THIS DOCUMENT?

22     A.   YES.  SHE'S THE FOURTH FROM THE BOTTOM ON THE FIRST PAGE.

23     Q.   AND DID SHE SIGN THE SIGN-IN SHEET?

24     A.   YES.  SHE SIGNED IN AND SHE SIGNED OUT.

25           MS. MURAKAMI:  YOUR HONOR, I OFFER EXHIBIT 520 INTO

1    EVIDENCE.

2             MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

3             THE COURT:  IT MAY BE RECEIVED.

4             MS. MURAKAMI:  THANK YOU.

5         (DEFENDANT'S EXHIBIT 520 WAS RECEIVED IN EVIDENCE.)

6    BY MS. MURAKAMI:

7    Q.   AND COULD YOU PLEASE TURN TO THE NEXT TAB 521?

8    A.   OKAY.

9    Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

10   A.   YES.  IT'S A UNION CONTRACT.

11   Q.   AND ARE WORKERS -- ARE SOME WORKERS AT BAY 101 IN THE

12   UNION?

13   A.   YES.

14   Q.   AND WHICH KINDS OF WORKERS ARE TYPICALLY IN THE UNION?

15   A.   FOOD AND BEVERAGE, FOOD SERVICES, FACILITIES,

16   HOUSEKEEPING, AND PBX OPERATORS.

17            MS. MURAKAMI:  YOUR HONOR, WE OFFER EXHIBIT 521 INTO

18   EVIDENCE.

19            MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

20            THE COURT:  521 IS RECEIVED.  THANK YOU.

21        (DEFENDANT'S EXHIBIT 521 WAS RECEIVED IN EVIDENCE.)

22            MS. MURAKAMI:  YOUR HONOR, AS TO EXHIBIT 1000, WE

23   HAVE A STIPULATION AS TO THE ADMISSION OF THIS EXHIBIT.

24        MAY I PUBLISH IT?

25            THE COURT:  SURE.

1    BY MS. MURAKAMI:

2    Q.   AND DO YOU RECOGNIZE THIS EXHIBIT?

3    A.   YES.

4    Q.   AND WHAT IS IT?

5    A.   IT'S A TRACKING SHEET FOR REST BREAKS AND MEAL BREAKS.

6    Q.   AND WHICH DEPARTMENT IS IT FOR?

7    A.   IT'S FOR DEPARTMENT 20.

8    Q.   AND WHAT IS DEPARTMENT 20?

9    A.   IT'S FOOD AND BEVERAGE IN THE KITCHEN.

10   Q.   THANK YOU.

11        YOUR HONOR, I OFFER EXHIBIT 1000 INTO EVIDENCE.

12             THE COURT:  ALL RIGHT.  I TAKE IT THE STIPULATION

13   WAS THAT IT COULD BE ADMITTED.

14             MS. MURAKAMI:  OKAY.

15             MS. NGUYEN:  YES, YOUR HONOR.

16             THE COURT:  ALL RIGHT.  IT'S ADMITTED.

17             MS. MURAKAMI:  THANK YOU.

18        (DEFENDANT'S EXHIBIT 1000 WAS RECEIVED IN EVIDENCE.)

19             MS. MURAKAMI:  CINDY, COULD YOU PLEASE GO TO BATES

20   STAMP BAY 00013?  OH, YOU'RE ALREADY THERE.  YOU READ MY MIND.

21   Q.   WHAT IS THE DATE ON THIS DOCUMENT?

22   A.   I'M SORRY.

23   Q.   IS IT TOO FAR AWAY TO SEE THE DATE ON THERE?

24   A.   I'M SORRY.  IT LOOKS LIKE JULY 10TH, 2006.  IS THAT

25   CORRECT?  OH, SORRY.  JULY 30TH, 2006.

1    Q.   AND IS THIS AN EXAMPLE OF ONE OF THE DAILY TRACKING SHEETS

2    FROM THAT YEAR?

3    A.   YES.

4         MS. MURAKAMI:  AND, CINDY, COULD YOU PLEASE GO TO

5    BAY 00319?  COULD YOU PULL IT UP A LITTLE BIT?

6    Q.   AND WHAT IS THE DATE OF THIS DAILY TRACKING SHEET?

7    A.   IT LOOKS LIKE MARCH 8TH, 2007.

8    Q.   AND CAN YOU JUST EXPLAIN TO THE JURY WHAT EACH OF THE

9    COLUMNS MEAN?

10   A.   OKAY.  THE EMPLOYEE'S NAME IS LISTED; AND THEN THERE'S A

11   COLUMN FOR THEIR IN TIME FOR THE DAY; THE START TIME OF THEIR

12   FIRST BREAK; THE END TIME OF THEIR FIRST BREAK; THE START TIME

13   OF THEIR LUNCH PERIOD; THE END TIME OF THEIR LUNCH; THE START

14   TIME OF THEIR SECOND BREAK; THE END TIME OF THEIR SECOND BREAK;

15   THEIR OUT PER DAY TIME; AND THE SUPERVISOR'S INITIALS IS THE

16   LAST COLUMN.

17   Q.   THANK YOU.

18        CINDY, COULD YOU PLEASE GO TO BAY 789.

19        AND WHAT IS THE DATE ON THIS DAILY TRACKING SHEET?

20   A.   JULY 2ND, 2008.

21   Q.   AND IS THERE A REASON WHY THIS TRACKING SHEET HAS FEWER

22   COLUMNS THAN THE ONE WE JUST LOOKED AT FROM 2007?

23   A.   YES.  BECAUSE THEIR LUNCHES ARE PUNCHED IN AND OUT ON THE

24   CLOCK, SO THERE'S NO REASON TO RECORD THEM.

25   Q.   SO EMPLOYEES ONLY WRITE DOWN THEIR IN AND OUT FOR BREAK

1    TIMES?

2    A.   CORRECT.

3    Q.   OKAY.  AND BAY 1047, PLEASE.

4         AND WHAT IS THE DATE OF THIS DOCUMENT?

5    A.   APRIL 10TH, 2009.

6    Q.   AND ARE THESE THE BREAK SHEETS THAT ARE CURRENTLY USED AT

7    BAY 101?

8    A.   YES, YES.

9    Q.   THANKS, CINDY.

10        I'M GOING TO GO BACK TO EXHIBIT 1007, WHICH WE ADMITTED

11   YESTERDAY.

12        CINDY, IF YOU COULD PUT THAT UP.

13        SO I ASKED YOU A COUPLE OF QUESTIONS ABOUT THIS MEMO

14   YESTERDAY.  I JUST WANT SOME CLARIFICATION ON WHERE EXACTLY WAS

15   THIS MEMO POSTED?

16   A.   OKAY.  NUMEROUS PLACES THROUGHOUT THE BUILDING.  THEY WERE

17   POSTED BY THE TIME CLOCKS, IN THE EMPLOYEE BREAK ROOM, IN THE

18   EMPLOYEE CAFETERIA.  THEY'RE POSTED IN BINDERS ON BOTH SIDES OF

19   THE CASINO FLOOR AND USUALLY POSTED ON THE H.R. DOOR.

20   Q.   THANK YOU.

21        1008.  CAN YOU BLOW IT UP A LITTLE MORE, THE TEXT?

22            MS. MCCLELEN:  THIS PART OR PORTIONS?

23            MS. MURAKAMI:  JUST THE MAIN PART.

24   Q.   OKAY.  AND THIS IS EXHIBIT 1008, WHICH I ALSO ASKED YOU

25   ABOUT YESTERDAY.

1          AND WHERE WAS THIS MEMO POSTED IN BAY 101?

2     A.   IN ALL OF THE SAME PLACES.

3     Q.   THANK YOU.

4          COULD YOU PLEASE TURN TO TAB 1009.

5     A.   OKAY.

6     Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

7     A.   YES.  IT'S A CHECK DIRECT DEPOSIT REGISTER.

8     Q.   IS IT FOR A PARTICULAR EMPLOYEE?

9     A.   YES, IT'S FOR MS. DANG.

10    Q.   AND WHAT ARE THE DATES OF THIS DEPOSIT REGISTER?

11    A.   JULY 6TH, 2006, THROUGH DECEMBER 21ST, 2009.

12    Q.   AND ARE THOSE THE DATES OF MS. DANG'S EMPLOYMENT AT

13    BAY 101?

14    A.   YES, THEY WERE.

15    Q.   AND HOW IS THIS REPORT GENERATED?

16    A.   IT'S GENERATED FROM OUR PAYROLL PROGRAM.

17    Q.   AND IS THE PAYROLL PROGRAM MAINTAINED BY YOUR H.R. OFFICE?

18    A.   YES, IT IS.

19              MS. MURAKAMI:  YOUR HONOR, WE OFFER EXHIBIT 1009.

20              MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

21              THE COURT:  ALL RIGHT.  1009 IS ADMITTED.

22              MS. MURAKAMI:  THANK YOU.

23         (DEFENDANT'S EXHIBIT 1009 WAS RECEIVED IN EVIDENCE.)

24              MS. MURAKAMI:  CINDY, COULD YOU PLEASE GO TO BAY

25    1516.  BLOW UP THAT BOTTOM PORTION.  OKAY.

1    Q.    SO I'M SHOWING YOU HERE AN EXAMPLE FROM JULY 17TH, 2009.

2    COULD YOU PLEASE GO THROUGH THE FIRST COLUMN AND EXPLAIN TO THE

3    JURY WHAT EACH OF THOSE LINE ITEMS MEANS?

4    A.    OKAY.  THE FIRST LINE ARE -- IS THE REGULAR HOURS FOR THE

5    FIRST WEEK OF THE PAY PERIOD; THE SECOND LINE ARE THE REGULAR

6    HOURS FOR THE SECOND WEEK OF THE PAY PERIOD; THE THIRD LINE ARE

7    MEALS FOR THE FIRST PAY PERIOD -- THE FIRST WEEK OF THE PAY

8    PERIOD; THE FOURTH LINE ARE MEALS FOR THE SECOND PAY PERIOD --

9    OR EXCUSE ME, THE SECOND WEEK OF THE PAY PERIOD; AND THE FIFTH

10   LINE IS VACATION TIME; THE SIXTH LINE IS DECLARED TIPS; AND THE

11   SEVENTH LINE IS UNION MEAL, WHICH IS A TAX ONLY MEAL.

12   Q.    THANK YOU.  COULD YOU PLEASE DO THE SAME FOR THE SECOND

13   COLUMN?

14   A.    SURE.  THE FIRST IS THE CALIFORNIA INCOME TAX AMOUNT; THE

15   SECOND IS THE CALIFORNIA SDI AMOUNT; THE THIRD IS THE FEDERAL

16   INCOME TAX AMOUNT; THE FOURTH IS THE MEDICARE AMOUNT; AND THE

17   FIFTH IS THE SOCIAL SECURITY AMOUNT.

18   Q.    AND THE LAST COLUMN, PLEASE?

19   A.    THE LAST -- THE THIRD COLUMN IS FOR DEDUCTIONS AND THERE

20   WAS A DEDUCTION TAKEN FOR UNION DUES.

21   Q.    THANK YOU.

22         CINDY, 1502, PLEASE.  COULD YOU PLEASE PUT UP THE LAST

23   THIRD OR SO.  OKAY.

24         THESE ARE A COUPLE OF EXAMPLES FROM 2006.  DO ANY OF THESE

25   SHOW THAT MS. DANG WAS PAID OVERTIME?

1    A.   YES, ALL THREE OF THESE CHECKS HAVE OVERTIME ON THEM.

2         MS. MURAKAMI:  CINDY, COULD YOU PLEASE HIGHLIGHT

3    THOSE.  YOU DID THEN ONE AT A TIME.  OKAY.  THAT'S FINE.

4    Q.   COULD YOU PLEASE GO TO 1508.

5    A.   OKAY.

6    Q.   AND TO YOUR KNOWLEDGE, WAS MS. DANG EVER PAID PREMIUM PAY

7    FOR MISSING A MEAL PERIOD OR TAKING A MEAL FOR LESS THAN

8    30 MINUTES?

9    A.   YES, SHE WAS.

10   Q.   AND WHERE ON THIS DEPOSIT REGISTER WOULD THAT BE

11   REFLECTED?

12   A.   THE THIRD LINE ON THE LEFT-HAND COLUMN, LUNCH ADJUSTMENT,

13   LUNCH ADJUST.

14   Q.   AND I DON'T KNOW, CAN YOU SEE THE ACTUAL NUMBERS?

15   A.   IT SAYS TWO.

16   Q.   OKAY.  SO SHE WAS TAKING -- GIVEN TWO HOURS OF LUNCH

17   ADJUSTMENT.  HOW MANY LUNCHES DID SHE MISS?

18   A.   THAT WOULD BE --

19   Q.   OR TAKE LESS THAN 30 MINUTES?

20   A.   THAT WOULD HAVE BEEN HER TWO.

21   Q.   AND COULD YOU PLEASE TURN TO EXHIBIT 1010 -- OH, I'M

22   SORRY.

23   A.   1010?

24   Q.   OH, IS THAT IN THE SAME BINDER?

25   A.   YEAH.

1    Q.   OKAY.  AND DO YOU RECOGNIZE THIS DOCUMENT?

2    A.   YES, IT'S MS. DANG'S PAY STUB FOR THE PAY PERIOD ENDING

3    JULY 26TH, 2009.

4    Q.   AND ARE THERE MULTIPLE PAGES IN THIS DOCUMENT?

5    A.   YES.

6    Q.   ARE THESE ALL OF MS. DANG'S PAY STUBS?

7    A.   IT APPEARS TO BE.  HOWEVER, THEY'RE NOT IN DATE ORDER, SO

8    I CAN'T SAY FOR SURE.

9    Q.   I APOLOGIZE FOR THAT.

10        YOUR HONOR, WE OFFER EXHIBIT 1010.

11            THE COURT:  ALL RIGHT.  IT MAY BE RECEIVED.

12            MS. MURAKAMI:  THANK YOU.

13        (DEFENDANT'S EXHIBIT 1010 WAS RECEIVED IN EVIDENCE.)

14   BY MS. MURAKAMI:

15   Q.   NOW, ARE EMPLOYEES DISCIPLINED FOR FAILING TO TAKE THEIR

16   30 MEAL BREAKS?

17   A.   YES.

18   Q.   AND DURING MS. DANG'S EMPLOYMENT PERIOD FROM 2006 TO 2009,

19   WERE EMPLOYEES DISCIPLINED FOR FAILING TO TAKE LESS THAN 30

20   MEAL BREAKS?

21   A.   YES, THEY WERE.

22   Q.   AND DURING MS. DANG'S EMPLOYMENT, WERE EMPLOYEES

23   DISCIPLINED IF THEY TOOK 29-MINUTE BREAKS?

24   A.   YES.

25   Q.   AND WHY DOES ONE MINUTE MAKE A DIFFERENCE?

1      A.   BECAUSE CALIFORNIA LAW STATES 30 MINUTES.

2      Q.   AND DURING MS. DANG'S EMPLOYMENT, WERE EMPLOYEES

3      DISCIPLINED FOR TAKING MORE THAN 30 MINUTES?

4      A.   THAT WAS LEFT UP TO THE DEPARTMENT.

5      Q.   AND DID MS. DANG EVER RECEIVE COUNSELLING MEMOS FOR MEAL

6      BREAK VIOLATIONS?

7      A.   YES, SHE DID.

8      Q.   AND DURING MS. DANG'S EMPLOYMENT AT BAY 101, DID SHE EVER

9      FILE A COMPLAINT IN THE H.R. DEPARTMENT STATING THAT SHE WASN'T

10     ALLOWED TO TAKE A MEAL OR A REST BREAK?

11     A.   NO, SHE DID NOT.

12     Q.   AND DO YOU RECEIVE A NOTICE WHEN AN EMPLOYEE FILES A

13     GRIEVANCE WITH THEIR UNION?

14     A.   YES, WE DID.

15     Q.   AND DID MS. DANG EVER FILE A GRIEVANCE FOR MEAL AND REST

16     BREAKS?

17     A.   NO, SHE DID NOT.

18     Q.   HAS ANY EMPLOYEE COME TO YOU AND SAID THAT THEY HAVE NOT

19     BEEN ABLE TO TAKE THEIR 30 MEAL BREAK OR REST BREAK?

20     A.   NO, THEY HAVE NOT.

21     Q.   THANK YOU.

22          NOW, I WANT TO GO BACK TO THIS CANDY INCIDENT THAT YOU

23     TALKED ABOUT YESTERDAY, OR YOU TALKED WITH COUNSEL ABOUT

24     YESTERDAY.

25          DO YOU RECALL THAT INCIDENT?

1    A.   YES.

2    Q.   AND HOW DID YOU FIND OUT ABOUT THE INCIDENT?

3    A.   I BELIEVE THE SHIFT MANAGER THAT WAS ON DUTY AT THE TIME

4    REPORTED IT TO ME.

5    Q.   AND WHICH SHIFT MANAGER WAS THAT?

6    A.   IT WOULD HAVE BEEN MIKE WILSON.

7    Q.   AND WHAT DID YOU DO AFTER YOU LEARNED ABOUT THIS INCIDENT?

8    A.   I NOTIFIED JOHN ST. CROIX AND WE CONTACTED SURVEILLANCE

9    AND SET UP A TIME TO REVIEW THE TAPE OF THE INCIDENT.

10   Q.   AND ABOUT HOW MUCH TIME PASSED BETWEEN THE TIME YOU WERE

11   INFORMED ABOUT THE INCIDENT, PASSED BETWEEN THAT TIME AND THE

12   TIME YOU REVIEWED THE SURVEILLANCE VIDEO?

13   A.   I BELIEVE WE REVIEWED IT THE NEXT MORNING.

14   Q.   AND WHAT DID YOU OBSERVE ON THAT VIDEO?

15   A.   THERE WAS A GROUP OF I BELIEVE FOUR COOKS, MS. DANG WAS

16   ONE OF THEM, AND THEY APPEARED TO BE TALKING AND THEY APPEARED

17   TO BE LAUGHING.  THERE WAS NO AUDIO SO I DON'T KNOW WHAT WAS

18   BEING SAID.

19        AND AT ONE POINT ONE OF THE COOKS REACHED OUT AND APPEARED

20   TO BE TAKING OUT CANDY OUT OF MS. DANG'S POCKET.  THEY ALL HAD

21   SMOCKS ON.

22   Q.   AND DID YOU SPEAK WITH MS. DANG ABOUT THIS INCIDENT

23   SHORTLY AFTER IT HAPPENED?

24   A.   YES.

25   Q.   AND WHAT DID MS. DANG TELL YOU ABOUT THE INCIDENT?

1    A.   SHE SAID THAT IT MADE HER VERY UNCOMFORTABLE AND THAT HE

2    SHOULD NOT HAVE TAKEN THE CANDY WITHOUT ASKING.

3    Q.   DO YOU REMEMBER WHICH EMPLOYEE IT WAS THAT HAD REACHED

4    INTO HER POCKET?

5    A.   I REMEMBER HIS FIRST NAME WAS RUDOLPH.

6    Q.   AND SO IT WAS NOT LUCIO SUAREZ?

7    A.   NO, IT WAS NOT.

8    Q.   AND WAS THAT EMPLOYEE DISCIPLINED FOR REACHING INTO

9    MS. DANG'S POCKET?

10   A.   YES, HE WAS.

11   Q.   AND WHAT FORM OF DISCIPLINE WAS THAT?

12   A.   HE RECEIVED TWO DAYS SUSPENSION.

13   Q.   OKAY.  THANK YOU.

14        SWITCHING GEARS NOW.  DO YOU RECALL AN INCIDENT REGARDING

15   MS. DANG AND LINDA ELIAS IN OCTOBER OF 2009?

16   A.   2009?

17   Q.   YES.

18   A.   YES.

19   Q.   AND MS. DANG, WAS SHE DISCIPLINED AS A RESULT OF THIS

20   INCIDENT?

21   A.   YES, SHE WAS.

22   Q.   AND WHAT EXACTLY WAS THAT FORM OF DISCIPLINE?

23   A.   SHE WAS SUSPENDED.

24        MS. MURAKAMI:  CINDY, COULD YOU PLEASE PUT UP

25   EXHIBIT 1001, ALREADY IN EVIDENCE, BAY 232.

1    Q.   NOW, DO YOU RECOGNIZE THIS DOCUMENT?

2    A.   YES.

3    Q.   IS THIS THE COUNSELLING MEMO GIVEN TO MS. DANG REGARDING

4    HER SUSPENSION?

5    A.   YES, IT WAS.

6    Q.   AND WHAT IS THE DATE ON THIS MEMO?

7    A.   OCTOBER 8TH, 2009.

8    Q.   AND WERE YOU PRESENT WHEN THIS DOCUMENT WAS SIGNED?

9    A.   YES, I WAS.

10   Q.   AND ARE THOSE YOUR INITIALS ON THAT PAGE?

11   A.   YES.

12   Q.   IN THE BOTTOM RIGHT-HAND CORNER?

13   A.   YES.

14   Q.   OKAY.  AND WHY ARE YOUR INITIALS ON THIS DOCUMENT?

15   A.   ALL COUNSELLING MEMOS ARE ENTERED INTO OUR H.R. PROGRAM BY

16   MY H.R. CLERK, SO THE INITIALS ABOVE MINE ARE MY CLERK'S, AND

17   AFTER SHE ENTERED THEM, SHE PUTS IT IN MY BOX.  I OPEN THE

18   PROGRAM AND VERIFY THAT IT HAS BEEN ENTERED AND I INITIAL IT.

19   Q.   AND WHO WAS INVOLVED IN THE DECISION TO SUSPEND MS. DANG

20   FOR THIS INCIDENT?

21   A.   MR. ORTEGA AND I WERE.

22   Q.   AND WAS MR. WERNER INVOLVED AT ALL?

23   A.   NO.

24   Q.   AND WOULD YOU PLEASE REPEAT FOR THE JURY WHAT INFORMATION

25   YOU REVIEWED IN DECIDING TO SUSPEND MS. DANG?

1    A.   I REVIEWED SURVEILLANCE VIDEO OF THE INCIDENT AND I

2    REVIEWED STATEMENTS BY ARLENE FONTILLAS AND LINDA ELIAS.

3    Q.   COULD YOU PLEASE GO TO 1017.

4    A.   OKAY.

5    Q.   SO IS THAT A CD?

6    A.   YES, IT IS.

7    Q.   SO THAT'S A CD THAT HAS BEEN MARKED AS JOINT EXHIBIT 1017,

8    AND I'LL REPRESENT TO YOU THAT THIS IS THE SURVEILLANCE TAPE OF

9    THAT NIGHT, OCTOBER 4TH, 2009.

10   A.   OKAY.

11   Q.   HAVE YOU REVIEWED THIS TAPE BEFORE?

12   A.   YES, I HAVE.

13   Q.   AND HAVE YOU REVIEWED IT RECENTLY?

14   A.   YES.

15   Q.   AND WHAT IS SHOWN ON THAT VIDEOTAPE?

16   A.   IT'S BASICALLY THE EVENTS THAT HAPPENED ON OCTOBER 4TH,

17   2009.

18   Q.   AND WHO KEEPS THE -- WHO MAINTAINS THAT VIDEOTAPE AT

19   BAY 101?

20   A.   THE SURVEILLANCE DEPARTMENT.

21        MS. MURAKAMI:  YOUR HONOR, WE OFFER EXHIBIT 1017.

22        MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

23        THE COURT:  ALL RIGHT.  IT MAY BE RECEIVED.

24        MS. MURAKAMI:  THANK YOU.

25        (DEFENDANT'S EXHIBIT 1017 WAS RECEIVED IN EVIDENCE.)

1    BY MS. MURAKAMI:

2    Q.   NOW, WERE THERE CERTAIN KEY POINTS IN THE VIDEO THAT YOU

3    RELIED ON IN MAKING YOUR DECISION TO SUSPEND MS. DANG?

4    A.   YES, THERE WERE.

5    Q.   AND DID YOU IDENTIFY CERTAIN PORTIONS OF THE VIDEO FOR

6    THIS TRIAL?

7    A.   YES, I DID.

8    Q.   AND COULD YOU PLEASE TURN TO TABS 552 TO 559?  I THINK

9    THAT'S IN YOUR BINDER.

10   A.   YOU SAID 552 AND 559 OR THROUGH?

11   Q.   THROUGH 559, PLEASE.

12   A.   THE PAGES CAME OUT.

13   Q.   OH, NO.

14   A.   YEAH, THE WHOLE THING KIND OF EXPLODED.

15        OKAY.  SO 552?

16   Q.   YES, THROUGH 559.

17   A.   OKAY.  THEY ARE ALL DISKS.

18   Q.   SO I'LL REPRESENT TO YOU THAT THESE ARE EIGHT PORTIONS OF

19   THE SURVEILLANCE VIDEO THAT YOU IDENTIFIED.

20        AND HAVE YOU REVIEWED THESE EXCERPTS RECENTLY?

21   A.   YES, I HAVE.

22        MS. MURAKAMI:  YOUR HONOR, WE OFFER EXHIBITS 552

23   THROUGH 559.

24        MS. NGUYEN:  YOUR HONOR, JUST FOR THE RECORD, WE

25   OBJECT TO THEM WITH RESPECT TO THE COMPLETENESS BECAUSE THEY'RE

1    JUST CLIPS.  BUT I KNOW THAT WE TALKED ABOUT THAT SO I KNOW

2    THAT IT'S GOING TO GO IN.

3           THE COURT:  I DON'T THINK THAT'S WHAT I SAID BEFORE,

4    BUT I THINK I INDICATED THAT IF THE EXCERPTS WERE BASICALLY

5    COMPLETE FOR WHAT THEY WANTED TO SHOW, THEY COULD COME IN AND

6    YOU COULD PROVIDE ADDITIONAL PORTIONS IF YOU WANTED.

7        IF I THOUGHT THE EXCERPT WAS MISLEADING THE WAY IT WAS

8    TAKEN OUT, I WOULD NOT PERMIT IT WITHOUT AN ADDITIONAL PORTION

9    BEING PLAYED.

10       I THINK THAT'S WHAT I INDICATED.

11          MS. NGUYEN:  THANK YOU, YOUR HONOR.

12          MR. MCMANIS:  SO THEY'RE IN?

13          THE COURT:  YES.

14          MR. MCMANIS:  THANK YOU.

15       (DEFENDANT'S EXHIBITS 552 - 559 WERE RECEIVED IN

16   EVIDENCE.)

17          THE COURT:  WELL, BASED ON THE FACT I HAVEN'T HEARD

18   AN OBJECTION THE EXCERPT IS MISLEADING.

19          MS. NGUYEN:  OUR OBJECTION WAS JUST ON THE

20   COMPLETENESS.

21          THE COURT:  OKAY.

22          MS. MURAKAMI:  YOUR HONOR, MAY THE WITNESS APPROACH

23   THE SCREEN?

24          THE COURT:  SURE.

25          MS. MURAKAMI:  AND MAY SHE USE THE LASER POINTER?

1          THE COURT:  YES.

2          MS. MURAKAMI:  THANK YOU.

3     Q.  MS. GILBERT, WE'LL START HERE WITH 552, WHICH IS THE FIRST

4     CLIP THAT YOU IDENTIFIED.  THIS CLIP IS TIME STAMPED 23:48

5     MINUTES 57 SECONDS THROUGH 23:49 MINUTES AND 30 SECONDS.

6          IN OTHER WORDS, THIS IS AROUND 11:45 P.M. TO 11:49 P.M.

7          DO YOU SEE THE DATE AT THE BOTTOM OF THE SCREEN?

8     A.  YES, I DO.

9     Q.  AND DOES THIS APPEAR TO BE THE CLIP THAT YOU REVIEWED --

10    A.  YES.

11    Q.  -- PREVIOUSLY?

12         MS. MURAKAMI:  CINDY, COULD YOU PLEASE PLAY A COUPLE

13    OF SECONDS.

14    Q.  MS. GILBERT, COULD YOU PLEASE SET THE SCENE UP FOR US, FOR

15    THE JURY?

16    A.  OKAY.  SO FOR FRAME OF REFERENCE, THE TABLE IN QUESTION IS

17    THE ONE WITH THE GENTLEMAN IN PURPLE RIGHT HERE, THIS IS THE

18    DEALER, AND THIS IS THE CUSTOMER INVOLVED AND HE'S SEATED IN

19    SEAT ONE, THIS IS MS. DANG, AND THIS IS ARLENE FONTILLAS

20    DRESSED IN RED AT THE ADJACENT TABLE (INDICATING).

21    Q.  THANK YOU.  LET'S PLAY IT.

22        (VIDEO PLAYING.)

23    BY MS. MURAKAMI:

24    Q.  SO WHAT DID YOU OBSERVE THERE?

25    A.  MS. DANG APPEARS TO BE TAKING THE CUSTOMER'S ORDER.

1              MS. MURAKAMI:  CONTINUE.

2         (VIDEO PLAYING.)

3              MS. MURAKAMI:  LET'S PAUSE THERE.

4    Q.   WHAT DID YOU OBSERVE THERE?

5    A.   THIS IS MS. ELIAS AND SHE'S WALKING ON THE FLOOR.  AND YOU

6    CAN TELL THE DIFFERENCE BETWEEN THE TWO OF THEM, MS. ELIAS IS

7    WEARING HER APRON HARNESS AND MS. DANG IS NOT IF THAT MAKES IT

8    EASIER (INDICATING).

9    Q.   THANK YOU.

10        CONTINUE.

11        (VIDEO PLAYING.)

12             MS. MURAKAMI:  THANKS, CINDY.

13        LET'S MOVE ON TO 553, AND THIS IS 23:55 MINUTES AND

14   55 SECONDS THROUGH 23:55 MINUTES AND 50 SECONDS FOR ROUGHLY

15   11:55 P.M. TO 11:57 P.M.

16        CINDY, LET'S GO AHEAD AND PLAY THAT.

17        (VIDEO PLAYING.)

18             MS. MURAKAMI:  LET'S PAUSE IT FOR A SECOND.

19   Q.   WHAT DID YOU OBSERVE THERE?

20   A.   MS. DANG HAS BROUGHT THE CUSTOMER'S ORDER OUT TO HIM.

21   Q.   THANK YOU.

22        LET'S CONTINUE.

23        (VIDEO PLAYING.)

24   BY MS. MURAKAMI:

25   Q.   AND WHAT DID YOU OBSERVE THERE?

1    A.    THE CUSTOMER PAID MS. DANG FOR THE DRINK SHE BROUGHT HIM.

2    Q.    THANK YOU.

3          LET'S CONTINUE.

4          (VIDEO PLAYED.)

5               MS. MURAKAMI:  THANK YOU.  LET'S GO TO CLIP 3, WHICH

6    IS 554.  THIS CLIP IS TIME STAMPED 0 HOURS, 6 MINUTES AND 20

7    SECONDS TO 0 HOURS, 6 MINUTES AND 25 SECONDS OR 12:06 A.M.

8    ROUGHLY.

9          GO AHEAD AND PLAY IT.

10         (VIDEO PLAYED.)

11              MS. MURAKAMI:  PAUSE.

12   Q.    SO WHAT DID YOU JUST OBSERVE THERE?

13   A.    THE CUSTOMER CALLED MS. ELIAS OVER.

14   Q.    THANK YOU.

15         CONTINUE.

16         (VIDEO PLAYED.)

17              MS. MURAKAMI:  LET'S JUST PLAY THAT ONE MORE TIME.

18         (VIDEO PLAYED.)

19              MS. MURAKAMI:  LET'S MOVE ON TO 555, WHICH IS THE

20   FOURTH CLIP YOU IDENTIFIED.  THIS CLIP IS TIME STAMPED 0 HOURS,

21   9 MINUTES AND 40 SECONDS TO 0 HOURS, 10 MINUTES AND 50 SECONDS

22   OR ABOUT 12:09 TO 12:10 A.M.

23         LET'S GO AHEAD AND PLAY IT.

24         (VIDEO PLAYING.)

25              MS. MURAKAMI:  LET'S PAUSE FOR A SECOND.

1     Q.    SO WHAT DID YOU OBSERVE THERE?

2     A.    MS. ELIAS IS BRINGING THE CUSTOMER A DRINK.

3           MS. MURAKAMI:  CONTINUE.

4     (VIDEO PLAYING.)

5           MS. MURAKAMI:  LET'S PAUSE FOR A SECOND.

6     Q.    WHAT DID YOU OBSERVE THERE?

7     A.    THE CUSTOMER APPEARED TO BE WAVING AWAY THE FIRST DRINK.

8           MS. MURAKAMI:  OKAY.  LET'S CONTINUE.

9     (VIDEO PLAYING.)

10          MS. MURAKAMI:  LET'S PAUSE FOR A SECOND.

11    Q.    WHAT DID YOU OBSERVE THERE?

12    A.    THE CUSTOMER IS PAYING MS. ELIAS.

13    Q.    OKAY.  LET'S CONTINUE.

14    (VIDEO PLAYING.)

15          MS. MURAKAMI:  LET'S PAUSE FOR A SECOND.

16    Q.    WHAT DID YOU OBSERVE THERE?

17    A.    MS. ELIAS GAVE THE CUSTOMER HIS CHANGE AND REMOVED THE

18    FIRST DRINK.

19    Q.    OKAY.  LET'S JUST PLAY IT ONE MORE TIME WITHOUT

20    INTERRUPTIONS.  THANK YOU.

21          (VIDEO PLAYING.)

22          MS. MURAKAMI:  ALL RIGHT.  LET'S MOVE ON TO

23    EXHIBIT 556, WHICH IS THE FIFTH CLIP THAT YOU IDENTIFIED, AND

24    THIS IS TIME STAMPED 0 HOURS, 16 MINUTES AND 10 SECONDS TO

25    0 HOURS, 16 MINUTES AND 35 SECONDS, OR ROUGHLY 12:16 A.M.

1          LET'S GO AHEAD AND PLAY IT.

2          (VIDEO PLAYING.)

3               MS. MURAKAMI:  LET'S PAUSE FOR A SECOND.

4     Q.   WHAT DID YOU OBSERVE THERE?

5     A.   MS. ELIAS BROUGHT THE CUSTOMER THE AMOUNT HE PAID FOR THE

6     FIRST DRINK.

7     Q.   OKAY.

8          JUST FINISH UP THE CLIP.

9          (VIDEO PLAYING.)

10              MS. MURAKAMI:  LET'S MOVE ON TO EXHIBIT 557, WHICH

11    IS THE FIFTH CLIP YOU SELECTED, AND THIS CLIP IS TIMED 0 HOURS,

12    20 MINUTES AND 30 SECONDS TO 0 HOURS, 22 MINUTES AND 15 SECONDS

13    OR ROUGHLY 12:20 TO 12:22 A.M., SO ABOUT FOUR MINUTES AFTER THE

14    LAST ONE.

15         GO AHEAD AND PLAY IT.

16         (VIDEO PLAYING.)

17              MS. MURAKAMI:  PAUSE FOR A SECOND.

18    Q.   WHAT DID YOU OBSERVE THERE?

19    A.   MS. DANG APPROACHING THE CUSTOMER.

20    Q.   OKAY.

21         CONTINUE.

22         (VIDEO PLAYING.)

23              MS. MURAKAMI:  LET'S PAUSE FOR A SECOND.

24    Q.   WHAT ARE YOU OBSERVING HERE?

25    A.   MS. DANG TOOK THE NOTE PAD THAT SHE USES TO TAKE ORDERS

1    OUT OF HER APRON AND APPEARS TO BE SHOWING IT TO THE CUSTOMER.

2    Q.   CONTINUE.

3         (VIDEO PLAYING.)

4              MS. MURAKAMI:  LET'S PAUSE THERE.

5    Q.   WHAT DID YOU OBSERVE THERE?

6    A.   IT LOOKS LIKE THE CUSTOMER PUSHED THE SERVING TABLE AWAY

7    FROM HIM.

8    Q.   OKAY.

9         LET'S CONTINUE.

10        (VIDEO PLAYING.)

11             MS. MURAKAMI:  LET'S PAUSE FOR A SECOND.

12   Q.   AND WHAT DID YOU OBSERVE THERE?

13   A.   MS. DANG APPEARS TO BE STILL POINTING AT HER NOTE PAD AND

14   TALKING TO THE CUSTOMER.

15   Q.   OKAY.

16        LET'S CONTINUE.

17        (VIDEO PLAYING.)

18             MS. MURAKAMI:  LET'S PAUSE FOR A SECOND.

19   Q.   WHAT DID YOU OBSERVE THERE?

20   A.   MS. ELIAS.

21   Q.   THANK YOU.

22        CONTINUE.

23        (VIDEO PLAYING.)

24             MS. MURAKAMI:  OKAY.  LET'S PAUSE THERE FOR A

25   SECOND.

1    Q.   WHAT DID YOU OBSERVE THERE?

2    A.   MS. ELIAS APPEARS TO BE TRYING TO CALM THE SITUATION AND

3    MOVE MS. DANG AWAY FROM THE TABLE.

4    Q.   OKAY.  CONTINUE.

5         (VIDEO PLAYING.)

6              MS. MURAKAMI:  LET'S PAUSE THERE.

7    Q.   AND WHAT DID YOU OBSERVE THERE?

8    A.   IT LOOKS LIKE SHE'S APOLOGIZING TO THE CUSTOMER.

9    Q.   OKAY.

10        CONTINUE.

11        (VIDEO PLAYING.)

12             MS. MURAKAMI:  SO BEAR WITH ME HERE, BUT I THINK

13   WE'RE GOING TO PLAY IT ONE MORE TIME WITHOUT ANY INTERRUPTION.

14   THIS IS THE SAME CLIP, EXHIBIT 557.

15        (VIDEO PLAYED.)

16             MS. MURAKAMI:  LET'S MOVE ON TO EXHIBIT 558, WHICH

17   IS THE SEVENTH CLIP YOU IDENTIFIED.  THIS CLIP IS TIME STAMPED

18   0 HOURS, 30 MINUTES AND 15 SECONDS TO 0 HOURS, 33 MINUTES AND

19   25 SECONDS, OR ABOUT 12:33 A.M.

20        LET'S GO AHEAD.

21        (VIDEO PLAYING.)

22   BY MS. MURAKAMI:

23   Q.   AND WHAT DID YOU OBSERVE THERE?

24   A.   IT APPEARS THAT MS. ELIAS TOOK ANOTHER DRINK ORDER FROM

25   THE CUSTOMER.

1     Q.   OKAY.

2          GO AHEAD.

3          (VIDEO PLAYED.)

4               MS. MURAKAMI:  LET'S MOVE ON TO EXHIBIT 559, WHICH

5     IS THE FINAL CLIP, THE EIGHTH CLIP, AND THIS CLIP IS TIME

6     STAMPED 0 HOURS, 37 MINUTES AND 10 SECONDS TO 0 HOURS,

7     38 MINUTES AND 55 SECONDS, OR ABOUT 12:37 TO 12:38 A.M., ABOUT

8     FOUR MINUTES AFTER THE LAST CLIP.

9          GO AHEAD AND PLAY IT.

10         (VIDEO PLAYING.)

11              MS. MURAKAMI:  LET'S PAUSE FOR A SECOND.

12    Q.   AND WHAT DID YOU OBSERVE THERE?

13    A.   THIS IS MS. DANG APPROACHING THE CUSTOMER AGAIN.

14    Q.   OKAY.

15         CONTINUE.

16         (VIDEO PLAYED.)

17              MS. MURAKAMI:  LET'S PAUSE.

18    Q.   WHAT DID YOU OBSERVE THERE?

19    A.   MS. ELIAS HAS NOW ENTERED AND MS. DANG APPEARS TO BE

20    ARGUING WITH THE CUSTOMER.

21    Q.   LET'S CONTINUE.

22         (VIDEO PLAYING.)

23              MS. MURAKAMI:  LET'S PAUSE FOR A SECOND.

24    Q.   AND WHAT DID YOU OBSERVE THERE?

25    A.   MS. FONTILLAS HAS HEARD THE RAISED VOICES AND SHE HAS

1    GOTTEN UP FROM HER TABLE AND HAS TURNED AROUND.

2    Q.   AND CONTINUE.

3         (VIDEO PLAYING.)

4              MS. MURAKAMI:  LET'S PAUSE THERE.

5    Q.   AND WHAT DID YOU OBSERVE THERE?

6    A.   MS. ELIAS CAME BACK TO COLLECT MONEY FOR THE PREVIOUS

7    ORDER THAT SHE HAD, AND THEN SHE AND MS. FONTILLAS APPEARED TO

8    HAVE A CONVERSATION.

9    Q.   THANK YOU.  AND WE'LL PLAY IT ONE MORE TIME AFTER WITHOUT

10   INTERRUPTION.

11        (VIDEO PLAYING.)

12             MS. MURAKAMI:  ALL RIGHT.  THANK YOU.  YOU CAN TAKE

13   THE WITNESS STAND AGAIN.

14   Q.   NOW, WAS THERE ANY AUDIO WITH THIS SURVEILLANCE TAPE?

15   A.   NO, THERE WAS NOT.

16   Q.   AND SO HOW DID YOU KNOW WHAT WAS KIND OF GOING ON IN THE

17   SCENES WITHOUT HEARING THE CONVERSATIONS BETWEEN THE PEOPLE IN

18   THE VIDEO?

19   A.   I ALSO HAD STATEMENTS FROM MS. ELIAS AND MS. FONTILLAS.

20   Q.   AND WERE THOSE CONSISTENT WITH WHAT YOU SAW ON THIS

21   SCREEN?

22   A.   YES, THEY WERE.

23   Q.   THANK YOU.  AND DID YOU RELY ON ALL OF THESE CLIPS IN

24   DECIDING TO SUSPEND MS. DANG?

25   A.   YES, WE DID.

1     Q.   NOW, IS IT THE POLICY AT BAY 101 TO DISCIPLINE EMPLOYEES

2     WHO ARGUE WITH CUSTOMERS ON THE CASINO FLOOR?

3     A.   YES, IT IS.

4     Q.   I'D LIKE YOU TO TURN TO EXHIBIT 523 ALREADY IN EVIDENCE.

5     A.   OKAY.

6     Q.   AND WHAT DO YOU HAVE BEFORE YOU?

7     A.   IT IS THE EMPLOYEE HANDBOOK FROM AUGUST 2008.

8     Q.   AND WHICH PROVISIONS OF THAT HANDBOOK DID YOU RELY UPON IN

9     DECIDING TO SUSPEND MS. DANG?

10    A.   OKAY.  IT'S UNDER THE DISCIPLINARY POLICY.  SORRY.

11    Q.   IT'S OKAY.

12    A.   OKAY.  IT STARTS ON PAGE 42, WHICH IS THE BAY 001962.

13         OH, DO YOU WANT ME TO GO AHEAD AND READ THE PROVISIONS?

14    Q.   I'LL HAVE CINDY PUT IT UP ON THE SCREEN.

15         CINDY, COULD YOU PUT UP BAY 01962?

16    A.   THAT'S WHERE THE POLICY STARTS, AND IF SHE GOES ON TO THE

17    NEXT PAGE.

18    Q.   UH-HUH.

19    A.   IT'S UNDER MAJOR RULES, 2, NUMBER 8, HARASSING,

20    THREATENING, INTIMIDATING, OR COERCING ANOTHER EMPLOYEE OR

21    CUSTOMER WHETHER ON OR OFF DUTY.

22    Q.   OKAY.

23    A.   AND ALSO ON THE FOLLOWING PAGE, PAGE 44, NUMBER 10, VERBAL

24    ARGUMENT ON BAY 101 PROPERTY IN VIEW OF CUSTOMERS.

25    Q.   THANK YOU.

1         AND DID YOU MEET WITH MS. DANG TO INFORM HER OF HER

2    SUSPENSION?

3    A.   MR. ORTEGA AND I DID, YES.

4    Q.   AND WHEN DID THIS MEETING OCCUR?

5    A.   IT OCCURRED ON THE 8TH OF OCTOBER 2009.

6    Q.   AND WHAT HAPPENED DURING THIS MEETING?

7    A.   MR. ORTEGA AND I EXPLAINED TO MS. DANG THAT, YOU KNOW, WE

8    HAD WATCHED THE SURVEILLANCE INCIDENT -- OR EXCUSE ME -- THE

9    SURVEILLANCE FOOTAGE OF THE INCIDENT THAT TOOK PLACE ON THE

10   SUNDAY BEFORE AND WE HAD REVIEWED STATEMENTS FROM TWO OF HER

11   COWORKERS AND WE HAD DETERMINED THAT SHE HAD BEEN ARGUING WITH

12   A CUSTOMER ON THE CASINO FLOOR AND WITH A COWORKER IN VIEW OF

13   CUSTOMERS.

14   Q.   AND WHAT DID MS. DANG SAY?

15   A.   SHE TOOK OUT HER NOTE PAD OUT OF AN APRON AND TURNED TO A

16   PAGE AND POINTED AT IT AND SAID "I DIDN'T TAKE THE WRONG

17   ORDER."

18        MR. ORTEGA AND I TRIED TO GET HER TO UNDERSTAND THAT SHE

19   WAS BEING SUSPENDED NOT FOR TAKING A WRONG ORDER, BUT FOR

20   ARGUING WITH THE CUSTOMER.

21   Q.   AND DID YOU TELL HER TO SHUT UP AT ANY TIME?

22   A.   NO, I DID NOT.

23   Q.   AND DID YOU TELL HER TO BE QUIET AT ANY TIME DURING THIS

24   MEETING?

25   A.   NO, I DID NOT.

1     Q.   DID YOU RAISE YOUR VOICE AT MS. DANG DURING THIS MEETING?

2     A.   NO.

3     Q.   AND DID YOU TELL HER "I'M DONE WITH YOU"?

4     A.   NO, I DID NOT.

5          MS. MURAKAMI:  AND CINDY, COULD YOU PLEASE SHOW

6     EXHIBIT 1001, BAY 1332, ALREADY IN EVIDENCE.  COULD YOU MAKE IT

7     A LITTLE BIGGER?  THANK YOU.

8     Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

9     A.   YES, I DO.

10    Q.   AND WE JUST LOOKED AT IT.  DO YOU SEE THAT PORTION WHERE

11    IT SAYS BELOW "EMPLOYEE COMMENTS"?

12    A.   YES.

13    Q.   AND DID MS. DANG HAVE THE OPTION OF WRITING COMMENTS IF

14    SHE WANTED TO?

15    A.   YES, SHE DID, AND I GAVE HER THE ADDITIONAL OPTION OF

16    BRINGING COMMENTS IN AT A LATER DATE AND I WOULD ATTACH THEM TO

17    THE MEMO.

18    Q.   IS THAT YOUR USUAL PRACTICE?

19    A.   YES, IT IS.

20    Q.   DID YOU DISCUSS ANY PERFORMANCE RELATED ISSUES WITH

21    MS. DANG DURING THIS MEETING?

22    A.   YES, WE DID.

23    Q.   AND WHAT PERFORMANCE ISSUES WERE THOSE?

24    A.   SHE WAS HAVING PROBLEMS BALANCING HER ENVELOPE.  ALL GROUP

25    SERVERS HAVE AN ENVELOPE THAT THEY HAVE TO TURN IN TO THE CAGE

1      AT THE END OF THE DAY AND IT NEEDS TO BE BALANCED.

2      Q.   AND HOW DID YOU KNOW THAT SHE HAD THESE PROBLEMS BALANCING

3      HER ENVELOPES?

4      A.   THE COMPLIANCE ANALYST HAD SENT MEMOS DOWN TO MR. ORTEGA.

5              MS. MURAKAMI:  OKAY.  CINDY, COULD YOU PLEASE PUT UP

6      EXHIBIT 1001, BAY 1331.

7      Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

8      A.   YES.

9      Q.   AND WHAT IS THIS DOCUMENT?

10     A.   IT'S THE SECOND COUNSELLING MEMO THAT WAS GIVEN TO

11     MS. DANG THAT DAY ON OCTOBER 8TH.

12     Q.   AND DID YOU READ THIS MEMO TO MS. DANG?

13     A.   YES.

14     Q.   AND HOW DID SHE RESPOND?

15     A.   SHE DIDN'T HAVE A RESPONSE.  SHE SIGNED IT AND LEFT.

16     Q.   AND DID YOU PREVENT HER FROM WRITING ANY COMMENTS ON THIS

17     MEMO?

18     A.   NO, I DID NOT.

19             MS. MURAKAMI:  THANKS, CINDY.  YOU CAN TAKE IT DOWN.

20     OKAY.

21     Q.   NOW, DID MS. DANG MAKE ANY COMPLAINTS ABOUT MR. ORTEGA AT

22     THIS MEETING?

23     A.   NO, SHE DID NOT.

24     Q.   DID SHE MAKE ANY COMPLAINTS ABOUT MR. SUAREZ AT THIS

25     MEETING?

1    A.   NO, SHE DID NOT.

2    Q.   DID MS. DANG MAKE ANY COMPLAINTS ABOUT DISCRIMINATION OR

3    HARASSMENT AT THIS MEETING?

4    A.   NO, SHE DID NOT.

5    Q.   DID MS. DANG MAKE ANY COMPLAINTS ABOUT MEAL AND REST

6    BREAKS AT THIS MEETING?

7    A.   NO.

8    Q.   AND YOU'RE -- ARE YOU FAMILIAR WITH MS. DANG'S APRIL 20TH,

9    2007, LETTER?

10   A.   YES.

11   Q.   AND BETWEEN THE DATE OF THAT LETTER, APRIL 20TH, 2007, AND

12   THE DATE OF THIS MEETING, OCTOBER 8TH, 2009, DID MS. DANG MAKE

13   ANY COMPLAINTS ABOUT MR. SUAREZ TO THE H.R. DEPARTMENT?

14   A.   NO, SHE DID NOT.

15   Q.   AND BETWEEN THE TIME THAT MS. DANG BECAME A FOOD SERVER

16   AND THE DAY OF THIS MEETING BEING OCTOBER 8TH, 2009, DID

17   MS. DANG, WAS SHE EVER CALLED IN TO H.R. TO DISCUSS ANYTHING?

18   A.   I DON'T BELIEVE SO, NO.

19   Q.   NOW, DID MS. DANG EVER MAKE A COMPLAINT ABOUT YOU TO

20   BAY 101?

21   A.   YES, SHE DID.

22   Q.   AND WHAT WAS THE NATURE OF THIS COMPLAINT?

23   A.   I DON'T KNOW THE EXACT NATURE.  I WAS JUST TOLD THAT A

24   COMPLAINT WAS MADE.

25   Q.   AND WERE YOU TOLD WHO MADE THE COMPLAINT?

1    A.   YES.  MR. WERNER INFORMED MR. ORTEGA AND MYSELF THAT

2    MS. DANG HAD MADE A COMPLAINT ABOUT BOTH OF US.

3    Q.   AND DO YOU KNOW WHAT FORM THIS COMPLAINT CAME IN?

4    A.   I BELIEVE HE SAID HE RECEIVED A LETTER.

5    Q.   AND HAVE YOU EVER SEEN THIS LETTER?

6    A.   NO, I HAVE NOT.

7    Q.   DID MR. ORTEGA TELL YOU ANY DETAILS OF THE LETTER?

8    A.   NO.  HE JUST TOLD US THAT A COMPLAINT HAD BEEN MADE AND WE

9    WERE NOT TO RETALIATE AGAINST MS. DANG, AND HE WAS HIRING AN

10   INVESTIGATOR TO LOOK INTO THE ALLEGATIONS.

11   Q.   AND WAS AN INVESTIGATOR HIRED TO LOOK INTO THE

12   ALLEGATIONS?

13   A.   YES.

14   Q.   WERE YOU INVOLVED IN HIRING THE INVESTIGATOR?

15   A.   NO, I WAS NOT.

16   Q.   DO YOU REMEMBER THE INVESTIGATOR'S NAME?

17   A.   I BELIEVE IT WAS CAROLE EDMAN.

18   Q.   AND WHAT WAS THE PURPOSE OF MS. EDMAN'S INVESTIGATION?

19   A.   SHE WAS TO LOOK INTO MS. DANG'S ALLEGATIONS.

20   Q.   AND APPROXIMATELY WHEN DID THIS INVESTIGATION TAKE PLACE?

21   A.   I BELIEVE NOVEMBER 2009.

22   Q.   AND WERE YOU ASKED TO ASSIST IN ANY PART OF THE

23   INVESTIGATION?

24   A.   I WAS ASKED TO COOPERATE WITH THE INVESTIGATOR.  I PULLED

25   FILES THAT SHE REQUESTED.  I SET APPOINTMENTS WITH EMPLOYEES

1    THAT SHE WANTED TO SEE.

2    Q.   AND DID YOU REVIEW ANY OF THESE DOCUMENTS WITH MS. EDMAN?

3    A.   NO, I DID NOT.

4    Q.   DID YOU DISCUSS ANY OF THE DOCUMENTS WITH MS. EDMAN?

5    A.   NO, I DID NOT.

6    Q.   WHEN YOU CONTACTED EMPLOYEES TO MEET WITH MS. EDMAN, WHAT

7    DID YOU SAY TO THEM?

8    A.   SHE HAD GIVEN ME A SCRIPT THAT I WAS BASICALLY TO TELL

9    THEM THAT A COMPLAINT HAD BEEN FILED BY A COWORKER AND THEIR

10   NAME HAD BEEN MENTIONED AND THEY WERE NOT IN TROUBLE AND I GAVE

11   THEM THE DATE AND TIME OF THE MEETING.

12   Q.   DID YOU TELL ANY OF THESE EMPLOYEES WHAT TO SAY TO

13   MS. EDMAN?

14   A.   NO, I DID NOT.

15   Q.   OKAY.  AND HAVE YOU EVER SEEN MS. EDMAN'S INVESTIGATION

16   REPORT?

17   A.   NO, I HAVE NOT.

18   Q.   WERE YOU EVER TOLD ANY OF THE RESULTS OF THE REPORT?

19   A.   MR. WERNER MET WITH MR. SHAW, MR. ORTEGA, AND MYSELF, I

20   BELIEVE EARLY DECEMBER OR MID-DECEMBER, AND DISCUSSED SOME OF

21   THE FINDINGS WITH US.

22   Q.   AND WHO IS MR. SHAW AGAIN?

23   A.   MR. SHAW IS THE DIRECTOR OF OPERATIONS, OR HE WAS AT THE

24   TIME.

25   Q.   OKAY.  AND WAS HE MR. ORTEGA'S SUPERVISOR?

1      A.   HE WAS HIS DIRECT REPORT, YES.

2      Q.   OKAY.  AND WHAT HAPPENED DURING THIS MEETING?

3      A.   MR. WERNER TOLD US THAT HE WANTED US TO SET UP A MEETING

4      WITH MS. DANG.  HE GAVE US AN OUTLINE OF WHAT WAS TO BE

5      DISCUSSED, WHICH WERE BASICALLY THE FINDINGS OF THE

6      INVESTIGATOR, THAT SHE FOUND MOST ALLEGATIONS WERE UNFOUNDED,

7      AND THEN WE WERE SUPPOSED TO MOVE ON TO HER OUTSTANDING

8      PERFORMANCE ISSUES.

9      Q.   AND DID MR. WERNER TELL YOU HOW TO PROCEED OR DID HE GIVE

10     YOU ANY INSTRUCTIONS WITH REGARD TO MR. ORTEGA?

11     A.   YES.  I WAS TO SET UP SUPERVISORY TRAINING WITH MR. ORTEGA

12     AND MR. ORTEGA WAS TOLD TO BASICALLY STOP BANTERING WITH

13     MAMA ANH IN THE KITCHEN.

14     Q.   OKAY.  AND DID MR. WERNER TELL YOU HOW TO PROCEED WITH

15     MS. DANG?

16     A.   YES.  ALL THREE OF US WERE TO SET UP A MEETING TO MEET

17     WITH MS. DANG.

18     Q.   DO YOU KNOW WHY MR. WERNER WANTED MR. SHAW TO ATTEND THE

19     MEETING WITH MS. DANG?

20     A.   I BELIEVE IT WAS BECAUSE MS. DANG COMPLAINED ABOUT MEETING

21     WITH ME AND MR. ORTEGA AND SO HE WANTED SOMEBODY ELSE PRESENT.

22              MS. MURAKAMI:  CINDY, COULD YOU PLEASE SHOW

23     EXHIBIT 1014, BAY 51 ALREADY IN EVIDENCE.

24     Q.   DO YOU RECOGNIZE THIS DOCUMENT?

25     A.   YES.  IT'S THE OUTLINE THAT MR. WERNER BROUGHT TO THAT

1    MEETING.

2    Q.   COULD WE GO TO 1751, PLEASE.

3         AND DO YOU RECOGNIZE THIS DOCUMENT?

4    A.   YES.  IT'S THE COUNSELLING MEMO THAT I USED TO DETAIL THE

5    AREAS OF PERFORMANCE THAT NEEDED TO BE IMPROVED BY MS. DANG.

6    Q.   AND NOW, WAS THIS COUNSELLING MEMO MEANT TO BE

7    DISCIPLINARY?

8    A.   NO, IT WAS NOT.

9    Q.   AND SO WHY IS THE WARNING BOX CHECKED OFF?

10   A.   THAT WAS AN ERROR ON MY PART.  I -- THESE ARE STORED IN MY

11   COMPUTER.  I NO LONGER HAVE A BLANK ONE, SO I TYPICALLY PULL UP

12   AN OLD ONE AND SAVE IT UNDER A NEW NAME AND RETYPE IT AND I

13   NEGLECTED TO UNCHECK THAT BOX.

14   Q.   NOW, WAS MR. ORTEGA SUPPOSED TO NOTIFY MS. DANG OF THE

15   MEETING?

16   A.   YES, YES, HE WAS.

17   Q.   AND DO YOU KNOW HOW FAR IN ADVANCE HE WAS SUPPOSED TO GIVE

18   HER NOTICE OF THE MEETING?

19   A.   I BELIEVE HE WAS SUPPOSED TO COME TO WORK A LITTLE EARLIER

20   THAN NORMAL THAT MORNING TO TELL MS. DANG THAT SHE NEEDED TO

21   REPORT AT THE END OF HER SHIFT, 7:00 A.M.

22   Q.   AND HOW LONG WAS THIS MEETING SUPPOSED TO LAST?

23   A.   IT WAS SUPPOSED TO BE SHORT, ABOUT TEN MINUTES.

24   Q.   AND WOULD THIS MEETING, THE TIME SPENT ON THIS MEETING

25   HAVE COUNTED TOWARDS MS. DANG'S WORK HOURS THAT DAY?

1    A.   YES.

2    Q.   WOULD MS. DANG HAVE BEEN ELIGIBLE FOR OVERTIME PAY IF THE

3    MEETING CAUSED HER TO WORK MORE THAN EIGHT HOURS THAT DAY?

4    A.   YES.

5    Q.   DID YOU FEEL AN INTERPRETER WOULD BE NECESSARY FOR THIS

6    MEETING?

7    A.   NO.

8    Q.   DID YOU HAVE ANY PROBLEMS UNDERSTANDING MS. DANG IN THE

9    PAST?

10   A.   NO.

11   Q.   SO DID YOU GO TO WORK ON DECEMBER 21ST, 2009?

12   A.   YES.

13   Q.   AND IS THAT THE DAY OF THE MEETING WITH MS. DANG,

14   MR. ORTEGA, AND MR. SHAW?

15   A.   YES.

16   Q.   AND DID THIS PLANNED MEETING TAKE PLACE?

17   A.   NO, IT DID NOT.

18   Q.   AND HOW WERE YOU INFORMED THAT THE MEETING WOULD TAKE

19   PLACE?

20   A.   WHEN I ARRIVED AT WORK THAT MORNING, I CALLED MR. ORTEGA

21   AND HE INFORMED ME THAT MS. DANG WOULD NOT BE ATTENDING THE

22   MEETING.

23        HE SAID THAT HE HAD LEFT ME A VOICEMAIL ON MY CELL PHONE

24   AND I HADN'T SEEN IT.

25   Q.   OKAY.  AND WAS MS. DANG TERMINATED ON THAT SAME DAY?

1    A.   YES, SHE WAS.

2    Q.   AND WHO MADE THE DECISION TO TERMINATE HER?

3    A.   MR. WERNER DID.

4    Q.   AND DID HE TELL YOU WHY MS. DANG WAS BEING TERMINATED?

5    A.   HE SAID THAT HE FELT HER NOT ATTENDING THE MEETING WAS JOB

6    ABANDONMENT.

7    Q.   AND AS HEAD OF H.R., WERE YOU RESPONSIBLE FOR PROCESSING

8    HER TERMINATION PAPERWORK?

9    A.   YES, I WAS.

10   Q.   WHAT STEPS DID YOU TAKE TO PROCESS HER TERMINATION?

11   A.   I HAD THE PAYROLL CLERK CUT HER FINAL PAYCHECK; I FILLED

12   OUT THE TERMINATION PACKET; I ENCLOSED HER FINAL PAYCHECK AND

13   UNEMPLOYMENT PACKET AND A LETTER INDICATED HER STATUS AS

14   TERMINATED WITH THAT DATE AND SIGNED THAT AND PUT ALL OF THAT

15   IN A FEDEX ENVELOPE AND SENT IT OUT OVERNIGHT.

16   Q.   OKAY.  ALL RIGHT.  HERE YOU GO.

17        WOULD YOU PLEASE TURN TO TAB 11.

18   A.   ALL RIGHT.

19            MR. MCMANIS:  I'M SORRY.  WHAT WAS THAT?

20            MS. MURAKAMI:  11.

21            MR. MCMANIS:  THANK YOU.

22   BY MS. MURAKAMI:

23   Q.   DO YOU RECOGNIZE THAT DOCUMENT?

24   A.   YES, I DO.

25   Q.   AND WHAT IS IT?

1    A.   IT IS THE STATUS CHANGE FORM FOR MS. DANG FOR

2    DECEMBER 2009.

3    Q.   AND DID YOU PREPARE THIS DOCUMENT?

4    A.   YES, I DID.

5    Q.   AND WAS THIS SENT TO MS. DANG?

6    A.   NO.

7    Q.   IS THIS FOR BAY 101'S RECORDS?

8    A.   YES, THIS WAS FOR THE PERSONNEL FILE.

9         MS. MURAKAMI:  OKAY.  YOUR HONOR, I MOVE EXHIBIT 11

10   INTO EVIDENCE.

11        MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

12        THE COURT:  11 IS RECEIVED.

13   (DEFENDANT'S EXHIBIT 11 WAS RECEIVED IN EVIDENCE.)

14        MS. MURAKAMI:  CAN WE JUST SHOW THAT QUICKLY FOR THE

15   JURY?

16   Q.   AND UNDER REMARKS THERE, WHAT IS WRITTEN?

17   A.   JOB ABANDONMENT.

18   Q.   AND IS THAT THE REASON THAT MR. WERNER TERMINATED

19   MS. DANG?

20   A.   YES.

21   Q.   OKAY.  SORRY.  WE'RE GOING TO HAVE TO KEEP SWITCHING HERE.

22   I'LL GET IT FOR YOU.

23        PLEASE TURN TO EXHIBIT 1001, BAY 1330.

24   A.   OKAY.

25   Q.   IT'S ALREADY IN EVIDENCE.

1          CINDY, COULD YOU PLEASE PUT THIS UP, AND BLOW UP THE

2    REMARKS.

3          AND DO YOU RECOGNIZE THIS DOCUMENT?

4    A.   YES.

5    Q.   AND WHAT IS THIS DOCUMENT?

6    A.   IT'S A COUNSELLING MEMO FOR MS. DANG INDICATING DISCHARGE,

7    AND THE DATE IS DECEMBER 21ST, 2009.

8    Q.   AND WHO PREPARED THIS DOCUMENT?

9    A.   MR. ORTEGA, I BELIEVE, HAD HIS SECRETARY PREPARE IT.

10   Q.   AND DO YOU KNOW WHY THIS SAYS INSUBORDINATION WHILE THE

11   OTHER MEMO THAT WE JUST LOOKED AT SAYS JOB ABANDONMENT?

12   A.   I ASKED MR. ORTEGA TO PREPARE THE FINAL COUNSELLING MEMO.

13   I DID NOT TELL HIM TO PUT JOB ABANDONMENT.  I DIDN'T MENTION

14   THAT TO HIM.  SO HE CHOSE TO PUT INSUBORDINATION.

15   Q.   OKAY.  WAS THERE ANY OTHER PAPERWORK THAT YOU PROCESSED

16   FOR MS. DANG'S TERMINATION?

17   A.   OTHER THAN THE TERM PACKET?

18   Q.   YES.

19   A.   NO.

20   Q.   OKAY.  LET ME JUST SHOW YOU ONE LAST EXHIBIT.

21        COULD YOU PLEASE TURN TO TAB 10.

22   A.   OKAY.

23   Q.   DO YOU RECOGNIZE THIS EXHIBIT?

24   A.   YES.  IT'S AN UNEMPLOYMENT INSURANCE SERVICES TERMINATION

25   REPORT.

1    Q.   AND IS THIS SENT TO ANYBODY?

2    A.   YEAH.  WE RETAIN EMPLOYERS GROUP TO HANDLE OUR

3    UNEMPLOYMENT CLAIMS, SO ANY TIME THERE'S A TERMINATION, THIS

4    FORM IS FILLED OUT AND FAXED TO THEM.

5    Q.   SO THIS IS A STANDARD FORM THAT YOU ALWAYS FILL OUT WHEN

6    SOMEONE IS TERMINATED?

7    A.   IT'S PART OF THE TERM PACKET.

8             MS. MURAKAMI:  YOUR HONOR, I OFFER EXHIBIT 10.

9             MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

10            THE COURT:  10 IS RECEIVED.

11            MS. MURAKAMI:  THANK YOU.

12       (DEFENDANT'S EXHIBIT 10 WAS RECEIVED IN EVIDENCE.)

13   BY MS. MURAKAMI:

14   Q.   SO MOVING ON TO A NEW TOPIC.

15       WAS MS. DANG DISCIPLINED 2007 FOR AN ABSENTEEISM EVENT?

16   A.   YES, SHE WAS.

17   Q.   COULD YOU PLEASE TURN AGAIN TO 1001, BAY 1342 ALREADY IN

18   EVIDENCE.

19       CINDY, COULD YOU PLEASE PUT UP BAY 1342?

20   A.   OKAY.  I HAVE IT.

21   Q.   OKAY.  AND DO YOU RECOGNIZE THIS DOCUMENT?

22   A.   YES.  IT'S A COUNSELLING MEMO FOR MS. DANG DATED

23   JANUARY 6TH, 2007.

24   Q.   AND ACCORDING TO THIS MEMO, WHY WAS MS. DANG GIVEN WHAT

25   LOOKS LIKE A CORRECTION?

1    A.    YES.  SHE WAS LATE FOR WORK.

2    Q.    AND WHO WOULD HAVE GIVEN MS. DANG THIS CORRECTION?

3    A.    MR. ORTEGA.

4    Q.    AND WHAT IS A CORRECTION?

5    A.    IT'S A DOCUMENTED ORAL WARNING.

6    Q.    AND DO YOU HAVE TO BE CONSULTED BEFORE A SUPERVISOR GIVES

7    AN EMPLOYEE A VERBAL WARNING?

8    A.    NO, I DO NOT.

9    Q.    AND IS THIS ORAL WARNING CONSISTENT WITH BAY 101'S

10   POLICIES REGARDING TARDINESS?

11   A.    YES, IT IS.

12   Q.    PLEASE FLIP TO BAY 1341 WITHIN EXHIBIT 1001.

13   A.    OKAY.

14   Q.    AND SO WE LOOKED AT THIS YESTERDAY WITH PLAINTIFF'S

15   COUNSEL.

16         AND DO YOU RECOGNIZE THIS DOCUMENT?

17   A.    YES.  IT'S ANOTHER COUNSELLING MEMO FOR MS. DANG.

18   Q.    AND WHAT KIND OF ACTION IS BEING TAKEN UNDER THIS MEMO?

19   A.    SUSPENSION.

20   Q.    AND WHAT IS THE REASON?

21   A.    NO CALL, NO SHOW FOR THREE DAYS.

22   Q.    OKAY.  AND WITHOUT TELLING ME THE OUTCOME, DID MS. DANG

23   GRIEVE THIS SUSPENSION?

24   A.    YES, SHE DID.

25   Q.    AND COULD YOU PLEASE FLIP TO BAY 1340.

1    A.   OKAY.

2              MS. MURAKAMI:  CINDY, COULD YOU PLEASE PUT UP 1340?

3    THANK YOU.

4    Q.   AND DO YOU RECOGNIZE THIS DOCUMENT?

5    A.   YES.  IT'S ANOTHER COUNSELLING MEMO FOR MS. DANG.

6    Q.   AND WHAT ACTION IS BEING TAKEN UNDER THIS MEMO?

7    A.   IT'S A SUSPENSION FOR AN UNEXCUSED ABSENCE.

8    Q.   AND ACCORDING TO THIS MEMO, WHAT ARE THE CIRCUMSTANCES OF

9    THE UNEXCUSED ABSENCE?

10   A.   IT SAYS ON FEBRUARY 11TH, 2007, CUC CALLED IN SICK TO

11   SUPERVISOR JOSE SOLIS.  HE ASKED HER TO BRING A DOCTOR'S NOTE.

12   SHE SAID SHE WAS GOING TO DOCTOR ON MONDAY.

13        AND THEN IT SAYS, "I ASKED HER FOR DOCTOR'S NOTE ON

14   WEDNESDAY, 2-14-07 AND SHE SAID SHE DIDN'T GO.  SHE DID NOT

15   HAVE A DOCTOR'S NOTE."

16   Q.   AND WAS THIS SUSPENSION CONSISTENT WITH BAY 101'S

17   POLICIES?

18   A.   YES.

19   Q.   OKAY.  I WANT TO TALK ABOUT MR. ORTEGA QUICKLY.

20        HAS ANY EMPLOYEE EVER COMPLAINED TO YOU ABOUT BEING

21   TREATED UNFAIRLY BY MR. ORTEGA BECAUSE HE OR SHE IS VIETNAMESE?

22   A.   NO.

23   Q.   AND HAS ANY EMPLOYEE EVER COMPLAINED TO YOU ABOUT BEING

24   SUBJECTED TO DEROGATORY REMARKS BECAUSE HE OR SHE IS

25   VIETNAMESE, BY MR. ORTEGA THAT IS?

1    A.   NO.

2    Q.   AND HAS ANY FEMALE EMPLOYEE COMPLAINED TO YOU ABOUT BEING

3    TREATED UNFAIRLY BY MR. ORTEGA BECAUSE SHE'S A WOMAN?

4    A.   NO.

5         MS. MURAKAMI:  YOUR HONOR, MAY I HAVE ONE MINUTE

6    WITH MY COUNSEL?

7         THE COURT:  SURE.

8       (PAUSE IN PROCEEDINGS.)

9         MS. MURAKAMI:  THAT'S ALL.  THANK YOU.

10        THE COURT:  ALL RIGHT.  MS. NGUYEN, DO YOU HAVE SOME

11   QUESTIONS?

12        MS. NGUYEN:  YES, YOUR HONOR.  THANK YOU, YOUR

13   HONOR.

14                 **AS-ON RECROSS-EXAMINATION**

15   BY MS. NGUYEN:

16   Q.   WE WOULD LIKE TO GO BACK TO SOME OF THE VIDEOTAPES.

17   A.   SO WOULD YOU LIKE ME UP THERE?

18   Q.   YES.  I'M SORRY.

19        WE'RE GOING TO GO TO CLIP 2, WHICH I BELIEVE IS

20   EXHIBIT 553.

21        CAN YOU HEAR ME OKAY, MS. GILBERT?

22   A.   YES.

23   Q.   AND YOU CAN HEAR ME?

24        ALL RIGHT.  SO I'D LIKE TO JUST GO THROUGH THIS REALLY

25   QUICKLY AND ASK YOU SOME QUESTIONS ABOUT IT.  I KNOW THAT WE

1    HAVE GONE THROUGH IT BEFORE.

2          ANDRE, PLEASE PLAY.

3          (VIDEO PLAYING.)

4    BY MS. NGUYEN:

5    Q.   SO THIS IS MS. DANG BRINGING THE DRINKS TO THE CUSTOMER,

6    RIGHT?

7    A.   YES.

8          (VIDEO PLAYED.)

9    BY MS. NGUYEN:

10   Q.   HE'S PAYING HER, RIGHT?

11   A.   YES.

12   Q.   AND NOW HE'S TAKING AN SIP OF THE DRINK THAT SHE JUST

13   BROUGHT HIM?

14   A.   YES.

15   Q.   SHE'S GIVING HIM CHANGE?

16   A.   CORRECT.

17   Q.   AND HE WENT BACK TO PLAY?

18   A.   CORRECT.

19   Q.   HE DIDN'T SAY ANYTHING ABOUT HER HAVING BROUGHT HIM THE

20   WRONG DRINK, DID HE?

21   A.   AT THAT TIME, NO.

22   Q.   NOW, THE NEXT CLIP THAT YOU HAD, CLIP NUMBER 3, STARTED AT

23   00:06:10.  THAT'S CLIP NUMBER 3, DEFENSE EXHIBIT.

24         WHAT I'D LIKE TO SHOW NOW IS WHAT HAPPENED IN BETWEEN 2

25   AND 3 THAT WASN'T SHOWN EARLIER.

1        AND SO TO DO THAT WE'RE GOING TO GO TO EXHIBIT, THE ENTIRE

2   VIDEO, WHICH WAS EXHIBIT 20 -- 1017.

3        AND I'D LIKE TO SHOW THE CLIP THAT WAS IN BETWEEN CLIP 2

4   AND CLIP 3 THAT YOU SAW EARLIER.

5        SO WE'RE LOOKING AT 23:57 TO 23:58.

6        SO THIS IS WHERE THE CUSTOMER TOOK THE FIRST SIP?

7        (VIDEO PLAYED.)

8   BY MS. NGUYEN:

9   Q.   AND MS. DANG WALKED AWAY.  SO THAT WAS THE END OF THE LAST

10  CLIP?

11  A.   CORRECT.

12  Q.   DO YOU SEE HIM TAKING ANOTHER SIP OF THE DRINK?

13  A.   YES.

14       (VIDEO PLAYED.)

15  BY MS. NGUYEN:

16  Q.   AND NOW HE'S TAKING ANOTHER SIP.  DO YOU SEE THAT?

17  A.   YES.

18  Q.   AND NOW THIS IS THE FOURTH SIP THAT HE HAS TAKEN?

19  A.   YES.

20  Q.   AND YOU DON'T SEE HIM TRYING TO SIGNAL TO ANY OF THE

21  SERVERS TO TRY TO GET HIM A DIFFERENT DRINK BECAUSE IT WAS THE

22  WRONG DRINK; CORRECT?

23  A.   I DON'T BELIEVE A SERVER HAD BEEN ON THE FLOOR PRIOR TO

24  THAT.  I DIDN'T NOTICE ANOTHER SERVER.

25  Q.   BUT HE DRANK IT FOUR TIMES?

1    A.   YES.

2    Q.   AND THIS IS MS. DANG COMING BACK.  DO YOU SEE THAT?

3         AND HE DIDN'T ASK HER FOR A NEW DRINK?  HE DIDN'T SAY WHAT

4    SHE BROUGHT HIM WAS WRONG?

5    A.   THIS IS -- I TURNED TOWARD YOU, SO I'M NOT SURE WHETHER

6    YOU RESTARTED THIS VIDEO OR WHETHER WE'RE WATCHING IT FROM THE

7    SAME.

8    Q.   OKAY.

9         CAN YOU STOP THAT, PLEASE, ANDRE?

10        SO DURING THE CLIP THAT WAS BETWEEN THE FIRST AND SECOND

11   CLIP THAT WAS SHOWN EARLIER WHEN YOU WERE TALKING WITH YOUR

12   COUNSEL, THE CUSTOMER TOOK FOUR MORE SIPS; CORRECT?

13   A.   RIGHT, I SAW THAT.

14   Q.   AND HE WASN'T SIGNALLING TO ANYBODY, OR HE WASN'T LOOKING

15   TO FIND ANYBODY TO SAY THAT THEY HAD BROUGHT HIM THE WRONG

16   DRINK; CORRECT?

17   A.   WELL, I BELIEVE I SAW HIM LOOK AROUND A FEW TIMES, BUT I

18   ALSO DIDN'T SEE ANY OTHER FOOD SERVER WALK IN THAT AREA DURING

19   THAT TIMEFRAME.

20   Q.   AND EARLIER, I THINK WITH THE CLIP NUMBER 4, YOU SAW THE

21   CUSTOMER PAY LINDA FOR THE NEW ORDER -- THE NEW DRINK THAT SHE

22   BROUGHT HIM?

23        I'M SORRY.  DO YOU REMEMBER SEEING THAT?

24   A.   CORRECT.  SHE WOULD HAVE BEEN REQUIRED TO GET PAYMENT.

25   Q.   AND ISN'T IT TRUE, MS. GILBERT, THAT IF IT WAS THE WRONG

1    ORDER THAT THEY SHOULD HAVE JUST REPLACED THE ORDER FOR HIM?

2    A.   OKAY.  SO BECAUSE LINDA WAS A DIFFERENT FOOD SERVER, SHE

3    WOULD HAVE TO RING THE SECOND DRINK UP IN THE POS SYSTEM TO GET

4    IT FROM THE BARTENDER, SO NOW SHE HAS A SALE ON HER RECORD.

5         SHE WOULD HAVE TO GO APPROACH MS. DANG AND HAVE MS. DANG

6    GET HER TICKET VOIDED IN ORDER TO REFUND THE CUSTOMER.

7    Q.   AND IS THAT SOMETHING THAT IS BROUGHT TO A CASINO SHIFT

8    MANAGER'S ATTENTION SO THAT HE COULD HELP WITH THE VOID?

9    A.   YES.  THE CASINO SHIFT MANAGERS ARE SUPPOSED TO AUTHORIZE

10   VOIDS.

11        MS. NGUYEN:  AND I'D LIKE, ANDRE, PLEASE, TO GO BACK

12   TO CLIP NUMBER 6.

13        (VIDEO PLAYED.)

14   BY MS. NGUYEN:

15   Q.   SO, MS. GILBERT, YOU WATCHED THIS AND YOU DIDN'T HEAR

16   ANYTHING ON THE AUDIO, AND FROM WHAT YOU SAW YOU'RE SAYING THAT

17   MS. DANG WAS ARGUING WITH THE CUSTOMER?

18   A.   I BELIEVE I SAID THAT THE SECOND TIME SHE APPROACHED THE

19   TABLE.

20   Q.   LET'S WATCH IT.

21        (VIDEO PLAYING.)

22   BY MS. NGUYEN:

23   Q.   DID YOU EVER ASK MS. DANG WHAT SHE WAS DOING?

24   A.   I DID TALK TO HER ON THURSDAY, THE 8TH, WHEN WE GAVE HER

25   THE COUNSELLING MEMO.  I GAVE HER AMPLE OPPORTUNITY TO TELL US

1    WHAT HAPPENED.

2    Q.   AND DID YOU HAVE AN INTERPRETER THERE TO HELP HER?

3    A.   NO, I DID NOT.

4    Q.   SO DO YOU SEE MS. ELIAS ALSO GESTURING?  DOESN'T IT SEEM

5    LIKE SHE WAS ALSO ARGUING?

6    A.   IT LOOKS LIKE SHE WAS TALKING WITH HER HANDS.

7    Q.   SO WHEN MS. DANG IS TALKING WITH HER HANDS, YOU THINK THAT

8    SHE'S ARGUING, BUT WHEN MS. ELIAS IS TALKING WITH HER HANDS,

9    YOU DON'T THINK SHE'S ARGUING?

10   A.   NOBODY EVER ASKED ME ABOUT MS. DANG'S HANDS.

11        I WAS ASKED WHAT I SAW.  I SAW MS. DANG TAKE A NOTE PAD

12   OUT OF HER APRON AND APPEARED TO BE POINTING AT IT AND

13   DISCUSSING IT WITH THE CUSTOMER.

14   Q.   OKAY.  SO DISCUSSING IS ARGUING?

15   A.   I DON'T BELIEVE THAT I SAID THAT MS. DANG LOOKED TO BE

16   ARGUING WITH THE CUSTOMER IN THIS CLIP.

17        I BELIEVE I STATED THAT IN THE SECOND CLIP WHERE SHE

18   APPROACHED THE TABLE THE SECOND TIME.

19   Q.   WOULD THAT HAVE BEEN CLIP 8, THE LAST CLIP?

20   A.   IT WAS THE SECOND TIME THAT SHE APPROACHED THE TABLE.

21   Q.   COULD WE SHOW THE CLIP 8, PLEASE?

22        DID MS. DANG EXPLAIN TO YOU THAT SHE WAS TRYING TO GET AN

23   ORDER FROM THE CUSTOMER'S FRIEND WHO WAS STANDING?

24   A.   NO, SHE DID NOT.

25   Q.   ISN'T THAT THE CUSTOMER TIPPING MS. DANG?

1    A.   I'M SORRY.  I TURNED AWAY.

2    Q.   OKAY.  COULD WE GO BACK A LITTLE BIT, ANDRE.  GO BACK A

3    LITTLE BIT MORE.  ISN'T -- I'M SORRY.

4    A.   I'M SORRY.  I WON'T TURN AWAY.

5         (VIDEO PLAYED.)

6    BY MS. NGUYEN:

7    Q.   ISN'T THAT THE CUSTOMER TIPPING MS. DANG?

8    A.   I SEE HIM PUTTING HIS HAND OUT.  I DON'T KNOW WHAT HE'S

9    DOING.

10   Q.   RIGHT THERE (INDICATING)?

11   A.   HE APPEARS TO BE EXTENDING HIS ARM OUT.  I DON'T KNOW

12   WHETHER THAT'S A TIP OR NOT.

13   Q.   AND YOU NEVER ASKED MS. DANG ABOUT IT THOUGH, DID YOU?

14   A.   ABOUT THAT MOTION?

15   Q.   ABOUT WHAT HAPPENED WITH THE CUSTOMER.

16   A.   YES, WE ASKED HER WHAT HAPPENED WITH THE INCIDENT IN

17   TOTAL.  WE DID NOT -- WE WERE NOT WATCHING THE VIDEO AT THE

18   TIME, SO WE WERE NOT ASKING THEM ABOUT INDIVIDUAL CLIPS.

19   Q.   AND DIDN'T SHE TELL YOU THAT THE CUSTOMER WAS NOT UNHAPPY

20   WITH HER AND HE WAS TIPPING HER?

21   A.   I DON'T BELIEVE THAT SHE MENTIONED THAT HE TIPPED HER.

22        SHE DID SAY THAT SHE AND THE CUSTOMER WERE TALKING IN

23   VIETNAMESE, I BELIEVE.

24   Q.   AND DO YOU SEE THAT THERE'S -- THAT THERE'S THAT DEALER

25   WEARING THE WHITE SHIRT STANDING NEXT TO THE CUSTOMER, TO THE

1    CUSTOMER'S RIGHT AT THE SAME TABLE WHERE THE CUSTOMER IS

2    SITTING?

3    A.   HE'S SEATED.  HE'S NOT STANDING.  HE'S SEATED.

4    Q.   NEXT TO THE CUSTOMER, RIGHT?

5    A.   RIGHT HERE (INDICATING).

6    Q.   RIGHT.  AND DID ANYONE TALK TO THE DEALER TO ASK HIM WHAT

7    HAPPENED?

8    A.   NO.

9    Q.   THAT'S IT.  THANK YOU VERY MUCH.  YOU CAN GO BACK TO THE

10   WITNESS STAND.

11        MS. GILBERT, BACK IN APRIL OF 2007 WHEN YOU HAD THAT

12   MEETING WITH MS. DANG TO TALK ABOUT THE COMPLAINTS THAT SHE

13   MADE AGAINST LUCIO SUAREZ, DO YOU REMEMBER THAT?

14   A.   YES.

15   Q.   YOU HAD AN INTERPRETER THERE FOR HER, DIDN'T YOU?

16   A.   I HAD MS. MINH VU SIT IN, YES.

17   Q.   AND IT WAS BECAUSE YOU WANTED TO MAKE SURE THAT MS. DANG

18   COULD UNDERSTAND WHAT WAS BEING COMMUNICATED TO HER?

19   A.   YES.

20   Q.   AND FOR HER TO BE ABLE TO COMMUNICATE TO YOU HER SIDE OF

21   THE STORY?

22   A.   WELL, IT WAS MORE TO MAKE SURE THAT SHE UNDERSTOOD ME.

23   Q.   YOU DIDN'T CARE ABOUT HER SIDE OF THE STORY?

24   A.   NO.  I DIDN'T HAVE A PROBLEM UNDERSTANDING MS. DANG.

25   Q.   SO SHE -- YOU COULD UNDERSTAND HER, BUT SHE COULDN'T

1    UNDERSTAND YOU?

2    A.   I JUST WANTED TO MAKE SURE THAT SHE COULD UNDERSTAND ME.

3    Q.   AND ISN'T IT TRUE THAT AS PART OF THE PERFORMANCE

4    IMPROVEMENT PLANS THAT MR. WERNER HAD PROPOSED FOR MS. DANG IN

5    DECEMBER OF 2009, THAT A VIETNAMESE SERVER WAS GOING TO BE

6    ASSIGNED TO HELP HER SO THAT SHE COULD UNDERSTAND WHAT WAS

7    EXPECTED OF HER?

8    A.   SHE WAS SUPPOSED TO TRAIN WITH TWO SEPARATE FOOD SERVERS.

9    ONE WAS SUPPOSED TO SPEAK HER LANGUAGE, YES.

10   Q.   BUT WHEN YOU MET WITH MS. DANG IN OCTOBER OF 2009 TO

11   EXPLAIN TO HER THAT SHE WAS BEING SUSPENDED, YOU DIDN'T HAVE

12   ANYBODY THERE TO HELP HER UNDERSTAND WHAT WAS HAPPENING TO HER?

13   A.   I DIDN'T FEEL ONE WAS NEEDED AND SHE DID NOT REQUEST ONE.

14   Q.   ISN'T IT TRUE THAT SHE TRIED TO EXPLAIN TO YOU WHAT

15   HAPPENED, BUT YOU DIDN'T LET HER EXPLAIN?

16   A.   NO.  I LET HER EXPLAIN.

17   Q.   AND ISN'T IT TRUE THAT FOR THE DECEMBER 2009 MEETING THERE

18   WAS ALSO NO TRANSLATOR WHO WAS GOING TO BE PRESENT?

19   A.   THAT'S CORRECT.

20   Q.   SO YOU DIDN'T CARE WHETHER OR NOT SHE COULD UNDERSTAND

21   WHAT WAS BEING EXPLAINED TO HER?

22   A.   I'M NOT SAYING I DIDN'T CARE.

23        THE FEELING WAS THAT A TRANSLATOR WAS NOT NEEDED.

24   Q.   AND THAT MEETING WAS SUPPOSED TO BE -- TO EXPLAIN TO

25   MS. DANG THE RESULTS OF THE INVESTIGATION INTO HER COMPLAINTS

1    AGAINST YOU AND MR. ORTEGA; CORRECT?

2    A.   CORRECT, AND TO ADDRESS OUTSTANDING JOB PERFORMANCE

3    ISSUES.

4    Q.   AND BAY 101, ITS POSITION IS THAT IT TOOK MS. DANG'S

5    COMPLAINTS SERIOUSLY; CORRECT?  AND IT WENT THROUGH THE PROCESS

6    OF HIRING AN INVESTIGATOR; CORRECT?

7    A.   CORRECT.

8    Q.   BUT IT DID NOT CARE WHETHER OR NOT SHE UNDERSTOOD WHAT THE

9    RESULTS OF THE INVESTIGATION WAS?

10           THE COURT:  WELL, IT'S GETTING ARGUMENTATIVE ABOUT

11   THE INTERPRETER.  WE'VE BEEN OVER THIS SAME POINT SEVERAL

12   TIMES.

13   BY MS. NGUYEN:

14   Q.   YOU STATED EARLIER, MS. GILBERT, THAT YOU AND MR. ORTEGA

15   WERE THE ONES WHO MADE THE DECISION TO SUSPEND MS. DANG BECAUSE

16   OF THE OCTOBER 2009 INCIDENT; CORRECT?

17   A.   CORRECT.

18   Q.   AND YOU DID THAT BASED ON THE REVIEW OF THE VIDEO?

19   A.   CORRECT.

20   Q.   PLUS THE STATEMENTS FROM LINDA ELIAS?

21   A.   CORRECT.

22   Q.   PLUS THE STATEMENT FROM ARLENE FONTILLAS?

23   A.   CORRECT.

24   Q.   AT THE TIME THAT YOU MADE THAT DECISION, YOU HAD NOT

25   RECEIVED A STATEMENT FROM MR. KEN MEAKCHAROON?

1    A.   I HAD NOT RECEIVED IT YET, NO.

2    Q.   AND DID YOU INVESTIGATE AND TALK TO HIM PRIOR TO MAKING

3    THAT DECISION?

4    A.   NO.

5    Q.   AND DO YOU KNOW, MS. GILBERT, THAT MR. MEAKCHAROON SAID

6    THAT HE HEARD BOTH MS. ELIAS AND MS. DANG ARGUING NEAR THE

7    EXPEDITER STATION?

8    A.   NO, I'M NOT AWARE OF THAT.

9    Q.   AND SO IF BOTH OF THEM WERE ARGUING, WHY WAS MS. ELIAS NOT

10   ALSO DISCIPLINED?

11   A.   OKAY.  I JUST TOLD YOU THAT I WAS NOT AWARE THAT HE SAID

12   THAT HE HAD HEARD BOTH OF THEM ARGUING.

13        MY UNDERSTANDING WAS THAT HE HEARD THAT IN THE KITCHEN,

14   NOT OUT ON THE FLOOR.

15   Q.   EARLIER WITH YOUR COUNSEL WE WENT THROUGH SOME OF THE

16   COUNSELLING MEMOS THAT MS. DANG HAD AGAINST HER BACK IN 2007

17   WITH RESPECT TO BEING LATE FOR WORK AND UNEXCUSED ABSENCES.

18        DO YOU REMEMBER THAT?

19   A.   CORRECT.

20   Q.   AND DO YOU KNOW WHETHER THOSE COUNSELLING MEMOS WERE PART

21   OF THE MEMOS THAT WERE INCLUDED IN MR. WERNER'S PERFORMANCE

22   IMPROVEMENT PLAN THAT WAS ON THE COUNSELLING MEMO FOR DECEMBER

23   OF 2009?

24   A.   I DON'T KNOW.

25   Q.   AND DO YOU KNOW WHETHER HE TOOK THAT INFORMATION FROM

1    COUNSELLING MEMOS IN HIS PERSONNEL FILES?

2    A.   I DON'T KNOW WHAT MR. WERNER USED TO PREPARE THAT OUTLINE.

3    Q.   HE DIDN'T CONSULT WITH YOU ON IT?

4    A.   NO, HE DID NOT.

5    Q.   AND, MS. GILBERT, EARLIER YOU TALKED ABOUT PREPARING THE

6    TERMINATION PAPER; CORRECT?

7    A.   CORRECT.

8    Q.   AND ACCORDING TO WHAT MR. WERNER TOLD YOU, MS. DANG WAS

9    BEING TERMINATED FOR JOB ABANDONMENT?

10   A.   THAT'S MY RECOLLECTION, YES.

11   Q.   AND IT WAS BECAUSE SHE DIDN'T STAY FOR THE MEETING;

12   CORRECT?

13   A.   CORRECT.

14   Q.   AND ISN'T IT TRUE, MS. GILBERT, THAT YOU YOURSELF, BEING

15   THE H.R. MANAGER, ARE NOT AWARE OF ANY EMPLOYEE HAVING BEEN

16   TERMINATED FOR REFUSING TO WORK OVERTIME?

17   A.   FOR REFUSING TO WORK OVERTIME?

18   Q.   YES.

19   A.   NOT THAT I CAN RECALL.

20   Q.   AND ISN'T IT TRUE THAT, IN YOUR CAPACITY AS AN H.R.

21   MANAGER AT BAY 101, THAT YOU ARE NOT AWARE OF ANY EMPLOYEE

22   BEING TERMINATED FOR NOT STAYING FOR A MEETING?

23   A.   NOT THAT I CAN REMEMBER, NO.

24   Q.   AND SO MS. DANG IS THE ONLY ONE?

25   A.   WELL, SHE'S THE ONLY ONE THAT I CAN RECALL THAT REFUSED TO

1    ATTEND A MEETING.

2    Q.   ARE YOU SAYING THAT THERE HAVE BEEN OTHER EMPLOYEES WHO

3    HAVE NEVER STAYED FOR A MEETING BECAUSE THEY HAD OTHER

4    OBLIGATIONS?

5    A.   NOT THAT I'M AWARE OF.

6    Q.   AND ARE YOU ALSO TESTIFYING THEN THAT THERE HAVE BEEN NO

7    EMPLOYEES AT BAY 101 WHOSE REFUSED TO WORK OVERTIME BECAUSE OF

8    PRIOR OBLIGATIONS?

9    A.   I'M NOT SAYING THAT, NO.  I WAS REFERRING TO MEETINGS.

10   Q.   OKAY.  BUT WITH RESPECT TO WORKING OVERTIME, YOU DON'T

11   KNOW OF ANY EMPLOYEE WHO WAS TERMINATED FOR REFUSING TO WORK

12   OVERTIME; CORRECT?

13   A.   NOT THAT I'M AWARE OF, NO.

14        MS. NGUYEN:  YOUR HONOR, THE PLAINTIFF HAS A NEW

15   EXHIBIT THAT WE WOULD LIKE TO HAVE MARKED AS 32.

16        THE COURT:  ALL RIGHT.

17   (PLAINTIFF'S EXHIBIT 32 WAS MARKED FOR IDENTIFICATION.)

18        MS. NGUYEN:  MAY I APPROACH THE WITNESS?

19        THE COURT:  YES.

20        MS. NGUYEN:  THANK YOU.

21   Q.   MS. GILBERT, I'VE JUST SHOWN YOU AN EXHIBIT THAT HAS BEEN

22   MARKED EXHIBIT 32 AND IT'S A TWO-PAGE EXHIBIT.  DO YOU SEE THE

23   TWO-PAGE EXHIBIT BEFORE YOU?

24   A.   YES.

25   Q.   AND DO YOU RECOGNIZE THOSE DOCUMENTS?

1    A.    YES.    THE FIRST ONE IS DATED JANUARY 18TH, 2007.    IT'S A

2    NOTE FROM MY PBX OPERATOR, ANA, TO MY H.R. CLERK, KATHY.    THEY

3    WORK SEPARATE SHIFTS.

4         IT SAYS, "JOHN ST. CROIX CALLED TODAY 2:45 P.M. REGARDING

5    CUC'S TERMINATION PAPERS AND HE SAID TO PUT IT ON HOLD BECAUSE

6    HE'S STILL THINKING WHAT TO DO ABOUT HER CASE."

7    Q.    SO BACK IN JANUARY OF 2007, MR. ST. CROIX WAS THINKING

8    ABOUT TERMINATING HER; CORRECT?

9    A.    THAT'S WHAT IT SOUNDS LIKE, YES.

10   Q.    AND THEN THE SECOND PAGE OF THAT DOCUMENT, OR OF THAT

11   EXHIBIT, CAN YOU PLEASE TELL US WHAT THAT IS?

12   A.    IT'S ON BAY 101 LETTERHEAD AND IT'S DATED JANUARY 22ND,

13   2007, AND IT IS NOTIFICATION TO THE UNION THAT MS. DANG'S

14   EMPLOYMENT HAS BEEN ACTIVATED, SHE'S NOT BEEN TERMINATED AFTER

15   ALL, AND IT IS SIGNED BY KATHY SIMS AND THAT WAS MY H.R. CLERK

16   AT THE TIME.

17   Q.    SO MR. ST. CROIX CHANGED HIS MIND ABOUT TERMINATING HER?

18   A.    IT APPEARS SO, YES.

19   Q.    AND I BELIEVE YOU TESTIFIED YESTERDAY THAT SHE WAS NEVER

20   INFORMED ABOUT THIS TERMINATION; CORRECT?

21   A.    I DON'T RECALL SAYING THAT YESTERDAY.

22        BUT I WAS NOT PRESENT WHEN THIS TOOK PLACE, SO I DON'T

23   KNOW WHETHER SHE WAS EVER INFORMED OR NOT.

24   Q.    OKAY.    SO YOU HAVE NO RECOLLECTION OR NO INFORMATION?

25   A.    WELL, I WAS NOT PRESENT WHEN THESE PAPERS WERE DRAFTED.    I

1    SAW THEM AFTER THE FACT.

2    Q.   AND HAVE YOU EVER SPOKEN WITH MR. ST. CROIX ABOUT HIS

3    DECISION TO TERMINATE HER?

4    A.   HE HAD SPOKEN TO ME PREVIOUS TO THIS AND SAID THAT HE HAD

5    SOME CONCERNS ABOUT HER PERFORMANCE AND I BELIEVE HER ABILITY

6    TO GET ALONG WITH HER COWORKERS.

7         BUT I WASN'T PRESENT WHEN HE MADE THE DECISION TO

8    TERMINATE HER.

9    Q.   AND DID HE TELL YOU WHY HE DECIDED TO WITHDRAW THE

10   TERMINATION?

11   A.   HE CHANGED HIS MIND.

12   Q.   DID HE TELL YOU WHY?

13   A.   I DON'T BELIEVE HE GAVE ME DETAILS, NO.

14        MS. NGUYEN:  YOUR HONOR, THE PLAINTIFF MOVES TO HAVE

15   EXHIBIT 32 ADMITTED INTO EVIDENCE.

16        MR. MCMANIS:  NO OBJECTION.

17        THE COURT:  32 IS ADMITTED.

18   (PLAINTIFF'S EXHIBIT 32 WAS RECEIVED IN EVIDENCE.)

19        THE COURT:  THIS PROBABLY WILL BE A GOOD TIME FOR A

20   BREAK.  WE'LL BE IN RECESS FOR 15 MINUTES.

21        THE WITNESS:  DO YOU WANT ME TO JUST LEAVE THIS

22   STUFF ON HERE?

23        MS. NGUYEN:  YES.  THANK YOU.

24   (RECESS FROM 10:09 A.M. UNTIL 10:30 A.M.)

25        THE COURT:  YOU MAY CONTINUE.

1              MS. NGUYEN:  YES, YOUR HONOR.  WE HAVE BEEN

2     PROVIDED --

3              THE COURT:  YEAH, WE CAN TALK ABOUT THAT LATER IF

4     YOU WANT.

5     BY MS. NGUYEN:

6     Q.  I JUST HAVE ONE MINOR POINT LEFT.

7         MS. GILBERT, YOU STATED EARLIER THAT YOU RELIED UPON THE

8     STATEMENTS OF MS. ELIAS AND MS. FONTILLAS; CORRECT?

9     A.  CORRECT.

10    Q.  AND THOSE STATEMENTS WERE OBTAINED BY MR. ORTEGA?

11    A.  I BELIEVE THEY WERE TYPED BY HIS SECRETARY.

12    Q.  DID YOU YOURSELF SPEAK WITH THOSE TWO WITNESSES?

13    A.  NO, I DID NOT.

14             MS. NGUYEN:  THANK YOU.  THOSE ARE ALL OF THE

15    QUESTIONS I HAVE FOR THIS WITNESS, YOUR HONOR.

16             THE COURT:  OKAY.  ANYTHING FURTHER?

17             MS. MURAKAMI:  I JUST HAVE ONE QUESTION.

18                     **AS-ON REDIRECT EXAMINATION**

19    BY MS. MURAKAMI:

20    Q.  I JUST HAVE ONE QUESTION FOR THE JURY FOR YOU TO ANSWER.

21    A.  OKAY.

22    Q.  WHAT IS THE SICK POLICY AT BAY 101?

23             THE COURT:  I BELIEVE WE CAN TAKE THAT UP LATER.

24    HAVE YOU TALKED BETWEEN YOURSELVES?

25             MR. MCMANIS:  I DON'T THINK THERE'S ANY PROBLEMS

1    THAT EITHER OF US HAS WITH THAT QUESTION.

2              MS. NGUYEN:  THAT'S FINE, YOUR HONOR.

3              THE COURT:  ALL RIGHT.  GO AHEAD.

4              MS. MURAKAMI:  GO AHEAD.

5              THE WITNESS:  OKAY.  THE SICK LEAVE POLICY IN

6    REFERENCE TO?

7    BY MS. MURAKAMI:

8    Q.   EMPLOYEES.

9    A.   TO PEOPLE TAKING SICK LEAVE?

10   Q.   YES.

11   A.   PEOPLE ARE TO CALL IN AT LEAST THREE HOURS PRIOR TO THEIR

12   SHIFT STARTING IF THEY'RE ILL AND UNABLE TO MAKE THEIR SHIFT.

13   Q.   AND DO THEY HAVE TO BRING A DOCTOR'S NOTE AFTER THEY COME

14   BACK?

15   A.   YES.

16   Q.   AND WHAT HAPPENS IF THEY DON'T BRING A DOCTOR'S NOTE?

17   A.   IT'S CONSIDERED UNEXCUSED.

18   Q.   THANK YOU.

19        THAT'S ALL I HAVE.

20             MS. NGUYEN:  I DO HAVE A FOLLOW-UP TO THAT, YOUR

21   HONOR.

22             THE COURT:  ALL RIGHT.

23                 **FURTHER AS-ON RECROSS-EXAMINATION**

24   BY MS. NGUYEN:

25   Q.   SO, MS. GILBERT, IF AN EMPLOYEE IS SICK AT HOME WITH A

1    COLD OR A FEVER BUT DOESN'T NEED TO GO SEE A DOCTOR, DOES

2    BAY 101 STILL REQUIRE THEM TO GO SEE A DOCTOR TO GET A NOTE FOR

3    THE ONE DAY OFF?

4    A.   YES.

5              MS. MURAKAMI:  OKAY.  THAT'S ALL I HAVE, YOUR HONOR.

6              THE COURT:  OKAY.  I THINK YOU'RE FINISHED.

7              THE WITNESS:  I'M EXCUSED FOR THE DAY?

8              THE COURT:  YES.

9              THE WITNESS:  OKAY.  THANK YOU.

10             MS. NGUYEN:  YOUR HONOR, THE PLAINTIFF WOULD LIKE TO

11   CALL AS ITS NEXT WITNESS MR. NICK ORTEGA.

12             THE COURT:  OKAY.  COME FORWARD AND THE CLERK WILL

13   SWEAR YOU IN AND YOU CAN TAKE THE WITNESS STAND.

14        **(PLAINTIFF'S WITNESS, NICHOLAS ORTEGA, SWORN.)**

15             THE WITNESS:  I DO.

16             THE CLERK:  THANK YOU.  PLEASE TAKE THE STAND.

17   PLEASE STATE YOUR NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

18             THE WITNESS:  NICHOLAS JOSEPH ORTEGA, O-R-T-E-G-A.

19                  **AS-ON CROSS-EXAMINATION**

20   BY MS. NGUYEN:

21   Q.   GOOD MORNING, MR. ORTEGA.

22   A.   GOOD MORNING.

23   Q.   MR. ORTEGA, WHEN DID YOU START WORKING AT BAY 101?

24   A.   '93.

25   Q.   I'M SORRY.

1       A.   '93.

2       Q.   YOU MIGHT WANT TO PULL THE MICROPHONE CLOSER TO YOU.

3       THANK YOU.

4            WHEN MR. JOHN ST. CROIX WAS STILL ALIVE, HE WAS THE

5       DIRECTOR OF THE FOOD AND BEVERAGE DEPARTMENT; CORRECT?

6       A.   YES.

7       Q.   AND AT THE TIME YOU WERE THE SECOND IN COMMAND IN THE

8       DEPARTMENT UNDER HIM?

9       A.   YES.

10      Q.   AS EXECUTIVE SOU CHEF?

11      A.   YES.

12      Q.   AND AFTER HE PASSED IN NOVEMBER OF 2007, YOU THEN TOOK

13      OVER THE POSITION AS THE HEAD OF THE FOOD AND BEVERAGE

14      DEPARTMENT?

15      A.   INTERIM.

16      Q.   OKAY.  AND IS THAT THE POSITION THAT YOU NOW HOLD?

17      A.   I DON'T UNDERSTAND THE QUESTION.

18      Q.   ARE YOU CURRENTLY THE HEAD OF THE FOOD AND BEVERAGE

19      DEPARTMENT?

20      A.   YES.

21      Q.   AND IN 2006, WHEN MY CLIENT WAS WORKING AT BAY 101, YOU

22      SUPERVISED THE KITCHEN STAFF; CORRECT?

23      A.   YES.

24      Q.   AND DIRECTLY UNDERNEATH YOU WERE LEAD COOKS?

25      A.   YES.

1    Q.   AND THERE WAS ONE LEAD COOK PER SHIFT?

2    A.   YES.

3    Q.   AND WHEN YOU WEREN'T WORKING, THEN THE LEAD COOKS WERE THE

4    ONES IN CHARGE?

5    A.   YES.

6    Q.   AND DO YOU RECALL A MAN BY THE NAME OF GEORGE RODRIGUEZ

7    CASTILLO?

8    A.   YES.

9    Q.   AND HE WAS ONE OF THE LEAD COOKS ON THE GRAVEYARD SHIFT?

10   A.   YES.

11   Q.   AND LUCIO SUAREZ, DID HE FILL IN AS A LEAD COOK WHEN THE

12   OTHER LEAD COOKS WERE NOT AROUND?

13   A.   YES.

14   Q.   AND AS HEAD OF THE DEPARTMENT, YOU CAN MAKE DECISIONS

15   REGARDING DISCIPLINING EMPLOYEES IN YOUR DEPARTMENT; ISN'T THAT

16   RIGHT?

17   A.   YES.

18   Q.   AND YOU CAN DECIDE WHOM TO TERMINATE?

19   A.   REPEAT THE QUESTION, PLEASE.

20   Q.   YOU CAN MAKE DECISIONS REGARDING TERMINATING EMPLOYEES IN

21   YOUR DEPARTMENT, CAN'T YOU?

22   A.   I CAN.

23   Q.   I'D LIKE TO ASK YOU A FEW QUESTIONS REGARDING THE REST

24   BREAKS AND MEAL PERIODS POLICIES IN YOUR DEPARTMENT.

25        NOW, BACK IN 2009, YOUR EMPLOYEES WERE REQUIRED TO FILL

1    OUT DAILY TRACKING SHEETS; CORRECT?

2    A.   YES.

3    Q.   AND TO KNOW SUPPOSEDLY THE TIME THAT THEY TOOK BREAKS AND

4    LUNCHES?

5    A.   YES.

6    Q.   AND IN YOUR DEPARTMENT, EMPLOYEES HAD TO CHECK IN WITH

7    THEIR SUPERVISOR OR THE LEAD IN CHARGE OF THE SHIFT BEFORE THEY

8    WENT ON LUNCH BREAKS OR REST BREAKS?

9    A.   REPEAT THAT, PLEASE.

10   Q.   DID YOUR EMPLOYEES HAVE TO CHECK IN WITH THE SUPERVISOR

11   BEFORE THEY WENT ON BREAKS?

12   A.   YES.

13   Q.   BECAUSE IT WAS IMPORTANT FOR THE SUPERVISOR TO MAKE SURE

14   THAT THERE WAS COVERAGE DURING THOSE BREAKS; CORRECT?

15   A.   WELL, TO KNOW WHO IS ON THE FLOOR OR TO MAKE SURE THERE

16   WAS COVERAGE, YES.

17   Q.   RIGHT.  YOU DON'T WANT HALF OF YOUR EMPLOYEES GOING ON

18   BREAKS AT THE SAME TIME; CORRECT?

19   A.   CORRECT.

20   Q.   AND DURING THAT TIME PERIOD, WE'RE STILL TALKING ABOUT

21   2006, 2009, YOU HAVE RECEIVED COMPLAINTS FROM SOME OF YOUR

22   EMPLOYEES THAT THEY SOMETIMES HAD TO MISS REST BREAKS AND MEAL

23   BREAKS?

24   A.   I DON'T REMEMBER THE QUESTION THERE.

25   Q.   DURING THAT PERIOD OF TIME -- YOU KNOW WE'RE TALKING ABOUT

1    2006 AND 2009, RIGHT?

2    A.   YES.

3    Q.   DID YOU RECEIVE ANY COMPLAINTS FROM ANY OF YOUR EMPLOYEES

4    REGARDING THEIR NOT BEING ABLE TO TAKE THEIR BREAKS?

5    A.   YES.

6    Q.   AND THAT INCLUDES REST BREAKS AND MEAL BREAKS; CORRECT?

7    A.   NO.

8    Q.   AND WHAT KIND OF BREAKS DID THEY HAVE TO MISS?

9    A.   LUNCH.

10        EXCUSE ME.  I DIDN'T UNDERSTAND THAT QUESTION.

11   Q.   DID YOU RECEIVE ANY COMPLAINTS FROM EMPLOYEES THAT THEY

12   WERE NOT ABLE TO TAKE THEIR 10-MINUTE REST BREAKS?

13   A.   ONCE.

14   Q.   AND WHO WAS THAT FROM?

15   A.   JORGE CASTILLO.

16   Q.   AND NO ONE ELSE?

17   A.   NOT THAT I RECALL.

18   Q.   AND DID YOU RECEIVE COMPLAINTS FROM ANY EMPLOYEE REGARDING

19   THEIR NOT BEING ABLE TO TAKE THEIR LUNCH BREAKS?

20   A.   NO.  ONE IN PARTICULAR, JUST ONE.

21   Q.   AND WHO WOULD THAT BE?

22   A.   GEORGE CASTILLO.

23   Q.   AND WERE YOU AWARE, MR. ORTEGA, THAT SOME OF YOUR

24   EMPLOYEES WERE NOT ABLE TO TAKE LUNCH BREAKS BECAUSE IT WAS TOO

25   BUSY IN THE CASINO?

1    A.   NO.

2    Q.   NO ONE HAD COME TO YOU WITH THAT COMPLAINT?

3    A.   NO.

4    Q.   AND ARE YOU AWARE THAT SOMETIMES YOUR EMPLOYEES HAD BEEN

5    CALLED BACK TO WORK EVEN THOUGH THEY HAD CLOCKED OUT FOR LUNCH?

6    A.   NO.

7    Q.   NO ONE HAD TOLD YOU ABOUT THAT?

8    A.   NOT THAT I RECALL.

9    Q.   AND OTHER THAN MR. CASTILLO, ALL OF YOUR EMPLOYEES WERE

10   ABLE TO TAKE REST BREAKS?

11   A.   TO MY KNOWLEDGE.

12   Q.   AND THEY WERE ALL ABLE TO TAKE THEIR LUNCH BREAKS?

13   A.   TO MY KNOWLEDGE.

14   Q.   ALL OF THE TIME?

15   A.   "ALL OF THE TIME"?

16        REPEAT THE QUESTION AGAIN.

17   Q.   WELL, YOU SAID THAT YOU ARE NOT AWARE OF ANYONE HAVING TO

18   MISS IT.

19        SO AS FAR AS YOU KNOW, THEY WERE ALL ABLE TO TAKE THEIR

20   REST BREAKS AND MEAL BREAKS OTHER THAN MR. CASTILLO?

21   A.   THERE MAY HAVE BEEN SOME.  I DON'T RECALL WHO.

22   Q.   BUT YOU RECALL THAT THERE WERE SOME INSTANCES?

23   A.   POSSIBLY.

24   Q.   AS YOU SIT HERE TODAY, DO YOU RECALL ANY OTHER INSTANCES

25   OTHER THAN MR. CASTILLO'S COMPLAINTS?

1    A.   NO.

2          THE COURT:  MAYBE -- I'M NOT SURE, BUT THERE MAY BE

3    A DIFFERENCE BETWEEN A COMPLAINT AND SOMEONE NOTIFYING THEM

4    THAT THEY MISSED A LUNCH BREAK.

5          IN OTHER WORDS, SOMEBODY MIGHT HAVE MISSED A LUNCH BREAK

6    AND SUBMITTED A NOTIFICATION OF THAT AND NOT COMPLAINED BUT

7    WANTED BAY 101 TO KNOW.

8          I'M NOT SUGGESTING THAT THAT HAPPENED, BUT I JUST THINK

9    THAT THE QUESTION MAY BE POSSIBLY CONFUSING.

10          MS. NGUYEN:  I'LL CLEAR THAT UP, YOUR HONOR.

11    Q.   SO I UNDERSTAND THAT YOU RECEIVED COMPLAINTS FROM

12    MR. CASINO AND NO ONE ELSE; CORRECT?

13    A.   NO.

14    Q.   YOU RECEIVED COMPLAINTS FROM OTHER PEOPLE OTHER THAN

15    MR. CASTILLO?

16    A.   I HEARD FROM MY LEADS.

17    Q.   AND WHAT DID YOU HEAR ABOUT EMPLOYEES NOT BEING ABLE TO

18    TAKE THEIR BREAKS?

19    A.   SOME SAY THAT THEY DIDN'T HAVE TIME.

20    Q.   AND DID YOU DO ANYTHING ABOUT THAT?

21    A.   YES.  I TOLD THEM THAT THEY NEEDED TO MAKE TIME TO MAKE

22    SURE THAT THEY ALL GOT ON THEIR BREAKS.

23    Q.   AND DID YOU FIND OUT WHY THEY WEREN'T -- WHY THEY DIDN'T

24    HAVE THE TIME TO GO ON THE BREAKS?

25    A.   REPEAT THE QUESTION.

1    Q.   YOU SAID THAT SOME OF THEM SAID THAT THEY DIDN'T HAVE

2    TIME.  WAS IT BECAUSE THE CASINO WAS TOO BUSY?

3    A.   THAT'S WHAT THEY SAID, YES.

4    Q.   AND DID ANY OF YOUR LEADS SAY THAT THEY WERE NOT ABLE TO

5    LET THE EMPLOYEES GO ON THE BREAKS BECAUSE IT WAS TOO BUSY?

6    A.   NO.

7    Q.   IN 2006 WHEN MS. DANG BEGAN WORKING AT BAY 101, YOU WERE

8    HER IMMEDIATE SUPERVISOR; CORRECT?

9    A.   YES.

10   Q.   AND I BELIEVE YOU STATED IN THE PAST THAT SHE DID A GOOD

11   JOB IN TERMS OF HER PERFORMANCE AS A COOK.

12        DO YOU RECALL THAT?

13   A.   YES.

14   Q.   SO YOU DIDN'T HAVE ANY PROBLEM WITH HER PERFORMANCE WHEN

15   SHE WAS A COOK IN THE KITCHEN; CORRECT?

16   A.   NOT CORRECT.

17   Q.   YOU SAID EARLIER THAT IT WAS TRUE THAT SHE DIDN'T -- THAT

18   SHE DID A GOOD JOB IN TERMS OF HER PERFORMANCE AS A COOK.

19   A.   A GOOD JOB?

20   Q.   UH-HUH.

21   A.   YES, BUT --

22   Q.   WHAT WAS NOT CORRECT ABOUT THE EARLIER STATEMENT?

23   A.   NOT ALL OF THE TIME.

24   Q.   WHAT WERE ISSUES WITH RESPECT TO HER BEING A COOK?

25   A.   PUTTING UP THE FOOD ON TIME, NOT BEING PREPARED.

1    Q.   MR. ORTEGA, YOU REMEMBER WHEN WE LAST MET IT WAS WITH --

2    AT YOUR DEPOSITION; CORRECT?

3    A.   CORRECT.

4    Q.   AND DO YOU RECALL AT THE TIME THAT YOU TOLD ME THAT YOU

5    HAD -- THAT YOUR OPINION WAS THAT SHE DID A GOOD JOB IN TERMS

6    OF PERFORMANCE AS A COOK?

7    A.   YES.

8    Q.   OKAY.  SO TODAY YOU'RE STATING IT A LITTLE DIFFERENTLY?

9    A.   NO.

10   Q.   SO EVEN THOUGH SHE HAD SOME ISSUES, YOU STILL THOUGHT SHE

11   DID A GOOD JOB AS A COOK?

12   A.   YES.

13   Q.   AND AT THE END OF APRIL 2007, SHE WAS CHANGED TO THE

14   MORNING SHIFT; CORRECT?

15   A.   WHAT WAS THE DATE?

16   Q.   APRIL 2007 HER SHIFT CHANGED?

17   A.   YES.

18   Q.   AND THAT WAS BECAUSE MR. ST. CROIX WANTED TO GET HER AWAY

19   FROM WORKING WITH LUCIO SUAREZ?

20   A.   THAT WAS MY UNDERSTANDING.

21   Q.   DID YOU HAVE ANY INVOLVEMENT WITH THE INVESTIGATION INTO

22   MS. DANG'S COMPLAINT IN APRIL OF 2007?

23   A.   NOT THAT I RECALL.  NOT THAT I RECALL.

24   Q.   I'M GOING TO ASK YOU TO TAKE A LOOK AT EXHIBIT 1011, 1011.

25   IT WOULD BE IN THE WHITE BINDER.  HAVE YOU FOUND IT?

1    A.   YES.

2    Q.   THIS EXHIBIT REFERS TO BE A SUPPLEMENTAL REPORT REGARDING

3    WHAT HAPPENED TO MS. DANG ON APRIL 12TH, 2007.

4         DO YOU SEE THAT?  DO YOU RECALL THAT INCIDENT, MR. ORTEGA?

5    A.   NO.

6    Q.   DO YOU RECALL THAT AFTER THAT INCIDENT YOU AND MS. GILBERT

7    CALLED MS. DANG AT HOME TO ASK HER ABOUT IT?

8    A.   I DON'T RECALL.

9    Q.   YOU DON'T RECALL TALKING TO HER AND HAVING HER SAY THAT

10   MR. LUCIO CALLED HER ALL OF THE TIME?

11   A.   I DON'T RECALL THAT.

12   Q.   I'M GOING TO REFER YOU TO THE NEXT EXHIBIT, 1012.  THAT'S

13   BEEN ADMITTED IN MS. -- I'M SORRY.

14        MS. GILBERT, WHEN SHE WAS HERE, STATED THAT THOSE WERE HER

15   NOTES FROM APRIL OF 2007.

16        AND SHE NOTED THAT ON APRIL 13TH OF 2007 YOU AND SHE

17   CALLED MS. DANG TO FOLLOW UP ON THE SECURITY REPORT.

18        DOES THAT REFRESH YOUR RECOLLECTION?

19   A.   NO.

20   Q.   SO IS IT YOUR TESTIMONY THEN THAT YOU DID NOT HAVE ANY

21   INVOLVEMENT IN INVESTIGATING THE INCIDENT IN APRIL OF 2007

22   BETWEEN MS. DANG AND MR. SUAREZ?

23   A.   I DON'T RECALL.

24   Q.   YOU DON'T RECALL ANY INVOLVEMENT?

25   A.   I DON'T RECALL.

1    Q.   WHEN WAS THE FIRST TIME THAT YOU FOUND OUT THAT MS. DANG

2    HAD COMPLAINED ABOUT MR. SUAREZ?

3    A.   I DON'T RECALL THAT.

4    Q.   ISN'T IT TRUE THAT YOU ONLY FOUND OUT AFTER MR. ST. CROIX

5    TOLD YOU, AFTER HE SWITCHED MS. DANG TO THE MORNING SHIFT?

6    A.   YES.

7    Q.   ISN'T IT TRUE THAT MR. SUAREZ IS A FRIEND OF

8    MR. ST. CROIX?

9    A.   I'M SORRY.  I STILL DON'T UNDERSTAND THAT QUESTION.

10   Q.   DO YOU KNOW IF MR. SUAREZ IS A FRIEND OF MR. ST. CROIX?

11   A.   NO.

12   Q.   AND HAVE YOU EVER BEEN TO MR. ST. CROIX'S HOUSE?

13   A.   YES.

14   Q.   AND HAVE YOU EVER BEEN THERE WITH MR. SUAREZ?

15   A.   NO.

16   Q.   HAVE YOU EVER SEEN MR. SUAREZ SOCIALIZE WITH MR. ST. CROIX

17   OUTSIDE OF BAY 101?

18   A.   NO.

19   Q.   HAVE YOU YOURSELF EVER SOCIALIZED WITH MR. SUAREZ OUTSIDE

20   OF BAY 101?

21   A.   YES.

22   Q.   AND YOU'RE FRIENDS WITH -- I'M SORRY.

23        HAVE YOU EVER SOCIALIZED WITH MR. SUAREZ OUTSIDE OF

24   BAY 101?

25   A.   NO.

1     Q.   AND BESIDES MS. DANG, YOU'RE AWARE OF OTHER WOMEN IN THE

2     FOOD AND BEVERAGE DEPARTMENT WHO COMPLAINED ABOUT MR. SUAREZ

3     HARASSING THEM, AREN'T YOU?

4     A.   NO.

5     Q.   YOU DIDN'T KNOW ABOUT NINA'S COMPLAINT?

6     A.   NO.

7     Q.   MR. ORTEGA, DIDN'T YOU RECEIVE A REPORT FROM

8     GEORGE CASTILLO ABOUT MR. SUAREZ HARASSING MS. DANG?

9     A.   NO.

10    Q.   HAVE YOU EVER SPOKEN WITH MR. CASTILLO ABOUT MS. DANG'S

11    CLAIM ABOUT BEING HARASSED BY MR. SUAREZ?

12    A.   NO.

13    Q.   ARE YOU AWARE, MR. ORTEGA, THAT PRIOR TO THE APRIL 2007

14    INCIDENT THAT MR. ST. CROIX HAD RECEIVED REPORTS AND COMPLAINTS

15    FROM MS. DANG ABOUT MR. SUAREZ'S HARASSMENT OF HER?

16    A.   NO.

17    Q.   MR. ST. CROIX HAD NEVER TALKED TO HER ABOUT THAT?  I'M

18    SORRY, WHAT WAS YOUR ANSWER?

19    A.   COULD YOU REPEAT THAT QUESTION?

20    Q.   DID MR. ST. CROIX EVER TALK TO YOU ABOUT THE COMPLAINTS

21    THAT HE RECEIVED FROM MS. DANG REGARDING MR. SUAREZ'S

22    HARASSMENT?

23    A.   YES.

24    Q.   AND WHEN DID HE TALK TO YOU ABOUT THAT?

25    A.   AFTER HE SWITCHED WITH LUCIO, AFTER HE SWITCHED.

1     Q.   BUT NO TIME BEFORE THAT?

2     A.   NO.

3     Q.   AND ARE YOU AWARE THAT IN APRIL OF 2007 MS. DANG FILED A

4     WRITTEN COMPLAINT REGARDING MR. SUAREZ?

5     A.   NO.

6     Q.   YOU HAVE NEVER SEEN THE LETTER THAT SHE WROTE TO H.R.?

7     A.   NO.

8     Q.   H.R. HAS NEVER INFORMED YOU OF HER COMPLAINT AGAINST

9     MR. SUAREZ?

10    A.   NOT THAT I RECALL.

11    Q.   ARE YOU AWARE THAT IN JANUARY OF 2007 MR. ST. CROIX HAD

12    DECIDED TO TERMINATE MS. DANG?

13    A.   NO.

14    Q.   I'M GOING TO ASK YOU TO TAKE A LOOK AT EXHIBIT 1001 AND GO

15    TO THE BATE STAMP PAGE OF 1341.

16         MR. ORTEGA, HAVE YOU FOUND IT?

17    A.   NO.

18    Q.   AND IT'S EXHIBIT 1001.

19    A.   YES.

20    Q.   AND THEN THE BATES STAMP IS BAY 1341.  IT WOULD BE ALMOST

21    TOWARD THE END.  I THINK IT'S THE THIRD FROM THE END.

22    A.   1431?

23    Q.   1341.

24         THE COURT:  YOU'RE WELCOME --

25         MS. NGUYEN:  YOUR HONOR, MAY I?

1    Q.   MR. ORTEGA, THAT'S A COUNSELLING MEMO WITH YOUR SIGNATURE

2    ON THE BOTTOM; CORRECT?

3    A.   YES.

4    Q.   AND IT'S DATED JANUARY 17TH, 2007; RIGHT?

5    A.   YES.

6    Q.   AND WITH THIS COUNSELLING MEMO YOU WERE SUSPENDING

7    MS. DANG FOR THREE DAYS -- FOR TWO DAYS NOT SHOWING UP FOR WORK

8    FOR THREE DAYS; CORRECT?

9    A.   YES.

10   Q.   AND THE DAYS THAT SHE IS BEING ACCUSED OF NOT SHOWING UP

11   TO WORK IS JANUARY 12TH, 13TH, AND 14TH OF 2007; CORRECT?

12   A.   YES.

13   Q.   AND WERE YOU AWARE, MR. ORTEGA, THAT SHE WAS OFF THOSE

14   DAYS BECAUSE SHE HAD SUFFERED AN INJURY AT BAY 101?

15   A.   I DON'T RECALL.

16   Q.   DO YOU RECALL THAT SHE HAD AN INJURY WHERE A BOWL FELL ON

17   HER FACE?

18   A.   YES.

19   Q.   AND DO YOU RECALL THAT SHE WENT TO THE E.R. AFTER THAT

20   INJURY?

21   A.   YES.

22   Q.   AND I'M GOING TO ASK YOU TO TAKE A LOOK AT -- IT WOULD BE

23   EXHIBIT 1, PAGE 17.  SO IT'S IN THE BINDER WITH THE YELLOW

24   PAPER.

25        YES.  SO IT'S THE FIRST EXHIBIT, PAGE 17.

1    A.   DO I NEED TO KEEP THIS OPEN?

2    Q.   YOU'RE DONE WITH THAT.  THANK YOU.

3         EXHIBIT 1, PAGE 17.  SORRY.

4         HAVE YOU FOUND IT, MR. ORTEGA?

5    A.   YES.

6    Q.   AND SO IT WOULD BE PAGE 17 OF EXHIBIT 1.  IT'S A WORK

7    RELEASE FORM FROM O'CONNOR HOSPITAL.

8         DO YOU SEE THAT?

9    A.   I DO NOT.

10   Q.   THAT'S A WORK RELEASE FORM FROM O'CONNOR HOSPITAL.

11        DO YOU SEE THAT?

12   A.   YES.

13   Q.   AND IT'S DATED AT THE BOTTOM --

14        ANDRE, IF YOU COULD MOVE IT UP A LITTLE BIT, PLEASE --

15   OR -- I'M SORRY.  SCROLL DOWN.  UP A LITTLE BIT TO SHOW THE

16   DATE OF THAT FORM.  THERE.

17        IT'S DATED JANUARY 11TH, 2007.

18        DO YOU SEE THAT?

19   A.   YES.

20   Q.   AND IN THAT THE DOCTOR GAVE MS. DANG THREE DAYS OFF AND

21   DIDN'T RELEASE HER TO GO BACK TO WORK UNTIL THE 15TH OF

22   JANUARY.

23        DO YOU SEE THAT?

24   A.   YES.

25   Q.   ISN'T IT TRUE THAT SHE TURNED THIS IN TO YOUR DEPARTMENT?

1    A.   AFTER THE 15TH.

2    Q.   IT'S NOT TRUE THAT HER FAMILY MEMBER CAME TO GIVE YOU THAT

3    FORM?

4    A.   NO.

5    Q.   AND SO IS IT YOUR TESTIMONY THAT YOU SUSPENDED HER BECAUSE

6    YOU DIDN'T KNOW THAT SHE WAS OUT ON WORK RELEASE FORM?

7    A.   YES.

8    Q.   DID YOU CALL TO FIND OUT HOW SHE WAS DOING AFTER THE

9    INJURY AT BAY 101?

10   A.   YES.

11   Q.   DID YOU TALK TO HER?

12   A.   NO.

13   Q.   DID YOU TALK TO ANY FAMILY MEMBERS TO FIND OUT HOW SHE WAS

14   DOING?

15   A.   THERE WAS NO ANSWER.

16   Q.   AND WHEN SHE CAME BACK, DID SHE EXPLAIN TO YOU THAT SHE

17   WAS OUT BECAUSE THE DOCTORS ALLOWED HER DAYS OFF TO RECOVER?

18   A.   YES.

19   Q.   AND YOU STILL SUSPENDED HER ANYWAY?

20   A.   YES.

21   Q.   IN 2008, MR. ORTEGA, MS. DANG SUBMITTED A REQUEST TO YOU

22   TO TRANSFER FROM THE KITCHEN OUT TO THE SERVER -- TO THE FLOOR

23   TO BECOME A SERVER; CORRECT?

24   A.   WHAT WAS THE DATE?

25   Q.   IN 2008.

1    A.   YES.

2    Q.   AND SHE WAS EVENTUALLY TRANSFERRED IN FEBRUARY OF 2009;

3    CORRECT?

4    A.   YES.

5    Q.   AND ISN'T IT TRUE THAT SHE HAD TO SUBMIT SEVERAL REQUESTS

6    BEFORE YOU APPROVED HER TRANSFER?

7    A.   I DON'T RECALL.

8    Q.   ISN'T IT TRUE THAT DURING THAT PERIOD OF TIME WHEN SHE HAD

9    SUBMITTED HER TRANSFER REQUEST THAT YOU HAD TWO OPENINGS FOR

10   SERVERS?

11   A.   YES.

12   Q.   AND ISN'T IT TRUE THAT YOU WERE INTERVIEWING PEOPLE FROM

13   OUTSIDE OF BAY 101 FOR THOSE POSITIONS?

14   A.   YES.

15   Q.   AND ISN'T IT TRUE THAT YOU KNEW THAT MS. DANG WANTED THE

16   TRANSFER?

17   A.   YES.

18   Q.   BUT YOU WERE NOT CONSIDERING HER?

19   A.   SHE HAD BEEN CONSIDERED.

20   Q.   BUT YOU HIRED PEOPLE FROM OUTSIDE?

21   A.   YES.

22   Q.   AND WHY WAS THAT?

23   A.   THEY HAD SEVERAL YEARS OF EXPERIENCE IN THE CASINO

24   BUSINESS AS CASINO SERVERS AND AT THE TIME I NEEDED SOMEONE

25   RIGHT AWAY AND THERE WAS LESS TRAINING TO BE DONE.

1    Q.   AND ISN'T IT TRUE, MR. ORTEGA, THAT MS. DANG ALSO HAD SOME

2    EXPERIENCE IN THE RESTAURANT BUSINESS?

3    A.   YES.

4    Q.   AND WHEN YOU APPROVED HER TRANSFER IN FEBRUARY OF 2010,

5    YOU PROVIDED THAT TRAINING; CORRECT?

6    A.   YES.

7    Q.   SO WHY COULDN'T SHE HAVE BEEN PROVIDED TRAINING TO GET HER

8    INTO THE SERVER POSITION?

9    A.   I HAD A LACK OF SERVERS.

10   Q.   DID YOU KNOW THAT SHE WANTED TO GET OUT TO THE FLOOR TO

11   GET AWAY FROM LUCIO SUAREZ?

12   A.   NO.

13   Q.   WERE YOU AWARE THAT SHE WAS UNCOMFORTABLE WORKING AROUND

14   LUCIO SUAREZ?

15   A.   NO.

16   Q.   ISN'T IT TRUE, MR. ORTEGA, THAT KEN MEAKCHAROON HAD

17   INFORMED YOU THAT MS. DANG WAS UNCOMFORTABLE WORKING AROUND

18   LUCIO SUAREZ?

19   A.   I DON'T RECALL.

20   Q.   MR. ORTEGA, IT'S TRUE, ISN'T IT, THAT YOU AND MAMA AHN

21   WOULD JOKE AROUND DURING THE WORK HOURS?

22   A.   YES.

23   Q.   AND SOMETIMES YOU WOULD MAKE ETHNIC JOKES?

24   A.   YES.

25   Q.   AND ISN'T IT TRUE THAT YOU HAVE STATED IN THE PAST THAT

1    THE VIETNAMESE, THEY'RE ALL BAD?

2    A.   NO.

3    Q.   WHAT KIND OF ETHNIC JOKES DID YOU MAKE WITH MAMA ANH?

4    A.   SHE WOULD SAY F...ING MEXICANS AND WE WOULD SAY F...ING

5    VIETNAMESE.

6    Q.   AND DO YOU RECALL AN INCIDENT WHERE SOMEONE CAME TO FIX

7    THE OVEN INSIDE OF THE KITCHEN AT BAY 101?

8    A.   WHEN?

9    Q.   DO YOU RECALL THAT YOU TOLD MS. DANG THAT THE OVEN WAS NOT

10   WORKING BECAUSE IT WAS A VIETNAMESE MAN WHO FIXED IT?

11   A.   NO.

12   Q.   MR. ORTEGA, ISN'T IT TRUE THAT MAMA AHN, YOU HAVE USED HER

13   IN THE PAST TO TRANSLATE FOR MS. DANG WHEN YOU WANTED TO MAKE

14   SURE THAT MS. DANG COULD UNDERSTAND?

15   A.   YES.

16   Q.   NOW, IN OCTOBER OF 2009, YOU HAD A MEETING WITH

17   MS. GILBERT AND MS. DANG TO TELL HER ABOUT THE SUSPENSION;

18   CORRECT?

19   A.   WHICH SUSPENSION?

20   Q.   THIS IS IN OCTOBER OF 2009.  DO YOU RECALL THE INCIDENT

21   WITH LINDA ELIAS?

22   A.   YES.

23   Q.   AND AS A RESULT OF THAT INCIDENT YOU SUSPENDED MS. DANG;

24   CORRECT?

25   A.   YES.

1    Q.   YOU LEARNED ABOUT THAT INCIDENT FROM KEN?

2    A.   YES.

3    Q.   AND YOU WENT ABOUT INVESTIGATING THE INCIDENT; CORRECT?

4    A.   YES.

5    Q.   AND AS PART OF YOUR INVESTIGATION, YOU SPOKE WITH AND

6    OBTAINED A STATEMENT FROM LINDA ELIAS?

7    A.   YES.

8    Q.   AND YOU ALSO SPOKE WITH AND OBTAINED A STATEMENT FROM

9    ARLENE FONTILLAS?

10   A.   YES.

11   Q.   DID YOU SPEAK WITH MR. MEAKCHAROON?

12   A.   YES.

13   Q.   AND DID HE SUBMIT A HANDWRITTEN STATEMENT TO YOU?

14   A.   YES.

15   Q.   AND THEN YOU HAD BETSY TYPE UP HIS HANDWRITTEN STATEMENT?

16   A.   YES.

17   Q.   AND DID HE EVER SUBMIT HIS -- THE TYPED UP STATEMENT TO

18   MR. MEAKCHAROON TO REVIEW AND SIGN?

19   A.   I DON'T RECALL.

20   Q.   AND BESIDES THOSE THREE INDIVIDUALS, DID YOU SPEAK WITH

21   MS. DANG ABOUT WHAT HAPPENED WITH THE OCTOBER 4TH, 2009,

22   INCIDENT BEFORE YOU MADE THE DECISION TO SUSPEND HER?

23   A.   I DON'T RECALL.

24   Q.   AND WHEN YOU HAD THE MEETING IN H.R. WITH MS. DANG TO

25   SUSPEND HER, IT WAS JUST YOU, MS. DANG, AND MS. GILBERT;

1    CORRECT?

2    A.   YES.

3    Q.   AND THERE WAS NO ONE ELSE FROM THE UNION THERE; CORRECT?

4    A.   REPEAT THAT.

5    Q.   THERE WAS NO ONE ELSE FROM THE UNION AT THAT MEETING;

6    CORRECT?

7    A.   NO.  CORRECT.

8    Q.   NOW -- AND THERE WAS NO TRANSLATOR THERE TO HELP MS. DANG

9    UNDERSTAND WHAT WAS BEING SAID TO HER; CORRECT?

10   A.   CORRECT.

11   Q.   AND THERE WAS NO TRANSLATOR TO HELP HER EXPLAIN HER SIDE

12   OF THE STORY TO YOU; ISN'T THAT TRUE?

13   A.   TRUE.

14   Q.   AND YOU ALSO REVIEWED THE SURVEILLANCE VIDEO FROM THE

15   OCTOBER 4TH, 2009, INCIDENT, DIDN'T YOU?

16   A.   YES.

17   Q.   AND THE VIDEO DIDN'T HAVE ANY AUDIO, RIGHT?

18   A.   RIGHT.

19   Q.   AND DID YOU REVIEW THE VIDEO WITH LINDA ELIAS?

20   A.   NO.

21   Q.   DID YOU REVIEW THE VIDEO WITH MS. DANG?

22   A.   NO.

23   Q.   AND DID YOU MAKE CONCLUSIONS THAT MS. DANG WAS ARGUING

24   WITH THE CUSTOMER BASED ON YOUR REVIEW OF THAT VIDEO?

25   A.   YES.

1    Q.   DID YOU EVER ASK MS. DANG FOR A WRITTEN STATEMENT ABOUT

2    WHAT HAPPENED WITH THE OCTOBER 4TH, 2009, INCIDENT?

3    A.   NO.

4    Q.   DID YOU SPEAK TO THE DEALER WHO WAS SITTING NEXT TO THE

5    CUSTOMER REGARDING THE OCTOBER 2009 INCIDENT?

6    A.   NO.

7    Q.   AND YOU NEVER SPOKE WITH THE CUSTOMER EITHER; CORRECT?

8    A.   CORRECT.

9    Q.   I'M GOING TO ASK YOU TO TAKE A LOOK AT EXHIBIT 1001.  IT

10   WOULD BE IN THE WHITE BINDER.  AND LOOK AT PAGE BAY 1332.  IT

11   WOULD BE THE COUNSELLING MEMO FROM OCTOBER 8TH, 2009?

12   A.   COULD YOU REPEAT THAT?

13   Q.   BAY 1332.

14   A.   WHICH EXHIBIT?

15   Q.   EXHIBIT 1001.

16   A.   AND BAY WHAT?

17   Q.   1332.

18   A.   OKAY.

19   Q.   SO YOU PREPARED THAT COUNSELLING MEMO YOURSELF, DIDN'T

20   YOU?

21   A.   JENNIFER GILBERT.

22   Q.   I'M SORRY?

23   A.   JENNIFER GILBERT HELPED ME TYPE IT.

24   Q.   AND THE INFORMATION ON THERE CAME FROM YOU?

25   A.   YES.

1    Q.   AND YOU WERE SUSPENDING MS. DANG FOR ARGUING WITH A

2    COWORKER AND A CUSTOMER; CORRECT?

3    A.   YES.

4    Q.   AND WHEN YOU REVIEWED THE SURVEILLANCE VIDEO, WAS IT YOUR

5    CONCLUSION THAT ELIAS WAS NOT ARGUING WITH MS. DANG IN FRONT OF

6    THE CUSTOMER?

7    A.   YES.

8    Q.   AND WAS IT ALSO YOUR CONCLUSION THAT MS. ELIAS WAS NOT

9    ARGUING WITH THE CUSTOMER?

10   A.   YES.

11   Q.   AND WAS THAT BASED ON MS. ELIAS'S VERSION OF WHAT

12   HAPPENED?

13   A.   NO.

14   Q.   YOU DIDN'T HEAR ANYTHING ON THE VIDEO, DID YOU?

15   A.   NO.

16   Q.   SO IT'S BASED ON WHAT YOU SAW, OR ASSUMED FROM WHAT YOU

17   SAW FROM THE VIDEO; CORRECT?

18   A.   NO.

19   Q.   WHAT ELSE DID YOU BASE YOUR CONCLUSION ON?

20   A.   ANOTHER WITNESS.

21   Q.   FROM ARLENE FONTILLAS?

22   A.   YES.

23   Q.   AND DID SHE SAY THAT MS. ELIAS WAS NOT ARGUING?

24   A.   YES.

25   Q.   DID YOU TALK TO KEN, TOO, REGARDING WHAT HAPPENED?

1    A.   WHEN I ARRIVED AT WORK, YES.

2    Q.   AND ISN'T IT TRUE THAT KEN SAID THAT HE HEARD BOTH OF THEM

3    ARGUING?

4    A.   NO.

5    Q.   I'M GOING TO ASK YOU TO FLIP ONE PAGE TO 1331.  THAT'S

6    ANOTHER COUNSELLING MEMO THAT YOU PRESENTED TO MS. DANG ON

7    OCTOBER 8TH, 2009; IS THAT CORRECT?

8    A.   CORRECT.

9    Q.   AND IN THAT YOU WERE GIVING HER A WARNING REGARDING NOT

10   BALANCING HER ENVELOPE; RIGHT?

11   A.   YES.

12   Q.   ISN'T IT TRUE, MR. ORTEGA, THAT YOU HAD PREVIOUSLY, JUST A

13   FEW DAYS BEFORE THAT, HAD COMPLIMENTED HER ON A GOOD JOB WELL

14   DONE?

15   A.   I DON'T RECALL.

16   Q.   AND ISN'T IT TRUE THAT YOU TOLD THE INVESTIGATOR THAT SHE

17   DID NOT HAVE ANYMORE BALANCING MISTAKE INPUT TO ACCOUNTING

18   SINCE SEPTEMBER?

19   A.   CAN YOU REPEAT THAT, PLEASE.

20   Q.   DID YOU TELL THE INVESTIGATOR, THE ONE THAT WAS SENT OUT

21   TO INVESTIGATE, CAROLE EDMAN, THAT MS. DANG DID NOT HAVE ANY

22   BALANCING MISTAKE INPUT TO ACCOUNTING SINCE SEPTEMBER OF 2009?

23   A.   I DON'T RECALL.

24   Q.   DIDN'T YOU TELL THE INVESTIGATOR THAT MS. DANG HAD

25   IMPROVED IN TERMS OF PERFORMANCE?

1    A.    EXPLAINED "IMPROVED."  I DON'T UNDERSTAND "IMPROVED."

2    Q.    DO YOU RECALL TELLING THE INVESTIGATOR THAT HER

3    PERFORMANCE HAD IMPROVED?

4    A.    YES.

5    Q.    AND IN THIS COUNSELLING MEMO DATED OCTOBER 8TH, 2009, IT

6    STATES THAT IF SHE CONTINUES WITH BALANCING MISTAKES, THAT SHE

7    WOULD FACE MORE SEVERE DISCIPLINARY ACTION.

8        DO YOU SEE THAT?  I KNOW -- I THINK THERE'S A TYPO THERE,

9    BUT YOU MEANT MORE SEVERE DISCIPLINARY ACTION; RIGHT?

10   A.    YES.

11   Q.    AND THAT THE COMPANY MIGHT BE ABLE TO OFFER HER A POSITION

12   IN THE KITCHEN?

13   A.    YES.

14   Q.    AND DOES THAT MEAN THAT SHE COULD BE SENT BACK TO THE

15   KITCHEN TO WORK?

16   A.    YES.

17   Q.    AND DID YOU KNOW THAT SHE WANTED TO GET AWAY FROM THE

18   KITCHEN TO GET AWAY FROM LUCIO SUAREZ?

19   A.    NO.

20   Q.    MS. DANG SENT A LETTER TO MR. WERNER IN OCTOBER OF 2009 TO

21   EXPLAIN ABOUT YOU AND MS. GILBERT.  WERE YOU AWARE OF THAT?

22   A.    YES.

23   Q.    BECAUSE MR. WERNER TOLD YOU ABOUT IT; CORRECT?

24   A.    NOT CORRECT.

25   Q.    HOW DID YOU LEARN ABOUT IT?

1    A.   TOM BOWLING.

2    Q.   AND WHAT DID MR. BOWLING TELL YOU?

3    A.   THAT THERE WAS A LETTER SENT TO UPPER MANAGEMENT AND

4    OWNERSHIP.

5    Q.   AND DID YOU ALSO HAVE A MEETING WITH MR. WERNER ABOUT THAT

6    COMPLAINT?

7    A.   A MEETING?

8    Q.   DID YOU HAVE ANY DISCUSSION WITH MR. WERNER ABOUT

9    MS. DANG'S OCTOBER 13TH, 2009, COMPLAINT?

10   A.   YES.

11   Q.   AND MR. WERNER ADVISED YOU NOT TO RETALIATE AGAINST

12   MS. DANG; IS THAT CORRECT?

13   A.   YES.

14   Q.   AND MR. WERNER TOLD YOU THAT HE WAS ORDERING AN

15   INVESTIGATION?

16   A.   YES.

17   Q.   AND DURING THIS INVESTIGATION, MR. ORTEGA, DID YOU OBTAIN

18   A STATEMENT FROM YOUR ASSISTANT, BETSY COCHRAN?

19   A.   I DON'T RECALL.  A STATEMENT?

20   Q.   I'D LIKE YOU TO TAKE A LOOK AT EXHIBIT 14.  YES, THAT

21   E-MAIL.

22        DOES THAT REFRESH YOUR RECOLLECTION, MR. ORTEGA, THAT YOU

23   OBTAINED A STATEMENT FROM YOUR ASSISTANT?

24   A.   YES.

25   Q.   DID MS. GILBERT ADVISE YOU TO GO GET THAT STATEMENT?

1    A.   NO.

2    Q.   YOU DID IT ON YOUR OWN?

3    A.   YES.

4    Q.   AND YOU DID IT DURING THE INVESTIGATION CONDUCTED BY

5    MS. CAROLE EDMAN; CORRECT?

6    A.   I DON'T RECALL.

7    Q.   THE STATEMENT IS DATED NOVEMBER 4TH, 2009.

8         DO YOU SEE THAT?

9    A.   YES.

10   Q.   AND ISN'T IT TRUE THAT YOU ALSO OBTAINED ANOTHER STATEMENT

11   FROM ONE OF YOUR LEAD COOKS BY THE NAME OF JOSE SOLIS?

12   A.   YES.

13   Q.   ALSO DURING THAT SAME TIME?

14   A.   I DON'T RECALL.

15   Q.   IF YOU WOULD TAKE A LOOK AT EXHIBIT 15.

16   A.   YES.

17   Q.   AND WAS THAT SOMETHING THAT YOU DID ON YOUR OWN AS WELL?

18   A.   YES.

19   Q.   NO ONE ADVISED YOU TO DO IT; CORRECT?

20   A.   NO.

21   Q.   CORRECT?

22   A.   CORRECT.

23   Q.   AND DID YOU TURN IN THOSE STATEMENTS TO H.R.?

24   A.   YES.

25   Q.   AND WERE YOU AWARE, MR. ORTEGA, THAT MS. EDMAN WAS

1    INTERVIEWING SOME OF YOUR EMPLOYEES TO INVESTIGATE THE

2    COMPLAINTS AGAINST YOU?

3    A.   WAS I AWARE?  YES.

4    Q.   BECAUSE YOU HAD TO MAKE SCHEDULE CHANGES TO ALLOW FOR SOME

5    OF THOSE INTERVIEWS; CORRECT?

6    A.   YES.

7    Q.   SO YOU KNEW WHICH EMPLOYEES WERE BEING INTERVIEWED BY

8    MS. EDMAN; CORRECT?

9    A.   YES.

10   Q.   DID YOU LEARN THE RESULT OF MS. EDMAN'S INVESTIGATION?

11   A.   YES.

12   Q.   AND YOU LEARNED ABOUT IT IN A MEETING WITH MR. WERNER,

13   MS. GILBERT, AND MR. SHAW?

14   A.   YES.

15   Q.   AND THAT MEETING TOOK PLACE SHORTLY -- A FEW DAYS BEFORE

16   DECEMBER 21ST, 2009?

17   A.   YES.

18   Q.   AND AT THAT MEETING, MR. WERNER TOLD YOU ABOUT THE RESULTS

19   OF THE INVESTIGATION; CORRECT?

20   A.   YES.

21   Q.   AND HE HAD PREPARED AN OUTLINE TO BE DISCUSSED WITH

22   MS. DANG?

23   A.   YES.

24   Q.   AND YOU WERE TO SET UP A MEETING WITH MS. DANG TO DISCUSS

25   THE RESULT OF THE INVESTIGATION?

1    A.   YES.

2    Q.   AND IN ADDITION TO THE RESULT OF THE INVESTIGATION, YOU

3    WERE ALSO TO DISCUSS WITH MS. DANG A PERFORMANCE IMPROVEMENT

4    PLAN?

5    A.   YES.

6    Q.   AND THERE WERE PLANS TO HAVE -- TO GIVE HER MORE TRAINING?

7    A.   REPEAT THE QUESTION.

8    Q.   AND PART OF THE PLANS WAS TO GIVE HER MORE TRAINING;

9    RIGHT?

10   A.   YES.

11   Q.   AND TO HAVE A SERVER WHO SPEAKS VIETNAMESE TRAIN WITH HER

12   TO HELP HER IMPROVE; CORRECT?

13   A.   YES.

14   Q.   WERE YOU ALLOWED TO READ A COPY OF THE OUTLINE PREPARED BY

15   MR. WERNER?

16   A.   I DON'T RECALL.

17   Q.   AND ON THE MORNING OF DECEMBER 21ST, 2009, THAT WAS WHEN

18   YOU INFORMED MS. DANG THAT SHE WAS TO GO TO H.R. FOR A MEETING;

19   CORRECT?

20   A.   YES.

21   Q.   AND YOU TOOK KEN MEAKCHAROON WITH YOU BECAUSE YOU WANTED

22   HIM TO BE A WITNESS TO THAT CONVERSATION BETWEEN YOU AND

23   MS. DANG?

24   A.   YES.

25   Q.   AND THAT WAS ABOUT 4:00 A.M. IN THE MORNING?

1    A.   YES.

2    Q.   AND YOU ASKED MS. DANG TO GO TO H.R. FOR A MEETING AFTER

3    SHE GOT OFF WORK AT 7:00 O'CLOCK IN THE MORNING; RIGHT?

4    A.   NO.

5    Q.   WHAT DID YOU ASK HER?

6    A.   I ASKED HER SHE NEEDED TO BE AT A MEETING AT 7:00 A.M. IN

7    HUMAN RESOURCES.

8    Q.   AND THAT WAS ALL YOU TOLD HER?

9    A.   YES.

10   Q.   AND YOU DIDN'T TELL HER WHAT THE MEETING WAS ABOUT, DID

11   YOU?

12   A.   THAT THERE WAS GOING TO BE A DISCUSSION WITH, YOU KNOW,

13   VINCE SHAW, MYSELF, AND JENNIFER AND THAT SHE NEEDED TO BE

14   THERE.

15   Q.   BUT YOU DIDN'T TELL HER WHAT THE MEETING WAS ABOUT, RIGHT?

16   A.   NO.  NO.

17   Q.   NOT RIGHT OR YOU DIDN'T TELL HER?

18   A.   NO, I DIDN'T TELL HER.

19   Q.   THANK YOU.  AND SHE TOLD YOU SHE WAS TIRED?

20   A.   YES.

21   Q.   AND SHE TOLD YOU SHE HAD OTHER PLANS?

22   A.   NO.

23   Q.   DID SHE TELL YOU THAT SHE HAD SOMETHING ELSE TO DO?

24   A.   NO.

25   Q.   MR. ORTEGA, YOUR DEPOSITION IN THIS CASE WAS TAKEN ON

1    OCTOBER 25TH, 20011.

2        DO YOU RECALL THAT?

3    A.   YES.

4    Q.   AND AT THAT DEPOSITION YOU SWORE TO TELL THE TRUTH UNDER

5    PENALTY OF PERJURY; RIGHT?

6    A.   YES.

7            MS. NGUYEN:  YOUR HONOR, I'D LIKE TO READ FROM

8    MR. ORTEGA'S DEPOSITION TRANSCRIPT, PAGE 12, LINE 19 TO 22.

9        ACTUALLY FROM LINE 15, PLEASE, JUST TO GIVE IT CONTEXT.

10           MR. MCMANIS:  NO OBJECTION.  THANK YOU.

11           THE COURT:  ALL RIGHT.

12           MS. NGUYEN:  MAY I START, YOUR HONOR?

13           THE COURT:  YES.

14           MS. NGUYEN:  LINE 15.  THE QUESTION WAS:  "DID YOU

15   TELL HER WHAT THE MEETING WAS ABOUT?

16       "ANSWER:  NO."

17   Q.   DO YOU RECALL THAT?

18   A.   YES.

19   Q.   AND NEXT QUESTION:  "DID SHE ASK YOU WHAT THE MEETING WAS

20   ABOUT?

21       "ANSWER:  I DON'T REMEMBER."

22       IS THAT STILL YOUR TESTIMONY TODAY?

23   A.   YES.

24   Q.   "QUESTION:  THEN HOW DID SHE RESPOND WHEN YOU TOLD HER

25   THAT YOU NEEDED TO GO TO THE MEETING?

1          "ANSWER:  SHE SAID THAT SHE WAS TIRED AND THAT SHE HAD

2     SOMETHING TO DO."

3          DO YOU RECALL THAT?

4     A.   SHE SAID THAT SHE WAS TIRED, BUT I JUST DON'T RECALL HER

5     SAYING THAT SHE HAD SOMETHING TO DO.

6     Q.   BUT YOU TOLD ME THAT IN 2011?

7     A.   THAT'S WHAT YOU SAID.

8     Q.   AND AFTER SHE TOLD YOU THAT, DID YOU SAY THAT SHE HAD TO

9     GO TO THE MEETING OR ELSE?

10    A.   NO.

11    Q.   DID YOU EVER TELL HER THAT SHE WOULD BE DISCIPLINED IF SHE

12    DIDN'T GO TO THE MEETING?

13    A.   NO.

14    Q.   IN FACT, YOU ACTUALLY APPROVED AN EARLY OUT FOR HER THAT

15    MORNING; CORRECT?

16    A.   YES.

17    Q.   AND WHICH MEANT THAT YOU LET HER GO EARLY; CORRECT?

18    A.   YES.

19    Q.   AND YOU HAD A CONVERSATION WITH HER HUSBAND SHORTLY AFTER

20    YOU TALKED TO HER; IS THAT RIGHT?

21    A.   YES.

22    Q.   AND ISN'T IT TRUE THAT MR. SUMMERS, HER HUSBAND, TOLD YOU

23    THAT AFTER WORK MS. DANG HAD TO GO PICK UP HER DAUGHTER?

24    A.   NO.

25    Q.   HE DIDN'T TELL YOU THAT HER DAUGHTER WAS WAITING FOR HER

1    AT A BUS STATION?

2    A.   NO.

3    Q.   AND HE DIDN'T TELL YOU THAT HE NEEDED HIS WIFE TO COME

4    HOME TO TAKE HIM TO KAISER FOR SKIN SURGERY?

5    A.   NO.

6    Q.   ISN'T IT TRUE THAT HE ASKED YOU WHAT THE MEETING WAS

7    ABOUT?

8    A.   YES.

9    Q.   AND THAT YOU DIDN'T LET -- YOU DIDN'T TELL HIM?

10   A.   I SAID I WAS NOT AT LIBERTY.  NO, I DIDN'T TELL HIM.

11   Q.   AND DIDN'T HE ASK YOU HOW LONG THE MEETING WAS GOING TO

12   LAST?

13   A.   I DON'T RECALL.

14   Q.   AND ISN'T IT TRUE THAT YOU DIDN'T TELL HIM HOW LONG THE

15   MEETING WAS GOING TO LAST?

16   A.   I DON'T RECALL.

17   Q.   AND HE ASKED YOU IF THERE WAS GOING TO BE A UNION REP

18   THERE WITH MS. DANG.

19        DO YOU RECALL THAT?

20   A.   CAN YOU REPEAT THAT QUESTION?

21   Q.   DIDN'T MS. -- DID MR. SUMMERS ASK YOU IF THERE WAS GOING

22   TO BE A UNION REP AT THE MEETING WITH MS. DANG?

23   A.   DID HE ASK ME?

24   Q.   YES.

25   A.   NO.

1    Q.   YOU DON'T RECALL THAT?

2    A.   NO, HE DIDN'T ASK ME.

3    Q.   AND THERE WASN'T GOING TO BE A UNION REP THERE; CORRECT?

4    A.   CORRECT.

5    Q.   AND THERE WASN'T GOING TO BE ANYONE TO HELP TRANSLATE FOR

6    MS. DANG; CORRECT?

7    A.   CORRECT.

8    Q.   AND ISN'T IT TRUE THAT MR. SUMMERS OFFERED TO HAVE HER

9    COME BACK ON HER DAY OFF FOR THE MEETING?

10   A.   NO.

11   Q.   YOU DON'T RECALL THAT?

12   A.   HE DIDN'T ASK.  HE DIDN'T ASK.

13   Q.   DID HE SAY THAT YOU CAN HAVE MR. WERNER CALL HIM?

14   A.   YES.

15   Q.   AND AFTER YOU SPOKE WITH MR. SUMMERS, YOU CALLED MR. SHAW

16   TO LET HIM KNOW THAT THE MEETING WASN'T GOING TO HAPPEN;

17   CORRECT?

18   A.   YES.

19   Q.   AND ISN'T IT TRUE THAT MR. SHAW TOLD YOU THAT -- DIDN'T HE

20   SAY, WHY DON'T WE JUST HOLD OFF ON THE MEETING?

21   A.   I DON'T RECALL.

22   Q.   I'D LIKE TO JUST REFRESH YOUR RECOLLECTION WITH RESPECT TO

23   THAT.

24        YOUR HONOR, WE WOULD LIKE TO READ FROM THE TRANSCRIPT FROM

25   THE ARBITRATION HEARING IN THIS MATTER.

1          MR. MCMANIS:  JUST A SECOND, PLEASE.  PAGE AND LINE,

2     PLEASE.

3          MS. NGUYEN:  44, 16 TO 23.

4     (PAUSE IN PROCEEDINGS.)

5          MR. MCMANIS:  NO OBJECTION.

6     BY MS. NGUYEN:

7     Q.   MR. ORTEGA, DO YOU REMEMBER THAT MS. DANG GRIEVED THIS

8     TERMINATION?

9          THE COURT:  CAN I SEE COUNSEL FOR A MINUTE?

10    (SIDE-BAR OFF THE RECORD.)

11    BY MS. NGUYEN:

12    Q.   MR. ORTEGA, I'D LIKE TO READ YOUR TESTIMONY FROM A PRIOR

13    PROCEEDING.

14    A.   OKAY.

15    Q.   YOU STATED THAT "SHE ASKED TO GO HOME.  SHE WANTED AN

16    EARLY OUT AND I SAID OKAY.  NOTHING I CAN DO ABOUT THAT.  AND I

17    SAID SURE.  I WAS GOING TO CALL.  I WENT AND I CALLED VINCENT

18    SHAW AND LEFT A MESSAGE ON HIS CELL PHONE.

19         "HE CALLED ME BACK WITHIN 15 TO 30 MINUTES.  I EXPLAINED

20    TO HIM THE SITUATION.  HE SAID, WELL, YOU KNOW, THERE'S NOT A

21    WHOLE LOT WE CAN DO.  WHY DON'T WE JUST HOLD OFF ON THE

22    MEETING."

23         DOES THAT REFRESH YOUR RECOLLECTION?

24    A.   YES.

25    Q.   WAS THERE ANY EFFORT TO TRY TO RESCHEDULE THE MEETING?

1    A.   NO.

2    Q.   BECAUSE YOU LEARNED SUBSEQUENTLY THAT MR. WERNER HAD FIRED

3    MS. DANG; CORRECT?

4    A.   NO.

5    Q.   WHY WAS THERE NO EFFORT TO RESCHEDULE THE MEETING?

6    A.   BECAUSE HER HUSBAND SAID THAT HE REFUSED TO LET HER COME

7    TO ANY MEETING THAT WAS GOING TO BE WITHOUT HIM AND HE WAS

8    CONTACTING A LAWYER.

9    Q.   AND HE DIDN'T TELL YOU THAT THEY WOULD COME BACK FOR THE

10   MEETING?

11   A.   NO.

12   Q.   MR. ORTEGA, ISN'T IT TRUE THAT NO ONE IN YOUR DEPARTMENT

13   HAS EVER BEEN FIRED FOR REFUSING TO STAY TO WORK OVERTIME?

14   A.   I DON'T UNDERSTAND THE QUESTION.

15   Q.   YOU'RE IN CHARGE OF THE FOOD AND BEVERAGE DEPARTMENT;

16   RIGHT?

17   A.   YES.

18   Q.   AND SOMETIMES YOU NEED EMPLOYEES TO WORK OVERTIME?

19   A.   YES.

20   Q.   ISN'T IT TRUE THAT YOU'VE NEVER FIRED ANYBODY FOR NOT

21   BEING ABLE TO WORK OVERTIME?

22   A.   TRUE.  CAN I REPHRASE THAT?

23   Q.   SURE.

24   A.   NO, I'LL STAY WITH TRUE.

25   Q.   OKAY.  BECAUSE NOT BEING -- NOT WANTING TO STAY TO WORK

1    OVERTIME, THAT'S NOT INSUBORDINATION, IS IT?

2    A.   NO.

3    Q.   AND IT CERTAINLY IS NOT JOB ABANDONMENT FOR NOT BEING ABLE

4    TO STAY TO WORK OVERTIME, IS IT?

5    A.   YES.

6    Q.   YOU DO CONSIDER IT JOB ABANDONMENT FOR NOT STAYING TO WORK

7    OVERTIME?

8    A.   THERE WAS NO OVERTIME.

9    Q.   I'M SORRY?

10   A.   THERE WAS NO OVERTIME.

11   Q.   YOU NEVER HAD TO ASK AN EMPLOYEE TO WORK OVERTIME?

12   A.   YES.

13   Q.   AND YOU NEVER HAD AN EMPLOYEE TELL YOU THAT THEY COULDN'T

14   STAY BECAUSE THEY HAD PRIOR OBLIGATIONS?

15   A.   YES.

16   Q.   YES, YOU HAVE HAD EMPLOYEES SAY THAT?

17   A.   YES.

18   Q.   AND HAVE YOU CONSIDERED -- LET ME REPHRASE THAT.

19        HAVE YOU EVER FIRED ANY EMPLOYEE FOR STAYING OVERTIME?

20   A.   NO.

21   Q.   MR. ORTEGA, YOU HAVE WORKED SOMEWHERE ELSE BESIDES BAY 101

22   WITH MR. GEORGE CASTILLO, HAVEN'T YOU?

23   A.   NO.

24   Q.   MR. ORTEGA, ARE YOU AWARE OF OTHER EMPLOYEES COMPLAINING

25   THAT THEY FEEL THAT YOU HAVE TREATED THEM UNFAIRLY?

1    A.    NO.

2    Q.    HAVE YOU BEEN TOLD OF ANY OF THE SPECIFICS OF THE

3    INVESTIGATOR'S INVESTIGATION?

4    A.    NO.

5    Q.    AS A RESULT OF THE INVESTIGATOR'S WORK, YOU WERE SENT FOR

6    MORE TRAINING?

7    A.    NO.

8    Q.    WHAT ACTION --

9    A.    I WASN'T SENT.

10   Q.    THERE WERE SOME ACTIONS THAT WERE RECOMMENDED BY THE

11   INVESTIGATOR THAT MR. WERNER TALKED TO YOU ABOUT; RIGHT?

12   A.    YES.

13   Q.    AND WHAT WERE THOSE?

14   A.    REPEAT THAT AGAIN, PLEASE.

15   Q.    WHAT WERE THOSE?

16   A.    THE FULL QUESTION.  I DIDN'T UNDERSTAND.

17           THE COURT:  WHAT DID MR. WERNER TALK TO YOU ABOUT?

18   WHAT DID MR. WERNER TALK TO YOU ABOUT?

19           THE WITNESS:  WELL, ABOUT THE INVESTIGATION?

20           THE COURT:  YES.

21           THE WITNESS:  JUST NOT TO DO ANY MORE BANTERING

22   BETWEEN MS. ANYH HUYNH AND MYSELF AND WE STOPPED THAT.

23        AND THEN I DID SOME TRAINING WITH THE -- DID SUPERVISOR

24   TRAINING WHICH HAD TO DO WITH DIFFERENT BACKGROUNDS AND

25   CULTURES AND THINGS LIKE THAT AND HOW TO MANAGE MY STAFF A

1    LITTLE MORE DIVERSELY.

2              MS. NGUYEN:  THANK YOU.  THOSE ARE ALL OF THE

3    QUESTIONS I HAVE FOR NOW, YOUR HONOR.

4              THE COURT:  ALL RIGHT.

5                    **AS-ON DIRECT EXAMINATION**

6    BY MS. MURAKAMI:

7    Q.   GOOD MORNING, MR. ORTEGA.

8    A.   GOOD MORNING.

9    Q.   I WANT TO GO BACK TO MR. GEORGE CASTILLO'S COMPLAINT ABOUT

10   NOT BEING ABLE TO TAKE A REST BREAK.  WAS THAT JUST ONE TIME?

11   A.   YES.

12   Q.   AND SAME THING WITH REGARD TO NOT BEING ABLE TO TAKE A

13   LUNCH BREAK.  WAS THAT JUST ONE TIME?

14   A.   YES.

15   Q.   AND WHAT DID YOU ADVISE HIM TO DO IN RESPONSE TO THOSE

16   COMPLAINTS?

17   A.   TO -- CAN I ELABORATE?  I SPOKE WITH MY SUPERVISOR, WHICH

18   WAS JOHN ST. CROIX, AND HE SAID YOU TELL HIM -- THE REASON HE

19   SAID HE COULDN'T TAKE BREAKS IS BECAUSE HE HAD HIS HANDHELD

20   PHONE WHICH CONTACTS US WITH THE CASINO, AND WE ADVISED HIM YOU

21   NEED TO GIVE THE TELEPHONE TO ONE OF THE COOKS AND HAVE HIM

22   TAKE CARE OF THE PHONE CALLS THAT COME IN.

23        IF THERE WAS AN EMERGENCY, THEN YOU WOULD NEED TO CONTACT

24   HIM, BUT OTHER THAN THAT HE NEEDED TO GIVE US HIS PHONE AND

25   TAKE HIS LUNCH BREAKS.

1    Q.   OKAY.  AND AS FAR AS YOU REMEMBER, HE NEVER COMPLAINED --

2    MR. CASTILLO NEVER COMPLAINED TO YOU AGAIN ABOUT NOT BEING ABLE

3    TO TAKE MEAL BREAKS OR REST BREAKS?  DID HE COMPLAIN TO YOU

4    AGAIN?

5    A.   NO.

6    Q.   AND SO DO YOU RECALL MS. DANG BEING SWITCHED TO THE DAY

7    SHIFT IN APRIL OF 2007?

8    A.   YES.

9    Q.   AND DID YOU HEAR ANY COMPLAINTS FROM HER REGARDING

10   MR. SUAREZ AFTER SHE WAS SWITCHED TO THE DAY SHIFT?

11   A.   NO.

12   Q.   DO YOU STILL JOKE AROUND WITH MAMA AHN ABOUT VIETNAMESE

13   PEOPLE AND MEXICAN PEOPLE?

14   A.   NO.

15   Q.   AND WHY IS THAT?

16   A.   BECAUSE I SIGNED A FORM SAYING I WOULD STOP DOING THAT.

17   Q.   AND DID SOMEONE ADVISE YOU THAT YOU WERE NOT SUPPOSED TO

18   DO THAT?

19   A.   YES.

20   Q.   AND WHO WAS THAT?

21   A.   MR. WERNER.

22   Q.   DO YOU KNOW IF MS. DANG EVER HEARD YOUR BANTER BETWEEN YOU

23   AND MAMA AHN?

24   A.   NO, I DON'T.

25   Q.   I WANT TO GO BACK TO MS. DANG'S TRANSFER TO BECOME A FOOD

1       SERVER.  I THINK YOU TALKED ABOUT TWO PEOPLE BECOMING A FOOD

2       SERVER AND THEY HAD EXPERIENCE.  DID THEY HAVE EXPERIENCE AS

3       CASINO SERVERS?

4       A.   YES.

5       Q.   AND BOTH OF THEM?

6       A.   YES.

7       Q.   AND DID MS. DANG HAVE ANY CASINO EXPERIENCE?

8       A.   NO.

9       Q.   WHEN MS. DANG WAS TRANSFERRED OUT TO BECOME A FOOD SERVER,

10      WHAT KIND OF TRAINING DID SHE RECEIVE?

11      A.   SHE RECEIVED TRAINING AS FAR AS BEGINNING WITH GREETING

12      CUSTOMERS; HOW TO APPROACH A CASINO TABLE; WHEN THE CUSTOMER IS

13      IN HAND, NOT TO INTERRUPT THEM; WHILE DELIVERING THE FOOD, NOT

14      TO INTERRUPT THEM BECAUSE THEY'RE IN A HAND AND IT DISRUPTS

15      THEIR GAME.

16           SHE RECEIVED MENU TRAINING; SHE RECEIVED INFO GENESIS

17      TRAINING, WHICH IS THE COMPUTER WE USE TO SEND ORDERS BACK TO

18      THE KITCHEN OR BACK TO SUTTER'S, WHICH IS OUR SUTTER'S

19      BAR/RESTAURANT; AND SHE RECEIVED TRAINING AS FAR AS WORKING

20      WITH -- FOLLOWING, YOU KNOW, TRAINING -- OR FOLLOWING SEVERAL

21      OTHER EMPLOYEES TO MAKE SURE SHE UNDERSTOOD WHAT WAS EXPECTED

22      OF HER.

23      Q.   AND HOW MUCH TRAINING DID MS. DANG RECEIVE?

24      A.   WELL, I WOULD SAY CLOSE TO TWO MONTHS.

25      Q.   IS THAT MORE OR LESS THAN OTHER FOOD SERVERS?

1    A.   IT'S MORE.

2    Q.   AND WHY DID SHE RECEIVE MORE TRAINING THAN OTHER FOOD

3    SERVERS?

4    A.   BECAUSE SHE WOULDN'T FOLLOW THE TRAINEES, THE TRAINERS.

5    Q.   WHAT DO YOU MEAN SHE WOULDN'T FOLLOW THE CERTAIN TRAINERS?

6    A.   BECAUSE I WOULD HAVE HER FOLLOW CERTAIN TRAINERS FOR THE

7    WEEK AND SHE WOULD GO AWAY FROM THEM THINKING SHE WOULD KNOW

8    WHAT SHE WAS DOING AND THEY WOULD COME AND COMPLAIN TO ME AND I

9    WOULD SAY BE PATIENT AND STAY WITH HER AND SHE NEEDS TO LEARN,

10   AND I WOULD HAVE CONVERSATIONS WITH HER THAT SHE NEEDS TO STAY

11   WITH THE TRAINER SO SHE WOULD LEARN.

12   Q.   SO DID I HEAR YOU CORRECTLY THAT YOU SAID THAT YOU WOULD

13   RECEIVE COMPLAINTS FROM HER TRAINERS?

14   A.   YES.

15   Q.   AND AFTER YOU STOPPED MS. DANG'S FORMAL TRAINING, HOW WAS

16   HER WORK PERFORMANCE AS A FOOD SERVER?  ONCE SHE STARTED

17   WORKING DURING HER SHIFT AS A FOOD SERVER, HOW WAS HER WORK

18   PERFORMANCE?

19   A.   NOT VERY GOOD.

20   Q.   COULD YOU ELABORATE A LITTLE BIT ON THAT?

21   A.   WELL, SHE WOULD MAKE MISTAKES AS FAR AS -- SHE DIDN'T KNOW

22   THE COCKTAILS.  SHE DIDN'T KNOW THE DIFFERENT TYPES OF BEERS.

23   SHE DIDN'T KNOW THE, YOU KNOW, THE MIXES OR ANYTHING LIKE THAT.

24   SOMEONE WOULD ORDER A CERTAIN KIND OF DRINK AND SHE WOULD MAKE

25   A MISTAKE ON IT.

1    THE FOOD, SHE DIDN'T UNDERSTAND AS FAR AS TAKING BREAKFAST

2    ORDERS AND, YOU KNOW, THINGS LIKE THAT.  SHE WOULD MAKE A LOT

3    OF MISTAKES ON THOSE AND WHERE THEY WOULD HAVE TO REMAKE THE

4    ORDER AND/OR ELSE JUST FIX IT FOR HER AND GET IT OUT TO THE

5    CUSTOMER BEFORE HE GOT UPSET.

6    Q.    AND WHO TOLD YOU ABOUT MS. DANG'S WORK PERFORMANCE

7    PROBLEMS?

8    A.    GEORGE CASTILLO AND KEN MEAKCHAROON.

9    Q.    AND DID YOU HEAR ABOUT HER WORK PERFORMANCE IN TERMS OF

10   BALANCING HER ENVELOPES?

11   A.    EXCUSE ME?

12   Q.    DID YOU HEAR ABOUT HER WORK PERFORMANCE IN TERMS OF HER

13   BALANCING HER ENVELOPES?

14   A.    YES.

15   Q.    AND WHAT DID YOU HEAR?

16        MS. NGUYEN:  OBJECTION.  HEARSAY, YOUR HONOR.

17        THE COURT:  I THINK IT'S TO EXPLAIN WHAT ACTION HE

18   TOOK OR DIDN'T TAKE.  IT CANNOT BE CONSIDERED FOR THE TRUTH OF

19   WHETHER OR NOT THE COMPLAINT WAS A VALID COMPLAINT OR NOT.

20        MS. MURAKAMI:  THANK YOU, YOUR HONOR.

21   Q.    YOU CAN ANSWER THE QUESTION.

22   A.    COULD YOU REPEAT IT, PLEASE?

23   Q.    SURE.  WHAT DID YOU HEAR ABOUT HER BALANCING PROBLEMS?

24   A.    THAT SHE WAS COMING UP SHORT.  SHE WASN'T -- HER

25   ADDITION -- SHE WOULDN'T ADD UP HER PROPER ACCOUNTABLE SALES TO

1    HER EMPLOYEE MEALS TO -- HER ADDITION WAS WRONG.  HER BAG

2    WOULDN'T BALANCE.

3    Q.   WHAT IS HER BAG?

4    A.   WE CALL WHAT THEY TURN INTO THE CAGE.  IT'S AN ENVELOPE,

5    BUT WE CALL THEM BAGS.  AND SHE WOULD HAVE TO PUT THE AMOUNT OF

6    $10 BILLS, $1 BILLS, NICKELS, QUARTERS, DIMES, ALL OF THAT KIND

7    OF STUFF AND LIST THEM.

8    Q.   AND BESIDES MR. MEAKCHAROON AND MR. CASTILLO, DID ANYONE

9    ELSE MAKE YOU AWARE OF MS. DANG'S BALANCING PROBLEMS?

10   A.   KATE KNAPP.

11   Q.   AND WHO IS KATE KNAPP AGAIN?

12   A.   COMPLIANCE ANALYST.

13   Q.   COULD YOU PLEASE TURN TO EXHIBIT 548?

14   A.   IN THIS ONE?

15          MS. MURAKAMI:  MAY I APPROACH THE WITNESS?

16          THE COURT:  SURE.

17   BY MS. MURAKAMI:

18   Q.   ARE YOU AT 548?

19   A.   YES.

20   Q.   AND DO YOU RECOGNIZE THAT DOCUMENT?

21   A.   YES.

22   Q.   AND WHAT IS THAT DOCUMENT?

23   A.   FROM THE DESK OF KATE KNAPP, COMPLIANCE ANALYST, TO

24   NICK ORTEGA, THE FOOD AND BEVERAGE DEPARTMENT DIRECTOR, TO ME.

25   Q.   AND WHAT IS THE DATE OF THE DOCUMENT?

1    A.   JUNE 5TH, 2009.

2    Q.   JUNE 8TH, 2009?

3    A.   YES.

4    Q.   IT'S ALREADY ADMITTED, SO I'M NOT GOING TO GO THROUGH ALL

5    OF THIS.

6         BUT WHAT IS THIS MEMO GENERALLY ABOUT?

7    A.   IT MAKES ME AWARE OF THE MISTAKES SHE IS MAKING AND WHEN

8    SHE IS MAKING THEM AND FOR ME TO TRY AND GET HER TO COMPLY WITH

9    THE ANALYST TO MAKE SURE THAT THE FOOD AND BEVERAGE DEPARTMENT

10   IS ABLE TO BALANCE ON A DAILY BASIS.  THAT'S WHAT KATE DOES.

11           MS. MURAKAMI:  CINDY, COULD YOU PLEASE PULL UP THE

12   FIRST BULLET POINT.  THE FIRST BULLET POINT.

13   Q.   SO THIS SAYS, "THIS SERVER HAS PROBLEM ON A REGULAR BASIS.

14   THE RECOMMENDATION OF THE COMPLIANCE ANALYST IS THAT THE SERVER

15   BE MONITORED AT CLOSING AND A SUPERVISOR MUST BE PRESENT.  IN

16   THIS WAY THE SUPERVISOR CAN STOP THE INCORRECT ACTION AND

17   INSTRUCT THE SERVER IN THE PROPER WAY TO COMPLETE THE CLOSE."

18        DID YOU READ THAT?

19   A.   YES.

20   Q.   AND IN 2009, JUNE OF 2009, WHO WOULD HAVE BEEN MS. DANG'S

21   SUPERVISOR AT CLOSING?

22   A.   JOSE, MYSELF, AND BETSY.

23   Q.   AND DID YOU, IN FACT, FOLLOW MS. KNAPP'S ADVICE HERE AND

24   START HELPING MS. DANG CLOSE?

25   A.   YES.

1    Q.   AND DID ANYONE ELSE HELP HER CLOSE?

2    A.   I DON'T RECALL.

3    Q.   JUST YOU?

4    A.   I BELIEVE SO, YES.

5    Q.   AND HOW LONG DID THAT LAST, YOUR ASSISTING HER WITH

6    CLOSING?

7    A.   UNTIL THE LAST DAY THAT SHE WORKED.

8    Q.   SO FROM THE DATE OF THIS MEMO, JUNE 2009, THROUGH DECEMBER

9    OF 2009?

10   A.   YES.

11   Q.   AND WHAT EXACTLY WOULD YOU DO TO HELP HER CLOSE?

12   A.   WHEN SHE WOULD COUNT HER MONEY AND MAKE SURE ALL OF HER

13   RECEIPTS WERE IN ORDER THAT NEEDED TO BE SENT TO THE CAGE; MAKE

14   SURE SHE HAD ALL OF HER ENVELOPES FILLED OUT CORRECTLY; IF SHE

15   HAD A 20, A 10, A DOLLAR, $5, YOU KNOW, MAKE SURE EVERYTHING

16   WAS WRITTEN DOWN IN THE ORDER THAT IT WAS SUPPOSED TO BE; AND

17   THEN WE WOULD DO OUR COUNTING OF CASH AND MAKE SURE SHE HAD HER

18   EMPLOYEE MEAL IN THERE AND EVERYTHING BALANCED OUT TO THE MONEY

19   THAT SHE HAD INSIDE.

20   Q.   AND DID YOU DO THIS WITH HER AFTER EVERY SHIFT?

21   A.   YES.

22   Q.   AND DID YOU HAVE TO HELP ANY OTHER FOOD SERVER CLOSE?

23   A.   NO.

24   Q.   COULD YOU PLEASE TURN TO THE NEXT TAB 549.

25        CINDY, IF YOU COULD PUT THAT UP.  IT'S ALREADY IN

1    EVIDENCE.  CAN YOU MAKE IT ANY BIGGER?

2         THANKS.

3         DO YOU RECOGNIZE THIS DOCUMENT?

4    A.   YES.

5    Q.   AND WHAT IS THIS DOCUMENT?

6    A.   THIS IS WHEN SHE WAS -- THIS IS FROM THE DESK OF

7    KATE KNAPP, AND SHE'S THE COMPLIANCE ANALYST, SEPTEMBER 14TH,

8    2009.

9    Q.   AND DO YOU REMEMBER RECEIVING THIS?

10   A.   YES, YES.

11   Q.   OKAY.  ACTUALLY, CAN WE GET THE WHOLE.

12        SO DO YOU SEE THE NOTE ON THE BOTTOM?

13   A.   YES.

14   Q.   AND IT SAYS, "SPOKE WITH SERVER.  SHE WILL BE MORE CAREFUL

15   IN THE FUTURE, AND I TOLD HER IF SHE WANTS, SHE CAN USE ADDING

16   MACHINE."

17        WHO SIGNED THAT?

18   A.   BETSY.

19   Q.   SO DID SHE SPEAK WITH MS. DANG?

20   A.   SHE ASSISTED HER WHEN JOSE WASN'T THERE.

21   Q.   SO MS. COCHRAN ALSO ASSISTED MS. DANG IF MS. --

22   A.   YES.

23   Q.   SO MS. COCHRAN WOULD ALSO HELP HER WHEN YOU WERE NOT

24   AROUND; IS THAT RIGHT?

25   A.   SHE WOULD ASSIST HER AND CLOSE OUT HER BANK BECAUSE I WAS

1    OFF DOING OTHER THINGS.

2    Q.   SO DID YOU RECEIVE THIS MEMO AND THEN MS. COCHRAN SPOKE

3    WITH MS. DANG ABOUT IT?

4    A.   YES.  I SPOKE WITH HER AND WE PUT AN ADDITION MACHINE OVER

5    THERE TO HELP HER WITH HER ADDITION.

6    Q.   AND SO YOU SPOKE WITH MS. DANG ABOUT THIS MEMO?

7    A.   YES.

8    Q.   AND HAD SUPERVISORS BEEN HELPING MS. DANG CLOSE AT THIS

9    POINT?

10   A.   YES.

11   Q.   SO WHY WOULD THERE STILL BE MISTAKES IF THE SUPERVISORS

12   ARE HELPING HER?

13   A.   WHY?

14   Q.   YEAH.

15   A.   I DON'T RECALL.

16   Q.   OKAY.  AND DID YOU HAVE THESE MEMOS IN MIND WHEN YOU WROTE

17   UP THIS COUNSELLING MEMO IN OCTOBER OF 2009?

18   A.   YES.

19   Q.   COULD YOU PLEASE TURN TO EXHIBIT 551?  DO YOU RECOGNIZE

20   THIS EXHIBIT?

21   A.   YES.

22   Q.   AND WHAT IS THIS DOCUMENT?

23   A.   THIS IS INFORMING ME THAT THEY WERE USING A REFUND KEY

24   INSTEAD OF USING -- GOING TO THE PROPER VOID PROCEDURE, WHICH

25   IS A CASINO MANAGER SIGNING AND A LEAD SUPERVISOR SIGNING.

1    Q.   AND WHO IS "THEY"?

2    A.   FOOD SERVERS.

3    Q.   FOOD SERVERS?

4    A.   YES.

5    Q.   AND THERE ARE SEVERAL ATTACHED DOCUMENTS.  COULD YOU

6    PLEASE LOOK THROUGH THOSE?

7    A.   OKAY.

8    Q.   SO IS THIS MEMO ABOUT A PARTICULAR EMPLOYEE?

9    A.   YES.

10   Q.   AND WHICH EMPLOYEE IS THAT?

11   A.   CUC DANG.

12        MS. MURAKAMI:  YOUR HONOR, I OFFER EXHIBIT 551.

13        MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

14        THE COURT:  551 IS ADMITTED.

15        MS. MURAKAMI:  THANK YOU.

16   (DEFENDANT'S EXHIBIT 551 WAS RECEIVED IN EVIDENCE.)

17        MS. MURAKAMI:  CINDY, COULD YOU PLEASE PUT THAT UP.

18   Q.   SO COULD YOU PLEASE REPEAT AGAIN YOUR TESTIMONY REGARDING

19   WHAT A VOID IS VERSUS A REFUND.

20   A.   ON THE AGYLIS MACHINE THERE'S A REFUND THAT IS NOT

21   SUPPOSED TO BE USED AND WE DISABLED IT AFTER A WHILE, BUT IT

22   WAS BEING USED BY SERVERS AND CUC DANG AND IT TAKES ITEMS AWAY

23   FROM THE CHECK WITHOUT HAVING A SIGNATURE FROM THE CASINO SHIFT

24   MANAGER AND THE LEAD SUPERVISOR, LEAD COOK, AND THAT IS NOT THE

25   PROPER PROCEDURE.

1           THE PROPER PROCEDURE IS THE CASINO SHIFT MANAGER, LEAD

2    SUPERVISOR, AND THEN IT'S VOIDED WHEN THE FOOD COMES BACK AND

3    HE OBSERVES THE FOOD TO BE VOIDED.

4    Q.   AND DID YOU SPEAK WITH MS. DANG AFTER YOU RECEIVED THIS

5    MEMO?

6    A.   YES.

7    Q.   AND WHEN DID YOU SPEAK WITH HER?

8    A.   WHEN I RECEIVED THE MEMO.

9    Q.   OKAY.  DO YOU REMEMBER WHAT YOU SPOKE ABOUT WITH HER?

10   A.   LETTING -- INFORMING HER NOT TO USE THE REFUND KEY AND YOU

11   SHOULD USE THE PROPER PROCEDURES FOR THE VOIDS.

12        WE EVEN PUT SIGNS UP FOR THEM.

13   Q.   OKAY.  AND HOW DID SHE RESPOND?

14   A.   I DON'T RECALL.

15   Q.   OKAY.  COULD YOU PLEASE TURN TO EXHIBIT 14.  IT MIGHT BE

16   IN A DIFFERENT BINDER.

17        SO IS THIS A MEMO FROM MS. COCHRAN?

18   A.   YES.

19   Q.   AND I BELIEVE PLAINTIFF'S COUNSEL JUST ASKED YOU A COUPLE

20   OF QUESTIONS ABOUT IT.

21        DID YOU ASK MS. COCHRAN TO WRITE YOU THIS MEMO?

22   A.   YES.

23   Q.   AND WHY DID YOU ASK HER TO WRITE YOU THE MEMO?

24   A.   FOR THE UNION.

25   Q.   AND WHAT DO YOU MEAN BY THAT?

1    A.   WELL, IN CASE THERE WERE ARBITRATIONS AND THINGS LIKE

2    THAT, WE ALWAYS KEEP MEMOS OF THINGS THAT WE HAVE HAD

3    CONVERSATIONS WITH OTHER EMPLOYEES.

4    Q.   OKAY.  DID YOU ASK MS. COCHRAN TO WRITE THIS MEMO IN ORDER

5    TO INTERFERE WITH BAY 101'S INVESTIGATION?

6    A.   NO.

7    Q.   AND DID YOU TELL MS. COCHRAN WHAT TO WRITE?

8    A.   NO.

9    Q.   COULD YOU PLEASE TURN TO THE NEXT ONE, EXHIBIT 15.

10   IS THAT THE NOVEMBER 10TH, 2009, MEMO FROM JOSE SOLIS?

11   A.   YES.

12   Q.   AND I BELIEVE PLAINTIFF'S COUNSEL ALSO ASKED YOU ABOUT

13   THIS MEMO AS WELL.

14   DID YOU ASK MR. SOLIS TO DRAFT THIS STATEMENT?

15   A.   OF THE CONVERSATIONS, YES.

16   Q.   OKAY.  AND WHY DID YOU ASK HIM TO DO THAT?

17   A.   FOR THE UNION.

18   Q.   AND "FOR THE UNION," THAT MEANS --

19   A.   IF THERE WAS ANY DISCREPANCY, ARBITRATIONS.

20   Q.   SO YOU'RE JUST MAKING A RECORD?

21   A.   YES.

22   Q.   AND DID YOU SOLICIT THIS REPORT FOR HIM TO INTERFERE WITH

23   BAY 101'S INVESTIGATION?

24   A.   NO.

25   Q.   COULD YOU PLEASE GET THE BINDER WITH THE 500'S AND TURN TO

1    503.

2         DO YOU RECOGNIZE THIS DOCUMENT?

3    A.   YES.

4    Q.   AND WHAT IS THIS DOCUMENT?

5    A.   THIS DOCUMENT IS A DECEMBER 5TH, 2009.  IT HAS TO DO WITH

6    THE SITUATION THAT CUC DANG HAD TRIED TO BUY -- NOT TRIED TO

7    BUY.

8         SHE ORDERED A DRINK THROUGH THE AGYLIS, A-G-Y, WILD GUESS,

9    L-I-S, THE AGYLIS MACHINE, SENDING A TICKET ORDERING A GLASS OF

10   RED WINE, WHICH WAS AFTER THE HOURS THAT WE ALLOW SERVERS TO

11   BUY DRINKS FOR THE CASINO FLOOR.

12        AND SHE WENT TO COLLECT AND THE SERVER, BARTENDER, TOLD

13   HER THAT IT'S TOO LATE TO BE ABLE TO GET A DRINK AND SHE -- SO

14   SHE REFUSED HER BECAUSE SHE DIDN'T WANT TO BE WRITTEN UP FOR

15   SELLING LIQUOR AFTER THE ALLOTTED TIME.

16        SO SHE WENT TO JESSE DOMINGO, WHO IS A PORTER, AND GAVE

17   HER THE RECEIPT AND THE $20 BILL AND TOLD HER TO GO AROUND AND

18   INTO SUTTER'S, WHICH YOU COULD STILL BUY A DRINK IF YOU DRANK

19   IT INSIDE OF SUTTER'S, TO GET A GLASS OF WINE FOR HER FOR THE

20   CUSTOMER ON THE CASINO FLOOR, WHICH OUR PORTERS ARE NOT ALLOWED

21   TO SERVE ALCOHOL.

22        AND SO SHE WENT IN THERE AND BETH LICONA THAT TOLD HER

23   THAT SHE COULD NOT BE GETTING DRINKS FOR OTHER -- FOR THE

24   SERVERS BECAUSE SHE SAW THE TICKET WAS FOR CUC.

25        SO SHE GOT REALLY SCARED BECAUSE BETH TOLD HER SHE WAS

1    GOING TO GET IN TROUBLE, YOU CAN'T BE DOING THAT.

2    Q.   AND LET ME CUT YOU OFF.  WHO IS "SHE"?

3    A.   BETH LICONA.

4    Q.   COULD YOU PLEASE USE THEIR FIRST NAMES BECAUSE THERE ARE

5    TOO MANY "SHE'S" AND "HERS"?

6    A.   OKAY.  LILIBETH TOLD JESSICA DOMINGO NOT TO BE DOING THIS

7    BECAUSE JESSE COULD GET HERSELF IN TROUBLE, AND SO SHE WENT

8    BACK -- AND SO JESSICA WENT BACK AND GAVE CUC HER MONEY AND SHE

9    WAS UPSET BECAUSE JESSICA THOUGHT SHE WAS GOING TO BE IN

10   TROUBLE.

11   Q.   SO WHAT IS THE PURPOSE OF THIS DOCUMENT?

12   A.   THE PURPOSE OF IT IS THAT BECAUSE SHE WAS PROTECTING

13   HERSELF.  SHE WANTED TO KNOW IF SHE WAS GOING TO BE FIRED OR

14   TERMINATED OR ANYTHING BECAUSE WHAT SHE WAS TRYING TO DO AND

15   SHE WASN'T.

16           MR. MCMANIS:  "SHE" IS JESSICA?

17           THE WITNESS:  JESSICA.  I'M SORRY.

18           MS. MURAKAMI:  YOUR HONOR, I OFFER EXHIBIT 503.

19           MS. NGUYEN:  YOUR HONOR, WE WOULD OBJECT AS HEARSAY.

20       AND I DON'T KNOW IF MS. DOMINGO WILL BE COMING IN, BUT I

21   THINK IT'S HEARSAY.

22           THE COURT:  WELL, IT DEPENDS WHAT IT IS OFFERED FOR.

23       IF IT'S OFFERED FOR ONE OF THE DOCUMENTS ON WHICH

24   MR. WERNER MADE HIS DECISION, THEN IT CAN BE CONSIDERED AS TO

25   WHETHER IT'S -- IN WHAT WAY IT AFFECTED HIS DECISION, IF IT

1    DID.

2         IT CANNOT BE CONSIDERED FOR THE TRUTH OF WHAT IS RELATED

3    IN THE DOCUMENT BECAUSE THAT WOULD HAVE TO COME FROM A WITNESS

4    WHO SAW WHAT OCCURRED.

5              MS. NGUYEN:  YOUR HONOR, MR. WERNER IS NOT ON THE

6    STAND.

7              THE COURT:  IT DOESN'T MATTER.

8              MS. MURAKAMI:  YOUR HONOR, IT'S NOT BEING OFFERED

9    FOR THE TRUTH.

10              THE COURT:  I UNDERSTAND THAT.

11         I'LL ALLOW IT TO COME IN FOR SHOWING THE ACTION WAS TAKEN,

12    AND IF THE JURY FINDS THAT MR. WERNER CONSIDERED THIS DOCUMENT

13    IN MAKING HIS DECISION, THEY CAN CONSIDER IT FOR THE PURPOSES

14    OF IT TO BE CONSIDERED.

15         BUT IT'S NOT EVIDENCE OF WHAT IS RELATED IN THE MEMO.

16              MS. MURAKAMI:  THANK YOU, YOUR HONOR.

17         (DEFENDANT'S EXHIBIT 503 WAS RECEIVED IN EVIDENCE.)

18              MS. MURAKAMI:  CINDY, COULD I GET THAT ON THE

19    SCREEN.

20    Q.   IS THAT JESSICA'S SIGNATURE ON THE BOTTOM?

21    A.   YES.

22    Q.   AND SO DID YOU SPEAK WITH MS. DOMINGO ABOUT THIS INCIDENT

23    BEFORE YOU WROTE THE STATEMENT?

24    A.   SHE CAME TO ME.

25    Q.   SHE CAME TO YOU?

1      A.   YES.

2      Q.   AND DID YOU TELL HER WHAT TO WRITE?

3      A.   NO.

4      Q.   AND DID YOU SPEAK WITH MS. DANG ABOUT THIS INCIDENT?

5      A.   YES.

6      Q.   AND WHAT DID MS. DANG SAY ABOUT THE INCIDENT?

7      A.   I DON'T RECALL WHAT SHE SAID.

8      Q.   WAS MS. DANG DISCIPLINED FOR THIS INCIDENT?

9      A.   DISCIPLINED?

10     Q.   DID YOU GIVE HER A WARNING OR WAS SHE SUSPENDED?

11     A.   NO.

12     Q.   LET'S MOVE ON.  COULD YOU PLEASE TURN TO 504.  IT'S THE

13     NEXT ONE.

14          DO YOU RECOGNIZE THAT DOCUMENT?

15     A.   YES.

16     Q.   AND WHAT IS THAT DOCUMENT?

17     A.   LILIBETH'S DECEMBER 17TH, 2009, NICK ORTEGA, DIRECTOR F&B,

18     BAY 101.

19     Q.   OKAY.

20          MS. MURAKAMI:  CINDY, COULD WE GET THIS UP THERE?

21     IT'S ALREADY IN EVIDENCE.

22     Q.   AND WHAT IS THIS STATEMENT GENERALLY ABOUT?

23     A.   SHE WROTE UP A VIRGIN MARGARITA, CUC DANG, AND DECIDED SHE

24     MADE A MISTAKE ON THAT.  I BELIEVE THAT'S WHAT IT WAS.

25          AND SHE CAME -- AND SHE SAID SHE WANTED A REGULAR

1    MARGARITA, AND LILIBETH KNOWS THAT WE NEED TO VOID THE VIRGIN

2    MARGARITA IN ORDER TO BE ABLE TO RECEIVE ANOTHER DRINK OF A

3    DIFFERENT KIND.

4    Q.   AND DID MS. LICONA SPEAK TO YOU ABOUT THIS INCIDENT?

5    A.   YES, SHE DID.  SHE LEFT ME A MESSAGE ON THE PHONE.

6    Q.   AND SO DID YOU FOLLOW UP WITH HER AFTER YOU GOT THAT

7    MESSAGE?

8    A.   YES.

9    Q.   OKAY.  AND DOES THIS DOCUMENT ACCURATELY REFLECT WHAT

10   MS. LICONA TOLD YOU?

11   A.   YES.

12   Q.   AND WHAT IS THE PURPOSE OF THIS DOCUMENT?

13   A.   FOR THE UNION.

14   Q.   DID YOU TELL MS. LICONA WHAT TO WRITE?

15   A.   NO.

16   Q.   AND WAS MS. DANG DISCIPLINED IN RELATIONSHIP TO THIS

17   INCIDENT?

18   A.   I SPOKE WITH HER.

19   Q.   AND DID SHE RECEIVE A COUNSELLING MEMO?

20   A.   NOT THAT I RECALL.

21   Q.   AND WHAT WAS MS. DANG'S RESPONSE WHEN YOU SPOKE TO HER

22   ABOUT THIS INCIDENT?

23   A.   DENIED WHAT HAD HAPPENED AND GOT UPSET AND BLAMED

24   LILIBETH LICONA AND SAID SHE WAS AT FAULT.

25   Q.   I HAVE A FEW QUESTIONS ABOUT THE OCTOBER 2009 INCIDENT

1      BETWEEN MS. ELIAS AND MS. DANG.

2              THE COURT:  WHY DON'T WE TAKE A BREAK AT THIS TIME

3      SINCE YOU'RE SWITCHING?

4              MS. MURAKAMI:  OKAY.  WE'LL BE IN RECESS FOR

5      15 MINUTES.

6          (RECESS FROM 12:12 P.M. UNTIL 12:29 P.M.)

7              THE COURT:  ALL RIGHT.  YOU MAY CONTINUE.

8              MS. MURAKAMI:  CINDY, COULD WE START WITH 534,

9      ALREADY IN EVIDENCE.

10     Q.  SO GOING BACK TO THE OCTOBER 4TH, 2009, INCIDENT -- IT'S

11     OKAY, MR. ORTEGA.  YOU CAN JUST LOOK AT IT ON THE SCREEN.

12     A.  OKAY.

13     Q.  YEAH.  DO YOU RECOGNIZE THIS DIAGRAM?

14     A.  YES.

15     Q.  NOW, WHERE ON THIS DIAGRAM IS THE AREA WHERE MS. DANG

16     AND MS. ELIAS HAD THEIR INCIDENT IN OCTOBER OF 2009?

17     A.  ON THE POKER SIDE.

18     Q.  ON THE POKER SIDE TO THE RIGHT (INDICATING)?

19     A.  YES, TO THE RIGHT.

20     Q.  OKAY.  AND WHERE IS THE KITCHEN?

21     A.  ALL OF THE WAY TO THE BACK OF THE BUILDING.

22     Q.  SO ARE THERE DOORS BETWEEN THE POKER AREA AND THE KITCHEN?

23     A.  YES, THERE ARE AUTOMATIC DOORS THERE.

24     Q.  AND WHAT IS MR. MEAKCHAROON'S POSITION AGAIN?

25     A.  HE'S THE LEAD COOK.

1     Q.   SO DOES HE WORK IN THE KITCHEN?

2     A.   YES.

3     Q.   AND DOES HE EVER COME OUT ON THE FLOOR?

4     A.   YES.

5     Q.   AND HE COMES OUT ONTO THE CASINO FLOOR AT TIMES?

6     A.   YES, HE CAN.

7     Q.   HE CAN.  OKAY.

8          IF PEOPLE WERE ARGUING ON THE POKER ROOM FLOOR, WOULD

9     ANYBODY IN THE KITCHEN BE ABLE TO HEAR THAT?

10    A.   NO.

11    Q.   SO I THINK YOU TESTIFIED THAT YOU GOT STATEMENTS FROM

12    LINDA ELIAS, ARLENE FONTILLAS, AND KEN MEAKCHAROON; IS THAT

13    RIGHT?

14    A.   YES.

15    Q.   AND YOU REQUESTED THAT THEY MAKE STATEMENTS?

16    A.   YES.

17    Q.   AND DID YOU TELL THEM WHAT TO WRITE IN THEIR STATEMENTS?

18    A.   NO.

19    Q.   AND DID YOU REVIEW THOSE STATEMENTS BEFORE MAKING THE

20    DECISION TO SUSPEND MS. DANG?

21    A.   I DON'T RECALL.

22    Q.   DID YOU REVIEW THE SURVEILLANCE VIDEO BEFORE MAKING THE

23    DECISION TO SUSPEND MS. DANG?

24    A.   YES.

25    Q.   SO I WANT TO GO TO THE MEETING WHERE YOU INFORMED MS. DANG

1    ABOUT HER SUSPENSION AS A RESULT OF THE OCTOBER INCIDENT.

2        DID YOU GIVE MS. DANG THE OPPORTUNITY TO TELL HER SIDE OF

3    THE STORY?

4    A.   YES.

5    Q.   DID MS. DANG REQUEST A UNION REPRESENTATIVE FOR THIS

6    MEETING?

7    A.   NO.

8    Q.   I WANT TO GO TO EXHIBIT 1001, BAY 1331?

9            MR. MCMANIS:  WHAT WAS THAT AGAIN, PLEASE?

10           MS. MURAKAMI:  EXHIBIT 1001, BATE STAMP 1331.

11           MR. MCMANIS:  THANK YOU.

12   BY MS. MURAKAMI:

13   Q.   AND DO YOU RECOGNIZE THIS COUNSELLING MEMO?

14       OH, SURE, GO AHEAD AND YOU CAN LOOK AT IT IN THE BINDER.

15   A.   1001?

16   Q.   1001.  AND THE STAMP AT THE BOTTOM IS BAY 1331?

17   A.   1331?

18   Q.   YES.

19       DO YOU RECOGNIZE THAT MEMO?

20   A.   YES.

21   Q.   DO YOU REMEMBER GIVING THIS MEMO TO MS. DANG AT THIS

22   MEETING REGARDING HER SUSPENSION?

23   A.   YES.

24   Q.   AND WAS THERE AN ISSUE BETWEEN MS. ELIAS AND MS. DANG ON

25   OCTOBER 4TH THAT RELATED TO BALANCING ENVELOPES?

1      A.   COULD YOU REPEAT THE QUESTION?

2      Q.   SO THE INCIDENT FOR WHICH MS. DANG WAS BEING SUSPENDED,

3      THE OCTOBER 4TH INCIDENT, DID THAT INVOLVE BALANCING ENVELOPES?

4      A.   NO.

5      Q.   AND SO WHY WOULD MS. DANG RECEIVE A COUNSELLING MEMO ABOUT

6      HER ENVELOPES AT THIS MEETING?

7      A.   SHE WAS HAVING TROUBLE STILL TOWARDS THE END.

8      Q.   AND AT THIS POINT -- AT THIS TIME WAS MS. DANG STILL

9      RECEIVING ASSISTANCE WITH HER ENVELOPES?

10     A.   YES.

11     Q.   AND DID YOU VIEW HER BALANCING ENVELOPES AS A CONTINUING

12     PROBLEM?

13     A.   YES.

14     Q.   NOW, GOING -- DID YOU OR MS. GILBERT TELL MS. DANG TO SHUT

15     UP DURING THIS MEETING?

16     A.   NO.

17     Q.   AND DID YOU TELL MS. DANG DURING THIS MEETING THAT YOU

18     WOULD SEND HER BACK TO THE KITCHEN?

19     A.   THAT I WOULD SEND HER BACK?  NO.

20     Q.   DID YOU MENTION TO HER IN ANY WAY THAT SHE MIGHT HAVE TO

21     GO BACK TO THE KITCHEN TO WORK?

22     A.   YES.

23     Q.   AND WHAT DID YOU SAY EXACTLY?

24     A.   I SAID THAT IF IT CONTINUES, YOU KNOW, WE WOULD OFFER HER

25     A JOB IN THE KITCHEN BECAUSE SHE -- YOU KNOW, BECAUSE OF THE

1    PERFORMANCE SHE WAS HAVING -- THE PERFORMANCE ISSUES SHE WAS

2    HAVING ON THE FLOOR.

3    Q.   DO YOU RECALL THAT BAY 101 PERFORMED AN INVESTIGATION

4    FOLLOWING THE OCTOBER 2009 INCIDENT?

5    A.   YES.

6    Q.   AND DO YOU KNOW THE PURPOSE OF THAT INVESTIGATION?

7    A.   IT WAS TO INVESTIGATE ACCUSATIONS THAT WERE MADE TOWARDS

8    ME.

9    Q.   AND I THINK YOU TESTIFIED THAT YOU HELPED WITH SOME

10   SCHEDULING --

11   A.   YES.

12   Q.   -- OF EMPLOYEE INTERVIEWS.

13   A.   YES.

14   Q.   AND WHAT DID YOU TELL PEOPLE WHEN YOU TOLD THEM THAT THEY

15   HAD TO GO TO THE INTERVIEW WITH THE INVESTIGATOR?

16   A.   I TOLD THEM THAT THEY HAD TO GO UP TO THE ELEVATOR TO THE

17   ACCOUNTING ROOM AND BE THERE AT A CERTAIN TIME.

18   Q.   AND DID YOU TELL THEM WHAT THE INVESTIGATION WAS ABOUT?

19   A.   NO.

20   Q.   AND DID YOU DISCUSS THE INVESTIGATION WITH THESE EMPLOYEES

21   IN ANY WAY?

22   A.   NO.

23   Q.   IS THERE ANYONE ELSE WHO WOULD HAVE TOLD THE EMPLOYEES TO

24   MEET WITH THE INVESTIGATOR?

25   A.   NO.

1    Q.   AND WHY IS THAT?

2    A.   I DO THE SCHEDULING AND OTHER EMPLOYEES, THEY JUST DON'T

3    UNDERSTAND -- THAT'S JUST NOT WHAT THEY DO.

4    Q.   AND DO YOU REMEMBER BEING INTERVIEWED BY THE INVESTIGATOR?

5    A.   YES.

6    Q.   AND WHAT DID THE INVESTIGATOR ASK YOU ABOUT?

7    A.   SEXUAL HARASSMENT QUESTIONS, DISCRIMINATION QUESTIONS, IF

8    I HAVE EVER BANTERED WITH NGA NGUYEN.

9    Q.   AND WERE YOU EVER ASKED TO MEET WITH THAT INVESTIGATOR?

10   A.   YES.

11   Q.   AND WHO WAS THAT?

12   A.   JENNIFER GILBERT.

13   Q.   AND DID SHE TELL YOU WHAT TO SAY TO THE INVESTIGATOR?

14   A.   NO.

15   Q.   AND DID THE INVESTIGATOR TRY TO GET YOU TO ANSWER ONE WAY

16   OR ANOTHER?

17   A.   NO.

18   Q.   I THINK YOU TESTIFIED THAT YOU HAD TO DO SOME SUPERVISOR

19   TRAINING --

20   A.   YES.

21   Q.   -- AS A RESULT OF THE INVESTIGATION?

22   A.   YES.

23   Q.   AND HOW LONG WAS THAT TRAINING?

24   A.   EIGHT HOURS.

25   Q.   TOTAL?

1    A.   TOTAL, YES.

2    Q.   AND WAS THAT IN A CLASS OR WAS IT WITH ONE PERSON?

3    A.   ONE ON ONE.

4    Q.   NOW, I WANT TO TALK ABOUT DECEMBER 21ST, 2009.

5         WHAT TIME DID YOU GET INTO WORK THAT DAY?

6    A.   APPROXIMATELY 3:00, 3:30.

7    Q.   AND IS THAT DIFFERENT FROM THE TIME THAT YOU WOULD

8    NORMALLY COME IN?

9    A.   YES.

10   Q.   AND IS IT EARLIER OR LATER?

11   A.   EARLIER.

12   Q.   AND WHAT TIME DO YOU USUALLY COME INTO WORK?

13   A.   4:30, 5:00.

14   Q.   NOW, AFTER YOU TOLD MS. DANG ABOUT THIS MEETING IN H.R.,

15   DID SHE SAY ANYTHING TO YOU ABOUT HER DAUGHTER?

16   A.   NO.

17   Q.   DID SHE SAY ANYTHING TO YOU ABOUT HER HUSBAND?

18   A.   NO.

19   Q.   DID YOU TRY TO MOVE THE MEETING EARLIER?

20   A.   YES.

21   Q.   WERE YOU ABLE TO MOVE THE MEETING EARLIER?  WERE YOU ABLE

22   TO MOVE THE MEETING UP EARLIER?

23   A.   YES, I WAS -- I MEAN, I DON'T UNDERSTAND THE QUESTION.

24   Q.   DID YOU TRY TO MOVE THE MEETING TO AN EARLIER TIME AFTER

25   MS. DANG SAID SHE WASN'T GOING TO THE MEETING?

1      A.    I WAS GOING TO, YES, I WAS GOING TO GET AHOLD OF JENNIFER

2      AND VINCE.

3      Q.    SO YOU WERE GOING TO TRY?

4      A.    YES.

5      Q.    AND DID SOMETHING INTERRUPT THAT?

6      A.    I RECEIVED A PHONE CALL FROM SOMEBODY CLAIMING TO BE HER

7      HUSBAND.

8      Q.    CLAIMING TO BE MS. DANG'S HUSBAND?

9      A.    YES.

10     Q.    AND WHAT DID MS. DANG'S HUSBAND SAY TO YOU?

11     A.    HE WAS ASKING ME QUESTION AS FAR AS, YOU KNOW, WHO

12     AUTHORIZED THIS MEETING AND I SAID MR. RON WERNER, AND HE SAID,

13     "WELL, SHE'S NOT ATTENDING ANY MEETING WITHOUT ME."

14           I SAID, "SHE'S A BAY 101 EMPLOYEE AND WE NEED TO SPEAK TO

15     HER."

16           AND HE SAID, "WELL, SHE'S NOT GOING TO BE AT ANY MEETING

17     WITHOUT ME AND I'LL BE CONTACTING A LAWYER."

18           AND HE GAVE ME HIS PHONE NUMBER AND TELLING ME "RON WERNER

19     CAN CONTACT ME IF NEED BE."

20     Q.    AND DID HE REFUSE ON HER BEHALF?

21     A.    I ASKED HIM THAT QUESTION, IF HE WAS REFUSING ON HER

22     BEHALF, AND HE SAID YES.

23     Q.    OKAY.  AND WHAT DID YOU DO AFTER GETTING OFF THE PHONE

24     WITH MS. DANG'S HUSBAND?

25     A.    I WENT AND CALLED VINCE SHAW AND JENNIFER GILBERT.

1    Q.   OKAY.  DID YOU TALK TO MS. DANG AGAIN THAT MORNING?

2    A.   YES.

3    Q.   AND WHAT DID YOU TALK TO HER ABOUT?

4    A.   SHE ASKED ME IF SHE COULD HAVE AN EARLY OUT.

5    Q.   AND SO THIS REQUEST TO HAVE AN EARLY OUT, WAS THAT AFTER

6    YOU HAD SPOKEN WITH HER HUSBAND ON THE PHONE?

7    A.   YES.

8    Q.   AND DID SHE TELL YOU WHY SHE WANTED TO GO HOME EARLY?

9    A.   SHE WAS TIRED.

10   Q.   AND WHAT DID YOU SAY IN RESPONSE?

11   A.   YES.

12   Q.   YES, SHE COULD GO LEAVE EARLY?

13   A.   YES, SHE COULD GO.

14   Q.   AND IS IT YOUR NORMAL PRACTICE TO DEAL WITH EMPLOYEE'S

15   SPOUSES?

16   A.   NO.

17   Q.   HAVE YOU EVER ASKED MR. WERNER TO CALL AN EMPLOYEE'S

18   SPOUSE?

19   A.   NO.

20   Q.   COULD YOU PLEASE TURN TO EXHIBIT 1003.

21        DO YOU RECOGNIZE THAT DOCUMENT?

22   A.   YES.

23   Q.   AND WHAT IS THAT DOCUMENT?

24   A.   THE DOCUMENT IS WHAT I -- IS WHAT CONVERSATION I HAD WITH

25   HER, WITH CUC DANG, AND THE CONVERSATION I HAD OVER THE PHONE

1    WITH HER -- WITH A MAN SAYING IT WAS HER HUSBAND.

2    Q.   AND DID YOU PREPARE THIS DOCUMENT?

3    A.   I DID, YES.

4    Q.   AND DID YOU GIVE THIS DOCUMENT TO ANYBODY?

5    A.   I GAVE THIS DOCUMENT TO HUMAN RESOURCES.

6    Q.   TO HUMAN RESOURCES?

7    A.   YES.

8    Q.   OKAY.

9              MS. MURAKAMI:  YOUR HONOR, I OFFER EXHIBIT 1003.

10             MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

11             THE COURT:  1003 IS ADMITTED THANK YOU.

12        (DEFENDANT'S EXHIBIT 1003 WAS RECEIVED IN EVIDENCE.)

13             MS. MURAKAMI:  CINDY, COULD WE HAVE IT UP?

14   Q.   SO THE TOP OF THIS SAYS JANUARY 7TH, 2010.  IS THAT WHEN

15   YOU WROTE THIS DOCUMENT?

16   A.   NO.

17   Q.   AND WHEN DID YOU MAKE -- WHEN DID YOU PREPARE YOUR

18   DOCUMENT?

19   A.   SHORTLY AFTER I HAD THE CONVERSATION WITH JENNIFER AND

20   VINCE SHAW.

21   Q.   WAS THAT A TYPEWRITTEN DOCUMENT OR A HANDWRITTEN DOCUMENT?

22   A.   HANDWRITTEN.

23   Q.   SO YOU ORIGINALLY HAD A HANDWRITTEN DOCUMENT?

24   A.   YES.

25   Q.   AND WHO TYPED THIS?

1    A.    BETSY COCHRAN.

2    Q.    AND WHO WAS THAT?

3    A.    SHE'S IN A MANAGEMENT POSITION.  SHE DOES PURCHASING

4    AND --

5    Q.    SO MS. COCHRAN TYPED UP THE DOCUMENT WITH THE DATE THAT

6    SHE TYPED IT OR THE DATE THAT THE PERSON WROTE THE STATEMENT?

7    A.    SHE TYPES IT WITH THE DATE THAT SHE TYPES IT.  SHE PUTS A

8    DATE ON IT THAT SHE TYPED IT.

9    Q.    OKAY.  SO YOU WROTE THIS ON DECEMBER 21ST, BUT SHE TYPED

10   IT ON JANUARY 7TH?

11   A.    YES.

12   Q.    OKAY.  AND DOES THIS STATEMENT ACCURATELY REFLECT WHAT

13   HAPPENED THAT DAY?

14   A.    YES.

15   Q.    THANK YOU.  THAT'S ALL.

16          THE COURT:  OKAY.  MS. NGUYEN, ANYTHING FURTHER?

17          MS. NGUYEN:  THANK YOU, YOUR HONOR.

18                    **AS-ON RECROSS-EXAMINATION**

19   BY MS. NGUYEN:

20   Q.    MR. ORTEGA, I'D LIKE YOU TO TAKE A LOOK AT EXHIBIT 550,

21   PLEASE.

22          MR. MCMANIS:  WHAT WAS THAT NUMBER AGAIN?

23          MS. NGUYEN:  550.

24   Q.    HAVE YOU FOUND IT?

25   A.    YES.

1    Q.   AND THIS IS ANOTHER MEMO FROM MS. KNAPP, CORRECT?

2    A.   IT IS.

3    Q.   AND DO YOU SEE IT THERE THAT MS. KNAPP WROTE, "MY

4    DOCUMENTATION OF THE ERRORS FOR MS. DANG IS ABOUT THE SAME FOR

5    ANY OTHER SERVER."

6         DO YOU SEE THAT?

7    A.   YES.

8    Q.   AND TOWARD THE BOTTOM, THE VERY LAST PARAGRAPH, SHE NOTED

9    THAT "THIS SERVER HAS THE POTENTIAL TO BE VERY GOOD AT HER

10   JOB."

11        DO YOU SEE THAT?

12   A.   YES.

13   Q.   "AND THAT SHE ONLY NEEDS TO BE ABLE TO ASK FOR HELP AND

14   NOT TO FEEL AS IF SHE IS SINGLED OUT."

15        DO YOU SEE THAT?

16   A.   YES.

17   Q.   AND I'D LIKE FOR YOU TO TURN A FEW PAGES TO -- IT'S THE

18   DOCUMENT BATES STAMPED BAY 1535.

19        DO YOU HAVE THAT IN FRONT OF YOU NOW, MR. ORTEGA?

20   A.   1535?

21   Q.   YES.

22   A.   YES.

23   Q.   AND DO YOU SEE TOWARD THE BOTTOM MS. DANG'S NAME?

24   A.   YES.

25   Q.   AND THAT SHE IS SHORT $20.60?

1    A.   YES.

2    Q.   AND ON THAT PAGE ANOTHER SERVER BY THE NAME OF

3    AMY SARDCHIEN, S-A-R-D-C-H-I-E-N, SHE'S SHORT $25.91?

4    A.   YES.

5    Q.   AND THAT THERE ARE OTHER SERVERS ON THERE WITH

6    DISCREPANCIES, FOR EXAMPLE, $4, $27, $12, $43, $34, 29.

7         DO YOU SEE ALL OF THOSE?

8    A.   YES.

9    Q.   WERE THEY ALL WRITTEN UP?

10   A.   NO.

11   Q.   YOU TESTIFIED EARLIER, MR. ORTEGA, WHEN YOU SPOKE TO

12   MR. SUMMERS, WHO CLAIMED TO BE MS. DANG'S HUSBAND, HE WAS THE

13   ONE WHO REFUSED TO HAVE HER ATTEND THE MEETING; RIGHT?

14   A.   REPEAT THAT AGAIN.

15   Q.   I'M REFERRING BACK TO YOUR CONVERSATION WITH

16   MR. SUMMERS --

17   A.   YES.

18   Q.   -- OF DECEMBER 21ST.

19        AND WAS IT YOUR TESTIMONY THAT IT WAS MR. SUMMERS WHO SAID

20   THAT HE WAS REFUSING, ON HIS WIFE'S BEHALF, FOR HER TO ATTEND

21   THE MEETING AND H.R. AFTER HER SHIFT ENDED?

22   A.   WHEN HE CALLED, YES.  WHEN HE CALLED?

23   Q.   YES.  SO THAT WAS YOU CONSIDERING HER REFUSING TO ATTEND

24   THE MEETING; CORRECT?

25   A.   YES.

1    Q.   AND AFTER YOU SPOKE WITH MR. SUMMERS, YOU HAD NO FURTHER

2    CONVERSATION WITH MS. DANG OTHER THAN TO LET HER OUT EARLY THAT

3    DAY?

4    A.   YES.

5    Q.   DID YOU EVER ASK HER WHETHER SHE WAS REFUSING TO ATTEND

6    THE MEETING?

7    A.   I DIDN'T ASK HER.

8    Q.   DID YOU EVER TALK TO HER ABOUT HER HUSBAND REFUSING ON HER

9    BEHALF?

10   A.   NO.

11   Q.   I'D LIKE FOR YOU TO TURN YOUR ATTENTION NOW TO

12   EXHIBIT 1003.

13       YOU TESTIFIED, MR. ORTEGA, THAT YOU ACTUALLY WROTE THAT

14   STATEMENT ON THE 21ST OF -- DECEMBER 21ST, 2009; IS THAT

15   CORRECT?

16   A.   I'M MAKING SURE.

17   Q.   THAT'S THE ONE THAT YOU JUST SPOKE TO COUNSEL ABOUT, ABOUT

18   FIVE MINUTES AGO?

19   A.   YES.

20   Q.   AND YOU RECALL TESTIFYING THAT YOU HAD WRITTEN IN

21   HANDWRITING YOUR STATEMENT ON DECEMBER 21ST, 2009?

22   A.   YES.

23   Q.   BUT THAT IT WAS BETSY WHO TYPED IT UP FOR YOU ON

24   JANUARY 7TH?

25   A.   YES.

1    Q.   ABOUT TWO, THREE WEEKS LATER?

2    A.   IF THAT'S WHAT IT SAYS, YES.

3    Q.   AND WHAT HAPPENED TO THE HANDWRITTEN STATEMENT?

4    A.   I DON'T RECALL.

5    Q.   AND IS IT YOUR PRACTICE, MR. ORTEGA, TO HAVE BETSY TYPE UP

6    STATEMENTS BY YOUR EMPLOYEES?

7    A.   YES.

8    Q.   AND WHEN SHE TYPES THEM UP, SHE PUTS DOWN THE DATE THAT

9    SHE TYPED THEM UP?

10   A.   YES.

11   Q.   WHY DOES SHE DO THAT INSTEAD OF THE DATE OF THE ACTUAL

12   STATEMENT BY THE EMPLOYEE?

13   A.   BETSY LIKES TO WRITE WHEN SHE DOES HER TYPING AND IT'S THE

14   DAY SHE DOES THE TYPING.

15   Q.   AND THEN AFTER SHE'S DONE, DOES SHE KEEP THE HANDWRITTEN

16   STATEMENT?

17   A.   SHE DOESN'T -- I DON'T KNOW.  SHE DOES NOT.

18   Q.   AND YOU SAID THAT THIS STATEMENT WAS USED FOR THE UNION?

19   A.   YES.

20   Q.   AND YOU GAVE IT TO H.R. OR THE UNION?

21   A.   H.R.

22   Q.   AND WAS IT FOR THE GRIEVANCE OR THE TERMINATION?

23   A.   I DON'T RECALL WHICH ONE IT WAS.

24   Q.   WELL, THE STATEMENT OF YOURS WAS ABOUT THE DECEMBER 21ST,

25   2009, DATE; RIGHT?

1    A.   RIGHT.

2    Q.   AND THAT WAS THE DATE THAT MS. DANG WAS TERMINATED;

3    CORRECT?

4    A.   YES.

5         MS. NGUYEN:  THAT'S ALL OF THE QUESTIONS I HAVE.

6    THANK YOU, YOUR HONOR.

7         MS. MURAKAMI:  JUST ONE FOLLOW-UP QUESTION.

8         THE COURT:  IF IT'S ONE.

9                **AS-ON REDIRECT EXAMINATION**

10   BY MS. MURAKAMI:

11   Q.   I JUST WANT TO CLARIFY ONE THING.

12        BEFORE YOU HAD SPOKEN WITH MS. DANG'S HUSBAND ON THE PHONE

13   ON DECEMBER 21ST, 2009, HAD MS. DANG ALREADY REFUSED TO ATTEND

14   THE MEETING?

15   A.   SHE SAID SHE WAS TIRED AND SHE WASN'T -- SHE DIDN'T WANT

16   TO GO.

17   Q.   OKAY.  THANK YOU.

18        THE COURT:  OKAY.  YOU MAY STEP DOWN, MR. ORTEGA.

19   YOU'RE FINISHED.

20        THE WITNESS:  THANK YOU.

21        THE COURT:  CALL YOUR NEXT WITNESS.

22        MS. NGUYEN:  YES, YOUR HONOR.  THE PLAINTIFF WOULD

23   LIKE TO CALL MR. MICHAEL WILSON.

24        THE COURT:  OKAY.  COME FORWARD AND WE'LL GET YOU

25   WHERE YOU NEED TO GO.

1           COME FORWARD AND MY COURT REPORTER WILL SWEAR YOU IN.

2                THE CLERK:  RAISE YOUR RIGHT HAND.

3           **(MICHAEL WILSON, PLAINTIFF'S WITNESS, SWORN.)**

4                THE WITNESS:  I DO.

5                THE CLERK:  THANK YOU.  PLEASE TAKE THE STAND.

6           PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR

7      THE RECORD.

8                THE WITNESS:  MICHAEL ANTHONY WILSON, W-I-L-S-O-N.

9                THE CLERK:  THANK YOU.

10                        **AS-ON CROSS-EXAMINATION**

11     BY MS. NGUYEN:

12     Q.   GOOD MORNING, MR. WILSON.

13     A.   GOOD MORNING.

14     Q.   AND YOU'RE CURRENTLY EMPLOYED AT BAY 101; IS THAT TRUE?

15     A.   YES.

16     Q.   AND HOW LONG HAVE YOU BEEN THERE?

17     A.   NINETEEN YEARS.

18     Q.   AND WHAT IS YOUR CURRENT POSITION?

19     A.   CASINO SHIFT MANAGER.

20     Q.   AND WAS THAT THE SAME POSITION THAT YOU HAD DURING THE

21     PERIOD OF 2006 TO 2009?

22     A.   YES.

23     Q.   AND YOU BEGAN DATING MY CLIENT, CUC DANG, AFTER SHE

24     STARTED WORKING AT BAY 101, DIDN'T YOU?

25     A.   DEFINE "DATING."

1    Q.   YOU HAVE GONE OUT ON DATES WITH HER?

2    A.   I WENT TO DINNER WITH HER A COUPLE OF TIMES, YES.

3    Q.   AND YOU MET HER DAUGHTER LISA?

4    A.   YES.

5    Q.   AND YOU MET HER OTHER DAUGHTERS IN -- WHO LIVE IN

6    LAS VEGAS?

7    A.   WE WENT TO DINNER ONCE, YES.

8    Q.   AND YOU HAVE ALSO BEEN OUT TO DINNER BY YOURSELF WITH

9    MS. DANG; CORRECT?

10   A.   A COUPLE OF TIMES, YES.

11   Q.   AND YOU'VE ALSO TAKEN MS. DANG TO THE EMERGENCY ROOM ONCE?

12   A.   YES.

13   Q.   AND YOU WAITED AROUND TO DRIVE HER HOME AFTER THE

14   EMERGENCY ROOM?

15   A.   YES.

16   Q.   BUT AT SOME POINT WHILE MY CLIENT WAS STILL WORKING AT

17   BAY 101, YOU AND SHE STOPPED DATING; CORRECT?

18   A.   IF YOU CALL GOING TO DINNER "DATING," YES.

19   Q.   YOU STOPPED GOING OUT TO DINNER DATES?

20   A.   YES, UH-HUH.

21   Q.   AND DO YOU RECALL THAT IN THE 2008/2009 TIMEFRAME, THAT

22   MS. DANG WANTED TO TRANSFER OUT FROM THE KITCHEN TO BECOME A

23   SERVER ON THE FLOOR?

24   A.   YES.

25   Q.   AND THAT YOU ASSISTED HER WITH THAT REQUEST?

1    A.   NO.

2    Q.   DO YOU RECALL SPEAKING TO TOM BOWLING, ONE OF BAY 101'S

3    OWNERS, TO HELP HER GET TRANSFERRED?

4    A.   I LEFT HIM A VOICE MESSAGE, I BELIEVE.

5    Q.   TO TELL HIM THAT SHE HAD ASKED HER SUPERVISOR FOR A

6    TRANSFER BUT THAT HE HAD NOT GIVEN HER ONE FOR WHATEVER REASON

7    YOU DIDN'T KNOW.

8         DO YOU RECALL THAT?

9    A.   CUC HAD ASKED ME WHO NICK'S SUPERVISOR WAS AT THE TIME

10   BECAUSE SHE WANTED TO TALK TO NICK'S SUPERVISOR ABOUT BEING

11   TRANSFERRED.  I TOLD HER WHO THAT WAS AT THE TIME, YES.

12   Q.   AND WAS IT -- WASN'T IT BECAUSE SHE HAD WAITED A LONG TIME

13   TO GET A RESPONSE FROM MR. ORTEGA?

14   A.   THAT I WOULDN'T KNOW.  I'M SORRY.

15   Q.   AND AFTER SHE SPOKE WITH YOU WAS WHEN YOU LEFT THE MESSAGE

16   FOR MR. BOWLING?

17   A.   CORRECT.

18   Q.   AND ISN'T IT TRUE THAT AFTER YOU LEFT THE MESSAGE FOR

19   MR. BOWLING, THAT MS. DANG WAS TRANSFERRED OUT TO BECOME A

20   SERVER?

21   A.   SHE HAD A SERVER'S UNIFORM ON SHORTLY AFTER THAT.  I WOULD

22   IMAGINE, YES.

23   Q.   AND DO YOU KNOW A MAN BY THE NAME OF LUCIO SUAREZ?

24   A.   I DO, YES.

25   Q.   AND ARE YOU AWARE THAT MS. DANG WAS SEXUALLY HARASSED BY

1    MR. SUAREZ?

2    A.   I WAS NOT.

3    Q.   SHE NEVER TOLD YOU ABOUT IT?

4    A.   NO.

5    Q.   AND YOU NEVER TOLD HER THAT SHE SHOULD GET HERSELF

6    TRANSFERRED OUT TO THE FLOOR SO THAT YOU COULD WATCH OVER HER?

7    A.   NO.

8    Q.   DURING THE TIME PERIOD OF 2006 TO 2009, IT WAS PART OF

9    YOUR JOB, WASN'T IT, TO ADDRESS AND HANDLE CUSTOMER COMPLAINTS

10   REGARDING FOOD AND DRINKS?

11   A.   YES AND NO.

12   Q.   YOU WERE THE CASINO'S SHIFT MANAGER; CORRECT?

13   A.   YES.

14   Q.   AND SO IF THERE WERE PROBLEMS WITH CUSTOMERS, THE SERVERS

15   COULD COME TO YOU?

16   A.   YES.

17   Q.   AND IF CUSTOMERS HAD COMPLAINTS ABOUT THE FOOD OR THE

18   DRINKS THAT THEY RECEIVED, THEY COULD COME TO YOU?

19   A.   YES.

20   Q.   AND IN THOSE SITUATIONS YOU WOULD GO TALK TO THE CUSTOMER

21   AND TRY TO MAKE THEM MORE SATISFIED; RIGHT?

22   A.   MOST, YES.

23   Q.   AND YOU RECALL THAT YOU AND I HAVE MET BEFORE AT YOUR

24   DEPOSITION; RIGHT?

25   A.   YES.

1    Q.   AND THAT AT THAT TIME YOU ANSWERED SOME OF MY QUESTIONS

2    UNDER OATH.

3         DO YOU REMEMBER THAT?

4    A.   YES.

5    Q.   AND ISN'T IT TRUE, MR. WILSON, THAT WHEN MS. DANG WAS

6    WORKING AT BAY 101, YOU WERE NOT AWARE OF ANY COMPLAINTS BY

7    ANYONE AT BAY 101 ABOUT HER?

8    A.   DEFINE "COMPLAINTS."

9    Q.   ANY COMPLAINTS BY ANYONE?

10   A.   WELL, THERE'S -- THERE ARE SMALL COMPLAINTS OFTEN ABOUT

11   PEOPLE.  I MEAN, THE WRONG ORDER OR SOMETHING.

12   Q.   DO YOU RECALL THAT AT YOUR DEPOSITION YOU TOLD ME THAT YOU

13   WERE NOT AWARE OF ANY COMPLAINTS BY ANYONE AT BAY 101 ABOUT

14   CUC DANG?

15   A.   OKAY, YES.

16   Q.   YOU RECALL THAT NOW?

17   A.   UH-HUH.

18   Q.   AND DO YOU ALSO RECALL THAT YOU TOLD ME AT THE DEPOSITION

19   THAT YOU ARE NOT AWARE OF ANY COMPLAINTS ABOUT CUC WHEN SHE WAS

20   WORKING AS A COOK IN THE KITCHEN?

21   A.   YES.

22   Q.   AND THAT YOU WERE ALSO NOT -- I'M SORRY.

23        DO YOU RECALL TELLING ME THAT YOU WERE AWARE OF COMPLAINTS

24   ABOUT CUC WHEN SHE WAS WORKING AS A SERVER?

25   A.   I'M SORRY.  COULD YOU REPEAT THAT, PLEASE.

1    Q.   YOU WERE AWARE OF SOME COMPLAINTS ABOUT MS. DANG WHEN SHE

2    WAS WORKING AS A SERVER?

3    A.   YES.

4    Q.   AND ISN'T IT TRUE, HOWEVER, THAT YOU TOLD ME THAT THE

5    COMPLAINTS ABOUT MS. DANG, WHEN SHE WAS WORKING AS A SERVER,

6    WERE JUST NORMAL COMPLAINTS THAT ARE MADE AGAINST ALL OF THE

7    OTHER WAITRESSES?

8    A.   YES.

9    Q.   FOR EXAMPLE, YOU -- I THINK YOU GAVE ME AN EXAMPLE OF ALL

10   OF THE OTHER WAITRESSES ALSO MAKING MISTAKES WITH ORDERING THE

11   WRONG FOOD OR DRINKS?

12   A.   IT HAPPENS, YES.

13   Q.   AND THAT WHEN A CUSTOMER COMPLAINS THAT HE ORDERS

14   SOMETHING BUT THEN RECEIVES SOMETHING ELSE, YOU WOULD CALL THE

15   KITCHEN SUPERVISOR AND THEN HAVE THEM TO TRY TO REMAKE THE FOOD

16   TO MAKE THE CUSTOMER HAPPY; CORRECT?

17   A.   YES.

18   Q.   AND THAT IT'S -- IN YOUR EXPERIENCE THOSE MISTAKES ARE

19   MADE BY EVERY WAITRESS AT BAY 101, ISN'T IT?

20   A.   SOME MORE THAN OTHERS, YES.

21   Q.   AND THAT ACCORDING TO YOU, THE COMPLAINTS ABOUT CUC ARE

22   SIMILAR TO THE COMPLAINTS LODGED AGAINST THE OTHER WAITRESSES;

23   CORRECT?

24   A.   YES.

25   Q.   AND THAT YOU ARE NOT AWARE OF ANY OTHER COMPLAINTS ABOUT

1    MS. DANG THAT WOULD BE OUT OF THE ORDINARY; ISN'T THAT TRUE?

2    A.   YES.

3    Q.   NOW, AGAIN, WHEN I SPOKE TO YOU AT YOUR DEPOSITION, YOU

4    RECALL THAT YOU WERE THERE ON OCTOBER 4TH, 2009, WORKING

5    WHEN --

6    A.   I'M SORRY, NO.

7    Q.   I'M SORRY.  LET ME -- I'M TALKING ABOUT THE INCIDENT

8    BETWEEN MS. DANG AND MS. ELIAS.

9         DO YOU RECALL THAT?

10   A.   YES.

11   Q.   AND THAT OCCURRED ON OCTOBER 4TH, 2009?

12   A.   WHATEVER YOU SAY, YES.

13   Q.   DO YOU RECALL THE INCIDENT?

14   A.   I DO.

15   Q.   AND DO YOU RECALL THAT YOU WORKED THAT NIGHT?

16   A.   I RECALL THE INCIDENT.

17   Q.   AND -- BUT YOU WEREN'T THERE TO SEE WHAT HAPPENED;

18   CORRECT?

19   A.   THAT'S CORRECT.

20   Q.   AND YOU DID SPEAK WITH THE CUSTOMER; CORRECT?

21   A.   YOU'VE ASKED ME THAT MULTIPLE TIMES.  I NORMALLY DO, BUT I

22   CAN'T SAY THAT I DID THAT NIGHT.  I DON'T KNOW.

23   Q.   AND DO YOU REMEMBER ANYTHING ELSE THAT HAPPENED ON THAT

24   NIGHT WITH RESPECT TO THE INCIDENT BETWEEN MS. DANG AND

25   MS. ELIAS?

1     A.    REALLY, NO.

2     Q.    YOU RECALL BEING INTERVIEWED BY AN INVESTIGATOR BY THE

3     NAME OF CAROLE EDMAN?

4     A.    YES.

5     Q.    AND DO YOU RECALL THAT SHE TOLD YOU THAT MS. DANG SAID

6     THAT YOU WERE HER FIANCE?

7     A.    YES.

8     Q.    AND DID THAT TAKE YOU BY SURPRISE?

9     A.    YES.

10    Q.    BECAUSE YOU AND MS. DANG HAD NEVER BEEN FIANCES; CORRECT?

11    A.    THAT'S CORRECT.

12          MS. NGUYEN:  THOSE ARE ALL OF THE QUESTIONS THAT I

13    HAVE FOR MR. WILSON, YOUR HONOR.

14          THE COURT:  ANY QUESTIONS?

15          MR. MCMANIS:  THANK YOU.

16                    AS-ON **DIRECT EXAMINATION**

17    BY MR. MCMANIS:

18    Q.    GOOD MORNING, MR. WILSON.

19    A.    GOOD MORNING.

20    Q.    YOU AND I HAVE NEVER SPOKEN BEFORE; IS THAT TRUE?

21    A.    THAT'S CORRECT.

22          THE COURT:  I THINK IT'S AFTERNOON, MR. MCMANIS.

23          MR. MCMANIS:  PARDON ME?

24          THE COURT:  I THINK IT'S AFTERNOON, BUT THAT'S OKAY.

25          MR. MCMANIS:  I STAND CORRECTED.  OCCASIONALLY AN

1    ELDERLY PERSON GETS THE TIME WRONG.  IT IS AFTERNOON, I

2    BELIEVE, AT 1:05.

3    Q.   IS THAT YOUR MEASURE, SIR?

4    A.   UH-HUH.

5    Q.   YOU HAVE TO SAY YES OR NO?

6    A.   YES, SIR.

7    Q.   ALL RIGHT.  A ROUGH PLACE TO WORK.

8         IN ANY EVENT, THERE WAS A QUESTION ABOUT DATING AND YOU

9    SAID PLEASE DEFINE "DATING."

10        HOWEVER YOU THINK OF DATING IN YOUR MIND, DID YOU EVER

11   DATE THE PLAINTIFF, MS. DANG?

12   A.   WE DID GO TO DINNER A COUPLE OF TIMES, YES.

13   Q.   NOW, THERE ARE DINNERS AND THERE ARE DINNERS.  DID YOU IN

14   ANY SENSE THINK OF THE DINNERS THAT YOU HAD WITH HER AS SOME

15   SORT OF A ROMANTIC OR AMOROUS OCCASION?

16   A.   I WOULD SAY NO.

17   Q.   THAT WAS -- DID YOU EVER HAVE A CONVERSATION WITH THE

18   PLAINTIFF WHERE SHE TOLD YOU SHE THOUGHT THERE WAS SOME KIND OF

19   A ROMANTIC RELATIONSHIP BETWEEN YOU?

20   A.   COULD YOU REPEAT THAT.  I'M SORRY.

21   Q.   SURE.  DID SHE EVER CALL YOU ON AN OCCASION AND TELL YOU

22   THAT SHE VIEWED YOU AS SOME KIND OF A ROMANTIC PARTNER?

23   A.   YES.

24   Q.   AND WOULD YOU TELL THE JURY THE CIRCUMSTANCES OF THAT,

25   PLEASE?

1    A.   I RECEIVED A PHONE CALL ONE NIGHT, AND I WAS DRIVING DOWN

2    MERIDIAN AVENUE, AND I'LL NEVER FORGET IT AS LONG AS I LIVE.  I

3    WAS ACTUALLY WITH MY GIRLFRIEND AT THE TIME.  AND I KEEP MY

4    PHONE ON THE VISOR AND I JUST REACHED UP AND HIT THE TOP BUTTON

5    OR THE SPEAKER BUTTON AND I SAID, "HELLO."

6        AND WE STARTED TALKING AND SHE TOLD ME THAT SHE LOVED ME

7    AND WANTED TO KNOW HOW COME I HAVEN'T MARRIED HER, AND ET

8    CETERA.

9    Q.   SHE LOVED YOU AND WANTED TO KNOW WHY YOU HADN'T MARRIED

10   HER?

11   A.   SHE WANTED TO GET MARRIED, YES.

12   Q.   OKAY.  WAS THAT ON -- THAT WAS ON THE SPEAKERPHONE?

13   A.   IT WAS ON THE SPEAKERPHONE, YES.

14   Q.   AND WAS ANYONE ELSE IN THE CAR BESIDES YOU AND YOUR

15   GIRLFRIEND?

16   A.   NO.

17   Q.   AND WHAT DID YOU SAY, IF ANYTHING, IN REPLY TO THIS

18   PROPOSAL I GUESS?

19   A.   I TRIED TO EXPLAIN TO HER THAT WE WERE FRIENDS AND THAT I

20   DIDN'T VIEW HER IN THAT WAY, AND THAT I WAS SORRY AND THAT SHE

21   MISUNDERSTOOD.

22       AT THAT POINT THERE I DON'T EVEN THINK I HAD TALKED TO HER

23   OR SEEN HER IN A FEW MONTHS OR MAYBE EVEN MORE.

24   Q.   OKAY.  NOW, YOU MENTION THAT ON ONE OCCASION YOU TOOK HER

25   TO THE HOSPITAL?

1    A.   YES.

2    Q.   AND COULD YOU TELL THE JURY, PLEASE, WHAT THE

3    CIRCUMSTANCES OF THAT TRIP WERE?

4    A.   OKAY.  I'M THE SWING SHIFT MANAGER -- EXCUSE ME.  WHEN I

5    GET OFF AT 1:00 OR 1:30 IN THE MORNING, I USUALLY GO HOME AND I

6    UNWIND UNTIL 3:00 OR 4:00 O'CLOCK IN THE MORNING AND THEN I

7    USUALLY GO TO BED.

8         MS. DANG'S DAUGHTER, LISA, WHICH I BECAME CLOSE TO BECAUSE

9    SHE'S JUST A GREAT KID, CALLED ME AND SAID THAT HER MOTHER WAS

10   ILL AND ASKED IF I WOULD TAKE HER TO THE HOSPITAL FOR HER AND

11   FOR HER.  AND I GLADLY DID IT.

12        I CAME DOWN AND PICKED THEM UP -- PICKED HER UP, I'M

13   SORRY, PICKED HER UP.  I TOOK HER TO THE VALLEY MEDICAL CENTER,

14   AND WE WERE THERE FOR TWO OR THREE HOURS AND MOST OF THE TIME I

15   WAITED OUTSIDE IN THE -- OUTSIDE IN THE AIR, THE FRESH AIR, AND

16   WHEN THEY RELEASED HER, I TOOK HER HOME.  EXCUSE ME.

17   Q.   ALL RIGHT.  SO YOU WERE AT HOME WHEN HER DAUGHTER CALLED?

18   A.   THAT'S CORRECT, UH-HUH.

19   Q.   AND DID EITHER HER DAUGHTER OR MS. DANG EVER TELL YOU THE

20   NATURE OF THE PROBLEM, THE MEDICAL COMPLAINT?

21   A.   NO.

22   Q.   OKAY.  BUT IN ANY EVENT, YOU PICKED MS. DANG UP, YOU DROVE

23   HER TO VALLEY MEDICAL CENTER?

24   A.   YES.

25   Q.   WAITED SEVERAL HOURS OUTSIDE UNTIL SHE WAS RELEASED?

1    A.   YES.

2    Q.   AND DROVE HER HOME?

3    A.   YES.

4    Q.   DOES THAT SUM IT UP?

5    A.   THAT SUMS IT UP.

6    Q.   NOW, WE HEARD SOME QUESTIONS ABOUT A TRANSFER.  DO YOU

7    RECALL WHEN IT WAS THAT MS. DANG ASKED YOU WHO IS NICK ORTEGA'S

8    SUPERVISOR?

9    A.   ARE YOU ASKING ME IF I REMEMBER THE DATE?

10   Q.   YEAH.

11   A.   NO.

12   Q.   ALL RIGHT.  BUT THE PURPOSE WAS WHAT?

13   A.   SHE FELT THAT NICK WAS NOT TREATING HER FAIRLY AND SHE

14   WANTED TO KNOW WHO NICK'S SUPERVISOR WAS AND I TOLD HER WHO IT

15   WAS.

16   Q.   OKAY.  AND THEN I TAKE IT -- AND WHO WAS THAT PERSON FOR

17   THE RECORD?

18   A.   TOM BOWLING AT THE TIME.

19   Q.   AND DID YOU LEAVE A MESSAGE FOR MR. BOWLING THAT HE MIGHT

20   BE HEARING FROM HER?

21   A.   CORRECT.

22   Q.   AND ANY FURTHER CONVERSATION WITH MR. BOWLING OR ANY

23   CONVERSATION WITH MR. BOWLING?

24   A.   I BELIEVE I LEFT HIM A MESSAGE.  I MIGHT HAVE TALKED TO

25   HIM ONCE OTHER THAN THAT, BUT I DON'T THINK SO.

1   Q.   OKAY.  NOW, THERE WERE SOME QUESTIONS ABOUT YOUR

2   DEPOSITION.  DO YOU RECALL WHEN YOU GAVE A DEPOSITION IN THIS

3   CASE?

4        LET ME HELP YOU OUT HERE.

5   A.   OKAY.

6   Q.   THE COPY I HAVE SAYS FEBRUARY 15, 2012.  DOES THAT REFRESH

7   YOUR RECOLLECTION?

8   A.   I GUESS SO IF THAT'S WHAT IT SAYS.

9   Q.   ALL RIGHT.  DO YOU WANT TO TAKE A LOOK AT THIS TO BE SURE?

10  A.   NO, I DON'T THINK SO.

11  Q.   YOU TRUST ME?

12  A.   I DO.

13  Q.   ALL RIGHT.  ALL RIGHT.  TODAY IS MAY 2ND.  DO I HAVE THAT

14  RIGHT?

15  A.   YEAH.

16  Q.   ALL RIGHT.  I THINK WE HEARD FROM KEN, THE COOK, THAT HE

17  GAVE HIS DEPOSITION MAY OF 2011 AND WE HAVE ESTABLISHED, I

18  HOPE, THAT YOU GAVE YOURS FEBRUARY 15TH -- FEBRUARY 15, 2012.

19       NOW, DO YOU RECALL GIVING A STATEMENT OR BEING INTERVIEWED

20  BY CAROLE EDMAN, THE INVESTIGATOR IN THIS MATTER?

21  A.   I DO RECALL THAT, YES.

22  Q.   I WANT TO LOOK AT THAT.

23       WOULD YOU PUT THAT UP, PLEASE, CINDY.

24            MS. MCCLELEN:  DO YOU HAVE A PARTICULAR PAGE IN

25  MIND?

1                    MR. MCMANIS:  PAGE 40.  I APOLOGIZE.

2                    MS. NGUYEN:  YOUR HONOR, SIDE-BAR, PLEASE.

3                    THE COURT:  OKAY.

4                    MR. MCMANIS:  IS THAT OKAY?  ALL RIGHT.  NO PROBLEM.

5                    THE COURT:  OKAY.

6                    MR. MCMANIS:  BLOW THAT UP IF YOU WOULD, PLEASE.

7       Q.   ALL RIGHT.  MR. WILSON, HAVE YOU EVER SEEN THIS REPORT OF

8       CAROLE EDMAN, THE INVESTIGATOR?

9       A.   I DON'T BELIEVE SO, NO.

10      Q.   YOU'RE SEEING IT FOR THE FIRST TIME?

11      A.   I BELIEVE SO, YES.

12      Q.   AND THE REPORT SAYS THAT YOU WERE HIRED BY THE COMPANY ON

13      NOVEMBER 9, 1993.  IS THAT YOUR RECOLLECTION THAT IT WAS 1993?

14      A.   YES, SIR.

15      Q.   OKAY.  DID YOU TELL HER, QUOTE, "I'VE ALWAYS LOVED THIS

16      JOB; CHANGES DAILY; LOT OF INTERESTING THINGS ABOUT IT"?

17      A.   YES.

18      Q.   AND, NOW, IT SAYS THAT THE INVESTIGATOR INTERVIEWED YOU ON

19      NOVEMBER 11, 2009, NOVEMBER 16, 2009, WITH FOLLOW-UP CALLS ON

20      NOVEMBER 29TH, AND NOVEMBER 30.

21           IS THAT CONSISTENT WITH YOUR MEMORY?

22      A.   I DON'T REMEMBER THE CALLS, BUT I REMEMBER TALKING TO HER,

23      YES.

24      Q.   OKAY.  FAIR ENOUGH.  AND SHE STATED NO WITNESSES WERE

25      PRESENT.  IS THAT YOUR RECOLLECTION?

1      A.   THAT'S CORRECT.

2      Q.   AND JUST YOU AND THE INVESTIGATOR?

3      A.   JUST HER AND I, YES.

4      Q.   AND SO THAT WAS NOVEMBER 11, NOVEMBER 16TH, WERE

5      APPARENTLY THE INTERVIEWS.

6           WE HAVE KEN, THE COOK, AND HE WAS ON THAT DATE

7      NOVEMBER 11TH AND 16.

8           IF YOU WOULD, CINDY, GO DOWN.

9           THE INVESTIGATOR REPORTED THAT MR. WILSON HAD NO PERSONAL

10     RELATIONSHIP WITH CUC DANG OTHER THAN AS A FRIEND AND HAD NOT

11     HAD ANY ROMANTIC RELATIONSHIP WITH HER AT ANY TIME; THAT HE WAS

12     WITH HIS GIRLFRIEND, NOT MS. DANG'S HOME AS MS. DANG HAD SAID

13     WHEN MS. DANG'S DAUGHTER CALLED HIM TO TAKE MS. DANG TO THE

14     EMERGENCY ROOM ON ONE OCCASION.  AND IT GOES ON TO TALK ABOUT

15     NO KNOWLEDGE OF OTHER HOSPITAL.

16          DO YOU RECALL TELLING THAT TO THE INVESTIGATOR?

17     A.   I MUST HAVE.  IT'S WRITTEN DOWN THERE.  I WAS ASKED SO

18     MANY QUESTIONS.  IT LOOKS ACCURATE TO ME.

19     Q.   OKAY.  NOW, UNDER INVESTIGATOR'S COMMENT IT SAID,

20     "MR. WILSON WAS VISIBLY SURPRISED BY SOME OF THE STATEMENTS

21     MADE BY MS. DANG THAT WERE ATTRIBUTED TO HIM."

22          DO YOU RECALL SOME SURPRISE ON THE OCCASION OF YOUR

23     INTERVIEW?

24     A.   YES.

25     Q.   LET'S GO TO THE NEXT POINT.  THIS IS SOMETHING ABOUT A

```
 1      RECENT RUMOR.  MR. WILSON STATED THAT HE HAD NO KNOWLEDGE OF

 2      NICK ORTEGA AND LUCIO SUAREZ BEING CLOSE FRIENDS OR,

 3      QUOTE-UNQUOTE, "BEST FRIENDS" AND HE HAD NEVER SEEN THEM

 4      TOGETHER ANYWHERE OUTSIDE OF WORK.

 5          IS THAT TRUE?

 6      A.   THAT'S CORRECT.  CAN I ASK A QUESTION?

 7      Q.   SURE.

 8      A.   CAN YOU MAKE THAT BIGGER SO I CAN READ IT?

 9      Q.   MAESTRO.

10          MS. MCCLELEN:  HE DOES HAVE A COPY IN FRONT OF HIM.

11          MR. MCMANIS:  CAN I APPROACH, YOUR HONOR?

12          THE COURT:  SURE.

13      BY MR. MCMANIS:

14      Q.   THERE'S A COPY IN THESE BOOKS.

15      A.   OH, OKAY.

16      Q.   DON'T WORRY ABOUT IT.  HERE IT IS.

17          ALL RIGHT.  LET'S GO DOWN TO THE NEXT HEADING, MS. DANG'S

18      CLAIM OF SELECTIVE ENFORCEMENT OF THE RULES.  AND YOU ARE

19      CERTAINLY FREE TO LOOK AT IT THERE, MR. WILSON.  YOU'RE FREE TO

20      DO THAT.

21          MS. DANG'S CLAIM OF SELECTIVE ENFORCEMENT OF RULES RELATED

22      TO MS. DANG'S STATEMENTS ABOUT UNFAIR TREATMENT OF VIETNAMESE

23      EMPLOYEES.

24          MR. WILSON STATED HE HAD NOT SEEN OR HEARD ANYTHING OR HAD

25      ANY COMPLAINTS BROUGHT TO HIS ATTENTION ABOUT UNFAIR TREATMENT
```

1      OF VIETNAMESE EMPLOYEES, OR ANY OTHER PARTICULAR GROUP, IN HIS

2      15 YEARS OF WORKING FOR BAY 101.

3           HE STATED, QUOTE, "'I, 100 PERCENT, DON'T BELIEVE THAT AT

4      ALL,'" UNQUOTE.

5           DID YOU MAKE THAT STATEMENT?

6      A.   CORRECT.

7      Q.   AND IS THAT A TRUE STATEMENT?

8      A.   CORRECT.

9      Q.   AND DO YOU HAVE MANY VIETNAMESE EMPLOYEES AT BAY 101?

10     A.   A VERY LARGE NUMBER, 50 PERCENT OR MORE MAYBE.

11     Q.   AND HOW ABOUT VIETNAMESE CUSTOMERS, ANY VIETNAMESE

12     CUSTOMERS?

13     A.   60 OR 70 PERCENT PROBABLY.

14     Q.   AND HAVE YOU EVER MET MR. WERNER'S WIFE?

15     A.   I HAVE, YES.

16     Q.   AND DO YOU KNOW WHAT --

17     A.   VERY NICE LADY.  SHE'S VIETNAMESE, YES.

18     Q.   AND THE NEXT SENTENCE IT STATES, "HE ALSO STATED HE HAD NO

19     KNOWLEDGE OF AND HAD NEVER HEARD OF AND BEEN AWARE OF ANYONE

20     SAYING THAT NICK ORTEGA GAVE MORE LENIENT TREATMENT TO

21     NON-VIETNAMESE EMPLOYEES THAN HE GAVE TO VIETNAMESE EMPLOYEES."

22          IS THAT YOUR BELIEF?

23     A.   YES, SIR.

24     Q.   LET'S GO TO THE NEXT PAGE, PAGE 42, THE COMPLAINT OF

25     UNFAIR SUSPENSION.

1        AND YOU CAN BLOW THAT UP, CINDY.

2        THE INVESTIGATOR NOTED THAT YOU HAD NEVER HEARD ANY

3    COMPLAINTS ABOUT THE BARTENDER, BETH LICONA.  AND WE HEARD

4    ABOUT HER THIS MORNING.  THAT LINDA ELIAS WAS THE BEST FOOD

5    SERVER ON HER SHIFT AND IS KNOWN TO TRY TO HELP HER COWORKERS

6    BUT THAT HE HAD HAD A NUMBER OF COMPLAINTS ABOUT MS. DANG.

7        IS THAT ALL TRUE?

8    A.  YES, SIR.

9    Q.  STATED THAT MS. DANG'S ENGLISH COMPREHENSION IS POOR, AND

10   THAT THERE HAVE BEEN MANY OCCASIONS WHEN SHE HAS GOTTEN AN

11   ORDER WRONG, ESPECIALLY WITH ALCOHOLIC DRINK ORDERS.

12       HE IS MADE AWARE OF THESE BECAUSE AS THE SHIFT MANAGER, HE

13   HAS TO APPROVE TICKET VOIDS WHEN MISTAKES OR OVERRINGS OCCUR

14   AND HE HEARS IT FROM OTHER FOOD SERVERS WHO SAY THAT MS. DANG'S

15   ERRORS ARE BECAUSE SHE DOES NOT UNDERSTAND ENGLISH VERY WELL.

16       IS THAT YOUR EXPERIENCE?

17   A.  YES.

18   Q.  AND APPARENTLY YOU TOLD THE INVESTIGATOR THAT YOU WERE AT

19   WORK WHEN AN INCIDENT AROSE AT WORK ON OCTOBER 4TH, 2009.  IT

20   WAS BROUGHT TO YOUR ATTENTION.

21       I THINK REGARDING THIS NEXT SENTENCE HE STATED THAT HE

22   WENT TO THE CUSTOMER LATER TO VERIFY THAT THE CUSTOMER HAD THE

23   DRINK HE WANTED AND STATED THAT THE CUSTOMER DID NOT SEEM TOO

24   UPSET AT THAT TIME.

25       YOU DON'T RECALL THE DAY WHETHER YOU DID IT OR NOT, BUT I

1    THINK YOU DID SAY IN FAIRNESS THAT'S SOMETHING YOU WOULD HAVE

2    DONE?

3    A.   IT'S MY NORMAL PROCEDURE.

4    Q.   OKAY.  MS. DANG -- MR. WILSON ATTRIBUTED THE PROBLEM TO

5    MS. DANG'S ENGLISH NOT BEING THAT GOOD AND THAT MS. DANG

6    APPEARS TO BE, QUOTE-UNQUOTE, "TO HAVE A LITTLE TEMPER."

7         NOW, THIS NEXT PARAGRAPH HERE HE APPARENTLY BRINGS UP

8    ANOTHER INCIDENT WITH THE BARTENDER BETH LICONA.  AND YOUR

9    QUOTE IS SAYING, "HE WARNED MS. DANG TO KEEP YOUR TONGUE ABOUT

10   YOU AND NO ARGUMENTS IN FRONT OF THE BAR, PRIOR TO ESCORTING

11   HER TO THE BAR AREA TO ADDRESS THE PROBLEM."

12        MS. DANG DID NOT FOLLOW --

13             MS. NGUYEN:  OBJECTION, YOUR HONOR.

14             THE COURT:  I THINK YOU CAN ASK QUESTIONS.

15             MR. MCMANIS:  ALL RIGHT.

16   Q.   WELL, LET'S LOOK AT THIS NEXT SENTENCE HERE.  IF YOU WOULD

17   LOOK AT THE SENTENCE, PLEASE, ABOUT MS. DANG DID NOT FOLLOW

18   YOUR INSTRUCTION AND HAD A LOUD VERBAL ALTERCATION WITH BETH IN

19   FRONT OF CUSTOMERS, MR. MEAKCHAROON, AND MR. WILSON.

20        DO YOU RECALL THAT?

21   A.   I DO RECALL.

22   Q.   ALL RIGHT.  WHAT DO YOU RECALL IN THAT REGARD?

23   A.   I TALKED TO CUC FIRST AND SHE TOLD ME WHAT WAS BOTHERING

24   HER.

25        AND THEN I WENT TO THE OTHER PARTY WHICH WAS BETH IN THE

1    BAR THROUGH THE BACK WINDOW OF THE BAR AND CUC CAME ALONG, AND

2    I TOLD CUC THAT SHE SHOULDN'T BE THERE BECAUSE I WANTED TO HEAR

3    THAT SIDE OF THE CONVERSATION.  SO SHE STOOD OFF TO THE SIDE

4    AND SHE GOT CLOSER.

5        SHE CONTINUED TO CALL BETH A LIAR.  AND I TOLD CUC TO

6    STAND OFF SO I COULD HEAR BETH'S SIDE OF THE STORY.  SO WHEN

7    SHE CONTINUED TO CALL BETH A LIAR AND THE SITUATION JUST GOT

8    UGLIER, SO I ASKED HER TO STAND DOWN BECAUSE IT WAS BECOMING

9    LOUD.

10   Q.  NOW, YOU SAY YOU TOLD HER TO STAND OFF BUT SHE DID AND WAS

11   SHE APPROACHING, WAS SHE?

12   A.  SHE WAS FACING THE BAR WINDOW AND CUC WAS TO MY LEFT AT

13   THAT TIME OFF AND THEN SHE APPROACHED.

14   Q.  WHEN YOU SAY THAT SHE KEPT CALLING BETH A LIAR, ACCORDING

15   TO THE INVESTIGATOR'S NOTE, MS. DANG CALLED BETH A LIAR FOUR

16   TIMES.  IS THAT -- DO YOU RECALL THAT NUMBER OR NOT?

17   A.  I DON'T RECALL THAT NUMBER, I'M SORRY.

18   Q.  ALL RIGHT.  WELL, THIS WAS A STATEMENT THAT YOU GAVE THE

19   INVESTIGATOR I GUESS ABOUT SIX WEEKS AFTER THE INCIDENT?

20   A.  OKAY.

21   Q.  WAS YOUR RECOLLECTION OF THE INCIDENT AT THAT TIME --

22   A.  I WOULD HAVE TO SAY IT WAS PROBABLY BETTER AT THAT TIME

23   THAN NOW.

24   Q.  YEAH, WE'RE NOW THREE PLUS YEARS LATER.

25       DID I GET THAT RIGHT?  IT'S 2013?

1    A.   FOUR.

2    Q.   NINE AND FOUR IS THIRTEEN?

3    A.   OKAY.

4    Q.   NOW, IN FAIRNESS TO THE PLAINTIFF THIS LAST STATEMENT THAT

5    MR. WILSON FELT THIS WAS UNACCEPTABLE ESPECIALLY IN FRONT OF

6    CUSTOMERS AND REQUESTED MS. DANG APOLOGIZE TO BETH, WHICH SHE

7    DID, RIGHT?  OR YOU DON'T RECALL?

8    A.   I DON'T RECALL, BUT AFTER READING IT HERE, OBVIOUSLY SHE

9    DID.

10   Q.   OKAY, FINE.

11        MR. MCMANIS:  THANK YOU.  THAT'S ALL I HAVE, YOUR

12   HONOR.

13        THE COURT:  ANYTHING FURTHER?

14        MS. NGUYEN:  JUST A QUICK FOLLOW-UP, YOUR HONOR.

15            **AS-ON RECROSS-EXAMINATION**

16   BY MS. NGUYEN:

17   Q.   MR. WILSON, YOU MENTIONED YOU BECAME FRIENDS WITH

18   MS. DANG'S DAUGHTER, LISA; CORRECT?

19   A.   YES.

20   Q.   AND LISA HAD BEEN TO BAY 101 BEFORE?

21   A.   YES.

22   Q.   AND DO YOU RECALL TAKING HER AROUND AND INTRODUCING HER TO

23   PEOPLE WHO WORKED AT BAY 101?

24   A.   DO I REMEMBER TAKING LISA AROUND AND INTRODUCING HER TO

25   PEOPLE AT BAY 101?

1    Q.   YES.

2    A.   NO.

3    Q.   AND YOU DON'T RECALL SHE'S BEEN THERE TO SEE YOU?

4    A.   THE FIRST TIME I MET LISA WAS I BELIEVE THE CHRISTMAS

5    PARTY WHEN CUC BROUGHT HER DAUGHTER TO THE CHRISTMAS PARTY.

6    THE WHOLE COMPANY WAS THERE HAVING A CHRISTMAS PARTY.

7    Q.   WERE YOU THE ONE THAT TOOK LISA TO DMV TO GET HER LICENSE?

8    A.   YES.

9    Q.   AND, MR. WILSON, YOU STATED EARLIER THAT YOU HAD GONE ON

10   DINNER -- OUT TO DINNER WITH MS. DANG AND HER FAMILY?

11   A.   YES.

12   Q.   AND YOU DIDN'T CONSIDER THOSE DATES, YOU SAID THAT?

13   A.   NO.

14   Q.   NO, YOU DIDN'T CONSIDER THEM DATES OR, NO, YOU DIDN'T SAY

15   THAT?

16   A.   NO, I DIDN'T CONSIDER THOSE DATES.  I DON'T --

17   Q.   EXCUSE ME.  IS THERE SOMETHING YOU WANT TO ADD?

18   A.   WELL, I DON'T CONSIDER GOING TO A PHO HOUSE FOR SOUP IS AN

19   ACTUAL DATE.  MAYBE YOU DO.  I DON'T KNOW.

20   Q.   WELL, ISN'T IT TRUE THAT AFTER YOU WERE INTERVIEWED BY THE

21   INVESTIGATOR THAT YOU WENT TO MR. WERNER AND APOLOGIZED FOR NOT

22   LETTING HIM KNOW EARLIER ABOUT HIS RELATIONSHIP WITH MS. DANG?

23   A.   THAT'S NOT NECESSARILY THE REASON WHY I WENT TO

24   MR. WERNER, NO.

25   Q.   AND DID YOU APOLOGIZE TO HIM?

1    A.   I DON'T RECALL.  MAYBE I DID.

2    Q.   AND DID YOU ADVISE HIM THAT YOU HAD BEEN OUT TO DINNER

3    WITH MS. DANG AND HER FAMILY?

4    A.   YES.

5    Q.   OKAY.  AND YOU ALSO ADVISED HIM THAT YOU HAD TAKEN

6    MS. DANG TO THE EMERGENCY ROOM; CORRECT?

7    A.   I DON'T RECALL.  WHAT I DO RECALL IS BEING ANGRY THAT I

8    HAD NO RETALIATION FOR WHAT WAS SAID TO ME ABOUT THE ACCUSATION

9    BEING MADE TO ME ABOUT BEING SOMEBODY'S FIANCE AND ET CETERA.

10   Q.   DO YOU KNOW WHY THE INVESTIGATOR WOULD TELL YOU THAT

11   MS. DANG HAD CALLED YOU HER FIANCE WHEN SHE DIDN'T?

12   A.   I DON'T KNOW WHY.

13        MS. NGUYEN:  THOSE ARE ALL OF THE QUESTIONS I HAVE,

14   YOUR HONOR.

15        THE COURT:  ALL RIGHT.  YOU MAY BE EXCUSED.  THAT

16   COMPLETES THE DAY FOR TODAY.  WE'LL SEE YOU MONDAY AT 1:00

17   O'CLOCK AND PLEASE HAVE A GOOD WEEKEND.

18        MR. MCMANIS:  EXCUSE ME, YOUR HONOR.  THAT'S MONDAY

19   AT 1:00 O'CLOCK AND NOT 1:30.

20        THE COURT:  CORRECT.

21        MR. MCMANIS:  THANK YOU.

22      (JURY OUT AT 1:29 P.M.)

23        THE COURT:  I'M ASSUMING THE SCHEDULE SAYS 1:00.

24   THAT'S MY USUAL PRACTICE.

25        MR. MCMANIS:  I'M SURE IT IS.  I THINK WE STARTED AT

1    1:30 THIS WEEK.

2              THE COURT:  I JUST WANTED TO DOUBLE-CHECK BECAUSE

3    EVEN IF THE SCHEDULE SAID 1:30 AND EVEN THOUGH I SAID AT 1:00

4    O'CLOCK, YOU SHOULD SHOW UP AT 1:00 O'CLOCK.

5              MR. MCMANIS:  WE'LL BE HERE.

6         YOUR HONOR, WE HAD A MATTER THAT YOU MAY RECALL AT THE

7    RECESS YESTERDAY AFTERNOON INVOLVING REDACTING PORTIONS OF THE

8    INVESTIGATOR'S REPORT, CAROLE EDMAN'S REPORT, WITH REFERENCE TO

9    MEDIATION AND WHAT HAVE YOU.

10        AND I SUGGESTED THAT MY FRIEND SEND ME THOSE PORTIONS THAT

11   SHE WOULD LIKE REDACTED AND WE WOULD MEET AND CONFER AND IF WE

12   WERE ABLE TO RESOLVE IT, FINE, AND IF NOT, WE WOULD BRING IT UP

13   TO YOUR HONOR.

14        SHE DID SEND ME OR SOMEBODY SENT ME A NUMBER OF PAGES WITH

15   PROPOSED REDACTIONS.

16        THE PROBLEM WE'RE WRESTLING WITH NOW IS THAT I'M TOLD THAT

17   THE INVESTIGATOR, CAROLE EDMAN, RELIED IN PART IN HER

18   ASSESSMENT OF THE SITUATION ON THE FACT THAT THE MEDIATION OF

19   THE DISCIPLINE OF OCTOBER 4TH, 2009, WAS APPROPRIATE AND

20   UPHELD, AND ET CETERA, ET CETERA.  SO IT WOULD CLEARLY BE

21   RELEVANT.

22        THAT SAID, I UNDERSTAND THAT THERE'S A DISCRETIONARY

23   BALANCING THAT THE COURT NEEDS TO UNDERTAKE IN TERMS OF WHETHER

24   ITS PROBATIVE VALUE IS OUTWEIGHED BY THE POSSIBILITY OF

25   CONSUMING TIME AND MISLEADING THE JURY AND THIS AND THAT.

1          THERE ARE SOME PARTS OF THE PROPOSED REDACTION THAT IN MY

2     JUDGMENT ARE CLEARLY NOT NECESSARY.

3          SO THIS IS A LONG WINDED WAY OF SAYING I'D LIKE TO THINK

4     ABOUT THIS OVER THE WEEKEND AND TALK FURTHER WITH MS. NGUYEN,

5     AND I'LL STATE ON THE RECORD THAT THERE WILL BE NO REFERENCE,

6     AND WE WERE VERY CAREFUL BEFORE WE PUT MR. WILSON'S STATEMENT

7     UP, WITH THAT STATEMENT TO THE MEDIATION.

8          BUT I'M NOT QUITE READY TO THROW THAT IN YOUR LAP AND IF

9     WE CAN HAVE THIS TIME BETWEEN NOW AND MONDAY TO SEE IF WE CAN

10    WORK SOMETHING OUT, I'D APPRECIATE IT.

11          MS. NGUYEN:  YOUR HONOR, WE WOULD OBJECT JUST

12    BECAUSE NOT ONLY WILL I NEED TO PREPARE MY WITNESSES TO START

13    ON MONDAY AT 1:00 BUT ALSO BECAUSE ALL OF THE EXCERPTS THAT WE

14    HAVE TO BE REDACTED REFER TO THE MEDIATIONS AND THE OUTCOME OF

15    THE MEDIATION.

16          I KNOW THAT IN THIS CASE BAY 101 HAS REQUESTED AND THAT

17    YOUR HONOR GRANTED THE MOTION IN LIMINE THAT WE'RE NOT ALLOWED

18    TO TALK ABOUT OUTCOME OF THE ARBITRATION.

19          SO I THINK THAT THIS WOULD BE JUST UNDULY PREJUDICIAL NOT

20    ONLY TO US BUT THAT BALANCING THAT MR. MCMANIS IS TALKING ABOUT

21    WAS DONE WITH RESPECT TO THE ARBITRATION.

22          SO WITH RESPECT TO THE MEDIATION, IF THEY ARE ALLOWED TO

23    REFER TO THE MEDIATION OR MS. EDMAN'S INVESTIGATION REPORT IS

24    ALLOWED IN AND THE JURORS ARE GOING TO BE ALLOWED TO HEAR ABOUT

25    SOME OF THESE MEDIATIONS AND WHAT HAPPENED AT THE MEDIATIONS,

1    THEN I WOULD REQUEST THAT WE BE ALLOWED TO TALK ABOUT THE

2    MEDIATION WITH RESPECT TO THE GRIEVANCE FOR THE TERMINATION AS

3    WELL AS THE ARBITRATION.

4              MR. MCMANIS:  I DON'T THINK I EXPLAINED MYSELF

5    CLEARLY.  I DON'T NECESSARILY DISAGREE WITH ANY OF THAT.

6         I'M JUST SIMPLY ASKING, AND I HAVEN'T HEARD THAT THIS HAS

7    TO BE RESOLVED BEFORE MONDAY AFTERNOON, FOR EXAMPLE, WE GOT

8    THIS MR. ANDRE THOMAS.  MR. THOMAS, THE PARALEGAL, SENT AN

9    E-MAIL TO MY OFFICE AT 7:30 LAST NIGHT, AND I LOOKED AT IT THIS

10   MORNING.

11        I'M LOOKING AT ONE PAGE AND IT SAYS THE INVESTIGATOR WAS

12   UNABLE TO FIND ANY DISCRIMINATORY OR RETALIATION BASIS FOR THE

13   FACT THAT MS. DANG HAD BEEN GIVEN A COUNSELLING MEMO REGARDING

14   NOT BALANCING HER ENVELOPES CORRECTLY ON A DAILY BASIS.

15        THEY WANT THAT REDACTED BECAUSE THE FOLLOWING SENTENCE

16   REFERENCES THE MEDIATION.  AT A MINIMUM THAT FOLLOWING SENTENCE

17   WOULD BE SUBJECT POSSIBLY TO REDACTION, NOT THE FIRST SENTENCE.

18        AND ALL I'M ASKING IS THAT WE HAVE THE WEEKEND TO TRY AND

19   WORK THIS OUT AND IF WE CAN'T, WE'LL SUBMIT TO YOUR HONOR THE

20   PORTIONS THAT WE THINK SHOULD NOT COME OUT.

21             THE COURT:  WELL, ONE THING THAT HAS CONFUSED ME A

22   LITTLE BIT, THE ONLY IN LIMINE MOTION WAS WITH RESPECT TO THE

23   ARBITRATION.

24             MR. MCMANIS:  YES.

25             THE COURT:  AND THEY THINK THERE WAS GENERAL

1    AGREEMENT THAT THERE WAS NO REFERENCE TO WHAT OCCURRED IN THE

2    MEDIATION.

3         IS THERE JUST ONE MEDIATION THAT HAPPENED?

4              MR. MCMANIS:  WHAT HAPPENED HERE, YOUR HONOR, WAS

5    THIS:  WHEN SHE WAS DISCIPLINED FOR THE OCTOBER 4TH, '09

6    INCIDENT, SHE FILED A GRIEVANCE AND SHE FILED A COMPLAINT WITH

7    THE DFEH, AND SHE FILED A DEMAND FOR THE INVESTIGATION WHICH

8    LED TO THIS CAROLE EDMAN INVESTIGATION.

9         THERE WAS THEN A MEDIATION ARRANGED BY THE UNION, WHICH WE

10   CONCURRED AND THE MEDIATOR CONCLUDED THAT THE SUSPENSION WAS

11   JUSTIFIED AND UPHELD AND THAT'S WHEN HER AND HER HUSBAND WALKED

12   OUT OF THE MEDIATION.

13        THE LATER PROCEEDINGS FOLLOWED HER TERMINATION AND THAT'S

14   THE SUBJECT OF YOUR ORDER REGARDING A MOTION IN LIMINE.

15        THIS PARTICULAR MATTER WAS NEVER BROUGHT UP ON MOTION.

16        MY FRIEND BROUGHT IT UP FOR THE FIRST TIME YESTERDAY, AND

17   I SAID LET ME TAKE A LOOK AT THIS AND WE'LL TRY AND WORK IT OUT

18   AND OTHERWISE WE'LL GIVE IT TO THE JUDGE.

19        AND THEN, YOU KNOW, WE GOT THIS YESTERDAY EVENING AND I

20   SAID -- I TALKED TO MY COLLEAGUES AND I WAS TOLD ONE OF THE

21   LEGAL PROBLEMS IS THAT THE INVESTIGATOR RELIED IN PART ON THE

22   FACT THAT THE SUSPENSION OF OCTOBER 4TH, '09 WAS UPHELD BY THE

23   MEDIATOR.  AND ALL I'M SAYING IS THAT I THINK THAT RAISES A

24   CONCERN, LEGALLY, ABOUT THE PROPRIETY OF REDACTING THAT.

25        AND IF YOUR HONOR RULES AGAINST ME ON THAT, WHICH YOU

1      MIGHT WELL RULE AGAINST ME ON THAT -- I'M NOT MAKING ANY

2      PREDICTIONS.  MY SECOND POINT IS THAT THERE ARE STILL PARTS

3      THAT SHE WANTS REDACTED THAT HAVE NOTHING TO DO WITH THE

4      MEDIATION.

5           SO ALL I'M ASKING FOR IS THAT WE WOULD LIKE A LITTLE MORE

6      TIME TO LOOK AT THIS.

7                THE COURT:  WHAT WITNESS TESTIMONY WILL IT EFFECT

8      FROM YOUR STANDPOINT?

9                MS. NGUYEN:  WITH RESPECT TO BEING ABLE TO TALK

10     ABOUT THE OUTCOME OF THE MEDIATION.

11          MY CLIENT WILL BE TAKING THE STAND ON MONDAY AND

12     MR. MCMANIS ALREADY ASKED SOME WITNESSES ABOUT WALKING OUT OF

13     THE MEDIATION.  AND SO I WOULD LIKE HER TO BE ABLE TO TALK

14     ABOUT WHY SHE WALKED OUT OF THE MEDIATION AND WHAT HAPPENED.

15          AND IF THAT'S THE CASE, THEN IT REALLY OPENS THE DOOR FOR

16     HER TO TALK ABOUT WHAT HAPPENED AT THE MEDIATION AND THE

17     ARBITRATION.

18          BUT I KNOW THAT WITH RESPECT -- YOUR HONOR HAD SAID THAT

19     WE COULDN'T TALK ABOUT THE OUTCOME OF THE ARBITRATION.

20          IN THE INVESTIGATOR'S REPORT, WHAT SHE NOTED WAS ACTUALLY

21     THE OUTCOME OF THESE MEDIATIONS BEING DECISIONS OF THE

22     MEDIATOR, ALMOST AS IF THEY ARE BINDING DECISIONS.

23                THE COURT:  THERE'S TWO -- ONE OR TWO MEDIATIONS?

24                MS. NGUYEN:  THERE WERE THREE ACTUALLY:  ONE YEAR

25     BEFORE THAT SHE ALSO TALKED ABOUT, I THINK IN HERE; AS WELL AS

1    THE ONE ARISING FROM OCTOBER 2009; AND THE ONE FROM THE

2    TERMINATION.

3            MR. MCMANIS:  THE REPORT, THE INVESTIGATOR'S REPORT

4    WAS PREPARED BEFORE THERE WAS THAT ARBITRATION, WHICH IS THE

5    SUBJECT OF YOUR ORDER ON MOTION IN LIMINE.

6        IF SHE WANTS TO TALK ABOUT WHAT HAPPENED AT THE MEDIATION

7    OF HER SUSPENSION ON OCTOBER 4, 2009, TALK ABOUT OPENING THAT

8    DOOR, I GUESS THAT'S A CHOICE FOR HER TO MAKE.

9        BUT MY POINT HERE IS THAT THE ONLY ISSUE BEFORE THE COURT,

10   AND I'M SORRY WE'RE TAKING SO MUCH TIME, YOUR HONOR, BEFORE THE

11   COURT, BUT THE ONLY ISSUE BEFORE THE COURT IS WHETHER OR NOT

12   THE INVESTIGATOR'S REPORT IN CERTAIN RESPECTS NEED TO BE

13   REDACTED.

14       AS THAT IS NOT GOING TO BE AN ISSUE WITH HER TESTIMONY

15   BECAUSE I CANNOT IMAGINE MY FRIEND IS GOING TO BE REFERENCING

16   THE INVESTIGATOR'S REPORT AND SHOWING IT TO HER, HER OWN

17   CLIENT.

18       AND THIS IS NOT GOING TO GET BEFORE THE JURY UNTIL WE GIVE

19   THE CASE TO THE JURY, AND WE CAN SOLVE THE PROBLEM BEFORE THEN.

20   THAT'S ALL I'M SAYING.

21           MS. NGUYEN:  YOUR HONOR, THE MAIN QUESTION ISN'T

22   JUST THE REDACTION, IT'S THE MEDIATION AND WHETHER OR NOT

23   EITHER OF THE PARTIES SHOULD BE ALLOWED TO TALK ABOUT THE

24   MEDIATION AND THE OUTCOME OF THE MEDIATION.

25           MR. MCMANIS:  THAT'S A WHOLE DIFFERENT ISSUE.

1          THE COURT:  THAT IS A LITTLE BIT OF A DIFFERENT

2     ISSUE.

3          OBVIOUSLY I CAN'T RULE ON IT WITHOUT SEEING WHAT THE

4     REDACTIONS ARE.

5          TOMORROW IS A FURLOUGH DAY SO WE HAVE NO COURT TOMORROW.

6          WHAT I COULD SUGGEST IS THAT IF YOU ARE CONCERNED FOR

7     PREPARATION, IF YOU CAN'T RESOLVE IT BETWEEN YOURSELVES BY THE

8     CLOSE OF TOMORROW, YOU SEND ME AN E-MAIL AND SET FORTH YOUR

9     RESPECTIVE POSITIONS, AND I'LL LOOK AT IT OVER THE WEEKEND.

10          MR. MCMANIS:  THAT'S FINE, YOUR HONOR.  THANK YOU.

11          MS. NGUYEN:  THANK YOU, YOUR HONOR.

12          THE COURT:  ALL RIGHT.

13     (COURT CONCLUDED AT 1:39 P.M.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                       CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     IRENE RODRIGUEZ, CSR, CRR
     CERTIFICATE NUMBER 8076

17

18
     _____
19   LEE-ANNE SHORTRIDGE, CSR, CRR
     CERTIFICATE NUMBER 9595

20

21   DATED:  MAY 2, 2013

22

23

24

25