```
 1                    UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                         SAN JOSE DIVISION,

 3
        CUC DANG,
 4
                PLAINTIFF,              CASE NO.  CV-10-02181-RMW
 5
           VS.                          SAN JOSE, CALIFORNIA
 6
        SUTTER'S PLACE, INC., DBA BAY   MAY 6, 2013
 7      101 OR BAY 101 CASINO, UNITE
        HERE! LOCAL 19, AND DOES 1      VOLUME 4
 8      THROUGH 20, INCLUSIVE,
                                        PAGES 477 - 568
 9              DEFENDANTS.

10

11                        TRANSCRIPT OF TRIAL
                  BEFORE THE HONORABLE RONALD M. WHYTE
12              UNITED STATES DISTRICT JUDGE AND A JURY

13                      A-P-P-E-A-R-A-N-C-E-S

14      FOR THE PLAINTIFF:    ROBINSON & WOOD, INC.
                              BY:   ANN A.P. NGUYEN
15                            227 NORTH FIRST STREET
                              SAN JOSE, CALIFORNIA 95113
16
        ALSO PRESENT:         ANDRE THOMAS
17       FOR THE DEFENDANTS:  MCMANIS FAULKNER
                              BY:   JAMES MCMANIS
18                                  JENNIFER MURAKAMI
                              FAIRMONT PLAZA
19                            10TH FLOOR
                              50 W. SAN FERNANDO STREET
20                            SAN JOSE, CALIFORNIA 95113

21      ALSO PRESENT:         CINDY MCCLELEN

22

23      OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, CRR
                                   CERTIFICATE NUMBER 8074

24          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
                   TRANSCRIPT PRODUCED WITH COMPUTER
25
```

1

2                    INDEX OF PROCEEDINGS

3

4    FOR THE PLAINTIFF:

5

6    **CUC DANG**
         DIRECT EXAM BY MS. NGUYEN              P. 481
7

8    **CHI LUONG**
         DIRECT EXAM BY MS. NGUYEN              P. 516
9        CROSS-EXAM BY MS. MURAKAMI             P. 528

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>INDEX OF PROCEEDINGS</u>

2
                                  IDENT.        EVIDENCE
3        PLAINTIFF'S:

4
         1032                                   485
5        5                                      505

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SAN JOSE, CALIFORNIA                    MAY 6, 2013
                    P R O C E E D I N G S
2

3        (COURT CONVENED JURY PRESENT.)

4            THE COURT:  ARE WE READY TO GO?

5            MR. MCMANIS:  WE ARE, YOUR HONOR.  WE HAVE A

6    QUESTION FROM ONE OF THE JURORS.

7        HOW DO YOU WANT TO HANDLE THAT?  I HAVE THE ANSWERS TO THE

8    QUESTION, BUT I'M NOT SURE IF IT'S APPROPRIATE FOR ME TO GIVE

9    THOSE ANSWERS OR IF WE NEED A WITNESS.

10           THE COURT:  WELL, WHY DON'T YOU COME UP FOR JUST A

11   MINUTE, AND WE'LL TALK ABOUT IT REALLY QUICKLY.

12       (SIDE-BAR OFF THE RECORD.)

13           MR. MCMANIS:  THANK YOU, YOUR HONOR.

14           THE COURT:  ALL RIGHT.  COUNSEL ASSURED ME THAT THE

15   QUESTIONS THAT WERE ASKED WILL BE ANSWERED IN THE COURSE OF THE

16   TESTIMONY.

17       ALL RIGHT.  ARE YOU READY TO PROCEED?

18           MS. NGUYEN:  YES, YOUR HONOR.  THE PLAINTIFF WOULD

19   NOW LIKE TO CALL MS. CUC DANG AS ITS NEXT WITNESS.

20           THE COURT:  OKAY.

21           MS. NGUYEN:  AND WE DO HAVE A VIETNAMESE INTERPRETER

22   TO ASSIST.

23       (INTERPRETER SWORN.)

24       **(PLAINTIFF CUC DANG SWORN.)**

25           THE COURT:  IT MAKES ME A LITTLE NERVOUS BECAUSE

1    THAT PLATFORM IS THERE.

2         ARE YOU ALL RIGHT?

3              THE INTERPRETER:  YES.

4              THE COURT:  OKAY.

5                        **DIRECT EXAMINATION**

6    BY MS. NGUYEN:

7    Q.   GOOD AFTERNOON, MS. DANG.  PLEASE TELL US WHERE YOU WERE

8    BORN?

9    A.   IN VIETNAM.

10   Q.   AND WHEN DID YOU COME TO THE U.S.?

11   A.   2002.

12   Q.   AND ARE YOU NOW A CITIZEN?

13   A.   I AM.

14   Q.   ARE YOU MARRIED?

15   A.   YES.

16   Q.   WHERE DO YOU LIVE CURRENTLY?

17   A.   SAN FRANCISCO.

18   Q.   AND DO YOU HAVE ANY CHILDREN AND GRANDCHILDREN?

19   A.   I HAVE THREE DAUGHTERS AND TWO GRANDCHILDREN.

20   Q.   AND PLEASE TELL US WHAT IS THE HIGHEST LEVEL OF EDUCATION

21   THAT YOU OBTAINED?

22   A.   I COMPLETED 12TH GRADE.

23   Q.   AND WHEN ABOUT DID YOU WORK FOR BAY 101?

24   A.   JULY OF 2006.

25   Q.   THAT'S WHEN YOU STARTED THERE?

1    A.   CORRECT.

2    Q.   NOW, WOULD YOU PLEASE DESCRIBE FOR THE JURY WHAT YOU DID

3    FOR A LIVING BEFORE BAY 101?

4    A.   WHEN I WAS STILL LIVING IN VIETNAM, I COMPLETED HIGH

5    SCHOOL; AND I WAS OWNER OF A RESTAURANT AND A COFFEE SHOP; AND

6    LATER I OPENED A SHOP THAT SOLD CLOTHING AND SHOES.

7    Q.   DID YOU DO ANYTHING ELSE WHILE YOU WERE IN VIETNAM?

8    A.   NO.

9    Q.   AND THEN EVENTUALLY YOU LEFT VIETNAM; CORRECT?

10   A.   CORRECT.

11   Q.   AND WHERE DID YOU GO NEXT?

12   A.   IN 1994 I SETTLED IN AUSTRALIA.

13   Q.   AND WHAT DID YOU DO FOR A LIVING IN AUSTRALIA?

14   A.   I HAD A SEWING STORE, AND I HAD ABOUT 30 PEOPLE WORKING

15   FOR ME.

16   Q.   AND DID YOU DO ANYTHING ELSE FOR A LIVING WHILE IN

17   AUSTRALIA?

18   A.   YES.

19   Q.   AND WHERE DID YOU GO AFTER YOU LEFT AUSTRALIA?

20   A.   I SETTLED IN THE U.S. IN 2002.

21   Q.   AND IN THE U.S. BEFORE YOU STARTED WORKING FOR BAY 101,

22   WHAT DID YOU DO FOR A LIVING?

23   A.   I WAS THE OWNER OF A RESTAURANT IN LAS VEGAS.

24   Q.   AND WHAT ELSE DID YOU DO?

25   A.   A FEW YEARS LATER I MOVED BACK TO SAN JOSE WITH MY HUSBAND

1     AND THEN I FOUND WORK AT ASIANA GARDEN, AND THEN I WORKED AT

2     PHU KEE.

3     Q.   AND ARE THOSE TWO RESTAURANTS?

4     A.   CORRECT.

5     Q.   AND WHAT DID YOU DO AT THOSE RESTAURANTS?

6     A.   I WAS THE HEAD CHEF.

7     Q.   AND YOU WERE THE PRIMARY CHEF OR A COOK?

8     A.   I WAS A COOK -- WELL, ACTUALLY THERE WAS NO HEAD CHEF OR

9     NO LOWER CHEF.  EVERYONE WAS THE SAME.

10    Q.   AND BESIDES BEING A COOK AT THOSE TWO RESTAURANTS, DID YOU

11    DO ANYTHING ELSE TO EARN A LIVING BEFORE BAY 101?

12    A.   NO.

13    Q.   DID YOU -- ONCE YOU STARTED WORKING AT BAY 101, WERE YOU

14    STILL WORKING AT THE PRIOR RESTAURANTS?

15    A.   PRIOR TO THAT I WAS WORKING AT PHU KEE RESTAURANT.  IN

16    2006 I STARTED WORKING AT BAY 101, AND THEN AT THAT TIME I WAS

17    ALSO WORKING AT PHU KEE.

18    Q.   SO YOU WERE WORKING TWO JOBS AT THE SAME TIME?

19    A.   CORRECT.

20    Q.   AT DIFFERENT HOURS?

21    A.   CORRECT.

22    Q.   AND DID YOU HAVE ANY PROBLEMS WHILE WORKING AT THOSE

23    RESTAURANTS?

24    A.   NEVER.

25    Q.   AND, MS. DANG, ARE YOU CURRENTLY EMPLOYED?

1       A.   YES.

2       Q.   AND WHERE ARE YOU EMPLOYED NOW?

3       A.   SAN FRANCISCO.

4       Q.   WHAT ARE YOU DOING?

5       A.   HEAD CHEF.

6       Q.   AND HOW MUCH ARE YOU EARNING IN THAT POSITION?

7       A.   TWELVE DOLLARS AN HOUR.

8       Q.   AND WHO IS YOUR EMPLOYER?

9       A.   VERY YOUNG OWNER.

10      Q.   AND HOW MANY HOURS PER WEEK ARE YOU WORKING?

11      A.   AVERAGE 15 HOURS A WEEK.  SOMETIMES MORE AND SOMETIMES

12      LESS.

13              THE COURT:  DID SHE SAY 15?

14              THE INTERPRETER:  FIFTEEN.

15      BY MS. NGUYEN:

16      Q.   AND HOW IS THAT JOB WORKING OUT FOR YOU?

17      A.   I'M VERY HAPPY WITH IT.

18      Q.   I'D LIKE YOU TO TAKE A LOOK AT EXHIBIT 1032, PLEASE.  IT'S

19      IN ONE OF THE WHITE BINDERS.  WHITE.  EXHIBIT 1032.

20         YOUR HONOR, MAY I APPROACH?

21              THE COURT:  SURE.

22      BY MS. NGUYEN:

23      Q.   MS. DANG, WOULD YOU PLEASE TELL US WHAT IT IS?

24      A.   THIS IS THE DOCUMENTS FROM THE PLACE I'M WORKING NOW AND

25      IT SHOWS THE PAYMENTS THAT THEY PAY ME.

1   Q.   THOSE ARE THE PAYCHECK STUBS FROM YOUR CURRENT EMPLOYMENT?

2   A.   CORRECT.

3             MS. NGUYEN:  YOUR HONOR, THE PLAINTIFF MOVES TO HAVE

4   THAT ADMITTED INTO EVIDENCE.

5             MR. MCMANIS:  NO OBJECTION.

6             THE COURT:  ALL RIGHT.  IT'S RECEIVED.

7   (PLAINTIFF'S EXHIBIT 1032 WAS RECEIVED IN EVIDENCE.)

8             MS. NGUYEN:  THANK YOU, YOUR HONOR.

9   Q.   MS. DANG, ARE YOU STILL LOOKING FOR A MORE FULL-TIME JOB?

10  A.   SOMETIMES I WORK A LOT, BUT SOMETIMES I DON'T HAVE ENOUGH.

11  Q.   MY QUESTION IS WHETHER YOU CONTINUE TO LOOK FOR MORE -- A

12  MORE FULL-TIME JOB?

13  A.   YES.

14  Q.   AND WHAT ARE YOU DOING TO CONTINUE LOOKING?

15  A.   MY HUSBAND HAS A LIST SO THAT I CAN CALL AND GO TO THESE

16  DIFFERENT LOCATIONS TO FIND WORK.

17  Q.   NOW, I'D LIKE TO MOVE ON TO THE JOB AT BAY 101.  HOW DID

18  YOU LEARN ABOUT THE JOB AT BAY 101?

19  A.   MY FRIEND REFERRED ME.

20  Q.   AND DID ANYONE HELP YOU WITH THE APPLICATION?

21  A.   MY FRIEND HELPED ME.

22  Q.   AND AT THE TIME THAT YOU WORKED AT BAY 101, WERE YOU

23  MARRIED?

24  A.   NO.

25  Q.   WITH WHOM WERE YOU LIVING WHEN YOU WERE WORKING AT BAY

1   101?

2   A.   MY YOUNGEST DAUGHTER.

3   Q.   AND WHAT IS HER NAME?

4   A.   LISA.

5   Q.   AND WHAT IS THE NAME OF YOUR CURRENT HUSBAND?

6   A.   JASON.

7   Q.   AND WHEN DID YOU MARRY HIM?

8   A.   DECEMBER OF 2009.

9   Q.   AND I THINK YOU TESTIFIED THAT YOU STARTED WORKING IN BAY

10  101 IN JULY OF 2006; IS THAT RIGHT?

11  A.   CORRECT.

12  Q.   AND WHAT POSITION WERE YOU HIRED INTO?

13  A.   HEAD CHEF.

14  Q.   HEAD CHEF AS WERE YOU IN CHARGE OF THE KITCHEN?

15  A.   AS FAR AS VIETNAMESE FOOD, EACH PERSON HAD THEIR OWN

16  RESPONSIBILITIES THERE.

17  Q.   SO YOU WERE IN CHARGE OF THE VIETNAMESE FOOD?

18  A.   YES.

19  Q.   AND WHAT HOURS DID YOU WORK AT BAY 101?

20  A.   IN THE EVENING FROM 7:00 P.M. UNTIL 3:00 A.M. AND

21  SOMETIMES FROM 5:00 UNTIL 1:00.

22  Q.   I'D LIKE YOU TO TAKE A LOOK AT EXHIBIT 31, PLEASE.  YOU'VE

23  FOUND EXHIBIT 31?

24  A.   YES.

25  Q.   AND THIS IS THE EXHIBIT WITH THE UNDISPUTED FACTS THAT THE

1    PARTIES HAVE AGREED TO.  I'D LIKE YOU TO TAKE A LOOK AT

2    PARAGRAPH 14.

3        AND PARAGRAPH 14 HAS ALL OF THE PAY RATES THAT YOU WERE

4    EARNING AT THE TIME THAT YOU WORKED AT BAY 101?

5    A.   YES.

6    Q.   DOES THAT LOOK CORRECT?

7    A.   YES.

8    Q.   AND I BELIEVE EXHIBIT 31 HAS ALREADY BEEN ENTERED INTO

9    EVIDENCE.

10            MR. MCMANIS:  I'M NOT SURE IF IT'S IN EVIDENCE, YOUR

11   HONOR.  I THINK SOMEONE WILL PROBABLY NEED TO FIGURE OUT HOW

12   WE'RE GOING TO HANDLE THAT BUT I HAVE NO OBJECTION TO --

13            THE COURT:  THIS IS STIPULATED FACTS, RIGHT?

14            MR. MCMANIS:  YES.

15            THE COURT:  YOU CAN JUST READ IT IF YOU WANT.

16   BY MS. NGUYEN:

17   Q.   MS. DANG, FROM JULY 6TH, 2006, TO MARCH 14TH, 2007, YOU

18   WERE BEING PAID $11.65; IS THAT CORRECT?

19   A.   CORRECT.

20   Q.   AND THEN FROM THAT TIME UNTIL JUNE 30TH, 2007, YOU WERE

21   EARNING $11.90; IS THAT CORRECT?

22   A.   CORRECT.

23   Q.   AND THEN THE NEXT LEVEL OF PAY WAS AT $12.15.  DO YOU

24   REMEMBER THAT?

25   A.   YES.

1    Q.   AND THEN YOU GOT A $0.50 INCREASE TO 12.65?

2    A.   CORRECT.

3    Q.   AND THEN THE NEXT INCREASE WENT UP TO 12.90 FROM JULY 1ST,

4    2008, TO SEPTEMBER 31ST, 2008?

5    A.   CORRECT.

6    Q.   AND THEN YOU WERE EARNING 13.40 AN HOUR BETWEEN JANUARY

7    1ST, AND FEBRUARY 9TH, 2009; IS THAT RIGHT?

8    A.   YES.

9    Q.   AND THEN FEBRUARY 10TH, 2009, YOU TRANSFERRED OUT TO

10   BECOME A SERVER AND YOUR HOURLY RATE AT THE TIME WAS 9.45; IS

11   THAT CORRECT?

12   A.   CORRECT.

13   Q.   AND NOW -- THANK YOU.  WHEN YOU FIRST STARTED WORKING AT

14   BAY 101 AS A COOK, DID YOU RECEIVE ANY TRAINING?

15   A.   YES, FOR TWO WEEKS.

16   Q.   AND WHO WAS YOUR SUPERVISOR?

17   A.   JOHN, NICK, GEORGE.

18   Q.   JOHN ST. CROIX?

19   A.   YES.

20   Q.   NICK ORTEGA?

21   A.   NICK ORTEGA, YES.

22   Q.   AND LUCIO SUAREZ?

23   A.   YES.

24   Q.   AND GEORGE CASTILLO?

25   A.   GEORGE CASTILLO, YES.

1    Q.   ANYONE ELSE?

2    A.   JOSE AND TONY.

3    Q.   AND AT THE BEGINNING WHEN YOU FIRST STARTED WORKING AT BAY

4    101, HOW DID YOU LIKE THE JOB?

5    A.   I REALLY LOVED IT BECAUSE IT'S A BIG COMPANY AND I HAD

6    REALLY GOOD INSURANCE.

7    Q.   DID YOU LIKE THE KIND OF WORK THAT YOU WERE DOING?

8    A.   YES, I DID.

9    Q.   AND AT SOME TIME DID THAT CHANGE FOR YOU?

10   A.   YEAH, IT DID CHANGE.

11   Q.   AND WHEN DID IT CHANGE?

12   A.   ABOUT A MONTH TO A MONTH AND A HALF.

13   Q.   AND WHAT CHANGED?

14   A.   AT THE BEGINNING LUCIO CAME OVER TO HELP ME.  HE WOULD

15   CARRY THE HEAVY SOUP POTS, AND I THOUGHT HE WAS A GOOD

16   SUPERVISOR.  HE WOULD HELP THE EMPLOYEES.  I WAS HAPPY, AND I

17   TALKED.

18   Q.   AND AT SOME POINT DID HIS BEHAVIOR TOWARD YOU CHANGE?

19   A.   AFTER THAT HE CAME OVER ON A DAILY BASIS TO BOTHER ME TO

20   TALK TO ME WHILE I WAS WORKING AND AFTER THAT EVERY DAY HE

21   WOULD GIVE ME FLOWERS.

22   Q.   AND WHAT ELSE DID HE DO THAT BOTHERED YOU?

23   A.   HE WOULD COME IN AND INVITE ME OUT AND HE WOULD STOP ME

24   WHEN I HAD -- WHEN I WAS LEAVING OUT FOR LUNCH IN ORDER TO

25   TALK.

1          AND WHEN I WAS LEAVING TO GO HOME, HE WOULD FOLLOW ME.

2     Q.   DID HE ALSO CALL YOU?

3     A.   HE CALLED ME MANY TIMES, AND THIS WAS WHILE I WAS TRYING

4     TO GET SOME SLEEP SO THAT I COULD GO TO WORK IN THE MORNING.

5     Q.   SO HE CALLED YOU AT HOME?

6     A.   ON MY CELL PHONE.

7     Q.   DID HE ALSO CALL YOU SOMETIMES WHEN YOU WERE WORKING AT

8     BAY 101?

9     A.   WELL, ONE TIME HE DID CALL AT BAY 101.

10    Q.   AND BESIDES THE PHONE CALLS, THE FOLLOWING YOU HOME, THE

11    BRINGING YOU FLOWERS AND ASKING YOU OUT, DID MR. SUAREZ DO

12    ANYTHING ELSE THAT BOTHERED YOU?

13    A.   HE STOPPED ME WHEN I WAS AT WALMART AND HE OFFERED ME SOME

14    FLOWERS.

15    Q.   AND AT SOME POINT DID HIS ACTION TOWARD YOU ESCALATE TO

16    MORE THAN JUST ASKING YOU OUT AND FOLLOWING YOU?

17    A.   I CALLED INTO BAY 101 AND I SAID THAT I WAS ILL.  HE

18    BROUGHT INTO ME A BOX OF SOUP.  I WAS VERY AMAZED THAT HE KNEW

19    WHERE I WAS LIVING.

20         I ASKED HIM, AND HE SAID THAT HE KNEW WHERE I LIVED

21    BECAUSE HE SAW THAT MY CAR WAS PARKED IN THE FRONT.

22         I TOLD HIM THAT I DID NOT WANT THIS TO EVER HAPPEN AGAIN.

23    I SAID TO STOP RIGHT AWAY BECAUSE I DON'T WANT IT ANY MORE.

24    Q.   AND DID YOU GIVE HIM YOUR PHONE NUMBER, MS. DANG?

25    A.   NO, BUT I THINK BAY 101 HAD MY PHONE NUMBER.  IT WAS

1    AVAILABLE FOR BAY 101 TO CALL EMPLOYEES TO SEE IF THEY WERE

2    AVAILABLE TO COME INTO WORK.

3        AND SO THERE WERE A LOT OF EMPLOYEES THAT ALSO WOULD CALL

4    INTO BAY 101 TO ASK FOR THE SCHEDULE.  SO I THINK HE HAD MY

5    NUMBER FROM BAY 101.

6    Q.  BUT YOU DIDN'T GIVE IT TO HIM, RIGHT?

7    A.  NEVER.

8    Q.  AND HAD YOU EVER GONE OUT ON A DATE WITH MR. SUAREZ?

9    A.  NO.

10   Q.  HAVE YOU EVER INVITED HIM INTO YOUR HOME?

11   A.  NO.

12   Q.  DO YOU KNOW, MS. DANG, WHETHER MR. SUAREZ BOTHERED OR

13   HARASSED ANY OTHER WOMEN AT BAY 101?

14   A.  YES, I DO KNOW.

15   Q.  WHO ELSE DID HE BOTHER?

16   A.  HER NAME IS NGA, AND HER AMERICAN NAME IS NINA.  AND SHE'S

17   ALSO VIETNAMESE, AND HER LAST NAME IS NGUYEN.

18       AND ANOTHER WOMAN IN H.R.  HER NAME IS LUONG CHI.

19   Q.  SO THREE OR TWO WOMEN?

20   A.  THREE.

21   Q.  NINA WAS ONE AND CHI WAS THE SECOND?

22   A.  YES.

23   Q.  AND WHO IS THE THIRD?

24   A.  SO.

25   Q.  S-O?

1       A.   YES.

2       Q.   AND, MS. DANG, WHEN MR. SUAREZ BOTHERED YOU OR CALLING YOU

3       OUT FOR A DATE, DID YOU EVER REPORT IT TO YOUR SUPERVISOR?

4       A.   YES, MANY TIMES.

5       Q.   AND SO COULD YOU EXPLAIN HOW MANY TIMES YOU REPORTED

6       MR. SUAREZ'S ACTIONS TOWARD YOU?

7       A.   I TOLD JOHN AND NICK THIS ONE -- THIS PERSON HAS BOTHERED

8       ME A LOT, AND I'M NOT ABLE TO WORK.

9            AND THEN JOHN SAID THAT HE WAS GOING TO TAKE CARE OF IT

10      AND TALK TO MR. LUCIO.

11      Q.   AND DID ANYTHING CHANGE AFTER JOHN SAID HE WOULD TALK TO

12      LUCIO?

13      A.   THE FIRST FEW DAYS I DIDN'T SEE HIM BOTHER ME, BUT LATER

14      IT BECAME EVEN WORSE.

15      Q.   SO BESIDES JOHN ST. CROIX OR NICK ORTEGA, DID YOU COMPLAIN

16      TO ANY OTHER SUPERVISOR?

17      A.   GEORGE.

18      Q.   AND WHAT DID YOU TELL GEORGE?

19      A.   I ASKED HIM IF HE COULD PLEASE TALK TO LUCIO AND HAVE HIM

20      STOP BOTHERING ME, AND I'VE ALSO TOLD NICK AND JOHN.

21      Q.   AND AFTER YOU REPORTED MR. SUAREZ TO NICK AND JOHN, DID

22      NICK AND JOHN'S ACTIONS TOWARD YOU CHANGE IN ANY WAY?

23      A.   NOTHING CHANGED.  IT SEEMED LIKE HE WAS LOOKING FOR MORE

24      TROUBLE.

25      Q.   WHO WAS LOOKING FOR MORE TROUBLE?

1    A.    JOHN AND NICK.

2    Q.    AND WHAT KIND OF TROUBLE?

3    A.    WELL, I ALWAYS DID MY REGULAR WORK.  EACH TIME THAT I

4    REPORTED AND TOLD MY GRIEVANCES, HE WOULD COME IN AND SAY THIS

5    SOUP, THIS PHO HAS WAY TOO MUCH LIQUIDS IN IT.  THIS WILL BURN

6    THE SERVER.  AND HE WOULD SAY, "HOW COME THE VEGETABLES ARE NOT

7    FRESH?"

8         AND AS FAR AS THE MEAT AND SHRIMP, THAT THEY WERE NOT

9    FRESH, THEY WERE OLD AND WHY WAS I FILLING UP SO MUCH.

10   Q.    SO DID YOU DO ANY -- DID YOU MAKE ANY CHANGES IN THE WAY

11   YOU COOK?

12   A.    IT'S ALWAYS BEEN THE SAME.

13   Q.    AND HAD JOHN COMPLAINED ABOUT THAT BEFORE?

14   A.    NO.

15   Q.    SO HE JUST STARTED COMPLAINING AFTER YOU REPORTED LUCIO?

16   A.    NO.

17   Q.    AND HOW LONG AFTER DID JOHN OR NICK GIVE YOU A HARD TIME

18   AFTER YOU REPORTED LUCIO?

19   A.    COULD YOU REPEAT YOUR QUESTION.

20   Q.    YOU SAID THAT YOU REPORTED LUCIO HARASSING YOU AND AFTER

21   THAT JOHN AND NICK GAVE YOU A HARD TIME.

22        MY QUESTION IS HOW ELSE DID THEY DO THAT TO YOU?

23   A.    WHEN LUCIO HAD THE GLASS THROWN INTO MY FACE AND HE OPENED

24   THE CABINET DOOR AND MY LEG WAS HIT AND BRUISED.

25   Q.    I THINK I REMEMBER WHAT INCIDENT THAT WAS.  LET'S GET THE

1       EXHIBIT ON THE SCREEN.  IF YOU COULD PLEASE TAKE A LOOK AT

2       EXHIBIT 1011.  1011?

3                   THE INTERPRETER:  WE HAVE 1010 AND THAT WOULD BE IT.

4                   MS. NGUYEN:  HERE (INDICATING).

5       Q.   YOU FOUND IT?

6       A.   YES.

7       Q.   AND SO THIS IS A SUPPLEMENTAL REPORT FROM SECURITY.  IT'S

8       BEEN ENTERED INTO EVIDENCE.  AND IT RELATES TO THE TIME WHEN

9       MR. SUAREZ SLAMMED THE METAL DOOR ON YOUR FOOT; IS THAT RIGHT?

10      A.   CORRECT.

11      Q.   AND DO YOU REMEMBER WHAT HAPPENED DURING THAT INCIDENT?

12      A.   ONE EVENING WHEN I WAS WORKING, LUCIO, HE CAME NEXT TO ME

13      AND GAVE ME A GLASS OF WATER.  I SAID I DIDN'T NEED IT, THANK

14      YOU.  AND HE GOT ANGRY AND THEN THREW THE GLASS.

15          THE WATER WAS SPLASHED ALL OVER ME AND MY FACE.  AND HE

16      WASN'T SATIATED YET.  HE WAS STILL ANGRY.  SO HE TOOK THE DOOR

17      AND SLAMMED IT ON MY LEG, AND MY LEG WAS HURTING AND BRUISED.

18      Q.   DID YOU REPORT IT TO ANY SUPERVISOR?

19      A.   YES.

20      Q.   AND TO WHICH SUPERVISOR?

21      A.   GEORGE.

22      Q.   AND WERE YOU TAKEN TO SECURITY?

23      A.   HE TOOK ME UP TO SECURITY.

24      Q.   DO YOU KNOW IF LUCIO WAS DISCIPLINED AS A RESULT OF THAT

25      INCIDENT?

1   A.   I THINK HE COULD HAVE BEEN SUSPENDED.

2   Q.   I'D LIKE YOU TO PLEASE TURN TO EXHIBIT 1013.

3        DO YOU SEE IT?

4   A.   YES.

5   Q.   AND, MS. DANG, WOULD YOU PLEASE TELL THE JURORS WHAT THIS

6   IS?

7   A.   I HAVE TO ASK AN ATTORNEY TO WRITE A LETTER TO HELP ME TO

8   MAKE A COMPLAINT ABOUT LUCIO.

9   Q.   AND WHY DID YOU HAVE TO SEND IN THIS COMPLAINT?

10  A.   THIS WAS AFTER HE HIT THE DOOR ON MY LEG AND THREW THE

11  GLASS OF WATER ONTO ME.

12  Q.   LET'S TAKE A LOOK AT THE LETTER.  IT SAYS THAT LUCIO BEGAN

13  BOTHERING YOU IN JULY AND AUGUST AFTER YOU STARTED WORKING AT

14  BAY 101; IS THAT RIGHT?

15  A.   CORRECT.

16  Q.   AND THAT YOU REPORTED IT TO JOHN ST. CROIX?

17  A.   YES.

18  Q.   AND I BELIEVE YOU TESTIFIED EARLIER THAT IT STOPPED FOR A

19  LITTLE BIT, BUT THEN IT STARTED AGAIN, MR. SUAREZ'S HARASSMENT?

20  A.   CORRECT.

21  Q.   AND YOU ALSO NOTED -- ANDRE, IF YOU COULD SCROLL DOWN A

22  LITTLE BIT, PLEASE -- THAT SOME TIME IN AUGUST AND SEPTEMBER

23  THAT LUCIO INTRUDED INTO YOUR HOUSE?

24  A.   CORRECT.

25  Q.   DID YOU REPORT THAT TO YOUR SUPERVISOR?

1    A.   WHEN HE CAME TO MY HOUSE, I WAS VERY SURPRISED.  I DIDN'T

2    KNOW HOW HE WAS ABLE TO GET INTO MY HOUSE.  I WANTED TO KICK

3    HIM OUT AND CALL THE POLICE.  HE CRIED AND HE PROMISED THAT HE

4    WOULD NEVER DO THIS AGAIN.

5         SO I FELT SORRY FOR HIM, AND THAT'S WHY I DIDN'T REPORT IT

6    TO NICK OR JOHN.

7    Q.   NOW, MR. SUAREZ PROMISED NOT TO DO IT AGAIN BUT DID HE

8    RESUME HIS BEHAVIOR AND HARASSMENT TOWARD YOU?

9    A.   YES, HE KEPT ON.

10   Q.   IN THAT SAME LETTER --

11        WOULD YOU PLEASE SCROLL TO THE NEXT PAGE, ANDRE.

12        IN THAT SAME LETTER YOU REFERENCE ANOTHER INCIDENT WHERE

13   ANOTHER EMPLOYEE PUT HIS HAND INTO YOUR POCKET.

14        WOULD YOU PLEASE TELL US WHAT HAPPENED?

15   A.   ONE EVENING I WAS WORKING.  I WAS VERY BUSY.  THERE WAS A

16   MAN.  HE TOOK A CANDY FROM THE POCKET OF MY CLOTHING, BUT HE

17   DIDN'T ASK PERMISSION FIRST.

18        I SAID THAT IF YOU WANT THE CANDY, YOU HAVE TO ASK MY

19   PERMISSION FIRST.  YOU CAN'T DO THAT.

20        AND HE GOT ANGRY AND STARTED SWEARING AND THREW THE CANDY

21   AND WALKED AWAY.

22   Q.   DID YOU REPORT THAT INCIDENT TO A SUPERVISOR OR H.R.?

23   A.   I DID.

24   Q.   DO YOU KNOW IF ANYTHING WAS DONE?

25   A.   THEY SUSPENDED HIM A FEW DAYS.

1    Q.   BUT YOU CONTINUED HAVING TO WORK WITH HIM; RIGHT?

2    A.   CORRECT.

3    Q.   YOU'VE HEARD THERE WAS ANOTHER INCIDENT WHEN YOU HAD SOME

4    BOWLS FALL ON YOUR FACE.  DO YOU RECALL THAT?

5    A.   I'VE HAD QUITE A FEW ACCIDENTS THERE.

6    Q.   AND DO YOU REMEMBER A TIME WHEN YOU HAD AN ACCIDENT AND

7    YOU WERE ALLOWED SOME DAYS OFF OF WORK AND YOU CAME BACK AND

8    YOU WERE SUSPENDED?

9    A.   I REMEMBER.

10   Q.   LET'S TAKE A LOOK AT EXHIBIT 1, PLEASE.  EXHIBIT 1, PAGE

11   17.  EXHIBIT 1, THE YELLOW -- YES.  EXHIBIT 1, PAGE 17.

12        FOUND IT?  EXHIBIT 1.

13        MS. DANG, DO YOU RECALL THIS WAS THE TIME THAT YOU HAD

14   SOME BOWLS FALL ON YOUR FACE AT WORK?

15   A.   CORRECT.

16   Q.   AND YOU WENT TO THE EMERGENCY ROOM AT O'CONNOR HOSPITAL?

17   A.   CORRECT.

18   Q.   AND WHAT KIND OF INJURIES DID YOU RECEIVE?

19   A.   THERE WAS A STACK ON THE SHELF.  THEY STACKED THE BOWLS

20   REALLY HIGH.  I WAS TRYING TO GET IT DOWN, BUT THE STACKS FELL

21   ON MY FACE.

22   Q.   WHAT TYPE OF INJURIES DID YOU HAVE?

23   A.   THE BOWL, WHEN IT WAS FALLING, HIT MY EYE.

24   Q.   DID SOMETHING HAPPEN TO YOUR EYE?

25   A.   IT WAS BRUISED, AND I COULDN'T SEE FROM IT.

1     Q.   AND THE DOCTOR GAVE YOU A FEW DAYS OFF?

2     A.   CORRECT.

3     Q.   AND DID YOU REPORT IT TO BAY 101?

4     A.   I CALLED IN AND I SAID THAT I HAD A DOCTOR'S LETTER

5     ALLOWING ME TO STAY OFF WORK FOR A FEW DAYS.

6     Q.   AND DID YOU PROVIDE BAY 101 WITH A COPY OF YOUR DOCTOR'S

7     NOTE?

8     A.   I DID.

9     Q.   AND THEY STILL SUSPENDED YOU ANY WAY?

10    A.   THAT'S CORRECT.

11    Q.   PLEASE LOOK AT PAGE 1001, BAY 1343.

12         MR. THOMAS:  1343?

13         MS. NGUYEN:  YES.  IT'S THE COUNSELING MEMO FOR

14    UNEXCUSED ABSENCE.

15    Q.   DO YOU SEE IT ON THE SCREEN?

16         DO YOU REMEMBER WHAT HAPPENED IN THAT INCIDENT WHERE YOU

17    WERE SUSPENDED FOR NOT BRINGING IN A DOCTOR'S NOTE?

18    A.   I CALLED IN SICK.  I ASKED FOR A DAY OFF.  THE NEXT DAY

19    WHEN I WENT TO WORK THEY SAID THAT I DIDN'T BRING A NOTE IN.

20    IN ONE DAY WHILE I WAS SICK, I WASN'T -- I DIDN'T HAVE TIME TO

21    GO AND ASK THE DOCTOR TO WRITE UP A PAPER FOR ME.

22    Q.   WHEN YOU WERE SICK IT WASN'T AN EMERGENCY, WAS IT?

23    A.   CORRECT.

24    Q.   AND SO DID YOU KNOW IF OTHER EMPLOYEES WHO WERE SICK FOR

25    ONE DAY WERE WRITTEN UP BECAUSE THEY COULDN'T BRING IN A

1    DOCTOR'S NOTE?

2    A.   I KNOW THAT THIS DIDN'T HAPPEN.

3    Q.   SO ONLY YOU WERE SUSPENDED BECAUSE OF IT?

4    A.   YEAH, THAT'S CORRECT.

5    Q.   AND WHY DO YOU THINK THAT THEY WERE HARDER ON YOU?

6    A.   BECAUSE I COMPLAINED ABOUT OTHER THINGS, AND SO THEY

7    WANTED TO MAKE IT DIFFICULT FOR ME.

8    Q.   PLEASE TURN TO THE ONE PAGE BEFORE THAT.  IT WOULD BE BAY

9    1342 OF THE SAME EXHIBIT.

10        YOU WERE ALSO WRITTEN UP FOR COMING INTO WORK LATE.  DO

11   YOU SEE THAT FROM THE COUNSELLING MEMO?

12   A.   YES.

13   Q.   AND I THINK JANUARY 5TH, THEY SAID WAS THE DATE THAT YOU

14   CAME IN LATE.  COULD YOU PLEASE TELL US WHAT HAPPENED?

15   A.   WHEN THEY WOULD CHANGE THE TIME, SOMETIMES I WOULD START

16   AT 7:00 UNTIL 3:00 A.M.

17        SOMETIMES IT CHANGED TO -- FROM 5:00 TO 1:00.

18        A FEW DAYS PRIOR TO THAT MY HOURS WERE THE SAME.

19        BEFORE LEAVING BAY 101, THEY HAD NOT TOLD ME THAT THEY HAD

20   CHANGED MY SCHEDULE.  SO I WENT THE REGULAR TIME TO WORK.

21   Q.   SO THEY CHANGED THE SCHEDULE AND HAD YOU START AT AN

22   EARLIER TIME BEFORE TELLING YOU?

23   A.   THAT'S CORRECT.

24   Q.   WAS THIS ANOTHER WAY THAT THEY WERE GIVING YOU A HARD

25   TIME?

1          MR. MCMANIS:  I'M GOING TO OBJECT TO IT AS LEADING.

2          THE COURT:  SUSTAINED.

3     BY MS. NGUYEN:

4     Q.   MS. DANG, WE HAVE SEEN EARLIER THE APRIL 2007 LETTER THAT

5     YOU SENT TO H.R. TO COMPLAIN REGARDING LUCIO.

6          WHAT HAPPENED AFTER H.R. RECEIVED THAT LETTER?

7     A.   I REMEMBER THAT JENNIFER CALLED.  I WAS TOLD TO COME IN

8     FOR A MEETING.

9          WHEN I CAME IN I SAW JOHN, NICK, JENNIFER, AND SOMEONE BY

10    THE NAME OF BRYAN.  HE'S THE SECURITY MANAGER.

11    Q.   AND WHAT HAPPENED AT THE MEETING?

12    A.   JENNIFER SAID THAT THE PAPER THAT THEY RECEIVED, THERE'S A

13    MEETING TODAY.

14         SHE ASKED ME, WHEN THIS HAPPENED, AND NOW WHAT DO YOU

15    WANT.

16    Q.   AND WHAT DID YOU SAY?

17    A.   I SAID THAT I DID NOT WANT TO SEE LUCIO WHILE WORKING.

18    Q.   AND WHAT WAS THE RESPONSE FROM THE PEOPLE AT BAY 101?

19    A.   PRIOR TO SAYING THAT I SAID, I JUST SAID THAT I DIDN'T

20    WANT TO SEE LUCIO, AND THAT'S IT.

21         SO THEY SAID THAT IF THEY OFFERED ME A MORNING SHIFT,

22    WOULD I LIKE TO HAVE IT.

23    Q.   AND WHAT DID YOU SAY?

24    A.   I SAID AS LONG AS I DON'T SEE LUCIO, I'M FINE WITH IT.

25    Q.   AND DID THEY SWITCH YOUR SHIFT TO THE MORNING SHIFT?

1       A.   THE NEXT DAY THEY CHANGED IT.

2       Q.   AND AFTER YOU SWITCHED TO THE MORNING SHIFT, DID YOU STILL

3       HAVE TO SEE LUCIO WHEN YOU WENT TO WORK?

4       A.   NOT AS SOON AS I STARTED WORKING THERE.  IT WAS WHEN I WAS

5       ALMOST GOING HOME, HE CAME IN HALF AN HOUR EARLY.  AND IF I

6       LEFT LATE, LIKE 15 MINUTES LATE, I STILL WOULD SEE HIM.

7       Q.   AND HOW WOULD YOU FEEL WHEN YOU STILL HAD TO SEE HIM AT

8       WORK?

9       A.   I DIDN'T FEEL COMFORTABLE, AND I FELT AFRAID.

10      Q.   AND DID YOU COMPLAIN TO ANYONE?

11      A.   YES.

12      Q.   TO WHOM?

13      A.   TO NICK AND JOHN.

14      Q.   AND WHAT DID THEY SAY?

15      A.   THEY DIDN'T SAY ANYTHING.

16      Q.   AND, MS. DANG, WHEN YOU CONTINUED TO HAVE TO DEAL WITH

17      LUCIO, DID YOU THINK ABOUT HIRING AN ATTORNEY AT THAT TIME?

18      A.   AT THE BEGINNING I DIDN'T THINK THAT, BUT LATER I FELT

19      THAT IT WASN'T SAFE FOR ME BECAUSE NICK AND JOHN DIDN'T DO

20      ANYTHING TO PROTECT ME.

21      Q.   SO DID YOU HIRE AN ATTORNEY TO HELP YOU?

22      A.   I DIDN'T HIRE ONE, BUT AN ATTORNEY DID HELP ME.

23      Q.   AND THAT WAS THE ATTORNEY THAT HELPED YOU WRITE THE LETTER

24      OF APRIL 2007?

25      A.   CORRECT.

1    Q.   AND WHEN YOU STILL HAD TO CONTINUE SEEING LUCIO AT WORK --

2    A.   CORRECT.

3    Q.   -- DID YOU THINK ABOUT QUITTING?

4    A.   COULD YOU REPEAT IT.

5    Q.   YOU SAID THAT YOU WERE UNCOMFORTABLE AND YOU WERE AFRAID

6    WHEN YOU HAD TO CONTINUE SEEING LUCIO.

7         DID YOU AT ANY TIME THINK ABOUT STOPPING WORK AT BAY 101

8    AND GO SOMEWHERE ELSE?

9    A.   MANY TIMES I THOUGHT ABOUT LEAVING BUT BECAUSE I NEEDED A

10   JOB TO PAY FOR MY BILLS AND HAVE INSURANCE.

11   Q.   AND AT THE TIME IT WAS JUST YOU AND YOUR DAUGHTER; RIGHT?

12   A.   CORRECT.

13   Q.   AND AFTER YOU CHANGED TO THE MORNING SHIFT, DID NICK AND

14   JOHN CHANGE THE WAY THEY ACTED AND TREATED YOU?

15   A.   THEY BECAME MORE DIFFICULT WITH ME.

16   Q.   AND WHAT DID THEY DO TO BECOME MORE DIFFICULT?

17   A.   I WAS DOING MY REGULAR JOB THE SAME AS ALWAYS BUT NOW HE

18   WOULD COME OVER AND COMPLAIN ABOUT THIS AND THAT AND THE

19   VEGETABLE WASN'T FRESH, THE MEAT AND FISH WERE NOT FRESH.

20        THERE WAS A CABINET THAT WASN'T WORKING, AND I WAS TOLD

21   TO GO IN THERE AND I HAD TO CLEAN UP ALL OF THE WATER THAT WAS

22   INSIDE.

23        AT THE SAME TIME I HAD TO TAKE THE TICKETS, THE FOOD

24   TICKETS AND DO THAT JOB AND AT THE SAME TIME TAKE CARE OF THE

25   CLEANING UP.

1          AND EVERYONE ELSE, HE DIDN'T ASK THEM TO DO IT.  HE ONLY

2     ASKED ME TO DO IT.

3               THE COURT:  WHO IS HE?  WHO IS "HE"?

4               THE WITNESS:  JOHN AND NICK.

5     BY MS. NGUYEN:

6     Q.   AND HOW DID YOU FEEL WHEN JOHN AND NICK ACTED LIKE THAT

7     TOWARD YOU?

8     A.   I FELT LIKE THEY WERE DISCRIMINATING ME WITH THE

9     VIETNAMESE PEOPLE.  I THINK IT WAS DISCRIMINATION BETWEEN A MAN

10    AND A WOMAN.

11              THE INTERPRETER:  THE INTERPRETER NEEDS

12    CLARIFICATION.

13              THE WITNESS:  HE WAS DISCRIMINATING VIETNAMESE

14    PEOPLE BECAUSE I WAS VIETNAMESE AND THE SUPERVISOR WAS AMERICAN

15    OR SPANISH, OR IF THE PERSON WAS NOT VIETNAMESE.

16    BY MS. NGUYEN:

17    Q.   SO IN WHAT WAYS DID YOU FEEL THAT YOU WERE DISCRIMINATED

18    AGAINST BECAUSE YOU WERE A WOMAN?

19    A.   FOR EXAMPLE, LUCIO DIDN'T HAVE TO MOVE TO A DIFFERENT

20    SHIFT BUT I HAD TO.

21    Q.   ANYTHING ELSE?

22    A.   AND DISCRIMINATING VIETNAMESE PEOPLE.  FOR EXAMPLE, THE

23    OVEN WASN'T WORKING.  THERE WAS A VIETNAMESE PERSON WHO CAME TO

24    FIX THE STOVE.  THE NEXT DAY THE STOVE WAS NEEDING REPAIR

25    AGAIN.

1          SO I WOULD SAY, WELL, THIS STOVE WAS NOT WORKING YESTERDAY

2     AND IT WAS FIXED BUT NOW IT'S BROKEN AGAIN.

3          WHILE I SAID THIS, NICK WAS THERE.  WELL, THAT'S YOUR

4     VIETNAMESE THAT REPAIRED IT.

5          I FELT DISCRIMINATED WHEN THERE WAS SOMEONE OUT THERE WHO

6     WAS HAVING A FIGHT OR ARGUING, HE WOULD COME INTO THE KITCHEN

7     AND SAY TO EVERYONE, INCLUDING ME, THAT'S HOW VIETNAMESE PEOPLE

8     ARE.

9     Q.   AND, MS. DANG, EVENTUALLY YOU PUT IN A REQUEST TO TRANSFER

10    OUT TO THE FLOOR TO BECOME A SERVER?

11    A.   THAT'S CORRECT.

12    Q.   AND WHEN DID YOU PUT IN THAT REQUEST?

13    A.   IF I REMEMBER CORRECTLY, IN 2008.

14    Q.   AND WHEN DID YOU RECEIVE THE TRANSFER?

15    A.   IT WAS SIX MONTHS AFTER I MADE MY REQUEST.

16    Q.   AND HOW MANY TIMES DID YOU HAVE TO REQUEST BEFORE YOU WERE

17    TRANSFERRED?

18    A.   THREE TIMES.

19    Q.   AND DO YOU KNOW WHY?

20    A.   THE FIRST TIME I GAVE MY TRANSFER TO JOSE; THE SECOND TIME

21    I GAVE IT DIRECTLY TO NICK'S -- PUT IT ON NICK'S DESK, AND HE

22    WAS THERE; AND THE LAST TIME I GAVE IT TO HIM, AND HE RECEIVED

23    IT.  HE HELD THE PAPERS.

24    Q.   SO I'D LIKE YOU TO TAKE A LOOK AT EXHIBIT 5.  IT WOULD BE

25    IN THAT WHITE BINDER WITH THE YELLOW COVER.

1          EXHIBIT 5, PLEASE, ANDRE.

2          EXHIBIT 5.  MS. DANG, IS THAT THE TRANSFER REQUEST THAT

3     YOU GAVE TO MR. ORTEGA?

4     A.    CORRECT.

5               MS. NGUYEN:  YOUR HONOR, THE PLAINTIFF WOULD REQUEST

6     TO HAVE THAT EXHIBIT ADMITTED INTO EVIDENCE.

7               MR. MCMANIS:  NO OBJECTION.

8               THE COURT:  5 IS RECEIVED.

9          (PLAINTIFF'S EXHIBIT 5 WAS RECEIVED IN EVIDENCE.)

10    BY MS. NGUYEN:

11    Q.    AND, MS. DANG, WHAT IS THE DATE OF THAT TRANSFER REQUEST?

12    A.    JULY -- THE WRITING IS NOT VERY CLEAR.  I DON'T KNOW IF

13    IT'S 2006 OR 2008.

14    Q.    YOU'RE LOOKING AT THE HIRIING DATE.  WHAT IS THE DATE OF

15    THE REQUEST THAT YOU PUT?  IS IT AT THE BOTTOM?

16    A.    IN 2009.

17    Q.    JANUARY 6TH, 2009?

18    A.    CORRECT.

19    Q.    AND WAS THAT THE LAST TIME THAT YOU SUBMITTED THE TRANSFER

20    REQUEST TO NICK ORTEGA?

21    A.    CORRECT.

22    Q.    AND WHEN YOU GAVE THE TRANSFER REQUEST FORM TO MR. ORTEGA,

23    DID YOU SAY ANYTHING TO HIM?

24    A.    I SAID THIS IS THE THIRD TIME THAT I MADE THE REQUEST.  SO

25    THIS IS THE LAST TIME THAT I'M GIVING IT DIRECTLY TO YOU.

1          I SAID THAT I WANTED TO GIVE THIS DIRECTLY TO HIM AND IF

2     HE WOULDN'T LET ME OUT, THAT IT WOULD BE ILLEGAL.

3     Q.   SO WHY DID YOU HAVE TO TELL HIM THAT?

4     A.   BECAUSE THE TWO PRIOR TIMES HE SAID HE DIDN'T SEE THE

5     TRANSFER, HE DIDN'T SEE OR HEAR ABOUT IT.

6          HE SAID THAT HE KNEW, BUT THE OPENING WASN'T AVAILABLE

7     YET.

8     Q.   AND DURING THAT PERIOD OF TIME, DO YOU KNOW IF OTHER

9     PEOPLE WERE HIRED AS SERVERS?

10    A.   THERE WERE TWO PEOPLE, TWO NEW PEOPLE.

11    Q.   BUT EVENTUALLY YOU WERE TRANSFERRED OUT TO BECOME A

12    SERVER; RIGHT?

13    A.   CORRECT.

14    Q.   AND DID YOU GET TRAINING TO BECOME A SERVER?

15    A.   YES.

16    Q.   AND WHAT KIND OF TRAINING?

17    A.   NICK HAD A PERSON NAMED ELLIS THAT I COULD FOLLOW IN ORDER

18    TO BE TRAINED.

19    Q.   AND WERE YOU ABLE TO LEARN THE JOB -- THE TASK THAT YOU

20    HAD TO DO AS A SERVER?

21    A.   I DIDN'T LEARN MUCH FROM HER.

22    Q.   YOU WANTED TO GO OUT TO BECOME A SERVER.  WHY DID YOU WANT

23    TO DO THAT?

24    A.   FIRST I WOULD BE ABLE TO GET AWAY FROM THE KITCHEN; THAT

25    THE PEOPLE THERE WOULDN'T BE ABLE TO BOTHER ME ANY MORE.

1    Q.   AND WHO WERE THE PEOPLE BOTHERING YOU IN THE KITCHEN?

2    A.   NICK, LUCIO -- WELL, MOSTLY IT WAS NICK.  THE OTHER PEOPLE

3    I DON'T REMEMBER MUCH.

4    Q.   AND WHEN YOU WENT OUT TO BECOME A SERVER, DID THINGS GET

5    BETTER FOR YOU?

6    A.   IT WAS GOOD FOR ME BECAUSE I WAS ABLE TO GET AWAY.  I

7    DIDN'T STAY IN ONE PLACE.  I WOULD GO AROUND AND TALK TO

8    CUSTOMERS, AND I FELT THAT IT WAS BETTER FOR ME.

9    Q.   HOW DID NICK TREAT YOU AFTER YOU BECAME A SERVER?

10   A.   HE DIDN'T GIVE ME A GOOD TRAINER, AND HE CAME IN AND SAID

11   THAT I MADE A MISTAKE OF $0.10.

12        THERE WERE A LOT OF PEOPLE THAT MADE MISTAKES WITH MONEY,

13   BUT HE DIDN'T TALK TO THEM.  HE PICKED ME TO COMPLAIN ABOUT

14   THAT.

15   Q.   AND WHY DO YOU THINK THAT NICK KEPT GIVING YOU A HARD

16   TIME?

17   A.   MAYBE HE WAS TRYING TO DO THAT IN ORDER TO MAKE IT EASIER

18   TO FIRE ME BECAUSE I COMPLAINED ABOUT A LOT OF THINGS.

19   Q.   AND WHAT WERE THE THINGS THAT YOU COMPLAINED ABOUT?

20   A.   BECAUSE I COMPLAINED AND HE CALLED ME IN AND HE ASKED ME

21   IF I WENT OUT WITH LUCIO.  I ASKED HIM WHY ARE YOU ASKING ME

22   THAT?  AND HE POINTED AT MY FACE AND SAID JUST ANSWER YES OR

23   NO.

24   Q.   AND HAD YOU EVER GONE OUT WITH LUCIO?

25   A.   NEVER.

1    Q.   AND WHAT OTHER THINGS DID YOU COMPLAIN TO NICK ABOUT?

2    A.   ONE TIME I ASKED IF I COULD LEAVE WORK TEN MINUTES EARLY.

3    JOSE WAS ALSO THE SUPERVISOR.  HE GAVE ME PERMISSION TO LEAVE

4    EARLY.

5         AFTER I HAD DROPPED THE MONEY AND CLOCKED OUT TO LEAVE,

6    NICK RAN OUT, HE POINTED AT MY FACE AND PULLED ME IN AND MADE

7    ME STAY ANOTHER TEN MINUTES BEFORE ALLOWING ME TO LEAVE.

8         I WAS VERY HUMILIATED BECAUSE THERE WERE A LOT OF OTHER

9    EMPLOYEES WAITING TO CLOCK OUT AND THEY SAW IT.

10   Q.   AND DO YOU KNOW WHY NICK DID THAT?

11   A.   I FEEL THAT HE USED HIS POWER AS A SUPERVISOR TO SHOW HIS

12   POWER.

13   Q.   AND DO YOU KNOW IF NICK AND LUCIO ARE FRIENDS?

14   A.   NICK WAS ALWAYS DEFENDING LUCIO.

15   Q.   AND DO YOU KNOW IF NICK WAS MAD AT YOU BECAUSE YOU

16   COMPLAINED REGARDING LUCIO?

17   A.   YES.

18   Q.   AND DO YOU REMEMBER AN INCIDENT IN OCTOBER OF 2009 WITH

19   LINDA ELIAS?

20   A.   I REMEMBER.

21   Q.   COULD YOU TELL US WHAT HAPPENED, PLEASE?

22   A.   IT WAS A SUNDAY NIGHT.  THERE WAS A LOT OF ORDERS AND

23   AMONG THE ORDERS THERE WAS AN ORDER FROM A VIETNAMESE CUSTOMER.

24        WHEN I APPROACHED HIM, HE SPOKE ENGLISH AND SAID, "ARE YOU

25   VIETNAMESE?"  I SAID YES, I AM.

1          SO HE SAID IN VIETNAMESE, I'D LIKE TO ORDER A JIM BEAM.

2     Q.   AND THEN WHAT HAPPENED?

3     A.   WHEN I WENT IN TO GET THE ALCOHOL, THE CUSTOMER ASKED HOW

4     MUCH IT WAS.  I SAID THAT IT WAS ABOUT $13.

5          HE SAID HE HAD ORDERED THIS PREVIOUSLY, AND IT WAS ALWAYS

6     20 SOMETHING DOLLARS.

7          I SAID THAT THIS ALCOHOL HAS NEVER GONE UP TO 20 SOMETHING

8     DOLLARS, AND IF IT'S THAT PRICE, IT'S PROBABLY REMY XO.  THAT

9     WOULD PROBABLY COST 20 SOMETHING DOLLARS.  HE SAID HE MADE A

10    MISTAKE ORDERING.

11         I SAID, DO YOU NEED ME TO CHANGE THE DRINK?  I WILL DO IT.

12         HE SAID, THAT'S OKAY, I WANT TO TRY THIS.  AND HE SAID, IF

13    HE DECIDES TO CHANGE IT TO SOMETHING ELSE, HE'LL ASK ME.

14    Q.   AND THEN WHAT HAPPENED NEXT?

15    A.   I WENT IN AND CONTINUED MY REGULAR WORK.

16         WHEN I SAW LINDA IN THE KITCHEN, LINDA ASKED ME TO GIVE

17    THE MONEY THAT THE CUSTOMER GAVE ME BACK.  SHE SAID THAT THE

18    CUSTOMER SAID THAT I TOOK THE WRONG ORDER.  AND SO LINDA WANTED

19    THE MONEY BACK TO GIVE BACK TO THE CUSTOMER.

20         IN MY HANDS I HAD MANY THINGS THAT I WAS BRINGING OUT TO

21    CUSTOMERS.  I DIDN'T WANT TO ARGUE WITH HER SO I JUST GAVE HER

22    THE MONEY.

23         WHEN I CAME OUT, I SAW THE CUSTOMER.  I WANTED TO PLEASE

24    THE CUSTOMER, AND I SAID THAT LINDA TOLD ME THAT I TOOK THE

25    WRONG ORDER FROM YOU.

1          AND I REMEMBER THAT THE LAST TIME, THAT'S WHAT HE ORDERED.

2     THIS WAS THE ALCOHOL THAT HE ORDERED.  AND I SHOWED HIM THAT I

3     HAD WRITTEN DOWN THE ORDER THAT HE HAD ASKED.

4          AND I ASKED HIM WAS THERE ANYTHING ELSE THAT I COULD DO TO

5     MAKE HIM HAPPY.

6          HE SAID THAT IT WAS HIS MISTAKE.  HE ORDERED THE WRONG

7     THING.  AND HE WASN'T COMPLAINING.

8          HE SAID THAT WHAT LINDA SAID WAS WRONG, THAT HE WASN'T

9     ASKING FOR THE MONEY BACK.

10    Q.   SO AT ANY TIME WERE YOU ARGUING WITH THE CUSTOMER?

11    A.   I NEVER ARGUE WITH CUSTOMERS.

12    Q.   WAS HE MAD AT YOU?

13    A.   NO.

14    Q.   AND HAVE YOU EVER SEEN THE -- LET ME ASK IT THIS WAY:

15    FROM THAT OCTOBER 2009 INCIDENT, YOU WERE SUSPENDED; RIGHT?

16    A.   CORRECT.

17    Q.   BEFORE THE SUSPENSION, DID ANYONE AT BAY 101 SHOW YOU THE

18    VIDEO FROM THE SURVEILLANCE?

19    A.   PRIOR TO THE SUSPENSION, NO, THEY DIDN'T SHOW IT TO ME.

20    Q.   AND DID ANYONE ASK YOU FOR YOUR SIDE OF THE STORY BEFORE

21    THEY SUSPENDED YOU?

22    A.   NO ONE ASKED.

23    Q.   AND, MS. DANG, YOU HAVE NOW SEEN THE VIDEO; RIGHT?

24    A.   YES.

25    Q.   AND I'D LIKE YOU TO TAKE THIS OPPORTUNITY TO EXPLAIN TO

1    THE JURY, BECAUSE THE VIDEO HAS BEEN SHOWN, I'D LIKE YOU TO

2    EXPLAIN YOUR SIDE OF WHAT HAPPENED, OKAY?

3    A.   YES.

4    Q.   SO IF YOU WOULD PLEASE COME DOWN HERE.  AND I'M GOING TO

5    ASK THE MADAM INTERPRETER TO COME WITH YOU.

6        ANDRE, IF YOU COULD START WITH THE FIRST ONE OF 552,

7    THAT'S EXHIBIT 552, THE FIRST CLIP.

8            THE COURT:  TURN THE LIGHTS DOWN.

9        (VIDEO PLAYING.)

10           THE WITNESS:  THAT'S ME WALKING TOWARDS -- I WAS

11   TAKING THIS MAN'S -- THIS VIETNAMESE MAN'S ORDER.  THAT'S LINDA

12   (INDICATING).

13       I WENT IN THERE TO GET THE ORDER.

14           MS. NGUYEN:  NEXT CLIP, PLEASE, ANDRE.

15       (VIDEO PLAYING.)

16           THE WITNESS:  I BROUGHT OUT THE GLASS OF ALCOHOL.

17   THE MAN WAS ASKING ME --

18   BY MS. NGUYEN:

19   Q.   WHAT WAS HE ASKING YOU?

20   A.   YOU'LL SEE THAT HE'LL ASK HOW MUCH IT WAS.

21   Q.   AND IS THIS WHEN YOU TOLD HIM ABOUT THE PRICE?

22   A.   YEAH.  I SAID THAT IT WAS 13 SOMETHING.  AND THEN HE PAID.

23   I GAVE HIM THE CHANGE.

24   Q.   AND HE JUST TOOK THE SIP.  DID HE TELL YOU IT WAS THE

25   WRONG DRINK?

1    A.   HE DIDN'T SAY THAT IT WAS THE WRONG ALCOHOL.

2         MS. NGUYEN:  SO, ANDRE, IF YOU COULD PLEASE SHOW THE

3    CLIP BETWEEN 53 AND 54.

4         (VIDEO PLAYING.)

5    BY MS. NGUYEN:

6    Q.   MS. DANG, THIS IS THE END OF THE PRIOR CLIP.  AND WHEN YOU

7    LEFT BY THIS TIME HAD THE CUSTOMER ASKED YOU WHAT YOU HAD TAKEN

8    OUT TO HIM?

9    A.   HE HAD TAKEN THE ALCOHOL AND DRANK IT.  WHEN I GAVE HIM

10   BACK THE CHANGE, HE DID NOT SAY THAT THIS WAS THE WRONG ORDER.

11   Q.   DID HE TELL YOU THAT HE WAS ORDERING SOMETHING ELSE?

12   A.   WHEN I GAVE HIM THE MONEY HE SAID THAT HE MADE A MISTAKE.

13   HE SAID LATER HE MAY CALL ME BACK AGAIN IF HE WANTS TO ORDER

14   AGAIN.

15   Q.   SO HE SAID HE ORDERED THE WRONG THING, NOT BECAUSE YOU

16   BROUGHT OUT THE WRONG DRINK, RIGHT?

17   A.   THAT'S CORRECT.  HE DRANK IT ONCE MORE AND THEN HE TOOK

18   ANOTHER SIP AND THEN PUT IT DOWN.

19        MS. NGUYEN:  NEXT CLIP, PLEASE.

20        (VIDEO PLAYING.)

21        THE WITNESS:  LINDA CAME OUT.  WELL, THAT'S NOT EVEN

22   A SECOND SO HE DIDN'T EVEN HAVE A CHANCE TO COMPLAIN ABOUT ME.

23   BY MS. NGUYEN:

24   Q.   SO, ACCORDING TO THE COUNSELLING MEMO, LINDA COMPLAINED --

25   LINDA SAID THAT THE CUSTOMER SAID THAT YOU BROUGHT OUT THE

1    WRONG DRINK, RIGHT?

2    A.   CORRECT.

3    Q.   AND BASED ON WHAT WE'RE SEEING HERE, DID SHE HAVE A CHANCE

4    TO SEE THE CUSTOMER MAKING THAT KIND OF A COMPLAINT?

5    A.   CORRECT.

6    Q.   DID SHE HAVE A CHANCE?

7    A.   NO.

8            MS. NGUYEN:  NEXT CLIP, PLEASE.

9        (VIDEO PLAYING.)

10   BY MS. NGUYEN:

11   Q.   DO YOU SEE WHAT IS HAPPENING HERE?

12   A.   THAT IS LINDA BRINGING OUT AN ORDER.

13   Q.   SHE TOOK HIS MONEY.  SHE GAVE HIM BACK SOME CHANGE OR

14   SOMETHING.

15       IT DIDN'T SEEM THAT HE WAS SAYING ANYTHING TO HER.  AND

16   SHE GAVE HIM BACK A PIECE OF PAPER OR MONEY OR SOMETHING?

17           MS. NGUYEN:  NEXT, ANDRE.

18       (VIDEO PLAYING.)

19           THE WITNESS:  THAT'S LINDA.  SHE GAVE HIM BACK THE

20   MONEY.  MAYBE SHE DIDN'T GIVE HIM THE RIGHT AMOUNT OR THE BILL

21   WAS TOO BIG.  SHE HAD TO GO TO THE CASHIER TO CHANGE IN ORDER

22   TO MAKE CHANGE TO PAY HIM BACK.

23           MS. NGUYEN:  NEXT, PLEASE.

24       (VIDEO PLAYING.)

25           THE WITNESS:  THAT'S ME.  AFTER LINDA HAD ASKED ME

1    TO RETURN THE CUSTOMER'S MONEY IN THE KITCHEN, I WANTED THE

2    CUSTOMER -- I WANTED TO MAKE THIS CUSTOMER HAPPY WITH ME.

3         I SAID THAT LINDA SAID THAT I TOOK THE WRONG ORDER, AND I

4    TOOK THE PAPER AND SAID I DON'T THINK I ORDERED IT WRONG,

5    RIGHT?

6         AND THE CUSTOMER SAID HE DIDN'T ASK FOR THE MONEY BACK AT

7    ALL AND HE NEVER SAID THAT I TOOK THE WRONG ORDER.

8         LINDA RAN OVER.  SHE DID NOT ALLOW ME TO TALK TO THE

9    CUSTOMER, AND SHE WOULDN'T ALLOW ME TO TAKE AN ORDER.  SHE

10   PUSHED ME AWAY EXPLAINING IT.

11        SHE TALKED FOR A WHILE WITH HER HANDS OUT.

12   BY MS. NGUYEN:

13   Q.   SO, MS. DANG, DURING THAT CLIP THERE, WERE YOU ARGUING

14   WITH LINDA AT ALL?

15   A.   NO.

16   Q.   WHAT WERE YOU DOING?

17   A.   THE CASINO WAS VERY LOUD.  SHE JUST EXPLAINED THE REASON.

18   THAT'S IT.

19             MS. NGUYEN:  NEXT CLIP, ANDRE.

20        (VIDEO PLAYING.)

21             THE WITNESS:  THAT'S LINDA.  SHE CAME OUT TO CLEAN

22   THE GLASSES AND THEN LEFT.

23             MS. NGUYEN:  AND THE LAST CLIP, PLEASE.

24        (VIDEO PLAYING.)

25             THE WITNESS:  HE HAD ORDERED ADDITIONAL BEER FOR HIS

1    FRIEND THAT IS BEHIND HIM.  HE SAID DON'T BE SAD ANY MORE.

2        I SAID THAT I WASN'T UNHAPPY, I JUST WANTED TO PLEASE THE

3    CUSTOMER.

4        LINDA CAME OVER AND LOUDLY SAID THAT SHE DID NOT WANT ME

5    TO TAKE THE MAN'S ORDER.

6        SO I LEFT.  THAT'S IT.

7    BY MS. NGUYEN:

8    Q.   SO AT ANY TIME DID YOU ARGUE WITH LINDA?

9    A.   NO.

10   Q.   AND BEFORE SUSPENDING YOU, DID ANY ONE AT BAY 101 ALLOW

11   YOU A CHANCE TO EXPLAIN WHAT HAPPENED?

12   A.   NO.  I WANTED TO EXPLAIN BECAUSE JENNIFER HAD SAID THAT

13   SHE HAD SEEN THIS VIDEO.

14       I PUT MY HAND UP AND SWORE THAT THAT WAS NOT, I PUT MY

15   HAND UP AND SWORE AND ASKED IF I COULD EXPLAIN.

16       AND JENNIFER SAID THAT WHILE I'M TALKING, YOU CANNOT TALK.

17   SHE SAID THAT SHE KNEW EVERYTHING ALREADY AND THAT I DIDN'T

18   NEED TO SAY ANYTHING.

19   Q.   ALL RIGHT.  I THINK WE'RE DONE WITH THE CLIPS.  WOULD YOU

20   PLEASE TAKE THE WITNESS STAND AGAIN.  THANK YOU.

21           THE COURT:  ALL RIGHT.  THIS WILL BE A GOOD TIME FOR

22   A BREAK.

23           MS. NGUYEN:  YES, YOUR HONOR.  AND WE DO HAVE THE

24   NEXT WITNESS THAT WE'RE GOING TO TAKE OUT OF ORDER.

25           THE COURT:  ALL RIGHT.  FIFTEEN MINUTES.

1          (RECESS FROM 2:44 P.M. UNTIL 3:03 P.M.)

2              THE COURT:  DID YOU WANT TO TAKE A WITNESS OUT OF

3      ORDER?

4              MS. NGUYEN:  YES, YOUR HONOR.  THE PLAINTIFF WOULD

5      CALL MS. CHI LUONG TO THE STAND.  AND SHE'S GOING TO BE USING A

6      VIETNAMESE INTERPRETER AS WELL.

7              THE COURT:  OKAY.

8          **(PLAINTIFF'S WITNESS, CHI LUONG, SWORN.)**

9              THE WITNESS:  YES.

10             THE CLERK:  TAKE THE STAND, PLEASE.  BE VERY

11     CAREFUL.

12         FOR THE RECORD, PLEASE STATE YOUR FULL NAME AND SPELL YOUR

13     FIRST AND LAST NAME.

14             THE WITNESS:  C-H-I, L-I-E-N, L-U-O-N-G.

15             THE CLERK:  THANK YOU.

16                       **DIRECT EXAMINATION**

17     BY MS. NGUYEN:

18     Q.   GOOD AFTERNOON, MS. LUONG.

19     A.   GOOD AFTERNOON.

20     Q.   AND DO YOU KNOW MY CLIENT CUC DANG?

21     A.   I DO KNOW HER.

22     Q.   AND HOW DO YOU KNOW HER?

23     A.   WE WORK TOGETHER.

24     Q.   AND, MS. LUONG, WHAT DO YOU CURRENTLY DO FOR A LIVING

25     RIGHT NOW?

1    A.   ELECTRONICS TECHNICIAN.

2    Q.   AND DID YOU USED TO WORK AT BAY 101?

3    A.   THAT IS CORRECT.

4    Q.   AND WHEN DID YOU WORK AT BAY 101?

5    A.   AT THE END OF NOVEMBER OF 2007.

6    Q.   UNTIL WHEN?

7    A.   MARCH OF 2010.

8    Q.   AND WHY DID YOU STOP WORKING AT BAY 101?

9    A.   BECAUSE I QUIT.

10   Q.   AND WHEN YOU WERE WORKING AT BAY 101, WHAT WAS YOUR JOB

11   TITLE?

12   A.   I WAS WORKING IN H.R. DEPARTMENT.

13   Q.   DID YOU HAVE A JOB TITLE?

14   A.   PBX OPERATOR.

15   Q.   PBX OPERATOR?

16   A.   YES.

17   Q.   AND WOULD YOU PLEASE TELL US WHAT DOES A PBX OPERATOR DO?

18   A.   I ANSWER PHONES, I DO DATA ENTRY FOR THE TIMECARDS.  I DID

19   A LOT OF DIFFERENT THINGS.  AND I WOULD ALSO HELP THE

20   EMPLOYEES.

21   Q.   AND WHEN YOU WERE WORKING AS A PBX OPERATOR, WHO WAS YOUR

22   SUPERVISOR?

23   A.   JENNIFER GILBERT.

24   Q.   AND BESIDES THE POSITION AS PBX OPERATOR, DID YOU HAVE ANY

25   OTHER JOB DUTIES WHILE AT BAY 101?

1    A.   I DID.

2    Q.   WHAT ELSE DID YOU DO?

3    A.   I WORKED IN THE KITCHEN.  I WORKED DATA ENTRY OF INVOICES

4    IN THE KITCHEN AND EXPEDITING.

5    Q.   AND WHEN YOU WERE WORKING IN THE KITCHEN, WHO WAS YOUR

6    SUPERVISOR?

7    A.   NICK ORTEGA.

8    Q.   AT BAY 101, WHAT WERE YOUR WORKING HOURS?

9    A.   TUESDAYS AND THURSDAYS, I WORK IN THE AFTERNOON AND

10   SATURDAYS AND SUNDAYS I WORK IN THE DAYTIME.  AND AS FAR AS

11   KITCHEN, I WORKED ON WEDNESDAYS IN THE KITCHEN ALL DAY.

12   Q.   AND, MS. LUONG, DO YOU KNOW A MAN BY THE NAME OF

13   LUCIO SUAREZ?

14   A.   YES, I DO.

15   Q.   HOW DO YOU KNOW HIM?

16   A.   WE WORKED TOGETHER.

17   Q.   WHO IS HE?

18   A.   HE'S THE SUPERVISOR IN THE KITCHEN IN THE NIGHT.

19   Q.   AND WHAT IS YOUR RELATIONSHIP WITH HIM, IF ANY?

20   A.   NO.  WE JUST WORKED TOGETHER.

21   Q.   WHEN YOU WERE WORKING AT BAY 101, DID MR. SUAREZ DO

22   ANYTHING THAT BOTHERED YOU?

23   A.   YES.  HE INVITED ME OUT TO DINNER.  HE WOULD CALL ME

24   "BABE."

25        AND HE WOULD CALL ME NAMES IN SPANISH, ENDEARING NAMES IN

1       SPANISH.  AND HE LIKED TO TOUCH ME.

2       Q.   AND DID YOU TELL HIM TO STOP?

3       A.   I TOLD HIM I DIDN'T LIKE THAT.

4       Q.   AND DID HE STOP?

5       A.   HE WOULD STOP, BUT HE WOULD START AGAIN.

6       Q.   AND HOW OFTEN WAS HE DOING THIS?

7       A.   IT WAS WHENEVER I WORKED TOGETHER WITH HIM OR WHEN HE CAME

8       TO THE OFFICE TO GET HIS CHECK.

9       Q.   DO YOU KNOW WHETHER MR. SUAREZ HARASSED OR BOTHERED ANYONE

10      ELSE AT BAY 101?

11      A.   YES.  I TRIED TO CUT MY -- I TOLD HIM TO STOP.  I DIDN'T

12      WANT HIM TO SAY ANYTHING ANY MORE.

13      Q.   DO YOU KNOW IF HE DID SIMILAR THINGS TO OTHER WOMEN AT BAY

14      101?

15      A.   YES.  I HEARD QUITE A FEW PEOPLE TALK ABOUT IT.

16      Q.   AND WHO ELSE DID HE BOTHER WHILE AT BAY 101?

17      A.   THERE WAS CUC AND NGA.

18      Q.   AND IS THAT NINA?

19      A.   YES, NINA.

20      Q.   AND MY CLIENT CUC DANG?

21      A.   YES.

22      Q.   AND WHEN MR. SUAREZ BOTHERED YOU, DID YOU REPORT HIM TO

23      YOUR SUPERVISOR?

24      A.   NO, BECAUSE I NEEDED THE INSURANCE, THE MEDICAL INSURANCE,

25      AND I WAS AFRAID IF I REPORTED IT I WOULD BE FIRED.

1    Q.   DID YOU WORK WITH MS. DANG WHILE YOU WERE AT BAY 101?

2    A.   YES, WE DID.

3    Q.   AND THAT WAS IN THE KITCHEN?

4    A.   YES.

5    Q.   AND WHAT KIND OF A WORKER WAS SHE?

6    A.   SHE WAS A VERY FAST WORKER.

7    Q.   HAVE YOU -- DO YOU KNOW IF THERE WAS ANY COMPLAINTS

8    AGAINST HER?

9    A.   NOT WHILE I WAS WORKING THERE, NO.

10   Q.   AND DO YOU KNOW A MAN BY THE NAME OF MIKE WILSON?

11   A.   YES.

12   Q.   AND WHO WAS HE?

13   A.   CASINO SHIFT MANAGER.

14   Q.   DO YOU KNOW IF HE WAS DATING MS. DANG?

15   A.   YES.  HE TOLD ME.  I SPOKE TO HIM.  EVERYONE KNOWS THERE.

16   Q.   MS. LUONG, IN THIS CASE YOU HAVE BEEN INTERVIEWED BY AN

17   INVESTIGATOR BY THE NAME OF CAROLE EDMAN.  DO YOU REMEMBER

18   THAT?

19   A.   YES.

20   Q.   AND DID SHE TELL YOU WHAT THE INVESTIGATION WAS ABOUT?

21   A.   NOT VERY CLEARLY.

22   Q.   I'D LIKE TO ASK YOU ABOUT THAT INTERVIEW BY MS. EDMAN,

23   OKAY?

24   A.   YES.

25   Q.   I'D LIKE TO HAVE YOU LOOK AT WHAT HAS BEEN MARKED AS

1     EXHIBIT 500, MARKED AND ADMITTED INTO EVIDENCE.

2          EXHIBIT 500, PLEASE, ANDRE.

3          DO YOU SEE THAT?  I'D LIKE FOR YOU TO TAKE A LOOK AT PAGE

4     37 OF THE REPORT.

5          DO YOU SEE YOUR NAME AT THE TOP OF THE PAGE?

6     A.   YES.

7     Q.   AND SO THIS IS WHERE MS. EDMAN REPORTED THE INTERVIEW WITH

8     YOU.  I'D LIKE TO ASK YOU ABOUT WHAT YOU TOLD MS. EDMAN, OKAY?

9     A.   YES.

10    Q.   TOWARD THE MIDDLE OF THE PAGE UNDER THE HEADING "SUMMARY

11    FROM MS. LUONG INTERVIEWS."

12    A.   YES.

13    Q.   SHE ASKED YOU ABOUT YOUR TRANSFER REQUEST.  DO YOU

14    REMEMBER THAT?

15    A.   YES.

16    Q.   DID YOU PUT IN A REQUEST TO TRANSFER TO ACCOUNTING?

17    A.   I DID.

18    Q.   AND TOWARD THE BOTTOM OF THAT PARAGRAPH MS. EDMAN REPORTED

19    THAT IT WAS YOUR IMPRESSION THAT "IT DOESN'T MATTER WHAT YOU

20    KNOW, IT'S WHO YOU KNOW."

21         DO YOU SEE THAT?

22    A.   YES, I SEE IT.

23    Q.   AND DID YOU SAY THAT TO MS. EDMAN?

24    A.   YES.

25    Q.   AND WHAT DID YOU MEAN BY THAT?

1    A.   BECAUSE I FILLED OUT THE TRANSFER PAPERS, I WENT FOR THE

2    INTERVIEW WITH FOUR PEOPLE, AND THEN NO ONE ANSWERED ME.

3    Q.   AND DO YOU KNOW IF SOMEONE ELSE WAS HIRED FOR THAT

4    POSITION?

5    A.   YES.

6    Q.   AND WHEN IT SAYS, "IT DOESN'T MATTER WHAT YOU KNOW, IT'S

7    WHO YOU KNOW," WHAT DID YOU MEAN?

8    A.   WELL, IF YOU DON'T KNOW ANYBODY THERE, IT'S NOT SO

9    IMPORTANT TO HAVE THE KNOWLEDGE.

10   Q.   SO AT BAY 101 DID THE SUPERVISORS HAVE THE POWER TO

11   APPROVE OR DENY TRANSFERS?

12   A.   YES.

13   Q.   AND ON THAT PAGE AT THE BEGINNING OF THAT PARAGRAPH

14   MS. EDMAN SAYS THAT "ONE TRANSFER REQUEST WAS TO ACCOUNTING BUT

15   SHE," MEANING YOU, "DECLINED TO SUBMIT A FORMAL APPLICATION FOR

16   THAT POSITION AS MENTIONED ABOVE AFTER AN INTERVIEW IN EARLY

17   2009."

18        DO YOU SEE THAT?

19   A.   THAT'S NOT TRUE.

20   Q.   DID YOU TELL MS. EDMAN THAT?

21   A.   WELL, THEY ONLY HAD ME FILL OUT THE TRANSFER PAPERS.

22   Q.   DID YOU TELL MS. EDMAN THAT YOU DECLINED TO SUBMIT A

23   FORMAL APPLICATION?

24   A.   NO, I DIDN'T.

25   Q.   I'D LIKE YOU TO TURN TO THE NEXT SECTION AT THE TOP OF THE

1    NEXT PAGE ABOUT MR. LUCIO SUAREZ.

2         IN THIS YOU STATED THAT MS. LUONG STATED THAT LUCIO SUAREZ

3    ASKED HER FOR DATES ABOUT THREE TIMES.

4         DID YOU TELL MS. EDMAN THAT?

5    A.   YES.

6    Q.   AND HE STOOD CLOSE TO YOU AND RUBBED THE SIDE OF HIS UPPER

7    ARM AGAINST THE SIDE OF HER UPPER ARM.  DID YOU TELL MS. EDMAN

8    THAT?

9    A.   YES.

10   Q.   AND MS. EDMAN REPORTED THAT YOU TOLD HER, YOU STATED THAT

11   AFTER YOU TOLD HIM TO STOP, HE DID NOT DO SO AGAIN AND DID NOT

12   ASK YOU OUT AGAIN.

13        DID YOU TELL MS. EDMAN THAT?

14   A.   NO, HE STILL DID THAT.

15   Q.   DID YOU TELL MS. EDMAN THAT HE STILL PURSUED YOU AFTER YOU

16   TOLD HIM TO STOP?

17   A.   YES.

18   Q.   UNDER THE PARAGRAPH THAT STARTS "INVESTIGATOR'S COMMENTS."

19   "MS. LUONG APPEARED TO BE CREDIBLE IN EXPLAINING HER OWN

20   EXPERIENCES."

21        WHEN YOU WERE BEING INTERVIEWED BY MS. EDMAN, DID IT SEEM

22   THAT SHE BELIEVED YOUR STORY?

23   A.   YES, BECAUSE BEFORE SAYING IT TO HER I SAID THAT

24   EVERYTHING WAS THE TRUTH.  AND I TOLD HER THAT IT WAS

25   CONFIDENTIAL BETWEEN HER AND I BECAUSE I WAS AFRAID TO LOSE MY

1    JOB.

2    Q.   AND DO YOU KNOW WHY MS. EDMAN DID NOT REPORT THAT

3    LUCIO SUAREZ CONTINUED TO HARASS YOU?

4    A.   I DO NOT KNOW.

5    Q.   IF YOU GO TO THE BOTTOM OF THE PAGE WITH THE SECTION OF

6    "MS. DANG'S CLAIM OF SELECTIVE ENFORCEMENT OF RULES."

7         DO YOU SEE THAT?

8    A.   YES, I SEE IT.

9    Q.   DID YOU TELL MS. EDMAN THAT YOU FELT THAT AS IF

10   NICK ORTEGA AND JENNIFER GILBERT FAVOR THEIR OWN KIND?

11   A.   YES.

12   Q.   AND WHAT DID YOU MEAN BY THAT?

13   A.   WELL, AT TIMES THEY DID NOT TREAT THE VIETNAMESE PEOPLE

14   VERY WELL.

15   Q.   DO YOU HAVE ANY EXAMPLES?

16   A.   WHEN I WORKED IN THE KITCHEN WHEN I WAS DOING DATA ENTRY

17   IN THE ACCOUNTING ROOM THERE WAS A VIETNAMESE LADY THAT CAME IN

18   AND SAID THAT SHE WAS ILL BECAUSE SHE HAD SERIOUS HIGH BLOOD

19   PRESSURE AND SHE ASKED IF SHE COULD GO HOME.

20        NICK WOULDN'T ALLOW IT.  NICK TOLD HER TO GO UPSTAIRS AND

21   REST FOR 15 MINUTES AND THEN COME BACK DOWN AND CONTINUE

22   WORKING.

23        BUT SHE ASKED ME -- SHE BEGGED ME, PLEASE, TO TALK TO NICK

24   SO THAT SHE COULD GO HOME BECAUSE AT THIS POINT HER FACE WAS

25   PALE.

1    Q.   AND WAS THAT WHEN YOU WERE WORKING IN THE KITCHEN WITH

2    NICK?

3    A.   CORRECT.

4    Q.   AND WERE YOU ACTING AS A TRANSLATOR FOR THE WORKER?

5    A.   BECAUSE AT THE TIME SHE WAS ILL AND SHE WAS TREMBLING, AND

6    SHE WASN'T ABLE TO TALK.

7    Q.   AND DID YOU TELL MS. EDMAN ABOUT THAT SPECIFIC EXAMPLE?

8    A.   YES, I DID.

9    Q.   HERE MS. EDMAN ALSO REPORTED THAT YOU FELT PEOPLE WERE NOT

10   COMFORTABLE SPEAKING UP TO JENNIFER GILBERT OR NICK ORTEGA.

11        WHAT DID YOU MEAN BY THAT?

12   A.   THE WORKERS SOMETIMES WOULD COME OVER AND TALK TO ME.

13   THEY WERE AFRAID THAT -- TO COMPLAIN BECAUSE THEY WERE AFRAID

14   THAT THEY WOULD BE FIRED.

15   Q.   AND MS. EDMAN ALSO REPORTED YOUR FEELING THAT SOMETIMES IT

16   FEELS LIKE DISCRIMINATION ON MINOR THINGS.

17        CAN YOU, PLEASE, LET US KNOW WHAT HAPPENED THAT MADE IT

18   FEEL LIKE DISCRIMINATION?

19   A.   THERE WAS ONE TIME THAT MY BROTHER WAS ILL IN THE

20   HOSPITAL.  HE WAS IN THE ICU.  I HAD ASKED TO TAKE TIME OFF,

21   BUT THEY WOULDN'T ALLOW IT.  SO I HAD TO TAKE TIME OFF.  I HAD

22   TO QUIT BECAUSE I HAD ALREADY LOST ONE BROTHER IN VIETNAM.  I

23   DIDN'T WANT TO LOSE THIS ONE, TOO.

24   Q.   AND MS. GILBERT WOULDN'T LET YOU HAVE TIME OFF?

25   A.   I ASKED FOR HALF AN HOUR TO ONE HOUR OFF AND THEN NEXT I

1    WOULD GO BACK IN AND WORK SEVEN OR EIGHT HOURS.

2    Q.   AND SHE WOULDN'T LET YOU?

3    A.   SHE ALLOWED IT THE FIRST FEW DAYS, BUT SHE SAID THAT SHE

4    COULDN'T TRANSFER PEOPLE.

5    Q.   AND HAVE YOU SEEN HER TREAT OTHER PEOPLE DIFFERENTLY WHEN

6    THEY ASK FOR TIME OFF?

7    A.   THERE WAS A LADY THAT WAS A COWORKER NAMED ANNA AND

8    SOMEONE WAS ILL IN THE PHILIPPINES SO SHE WENT BACK THERE FOR

9    SIX, SEVEN WEEKS -- FOR FIVE, SIX WEEKS.

10   Q.   AND SHE WAS ALLOWED TO DO THAT?

11   A.   YES.

12   Q.   DID YOU TELL MS. EDMAN ABOUT THESE INSTANCES THAT YOU FELT

13   AS THOUGH MS. GILBERT TREATED YOU DIFFERENTLY?

14   A.   YES, I DID.

15   Q.   DO YOU KNOW WHY MS. EDMAN DID NOT INCLUDE THEM IN HER

16   REPORT?

17   A.   I DON'T KNOW BECAUSE ONCE SHE TOOK THE INTERVIEW, SHE

18   DIDN'T SHOW ME ANYTHING.

19   Q.   MS. LUONG, WHEN YOU WERE WORKING AT BAY 101, DID YOU EVER

20   SEE ANY EMPLOYEE NOT BEING ALLOWED TO TAKE THEIR LUNCH BREAK?

21   A.   YES.

22   Q.   AND WHAT DID YOU SEE?

23   A.   WHEN THEY WERE REALLY BUSY I WOULD SEE THEM CLOCK OUT, BUT

24   THEY WERE STILL WORKING AND THEN MUCH LATER THEY WOULD TAKE A

25   BREAK.

1    Q.   SO THEY HAD TO CLOCK OUT BUT THEY HAD TO CONTINUE WORKING?

2    A.   YES, BUT THEY WOULD DO IT LATER, TAKE IT MUCH LATER.

3    Q.   AND THAT WAS DURING THE TIME THAT YOU WERE WORKING IN THE

4    KITCHEN; RIGHT?

5    A.   YES.

6    Q.   AND DO YOU KNOW IF MR. ORTEGA KNEW THAT EMPLOYEES WERE

7    DOING THAT?

8    A.   YES, HE KNEW.

9    Q.   HOW DID HE KNOW?

10   A.   BECAUSE BEFORE THEY WOULD CLOCK OUT, THEY WOULD LET HIM

11   KNOW AND THEN WHEN HE NEEDED EMPLOYEES, HE WOULD ALSO TELL

12   THEM.

13   Q.   HE WOULD TELL THEM TO CLOCK OUT AND COME BACK TO WORK?

14   A.   YES.

15        MS. NGUYEN:  THOSE ARE ALL OF THE QUESTIONS THAT I

16   HAVE FOR THIS WITNESS, YOUR HONOR.

17        THE WITNESS:  THERE WAS ONE OTHER THING.  IN THE

18   KITCHEN, IN THE DINING ROOM THERE WAS WATER ON THE FLOOR AND I

19   CAME IN AND SLIPPED.

20        THEY TOOK ME TO SECURITY.  THEY ASKED IF I WAS OKAY.  I

21   SAID THAT I WAS IN PAIN.  THEY WROTE IN THE REPORT THAT I WAS

22   WEARING HIGH HEELS WHEN, IN FACT, I WAS WEARING FLAT HEELS.

23   AND THEN THEY DIDN'T TAKE ME TO THE HOSPITAL OR ANYTHING.

24        THEY TOLD ME TO GO BACK TO THE OFFICE AND CALL A FRIEND TO

25   TAKE ME TO THE HOSPITAL.  I WAS IN A LOT OF PAIN, AND SO I

1    STARTED TO CRY.  AND THEN THERE WAS A SECURITY MAN.  HE CAME TO

2    THE OFFICE.  HE HEARD ME CRY, AND HE WROTE A TICKET FOR ME TO

3    GET A TAXI TO LEAVE.

4         WHY ARE THEY TREATING US LIKE THAT?

5              MS. NGUYEN:  THANK YOU, MS. LUONG.

6              THE COURT:  ANY QUESTIONS?

7              MR. MCMANIS:  MY COLLEAGUE MAY HAVE A FEW, YOUR

8    HONOR.

9              THE COURT:  OKAY.

10                        **CROSS-EXAMINATION**

11   BY MS. MURAKAMI:

12   Q.   GOOD AFTERNOON, MS. LUONG.  MY NAME IS JENNIFER MURAKAMI,

13   AND I'M ONE OF THE ATTORNEYS FOR BAY 101.

14        AND WE HAVE NOT MET BEFORE; CORRECT?

15   A.   YES, NEVER.

16   Q.   WERE YOU SUBPOENAED TO TESTIFY HERE TODAY?

17   A.   YES, THERE WAS A PAPER.

18   Q.   AND WHO SERVED YOU WITH THAT PIECE OF PAPER?

19   A.   I DON'T REMEMBER WHICH OFFICE IT WAS.

20   Q.   WHERE WERE YOU SERVED WITH THE SUBPOENA?

21   A.   AT HOME.

22   Q.   AND DID YOU MEET WITH PLAINTIFF'S COUNSEL TO PREPARE FOR

23   YOUR TESTIMONY TODAY?

24   A.   YES.

25   Q.   HOW MANY TIMES?

1      A.    ONE TIME.  TWICE.

2      Q.    AND HOW LONG DID YOU SPEND WITH MS. NGUYEN FOR THE FIRST

3      MEETING?

4      A.    AN HOUR, TWO HOURS.

5      Q.    AND HOW LONG FOR THE SECOND MEETING?

6      A.    HALF AN HOUR BECAUSE THE FIRST TIME I HAD NEVER BEEN TO

7      COURT.

8      Q.    OKAY.  THANK YOU.  YOU ATTENDED SILICON VALLEY COLLEGE TO

9      GET A CERTIFICATION IN BOARD LAYOUT DESIGN; CORRECT?

10     A.    YES.

11     Q.    AND YOU TOOK SOME CLASSES AT MISSION COLLEGE AS WELL?

12     A.    CORRECT.

13     Q.    AND WAS THE COURSEWORK AT SILICON VALLEY COLLEGE IN

14     ENGLISH?

15     A.    YES.

16     Q.    AND WERE ALL OF THE TESTS AT SILICON VALLEY COLLEGE IN

17     ENGLISH?

18     A.    YES.

19     Q.    AND WERE YOUR CLASSES AT MISSION COLLEGE IN ENGLISH?

20     A.    I TOOK MATH AND ESL.

21     Q.    DO YOU REMEMBER GIVING A RESUME TO BAY 101 WHEN YOU

22     APPLIED FOR A JOB THERE?

23     A.    YES.

24     Q.    AND DID YOU PREPARE THAT RESUME YOURSELF?

25     A.    SOMEONE HELPED ME.

1    Q.   SO I'M GOING TO GO TO YOUR WORK AT BAY 101.  YOU STOPPED

2    WORKING AT BAY 101 IN APRIL OF 2010; CORRECT?

3    A.   AROUND THAT TIME.

4    Q.   AND WHILE YOU WERE WORKING AT BAY 101, YOU GOT A TEMPORARY

5    JOB AT ANOTHER COMPANY; CORRECT?

6    A.   CORRECT, BECAUSE THE SALARY WAS VERY LOW, AND IT WASN'T

7    ENOUGH FOR ME TO RAISE THREE CHILDREN.

8         THE HOURS -- I JUST WAS NOT GETTING THE HOURS.

9    Q.   OKAY.  THANK YOU.  SO THAT IS "YES" THAT YOU HAD A

10   TEMPORARY JOB WHILE YOU WERE AT BAY 101?

11   A.   YES.

12   Q.   YOU ASKED JENNIFER GILBERT IF YOU COULD TAKE TIME OFF AT

13   BAY 101 TO WORK AT THIS TEMPORARY JOB, RIGHT?

14   A.   WHICH COMPANY ARE YOU REFERRING TO?

15   Q.   DID YOU ASK MS. GILBERT FOR TIME OFF TO WORK AT ANY OF

16   YOUR TEMPORARY JOBS?

17   A.   NO.

18   Q.   SO YOUR TESTIMONY HERE TODAY IS THAT YOU NEVER ASKED

19   MS. GILBERT TO GIVE YOU SOME TIME OFF SO YOU COULD WORK AT YOUR

20   TEMPORARY JOBS?

21   A.   BECAUSE I WAS WORKING FOR FOUR DAYS AND I ASKED FOR

22   ONE DAY IN THE KITCHEN, BUT IT WASN'T ENOUGH EVEN.

23   Q.   SO JUST TO BE CLEAR HERE, YOU NEVER ASKED MS. GILBERT FOR

24   TIME OFF OF YOUR WORK AT BAY 101 IN ORDER TO WORK AT ONE OF

25   YOUR TEMPORARY JOBS?

1      A.   NO.  I ONLY ASKED FOR TIME OFF WHEN MY BROTHER WAS ILL.

2      SO IT WAS FAMILY TAKE TURNS.

3      Q.   I'M SORRY.  WHAT DO YOU MEAN BY "FAMILY TAKE TURNS"?

4      A.   WELL, IF IT WAS SOMEONE FROM THE FAMILY, THEN THEY WOULD

5      BE ABLE TO GO.

6      Q.   SO THIS INSTANCE WHERE YOUR BROTHER WAS ILL, WAS THIS WHEN

7      YOU QUIT WORKING AT BAY 101?

8      A.   CORRECT, BECAUSE I WASN'T ABLE TO GET WHAT I NEEDED.

9      Q.   SO IT HAD NOTHING TO DO WITH YOUR NEEDING TIME OFF TO GO

10     WORK AT YOUR TEMPORARY JOBS?

11     A.   NO.  WELL, I WOULD WORK THERE AT 6:00 A.M. AND THEN I

12     WOULD COME BACK AND WORK AT BAY 101 ALWAYS AT THE RIGHT TIME,

13     THE CORRECT TIME.  AND IT WAS ONLY THAT -- WHEN MY BROTHER WAS

14     ILL THAT I ASKED FOR TIME OFF.

15     Q.   ISN'T IT TRUE THAT YOU CONTACTED MR. WERNER AFTER YOU QUIT

16     TO ASK FOR YOUR JOB BACK?

17     A.   YES, BECAUSE I HEARD OTHER PEOPLE SAY THAT WORKED WITH ME

18     WHEN I RETURNED THE CAR, THE PERSON THAT WAS WORKING WITH ME

19     BECAUSE I WANTED TO SEE ONCE THAT YOU GIVE BACK THE CARD, IF

20     YOU CAN COME BACK AND WORK AGAIN.  BUT THAT OTHER WOMAN WAS

21     ABLE TO DO THAT YET I WASN'T ABLE TO DO THAT.

22     Q.   I'M SORRY.  YOUR TESTIMONY IS THAT YOU CONTACTED

23     MR. WERNER TO TRY TO GET YOUR JOB BACK; IS THAT RIGHT?

24     A.   THAT'S RIGHT, I DID, I DID ASK.  I WANTED TO SEE WHETHER

25     OR NOT HE WAS GOING TO GIVE IT TO ME OR NOT.

1    Q.   AND ISN'T IT TRUE THAT MS. GILBERT THEN CONTACTED YOU THEN

2    TO SEE WHETHER YOU WANTED TO RETURN?

3    A.   NO.

4    Q.   SO IT'S YOUR TESTIMONY HERE TODAY THAT NO ONE AT BAY 101

5    CONTACTED YOU AFTER YOU ASKED MR. WERNER FOR YOUR JOB BACK?

6    A.   NO, NO ONE CALLED ME.

7    Q.   I'M SORRY.  GO AHEAD.

8    A.   WERNER TOLD ME HE DIDN'T WANT ME TO COME BACK BECAUSE

9    JENNIFER HAD ALREADY FIRED ME BECAUSE I QUIT.  HE DID NOT WANT

10   TO GO OVER JENNIFER'S HEAD AND HIRE ME BACK AGAIN.  THAT'S WHAT

11   HE TOLD ME.

12        I CRIED.  I BEGGED HIM, BUT HE SAID NO.

13   Q.   ISN'T IT TRUE THAT THE REAL REASON THAT YOU WEREN'T

14   REHIRED BY BAY 101 WAS BECAUSE YOU SAID -- YOU TOLD MR. WERNER

15   OR MS. GILBERT THAT YOU WERE GOING TO CONTINUE WORKING A SECOND

16   JOB?

17   A.   NO, NO, I DIDN'T SAY THAT.

18   Q.   I WANT TO GO BACK TO YOUR INTERVIEW WITH THE INVESTIGATOR

19   EDMAN.  SHE SPOKE WITH YOU ON THREE SEPARATE OCCASIONS;

20   CORRECT?

21   A.   YES, BUT I DON'T REMEMBER EXACTLY HOW MANY TIMES.

22   Q.   AND SHE ASKED YOU QUESTIONS ABOUT YOUR JOB AT BAY 101?

23   A.   YES.

24   Q.   AND YOU ANSWERED HER TRUTHFULLY?

25   A.   AT THE BEGINNING THERE WERE THINGS THAT I DIDN'T DARE TELL

1    HER.

2         AT THE END SHE SAID, IT'S CONFIDENTIAL.  IT'S BETWEEN YOU

3    AND ME.  SO I SOLD HER I WAS TELLING THE TRUTH.

4    Q.   DIDN'T MS. EDMAN TAKE SEVERAL NOTES WHILE SHE SPOKE WITH

5    YOU?

6    A.   YES.

7    Q.   AND YOU DIDN'T TAKE ANY NOTES, RIGHT?

8    A.   NO.

9    Q.   AND I THINK YOU JUST TESTIFIED WITH PLAINTIFF'S COUNSEL

10   THAT MS. EDMAN MADE YOU FEEL LIKE SHE BELIEVED YOU?

11   A.   WHO ARE YOU TALKING ABOUT?

12   Q.   PLAINTIFF'S COUNSEL, MS. NGUYEN?

13   A.   WHAT IS YOUR QUESTION?

14   Q.   DIDN'T YOU JUST TESTIFY WITH MS. NGUYEN THAT MS. EDMAN

15   MADE YOU FEEL LIKE SHE BELIEVED YOU?

16   A.   BECAUSE I WAS TELLING THE TRUTH.  I WAS TELLING WHAT I

17   KNEW.

18   Q.   AND SHE HAD KNOWLEDGE THAT SHE BELIEVED, THIS IS

19   MS. EDMAN, MS. EDMAN ACKNOWLEDGED THAT SHE BELIEVED THAT YOU

20   WERE TELLING THE TRUTH?

21   A.   YES.

22   Q.   SO WHILE WORKING AT BAY 101, YOU PUT IN WRITTEN TRANSFER

23   REQUESTS TO BECOME A CHIP RUNNER AND A CAGE CASHIER; IS THAT

24   RIGHT?

25   A.   YES, BUT I KEPT ASKING BUT I DIDN'T GET IT.

1    Q.   ISN'T IT TRUE THAT WHEN YOU SUBMITTED THOSE TRANSFER

2    REQUESTS, THERE WERE NO OPENINGS FOR EITHER POSITION?

3    A.   THEY SAID THAT THEY DIDN'T HAVE ANYTHING BUT YET I COULD

4    SEE THAT THEY HAD HIRED PEOPLE FOR THOSE POSITIONS.

5    Q.   AND HOW DID YOU FIND OUT THAT THEY HIRED OTHER PEOPLE FOR

6    THOSE POSITIONS?

7    A.   IN THE ACCOUNTING DEPARTMENT THERE WAS ALSO ANOTHER WOMAN

8    THERE NAMED JULIE, BUT THERE WERE A LOT OF PEOPLE THAT WERE

9    COMING IN, BUT I KNEW THAT THERE WAS A WOMAN THAT HAD ACCEPTED

10   THAT POSITION.

11   Q.   SO I'M REFERENCING THE CHIP RUNNER AND CAGE CASHIER

12   POSITIONS.  YOU DON'T KNOW FOR CERTAIN THAT ANYONE WAS HIRED

13   FOR THOSE POSITIONS AFTER YOU SUBMITTED YOUR TRANSFER REQUEST;

14   RIGHT?

15   A.   YES, THERE WAS A FILIPINO LADY?

16   Q.   AND YOU NEVER DID ANY HIRING AT BAY 101; CORRECT?

17   A.   WHAT DO YOU MEAN?

18   Q.   IT WASN'T YOUR JOB TO HIRE PEOPLE AT BAY 101?

19   A.   IT WASN'T.

20   Q.   AND YOU WEREN'T ANY KIND OF A SUPERVISOR AT ANY TIME;

21   RIGHT?

22   A.   I WAS NOT.

23   Q.   SO YOU DON'T REALLY KNOW WHAT IS INVOLVED IN MAKING A

24   DECISION TO HIRE SOMEONE AT BAY 101; RIGHT?

25   A.   CORRECT.

1    Q.   NOW, YOU REQUESTED SOME EXTRA WORK HOURS IN 2008 AT BAY

2    101; CORRECT?

3    A.   YES.

4    Q.   AND BAY 101 SUPPORTED YOU AND LET YOU WORK IN THE KITCHEN;

5    CORRECT?

6    A.   YES, AND I WAS VERY APPRECIATIVE OF IT BUT THE SALARY WAS

7    STILL $11 AND SOMETHING, OR $12.  IT WASN'T ENOUGH FOR ME TO

8    RAISE MY CHILDREN.

9    Q.   AND MS. GILBERT KNEW THAT YOU WERE WORKING IN THE KITCHEN

10   FOR SOME EXTRA WORK; RIGHT?

11   A.   YES, BECAUSE SHE'S THE ONE THAT TOLD NICK ABOUT IT.

12   Q.   YOU TOLD MS. EDMAN, THE INVESTIGATOR, THAT YOU'RE NOT

13   PHYSICALLY AFRAID OF LUCIO SUAREZ; RIGHT?

14   A.   WELL, THERE'S NOTHING FOR ME TO BE AFRAID OF.  I JUST

15   DIDN'T LIKE HIM JOKING AROUND.  I'M NOT THAT TYPE OF PERSON.

16   Q.   AND YOU ALSO TOLD MS. EDMAN THAT MR. SUAREZ IS A VERY NICE

17   PERSON, DIDN'T YOU?

18   A.   HE'S JUST A NORMAL PERSON, BUT HE LIKED WOMEN, AND HE

19   LIKED TO BE CLOSE TO WOMEN.  THAT HE COULD NEVER LET GO.

20   Q.   YOU NEVER MADE ANY COMPLAINTS TO H.R. ABOUT BEING SEXUALLY

21   HARASSED BY MR. SUAREZ; RIGHT?

22   A.   WELL, IT'S DIFFICULT BECAUSE MY SUPERVISOR, WHEN I LEFT,

23   SHE WOULD COME IN.  AND I DIDN'T FEEL COMFORTABLE TELLING HER,

24   AND I WAS ALSO AFRAID OF LOSING MY JOB?

25   Q.   ARE YOU REFERRING TO JENNIFER GILBERT?

1     A.   YES, SHE'S MY MANAGER.

2     Q.   DID YOU TELL MS. EDMAN ABOUT THIS INCIDENT THAT YOU FELL

3     ON THE FLOOR BECAUSE THERE WAS WATER ON THE FLOOR?

4     A.   I DON'T REMEMBER.  THE REASON IS ON THAT DAY I WAS WEARING

5     FLAT HEELS.  I FELL AT NIGHT.

6          EARLY IN THE MORNING WHEN JENNIFER CAME IN, SHE DIDN'T

7     EVEN ASK ME IF I WAS OKAY.  SHE STARTED YELLING AT ME.  SHE

8     SAID WHY WERE YOU WEARING HIGH HEELS?  AND I TOLD HER I WAS NOT

9     WEARING HIGH HEELS.

10         SHE DIDN'T BELIEVE ME BECAUSE SHE SAID IN THE REPORT IT

11    SAID HIGH HEELS.

12    Q.   MS. LUONG, I JUST WANT TO CONFIRM THAT YOU DIDN'T TELL

13    MS. EDMAN ABOUT THIS INCIDENT WHEN SHE INTERVIEWED YOU?

14    A.   I DON'T REMEMBER BECAUSE THIS HAPPENED LATER.

15    Q.   OKAY.  YOU TOLD MS. EDMAN THAT YOU REALLY LIKED YOUR JOB

16    AND YOU LIKED JENNIFER, DIDN'T YOU?

17    A.   MY JOB WAS GOOD AND SHE WAS NICE, TOO, BUT WHEN SHE WAS

18    TREATING EMPLOYEES, IT WAS THAT SHE WOULD FAVOR OTHERS.

19    Q.   BUT IT'S NOT BECAUSE OF THE PEOPLE'S RACE, RIGHT?

20    A.   YES, I FEEL SO BECAUSE I'M VIETNAMESE.  AND WHEN I TOLD

21    HER SOMETHING, SHE DIDN'T BELIEVE ME.

22    Q.   THERE ARE MANY VIETNAMESE PEOPLE WHO WORK AT BAY 101;

23    CORRECT?

24    A.   THAT'S CORRECT.

25    Q.   AND YOU NEVER HEARD MS. GILBERT SAY ANYTHING DEROGATIVE

1    ABOUT VIETNAMESE PEOPLE; RIGHT?

2    A.   THE OTHER PEOPLE ARE AFRAID OF HER.

3    Q.   SO JUST TO ANSWER MY QUESTION, YOU HAVE NEVER HEARD

4    MS. GILBERT SAY ANYTHING DEROGATORY ABOUT VIETNAMESE PEOPLE;

5    RIGHT?

6    A.   NO, SHE DIDN'T SAY.  SHE'S A MANAGER.  SHE WOULDN'T DARE

7    SAY THAT.

8    Q.   AND YOU NEVER FILED ANY KIND OF COMPLAINT WITH THE H.R.

9    DEPARTMENT REGARDING DISCRIMINATION, RIGHT?

10   A.   NO.  I'M DIABETIC, AND I NEED MY MEDICAL INSURANCE SO I

11   WOULD NOT DARE SAY ANYTHING.

12   Q.   AND YOU NEVER FILED ANY KIND OF COMPLAINT WITH THE H.R.

13   DEPARTMENT REGARDING MEAL OR REST BREAKS, RIGHT?

14   A.   IS THIS FOR ME OR FOR SOMEONE ELSE?

15   Q.   FOR YOURSELF?

16   A.   YES, I WOULD CALL AND ORDER, AND THEY WOULDN'T TAKE MY

17   ORDER.  AND THEN WHEN I FINALLY WENT DOWN THERE TO EAT, THERE

18   WAS NO FOOD.  I HAD ALREADY CLOCKED OUT, BUT THERE WAS NO FOOD.

19   Q.   I'M SORRY.  I DON'T THINK --

20         THE COURT:  THAT WASN'T THE QUESTION.

21   THE QUESTION WAS WHETHER YOU EVER MADE A COMPLAINT ABOUT

22   MEAL OR REST BREAKS THAT YOU MISSED.

23         THE WITNESS:  I TOLD THE COWORKERS ABOUT IT, BUT I

24   DIDN'T DARE TELL JENNIFER ABOUT IT, BUT I DID CALL TO TALK TO

25   NICK AND THE SUPERVISORS.

1    BY MS. MURAKAMI:

2    Q.   BUT YOU NEVER FILED ANY FORMAL COMPLAINT IN THE H.R.

3    DEPARTMENT ABOUT THAT?

4    A.   I DIDN'T.

5    Q.   ONE MINUTE, PLEASE.

6            MS. MURAKAMI:  THAT'S ALL.

7            MS. NGUYEN:  NO OTHER QUESTIONS, YOUR HONOR.

8            THE COURT:  MS. DANG, DO YOU WANT TO COME FORWARD,

9    PLEASE.

10       BEFORE WE START, THE INTERPRETER, ARE YOU DOING OKAY?

11   BECAUSE IF YOU NEED A BREAK, I WANT TO GIVE IT TO YOU BECAUSE I

12   REALIZE THAT YOU'VE GONE MORE HOURS THAN AN INTERPRETER USUALLY

13   DOES.

14           THE INTERPRETER:  THANK YOU, YOUR HONOR.

15           THE COURT:  IF YOU NEED A BREAK.

16           THE INTERPRETER:  I WOULD LOVE FOR A LITTLE BREAK.

17   THANK YOU.

18           THE COURT:  WE'LL TAKE ONE FOR TEN MINUTES.

19       (RECESS FROM 3:52 P.M. UNTIL 4:05 P.M.)

20           THE COURT:  YOU MAY PROCEED.

21           MS. NGUYEN:  THANK YOU.

22                   **DIRECT EXAMINATION** (RESUMED)

23   BY MS. NGUYEN:

24   Q.   MS. DANG, IN THE VIDEO WE SAW BEFORE THE BREAK, YOU WERE

25   NOT WEARING THE SAME APRON AS LINDA WAS.  COULD YOU EXPLAIN

1    THAT TO US, PLEASE.

2    A.   WHEN YOU WEAR THAT, YOU PUT THE MONEY -- THE CHIPS MAY BE

3    TOO HEAVY SO THAT YOU WEAR THE APRON NOT TO HAVE BACK PAIN.

4         BUT I NOTICED THERE WERE ONLY ONE OR TWO OTHERS THAT WORE

5    THAT APRON.

6    Q.   AS PART OF YOUR JOB, WERE YOU REQUIRED TO WEAR THAT APRON?

7    A.   NO.

8    Q.   SO THERE WAS NO PENALTY FOR NOT WEARING IT, RIGHT?

9    A.   NO, THEY DIDN'T SAY.

10   Q.   EARLIER YOU MENTIONED THE NAME AND WE WANT TO CLARIFY ON

11   THE RECORD, YOU SAID ELLIS.  IS THAT E-L-L-I-S?

12   A.   CORRECT.

13   Q.   AND SHE WAS ONE OF THE EMPLOYEES IN THE SAME DEPARTMENT

14   THAT YOU WORKED AT BAY 101?

15   A.   CORRECT.

16   Q.   AND AFTER THE INCIDENT WITH LINDA ELIAS, WERE YOU

17   SUSPENDED?

18   A.   TWO DAYS.

19   Q.   HOW DID YOU FIND OUT ABOUT THAT SUSPENSION?

20   A.   AFTER MY DAY OFF, I CAME IN, I CAME INTO WORK AGAIN.

21        IN THE MORNING I SAW NICK AND HE SAID AFTER YOUR SHIFT

22   COME IN AND SEE ME AND LINDA.

23   Q.   LINDA OR JENNIFER?

24   A.   JENNIFER.

25   Q.   DID YOU GO TO THE MEETING?

1    A.   I DID.

2    Q.   AND WHAT HAPPENED AT THE MEETING?

3    A.   WHEN I CAME IN NICK AND JENNIFER WERE ALREADY THERE.

4    Q.   AND WHAT DID THEY SAY TO YOU?

5    A.   THEY SAID THAT THEY ALREADY HAD SEEN THE VIDEO AND THEY

6    SUSPENDED ME FOR TWO DAYS.  AND THERE WAS A LETTER THERE THAT

7    SAID THAT I HAVE TO GO TO THE KITCHEN.

8    Q.   YOU'RE REFERRING TO THE COUNSELLING MEMOS?

9    A.   CORRECT.

10   Q.   I'M GOING TO ASK YOU TO NOW TAKE A LOOK AT EXHIBIT 1001

11   THAT CONTAINS THE TWO COUNSELLING MEMOS THAT WE'RE TALKING

12   ABOUT.

13        IT'S IN THAT SECOND EXHIBIT.

14        SO I'LL ASK YOU TO TAKE A LOOK AT ONE COUNSELLING MEMO

15   FIRST.  HAVE YOU FOUND IT?  IT'S EXHIBIT 1001?

16   A.   WE HAVE 1001.

17   Q.   OKAY.

18   A.   BUT OURS DOESN'T LOOK LIKE THE SCREEN'S.

19   Q.   SO TAKE A LOOK AT THE COUNSELLING MEMO DATED OCTOBER 8TH,

20   2009, ABOUT ARGUING WITH CUSTOMER.

21        DO YOU SEE THAT?

22   A.   I SEE IT.

23   Q.   AND WAS THAT ONE OF THE COUNSELLING MEMOS THAT NICK AND

24   JENNIFER GAVE TO YOU AT THE MEETING IN OCTOBER OF 2009?

25   A.   CORRECT.

1    Q.   AND IN THAT THEY SAID THAT YOU BROUGHT THE WRONG DRINK TO

2    THE CUSTOMER.

3         DID YOU BRING THE WRONG DRINK TO THE CUSTOMER?

4    A.   NO.

5    Q.   AND BEFORE THAT MEETING, HAD ANYONE TALKED TO YOU TO ASK

6    YOU WHAT HAPPENED?

7    A.   NO.

8    Q.   AND AT THE MEETING, DID ANYONE ASK YOU WHAT HAPPENED

9    BETWEEN YOU AND LINDA AND THE CUSTOMER ON APRIL 4TH -- I'M

10   SORRY -- OCTOBER 4TH, 2009?

11   A.   NO ONE.

12   Q.   IF YOU CAN TAKE A LOOK AT THE NEXT COUNSELLING MEMO OF THE

13   SAME DATE, PLEASE.

14        UP A LITTLE BIT, ANDRE.  THANK YOU.  I'M SORRY.

15        FOR THIS COUNSELLING MEMO THE SUBJECT IS JOB PERFORMANCE.

16   DO YOU SEE THAT?

17   A.   YES.

18   Q.   AND WAS THIS SOMETHING ELSE GIVEN TO YOU AT THE H.R.

19   MEETING IN OCTOBER OF 2009?

20   A.   CORRECT.

21   Q.   AND DID MR. ORTEGA OR MS. GILBERT TELL YOU WHAT YOU WERE

22   BEING GIVEN A COUNSELLING MEMO FOR WITH RESPECT TO JOB

23   PERFORMANCE?

24   A.   NO.

25   Q.   DID THEY TELL YOU THAT THEY THOUGHT THAT YOU HAD PROBLEMS

1    WITH BALANCING ENVELOPES?

2    A.   THEY TOLD ME ONE TIME THAT I WAS WRONG BY $0.10.

3    Q.   THAT'S IT?

4    A.   YES.

5    Q.   AND THEN YOU MENTIONED EARLIER SOMETHING ABOUT HAVING TO

6    GO BACK TO THE KITCHEN.  WHO SAID THAT?

7    A.   NICK SAID TWO THINGS.  ONE WAS THAT HE WAS GOING TO

8    SUSPEND ME FOR TWO DAYS AND THE OTHER THING, I HAD TO GO BACK

9    TO THE KITCHEN AND I WOULD HAVE TO WORK AT NIGHT, NOT THE PRIOR

10   SHIFT LIKE I USED TO.

11   Q.   AND SO YOUR UNDERSTANDING WAS THAT YOU WOULD HAVE TO GO

12   BACK TO THE KITCHEN TO WORK?

13   A.   YES.

14   Q.   AT THAT MEETING IN H.R., WAS THERE A UNION REP?

15   A.   NO.

16   Q.   AND WAS THERE ANYONE THERE TO HELP TRANSLATE FOR YOU?

17   A.   NO, NO.

18   Q.   DID EITHER MR. ORTEGA OR MS. GILBERT GIVE YOU A CHANCE TO

19   EXPLAIN WHAT HAPPENED WITH LINDA?

20   A.   NO.

21   Q.   I THINK YOU WERE HERE WHEN MS. GILBERT SAID THAT YOU NEVER

22   ASKED FOR EITHER AN INTERPRETER OR A UNION REP.  DID YOU ASK

23   FOR ONE?

24   A.   WHEN I CAME IN, SHE DIDN'T LET ME TALK.  SHE JUST GAVE ME

25   THOSE TWO PAPERS.

1    Q.   AND THIS WAS RIGHT AFTER YOUR SHIFT ENDED; CORRECT?

2    A.   CORRECT.

3    Q.   AND DID YOU KNOW THAT THEY WERE CALLING YOU IN TO SUSPEND

4    YOU?

5    A.   I DIDN'T.

6    Q.   YOUR SIGNATURE IS ON THE COUNSELLING MEMOS.

7         DO YOU SEE THAT?

8    A.   I SEE IT.

9    Q.   AND DOES THAT MEAN THAT YOU AGREED WITH THE COUNSELLING

10   MEMO?

11   A.   I DON'T AGREE.

12   Q.   DID ANYBODY TELL YOU THAT YOU COULD TAKE HOME THE

13   COUNSELLING MEMOS AND WRITE COMMENTS?

14   A.   NO ONE.

15   Q.   SO WHAT HAPPENED, MS. DANG, AFTER YOU WERE SUSPENDED IN

16   OCTOBER OF 2009?  DID YOU WRITE A COMPLAINT?

17   A.   YES.

18   Q.   IF YOU WOULD PLEASE TAKE A LOOK AT EXHIBIT 1016.

19        IS THIS THE COMPLAINT LETTER THAT YOU SENT TO MANAGEMENT

20   AT BAY 101.

21   A.   CORRECT.

22   Q.   AND DID SOMEONE HELP YOU TO PREPARE THAT LETTER?

23   A.   YES, JASON.

24   Q.   IS THAT YOUR CURRENT HUSBAND?

25   A.   CORRECT.

1    Q.   AND HOW DID JASON GET THE INFORMATION TO PREPARE THE

2    LETTER?

3    A.   I TOLD HIM WHAT HAD BEEN HAPPENING, AND I ALSO TOLD HIM

4    WHAT HAPPENED WITH LINDA.

5        I WAS REQUESTING THAT THIS LETTER BE HANDED TO A HIGHER

6    LEVEL SO THAT THE MANAGERS THERE WILL KNOW THAT I WAS INNOCENT.

7    Q.   AND WHEN YOU EXPLAINED TO JASON WHAT HAPPENED, WERE YOU

8    ABLE TO EXPLAIN EVERYTHING YOURSELF IN ENGLISH OR DID YOU NEED

9    ANY HELP.

10   A.   MY ENGLISH IS NOT GOOD.  I WAS NOT ABLE TO EXPLAIN

11   EVERYTHING, BUT I DID CALL MY CHILD.

12       I TOLD MY CHILD TO TELL JASON OF THE THINGS THAT I WANTED

13   TO BE WRITTEN.

14   Q.   AND AFTER YOU SENT THIS LETTER TO BAY 101, WHAT HAPPENED?

15   A.   AT THAT TIME THE INTERVIEWER, AN INVESTIGATOR ON THE PHONE

16   AND SHE SAID THAT SHE WANTED TO SEE ME IN ORDER TO INVESTIGATE

17   WHAT WAS HAPPENING.

18   Q.   YOU'RE TALKING ABOUT MS. EDMAN?

19   A.   CORRECT.

20   Q.   SO BEFORE WE MOVE ON TO MS. EDMAN, I'D LIKE YOU TO LET US

21   KNOW, AFTER YOU WERE SUSPENDED, DID YOU GO RIGHT BACK TO WORK

22   AFTER THE TWO-DAY SUSPENSION?

23   A.   NO.

24   Q.   AND WHY NOT?

25   A.   BECAUSE I WAS ILL.

1      Q.  WHAT HAPPENED?

2      A.  I WAS CRYING AND I WAS SAD.  THIS WAS NOT MY FAULT.  WHY

3      WERE THEY BLAMING ME?  AND I DIDN'T WANT TO EAT, AND I KEPT IN

4      BED, JUST IN BED.

5      Q.  DID YOU GO SEEK SOME TREATMENT AT KAISER?

6      A.  I DID.

7      Q.  AND EVENTUALLY DID YOU GO BACK TO WORK?

8      A.  AFTER THE INTERVIEW, AFTER THE INVESTIGATION SHE SAID THAT

9      RON PROMISED WHEN I CAME BACK AND WORKED, I WOULD HAVE TO STAY

10     QUIET AND ALL I SHOULD SAY IS THAT I WAS ILL AND NOW I'M BACK

11     TO WORK, AND HE PROMISED THAT NOTHING BAD WOULD HAPPEN TO ME.

12     NO ONE WOULD BOTHER ME.

13     Q.  AND WHEN YOU WENT BACK TO WORK AT BAY 101 AFTER THAT

14     SUSPENSION, DID ANYBODY BOTHER YOU?

15     A.  THE NIGHT THAT I FIRST STARTED GOING BACK TO WORK I HAD A

16     PROBLEM WITH BETH IN THE BAR.

17     Q.  AND WHAT HAPPENED?

18     A.  I HAD AN ORDER FROM A CUSTOMER OF ALCOHOL.  WHEN I PUSH

19     THE ORDER, MY HAND HIT AND IT PUSHED INTO THE NEXT LINE UP.

20          WHEN THE MACHINE CAME OUT WITH THE TICKET, IT WAS WRONG.

21     I RAN IN AND I TOLD BETH THAT I WAS CANCELLING IT.

22          AND WHEN I CAME OUT, I WORKED ON TWO OTHER TICKETS THAT

23     SOMEONE ORDERED.

24          I TOOK THE TICKET THAT WAS THE WRONG TICKET FROM THE

25     CUSTOMER.  I SAID "SEE ME."  AND I CAME IN AND I TOLD BETH THAT

1    I HAD CANCELLED THE PRIOR ONE SO THIS ONE, THE "SEE ME" ONE,

2    MARGARITA, I WASN'T SURE WHETHER IT WAS A MARGARITA OR NOT.

3    Q.   SO WHAT HAPPENED BETWEEN YOU AND BETH?

4    A.   WHEN I CAME IN --

5                THE INTERPRETER:  THE INTERPRETER NEEDS

6    CLARIFICATION.  THE WITNESS IS SAYING SOMETHING IN ENGLISH THAT

7    THE INTERPRETER DOESN'T UNDERSTAND:  "SEE ME."

8          SO WITNESS IS TRYING TO SAY, "SEE ME" MEANING SEE HER.

9                THE WITNESS:  WHEN I WENT IN TO TALK TO BETH, THE

10   ALCOHOL THAT I WANTED TO ORDER, AND THEN I WENT OUT.

11         WHEN I CAME BACK TO GET THE ALCOHOL ORDER, I SAW THAT

12   UNDERNEATH THE GLASS, THE ALCOHOL GLASS, THERE WAS A TICKET AND

13   I NOTICED THAT IT WAS THE WRONG ALCOHOL FROM WHAT I HAD TOLD

14   BETH.

15         I TOLD BETH THAT, "I TOLD YOU EARLIER THAT I CANCELLED THE

16   ORDER BECAUSE IT WAS WRONG."

17   BY MS. NGUYEN:

18   Q.   SO SHE FILLED THE WRONG ORDER?

19   A.   SHE TOOK THE FIRST ORDER, AND I TOLD HER THAT I HAD

20   ALREADY ASKED HER TO CANCEL THE ORDER.

21   Q.   AND WHY DO YOU THINK THAT SHE DID THAT?

22   A.   WHEN I CAME IN TO GET THE GLASS OF ALCOHOL, I SAW LINDA

23   THERE.  I ASKED, "CAN I CHANGE IT? "

24         BETH GOT ANGRY AND SHE SAID THAT THAT'S ALL -- I ONLY SAW

25   THIS TICKET.  YOU CANNOT CHANGE IT.  I WAS REALLY SAD AND I

1    TOOK THE ORDER AND PUT IT AWAY, AND THEN I WENT TO GET ANOTHER

2    ORDER FOR THE CUSTOMER.

3    Q.   SO THAT WAS SOMETHING THAT HAPPENED THE NIGHT THAT YOU

4    CAME BACK TO WORK AFTER THE SUSPENSION?

5    A.   IT WAS ON THE SAME DAY THAT I WENT BACK TO WORK.

6    Q.   OKAY.  AND DID YOU EXPERIENCE ANY OTHER INCIDENTS AFTER

7    YOU CAME BACK TO WORK THAT SEEMED LIKE THEY WERE GIVING YOU A

8    HARD TIME?

9    A.   AT THE BEGINNING I DIDN'T THINK THAT THIS WAS HAPPENING.

10   WHEN I WENT TO ORDER ANOTHER ALCOHOL ORDER, MICHAEL WILSON CAME

11   AND STOOD WHERE I WAS WORKING AND HE SAID FIRST WE'RE FRIENDS.

12   I SAID, WELL, OF COURSE.

13        HE TOOK ME OUT TO THE BAR.  AND HE ASKED BETH WHAT

14   HAPPENED.  BETH SAID THAT I TOOK THE WRONG ORDER AND THAT I WAS

15   LOUD.  I WAS ARGUING OR LOUD WITH HER.

16   Q.   AND WERE YOU SPEAKING IN A LOUD VOICE TO HER?

17   A.   NO.  I BEGGED HER TO CHANGE BUT SHE WOULDN'T LET ME.

18   Q.   OKAY.  AND YOU WERE HERE, I BELIEVE, LAST WEEK WHEN

19   MR. WERNER SAID THAT YOU WALKED OUT OF A UNION MEDIATION THAT

20   AROSE FROM THIS SUSPENSION.

21        DO YOU RECALL THAT?

22   A.   I REMEMBER.

23   Q.   AND WITHOUT SAYING WHAT WAS DISCUSSED IN THE UNION

24   MEDIATION, CAN YOU TELL US WHY MR. WERNER IS SAYING THAT YOU

25   WALKED OUT OF THE UNION MEDIATION?

1     A.   I HAD BEEN THERE WORKING AT 11:00 O'CLOCK P.M. UNTIL 7:00

2     A.M. THE NEXT DAY.  I HAD TO STAY THERE UNTIL 10:00 O'CLOCK AND

3     THEN THE MEETING WOULD START.  THE MEETING LASTED UNTIL 10:30.

4          I WAS HUNGRY AND I WAS TIRED.  AND I WAS SLEEPY.  I

5     COULDN'T TAKE IT ANYMORE.

6          I STOOD UP AND I ASKED IF I COULD GO HOME BECAUSE IF I

7     STAYED HERE LONGER, I COULD FAINT BECAUSE I'M SO TIRED.

8     Q.   AND DID THEY LET YOU GO?

9     A.   JENNIFER SAID, THAT'S RIGHT, YOU HAVE BEEN WORKING SINCE

10    LAST NIGHT SO YOU ARE TIRED.  SO I WENT HOME.

11    Q.   NOW, AFTER YOU CAME BACK TO WORK AND THE SUSPENSION, AND

12    YOU HAD ALREADY TOLD US ABOUT THE MEETING WITH BETH, DID YOU

13    FACE ANY OTHER INCIDENTS OR INTERACTIONS FROM YOUR COWORKERS

14    THAT INDICATED THAT THEY KNEW ABOUT YOUR COMPLAINTS?

15         MR. MCMANIS:  I'M GOING TO OBJECT TO THE QUESTION AS

16    ASSUMING FACTS.

17         THE COURT:  I THINK IT DOES TECHNICALLY ASSUME FACTS

18    AND THAT THERE WERE OTHER COMPLAINTS.  YOU CAN ASK HER IF THERE

19    WERE ANY FURTHER COMPLAINTS AFTER THAT.

20         MS. NGUYEN:  I'LL REPHRASE, YOUR HONOR.

21    Q.   MS. DANG, YOU TESTIFIED EARLIER THAT YOU WENT BACK TO WORK

22    BECAUSE YOU WERE ASSURED OF SOME CONFIDENTIALITY REGARDING YOUR

23    COMPLAINT.

24    A.   THAT'S CORRECT.

25    Q.   AND DO YOU KNOW WHETHER YOUR COMPLAINTS WERE KEPT

1    CONFIDENTIAL?

2    A.   THEY DIDN'T.

3    Q.   AND HOW DO YOU KNOW?

4    A.   WHEN I WAS SILENT OTHER THAN SAYING I WAS SICK AND THAT'S

5    WHY I CAME BACK TO WORK, BUT THAT NIGHT I HAD PROBLEMS.  AND IT

6    WAS NOT MY FAULT.  I HAD ALREADY TOLD HER AHEAD OF TIME.  I

7    THINK THAT THEY WANTED TO HURT ME.

8    Q.   WHY DID YOU THINK THAT THEY WANTED TO HURT YOU?

9    A.   IT'S LIKE THEY WERE FRAMING ME.  SO THAT I MADE A MISTAKE

10   SO THAT IT WOULD BE GOOD EVIDENCE TO FIRE ME.

11   Q.   AND EVENTUALLY YOU WERE FIRED, RIGHT?

12   A.   CORRECT.

13   Q.   AND WHEN WERE YOU FIRED?

14   A.   I DON'T REMEMBER CLEARLY.  I THINK IT WAS ON THAT DAY.  IT

15   WAS ALSO A SUNDAY, AROUND MONDAY MORNING, AROUND 3:00, 3:30.

16       I SAW NICK.  NICK SAID THAT AFTER WORK HOURS TO COME TO

17   H.R. TO SEE NICK.

18           MR. MCMANIS:  EXCUSE ME, YOUR HONOR.  I THINK THE

19   QUESTION WAS ANSWERED, AND I OBJECT TO THE NARRATIVE.

20           THE COURT:  PLEASE WAIT FOR -- ONCE YOU ANSWER THE

21   QUESTION, WAIT FOR ANOTHER QUESTION.

22   BY MS. NGUYEN:

23   Q.   YOU WERE FIRED IN DECEMBER OF 2009; RIGHT?

24   A.   CORRECT.

25   Q.   DO YOU RECALL WHETHER IT WAS DECEMBER 21ST, 2009?

1    A.   CORRECT.

2    Q.   AND THAT WAS A MONDAY YOU REMEMBER?

3    A.   CORRECT.

4    Q.   DO YOU RECALL A CONVERSATION WITH NICK ORTEGA THAT

5    MORNING?

6    A.   YES.

7    Q.   AND I BELIEVE YOU SAID THAT HE TOLD YOU ABOUT A MEETING IN

8    H.R.  RIGHT?

9    A.   CORRECT.

10   Q.   AND WHAT DID HE TELL YOU ABOUT THAT MEETING?

11   A.   AFTER YOU ARE DONE WITH WORK THERE WILL BE A MEETING.

12   Q.   AND DID HE TELL YOU WHO WAS GOING TO BE AT THE MEETING?

13   A.   HE SAID HE DIDN'T KNOW.

14   Q.   OKAY.  AND WHEN HE TOLD YOU TO STAY FOR THE MEETING, WHAT

15   DID YOU TELL HIM?

16   A.   I ASKED HIM WHY WAS I NOT NOTIFIED BEFORE.  TODAY I HAVE

17   TO GO AND PICK UP MY DAUGHTER AT A BUS STATION OR A PLACE WHERE

18   BUSES STOP, AND I ALSO HAVE TO GO HOME TO TAKE MY HUSBAND TO

19   THE HOSPITAL.

20   Q.   AND SO WHEN YOU TOLD MR. ORTEGA THAT YOU HAD THOSE PLANS,

21   WHAT DID HE SAY?

22   A.   HE SAID THAT HE ONLY JUST HEARD.  HE SAID THAT HE HAD JUST

23   KNOWN ABOUT IT SO THAT'S WHY HE WENT IN EARLY.

24   Q.   AND AFTER THAT, DID HE TELL YOU THAT YOU HAVE TO STAY?

25   A.   HE DIDN'T SAY.  AT THE TIME I WAS VERY CONFUSED.  I DIDN'T

1    KNOW WHAT TO DO.  I DIDN'T KNOW WHETHER TO GO PICK UP MY

2    DAUGHTER OR GO TO THE MEETING.

3         I CALLED MY HUSBAND --

4    Q.   AND WHAT DID YOU SAY TO YOUR HUSBAND?

5    A.   I ASKED IF MY HUSBAND COULD GO AND PICK UP MY DAUGHTER.

6    Q.   AND WHAT DID HE SAY?

7    A.   HE SAID THAT HE HAD JUST GONE TO BED AND THE NEXT MORNING

8    HE WOULD HAVE TO GO INTO THE HOSPITAL.  HE ASKED IF HE COULD

9    HAVE THE KITCHEN'S PHONE NUMBER SO THAT HE COULD TALK TO NICK.

10        I GAVE MY HUSBAND THE PHONE NUMBER FOR THE KITCHEN.

11   Q.   AND DO YOU KNOW WHETHER MR. SUMMERS SPOKE WITH NICK?

12   A.   I DON'T KNOW WHAT THEY TALKED ABOUT.

13   Q.   DO YOU KNOW WHETHER THEY ACTUALLY TALKED?

14   A.   THEY DID.

15   Q.   BUT YOU WEREN'T THERE WHEN THEY HAD THE CONVERSATION;

16   CORRECT?

17   A.   CORRECT.

18   Q.   SO AFTER YOU SPOKE WITH YOUR HUSBAND, WHAT HAPPENED NEXT?

19   A.   ABOUT TEN MINUTES LATER MY HUSBAND CALLED ME BACK.

20        HE TOLD ME TO CONTINUE WITH MY PLANS BECAUSE THE MEETING

21   WOULD HAPPEN THE NEXT DAY.

22   Q.   AND DID YOU GO HOME AT YOUR REGULAR HOURS THAT MORNING?

23   A.   ABOUT TEN MINUTES EARLY.

24   Q.   WHY DID YOU LEAVE TEN MINUTES EARLY?

25   A.   BECAUSE I HAVE TO LOG OUT PRIOR TO 7:00.  IF I DON'T LOG

1    OUT, THEY WILL CLOSE MY SHIFT.  SO EVERYONE HAS TO DO THAT

2    TEN MINUTES PRIOR.

3    Q.   AND DID YOU ASK MR. ORTEGA'S PERMISSION TO GO EARLY?

4    A.   HE'S MY SUPERVISOR, AND HE HAS TO OPEN THE TIMECARD IN

5    ORDER FOR ME TO GO HOME.

6    Q.   SO HE GAVE YOU PERMISSION TO GO HOME EARLY?

7    A.   YES, THAT'S CORRECT.

8    Q.   AND BEFORE HE LET YOU GO EARLY, DID HE TELL YOU THAT YOU

9    HAVE TO STAY FOR THE MEETING?

10   A.   NO, HE DIDN'T SAY ANYTHING.

11   Q.   DID HE SAY ANYTHING ELSE ABOUT THAT MEETING?

12   A.   NO.

13   Q.   AND WHEN YOU SPOKE WITH MR. ORTEGA, WHEN HE ASKED YOU TO

14   STAY, WAS THERE ANYONE ELSE THERE WHEN YOU BOTH WERE TALKING?

15   A.   I THINK KEN WAS THERE.

16   Q.   AND, MS. DANG, AFTER LEAVING WORK THAT MORNING, DID YOU GO

17   PICK UP YOUR DAUGHTER?

18   A.   I DID.

19   Q.   AND YOU TOOK HER HOME TO SAN FRANCISCO?

20   A.   CORRECT.

21   Q.   AND DID YOU TAKE YOUR HUSBAND TO SURGERY LATER THAT DAY?

22   A.   CORRECT.

23   Q.   WHAT KIND OF SURGERY DID HE HAVE?

24   A.   HE HAD CANCER ON THE NOSE.

25   Q.   AND HOW DID YOU FIND OUT -- I'M SORRY.  LET ME ASK THIS

1    FIRST:  WHEN YOU LEFT WORK THAT MORNING ON DECEMBER 21ST, 2009,

2    DID YOU THINK THAT YOU WERE COMING BACK TO WORK?

3    A.   COULD YOU REPEAT THE QUESTION?  I'M SORRY.

4    Q.   NO ONE TOLD YOU THAT YOU WOULD BE FIRED FOR NOT GOING TO

5    THE MEETING, RIGHT?

6    A.   I DIDN'T HEAR ANYONE SAY THAT.

7    Q.   SO YOU THOUGHT YOU STILL HAD A JOB, RIGHT?

8    A.   CORRECT.

9    Q.   AND WHEN DID YOU FIND OUT THAT YOU HAD BEEN FIRED?

10   A.   MY FRIEND CALLED ME.  ALL OF THE EMPLOYEES GOT A BONUS AND

11   SO I WENT IN TO GET MY BONUS.

12        THE WOMAN THERE THAT WORKED IN THE DEPARTMENT, SHE WAS

13   GIVING OUT THE BONUSES TO EMPLOYEES.  I ASKED HER, I SAID, I

14   DON'T SEE MY NAME.

15        WELL, SHE TOLD ME THAT I WAS FIRED AND SO I DIDN'T HAVE A

16   BONUS.

17   Q.   WAS THAT THE FIRST TIME THAT YOU HAD LEARNED THAT YOU HAD

18   BEEN FIRED?

19   A.   I DIDN'T BELIEVE IT SO I WENT BACK INTO H.R.  I SAW MARIA.

20   SHE TOLD ME THAT I WAS FIRED AND THE LETTER WHICH STATES THAT I

21   AM FIRED SHOULD PROBABLY BE HOME, SENT HOME.

22   Q.   AND SO WHEN YOU WENT TO BAY 101 TO GET YOUR BONUS CHECK,

23   YOU HAD NOT RECEIVED ANY LETTER; IS THAT RIGHT?

24   A.   I DIDN'T.

25   Q.   AND DID ANYONE FROM BAY 101 CALL YOU TO LET YOU KNOW THAT

1    YOU HAD BEEN FIRED?

2    A.   NO.

3    Q.   AND SO WHEN YOU WENT TO PICK UP YOUR BONUS CHECK, WAS THAT

4    THE CHRISTMAS BONUS CHECK?

5    A.   CORRECT.

6    Q.   AND THAT WAS ABOUT TWO OR THREE DAYS BEFORE CHRISTMAS?

7    A.   CORRECT.

8    Q.   AND HOW DID YOU FEEL AFTER YOU LEARNED THAT YOU HAD BEEN

9    FIRED BY BAY 101?

10   A.   I WAS FEELING EVEN SADDER THAN WHEN I WAS SUSPENDED.

11   Q.   AND WHY?

12   A.   I DIDN'T UNDERSTAND THE REASON THAT I WAS FIRED.

13   Q.   AND DID -- WAS YOUR HEALTH AFFECTED?

14   A.   A LOT.

15   Q.   HOW?

16   A.   I STAYED IN BED.  I DIDN'T WANT TO SEE ANYONE.  I DIDN'T

17   WANT TO TALK TO ANYONE EXCEPT MY HUSBAND.  I DIDN'T WANT TO EAT

18   OR I DIDN'T WANT TO SHOWER AND THAT CONTINUED FOR I DON'T KNOW

19   HOW LONG.

20       SO WHEN MY HUSBAND SAW THIS, HE ADVISED ME TO GO SEE A

21   DOCTOR.

22   Q.   AND DID YOU GO SEE A DOCTOR?

23   A.   I DID.

24   Q.   AND WHAT DID YOUR DOCTOR SAY WAS WRONG WITH YOU?

25   A.   THE DOCTOR SAID THAT I WAS DEPRESSED.  I TOLD THE DOCTOR

1    THAT IT FEELS LIKE MY STOMACH HURTS, AND I DON'T FEEL LIKE

2    DOING ANYTHING.  AND THEN I WASHED MY HANDS 30 TIMES A DAY.

3    Q.   WERE YOU DOING THAT BEFORE THE TERMINATION?

4    A.   NEVER.

5    Q.   AND WHAT HAPPENED TO YOU AFTER THE TERMINATION THAT YOU

6    DIDN'T HAVE BEFORE THE TERMINATION?

7    A.   I HEARD THE VOICE OF SOMEONE TELLING ME TO GET ON HIGH

8    STAIRS AND THEN JUMP DOWN, AND I'LL BE REALLY HAPPY.

9        AND AT NIGHT I WOULD GET NIGHTMARES.  IN THE MORNING I

10   WOULDN'T REMEMBER MUCH, BUT I WOULD BE SWEATING ALL OVER MY

11   BODY.  IT FELT LIKE SOMEBODY WANTED TO KILL ME.

12   Q.   AND DID YOU HAVE THESE THOUGHTS OR FEELINGS BEFORE YOU

13   WERE TERMINATED FROM BAY 101?

14   A.   NO.

15   Q.   AND WHAT KIND OF TREATMENT DID YOU GET FROM YOUR DOCTOR?

16   A.   IN THE BEGINNING MY FAMILY DOCTOR REFERRED ME TO A

17   PSYCHOLOGIST.  I WOULD OFTEN SEE THE FEMALE PSYCHOLOGIST ONCE A

18   WEEK SOMETIMES AND SOMETIMES TWO TO THREE WEEKS ONCE AND THIS

19   CONTINUED FOR A FEW YEARS.

20   Q.   AND WERE YOU PUT ON MEDICATION?

21   A.   YES.

22   Q.   AND BEFORE THE TERMINATION FROM BAY 101, HAD YOU EVER HAD

23   TO BE TREATED BY A PSYCHOLOGIST?

24   A.   NO.

25   Q.   OR A PSYCHIATRIST?

1      A.   NO.

2      Q.   AND WERE YOU EVER ON ANY MEDICATIONS FOR DEPRESSION PRIOR

3      TO BAY 101 TERMINATION?

4      A.   NO.

5      Q.   I WANT TO ASK YOU ABOUT YOUR EMPLOYMENT SEARCH AFTER YOU

6      STOPPED WORKING AT BAY 101.  WHEN DID YOU START WORKING FOR A

7      JOB AGAIN?

8      A.   ABOUT A MONTH TO A MONTH AND A HALF.

9      Q.   WHY DID YOU WAIT FOR A MONTH TO A MONTH AND A HALF BEFORE

10     LOOKING FOR A JOB?

11     A.   AT THAT TIME I DIDN'T THINK THAT I COULD GET UP AND BE

12     NORMAL.  I WAS VERY TIRED.  I DIDN'T WANT ANYTHING.

13     Q.   AND SO YOU STARTED LOOKING FOR A JOB ABOUT A MONTH, A

14     MONTH AND A HALF LATER.

15          WHAT DID YOU DO TO LOOK FOR A JOB?

16     A.   MY HUSBAND TOOK THE NAMES OF RESTAURANTS OR PHONE NUMBERS.

17     SOMETIMES I WOULD CALL FROM HOME AND SOMETIMES I WOULD GO

18     DIRECTLY TO THAT RESTAURANT OR COFFEE SHOP TO ASK FOR WORK.

19     Q.   DID YOU PUT IN ANY APPLICATION?

20     A.   SOME PLACES, YES, AND SOME PLACES, NO.

21     Q.   AND ON AVERAGE, HOW MANY HOURS A DAY OR HOW MANY HOURS A

22     WEEK DID YOU SPEND LOOKING FOR A JOB?

23     A.   I WOULD GO AND MAYBE LOOK AND SPEND ABOUT FOUR HOURS, IN

24     THE AFTERNOONS MAYBE TWO HOURS.

25          ON DAYS THAT I WASN'T FEELING WELL, I DIDN'T CALL.

1       Q.   DID YOU EVER ASK THE UNION TO HELP YOU LOOK FOR A JOB?

2       A.   NO, BECAUSE AT THE TIME I WAS THINKING THAT THE UNION WAS

3       TRYING TO ARGUE SO THAT I WOULD GET MY JOB BACK FROM BAY 101.

4       Q.   BESIDES LOOKING FOR ANOTHER JOB, DID YOU ALSO LOOK INTO

5       OTHER OPTIONS TO EARN A LIVING?

6       A.   I WAS THINKING OF CHANGING THE OCCUPATION AND GOING TO

7       SCHOOL.  I WANTED TO LEARN HOW TO DO HAIR, TO BE A MANICURIST

8       SO THAT I COULD OPEN UP A SALON SO THAT I COULD DO HAIR AND

9       NAILS.

10      Q.   AND DID YOU DO THAT?

11      A.   NO, BECAUSE I DIDN'T HAVE THE MONEY.

12      Q.   TO TAKE THE CLASS YOU MEAN?

13      A.   BOTH.  IF I DON'T HAVE THE MONEY TO GO TO SCHOOL OR ALSO I

14      WOULD HAVE ENOUGH MONEY TO OPEN UP A SALON.

15      Q.   I'D LIKE TO NOW ASK YOU ABOUT THE REST BREAKS AND THE MEAL

16      BREAKS WHILE YOU WERE WORKING AT BAY 101.

17           MS. DANG, AT BAY 101, WERE YOU ABLE TO TAKE ALL OF YOUR

18      10-MINUTE REST BREAKS?

19      A.   I WOULD HAVE TEN MINUTES AT THE BEGINNING OR THE END.

20      THAT'S IT.

21      Q.   SO ONCE A DAY?

22      A.   ONCE A DAY.

23      Q.   AND IS THAT DURING THE TIME AS A COOK OR BOTH AS A COOK

24      AND A SERVER?

25      A.   WHILE I WAS A COOK.

1    Q.   AND WHILE YOU WERE WORKING AS A COOK, WERE YOU ABLE TO

2    TAKE ALL OF YOUR 30-MINUTE LUNCH BREAKS?

3    A.   SOME DAYS, YES, AND SOME DAYS, NO.

4    Q.   AND WHY WERE YOU NOT ABLE TO DO THAT ON SOME DAYS?

5    A.   THERE WERE TOO MANY EMPLOYEES AND NOT ENOUGH TO DO THE

6    WORK.

7         WHEN I RAN OUT TO LOG IN AND LOG OUT, IT WAS JUST TO DO

8    THE LOG, I HAD TO RUN BACK AND WORK.

9    Q.   SO YOU'RE TALKING ABOUT HAVING TO CLOCK OUT FOR LUNCH?

10   A.   YES.

11   Q.   AND IS THAT SOMETHING THAT BAY 101 REQUIRED?

12   A.   YES, YOU HAVE TO FOLLOW THAT.

13   Q.   AND WHAT HAPPENS IF YOU DON'T CLOCK OUT AND CLOCK BACK IN

14   FOR LUNCH?

15   A.   AFTER THREE TIMES OF THAT, YOU WILL BE FIRED.

16   Q.   AND EVEN IF YOU'RE NOT ABLE TO TAKE A 30-MINUTE

17   UNINTERRUPTED LUNCH BREAK, ARE YOU STILL REQUIRED TO CLOCK OUT

18   AND CLOCK IN FOR LUNCH?

19   A.   CORRECT.

20   Q.   DID YOU EVER COMPLAIN ABOUT NOT BEING ABLE TO NOT TAKE

21   LUNCH BREAKS AND REST BREAKS TO A SUPERVISOR?

22   A.   YES.

23   Q.   AND TO WHICH SUPERVISOR?

24   A.   GEORGE.

25   Q.   AND DO YOU KNOW IF ANYTHING WAS DONE?

1    A.   THEY DIDN'T DO ANYTHING.  GEORGE SAID, HE SAID THAT EVEN

2    HE DIDN'T GET A BREAK OR LUNCH.

3    Q.   AND WHEN YOU WERE WORKING AS A COOK, HOW OFTEN DID YOU

4    HAVE TO MISS YOUR LUNCH?

5    A.   ON AVERAGE, TWO DAYS A WEEK.

6    Q.   DO YOU KNOW WHICH DAY OF THE WEEK OR WHICH DATES YOU WERE

7    NOT ABLE TO TAKE A LUNCH?

8    A.   IT'S BEEN SO LONG, I DON'T REMEMBER.

9    Q.   AND SO ON AVERAGE TWO DAYS A WEEK?

10   A.   CORRECT.

11   Q.   AND REST BREAKS WHILE YOU WERE WORKING AS A COOK, YOU SAID

12   THAT YOU MISSED AT LEAST ONE REST BREAK A DAY?

13   A.   CORRECT.

14   Q.   AND WHEN YOU WERE WORKING AS A SERVER, DID YOU GET TO TAKE

15   YOUR 10-MINUTE REST BREAKS?

16   A.   NEVER.

17   Q.   AND WHAT ABOUT LUNCH, WHEN YOU WERE WORKING AS A SERVER,

18   DID YOU GET TO TAKE YOUR LUNCH?

19   A.   YES.

20   Q.   AND WHEN YOU WERE WORKING AS A SERVER, DID YOUR SUPERVISOR

21   KNOW THAT YOU WERE NOT ABLE TO TAKE REST BREAKS?

22   A.   THEY KNEW BECAUSE IT'S BUSY AND WHILE I WAS WORKING,

23   SOMEONE ELSE WOULD BE TAKING A REST OR A LUNCH BREAK.

24        WHEN SOMEONE CAME BACK, I WOULD HAVE TO GO GET THE ORDERS

25   FOR THE CUSTOMERS.

1        DURING THE TIME THE OTHER ONE WAS GONE, I WOULD HAVE TO

2   TAKE CARE OF THE ORDERS FROM THE CUSTOMER.

3        AFTER THAT SOMEONE ELSE WOULD ALSO HAVE TO TAKE LUNCH SO I

4   COULD GO.

5   Q.   AND YOUR SUPERVISOR KNEW ABOUT IT?

6   A.   YES, HE KNEW.

7   Q.   NOW, WHEN YOU WERE AT BAY 101, BESIDES HAVING TO CLOCK OUT

8   FOR LUNCH, YOU HAD TO FILL OUT THE DAILY TRACKING SHEET, RIGHT?

9   A.   RIGHT.

10  Q.   AND WHICH I BELIEVE WE HAVE SEEN BEFORE.  THAT'S WHERE YOU

11  HAVE TO FILL IN THE TIME THAT YOU COME INTO WORK AND THE TIME

12  THAT YOU TAKE BREAKS AND LUNCHES, RIGHT?

13  A.   THAT'S CORRECT.

14  Q.   AND IS THAT SOMETHING THAT YOU WOULD DO ON A DAILY BASIS?

15  A.   AS SOON AS WE WALK IN, EVERYONE HAS TO WRITE DOWN THE

16  BREAK TIME.  EVERY DAY THIS HAPPENED.

17  Q.   SO EVEN WHEN YOU DON'T GET TO TAKE A BREAK OR LUNCH, DID

18  YOU STILL HAVE TO FILL IT OUT?

19  A.   THAT'S RIGHT.

20  Q.   AND WHY?

21  A.   IF YOU DON'T DO IT ON THE THIRD TIME, YOU WOULD BE FIRED.

22  Q.   AND DID YOUR SUPERVISOR KNOW THAT EMPLOYEES WERE FILLING

23  OUT THE DAILY TRACKING SHEET, EVEN THOUGH THEY DIDN'T GET TO

24  TAKE LUNCHES OR BREAKS?

25  A.   THEY KNEW.

1    Q.   AND IF I ASKED YOU HOW MANY BREAKS OR LUNCHES THAT YOU

2    MISSED DURING THE ENTIRE TIME THAT YOU WORKED AT BAY 101, WOULD

3    YOU BE ABLE TO TELL ME?

4    A.   I COULD.

5    Q.   COULD YOU LET ME KNOW AND DESCRIBE FOR ME HOW YOU KNOW?

6    A.   I DID NOT KNOW AT THAT TIME, BUT LATER I WAS ABLE TO LOOK

7    AT THE PAPERS THAT BAY 101 WROTE AND SO I SAW THE LOG IN AND

8    LOG OUT TIMES AND KNEW HOW MUCH I HAD LOST.

9    Q.   WITH RESPECT TO REST BREAKS AND LUNCH BREAKS, DO YOU KNOW

10   WHICH DATES YOU MISSED A LUNCH BREAK OR A REST BREAK?

11   A.   I ONLY SAW IT IN THE DOCUMENTS THAT WERE PRINTED, BUT AT

12   THE TIME I DID NOT KNOW.

13   Q.   BECAUSE YOU DIDN'T KEEP TRACK, RIGHT?

14   A.   CORRECT.

15   Q.   AND DID YOU EVER COMPLAIN HIGHER UP TO H.R. OR THE UNION

16   ABOUT NOT GETTING YOUR REST BREAKS OR LUNCH BREAKS?

17   A.   I DID NOT COMPLAIN.

18   Q.   WHY?

19   A.   I ONLY SPOKE TO GEORGE ABOUT THIS MATTER.  I DID NOT

20   COMPLAIN TO THE HIGHER UPPERS BECAUSE I DIDN'T KNOW.

21   Q.   YOU DIDN'T KNOW WHAT?

22   A.   I DID NOT KNOW THAT MY LUNCH BREAKS WERE LOST.  I DIDN'T

23   KNOW THAT.

24   Q.   I'M SORRY, YOUR HONOR.

25        I'M SORRY.  YOU WERE INTERRUPTED.

1          YOU SAID THAT YOU DIDN'T KNOW THAT YOU MISSED LUNCH OR

2     REST BREAKS?

3     A.   I DIDN'T KNOW THAT I HAD ALREADY LOST THAT TIME.

4     Q.   OKAY.  AND SO YOU DIDN'T COMPLAIN HIGHER?

5     A.   I DIDN'T.

6          THE COURT:  IT'S TIME TO BREAK FOR THE DAY UNLESS

7     YOU JUST HAVE A COUPLE MORE.

8          MS. NGUYEN:  WE CAN BREAK FOR THE DAY, YOUR HONOR.

9          THE COURT:  ALL RIGHT.  WE WILL BREAK FOR THE DAY

10    AND HAVE A GREAT REST OF THE AFTERNOON.

11         JURORS:  THANK YOU.

12     (JURY OUT AT 4:59 P.M.)

13         MS. NGUYEN:  I HAVE ONE SCHEDULING MATTER AND ONE

14    HAVING TO DO WITH EVIDENCE.

15         THE DEFENDANT WOULD LIKE TO PUT INTO EVIDENCE EXHIBIT 540,

16    WHICH IS THE TRANSCRIPT FROM THE AUDIO OF THE DEFENSE IME, AND

17    WE WOULD OBJECT TO THE TRANSCRIPT.

18         THEY HAVE THE AUDIO.  WE'RE NOT OBJECTING TO THE AUDIO,

19    BUT WE'RE OBJECTING TO THE TRANSCRIPT IN THAT IT'S -- THERE'S

20    NO AUTHENTICATION, THERE'S NO GUARANTEE OF ACCURACY WITH

21    RESPECT TO THE TRANSCRIPT.

22         SO THEY CAN USE THE AUDIO, BUT WE WOULD OBJECT TO THE

23    TRANSCRIPT.

24         MR. MCMANIS:  WELL, THIS COMES UP, AS WE KNOW, ALL

25    OF THE TIME.  WE CERTAINLY CAN AUTHENTICATE THE TRANSCRIPT IF

1    THAT'S A SERIOUS OBJECTION.

2        IT'S AN AID TO UNDERSTANDING.  I THINK IT'S A LOT EASIER

3    AND QUICKER FOR THE JURORS AND ALL CONCERNED IF YOU CAN

4    REFERENCE A TRANSCRIPT HAVING THE TAPE TO LISTEN.

5        AND I HAVE NO PROBLEM IF SHE WANTS TO PROPOSE AN

6    INSTRUCTION ABOUT THE TAPE IS THE EVIDENCE AND THE TRANSCRIPT

7    IS SIMPLY AN AID.

8            THE COURT:  WHAT IS THE REASON THAT THE JURORS NEED

9    TO -- WHAT IS THE REASON THAT THE JURORS, IF YOU'RE SUGGESTING

10   THAT THEY DO NEED TO HAVE THE TRANSCRIPT, OTHER THAN WHEN THE

11   WITNESS IS TESTIFYING?

12           MR. MCMANIS:  WELL, THE TAPE IS GOING IN AND IT'S AN

13   INTERVIEW OF MS. DANG.  IT COMES IN AS AN ADMISSION OF A PARTY

14   OPPONENT.

15       AND THE TRANSCRIPT IS SIMPLY AN ACCURATE STATEMENT SO THAT

16   YOU CAN REFERENCE THE TRANSCRIPT WITHOUT LOOKING AT THE --

17   HAVING TO LISTEN TO THE WHOLE TAPE, FIND IT ON THE TAPE,

18   OPERATE THE TAPE RECORDER.

19       THOSE ARE THE KINDS OF THINGS THAT I THINK USUALLY ARE THE

20   REASONS FOR TRANSCRIPTS.

21           THE COURT:  HOW LONG IS THE TRANSCRIPT?

22           MR. MCMANIS:  I DON'T KNOW.

23   DO YOU KNOW, CINDY?

24           MS. MCCLELLAN:  OVER EIGHT HOURS.

25           MR. MCMANIS:  THE INTERVIEW TAPE ITSELF, THE

1    AUDIOTAPE I'M TOLD IS OVER EIGHT HOURS.  I DON'T KNOW HOW MANY

2    PAGES OF THE TRANSCRIPT.

3              MS. NGUYEN:  118 IS THE ONE THAT YOU HAVE HERE.

4              THE COURT:  ARE THERE PARTICULAR PORTIONS YOU WANT

5    IN?

6              MR. MCMANIS:  WE MAY.  AND IT MAY BECOME A MOOT

7    QUESTION.  I DON'T WANT TO BURDEN THE RECORD OR THE JURY OR THE

8    COURT OR ANYBODY ELSE WITH IT, BUT SHE'S NOW BRINGING THIS UP

9    FOR THE FIRST TIME THAT I'M HEARING ABOUT IT AT LEAST, AND I'M

10   TRYING TO RESPOND AS BEST I CAN.

11             MS. NGUYEN:  ACTUALLY, YOUR HONOR, WE DID ASSERT THE

12   OBJECTIONS IN OUR RESPONSES TO THEIR EXHIBIT LIST.  IT'S JUST

13   TODAY WE'RE BEING PROVIDED WITH A COPY OF THE EXHIBIT AS IF

14   DEFENSE COUNSEL IS TRYING OR IS PLANNING TO BRING IT IN.

15        SO THAT'S WHY WE'RE JUST REASSERTING THE OBJECTION NOW.

16             THE COURT:  OKAY.  AND WHAT ARE THE OTHER MATTERS

17   YOU HAVE?

18             MS. NGUYEN:  THERE WAS A MOTION IN LIMINE RULING

19   YOUR HONOR MADE WITH RESPECT TO DR. BERG, AND THAT'S OUR

20   PSYCHOLOGIST, NOT BEING ABLE TO COMMENT ON THE QUALITY OF

21   MS. EDMAN'S REPORT.

22        WHEN WE FILED OUR OPPOSITION TO THAT MOTION IN LIMINE, WE

23   ALSO ASKED THAT IF YOUR HONOR WAS GOING TO MAKE THAT ORDER WITH

24   RESPECT TO DR. BERG, THAT IT WOULD APPLY EQUALLY TO DR. LIPIAN,

25   WHO IS THEIR IME EXPERT, BECAUSE DR. LIPIAN IN HIS REPORT AS

1    WELL AS HIS DEPOSITION ALSO COMMENTED ON THE QUALITY OF

2    MS. EDMAN'S REPORT.

3         SO IF MS. -- IF DR. BERG IS BEING PRECLUDED IN THAT

4    RESPECT, THEN WE HAVE REQUESTED THAT DR. LIPIAN BE SIMILARLY

5    PRECLUDED, BUT YOUR ORDER DID NOT STATE THAT.  SO WE'RE JUST

6    TRYING TO GET INTO CLARIFICATION BECAUSE WE ARE GETTING INTO

7    THE EXPERT'S TESTIMONY NOW.

8         MR. MCMANIS:  WELL, AGAIN, THIS IS THE FIRST I'VE

9    HEARD THAT WE'RE GOING TO REVISIT THE ORDERS ON MOTIONS IN

10   LIMINE.

11        WE'RE CERTAINLY NOT GOING TO BE CALLING DR. LIPIAN THIS

12   WEEK, AND MY INITIAL THOUGHT IS THAT PROBABLY NEITHER DOCTOR

13   SHOULD BE COMMENTING ON DR. EDMAN'S REPORT, BUT I HAVE LISTENED

14   CAREFULLY TO MY FRIEND'S ARGUMENT AND I'LL TAKE A LOOK AT THAT

15   AND I'LL ASK THAT THE COURT DEFER ON THAT.

16        THE COURT:  ALL RIGHT.  IT WOULD STRIKE ME, AND I

17   HAVEN'T LOOKED BACK AT THAT IN LIMINE MOTION EITHER, THAT THE

18   OBJECTION THAT I THINK I HAD WAS THAT THE DOCTOR DID NOT REALLY

19   HAVE A FOUNDATION TO EXPRESS AN OPINION AS TO WHETHER OR NOT

20   THE REPORT WAS WELL DONE OR MAYBE I SHOULD WAIT AND LOOK.

21        BUT IT WOULD STRIKE ME, IF THAT WAS THE BASIC REASONING I

22   HAD IT WOULD APPLY TO BOTH, BUT LET'S TAKE A LOOK AT IT.

23        MS. NGUYEN:  YOUR HONOR'S ORDER SAYS THAT DR. BERG

24   WOULD BE ABLE TO TESTIFY REGARDING WHAT MS. DANG REPORTED TO

25   HIM ON HOW SHE FELT WITH RESPECT TO THE INVESTIGATION, BUT, OF

1    COURSE, HE DIDN'T HAVE THE EXPERTISE TO BE ABLE TO COMMENT ON

2    THE QUALITY OF HER INVESTIGATION, AND WE MADE THE SAME ARGUMENT

3    WITH RESPECT TO DR. LIPIAN.

4            THE COURT:  THAT STRIKES ME AS RIGHT, BUT LET'S TAKE

5    A LOOK AND CONFIRM THAT.

6            MR. MCMANIS:  THAT SOUNDS FAMILIAR, BUT I WOULD LIKE

7    TO LOOK AT IT.

8            THE COURT:  THAT'S FINE.

9            MS. NGUYEN:  AND THEN JUST THE LAST THING IT HAS TO

10   DO WITH SCHEDULING IN THAT I HAVE MY MANAGEMENT EXPERT, SHE

11   WON'T BE ABLE TO COME IN BECAUSE SHE'S OUT OF TOWN UNTIL NEXT

12   MONDAY, BUT I ANTICIPATE FINISHING UP WITH OUR CASE BY PROBABLY

13   END OF WEDNESDAY OR THURSDAY.

14       SO I JUST WANTED TO -- I'VE ALERTED COUNSEL TO IT AND I

15   JUST WANTED TO ALERT THE COURT TO THAT, THAT WE MIGHT HAVE TO

16   HAVE THE DEFENSE START WITH THEIR CASE AND THEN MY MANAGEMENT

17   EXPERT WILL COME IN ON MONDAY MORNING.

18           THE COURT:  NOT MONDAY MORNING.

19           MS. NGUYEN:  MONDAY AFTERNOON AT 1:00 O'CLOCK,

20   SORRY, BUT MONDAY.

21           THE COURT:  WELL, WHY DON'T WE SEE WHERE WE ARE AT

22   THE TIME.

23           MR. MCMANIS:  YEAH, I THINK THAT'S A SENSIBLE

24   SUGGESTION.

25       I'M NOT NECESSARILY OPPOSED OR AGREEING TO IT, I JUST NEED

1     TO SEE HOW THE CASE UNFOLDS.

2              THE COURT:  OKAY.  GETTING BACK, WHAT WAS THE FIRST

3     ISSUE THAT YOU RAISED?

4              MS. NGUYEN:  THAT WAS THE TRANSCRIPT FROM

5     DR. LIPIAN'S IME AND THE AUDIO THAT THEY HAVE.

6         WE DON'T HAVE AN OBJECTION TO THE AUDIO ITSELF.

7              THE COURT:  HE'S NOT GOING TO TESTIFY UNTIL --

8              MS. NGUYEN:  -- PROBABLY NOT UNTIL NEXT WEEK.

9         WOULD YOU LIKE US TO SUBMIT SOMETHING IN WRITING?

10             THE COURT:  I WOULD REALLY PREFER TO WAIT AND SEE IF

11    MR. MCMANIS OR THE DEFENSE HAS AN OBJECTION OR WANTS TO

12    INTRODUCE THE ENTIRE TRANSCRIPT BECAUSE IT STRIKES ME AS

13    PROBABLY THERE'S ONLY GOING TO BE A PORTION OF IT THAT IS

14    SOUGHT TO BE INTRODUCED AND MAYBE WE CAN SAVE EVERYBODY SOME

15    TIME BY WAITING A COUPLE OF DAYS AND SEEING WHERE HE IS ON

16    THAT.

17             MS. NGUYEN:  OKAY.

18             MR. MCMANIS:  THAT'S FINE.

19             MS. NGUYEN:  YEAH, WE CAN MEET AND CONFER.

20             THE COURT:  YEAH, BECAUSE PART OF MY CONCERN IS NOT

21    SO MUCH OF ADMISSIBILITY AS JUST GIVING THE JURY A LENGTHY

22    TRANSCRIPT IS NOT GOING TO BE THAT HELPFUL TO THEM AND IF

23    EITHER ADD A TABLE OF CONTENTS THAT SOME WAY IS ADDRESSED OR

24    WHAT THE DEFENSE WANTED TO OFFER FROM IT OR THE DEFENSE JUST

25    HAD A TRANSCRIPT OF A CERTAIN PORTION OF IT, THAT'S A DIFFERENT

1    QUESTION AND IT MIGHT MAKE MORE SENSE.

2              MR. MCMANIS:  FINE.

3              THE COURT:  OKAY.  THANK YOU.

4              MR. MCMANIS:  THANK YOU.

5              THE COURT:  ANYTHING ELSE?

6              MS. NGUYEN:  THAT'S IT, YOUR HONOR.

7              THE COURT:  SO WHAT IS THE SCHEDULE FOR TOMORROW?

8              MS. NGUYEN:  SO TOMORROW WE HAVE MR. SUMMERS --

9    WE'LL FINISH UP WITH MS. DANG.  I'M NOT SURE HOW LONG THE

10   CROSS-EXAMINATION IS GOING TO BE, BUT I HAVE DR. MASON WHO HAS

11   TO COME IN TOMORROW AT 10:00 O'CLOCK BECAUSE HE'S ALSO FLYING

12   OUT OF TOWN FOR HIS KID'S GRADUATION.

13        SO WE'LL HAVE TO FIT HIM IN AT 10:00.  THAT'S OUR

14   ECONOMIST EXPERT.  AND THEN MS. DANG CAN BE FINISHED UP.

15        AND IF WE HAVE TIME, MR. SUMMERS WILL GO.  THAT'S HER

16   HUSBAND.

17             THE COURT:  OKAY.

18             MR. MCMANIS:  MAY I ASK THROUGH THE COURT FOR MY OWN

19   GUIDANCE, HOW MUCH MORE WE MIGHT BE HAVING WITH THE PLAINTIFF

20   AT THIS POINT?

21             THE COURT:  HOW MUCH MORE DIRECT DO YOU HAVE?

22             MS. NGUYEN:  NO MORE THAN 30 MINUTES, YOUR HONOR.

23             MR. MCMANIS:  FINE.  THANK YOU.

24             THE COURT:  THANK YOU.

25             (COURT CONCLUDED AT 5:09 P.M.)

1

2

3                              <u>CERTIFICATE OF REPORTER</u>

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16                         _____
                           IRENE RODRIGUEZ, CSR, CRR
                           CERTIFICATE NUMBER 8076
17

18
                           DATED:  MAY 6, 2013
19

20

21

22

23

24

25