1          UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                  SAN JOSE DIVISION

3

     CUC DANG,
4
            PLAINTIFF,          CASE NO.  CV-10-02181-RMW
5
       VS.                      SAN JOSE, CALIFORNIA
6
     SUTTER'S PLACE, INC., DBA BAY    MAY 7, 2013
7    101 OR BAY 101 CASINO, UNITE
     HERE! LOCAL 19, AND DOES 1       VOLUME 5
8    THROUGH 20, INCLUSIVE,
                                PAGES 569 - 679
9            DEFENDANTS.

10

11               TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE RONALD M. WHYTE
12     UNITED STATES DISTRICT JUDGE AND A JURY

13            A-P-P-E-A-R-A-N-C-E-S

14    FOR THE PLAINTIFF:   ROBINSON & WOOD, INC.
                        BY:   ANN A.P. NGUYEN
15                      227 NORTH FIRST STREET
                        SAN JOSE, CALIFORNIA 95113
16
     ALSO PRESENT:        ANDRE THOMAS
17
     FOR THE DEFENDANTS:  MCMANIS FAULKNER
18                      BY:   JAMES MCMANIS
                              JENNIFER MURAKAMI
19                      FAIRMONT PLAZA
                        10TH FLOOR
20                      50 W. SAN FERNANDO STREET
                        SAN JOSE, CALIFORNIA 95113
21
     ALSO PRESENT:        CINDY MCCLELEN
22
     OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, CRR
23                            CERTIFICATE NUMBER 8074

24
        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
25          TRANSCRIPT PRODUCED WITH COMPUTER

1

2                        <u>INDEX OF PROCEEDINGS</u>

3       FOR THE PLAINTIFF'S:

4       **CUC DANG**
             DIRECT EXAM BY MS. NGUYEN (RESUMED)      P. 572
5            CROSS-EXAM BY MR. MCMANIS                P. 582, 614

6       **PATRICK MASON**
             DIRECT EXAM BY MS. NGUYEN               P. 598
7            CROSS-EXAM BY MR. MCMANIS               P. 612

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        <u>INDEX OF EXHIBITS</u>

3

4                              IDENT.        EVIDENCE

5    PLAINTIFF'S:

6    33                                       574
     26                                       599
7    35 & 36                                  607

8

     DEFENDANTS':
9
     561                          664         665
10   562                          666
     563 & 564                    670         671
11   519                                      673

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SAN JOSE, CALIFORNIA                    MAY 7, 2013

2               P R O C E E D I N G S

3         (COURT CONVENED AND JURY PRESENT.)

4              THE COURT:  ARE WE ALL SET?

5              MS. NGUYEN:  ARE YOU READY TO RESUME?

6              THE COURT:  YES.

7              MS. NGUYEN:  THANK YOU, YOUR HONOR.

8         **(PLAINTIFF CUC DANG WAS PREVIOUSLY SWORN.)**

9                   **DIRECT EXAMINATION** (RESUMED)

10   BY MS. NGUYEN:

11   Q.   GOOD MORNING, MS. DANG.

12   A.   GOOD MORNING.

13   Q.   YESTERDAY WHEN WE LEFT OFF I WAS ASKING YOU ABOUT REST

14   BREAKS AND LUNCH BREAKS, AND I'D LIKE TO FINISH UP WITH THAT

15   AREA RIGHT NOW.

16        MS. DANG, DO YOU KNOW HOW MANY WEEKS YOU WORKED AT BAY 101

17   AS A COOK?

18   A.   ONE THIRTY WEEKS.

19   Q.   AND HOW MANY WEEKS DID YOU WORK AT BAY 101 AS A SERVER?

20   A.   THIRTY-SIX WEEKS.

21   Q.   AND HOW MANY REST BREAKS DID YOU MISS AS A COOK?

22   A.   ONE BREAK.

23   Q.   ONE BREAK A DAY THAT YOU MISSED?

24   A.   ONE BREAK A DAY.

25   Q.   AND WHEN YOU WERE A SERVER, HOW MANY BREAKS A DAY DID YOU

1    MISS?

2    A.   I MISSED TWO BREAKS.

3    Q.   AND WHEN YOU WERE WORKING AT BAY 101, ON AVERAGE HOW MANY

4    DAYS A WEEK DID YOU WORK?

5    A.   I WORKED FIVE DAYS A WEEK, BUT I MISSED TWO DAYS WITHOUT

6    LUNCH AS A COOK.

7    Q.   SO AS A COOK YOU MISSED TWO DAYS A WEEK WITHOUT LUNCH; IS

8    THAT RIGHT?

9    A.   YES.

10   Q.   AND WHEN YOU WERE A SERVER, DID YOU HAVE TO MISS ANY

11   LUNCH?

12   A.   YEAH, I HAVE LUNCH EVERY DAY.

13   Q.   AND WHEN YOU WERE A SERVER, DID YOU EVER VOLUNTARILY GIVE

14   UP YOUR BREAK?

15   A.   NO.

16   Q.   I'D LIKE YOU TO TAKE A LOOK NOW AT EXHIBIT 33.  MS. DANG,

17   HAVE YOU SEEN THAT BEFORE?

18   A.   NO.

19   Q.   DO YOU KNOW WHAT THAT IS?

20   A.   OKAY.  THIS IS A PAPER THAT BAY 101 SENT OUT FOR EMPLOYEES

21   TO KNOW THAT THE TIME THAT THEY PUNCH IN AND THE TIME THEY

22   PUNCH OUT AND THE TIME THAT THEY HAVE LUNCH.

23   Q.   AND YOU HAVE SEEN THAT BEFORE TODAY, HAVEN'T YOU?

24   A.   YES.

25        MS. NGUYEN:  YOUR HONOR, WE MOVE TO HAVE THAT

1    ADMITTED INTO EVIDENCE.

2              MR. MCMANIS:  NO OBJECTION.

3              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

4         (PLAINTIFF'S EXHIBIT 33 WAS RECEIVED IN EVIDENCE.)

5              MS. NGUYEN:  SCROLL DOWN, ANDRE.  YES.  OKAY.

6    Q.   MS. DANG, THERE'S A COLUMN, AND IT'S THE THIRD AND THE

7    FOURTH COLUMNS FROM THE LEFT, OR I'M SORRY, FROM THE RIGHT.

8         DO YOU SEE THAT?

9    A.   YES.

10   Q.   AND DO YOU KNOW WHAT THOSE COLUMNS SHOW?

11   A.   THE TIME THEY SHOW THAT I HAVE LUNCH, BUT ACTUALLY I DON'T

12   HAVE LUNCH.  SO BY DEDUCING THAT TIME I DON'T HAVE OVERTIME.

13   Q.   SO LET ME ASK IT THIS WAY, YOU SAID EARLIER WHEN YOU WERE

14   WORKING AS A COOK YOU MISSED TWO LUNCHES A WEEK, RIGHT?

15   A.   THAT'S CORRECT.

16   Q.   AND DURING THOSE TIMES, DID YOU STILL HAVE TO CLOCK OUT?

17   A.   YES.

18   Q.   AND WHEN YOU CLOCKED OUT, YOU DIDN'T GET PAID FOR THE TIME

19   THAT YOU DIDN'T WORK, RIGHT?

20   A.   THAT'S CORRECT.

21   Q.   SO IF THOSE TIMES WOULD HAVE BEEN INCLUDED IN THE TIMES

22   THAT YOU WORK, WOULD YOU HAVE WORKED MORE THAN EIGHT HOURS A

23   DAY?

24   A.   THAT'S CORRECT.

25   Q.   AND WHEN YOU WERE WORKING AT BAY 101, DID YOU WORK MORE

1    THAN 40 HOURS A WEEK A LOT OF TIMES?

2    A.    THAT'S CORRECT.

3    Q.    AND, MS. DANG, HAVE YOU CALCULATED TO HAVE AN ESTIMATE OF

4    HOW MUCH OVERTIME YOU BELIEVE THAT BAY 101 OWES TO YOU FOR THE

5    MISSED BREAKS?

6          I'M SORRY.  FOR THE MISSED LUNCH?

7    A.    ON AVERAGE I LOST 60 MINUTES A WEEK.

8    Q.    AND WHEN YOU WERE STILL WORKING AT BAY 101, MS. DANG, DID

9    YOU EVER COMPLAIN ABOUT MISSING OUT ON THE OVERTIME?

10   A.    PREVIOUSLY I DIDN'T KNOW SO I DIDN'T COMPLAIN ABOUT THAT.

11   Q.    ALL RIGHT.  LET ME ASK YOU SOME QUESTIONS ABOUT THE JOB

12   SEARCH THAT YOU CONDUCTED AFTER LEAVING BAY 101.

13         DO YOU KNOW HOW MANY PLACES YOU HAVE MADE INQUIRIES TO FOR

14   A JOB?

15   A.    AROUND OVER 100 PLACES.

16   Q.    AND DID YOU HAVE DIFFICULTIES WHEN YOU WENT TO LOOK FOR A

17   JOB?

18   A.    YES.

19   Q.    WHAT KIND OF DIFFICULTIES?

20   A.    BECAUSE THE EMPLOYEE ASK ME WHERE DID I WORK AND WHY DID I

21   STOP WORKING.  AND I TOLD THEM THAT I WORKED AT CASINO 101 AND

22   THEN I WAS TERMINATED.

23         SO IT WAS DIFFICULT FOR ME.  IT'S NOT EASY FOR ME TO FIND

24   A JOB WITH THAT BACKGROUND BECAUSE THEY FOUND OUT I WAS FIRED

25   AND THEY DIDN'T WANT TO HIRE ME.

1    Q.   AND BESIDES THAT DIFFICULTY, DID YOU HAVE ANY OTHER

2    DIFFICULTIES WHEN YOU STARTED LOOKING FOR A JOB?

3    A.   YES.

4    Q.   PLEASE TELL US.

5    A.   YES, LIKE SOMETIMES I FEEL LIKE I'M NOT WELL ENOUGH.  I

6    FEEL TIRED AND BECAUSE OF MY DEPRESSION IT MAKES ME, LIKE, NOT

7    STRONG ENOUGH, NOT WELL ENOUGH, AND NOT EAGER ENOUGH TO LOOK

8    FOR A JOB.

9    Q.   NOW, YESTERDAY, MS. DANG, YOU TALKED ABOUT HOW YOU FELT

10   SORRY FOR LUCIO AND THAT WAS THE REASON THAT YOU AGREED NOT TO

11   CALL THE POLICE OR REPORT HIS INTRUSION INTO YOUR HOUSE.

12        AND SOME TIME LATER DID YOU TELL BAY 101 MANAGEMENT ABOUT

13   LUCIO COMING INTO YOUR HOUSE?

14   A.   YES, I DID.

15   Q.   DID YOU TELL THEM THAT LUCIO SUAREZ WAS HARASSING YOU

16   OUTSIDE OF WORK?

17   A.   YES, I DID.

18   Q.   AND DID THEY DO ANYTHING TO HELP YOU?

19   A.   THEY TOLD ME THAT IF THE INCIDENT HAPPENED AGAIN, I CAN

20   CALL THE POLICE MYSELF BECAUSE THAT DOESN'T BELONG TO BAY 101.

21   Q.   NOW, YOU WORKED AT BAY 101 FOR OVER THREE YEARS.  IN THOSE

22   THREE PLUS YEARS WERE JOHN ST. CROIX AND NICK ORTEGA HARDER ON

23   YOU THAN THE OTHER EMPLOYEES?

24   A.   YES.

25   Q.   AND WHY DO YOU THINK THAT THEY WERE HARDER ON YOU?

1    A.   I SAID TO MYSELF HE TREATED ME LIKE MORE HARDER THAN

2    OTHERS.

3    Q.   DO YOU KNOW WHY?

4    A.   BECAUSE I COMPLAINED TO THEM A LOT SO THEY INTEND TO FIRE

5    ME AND THEY WANTED TO CAUSE TROUBLE FOR ME.

6    Q.   YOU THINK THAT THEY WANTED TO GET RID OF YOU?

7    A.   YEAH, YEAH, THAT'S WHAT MAMA AHN TOLD ME.  SHE SAID THAT

8    THEY WOULD FIRE ME, BUT I KNOW THAT SHE WOULD NOT ADMIT WHAT

9    SHE SAID BECAUSE SHE'S STILL WORKING THERE.

10   Q.   AND, MS. DANG, DID YOU COMPLAIN TOO MUCH?

11   A.   NO, IT'S NOT THAT I COMPLAIN TOO MUCH BUT BECAUSE THEY

12   CAUSE ME TOO MUCH TROUBLE.  I JUST WANT THEM -- TO DO MY JOB

13   WELL, BUT THEY KEEP CAUSING TROUBLE TO ME AND THEY DID NOT

14   LEAVE ME ALONE FOR ME TO DO MY JOB.

15   Q.   AND MR. ST. CROIX DIED IN NOVEMBER OF 2007.  DO YOU

16   REMEMBER THAT?

17   A.   YES, I DID.

18   Q.   AND AFTER THAT DID NICK ORTEGA CONTINUE TO GIVE YOU

19   PROBLEMS?

20   A.   YES.

21   Q.   AND I KNOW YESTERDAY YOU TOLD US OF SOME OF THE WAYS THAT

22   THEY MADE IT DIFFICULT FOR YOU.

23        WERE THERE OTHER WAYS THAT YOUR LIFE WAS MADE DIFFICULT AT

24   BAY 101 THAT YOU HAVEN'T TOLD US ABOUT?

25   A.   YES.

1    Q.   AND WHICH OTHER WAYS?

2    A.   OKAY.  YOU KNOW THERE WAS DISCRIMINATION ABOUT SEX OF MALE

3    AND FEMALE EMPLOYEES.  IF A MALE EMPLOYEE TOOK THE STEAKS,

4    NOTHING HAPPENED.  BUT WHEN I TOOK MY MEAL OUT TO HAVE TO EAT,

5    YOU KNOW, AND THEN MR. -- A GENTLEMAN -- I'M SORRY -- NICK CAME

6    OVER AND HE STIR MY FOOD.  AND WHEN I CAME BACK AND I ASKED

7    HIM, I ASKED HIM WHY HE DID IT.  HE SAID THAT HE WANTED TO SEE

8    WHAT IS IN MY MEAL.

9    Q.   SO AS EMPLOYEES AT BAY 101, WERE YOU ALLOWED TO EAT FROM

10   AN EMPLOYEE MENU?

11   A.   JUST THE FOOD FOR EMPLOYEES ONLY.

12   Q.   AND WHEN YOU SAID THAT SOME OF THE MEN WERE ABLE TO TAKE

13   FOOD, WAS IT NOT FROM THE EMPLOYEE MENU?

14   A.   THAT'S CORRECT.

15   Q.   AND MR. ORTEGA WAS CHECKING THE FOOD YOU WERE EATING ON

16   YOUR LUNCH BREAK?

17   A.   THAT'S CORRECT.

18   Q.   DID HE DO THAT TO ANY OF THE MEN?

19   A.   ALL OF THE MALE EMPLOYEES IN AMERICAN CUISINE, HE DIDN'T

20   SAY ANYTHING ABOUT THEM.  ONLY THE FEMALE EMPLOYEES IN THE

21   VIETNAMESE IS ACCUSING.

22   Q.   AND ANY OTHER WAYS IN WHICH MR. ORTEGA MADE YOUR LIFE

23   DIFFICULT?

24   A.   ONCE I MET THE CUSTOMER, AND THEY TOLD ME NOT TO ASK IF I

25   WAS HIS GIRLFRIEND.

1    Q.   AND WHAT DID YOU HAVE TO DO ABOUT THAT?

2              THE INTERPRETER:  I'M SORRY, YOUR HONOR.  THE

3    INTERPRETER DOES NOT UNDERSTAND WHAT IS IT.

4              THE COURT:  JUST ASK HER TO REPEAT HER ANSWER TO

5    YOU.

6              THE INTERPRETER:  CAN YOU REPEAT THE QUESTION.

7    BY MS. NGUYEN:

8    Q.   I ASKED WHAT YOU DID WHEN YOU FOUND OUT WHAT LINDA SAID TO

9    THE CUSTOMER AND CALLED YOU HIS GIRLFRIEND?

10   A.   I TOLD THE CUSTOMER THAT I DIDN'T WANT TO MAKE HIM SAD,

11   BUT LET ME GO INSIDE AND TALK WITH LINDA -- TALK WITH NICK.

12   Q.   AND WHAT DID YOU TALK TO MR. ORTEGA ABOUT?

13   A.   I TOLD NICK WHEN I MET HIM THAT IT DIDN'T HAPPEN LIKE

14   THAT, AND I WANT HIM TO TELL LINDA NOT TO TELL THE CUSTOMER

15   LIKE THAT.

16        AND ANYTHING CALLED JENNIFER.  I DIDN'T KNOW WHAT THEY

17   WERE TALKING ABOUT, AND I JUST HEARD THAT AND NICK LAUGHED WHEN

18   HE WAS TALKING.

19        AND THEN AFTER THAT HE TOLD ME JUST TO GO OUT, AND HE

20   DIDN'T ASK ANYTHING ABOUT LINDA.  AND THAT HURT ME A LOT.

21   Q.   SO HE DIDN'T RESOLVE THAT PROBLEM FOR YOU?

22   A.   THAT'S CORRECT.

23   Q.   ANY OTHER WAYS IN WHICH YOUR LIFE WAS MADE DIFFICULT AT

24   WORK?

25   A.   THERE WAS A LOT AND NOW I CANNOT REMEMBER.

1    Q.   YOU SAID, MS. DANG, THAT THE WAY BAY 101 TERMINATED YOU

2    MADE YOU VERY SAD.  DID IT ALSO MAKE YOU ANGRY?

3    A.   YES, VERY SAD AND VERY UPSET.

4    Q.   MS. DANG.  HOLD ON.  LET THE INTERPRETER INTERPRET FOR

5    YOU.  I'M SORRY TO INTERRUPT.

6         WE DON'T WANT TO MAKE HIS LIFE MORE DIFFICULT?

7    A.   THERE WAS A MEETING.  AND THEY SAID THAT I LEFT THE

8    MEETING ON MY OWN WILL, BUT ACTUALLY THE NIGHT BEFORE I WORKED

9    FROM 11:00 P.M. TO 7:00 A.M. IN THE MORNING.  AND THE MEETING

10   IS AT 10:00 A.M. AND IT LASTED UNTIL 1:00 P.M. -- 1:30 P.M.

11        AT THAT TIME I WAS SO TIRED, I WAS SO HUNGRY AND I DIDN'T

12   HAVE WATER TO DRINK AND ALSO I FELL SLEEPY AND SO TIRED BECAUSE

13   THE MEETING -- BECAUSE I HAVE TO, LIKE, STAY WORKING AND AT THE

14   MEETING FOR TOO LONG, AND I ALMOST FELL AND FAINTED.  AND

15   THAT'S WHY I TOLD JENNIFER THAT I HAD TO LEAVE.

16             MR. MCMANIS:  EXCUSE ME.  WITH GREAT RESPECT, THIS

17   IS CUMULATIVE, AND WE WENT OVER ALL OF THIS YESTERDAY.

18             THE COURT:  THIS WAS GONE OVER YESTERDAY.

19             MS. NGUYEN:  YES.  I WAS ASKING A DIFFERENT

20   QUESTION.

21   Q.   MS. DANG, I WAS ASKING YOU ABOUT THE TERMINATION.  CAN YOU

22   PLEASE TELL US AFTER THE TERMINATION, DID YOU WORRY ABOUT

23   EARNING A LIVING?

24   A.   YES, I DID.

25   Q.   BECAUSE BEFORE YOU WERE TERMINATED, YOU HAD BEEN WORKING

1    MOST OF YOUR LIFE, RIGHT?

2    A.   THAT'S CORRECT.

3    Q.   AND WERE YOU WORRIED ABOUT YOUR FRIENDS AND YOUR

4    COWORKERS, HOW THEY THOUGHT ABOUT IT?

5              MR. MCMANIS:  OBJECTION, LEADING.

6              THE COURT:  SUSTAINED.

7    BY MS. NGUYEN:

8    Q.   AFTER THE TERMINATION, DID YOUR FRIENDS KNOW THAT YOU HAD

9    BEEN FIRED FROM BAY 101?

10   A.   I DIDN'T KNOW BECAUSE I RARELY CONDUCTED WITH MY FRIENDS

11   ABOUT THAT.

12   Q.   WERE YOU WORRIED ABOUT WHAT YOUR COWORKERS THOUGHT ABOUT

13   YOUR TERMINATION?

14             MR. MCMANIS:  OBJECTION, LEADING.

15             THE COURT:  SUSTAINED.

16   BY MS. NGUYEN:

17   Q.   DID YOU TALK TO ANY OF YOUR COWORKERS AT BAY 101 AFTER YOU

18   WERE TERMINATED?

19   A.   NO.

20   Q.   NOW, MS. DANG, IN TERMS OF YOUR MENTAL HEALTH NOW, COULD

21   YOU PLEASE TELL US HOW YOU'RE DOING NOW?

22   A.   NOW I FEEL HAPPY AND MUCH BETTER BECAUSE I HAVE A JOB AND

23   I STUDY, TOO.  I HAVE FRIENDS AND I FEEL MUCH BETTER.

24        BUT IN MY SLEEPING, I STILL HAVE NIGHTMARES.

25   Q.   YOU SAID YOU'RE STUDYING.  ARE YOU TAKING CLASSES?

1    A.    YES.

2    Q.    AND WHAT KIND OF CLASSES ARE YOU TAKING?

3    A.    ESL.

4    Q.    AND ARE YOU STILL ON MEDICATIONS FOR DEPRESSION, MS. DANG?

5    A.    THAT'S CORRECT.

6          MS. NGUYEN:  THAT'S ALL OF THE QUESTIONS I HAVE FOR

7    THIS WITNESS, YOUR HONOR.

8          THE COURT:  ALL RIGHT.  MR. MCMANIS, DO YOU HAVE

9    SOME QUESTIONS?

10         MR. MCMANIS:  THANK YOU, YOUR HONOR.

11                        **CROSS-EXAMINATION**

12   BY MR. MCMANIS:

13   Q.    GOOD MORNING, MS. DANG.

14   A.    GOOD MORNING.

15   Q.    YOU AND I NEVER MET BEFORE THIS TRIAL; IS THAT CORRECT?

16   A.    THAT'S CORRECT.

17   Q.    YOUR LAWYER MENTIONED THAT AND MENTIONED YOUR MEDICATIONS.

18   ARE YOU TAKING MEDICATIONS TODAY?

19   A.    NOT YET.  USUALLY I TAKE THE MEDICATION AT NIGHT.

20   Q.    FINE.  DID YOU TAKE IT LAST NIGHT?

21   A.    YES.

22   Q.    DO YOU FIND THAT THE MEDICATIONS HELP?

23   A.    OKAY.

24   Q.    NOW, I WANT TO GO BACK TO THE BEGINNING WHEN YOU FIRST

25   BROUGHT THESE PROBLEMS WITH LUCIO TO THE ATTENTION OF

1    MANAGEMENT.

2         AND I'D LIKE YOU TO TAKE A LOOK AT EXHIBIT 1011.

3         AND, CINDY, IF YOU WOULD PUT THAT UP, PLEASE.  WOULD YOU

4    BLOW THAT UP, PLEASE.

5         NOW, MS. DANG, DO YOU HAVE THAT IN FRONT OF YOU, MA'AM?

6    A.   NO, NOT YET.

7    Q.   I'M SORRY?  NO, NOT YET?

8    A.   NOT YET.  OKAY.  I'VE GOT IT.

9    Q.   NOW, THIS REPORT THAT WE HAVE IN EVIDENCE REFERS TO A BAY

10   101 COOK THI MINH CUC DANG.

11        IS THAT YOU?

12   A.   THAT'S CORRECT.

13   Q.   AND CAME TO THE SECURITY OFFICE ON APRIL 12, 2007, TO FILE

14   A COMPLAINT AGAINST COOK LUCIO SUAREZ.

15        DO YOU RECALL GOING TO THE OFFICE?

16   A.   YES, THAT'S CORRECT.

17   Q.   AND IT MENTIONS PHONE CALLS ON APRIL 12TH, THAT MR. SUAREZ

18   WAS BOTHERING BY THE LINE COOK AREA, HE BECAME IRATE AND OPENED

19   THE METAL DOOR IN AN UNSAFE MANNER AND IT HIT THE BACK OF YOUR

20   RIGHT FOOT.

21        DID YOU TELL THE SECURITY PERSONNEL THAT?

22   A.   YES, I DID.

23   Q.   AND IS THERE A SECOND PAGE TO THIS EXHIBIT?  LET'S JUST

24   SEE.  I WANT TO SEE IF WE CAN HAVE THE COMPLETE PAGE HERE.

25        I HAVE TO WAIT FOR MS. DANG'S OTHER INFORMATION.

1          NOW, YESTERDAY YOU TOLD US THAT MR. SUAREZ HAD THROWN A

2     GLASS OF WATER IN YOUR FACE.

3          DO YOU REMEMBER THAT?

4     A.   I DID NOT SAY THAT HE SPLASHED WATER INTO MY FACE.  I ONLY

5     TOLD THAT THE WATER, LIKE, HE THROW THE WATER AND SOMEHOW THE

6     WATER SPLASHED INTO MY FACE.

7     Q.   ALL RIGHT.  SO IF I UNDERSTAND YOU CORRECTLY, HE DIDN'T

8     THROW THE WATER AT YOUR FACE BUT SOME OF IT GOT ON YOUR FACE;

9     IS THAT RIGHT?

10    A.   YEAH.

11    Q.   AND IS THAT THE REASON THAT YOU DIDN'T MENTION THAT TO THE

12    SECURITY PERSON?

13    A.   I ALREADY REPORTED THAT TO MR. GEORGE AND SO AT THAT TIME

14    HE OPENED THE DOOR AND IT HIT MY RIGHT FOOT.

15    Q.   ALL RIGHT.  LET'S LOOK -- IF YOU WOULD LOOK AT PAGE 1012,

16    JENNIFER GILBERT'S NOTES IN EVIDENCE, PLEASE.

17              MS. MCCLELEN:  THE TOP PORTION?

18              MR. MCMANIS:  IS THAT AS BIG AS YOU CAN GET IT?

19              MS. MCCLELEN:  THAT PORTION OR THE WHOLE THING?

20              MR. MCMANIS:  WELL, LET'S START AT THE TOP.

21    Q.   NOW, MS. DANG, THESE ARE THE NOTES FROM JENNIFER GILBERT.

22    THE FIRST ENTRY IN HER NOTES IS APRIL 12TH.

23         CUC WAS SENT TO SECURITY.  EMPLOYEE INJURY PAPERWORK.

24         CUC WAS NOT GIVEN A WARNING ABOUT TALKING TO LUCIO.

25         AND THIS WAS ON A THURSDAY.  DO YOU REMEMBER THIS HAPPENED

1      ON A THURSDAY?

2      A.   I DON'T REMEMBER THE DATE.

3      Q.   ALL RIGHT.  LET'S GO TO THE NEXT ENTRY.

4           NOW, THIS IS FRIDAY THE 13TH, AND GILBERT REFERS TO

5      SPEAKING TO NICK ABOUT 11:00.  CALLED CUC TO ASK WHAT HAD

6      HAPPENED THE PREVIOUS NIGHT.  SHE STATED THAT LUCIO HAD BROUGHT

7      HER SOME WATER AND THAT WHEN SHE REFUSED IT, LUCIO BECAME MAD

8      AND THEN HIT HER FOOT WITH THE DOOR.

9           DO YOU SEE THAT?

10     A.   YES, I SEE.

11     Q.   AND DO YOU RECALL TALKING TO MS. GILBERT AND MR. ORTEGA ON

12     THAT FRIDAY?

13     A.   I DON'T REMEMBER.

14     Q.   ALL RIGHT.  SHE GOES ON TO SAY THAT NICK ORTEGA AND

15     JENNIFER GILBERT TOLD YOU THAT LUCIO WAS BEING SUSPENDED FOR

16     THREE DAYS.

17          DID THEY TELL YOU THAT?

18     A.   NO.

19     Q.   THEY DID NOT?

20     A.   NO.

21     Q.   ALL RIGHT.  CUC ALSO TOLD THAT LUCIO WAS BOTHERING HER ALL

22     OF THE TIME AND FOLLOWS HER.

23          I TOLD HER IF LUCIO WAS BOTHERING HER DURING NON-WORK

24     HOURS, SHE NEEDED TO CONTACT THE POLICE.

25          I THINK YOU TOLD US TODAY THAT THAT'S SOMETHING THAT SHE

1    SAID TO YOU?

2    A.   THAT'S CORRECT.

3    Q.   THE LAST OF THE NOTES HERE IS APRIL 20TH, LETTER FROM CUC

4    IN MY BOX WHEN I ARRIVED AT 7:15 A.M.

5         DO YOU RECALL THE LETTER THAT THE LAWYER WROTE FOR YOU WAS

6    SENT TO JENNIFER GILBERT A WEEK AFTER YOUR CONVERSATION WITH

7    JENNIFER?

8    A.   NO.

9    Q.   YOU DO RECALL THAT A LAWYER PREPARED OR HELPED YOU PREPARE

10   A LETTER TO BAY 101?

11   A.   I DO.

12        MR. MCMANIS:  COULD YOU PUT 1013 UP, PLEASE.  AND

13   BLOW THAT UP, PLEASE, IF YOU WOULD, THE WHOLE LETTER.

14   Q.   THIS IS EXHIBIT 1013.  DO YOU RECALL THAT THIS IS THE

15   LETTER THAT THE LAWYER HELPED YOU PREPARE?

16   A.   THAT'S CORRECT.

17   Q.   ALL RIGHT.  WHAT WAS THE NAME OF THE LAWYER WHO HELPED YOU

18   PREPARE YOUR LETTER?

19   A.   I JUST KNOW HIS FIRST NAME IS JOHN, BUT I DON'T KNOW HIS

20   LAST NAME.

21   Q.   AND YOU DON'T REMEMBER WHETHER THAT LETTER WAS SENT TO

22   JENNIFER GILBERT A WEEK AFTER YOUR FIRST MEETING WITH HER ABOUT

23   LUCIO?

24   A.   I DON'T REMEMBER, BUT I DO REMEMBER THAT I DID SEND A

25   LETTER TO H.R.

```
 1              MR. MCMANIS:  OKAY.  WOULD YOU PUT JENNIFER'S NOTES

 2    BACK UP, PLEASE, 1012.

 3    Q.   YOU DO RECALL SPEAKING TO NICK AND JENNIFER THE NEXT DAY

 4    AFTER THE -- YOUR FOOT WAS HURT, RIGHT?

 5    A.   COULD YOU PLEASE REPEAT THE QUESTION?

 6    Q.   YES.  WE SEE THAT LUCIO HURT YOUR FOOT AND YOU WENT TO

 7    SECURITY?

 8    A.   THAT'S CORRECT.

 9    Q.   AND DO YOU REMEMBER THE NEXT DAY THAT YOU TALKED TO NICK

10    AND JENNIFER?

11    A.   NO, I DID NOT TALK TO THEM.  I ONLY REPORT TO GEORGE.

12    Q.   WELL, LET ME ASK YOU THIS WAY, AND MAYBE WE CAN GET IT

13    THIS WAY.

14         WOULD YOU PUT UP EXHIBIT 500, PLEASE, AND PAGE 8.  AND THE

15    BOTTOM BULLET POINT, PLEASE.

16         NOW, MS. DANG, THIS IS PAGE 8 FROM CAROLE EDMAN'S

17    INVESTIGATION REPORT.  DO YOU RECALL TALKING TO MS. EDMAN?

18    A.   YES.

19    Q.   ALL RIGHT.  AND WHEN YOU WERE INTERVIEWED BY MS. EDMAN,

20    THAT WAS FOR TWO DAYS?

21    A.   THAT'S CORRECT.

22    Q.   AND THAT WAS DONE AT YOUR LAWYER'S OFFICE?

23    A.   THAT'S CORRECT.

24    Q.   AND A VIETNAMESE INTERPRETER WAS PRESENT FOR THOSE

25    INTERVIEWS?
```

1     A.   THAT'S CORRECT.

2     Q.   WAS THAT THE SAME LAWYER THAT HAD HELPED YOU TWO AND A

3     HALF YEARS EARLIER WITH YOUR LETTER OF APRIL 2007?

4     A.   NO.

5     Q.   WHO WAS YOUR LAWYER THAT WAS WITH YOU DURING THE TWO DAYS

6     THAT YOU WERE INTERVIEWED BY CAROLE EDMAN?

7     A.   STEVEN NGO, LAST NAME N-G-O.  LAST NAME N-G-O.

8     Q.   I'VE GOT THAT PART.

9          AND IT WAS AT MR. NGO'S OFFICE THAT THESE INTERVIEWS TOOK

10    PLACE FOR THESE 2 DAYS.

11    A.   THAT'S CORRECT.

12    Q.   THAT'S CORRECT.

13         NOW, MS. EDMAN REPORTED THAT ON 11-3-09 THAT MS. DANG TOLD

14    THE INVESTIGATOR THAT MS. DANG EXPLAINED THE CIRCUMSTANCES

15    AROUND THE COMPLAINT THAT MS. DANG MADE IN 2007.

16         MS. GILBERT ARRANGED A MEETING WITH MS. DANG AND

17    MR. ORTEGA THE NEXT DAY.

18         DOES THAT HELP REFRESH YOUR MEMORY THAT YOU MET WITH NICK

19    AND JENNIFER THE DAY AFTER THE INCIDENT?

20    A.   I CANNOT IMAGINE THE MEETING BECAUSE THE PAPER WAS

21    PREPARED BY HER AND SHE NEVER SHOWED ME, AND I NEVER HAVE SEEN

22    THIS PAPER.

23    Q.   YOU'RE TALKING ABOUT CAROLE EDMAN'S REPORT?

24    A.   YES.

25    Q.   YOU UNDERSTAND THAT I'M ASKING YOU IF YOU TOLD MS. EDMAN

1    THAT MS. GILBERT ARRANGED A MEETING WITH YOU AND MR. ORTEGA THE

2    DAY AFTER YOUR COMPLAINT ABOUT LUCIO?

3    A.   NO.  I ONLY REMEMBER THAT I TALKED TO JOHN AFTER THIS

4    HAPPENED, AND JOHN ADVISED ME TO FIND A LAWYER BECAUSE MR. JOHN

5    WANTED TO CHANGE THE FILE.

6    Q.   ALL RIGHT.  LET'S GO ON THEN.

7         NOW, MS. EDMAN WROTE IN HER REPORT MS. DANG INDICATED,

8    QUOTE, "THEY WERE VERY CONCERNED, WANTED TO MEET IMMEDIATELY.

9    IT WAS THE NEXT DAY.  WHEN I ARRIVED AT THE MEETING, I ASKED

10   JENNIFER WHY LUCIO WAS NOT THERE; WHY THE PERSON I COMPLAINED

11   ABOUT WAS NOT PRESENT.

12        "JENNIFER SAID SHE WANTED TO KNOW WHAT I WANTED.  JENNIFER

13   WAS VERY WORRIED."

14        NOW, DID YOU TELL MS. EDMAN THIS?

15   A.   YES, I DID.

16   Q.   SO SHE PUT THAT IN QUOTES, "THEY WERE VERY CONCERNED."

17        DID YOU TELL MS. EDMAN THAT WHEN YOU MET WITH NICK AND

18   JENNIFER, THEY WERE VERY CONCERNED?

19   A.   THEY JUST CALLED ME AND TOLD ME THAT THERE WOULD BE A

20   MEETING AFTER I SENT A LETTER COMPLAINT ABOUT LUCIO THROW WATER

21   AND HIT MY FOOD.

22   Q.   DID YOU TELL -- DID JENNIFER AND NICK SEEM VERY CONCERNED

23   WHEN THEY MET WITH YOU?

24   A.   THAT'S CORRECT.

25   Q.   AND DID THEY SAY THAT THEY WANTED TO MEET WITH YOU

1    IMMEDIATELY?

2    A.   THEY DID NOT SAY THAT THEY WANTED TO MEET IMMEDIATELY, BUT

3    THEY JUST SAID THAT THEY WANTED TO SEE ME AFTER I GAVE THEM THE

4    LETTER COMPLAINING ABOUT LUCIO.

5    Q.   IS IT YOUR TESTIMONY THAT THEY DID NOT ASK TO SEE YOU

6    UNTIL THE LETTER?

7    A.   THAT'S CORRECT.

8    Q.   OKAY.  DID YOU TELL CAROLE EDMAN THAT IT WAS THE NEXT DAY

9    AFTER YOU HAD MADE YOUR COMPLAINT?

10   A.   THAT'S CORRECT.

11   Q.   WHEN YOU GOT TO THE MEETING WITH NICK AND JENNIFER, DID

12   YOU ASK JENNIFER WHY LUCIO WAS NOT THERE?

13   A.   I DID.

14   Q.   DID JENNIFER SAY THAT SHE WANTED TO KNOW WHAT YOU WANTED?

15   A.   WHAT SHE SAID I DIDN'T KNOW BECAUSE THE INTERPRETER WAS

16   NOT A PROFESSIONAL INTERPRETER.

17        SHE SAID THAT JENNIFER AND JOHN WANT TO ASK ME WHAT I

18   WANTED NOW AND THEN.

19        AND THEN BEFORE I COULD ANSWER, SHE ASKED ME IF THEY,

20   LIKE, CHANGE ME TO THE MORNING SHIFT, WOULD I AGREE.

21   Q.   WELL, THAT -- WE'LL GET TO THAT.

22        WHEN MS. EDMAN INTERVIEWED YOU AT YOUR LAWYER'S OFFICE,

23   THERE WAS A PROFESSIONAL INTERPRETER, WAS THERE NOT?

24   A.   NO.

25   Q.   YOUR LAWYER WAS THERE?

1    A.   NO.  I ONLY STATED THAT WHEN JOHN AND JENNIFER CALLED ME

2    TO THE MEETING, JENNIFER HAD AN INTERPRETER, BUT IT WAS NOT A

3    PROFESSIONAL INTERPRETER.

4    Q.   I UNDERSTAND -- I THINK I UNDERSTAND.

5         BUT WHEN MS. EDMAN INTERVIEWED AT YOUR LAWYER'S OFFICE,

6    THERE WAS A PROFESSIONAL INTERPRETER?

7    A.   THAT'S CORRECT.

8    Q.   ALL RIGHT.  SO WHEN YOU GAVE MS. EDMAN THIS STATEMENT,

9    YOUR LAWYER WAS PRESENT?

10   A.   THAT'S CORRECT.

11   Q.   AND THE PROFESSIONAL INTERPRETER WAS PRESENT?

12   A.   THAT'S CORRECT.

13   Q.   AND WHAT YOU'RE SAYING HERE IS THAT WHEN YOU MET WITH

14   JENNIFER AND NICK, THERE WAS A BAY 101 EMPLOYEE WHO WAS THERE?

15   A.   THAT'S CORRECT.

16   Q.   WAS THAT A VIETNAMESE EMPLOYEE?

17   A.   THAT'S CORRECT.

18   Q.   NOW, YOU HAD WORKED AT THE BAY 101 FOR OVER THREE YEARS IN

19   NOVEMBER 2009, HAD YOU NOT?

20   A.   THAT'S CORRECT.

21   Q.   AND YOU HAD BEEN ON THE FLOOR FOR A NUMBER OF MONTHS?

22   A.   THAT'S CORRECT.

23   Q.   AND YOU SERVED ENGLISH SPEAKING CUSTOMERS AS WELL AS

24   VIETNAMESE?

25   A.   THAT'S CORRECT.

1    Q.   OKAY.  IN ANY CASE, DID JENNIFER SEEM TO YOU TO BE VERY

2    WORRIED WHEN SHE WAS TALKING TO YOU?

3    A.   I CANNOT SAY WHETHER SHE WAS WORRIED OR NOT BECAUSE I

4    COULD NOT READ HER MIND, BUT SHE DID CALL ME TO SEE HER AFTER

5    SHE RECEIVED THE LETTER.

6    Q.   DID YOU JUST SAY THAT YOU COULD NOT READ HER MIND?

7    A.   NO.

8    Q.   YOU COULD NOT?

9    A.   I COULD NOT.

10   Q.   DID SHE ASK YOU WHAT YOU WANTED?

11   A.   SHE ASKED ME, BUT I DID NOT UNDERSTAND.

12       BUT THE INTERPRETER INTERPRETED THAT SHE ASKED ME WHAT I

13   WANTED.

14   Q.   WELL, LET'S TAKE A LOOK AT YOUR DEPOSITION ON PAGE 183,

15   LINES 13 TO 22.

16       THE COURT:  DO YOU NEED A BREAK?

17   OKAY.  THE INTERPRETER NEEDS A BREAK SO WE'LL TAKE A SHORT

18   BREAK.  WE'LL BE IN RECESS FOR ABOUT 15 MINUTES.

19       THE INTERPRETER:  THANK YOU, YOUR HONOR.

20   (RECESS FROM 9:31 A.M. UNTIL 9:51 A.M.)

21       THE COURT:  ALL RIGHT.  GO AHEAD.

22       MR. MCMANIS:  I'M GLAD WE HAVE THE 18 INTERPRETING

23   HERE, YOUR HONOR.  MS. LEBRUN IS BACK.

24   Q.   DO YOU RECALL MEETING WITH JOHN ST. CROIX AND MS. GILBERT?

25   A.   YES, I DO.

1    Q.   AND DO YOU RECALL THAT JOHN ST. CROIX SAID TO YOU THAT HE

2    WOULD CHANGE YOUR SHIFT IF YOU WANTED?

3    A.   THAT'S RIGHT.

4    Q.   LET'S TAKE A LOOK AT YOUR DEPOSITION TESTIMONY PAGE 183,

5    LINES 13 TO 22.

6         WOULD YOU BLOW THAT UP, PLEASE.

7         COULD I HAVE JUST A MOMENT, YOUR HONOR.  I SEEM TO HAVE

8    GOTTEN THE WRONG PAGE HERE.

9         I APOLOGIZE.  I MEANT PAGE 186, 13 TO 22.  I CAN'T READ MY

10   OWN WRITING.

11        QUESTION AT LINE 13, PAGE 186, "WHAT DID YOU SAY WHEN YOU

12   WERE ASKED 'WHAT DO YOU WANT TO DO'?

13        "ANSWER:  I SAID THAT I DID NOT WANT TO WORK TOGETHER WITH

14   LUCIO ANYMORE.

15        "QUESTION:  DID SOMEONE RESPOND TO THAT, SOMEONE WHO WAS

16   IN THE MEETING?

17        "ANSWER:  AND JOHN SAID THAT IF I DID NOT WANT TO WORK

18   WITH HIM, HE WOULD CHANGE MY SHIFT.

19        "QUESTION:  AND DID HE DO THAT?

20        "ANSWER:  YES."

21        NOW, THAT WAS YOUR TESTIMONY THAT YOU GAVE AT YOUR

22   DEPOSITION; IS THAT RIGHT?

23   A.   YES.

24   Q.   AND WAS THAT TRUE?

25   A.   CORRECT.

1     Q.   NOW, YOU MENTION SOMETHING ABOUT A -- WELL, ALL RIGHT.

2          NOW, WHILE WE HAVE YOUR DEPOSITION ON THE SCREEN, CINDY,

3     IF YOU WOULD PUT UP PAGE 192, 18 TO 21.

4               MS. NGUYEN:  MAY I --

5               MR. MCMANIS:  SURE.  I APOLOGIZE.

6               MS. NGUYEN:  192?

7               MR. MCMANIS:  18 TO 21.

8               MS. NGUYEN:  OKAY.

9     BY MR. MCMANIS:

10    Q.   THIS WAS THE QUESTION PUT TO YOU AT YOUR DEPOSITION:

11         "QUESTION:  OKAY.  AND THERE WASN'T ANYTHING THAT HAPPENED

12    WITH LUCIO SINCE 2007 WHEN YOUR SHIFT WAS CHANGED AND WHEN YOU

13    WROTE THIS LETTER, CORRECT?

14         "ANSWER:  QUESTION."

15         THAT WAS YOUR TESTIMONY?

16    A.   YES.

17    Q.   SO NO PROBLEMS WITH LUCIO AFTER 2007 WHEN YOUR SHIFT WAS

18    CHANGED AND YOU WROTE THE LETTER; CORRECT?

19    A.   CORRECT.

20    Q.   ALL RIGHT.  AND THEN YOU WERE ASKED -- AND I'M NOT GOING

21    TO PUT THIS UP UNTIL ANN HAS A CHANCE TO LOOK AT IT -- BUT YOUR

22    DEPOSITION PAGE 299, LINES 10 TO 15.

23              MS. NGUYEN:  SIDE-BAR, YOUR HONOR?

24              THE COURT:  ALL RIGHT.

25         (SIDE-BAR OFF THE RECORD.)

1              MR. MCMANIS:  ALL RIGHT.  WOULD YOU PUT THAT UP,

2     PLEASE.

3              THE CLERK:  GO AHEAD.

4              JUROR:  THANK YOU.

5     BY MR. MCMANIS:

6     Q.   NOW, MS. DANG, THIS AGAIN IS FROM YOUR DEPOSITION:

7          "QUESTION:  WOULD YOU COME BACK TO WORK AND WORK THE SAME

8     SHIFT AS LUCIO?

9          "ANSWER:  IF HE DOESN'T BROTHER ME.  AFTER THAT LETTER, HE

10    DIDN'T DO ANYTHING TO ME.

11         "QUESTION:  SO YOUR ANSWER IS YES?

12         "ANSWER:  YES."

13         IS THAT YOUR TESTIMONY?

14    A.   YES.

15    Q.   AND WHEN YOU TESTIFIED AT YOUR DEPOSITION THAT AFTER THE

16    LETTER OF APRIL 2007, LUCIO DIDN'T DO ANYTHING TO YOU, WAS THAT

17    TRUE?

18    A.   CORRECT.

19    Q.   NOW, WHEN YOU SENT THE LETTER ON OCTOBER 13, 2009,

20    EXHIBIT 1016 -- WOULD YOU PUT THAT UP SO WE CAN SEE THAT,

21    PLEASE.

22         THIS IS THE LETTER DATED 10-13-09.  YOU INCLUDED IN THAT

23    LETTER A COPY OF YOUR APRIL 2007 LETTER, HAD YOU NOT?  DID YOU

24    NOT?

25    A.   COUNSEL, COULD WE PLEASE GET TO THE EXHIBIT.

1    Q.   YES, WE CAN.  WOULD YOU GO TO THE ENCLOSURE, PLEASE.

2         WHAT BATES NUMBER IS THAT, PLEASE?

3              MS. MCCLELEN:  2180.

4              MR. MCMANIS:  2180.

5              MS. MCCLELEN:  IT'S THE SIXTH PAGE.

6              MR. MCMANIS:  SIXTH PAGE.

7    Q.   SO WHEN YOU SENT YOUR LETTER TO MR. WERNER ON

8    OCTOBER 13TH, 2009, REQUESTING AN INVESTIGATION OF YOUR

9    SUSPENSION FOR THE INCIDENT INVOLVING LINDA ELIAS, YOU INCLUDED

10   IN THE PACKAGE THE APRIL 2007 LETTER; CORRECT?

11   A.   CORRECT.

12   Q.   ALL RIGHT.  AND WHO HELPED YOU DO THIS LETTER OF

13   OCTOBER 13, 2009?

14   A.   THIS LETTER WAS FOR LUCIO.

15   Q.   I APOLOGIZE.  I'M TALKING NOW ABOUT THE -- PUT UP THE

16   FIRST PAGE OF 1016, PLEASE.

17        I'M TALKING NOW ABOUT THE LETTER OF OCTOBER 13TH, 2009, TO

18   MR. WERNER.  DID SOMEBODY HELP YOU WITH THAT?

19   A.   MY HUSBAND.

20   Q.   AND WHAT IS HIS NAME?

21   A.   JASON.

22   Q.   HE'S YOUR SECOND HUSBAND?

23   A.   THIRD.

24   Q.   THIRD?

25   A.   YES.

1    Q.   OKAY.  SO THIS WAS NOT SOMETHING THAT THE LAWYER HELPED

2    YOU WITH, THIS WAS SOMETHING THAT YOUR HUSBAND HELPED YOU WITH?

3    A.   CORRECT.

4    Q.   AND WHEN YOU WERE INTERVIEWED BY CAROLE EDMAN, DO YOU

5    RECALL AT YOUR LAWYER'S OFFICE WITH THE PROFESSIONAL

6    INTERPRETER?

7    A.   YES.

8    Q.   YOU DIDN'T TELL HER ABOUT ANY COMPLAINTS REGARDING LUCIO

9    SINCE APRIL OF 2007; CORRECT?

10   A.   CORRECT.

11   Q.   AND THAT WAS ABOUT TWO AND A HALF YEARS; CORRECT?

12   A.   CORRECT.

13          MR. MCMANIS:  YOUR HONOR, MY FRIEND ASKED THAT IF WE

14   INTERRUPT HER CLIENT'S TESTIMONY BECAUSE SHE HAS AN EXPERT THAT

15   NEEDS TO BE TAKEN OUT OF ORDER, AND I HAVE NO OBJECTION TO

16   THAT.

17          THE COURT:  ALL RIGHT.  BEFORE WE TAKE A BREAK, WHY

18   DON'T YOU LOOK AT THIS JUROR QUESTION BECAUSE MAYBE IT MIGHT

19   MAKE SENSE.

20      (PAUSE IN PROCEEDINGS.)

21          MR. MCMANIS:  I THINK I CAN CLARIFY THAT.  IF SHE

22   WANTS TO TAKE THE EXPERT FIRST?

23          THE COURT:  OKAY.

24          MR. MCMANIS:  OKAY.  FINE.  LET ME GET MY STUFF OUT

25   OF THE WAY.

1          THE COURT:  WE'LL DEAL WITH THE QUESTION LATER THIS

2     MORNING, BUT THE NEXT WITNESS APPARENTLY HAS SOME CONFLICTS SO

3     WE NEED TO GET HIM FINISHED.

4          MS. NGUYEN:  THANK YOU, YOUR HONOR.

5       THE PLAINTIFF WOULD LIKE TO CALL AS THEIR NEXT WITNESS

6     DR. PATRICK MASON.  AND THANK YOU FOR ACCOMMODATING US.

7     DR. MASON HAS TO LEAVE TOWN.

8          THE CLERK:  COME FORWARD, AND I'LL SWEAR YOU IN.

9     RAISE YOUR RIGHT HAND, PLEASE.

10        **(PLAINTIFF'S WITNESS, PATRICK MASON, WAS SWORN.)**

11         THE WITNESS:  I DO.

12         THE CLERK:  THANK YOU.  TAKE THE STAND, PLEASE.

13    STATE YOUR FULL NAME AND SPELL YOUR LAST NAME.

14         THE WITNESS:  WHICH CHAIR SHOULD I SIT IN?  WHICH IS

15    CLOSER TO THE MIKE?  WHICH ONE WORKS BETTER FOR SOUND?

16         THE COURT:  THAT ONE BECAUSE THE OTHER ONE MAY FALL

17    OFF THE PLATFORM (INDICATING).

18         THE WITNESS:  OKAY.  MY NAME IS PATRICK MASON,

19    M-A-S-O-N.

20         THE CLERK:  THANK YOU.

21                        **DIRECT EXAMINATION**

22    BY MS. NGUYEN:

23    Q.   GOOD MORNING, DR. MASON.

24    A.   GOOD MORNING.

25    Q.   THANK YOU FOR COMING TODAY BRIGHT AND EARLY, AND I KNOW

1    YOU HAVE TO LEAVE SO WE'RE TAKING YOU OUT OF ORDER SO THAT YOU

2    CAN GET YOUR TESTIMONY DONE AND LEAVE.

3    A.   THANK YOU.

4    Q.   SIR, WHAT IS YOUR OCCUPATION?

5    A.   I'M AN ECONOMIST.

6    Q.   AND WOULD YOU PLEASE DESCRIBE TO THE JURY BRIEFLY YOUR

7    EDUCATIONAL BACKGROUND?

8           MR. MCMANIS:  YOUR HONOR, I'M HAPPY TO STIPULATE TO

9    DR. MASON'S CREDENTIALS.  IN FACT, I HAVE ENGAGED HIM MYSELF IN

10   THE PAST.

11          MS. NGUYEN:  AND, YOUR HONOR, WE WILL ASK THAT HIS

12   CV BE ENTERED INTO EVIDENCE, THAT'S EXHIBIT 26.

13          MR. MCMANIS:  NO OBJECTION.

14          THE COURT:  ALL RIGHT.  IF THAT'S HOW YOU WANT TO

15   HANDLE IT, THAT'S FINE.

16      (PLAINTIFF'S EXHIBIT 26 WAS RECEIVED IN EVIDENCE.)

17   BY MS. NGUYEN:

18   Q.   I WOULD LIKE TO ASK HIM A LITTLE BIT ABOUT HIS BACKGROUND,

19   YOUR HONOR.

20      SO, DR. MASON, WOULD YOU PLEASE LET US KNOW BRIEFLY ABOUT

21   YOUR EDUCATIONAL BACKGROUND.  I KNOW YOUR CV WILL BE PROVIDED

22   TO THE JURORS IN THE JURY DELIBERATION ROOM.

23   A.   OKAY.  I WENT TO COLLEGE AT SANTA CLARA, AND THEN I WENT

24   TO GRADUATE SCHOOL AT THE UNIVERSITY OF COLORADO, BOULDER,

25   WHERE I RECEIVED A MASTER'S DEGREE AND A DOCTORATE IN

1    ECONOMICS.

2    Q.   AND WOULD YOU PLEASE LET US KNOW -- JUST GIVE US A QUICK

3    SUMMARY OF YOUR PROFESSIONAL EXPERIENCE, PLEASE?

4    A.   I FIRST STARTED WORKING FOR THE AFL-CIO, AMERICAN

5    FEDERATION OF LABOR CONGRESS AND INDUSTRIAL ORGANIZATIONS, THE

6    UMBRELLA ORGANIZATION OF LABOR UNION OF THE UNITED STATES AS A

7    RESEARCH ECONOMIST.

8        AND THEN I CAME BACK HOME TO THE BAY AREA HERE AND I

9    BECAME THE RESEARCH DIRECTOR FOR THE CALIFORNIA LABOR

10   FEDERATION, WHICH IS THE AFL-CIO OF CALIFORNIA.  I DID THAT FOR

11   ABOUT FOUR YEARS.

12       AND THEN I BECAME THE CHIEF ECONOMIST FOR OUR REGIONAL

13   GOVERNMENT, ABAG, ASSOCIATION OF BAY AREA GOVERNMENTS.  IT'S AN

14   ORGANIZATION OF THE NINE COUNTIES AND ROUGHLY HUNDRED CITIES IN

15   THE BAY AREA FOR PLANNING PURPOSES.

16       AND THEN I WENT ON MY OWN AND BECAME A CONSULTING

17   ECONOMIST, AND I HAVE BEEN PRIMARILY WORKING, RUNNING THE

18   CALIFORNIA FOUNDATION ON THE ENVIRONMENT AND THE ECONOMY WHICH

19   IS A NONPROFIT THAT'S COMPOSED OF BUSINESS, LABOR AND

20   ENVIRONMENTAL LEADERS.  IT'S A NON-PARTISAN.  AND WE WORK ON

21   PUBLIC POLICY ISSUES RELATING TO ENERGY AND TRANSPORTATION,

22   WATER, AND TELECOMMUNICATIONS.

23       BY "WORKING" I MEAN THAT WE ASSEMBLE CONFERENCES WITH

24   STATE LEGISLATORS, REGULATORS, THE GOVERNMENT PEOPLE, AND THEN

25   A MIX OF BUSINESS, LABOR AND ENVIRONMENTAL LEADERS WORKING ON

1    PRAGMATIC SOLUTIONS AND TRYING TO DEVELOP CONSENSUS ON THESE

2    LONG-TERM BIG PICTURE INFRASTRUCTURE ISSUES.

3         I DO THAT ABOUT 75 PERCENT OF MY TIME.  THE OTHER

4    25 PERCENT I WORK AS A FORENSIC ECONOMIST.

5    Q.   AND, DR. MASON, DO YOU HAVE ANY SPECIALTIES?

6    A.   IN ECONOMICS I'VE SPECIALIZED IN LABOR ECONOMICS.

7    Q.   AND WHAT IS LABOR ECONOMICS?

8    A.   LABOR ECONOMICS IS A SPECIALTY THAT TAKES THE SCIENCE OF

9    ECONOMICS AND METHODOLOGIES AND APPLIES THEM DIRECTLY TO THE

10   LABOR FORCE, TO WAGES, TO UNEMPLOYMENT, TO ISSUES RELATING TO

11   ALSO PRODUCTIVITY AND THE IMPACT OF COLLECTIVE BARGAINING,

12   THE -- YOU KNOW, DIFFERENT INDUSTRIAL DEVELOPMENTS REGARDING

13   THE LABOR FORCE AND UNEMPLOYMENT AND EMPLOYMENT.

14   Q.   AND I THINK YOU SAID, BUT IS PART OF YOUR WORK NOW AS A

15   FORENSIC ECONOMIST?

16   A.   YES.

17   Q.   AND WHAT DOES A FORENSIC ECONOMIST DO?

18   A.   WELL, A FORENSIC ECONOMIST TAKES THE SCIENCE AND THE

19   METHODOLOGY OF ECONOMICS AND APPLIES IT TO SITUATIONS OF

20   LITIGATION SUCH AS WE HAVE HERE TODAY.

21        PRIMARILY WHAT THE FORENSIC ECONOMIST DOES IS DOES A

22   CALCULATION OF DAMAGES, OF LOST EARNING DAMAGES, AND PROVIDES A

23   METHODOLOGY ABOUT HOW TO GO ABOUT THAT OF LOST PAST AND PRESENT

24   VALUE AND LOST FUTURE.

25   Q.   AND, DR. MASON, YOU HAVE BEEN QUALIFIED TO TESTIFY IN

1     COURT IN THE PAST?

2     A.   I HAVE.

3     Q.   AND I BELIEVE MY OPPOSING COUNSEL HAS SAID THAT HE

4     RETAINED YOU IN THE PAST AS WELL?

5     A.   YES.

6     Q.   AND YOU HAVE WORKED WITH MY LAW FIRM, ROBINSON & WOOD, AS

7     WELL IN THE PAST?

8     A.   YES, I HAVE.

9     Q.   AND, DR. MASON, WHAT IS YOUR RATE IN THIS CASE?

10    A.   MY RATE?

11    Q.   YES.

12    A.   FOR CONSULTATION, RESEARCH, PREPARATION, CALCULATIONS I

13    CHARGE $400 AN HOUR AND FOR DEPOSITION AND FOR COURT TIME I

14    CHARGE 500 AN HOUR.

15    Q.   AND WHAT WERE YOU ASKED TO DO IN THIS CASE, DR. MASON?

16    A.   I WAS ASKED TO CALCULATE THE LOST EARNINGS OF MS. DANG AND

17    UP TO THE PRESENT TIME AND THEN MAKE A PRESENT VALUE

18    CALCULATION OF LOST FUTURE EARNINGS BASED ON FACTS AND

19    ASSUMPTIONS IN THE CASE.

20    Q.   AND HOW MUCH TIME HAVE YOU SPENT WORKING ON THE CASE?

21    A.   ABOUT TEN HOURS.

22    Q.   AND THIS IS PART OF WHAT A FORENSIC ECONOMIST DOES?

23    A.   YES.

24    Q.   AND HOW DO YOU GO ABOUT MAKING THE CALCULATIONS THAT YOU

25    HAVE TO MAKE IN THIS CASE?

1    A.   WELL, YOU START LOOKING AT WAGE HISTORY.  IF YOU LOOK AT

2    LOST EARNINGS, YOU FIRST START WITH WHAT WAS THE PERSON

3    EARNING?  SO WE TAKE A RECENT HISTORY OF THE EARNINGS AND LOOK

4    AT THAT AS THE BASE.

5         AND THEN YOU LOOK FROM THE EVENT, THE DATE OF TERMINATION

6    FORWARD, WHAT HAS THAT PERSON ACTUALLY MADE?  AND WHAT IS THE

7    DIFFERENCE?

8         AND SO IT'S PRETTY SIMPLE.  IN THE PAST YOU JUST LOOK AT

9    WHAT THEY WERE MAKING AND HAD THEY CONTINUED TO MAKE THAT UP TO

10   THE PRESENT TIME AND THEN SUBTRACT OUT WHAT SHE ACTUALLY MADE.

11   AND THEN YOU HAVE A LOST PAST.

12        IT'S A LITTLE -- IT'S TRICKIER GOING FORWARD.  WE HAVE --

13   THERE'S ESSENTIALLY FOUR ELEMENTS THAT AN ECONOMIST -- ANY

14   ECONOMIST NEEDS TO CONSIDER.

15        NUMBER ONE IS THAT BASE.  THAT IS TYPICALLY ESTABLISHED BY

16   THE RECENT HISTORY OF WHAT THE PERSON WAS EARNING.  SO THAT'S

17   THE FIRST.

18        THE SECOND IS TIME.  HOW LONG IS THE FUTURE?  THE WAY WE

19   ANSWER THAT QUESTION IS THAT THERE ARE STANDARD TABLES,

20   ACTUARIAL TABLES CALLED WORK LIFE HISTORY ESTIMATES -- I'M

21   SORRY, WORK LIFE ESTIMATES.

22        SO BASED ON HER GENDER AND AGE AND EDUCATION, THESE TABLES

23   ARE USED BY ALL ECONOMISTS.  THEY'RE IN THE FORENSIC

24   LITERATURE.  IT TELLS US THAT ON AVERAGE A PERSON AT THE TIME

25   OF THE TERMINATION, A WOMAN WITH HER EDUCATION, HIGH SCHOOL

1    DEGREE AND HER AGE, WOULD WORK ON AVERAGE ANOTHER SO MANY

2    YEARS.  I THINK IN THIS CASE IT'S TEN POINT SOMETHING.

3         AND THEN SOME OF THAT TIME HAS BEEN EATEN UP BY THE PAST.

4    SO THE FUTURE IS REALLY WHAT IS LEFT OVER AFTER WE HAVE

5    CONSIDERED THE PAST.

6         AND THEN IT GETS A LITTLE MORE COMPLICATED.  INCOME TENDS

7    TO GO UP OVER TIME.  SO WHILE WE CAN LOOK AT WHAT SHE WAS

8    MAKING AT THE TIME, AS INCOMES GO UP, WE HAVE TO ACCOUNT FOR

9    THE FACT THAT SHE PROBABLY WOULD HAVE MADE MORE, NOT A LOT

10   MORE, BUT MORE.

11        AND SO WE HAVE TO FACTOR IN WHAT IS CALLED A WAGE GROWTH

12   FACTOR, WHICH WOULD MAKE THE AMOUNT LARGER.  THE LARGER THE

13   GROWTH FACTOR, THE LARGER THE LOSS.  SO THAT'S THE THIRD

14   ELEMENT.

15        AND THEN FINALLY WE NEED AN INTEREST RATE TO USE TO

16   DISCOUNT THE FUTURE INCOME LOSS TO ITS PRESENT VALUE.

17        SO PRESENT VALUE IS ESSENTIALLY, IT'S THE OPPOSITE OF

18   COMPOUNDING.  SO IF YOU HAVE $100 IN THE BANK AND IT GETS

19   3 PERCENT INTEREST, IT'S $103 AT THE END OF YEAR.  AND THEN AT

20   THE END OF TWO YEARS IT'S $106 AND SOME ODD CENTS BECAUSE OF

21   COMPOUNDING.

22        DISCOUNTING IS THE OPPOSITE.  IT SAYS HOW MUCH DO YOU NEED

23   TO PUT IN THE BANK TODAY AT 3 PERCENT INTEREST TO BECOME $100

24   IN THE FUTURE?

25        WELL, YOU DON'T NEED TO PUT IN THE WHOLE $100.  YOU CAN

1    PUT IN LESS.  ROUGHLY $97.  AND IF IT GAINS INTEREST A YEAR

2    FROM NOW, IT BECOMES THAT $100.

3         SO PRESENT VALUE CALCULATION IS FINDING OUT WHAT YOU NEED

4    TO COME UP WITH TODAY SO IT GAINS INTEREST AND IT BECOMES THESE

5    NUMBERS IN THE FUTURE.

6         AND YOU DO THAT BY -- YOU HAVE TO PICK AN INTEREST RATE.

7    THE LARGER THE INTEREST RATE, THE HARDER IT WORKS, THE LESS

8    MONEY YOU NEED TO PUT AWAY TODAY.  AND THE LOWER THE INTEREST

9    RATE, THE MORE YOU NEED TO PUT AWAY.

10        SO THOSE LAST TWO FACTORS, THE WAGE GROWTH FACTOR MAKES

11   THE LOSS BIGGER, THE WAGE GROWTH FACTOR, AND THEN THE DISCOUNT

12   RATE MAKES IT SMALLER.

13        SO WHAT REALLY MATTERS FOR THE ECONOMIST IS THE DIFFERENCE

14   BETWEEN THE TWO, WHICH IS BIGGER, THE WAGE GROWTH FACTOR OR THE

15   DISCOUNT?

16        WELL, BASED ON ECONOMIC THEORY AND BASED ON LONG-TERM

17   STATISTICS ON AVERAGE THEY'RE EQUAL AND SO THEY OFFSET EACH

18   OTHER COMPLETELY.  THEY'RE NOT EQUAL IN ANY GIVEN YEAR BUT OVER

19   TIME THEY'RE EQUAL.  THEY HAVE ABOUT THE SAME RELATIVE SIZE.

20   THEY MOVE TOGETHER.

21        SO OUR BEST GUIDE TO AN UNKNOWN FUTURE REALLY IS TO USE

22   THAT RELATIONSHIP OF EQUALITY, WHICH MEANS THAT THEY OFFSET

23   EACH OTHER.

24        SO THAT THIRD FACTOR, WHICH IS THE WAGE GROWTH AND THE

25   DISCOUNT RATE, THEY END UP DROPPING OUT OF THE EQUATION.

1       SO WHAT WOULD HAVE BEEN A LONGER, MORE COMPLEX CALCULATION

2  OF INFLATING AND THEN DISCOUNTING OVER THE FUTURE YEARS,

3  REDUCED TO A VERY SIMPLE ARITHMETIC CALCULATION OF THE LOSS IN

4  THE PRESENT YEAR, MULTIPLIED BY THE YEARS IN THE FUTURE.

5       AND WHAT THAT GIVES YOU IS A WAGE GROWTH ADJUSTED PRESENT

6  VALUE.  SO IT IS A PRESENT VALUE CALCULATION.  AND IT'S

7  ESSENTIALLY COMING UP WITH A LUMP SUM THAT YOU PUT AWAY IN THE

8  BANK, IT CAN PAY OFF THE LOSS IN THE FIRST YEAR AND THE REST

9  STAYS IN THE BANK.

10      THE NEXT YEAR IT PAYS OUT WHATEVER THE GENERAL INCREASE

11 WAS ACROSS THE UNITED STATES.  THE REST STAYS IN THE BANK AND

12 GAINS INTEREST.

13      SO THAT AT THE END OF HER WORK LIFE THERE IS ZERO MONEY

14 LEFT IN THE FUND.  IT'S JUST DESIGNED TO MATCH -- TO MAKE WHOLE

15 IN TERMS OF WHAT THE LOSS HAD OCCURRED FOR THE INCIDENT.

16 Q.   AND THAT'S IN GENERAL WHAT A FORENSIC ECONOMIST DOES?

17 A.   YES.

18 Q.   AND IN THIS SPECIFIC CASE WHAT DID YOU DO, DR. MASON, IN

19 TERMS OF THE WORK THAT YOU CONDUCTED IN THIS CASE?

20 A.   WELL, WE FIRST START WITH SOME BASIC FACTS OF HER DATE OF

21 BIRTH --

22 Q.   ACTUALLY, I DO THINK THAT WE HAVE A BOARD HERE WITH SOME

23 INFORMATION THAT YOU CAN REFER TO.

24 A.   OKAY.

25           MS. NGUYEN:  YOUR HONOR, WE WOULD LIKE TO HAVE THAT

1    ADMITTED INTO EVIDENCE PLAINTIFF'S EXHIBIT 35 AND 36, WHICH IS

2    THE BOARDS.

3         WE HAVE PROVIDED A COPY TO COUNSEL.

4              MR. MCMANIS:  I'M SORRY.  I WAS WEB SPINNING.  WHAT

5    WAS THE QUESTION?

6              MS. NGUYEN:  THESE ARE THE BOARDS EXHIBIT 35 AND 36

7    FROM HIS REPORTS.

8              MR. MCMANIS:  FINE.  NO OBJECTION.

9              THE COURT:  SHE'S OFFERED THEM INTO EVIDENCE.

10             MR. MCMANIS:  YES, THAT'S FINE.

11             THE COURT:  35 AND 36 ARE ADMITTED.

12        (PLAINTIFF'S EXHIBITS 35 AND 36 WERE RECEIVED IN

13   EVIDENCE.)

14   BY MS. NGUYEN:

15   Q.   DR. MASON, YOU MAY WANT TO COME FORWARD AND USE THESE

16   BOARDS UP HERE.

17   A.   IS IT SAFE?

18   Q.   THIS IS FOR YOU.

19   A.   THANK YOU.

20   Q.   SO YOU WERE TELLING US ABOUT SOME OF THE FACTS THAT YOU

21   USED IN DOING YOUR CALCULATION FOR THIS CASE?

22   A.   CORRECT.  SO WE HAVE TO START WITH HER DATE OF BIRTH, AND

23   THEN WE LOOK AT THE DATE OF TERMINATION, AND THE DATE OF TRIAL,

24   HER EDUCATION.

25        AND BASED ON HER AGE AND THE DATE OF LOSS, WHICH IS 53 AND

1    A HALF YEARS, WE LOOK UP IN THE LITERATURE WHAT THE TABLE SAID

2    AS TO WHAT HER -- THE YEARS IN THE FUTURE THAT SHE WOULD WORK

3    FROM THAT DATE ON.  IT DOESN'T MEAN THAT SHE'S GOING TO WORK

4    EVERY YEAR, BUT IT JUST MEANS THAT MANY MORE YEARS IN THE

5    FUTURE.

6         SO IT INCLUDES PERIODS OF ILLNESS OR SEPARATION FROM THE

7    LABOR FORCE OR UNEMPLOYMENT, BUT ON AVERAGE A FEMALE WITH A

8    HIGH SCHOOL DIPLOMA AT AGE 53 IS GOING TO WORK ANOTHER

9    10.26 YEARS, AND THAT'S FROM THE DATE OF THE TERMINATION.

10        I LOOKED AT HER RECENT EARNING HISTORY LEADING UP TO THAT

11   AND JUST AVERAGED IT.  SO IT AVERAGED ABOUT 27,340.

12        AND THEN SHE HAD FRINGE BENEFITS BY THE UNION CONTRACT.

13   SO THERE WAS $3.73 AN HOUR FOR HEALTH AND WELFARE FOR EVERY

14   HOUR THAT SHE WORKED AND $0.40 FOR THE PENSION.

15        AND THEN I LOOKED AT HER LAST YEAR FROM THE PAY STUBS AND

16   FIGURED OUT THAT IF SHE HAD WORKED -- IF SHE DIDN'T WORK IN

17   JANUARY, AND SHE MISSED THE LAST COUPLE WEEKS IN DECEMBER, BUT

18   IF SHE HAD WORKED THAT WHOLE YEAR IT WOULD HAVE WORKED OUT TO

19   1851 HOURS.  A FULL YEAR, FULL-TIME 40 HOURS A WEEK, 52 WEEKS A

20   YEAR IS 2080.  AND SO THIS WAS THE PACE THAT SHE WAS WORKING IN

21   THAT LAST YEAR ABOUT 1851.

22        AND THEN WE LOOKED AT WHAT SHE ACTUALLY DID EARN SINCE THE

23   TERMINATION AND THESE AMOUNTS HERE 3824 AND 2189.

24        AND THEN FINALLY SHE'S CURRENTLY EARNING $12 AN HOUR AND

25   IS GETTING ABOUT 15 HOURS A WEEK, AND SHE DOES THAT ALL YEAR

1    LONG AND THAT'S JUST OVER 9,000 A YEAR.

2        SO CURRENTLY IN THE SITUATION SHE'S MAKING AT A PACE OF

3    9,360 A YEAR.  SO THESE WERE THE BASIC FACTS THAT GO INTO THE

4    CALCULATION.

5    Q.   AND THEN IN ADDITION TO THE FACTS, WERE THERE ASSUMPTIONS

6    THAT YOU MADE IN ORDER TO CALCULATE THE DAMAGES IN THIS CASE?

7    A.   CORRECT.  SO IN ORDER TO -- IF THE JURY FINDS LIABILITY,

8    THEN ANSWER THE QUESTION WHAT DOES THAT -- WHAT DID SHE LOSE?

9    HOW MUCH IS IT?

10       WELL, I MADE THIS CALCULATION BASED ON THAT HAD IT NOT

11   BEEN FOR THE TERMINATION, SHE WOULD HAVE CONTINUED TO WORK,

12   EARN WHAT SHE WAS EARNING WITH MINOR INCREASES, WHATEVER THE

13   GENERAL INCREASES ARE NATIONALLY.  SHE WOULD HAVE WORKED FOR

14   HER WORK LIFE ESTIMATE FOR ANOTHER 10.26 YEARS.

15       SHE WOULD HAVE CONTINUED TO GET THOSE FRINGE BENEFITS, AND

16   THAT AMOUNTS TO ABOUT 7,000 -- THE VALUE OF THOSE ARE 7,645 A

17   YEAR PER THE CONTRACT RATE BASED ON 1851 HOURS A YEAR.

18       AND THEN GOING FORWARD, SHE'S GOING TO CONTINUE TO EARN

19   WHAT SHE'S EARNING.  SHE IS WHERE SHE IS.  SO SHE'S GOING TO BE

20   MAKING $12 A YEAR.  AND THAT, OF COURSE, GOES UP, TOO.  THAT

21   GOES UP OVER TIME.  AND SO WE USE THE SAME METHOD FOR THAT.

22       AND, ONCE AGAIN, SHE'S GOING TO DO THAT UNTIL THE END OF

23   HER WORK LIFE ESTIMATE.

24   Q.   AND SO BASED ON THOSE FACTS AND ASSUMPTIONS, HAVE YOU

25   ARRIVED AT AN OPINION IN THIS CASE?

1    A.   YES.

2    Q.   AND WHAT IS THE OPINION THAT YOU ARRIVED AT?

3    A.   MY OPINION IS THAT IF YOU ADD UP THE PAST LOSS AND DO A

4    PRESENT VALUE CALCULATION, ADJUSTED FUTURE WAGE GROWTH, THE

5    TOTAL IS 286,932.

6    Q.   IS THAT WITH THE OFFSETTING OF THE INCOME THAT SHE IS

7    EARNING?

8    A.   THAT'S OFFSETTING THE INCOME THAT SHE DID MAKE UP TO THE

9    PRESENT TIME AND OFFSETTING BY THE MONEY THAT THE INCOME THAT

10   SHE WOULD CONTINUE TO MAKE AT THE SAME RATE WHERE SHE'S WORKING

11   NOW.

12   Q.   AND SO HOW MUCH IS HER LOSS PAST EARNINGS?

13   A.   ALL RIGHT.  THE FIRST PART WE -- IF YOU TAKE THE 20 -- THE

14   AVERAGE OF 27,340 AND YOU ADD THE VALUE OF THE BENEFIT IS ON AN

15   ANNUAL BENEFITS, THE 7,645, THAT GIVES YOU, THAT GIVES YOU

16   34,985, ALMOST 35,000 A YEAR IS THE VALUE OF HER PACKAGE OF

17   EARNINGS AND BENEFITS.

18        FROM THE DATE OF TERMINATION TO THE DATE OF TRIAL IS

19   3.36 YEARS AND SO YOU JUST SIMPLY MULTIPLY THAT, AND THAT'S

20   117,550.

21   Q.   THAT'S THE LOST PAST EARNINGS?

22   A.   WELL, I HAVE NOT ADJUSTED FOR THE MONIES THAT SHE HAS

23   EARNED.  WE DO THAT AT THE END.  BUT THAT'S WHAT SHE HAS LOST

24   SO FAR FOR THE PAST.

25   Q.   AND WHAT ABOUT THE FUTURE LOST EARNINGS?

1    A.   IF THE WORK LIFE ESTIMATE IS 10.26 YEARS AND 3.36 HAS GONE

2    BY, THE FUTURE IS 6.9 YEARS GOING FORWARD.

3         SO AS I EXPLAINED, WELL, IF YOU ARE TRYING TO SAY, WELL,

4    HOW MUCH DO YOU NEED TO PUT AWAY IF YOU WANT TO PAY OUT 34,985

5    A YEAR FOR ALMOST SEVEN YEARS BUT YOU'RE GOING TO MAKE

6    INCREASES IN THE FUTURE, BUT YOU'RE ALSO GOING TO HAVE WHATEVER

7    YOU DON'T PAY OUT IN A GIVEN YEAR STAY IN THE BANK AND GET

8    INTEREST.  WHAT LUMP SUM DO YOU NEED?

9         AND THE ANSWER IS 241,397.  SO THAT IS THE PRESENT VALUE

10   FIGURE THAT YOU PUT AWAY IN THE BANK, AND IT WILL PAY OUT THE

11   ROUGHLY 35,000 THE FIRST YEAR, A LITTLE MORE IN THE SECOND

12   YEAR, AND THE REST STAYS IN THE BANK AND GETS INTEREST.

13        SO AT THE END OF 6.9 YEARS, THIS 241,000 REDUCES TO ZERO.

14   IT'S JUST DESIGNED TO MAKE WHOLE, NO MORE AND NO LESS.

15        SO WE ADD THE PAST AND THE FUTURE, PRESENT VALUE OF FUTURE

16   TOGETHER AND WE GET 358,947.

17   Q.   AND THEN YOU --

18   A.   OH.

19   Q.   I'M SORRY.  GO AHEAD.

20   A.   AND SO NOW WE HAVE TO TAKE AWAY WHAT SHE HAS EARNED AND

21   WHAT SHE IS EARNING NOW.

22        SO WE LOOK AT WHAT SHE DID EARN IN THOSE YEARS SINCE THE

23   TERMINATION AND HERE'S THE AMOUNT BY YEARS.  IT ADDS UP TO

24   7,431.

25        AND THEN WE HAVE TO TAKE A PRESENT VALUE CALCULATION OF

1    GOING FORWARD.

2        SO IF SHE'S MAKING $12 AN HOUR, 15 HOURS A WEEK, 52 WEEKS

3    A YEAR, THAT COMES OUT TO 9,360 A YEAR.

4        ONCE AGAIN, USING THE TOTAL OFFSET METHOD, YOU KNOW, THAT

5    AMOUNT WOULD GO UP.  YOU NEED A LUMP SUM TO REFLECT THE PRESENT

6    VALUE OF THAT AND THAT IS THE 64,584.

7        SO THE TOTAL OF THE OFFSETTING INCOME COMES TO 72,000.  SO

8    THE NET AND TOTAL PAST AND PRESENT VALUE FUTURE IS THE 286,932.

9    Q.   AND THAT AMOUNT IS IN PRESENT VALUE?

10   A.   YES.

11   Q.   OKAY.  THANK YOU, DR. MASON.

12       NO OTHER QUESTIONS FOR THIS WITNESS, YOUR HONOR.

13            THE COURT:  ALL RIGHT.

14                   **CROSS-EXAMINATION**

15   BY MR. MCMANIS:

16   Q.   GOOD MORNING, DR. MASON.

17   A.   GOOD MORNING.

18   Q.   I THINK I HEARD YOU SAY THAT YOUR CALCULATIONS ARE TO SHOW

19   THE LOSS IF THE JURY FINDS LIABILITY IN THIS CASE?

20   A.   CORRECT.

21   Q.   ALL RIGHT.  AND YOU'RE NOT EXPRESSING ANY OPINION ON THE

22   MERITS OF THIS CASE?

23   A.   THAT'S CORRECT.

24   Q.   AND YOU'RE SIMPLY DOING WHAT YOU WERE ASKED TO DO, WHICH

25   IS ASSUMING THIS WAS A WRONGFUL TERMINATION, THESE WAGE FACTS

1    AND SO FORTH AND SO ON, WHAT IS THE LOSS; CORRECT?

2    A.   CORRECT.

3    Q.   ALL RIGHT.  AND, FINALLY, I UNDERSTAND YOU'RE GOING BACK

4    TO PHILADELPHIA FOR A VERY SPECIAL OCCASION; IS THAT RIGHT?

5    A.   YES, SIR.

6    Q.   AND WHAT IS THAT?

7    A.   MY SON'S GRADUATION FROM GRAD SCHOOL.

8    Q.   WELL, CONGRATULATIONS.  THANK YOU.

9    A.   THANK YOU VERY MUCH.

10            MS. NGUYEN:  NO FURTHER QUESTIONS.

11            THE COURT:  YOU MAY BE EXCUSED.

12            MS. NGUYEN:  THANK YOU, DR. MASON.

13            THE WITNESS:  THANK YOU.

14            MS. NGUYEN:  THE PLAINTIFF WOULD LIKE TO RECALL

15   MS. CUC DANG.

16            THE COURT:  ALL RIGHT.

17            MR. MCMANIS:  I THINK SHE'S ON CROSS-EXAMINATION,

18   BUT --

19            MS. NGUYEN:  YES, BUT FOR YOU.

20            MR. MCMANIS:  THAT'S FINE.

21            MS. NGUYEN:  JUST FOR YOU.

22            MR. MCMANIS:  BUT I APPRECIATE THE COURTESY.

23                    **CROSS-EXAMINATION** (RESUMED)

24   BY MR. MCMANIS:

25   Q.   THIS IS JUST A SMALL POINT, MS. DANG, BUT DURING

1    DR. MASON'S TESTIMONY I WAS GIVEN A NOTE THAT YOU HAVE ACTUALLY

2    BEEN MARRIED FOUR TIMES; IS THAT RIGHT?

3    A.   THREE TIMES.

4    Q.   DO YOU RECALL TESTIFYING AT YOUR DEPOSITION THAT YOU WERE

5    MARRIED FOUR TIMES?

6    A.   WELL, I WAS MARRIED FOUR TIMES BUT THE -- I HAD OFFICIAL

7    PAPERS FOR THE THREE AND NOT THE LAST ONE.

8    Q.   CAN WE PUT UP ON THE SCREEN THE DEPOSITION AT PAGE 26,

9    LINE 19.  AND WAIT UNTIL COUNSEL HAS HAD A CHANCE TO LOOK AT

10   THAT, PLEASE.

11        MS. NGUYEN:  THAT'S FINE.

12   BY MR. MCMANIS:

13   Q.   QUESTION AT LINE 19:  "OKAY.  SO YOU'VE BEEN MARRIED FOUR

14   TIMES THEN?

15        "ANSWER:  YES."

16        WAS THAT YOUR TESTIMONY?

17   A.   THAT IS CORRECT, BUT IN VIETNAM WE WERE LIVING TOGETHER.

18   WE HAD A CHILD, BUT WE DID NOT HAVE ANY OFFICIAL PAPERS.  SO AS

19   FAR AS IN THE U.S., THEY DON'T CALL THAT AS A MARRIAGE.

20   Q.   YOUR PRESENT HUSBAND IS JASON SUMMERS?

21   A.   CORRECT.

22   Q.   WHEN WERE YOU AND MR. SUMMERS MARRIED?

23   A.   DECEMBER OF 2009.

24   Q.   AND WHAT DATE?

25   A.   I DON'T REMEMBER.

1     Q.   ALL RIGHT.  YOU DON'T REMEMBER THE DATE OF THE MARRIAGE

2     BUT IT WAS IN DECEMBER OF 2009?

3     A.   CORRECT.

4     Q.   AND IMMEDIATELY BEFORE YOU WERE MARRIED TO

5     MR. JASON SUMMERS, WAS YOUR HUSBAND TANH NGUYEN?

6     A.   CORRECT.

7     Q.   ALL RIGHT.  NOW, I WANT TO SEE IF I CAN CLEAR UP SOME

8     CONFUSION ABOUT YOUR TESTIMONY WITH RESPECT TO CONVERSATIONS

9     AND MEETINGS AFTER THE LUCIO INCIDENT IN APRIL OF 2007.

10         CAN WE PUT UP EXHIBIT 1012, PLEASE.

11         OKAY.  THESE ARE JENNIFER GILBERT'S NOTES, AND WE HAVE THE

12    NOTE OF APRIL 12TH ABOUT GETTING SENT TO SECURITY AND THE NEXT

13    DAY IT STATES, "NICK AND I CALLED CUC TO ASK WHAT HAPPENED."

14         AND THEN YOU SAID WHAT YOU SAID.

15         DO YOU RECALL A TELEPHONE CALL WITH JENNIFER AND NICK

16    ABOUT LUCIO?

17    A.   I CALLED?

18    Q.   NO.  DO YOU RECALL A TELEPHONE CONVERSATION WITH NICK AND

19    JENNIFER ABOUT LUCIO?

20    A.   I REMEMBER.

21         MR. MCMANIS:  CAN YOU PLEASE PUT UP PAGE 186,

22    PLEASE, 13 TO 22 THAT WE LOOKED AT?

23         MS. MCCLELEN:  DEPOSITION?

24         MR. MCMANIS:  DEPOSITION, I APOLOGIZE, 13 TO 22,

25    PAGE 186.

1    Q.   WE WON'T OVER THIS.  THIS REFERS TO A MEETING WITH

2    JOHN ST. CROIX AND JENNIFER.  DO YOU RECALL THAT MEETING?

3    A.   I REMEMBER.

4    Q.   "AND WHAT DID YOU SAY WHEN YOU WERE ASKED 'WHAT DID YOU

5    WANT TO DO'?

6         "ANSWER:  I SAID THAT I DID NOT WANT TO WORK WITH LUCIO

7    ANYMORE.

8         "DID SOMEONE RESPOND TO THAT, SOMEONE WHO WAS IN THE

9    MEETING.

10        "AND JOHN SAID THAT IF I DID NOT WANT TO WORK WITH HIM, HE

11   WOULD CHANGE MY SHIFT.

12        "QUESTION:  AND DID HE DO THAT?

13        "ANSWER:  YES."

14        AND THAT WAS JOHN ST. CROIX?

15   A.   PERHAPS SO.

16   Q.   WELL, PERHAPS SO?  WAS JOHN ST. CROIX THE PERSON YOU MET

17   WITH, WITH JENNIFER?

18   A.   CORRECT.

19   Q.   ALL RIGHT.  IT WASN'T JOHN, YOUR FIRST LAWYER?

20   A.   I DIDN'T SAY THAT I SAW MY FIRST ATTORNEY.

21   Q.   I UNDERSTAND, MA'AM.

22        MY QUESTION IS THE MEETING THAT WAS WITH JENNIFER, THAT

23   WAS JOHN ST. CROIX, NOT MEETING JOHN, THE LAWYER?

24   A.   CORRECT.

25   Q.   NOW, WITH RESPECT TO MIKE WILSON, IT'S CORRECT THAT YOU

1    HAD A ROMANTIC RELATIONSHIP WITH HIM IN YOUR MIND?

2    A.   CORRECT.

3    Q.   AND YOU BELIEVE THAT RELATIONSHIP STARTED IN 2006 SHORTLY

4    AFTER YOU CAME TO WORK AT BAY 101?

5    A.   WELL, I DON'T REMEMBER EXACTLY WHEN, BUT I THINK IT WAS A

6    MONTH AFTER I STARTED WORKING FOR BAY 101 I MET HIM IN THE

7    KITCHEN.

8    Q.   AND THAT WAS IN 2006?

9    A.   I DON'T REMEMBER, BUT PERHAPS SO.

10   Q.   AND DO YOU RECALL STARTING AT BAY 101 IN 2006?

11   A.   I REMEMBER STARTING WORKING THERE IN JULY OF 2006.

12   Q.   AND YOU MET MR. WILSON ABOUT A MONTH AFTER THAT?

13   A.   CORRECT.

14   Q.   NOW, THIS ROMANTIC RELATIONSHIP THAT YOU BELIEVED THE TWO

15   OF YOU HAD THAT WENT ON FOR ABOUT TWO YEARS?

16   A.   CORRECT.

17   Q.   AND AS I UNDERSTAND YOUR TESTIMONY FROM YOUR DEPOSITION,

18   YOU'RE NOT MAKING ANY CLAIM IN THIS LAWSUIT ABOUT YOUR

19   RELATIONSHIP WITH MR. WILSON; IS THAT RIGHT?

20   A.   CORRECT.

21          MR. MCMANIS:  LET'S PUT UP DEPOSITION PAGE 255,

22   LINES 2 TO 14, AFTER MS. NGUYEN HAS HAD A CHANCE TO LOOK AT IT,

23   PLEASE?

24          MS. NGUYEN:  255 AND THE LINES AGAIN, PLEASE?

25          MR. MCMANIS:  2 TO 14.

1                    MS. NGUYEN:  THAT'S FINE.  THANK YOU.

2        BY MR. MCMANIS:

3        Q.   ALL RIGHT.  THIS WAS YOUR DEPOSITION AGAIN.  YOU WERE

4        ASKED THE QUESTION:

5             "SO ARE YOU MAKING A CLAIM IN THIS LAWSUIT THAT YOUR

6        RELATIONSHIP WITH MIKE WILSON WAS HARASSMENT OR DISCRIMINATION

7        OR RETALIATION?"

8             YOU ANSWERED, "YES."

9             "QUESTION:  SO THE RELATIONSHIP THAT YOU HAD WITH

10       MR. WILSON CONSTITUTED HARASSMENT, DISCRIMINATION OR

11       RETALIATION, THAT'S WHAT YOU'RE SAYING?

12            "ANSWER:  WELL, IT'S NOT MR. WILSON.

13            "QUESTION:  OKAY.  SO I'M TALKING SPECIFICALLY ABOUT YOUR

14       RELATIONSHIP AND THE END OF YOUR RELATIONSHIP WITH MR. WILSON.

15       ARE YOU MAKING ANY CLAIM IN THIS LAWSUIT ASSOCIATED WITH THAT

16       RELATIONSHIP?

17            "ANSWER:  NO."

18            THAT WAS YOUR TESTIMONY?

19       A.   CORRECT.

20       Q.   AND THAT TESTIMONY WAS GIVEN AT YOUR DEPOSITION WHERE THE

21       INTERPRETER WAS THERE TO INTERPRET FOR YOU?

22       A.   CORRECT.

23       Q.   AND IT WAS A PROFESSIONAL INTERPRETER?

24       A.   CORRECT.

25       Q.   AND WHO WAS THE INTERPRETER?

1    A.   IT WAS A WOMAN, BUT I DON'T REMEMBER HER NAME.

2    Q.   OKAY.  IT WASN'T MS. LEBRUN?

3    A.   I DON'T REMEMBER.  NO, IT WASN'T CHRISTINE LEBRUN.

4    Q.   AND YOU WERE REPRESENTED BY A LAWYER AT THE DEPOSITION?

5    A.   PRIOR TO -- I NEED TO ASK BECAUSE I DON'T REMEMBER.  IS

6    THIS THE DEPOSITION FROM THE ATTORNEYS FROM BAY 101 WHEN THEY

7    HAD THE CAMERA?

8    Q.   WELL, YES?

9    A.   AND SO IT WAS CHRISTINE LEBRUN.

10   Q.   AND WHO IS CHRISTINE LEBRUN?

11   A.   (INDICATING).

12   Q.   A PRETTY GOOD INTERPRETER?

13   A.   VERY WELL.

14   Q.   AND ANN NGUYEN WAS REPRESENTING YOU AT THAT TIME; IS THAT

15   RIGHT?

16   A.   THAT'S CORRECT.

17   Q.   NOW, I'M GOING TO MOVE ON TO THE INCIDENT WITH LINDA ELIAS

18   ON OCTOBER 4, 2009.  DO YOU REMEMBER THAT INCIDENT?

19   A.   I REMEMBER.

20   Q.   AND DO YOU RECALL THAT YOU WENT OVER THE VIDEO FOR US

21   YESTERDAY?

22   A.   I REMEMBER.

23   Q.   OKAY.  I'M NOT GOING TO DO THAT AGAIN, BUT I'D LIKE TO PUT

24   UP EXHIBIT 505 IN EVIDENCE, LINDA ELIAS'S STATEMENT.

25        NOW, IN HER STATEMENT DATED OCTOBER 6TH, 2009, MS. ELIAS

1     SAYS ABOUT YOU THAT SHE WAS VERY UPSET AND STARTED YELLING AT

2     ME IN THE KITCHEN.

3          IS THAT TRUE?

4     A.   NO.

5     Q.   AND SHE GOES ON TO SAY, AFTER I RETURNED THE MONEY, CUC

6     WENT TO THE CUSTOMER AND CREATED A SCENE.

7          IS THAT TRUE?

8     A.   NO.

9     Q.   AND SHE TOLD HIM IT WAS HIS FAULT, AND SHE SHOWED HIM A

10    LIST OF DRINKS THAT SHE HAD HANDWRITTEN.

11         DID YOU SHOW THE CUSTOMER YOUR DRINKS LIST?

12    A.   I SHOWED THE PAPER BUT IT WASN'T -- WHEN I CAME OUT, I

13    JUST SAID THAT I WANTED TO MAKE THE CUSTOMER HAPPY.  AND IN THE

14    KITCHEN LINDA HAD ALREADY TAKEN THE MONEY BACK.

15         AND I HAD EXPLAINED THAT IT WASN'T -- I EXPLAINED TO THE

16    CUSTOMER THAT IT WASN'T MY FAULT THAT THE ORDER WAS WRONG.

17    Q.   I UNDERSTAND.  MY QUESTION IS A SIMPLE ONE:  DID YOU SHOW

18    THE CUSTOMER THE DRINKS THAT YOU HAD HANDWRITTEN?

19    A.   YES.

20    Q.   NOW, LINDA ELIAS IN HER STATEMENT DATED OCTOBER 6TH, 2009,

21    SAYS, "CUC WENT TO THE KITCHEN AND STARTED YELLING AT KEN

22    MEAKCHAROON."

23         DO YOU SEE THAT?

24    A.   I SEE IT.

25    Q.   IS THAT TRUE?

1    A.   NO.

2    Q.   "KEN TOLD HER IF SHE DIDN'T QUIT YELLING, HE WOULD SEND

3    HER HOME."

4         DID KEN TELL THAT TO YOU?

5    A.   THAT'S COMPLETELY FALSE.

6    Q.   OKAY.  LET'S TAKE A LOOK AT EXHIBIT 500, PAGE 47.

7              THE INTERPRETER:  COUNSEL, IS IT EXHIBIT 400?

8              MR. MCMANIS:  YES, 500.  AND IT'S PAGE 47.

9         AND WHILE YOU'RE GETTING THAT, I'M GOING TO ASK

10   MS. MCCLELEN TO PULL UP THIS PARAGRAPH AND THE COMMENTS

11   IMMEDIATELY BELOW IT.

12   Q.   DO YOU HAVE IT?

13   A.   YES.

14   Q.   THANK YOU.

15        NOW, HERE IS WHERE MS. EDMAN IN HER REPORT TALKS ABOUT HER

16   INTERVIEW WITH MR. MEAKCHAROON.

17        "MR. MEAKCHAROON PROVIDED THE INVESTIGATOR WITH DETAILS.

18   HE HEARD MS. DANG COME INTO THE KITCHEN TALKING LOUDLY AND

19   CUSSING."

20        AND YOU SAY THAT'S COMPLETELY FALSE?

21   A.   I NEVER SAID THAT TO HER.

22   Q.   I UNDERSTAND YOU DIDN'T SAY THAT TO HER.  THIS IS

23   MR. MEAKCHAROON.

24        MY QUESTION TO YOU IS HIS CLAIM THAT YOU WERE TALKING

25   LOUDLY AND CUSSING, IS THAT COMPLETELY FALSE?

1    A.   IT'S NOT CORRECT.

2    Q.   AND THEN HE'S QUOTED HERE IN THE REPORT HE'S STATED AS,

3    QUOTE, "MS. DANG SAID THIS IS F...ING B...S... WHOLE WORDS."

4         DID YOU EVER SAY THAT IN THE KITCHEN?

5    A.   NO.

6    Q.   "I SAID CALM DOWN."  DID HE TELL YOU TO CALM DOWN?

7    A.   I ASKED IF I COULD LEAVE EARLY BECAUSE I DIDN'T FEEL

8    COMFORTABLE WORKING TOGETHER WITH LINDA.

9    Q.   DID HE TELL YOU TO CALM DOWN?

10   A.   NO, HE DIDN'T SAY THAT.

11   Q.   HE GOES ON TO SAY, "CUC KEPT YELLING, WAS MAD, F....

12   B...S..."

13        WERE YOU ANGRY?

14   A.   NO.

15   Q.   HE THEN IS QUOTED AS SAYING, "I SAID I CAN'T HAVE THAT

16   ATTITUDE.  I SAID I'M THE REFEREE, NOT THE JUDGE.  NICK WILL BE

17   HERE IN THE MORNING.  IT'S HIS DECISION."

18        AND THEN THIS PART:  "RIGHT NOW YOU HAVE TO CALM DOWN OR

19   NO CHOICE BUT TO SEND YOU HOME."

20        DID HE TELL YOU THAT "RIGHT NOW YOU HAVE TO CALM DOWN OR

21   NO CHOICE BUT TO SEND YOU HOME"?

22   A.   HE DID NOT SAY THAT.

23   Q.   OKAY.  WOULD YOU PLEASE PUT UP 506, PLEASE.

24        NOW, THIS IS A STATEMENT BY ARLENE FONTILLAS, HANDWRITTEN,

25   DATED OCTOBER 7, 2009.

1          AND MY FIRST QUESTION IS DO YOU KNOW ARLENE FONTILLAS?

2     A.   YES.

3     Q.   WAS SHE IN THE VIDEOTAPE WE LOOKED AT YESTERDAY?

4     A.   YES, I SAW IT.

5     Q.   SHE SAYS, "ON OCTOBER 4, SUNDAY, AT ABOUT MIDNIGHT I WAS

6     PLAYING AT THE POKER SIDE."

7          DO YOU RECALL THAT SHE WAS SITTING THERE PLAYING?

8     A.   I REMEMBER.

9     Q.   "WHEN ALL OF A SUDDEN I HEARD YELLING ON THE NEXT TABLE,

10    IT WAS CUC WITH A CUSTOMER."

11         WERE YOU YELLING AT THE NEXT TABLE WITH A CUSTOMER?

12    A.   NO.

13    Q.   SHE GOES ON TO SAY, "I WAS A SERVER ALSO AND I THOUGHT I

14    COULD HELP."

15         IS ARLENE FONTILLAS A SERVER?

16    A.   CORRECT.

17    Q.   "TRIED TO CALM CUC BUT INSTEAD CUC RAISED HER VOICE ON THE

18    CASINO FLOOR."

19         IS THAT TRUE THAT YOU WERE RAISING YOUR VOICE ON THE

20    CASINO FLOOR?

21    A.   NO.

22    Q.   NOW, YOU WERE DISCIPLINED, RIGHTLY OR WRONGLY, YOU WERE

23    DISCIPLINED FOR THAT INCIDENT ON OCTOBER 4TH, '09; CORRECT?

24    A.   CORRECT.

25    Q.   A SUSPENSION?

1    A.   CORRECT.

2    Q.   RIGHT.  AND YOU FILED A GRIEVANCE ON THAT ON OCTOBER 8TH;

3    IS THAT RIGHT?

4    A.   CORRECT.

5    Q.   AND YOU SENT A LETTER TO MR. WERNER ON OCTOBER 13TH?

6    A.   CORRECT.

7    Q.   LET'S TAKE A LOOK AT THE LETTER TO MR. WERNER FIRST,

8    EXHIBIT 1016.

9         FIRST OF ALL, YOU INCLUDED IN THE LETTER TO MR. WERNER

10   COUNSELLING MEMOS ABOUT THE INCIDENT WITH LINDA AND ALSO

11   PROBLEMS WITH BALANCING ENVELOPES; IS THAT RIGHT?

12   A.   CORRECT.

13   Q.   OKAY.  LET'S LOOK AT THOSE.  THIS IS THE COUNSELLING MEMO

14   DATED OCTOBER 8TH, '09, WITH THE SUSPENSION ARGUING WITH A

15   CUSTOMER AND A COWORKER ON THE CASINO FLOOR.

16        AND LET'S GO DOWN TO THE BOTTOM, THE SIGNATURE LINE.

17        DO YOU RECOGNIZE THAT AS NICK ORTEGA'S SIGNATURE DATED

18   OCTOBER 8TH, 2009?

19   A.   YES.

20   Q.   OKAY.  AND THEN YOU FILED A GRIEVANCE ON THAT THE SAME

21   DAY; IS THAT RIGHT?

22   A.   I THINK IT WAS THE NEXT DAY BUT MAYBE SO.

23   Q.   LET'S LOOK AT THE GRIEVANCE, PLEASE, IT'S EXHIBIT 532 IN

24   EVIDENCE.

25        NOW, THIS IS A GRIEVANCE -- THIS IS THE GRIEVANCE THAT YOU

1    FILED AS A RESULT OF THE SUSPENSION; IS THAT RIGHT?

2    A.   THAT'S CORRECT.

3    Q.   OKAY.  AND THAT'S YOUR SIGNATURE AT THE BOTTOM OF THE

4    PAGE?

5    A.   CORRECT.

6    Q.   AND IT'S DATED OCTOBER 8, 2009?

7    A.   CORRECT.

8    Q.   AND YOU LIST THE STATEMENT OF YOUR GRIEVANCE FOUR ITEMS?

9              JUROR:  CAN WE BLOW THAT UP?

10   BY MR. MCMANIS:

11   Q.   IS THAT RIGHT?

12   A.   CORRECT.

13   Q.   AND WHOSE HANDWRITING IS THIS WHERE YOU LIST YOUR FOUR

14   ITEMS?

15   A.   MY HUSBAND'S.

16   Q.   THAT'S JASON SUMMERS?

17   A.   CORRECT.

18   Q.   HE WROTE THAT OUT?

19   A.   CORRECT.

20   Q.   AND THEN YOU SIGNED AND DATED IT?

21   A.   I SIGNED IT, BUT AS FAR AS THE DATE, I DON'T REMEMBER

22   EXACTLY.

23   Q.   SO EITHER YOUR HUSBAND PUT THE DATE IN OR YOU PUT THE DATE

24   IN?

25   A.   I DON'T REMEMBER.

1    Q.   BUT IN ANY CASE, IT WAS THE SAME DAY THAT YOU GOT YOUR

2    COUNSELLING MEMO?

3    A.   I DON'T REMEMBER IF IT'S THE SAME DAY.

4         MR. MCMANIS:  CINDY.

5         THE WITNESS:  I RECOGNIZE MY OWN SIGNATURE, BUT AS

6    FAR AS THE DATE, IT COULD BE MY HUSBAND THAT WROTE IT OR IT

7    COULD HAVE BEEN ME.

8    BY MR. MCMANIS:

9    Q.   OKAY.  LET'S JUST LOOK AT THE FIRST PARAGRAPH HERE.  BLOW

10   THAT UP, PLEASE.  PARAGRAPH 1, "SUPERVISOR IS USING UNION

11   EMPLOYEES TO RETALIATE AGAINST ME FOR FILING SEXUAL HARASSMENT

12   CHARGES AGAINST HIM IN THE PAST."

13        AND WHO IS THE SUPERVISOR?

14   A.   NICK.

15   Q.   I SEE.  AND "USING UNION EMPLOYEES TO RETALIATE AGAINST

16   ME."

17        WHAT UNION EMPLOYEES WAS HE USING IN YOUR OPINION TO

18   RETALIATE AGAINST YOU?

19   A.   WHAT I WAS TRYING TO SAY IS THAT I WAS TRYING TO SAY THAT

20   IT WAS LUCIO, AND THAT WAS PREVIOUSLY.

21   Q.   WELL, THIS IS THE GRIEVANCE THAT YOU FILED FOR THE

22   OCTOBER 4, 2009, INCIDENT; CORRECT?

23   A.   CORRECT.

24   Q.   ALL RIGHT.  AND YOU TOLD US THAT THE SUPERVISOR YOU HAD IN

25   MIND THERE WAS NICK.

1          AND MY QUESTION IS THAT WHEN YOU SAY NICK WAS USING UNION

2     EMPLOYEES TO RETALIATE AGAINST YOU FOR FILING SEXUAL HARASSMENT

3     CHARGES AGAINST YOU IN THE PAST, WHO WERE THE UNION EMPLOYEES

4     THAT YOU THOUGHT HE WAS USING TO RETALIATE AGAINST YOU?

5     A.   I THINK HIS NAME WAS ART.

6     Q.   ARE THE EMPLOYEES AT BAY 101 UNION EMPLOYEES?

7     A.   THE KITCHEN EMPLOYEES AND EMPLOYEES THAT ARE FULL SERVICE

8     ARE UNIONIZED.

9     Q.   ALL RIGHT.  SO LINDA ELIAS IS A UNION EMPLOYEE?

10    A.   CORRECT.

11    Q.   AND ARLENE FONTILLAS IS A UNION EMPLOYEE?

12    A.   CORRECT.

13    Q.   IS KEN MEAKCHAROON A UNION EMPLOYEE?

14    A.   CORRECT.

15    Q.   WERE THESE UNION EMPLOYEES THAT NICK WAS USING TO

16    RETALIATE AGAINST YOU?

17    A.   I DON'T KNOW WHO NICK WAS USING.

18    Q.   OKAY.  YOU SAY, "FOR FILING SEXUAL HARASSMENT CHARGES

19    AGAINST HIM IN THE PAST."

20         I UNDERSTOOD THAT IN THE PAST TWO AND A HALF YEARS BEFORE

21    YOU HAD FILED A SEXUAL HARASSMENT CHARGE AGAINST LUCIO?

22    A.   CORRECT.

23    Q.   OKAY.  NOW, IS IT TRUE, MS. DANG, THAT YOU BELIEVED THAT

24    WHAT HAPPENED ON OCTOBER 4, 2009, WAS THAT LINDA ELIAS WAS

25    TRYING TO STEAL YOUR CUSTOMER?

1    A.   I THINK SO.

2    Q.   OKAY.  AND I THINK YOU MADE THAT CLAIM IN YOUR LETTER TO

3    MR. WERNER.

4         IF WE COULD PUT 1016 UP, PLEASE.  SECOND LINE, PLEASE, AND

5    THESE LAST THREE OR FOUR LINES IN THIS PARAGRAPH.  STARTING "IN

6    THIS PARTICULAR INCIDENT."

7         THIS IS FROM YOUR LETTER.  "IN THIS PARTICULAR INCIDENT, I

8    BELIEVE SHE WAS SIMPLY TRYING TO STEAL A GOOD TIPPING CUSTOMER

9    FROM A MORE POPULAR WAITRESS.  I HAVE OWNED FIVE RESTAURANTS

10   MYSELF AND DON'T NEED ANY TRAINING FROM SOMEONE AS

11   UNPROFESSIONAL AS LINDA."

12        THAT WAS IN THE LETTER THAT YOU SIGNED?

13   A.   CORRECT.

14   Q.   AND WHEN YOU SAID THAT "SHE WAS SIMPLY TRYING TO STEAL A

15   GOOD TIPPING CUSTOMER," THAT WAS LINDA ELIAS?

16   A.   CORRECT.

17   Q.   AND "FROM A MORE POPULAR WAITRESS," THAT WAS YOU I TAKE

18   IT?

19   A.   CORRECT.

20   Q.   AND YOU GO ON TO SAY YOU DON'T NEED ANY TRAINING FROM

21   SOMEONE AS UNPROFESSIONAL AS LINDA.

22        DO YOU SEE THAT?

23   A.   YES.

24   Q.   NOW, BAY 101 HAD TRIED TO TRAIN YOU WHEN YOU MOVED FROM

25   THE KITCHEN TO THE FLOOR AS A SERVER; IS THAT RIGHT?

1    A.   CORRECT.

2    Q.   AND DO YOU RECALL THAT ELLIS WAS YOUR TRAINER?

3    A.   CORRECT.

4    Q.   AND LET'S TAKE A LOOK AT MS. EDMAN'S REPORT ON PAGE 19.

5         AND IF YOU COULD BLOW UP THIS BULLET POINT HERE, PLEASE

6    (INDICATING).

7         NOW, THIS IS YOUR INTERVIEW WITH CAROLE EDMAN.  TELL ME

8    WHEN YOU'RE READY?

9    A.   OKAY.

10   Q.   AND MS. EDMAN NOTES IN HER REPORT THAT "MS. DANG STATED IN

11   HER INTERVIEW WITH INVESTIGATOR ON 11-3-09," QUOTE, "I LOVE MY

12   JOB NOW.  I HAD THREE WEEKS TRAINING.  A CHINESE LADY TRAINED

13   ME; HER FIRST NAME IS ELLIS.  SHE DIDN'T REALLY TRAIN, SHE

14   WANTED TO MAKE MONEY FOR HERSELF."

15        DID YOU SAY THAT ABOUT ELLIS?

16   A.   CORRECT.

17   Q.   AND DID YOU FEEL THAT ELLIS WAS ALSO SOMEONE TRYING TO

18   STEAL YOUR TIPS?

19   A.   NO, SHE WASN'T TRYING TO STEAL THE TIPS.  AND WHEN I WAS

20   BEING TRAINED, I WOULD GET THE MONEY FROM THE CUSTOMER AND GIVE

21   IT TO HER.  THAT'S IT.

22   Q.   AND YOU FELT THAT SHE DIDN'T REALLY WANT TO TRAIN YOU, SHE

23   JUST WANTED THE MONEY FOR HERSELF?

24   A.   CORRECT.

25   Q.   NOW, YOU GO ON TO SAY, "I KNEW ALREADY.  I JUST LEARNED

1   MYSELF.  HAD MY OWN RESTAURANTS IN VIETNAM AND IN LAS VEGAS.  I

2   HAVE NO PROBLEMS WITH CUSTOMERS.  THEY LOVE ME.  FOOD IS EASY."

3        WAS THAT YOUR STATEMENT?

4   A.   CORRECT.

5   Q.   NOW, LET'S TAKE A LOOK AT PAGE 54 OF MS. EDMAN'S REPORT,

6   EXHIBIT 500.  AND LET'S BLOW UP STARTING AT SIX LINES DOWN

7   UNDER THIS SECTION WHERE IT SAYS, "MS. NG STATED SHE HAS

8   TRAINED FOOD SERVERS OF ALL DIFFERENT NATIONALITIES."

9        NOW, MS. NG IS MS. ELLIS; IS THAT RIGHT?

10  A.   I DON'T KNOW THE LAST NAME.

11  Q.   WELL, NG IS A VIETNAMESE NAME.

12  A.   SHE DID HAVE A VIETNAMESE NAME, BUT AT THIS POINT I DON'T

13  REMEMBER.

14  Q.   THAT'S FINE.  SHE WAS CHINESE WITH A VIETNAMESE NAME?

15  A.   I DON'T REALLY REMEMBER HER VIETNAMESE NAME.

16  Q.   FINE.  NOW, SHE STATED IN HER INTERVIEW WITH MS. EDMAN,

17  THIS NG OR ELLIS, THAT SHE HAS TRAINED FOOD SERVERS OF ALL

18  DIFFERENT NATIONALITIES; THAT SHE HAD A REAL DIFFICULT TIME

19  TRAINING MS. DANG.

20       DID YOU FEEL THAT THERE WERE SOME DIFFICULTIES IN YOUR

21  TRAINING?

22  A.   THE DIFFICULTY WAS THAT I WAS NOT ABLE TO GET THE

23  EXPERIENCE FROM HER BECAUSE SHE DIDN'T TRAIN.

24  Q.   WELL, SHE GAVE SOME REASONS.  LET'S LOOK AT THOSE.

25       "MS. DANG PRETENDS SHE UNDERSTAND IS BUT DOESN'T."

1          DID THAT EVER HAPPEN?

2     A.   I DID NOT KNOW THAT SHE WROTE THAT, BUT I DON'T THINK

3     THAT'S WHAT HAPPENED.

4     Q.   OKAY.  SHE SAID TO CAROLE EDMAN, "MS. DANG DOES NOT LISTEN

5     TO THE TRAINER OR THE CUSTOMERS"; IS THAT THE CASE?

6     A.   THAT'S NOT CORRECT.

7     Q.   "THAT MS. DANG DID NOT WRITE THINGS DOWN AS MS. NG

8     SUGGESTED SO THAT MS. DANG COULD BRING QUESTIONS TO MS. NG

9     BEFORE MAKING MISTAKES."

10         WAS THAT TRUE.

11    A.   NO.

12    Q.   "THAT MS. DANG BROUGHT CUSTOMERS THE WRONG ORDERS BECAUSE

13    OF THIS."

14         WAS THAT A PROBLEM YOU HAD, MS. DANG, BRINGING CUSTOMERS

15    THE WRONG ORDERS?

16    A.   YES, SOMETIMES.

17    Q.   "MS. DANG QUIT TRYING TO LEARN THE BAR DRINKS WHEN GIVEN

18    THE CHANCE TO DO SO."

19         IS THAT CORRECT?

20    A.   THAT'S NOT CORRECT.

21    Q.   "MS. DANG DOESN'T SAY WHEN SHE DOESN'T UNDERSTAND WHAT A

22    CUSTOMER WANTS."

23         TIS HAT TRUE?

24    A.   THAT'S NOT CORRECT.

25    Q.   "AND THAT MS. DANG DOES NOT GET ALONG WELL WITH HER

1     COWORKERS."

2          WAS THAT YOUR EXPERIENCE?

3     A.   THAT'S INCORRECT.

4     Q.   LET'S LOOK AT THE NEXT PARAGRAPH.

5          "MS. NG GAVE HER PERCEPTION THAT MS. DANG HAD MORE VOIDS

6     THAN ANYONE ELSE HAD IN THE PAST."

7          WHAT IS A VOID?

8     A.   COULD YOU REPEAT IT?

9     Q.   WHAT IS A VOID?

10    A.   I DON'T REMEMBER WHAT YOU'RE SAYING.  PLEASE REPEAT IT.

11    Q.   DO YOU UNDERSTAND AT BAY 101 WHAT A VOID WAS?

12    A.   IF THERE'S A PROBLEM WITH THE FOOD ORDER THEN YOU VOID IT,

13    YOU CANCEL IT.

14    Q.   ALL RIGHT.  AND IS IT TRUE THAT YOU HAD MORE VOIDS THAN

15    OTHER SERVERS AT BAY 101?

16    A.   THAT'S NOT REALLY CORRECT.

17    Q.   "MS. NG SAID THAT IT TOOK LONGER FOR MS. DANG TO LEARN

18    THIS JOB THAN ANYONE ELSE IN THE PAST."

19         DID IT SEEM TO YOU THAT IT TOOK YOU A LONG TIME TO LEARN

20    THE JOB?

21    A.   NO.

22    Q.   "MS. NG FELT THE OTHER FOOD SERVERS HAD TRIED TO HELP

23    MS. DANG WHEN ASKED."

24         IS THAT TRUE?

25    A.   THAT'S NOT CORRECT.

1    Q.   DID YOU FEEL THAT SOME OF THE OTHER FOOD SERVERS WHO WERE

2    UNION EMPLOYEES WERE TRYING TO RETALIATE AGAINST YOU FOR

3    SOMETHING?

4    A.   THAT'S CORRECT.

5    Q.   IN ANY CASE AFTER THE OCTOBER 4, 2009 INCIDENT FOR WHICH

6    YOU WERE SUSPENDED, YOU FILED A GRIEVANCE; IS THAT RIGHT?

7    A.   CORRECT.

8    Q.   AND LET'S JUST PUT THAT UP AGAIN TO MAKE SURE WE'RE ON THE

9    SAME PAGE HERE.  EXHIBIT 532.

10        THE GRIEVANCE THAT YOU FILED -- GO AHEAD.  I'M SORRY.  THE

11   GRIEVANCE THAT YOU FILED THE SAME DAY YOU GOT YOUR SUSPENSION

12   MEMO THERE WAS A MEDIATION ABOUT THAT?

13   A.   CORRECT.

14   Q.   AND THAT WAS UNDER THE UNION?

15   A.   CORRECT.

16   Q.   RIGHT.  AND THAT'S THE ONE THAT YOU LEFT?

17   A.   CORRECT.

18   Q.   AND, NOW, YOU TESTIFIED YESTERDAY ABOUT WHY YOU LEFT, AND

19   I WANT TO BE SURE THAT THIS IS CORRECT.  TAKE A LOOK, PLEASE --

20   WE'RE GOING TO PUT UP YESTERDAY'S TESTIMONY AT PAGE 547,

21   STARTING AT LINE 18.

22        AND IF YOU WOULD BLOW UP LINE 18 TO LINE 22.  YOU WERE

23   ASKED BY MS. NGUYEN:

24        "OKAY.  AND YOU WERE HERE, I BELIEVE, LAST WEEK WHEN

25   MR. WERNER SAID THAT YOU WALKED OUT OF A UNION MEDIATION THAT

1    AROSE FROM THIS SUSPENSION.

2         "DO YOU RECALL THAT?

3         "ANSWER:  I REMEMBER."

4         THAT WAS YOUR TESTIMONY YESTERDAY?

5    A.   CORRECT.

6    Q.   AND THEN THE NEXT QUESTION AND ANSWER:

7         "QUESTION:  AND WITHOUT SAYING WHAT WAS DISCUSSED IN THE

8    UNION MEDIATION, CAN YOU TELL US WHY MR. WERNER IS SAYING THAT

9    YOU WALKED OUT OF THE UNION MEDIATION?"

10        AND THEN YOUR ANSWER APPEARS ON PAGE 548.  AND LET'S BLOW

11   UP 548:1 TO 10.

12        "I HAD BEEN THERE WORKING AT 11:00 O'CLOCK P.M. UNTIL 7:00

13   A.M. THE NEXT DAY.  I HAD TO STAY THERE UNTIL 10:00 O'CLOCK AND

14   THEN THE MEETING WOULD START.  THE MEETING LASTED UNTIL 10:30.

15        "I WAS HUNGRY, AND I WAS TIRED.  AND I WAS SLEEPY.  I

16   COULDN'T TAKE IT ANYMORE.

17        "I STOOD UP AND I ASKED IF I COULD GO HOME BECAUSE IF I

18   STAYED HERE LONGER, I COULD FAINT BECAUSE I'M SO TIRED.

19        "QUESTION:  AND DID THEY LET YOU GO?

20        "ANSWER:  JENNIFER SAID, THAT'S RIGHT, YOU HAVE BEEN

21   WORKING SINCE LAST NIGHT SO YOU ARE TIRED.  SO I WENT HOME."

22        NOW, MY QUESTION IS, IS IT YOUR TESTIMONY THAT JENNIFER

23   GILBERT TOLD YOU, YOU DON'T HAVE TO STAY AROUND HERE?  YOU

24   COULD LEAVE THE MEDIATION?  IS THAT WHAT YOU'RE TELLING US?

25   A.   NO, THAT'S NOT RIGHT.  WHEN I SAID 10:30, I MEANT TO SAY

1    1:30.  I DON'T KNOW WHY IT SAYS 10:30 ON THERE.

2    Q.  DO YOU KIND OF UNDERSTAND WHAT THE INTERPRETER IS SAYING

3    IN ENGLISH, MA'AM.

4    A.  I UNDERSTAND A LITTLE.

5    Q.  WELL, YOU JUST CORRECTED HER, CORRECT?

6    A.  CORRECT.

7    Q.  ALL RIGHT.  WELL, THAT'S NOT REALLY MY QUESTION ABOUT

8    10:00 OR 10:30.

9        MY QUESTION HAS TO DO WITH JENNIFER GILBERT AND THE

10   QUESTION THAT YOU WERE ACTUALLY ASKED BY YOUR LAWYER WAS AT

11   LINE 8:  "AND DID THEY LET YOU GO? "

12       AND THE ANSWER YOU GAVE WAS:  "JENNIFER SAID, THAT'S

13   RIGHT, YOU HAVE BEEN WORKING SINCE LAST NIGHT SO YOU ARE TIRED.

14   SO I WENT HOME."

15       WITH RESPECT, I'D LIKE TO SEE IF YOU CAN ANSWER THE

16   QUESTION THAT YOU WERE ASKED, DID THEY LET YOU GO?  DID THE

17   MEDIATOR SAY THAT YOU'RE FREE TO GO?

18   A.  JENNIFER SAID TO SOMEONE THERE, SHE AGREED WITH ME THAT I

19   HAD BEEN WORKING SINCE THE NIGHT BEFORE.

20   Q.  DID SOMEONE TELL YOU THAT IT WAS ALL RIGHT FOR YOU TO

21   LEAVE THE MEDIATION?

22   A.  NO ONE SAID THAT.

23   Q.  BUT YOU DID LEAVE THE MEDIATION?

24   A.  JUST BEFORE I LEFT I SAID THAT.

25   Q.  LET'S GO BACK TO THE EDMAN REPORT AT PAGE 3, PLEASE, AND

1    WOULD YOU BLOW UP THE INTERVIEW SECTION IN THE MIDDLE OF THE

2    PAGE, PLEASE.

3         "THE INVESTIGATOR INTERVIEWED MS. DANG ON NOVEMBER 3, 2009

4    AND NOVEMBER 5, 2009, WITH THE ASSISTANCE OF A TRANSLATOR

5    MS. KIM ROBERTS DURING BOTH INTERVIEW DATES."

6         AND MS. ROBERTS WAS THE PROFESSIONAL INTERPRETER?

7    A.   CORRECT.

8    Q.   AND MR. STEVEN NGO WAS PRESENT ON THAT DAY ALSO.  THAT'S

9    YOUR SECOND LAWYER?

10   A.   MY FIRST ATTORNEY.

11   Q.   WELL, DIDN'T YOU HAVE A LAWYER NAMED JOHN WORKING FOR YOU

12   ON YOUR APRIL 2007 LETTER?

13   A.   I JUST ASKED HIM TO WRITE THIS LETTER FOR ME BAY 101,

14   THAT'S ALL.

15   Q.   ALL RIGHT.  IN ANY CASE, WHETHER HE WAS YOUR FIRST OR

16   SECOND LAWYER, STEVEN NGO WAS PRESENT; RIGHT?

17   A.   CORRECT.

18   Q.   AND HE WAS PRESENT IN THE INTERVIEW AS YOUR LAWYER AT YOUR

19   REQUEST; IS THAT RIGHT?

20   A.   CORRECT.

21   Q.   AND WOULD YOU PUT THE TABLE OF CONTENTS AND PUT THE COVER

22   SHEET OF EXHIBIT 500, THE FRONT PAGE UP, PLEASE.

23        NOW, THIS IS THE CONFIDENTIAL INVESTIGATION REPORT,

24   "SUMMARY OF KEY FINDINGS OF INVESTIGATION PREPARED BY

25   CAROLE EDMAN," SUBMITTED TO OUR LAW FIRM DECEMBER 10, 2009?

1          AND THIS IS A REPORT THAT HAS BEEN TURNED OVER TO YOUR

2     LAWYER IN THIS CASE; IS THAT RIGHT?

3     A.   BAY 101 DID NOT GIVE ME THIS SO I DON'T KNOW.

4     Q.   MY QUESTION WAS THIS IS THE REPORT THAT HAS BEEN TURNED

5     OVER TO YOUR LAWYER MS. ANN NGUYEN IN THIS CASE?

6     A.   CORRECT.

7     Q.   WITHOUT TELLING ME ANYTHING THAT YOU SAID TO HER OR SHE

8     SAID TO YOU, YOU HAVE SEEN THIS REPORT NOW?

9     A.   I DON'T REMEMBER.

10    Q.   LET'S LOOK AT THE TABLE OF CONTENTS, PLEASE.

11         NOW, HERE MS. EDMAN LISTS THE 15 PEOPLE SHE SPOKE TO

12    STARTING WITH YOU, JENNIFER GILBERT, ANYTHING ORTEGA,

13    LUCIO SUAREZ WHO WE HAVE HEARD ABOUT IN THIS CASE.

14         YOU HEARD ABOUT ALL OF THOSE PEOPLE AT BAY 101?

15    A.   YES, I DO.

16    Q.   LINDA ELIAS, THE PERSON WHO YOU FELT WAS TRYING TO STEAL

17    YOUR CUSTOMER, YOU KNEW HER?

18    A.   YES.

19    Q.   MS. CHI LUONG, THE PBX OPERATOR WE HEARD FROM YESTERDAY?

20    A.   YES.

21    Q.   AND WE ALSO HEARD FROM MICHAEL WILSON.

22         NGA NGUYEN, NUMBER 8, IS THAT ALSO A PERSON WE KNOW AS

23    NINA?

24    A.   CORRECT.

25    Q.   AND IS THAT ALSO A PERSON THAT YOU SAID LUCIO HAD BEEN

1      BOTHERING?

2      A.   CORRECT.

3      Q.   KATE KNAPP, THE COMPLIANCE OFFICER, MR. MEAKCHAROON,

4      GRAVEYARD SUPERVISOR, MS. SO NGUYEN.  SHE WAS A COOK?

5      A.   CORRECT.

6      Q.   AND THAT'S THE OTHER PERSON YOU SAID THAT LUCIO HAD BEEN

7      BOTHERING?

8      A.   CORRECT.

9      Q.   AND JOSE SOLIS, LEAD SUPERVISOR.  YOU KNEW HIM?

10     A.   YES.

11     Q.   AND THIS ALBERTA HORCHING-NG ALSO WAS A FOOD SERVER; IS

12     THAT RIGHT?

13     A.   YES.

14     Q.   AND NOW I THINK I LEFT OFF A VERY IMPORTANT PERSON, NUMBER

15     6, MS. ANYH HUYNH.  SHE WAS A COOK?

16     A.   CORRECT.

17     Q.   AND SHE WAS VIETNAMESE?

18     A.   CORRECT.

19     Q.   AND SHE WAS THE REAL HEAD CHEF AT BAY 101, WAS SHE NOT?

20     A.   CORRECT.

21     Q.   IN CHARGE OF VIETNAMESE FOOD?

22     A.   CORRECT.

23     Q.   DO YOU REMEMBER GETTING INTO AN ARGUMENT WITH HER ABOUT

24     YOUR SOUP?

25     A.   NEVER.

1    Q.   NEVER.  IT'S YOUR TESTIMONY THAT SHE NEVER TOLD YOU THAT

2    THE SOUP IS TOO WATERY, WE'RE GETTING COMPLAINTS FROM THE

3    CUSTOMERS?

4    A.   THAT NEVER HAPPENED.

5    Q.   NUMBER 6, IS SHE ALSO KNOWN IN THE KITCHEN AS MAMA ANH,

6    MAMA ANH?

7    A.   CORRECT.

8    Q.   NOW, YOU WERE HERE LAST WEEK WHEN MR. WERNER TESTIFIED?

9    A.   CORRECT.

10   Q.   OKAY.  AND YOU KNOW MR. WERNER?

11   A.   I DO KNOW HIM.

12   Q.   BY THE WAY, DO YOU FEEL RON WERNER IS PREJUDICED AGAINST

13   VIETNAMESE PEOPLE?

14   A.   I HAVE HAD VERY LITTLE CONTACT WITH HIM SO I'M NOT -- I

15   DON'T KNOW.

16   Q.   ALL RIGHT.  HAVE YOU EVER MET HIS WIFE?

17   A.   NEVER.

18   Q.   ALL RIGHT.  DO YOU RECALL MR. WERNER WHEN HE TESTIFIED

19   LAST WEEK TALKED ABOUT MS. EDMAN'S CONCLUSIONS AS SET FORTH IN

20   THAT REPORT, EXHIBIT 500?

21   A.   I REMEMBER.

22   Q.   AND THE CONCLUSIONS THAT MR. ORTEGA, NICK, AND MAMA ANH,

23   MAMA ANH SHOULDN'T BE TALKING IN ETHNIC TERMS TO EACH OTHER?

24   DO YOU REMEMBER THAT?

25   A.   I REMEMBER.

1    Q.   AND DO YOU REMEMBER THAT HE TESTIFIED THAT HE REQUIRED

2    NICK TO TAKE A MANAGEMENT TRAINING COURSE?

3    A.   WHO SAID THAT?

4    Q.   MR. WERNER.

5    A.   I DON'T REMEMBER.

6    Q.   ALL RIGHT.  AND DO YOU RECALL THAT HE ALSO TESTIFIED THAT

7    MS. EDMAN THOUGHT THAT THE BAY 101 PROCEDURES ABOUT TRANSFERS

8    NEEDED TO BE IMPROVED?

9    A.   I'M NOT SURE WHERE YOU'RE GETTING AT.

10   Q.   WELL, YOU WERE HERE WHEN MR. WERNER TESTIFIED?

11   A.   YES.

12   Q.   AND I THINK ONE OF YOUR COMPLAINTS IN THIS CASE WAS THAT

13   NICK ORTEGA WAS PREJUDICED AGAINST YOU OR RETALIATED AGAINST

14   YOU WHEN YOU TRIED TO TRANSFER?

15   A.   CORRECT.

16   Q.   AND DO YOU REMEMBER MR. WERNER TESTIFIED ABOUT THE THINGS

17   THAT MS. EDMAN WAS RECOMMENDING IN TERMS OF IMPROVING THE

18   TRANSFER POLICY?

19   A.   I DON'T REMEMBER.

20   Q.   ALL RIGHT.  ON THE SUBJECT OF TRANSFERS, IF WE MIGHT FOR A

21   MOMENT, THE FACT IS THAT YOU BELIEVE THAT NICK WAS NOT

22   APPROVING YOUR TRANSFER BECAUSE HE DIDN'T WANT TO LOSE A GOOD

23   COOK?

24   A.   CORRECT.

25   Q.   IT REALLY HAD NOTHING TO DO WITH LUCIO OR PREJUDICE ABOUT

1     VIETNAMESE OR WOMEN, IT WAS THAT YOU WERE A GOOD COOK AND HE

2     WANTED TO KEEP YOU IN THE KITCHEN.

3          IS THAT TRUE?

4     A.   IT COULD BE THAT.

5     Q.   ALL RIGHT.  IT COULD BE THAT.

6          AND AS A MATTER OF FACT, I THINK I RECALL YOU SAYING

7     YESTERDAY THAT YOU TOLD NICK THAT IF THAT'S THE REASON, THAT'S

8     ILLEGAL?  DO YOU REMEMBER THAT?

9     A.   I HAVEN'T UNDERSTOOD THE MEANING OF YOUR QUESTION.  PLEASE

10    REPEAT IT.

11    Q.   YES.  YOU TOLD NICK ORTEGA WHEN YOU GAVE HIM YOUR TRANSFER

12    REQUEST IF YOU'RE NOT APPROVING THIS BECAUSE YOU WANT TO KEEP A

13    GOOD COOK IN THE KITCHEN, THAT'S ILLEGAL?

14    A.   I SAID IF YOU DON'T WANT ME TO CHANGE JOBS, THAT'S NOT

15    CORRECT.

16    Q.   ALL RIGHT.  BUT IT HAD TO DO WITH YOUR BEING A GOOD COOK,

17    HADN'T IT?

18    A.   I DIDN'T SAY THAT.  HE DIDN'T SAY THAT IT WAS BECAUSE I

19    WAS A GOOD COOK.  IT WAS JUST BECAUSE HE DIDN'T WANT TO LET ME

20    GO.

21    Q.   DO YOU RECALL THAT YOUR HUSBAND, JASON SUMMERS, HELPED YOU

22    FILL OUT YOUR THIRD REQUEST?

23    A.   CORRECT.

24    Q.   AND DID YOU TELL HIM THAT YOU HANDED THAT THIRD REQUEST TO

25    NICK ORTEGA WITH SOME INSTRUCTIONS?

1    A.   CORRECT.

2    Q.   AND THAT THE INSTRUCTION YOU GAVE TO NICK WAS, AND I

3    QUOTE, "TOLD HIM THAT IF HE WAS TRYING TO KEEP YOU IN THE

4    KITCHEN SIMPLY BECAUSE YOU WERE A GOOD WORKER AND HE DIDN'T

5    WANT TO LOSE YOU, THAT WAS ILLEGAL."

6         IS THAT WHAT YOU TOLD HIM?

7    A.   IF HE DOES NOT WANT ME TO CHANGE JOBS, I SAID THAT THAT'S

8    NOT THE LAW.

9         I TOLD HIM THAT I AM THE ONE -- I DID TELL MS. ANYH THAT I

10   WAS A GOOD COOK AND THAT I HELPED HER OUT.

11   Q.   BUT MY POINT IS HERE, AND I WON'T BELABOR THIS, BUT WHAT

12   YOU SAID TO NICK WAS THAT YOU SUSPECTED HE WOULDN'T APPROVE

13   YOUR TRANSFER BECAUSE YOU WERE A GOOD WORKER?

14   A.   YES, I SAID IT WAS GOOD WORK.

15   Q.   RIGHT.

16   A.   BUT IT'S NOT BECAUSE OF THAT, THAT HE DIDN'T LET ME GO.

17   Q.   HE KEPT YOU IN THE KITCHEN IN YOUR OPINION BECAUSE HE

18   THOUGHT YOU WERE A GOOD WORKER?

19   A.   I DON'T KNOW WHAT HE THINKS.

20   Q.   BUT THIS WAS THE SUBJECT OF -- WELL, I'LL WAIT FOR

21   MR. SUMMERS TO ASK THAT QUESTION.

22        NOW -- SO MR. WERNER TESTIFIED ABOUT NICK AND MAMA ANH,

23   ABOUT TRANSFERS.

24        AND DO YOU RECALL THE THIRD THING THAT HE SAID MS. EDMAN

25   RECOMMENDED WAS SOMETHING THAT WOULD HELP IMPROVE YOUR

1    PERFORMANCE.

2         DO YOU RECALL THAT?

3    A.   I DON'T REMEMBER.

4    Q.   DID YOU THINK THAT YOUR PERFORMANCE COULD BE IMPROVED IN

5    CERTAIN AREAS?

6    A.   I DON'T REMEMBER.  WHAT DO YOU MEAN?

7    Q.   YES.  DO YOU THINK YOU COULD HAVE DONE A BETTER JOB AS A

8    SERVER?

9    A.   YES, I COULD.

10   Q.   AND DO YOU RECALL MR. WERNER TESTIFYING THAT THIS MEETING

11   THAT YOU MISSED, HE WANTED TO TALK TO YOU ABOUT THINGS THAT HE

12   WOULD LIKE YOU TO DO TO IMPROVE YOUR PERFORMANCE?

13   A.   WHETHER HE WANTED ME TO IMPROVE OR NOT, I DON'T KNOW, I

14   WASN'T THERE.  BUT LATER ON HE FIRED ME.

15   Q.   WELL, THERE NEVER WAS A DISCUSSION WITH MR. WERNER ABOUT

16   YOUR IMPROVING YOUR PERFORMANCE BECAUSE, AS YOU SAY, YOU WERE

17   NOT AT THE MEETING; IS THAT RIGHT?

18   A.   CORRECT.

19   Q.   NOW, I WANT TO TURN TO THE MORNING OF DECEMBER 21, 2009.

20   NICK ORTEGA TOLD YOU ABOUT 3:00 OR 4:00 A.M. THAT THEY WANTED

21   TO HAVE A MEETING WITH YOU WHEN YOU GOT OFF SHIFT AT 7:00 A.M.?

22   A.   I REMEMBER.

23   Q.   OKAY.  YOU CLAIM THAT YOU TOLD HIM TWO THINGS:  I HAVE TO

24   PICK UP MY DAUGHTER, AND I HAVE TO TAKE MY HUSBAND TO SURGERY;

25   IS THAT RIGHT?

1    A.   CORRECT.

2    Q.   YOU WERE HERE LAST WEEK WHEN MR. ORTEGA WAS ASKED BY YOUR

3    LAWYER ABOUT THOSE SUBJECTS AND SAID HE DIDN'T REMEMBER

4    ANYTHING LIKE THAT.

5         MY QUESTION TO YOU IS:  ARE YOU SURE THAT YOU TOLD

6    MR. ORTEGA I HAVE TO PICK UP MY DAUGHTER, AND I HAVE TO TAKE MY

7    HUSBAND TO SURGERY?

8    A.   I'M SURE.

9    Q.   NOW, WHETHER YOU SAID THOSE THINGS AS YOU RECALL, OR DID

10   NOT AS MR. ORTEGA RECALLS, THE CONVERSATION THAT YOU HAD WITH

11   MR. ORTEGA HAPPENED AROUND 3:00 OR 4:00 A.M.?

12   A.   ABOUT THAT.

13   Q.   OKAY.  AND WHATEVER WAS SAID AT THAT CONVERSATION, YOU

14   CALLED YOUR HUSBAND TO TALK TO HIM ABOUT IT; IS THAT RIGHT?

15   A.   CORRECT.

16   Q.   AND YOU WERE ABLE TO DO THAT ON A CELL PHONE?

17   A.   CORRECT.

18   Q.   AND YOU HAVE A CELL PHONE?

19   A.   CORRECT.

20   Q.   HE HAS A CELL PHONE?

21   A.   YES.

22   Q.   AND YOUR DAUGHTER HAS A CELL PHONE?

23   A.   YES.

24   Q.   WE ALL HAVE CELL PHONES?

25   A.   CORRECT.

1      Q.    EXCEPT FOR ME.

2            IN ANY CASE, I DON'T WANT TO GET INTO THE CONVERSATION

3      THAT YOU HAD WITH YOUR HUSBAND, BUT YOU CALLED HIM AFTER

4      NICK ORTEGA SAID THAT YOU NEED TO GO TO A MEETING AT 7:00 A.M.;

5      IS THAT RIGHT?

6      A.    YES.

7      Q.    NOW, WERE YOU A LITTLE WORRIED AT THAT TIME THAT MAYBE

8      SOMEONE WAS GOING TO FIRE YOU?

9      A.    I WASN'T WORRIED.  I JUST DIDN'T KNOW, I DIDN'T KNOW IF I

10     WENT TO THAT MEETING WHO WOULD PICK UP MY DAUGHTER.

11     Q.    WE'LL GET TO THAT.

12           WERE YOU WORRIED THAT MAYBE YOU WERE GOING TO GET ANOTHER

13     COUNSELLING MEMO AND A SUSPENSION?

14     A.    I DID NOT KNOW HOW IT WOULD HAPPEN.  I AM JUST WORRIED

15     HOW AM I GOING TO GO TO THE MEETING AND AT THE SAME TIME PICK

16     UP MY DAUGHTER.

17     Q.    WELL, YOU TOLD US ABOUT THE PROBLEMS YOU HAD WITH

18     LINDA ELIAS; ABOUT HOW KEN MEAKCHAROON'S STATEMENT TO

19     CAROLE EDMAN WAS NOT TRUE; YOU TALKED ABOUT ARLENE FONTILLAS;

20     AND YOU TALKED ABOUT HOW ELLIS WAS ONLY INTERESTED IN MONEY.

21           YOU HAD HAD SOME RECENT PROBLEMS WITH BETH LICONA, THE

22     BARTENDER, HAD YOU NOT?

23     A.    CORRECT.

24     Q.    AND LET'S PUT UP EXHIBIT 504 IN EVIDENCE, PLEASE.

25           NOW, THIS IS A LETTER MEMORANDUM FROM BETH LICONA TO

1    MR. ORTEGA TYPED DECEMBER 17TH, DOCUMENTING SOMETHING THAT SHE

2    SAID HAPPENED ABOUT A MONTH AGO BETWEEN HER AND CUC DANG.

3         AND BETH LICONA IS A BARTENDER AT BAY 101; IS THAT RIGHT?

4    A.   CORRECT.

5    Q.   ALSO A UNION EMPLOYEE?

6    A.   CORRECT.

7    Q.   AND DO YOU THINK THAT SHE WAS ONE OF THE UNION EMPLOYEES

8    THAT THEY WERE USING TO RETALIATE AGAINST YOU?

9    A.   NOT AT THE TIME I DIDN'T THINK THAT, BUT LATER ON AFTER I

10   WAS FIRED, I THOUGHT THAT MAYBE THIS WAS LIKE A TRAP AND THEY

11   USED HER.

12   Q.   ALL RIGHT.  WELL, SHE HAD REPORTED THAT YOU HAD A TICKET

13   FOR A VIRGIN MARGARITA AND THEN MADE ANOTHER ONE STATING SEE

14   ME.  I DID NOT MAKE THE ORDER BECAUSE I WAS WAITING FOR HER.

15        AND WHEN SHE CAME SHE SAID THAT SHE WOULD ORDER THE

16   REGULAR MARGARITA INSTEAD OF THE PREVIOUS ORDER.

17        I TOLD HER THE REGULAR HAS A DIFFERENT PRICE THAN THE

18   VIRGIN ONE.  CUC INSISTED IT IS THE SAME, BUT I TOLD HER IT IS

19   NOT.

20        SHE WENT INTO THE KITCHEN WITHOUT CLARIFYING WHICH

21   MARGARITA SHE WANTS.  AND WHEN SHE CAME BACK SHE WAS MAD

22   BECAUSE I DID NOT MAKE HER ORDER.

23        DO YOU RECALL THIS INCIDENT WITH BETH OVER THE MARGARITA?

24   A.   THIS LETTER IS NOT THE TRUTH.

25   Q.   ALL RIGHT.  BUT DO YOU RECALL AN INCIDENT WITH BETH OVER

1    THE MARGARITA?

2    A.   YES.

3    Q.   AND DO YOU RECALL GOING INTO THE KITCHEN AND COMING BACK

4    AND BEING MAD?

5    A.   I WAS NOT MAD.

6    Q.   AND, NOW, SHE SAID, I CALLED THE SHIFT MANAGER, MIKE

7    WILSON, AND TOLD HIM ABOUT HER ORDER.

8        I EXPLAINED TO THE SHIFT MANAGER ABOUT THE MATTER AND SHE,

9    CUC, TOLD MR. WILSON THAT I AM A LIAR.

10       DID YOU TELL THAT SHE WAS A LIAR?

11   A.   I DID.

12   Q.   AND THAT WAS MR. WILSON?

13   A.   CORRECT.

14           THE COURT:  LET'S TAKE OUR SECOND BREAK.

15           MR. MCMANIS:  FINE.  THANK YOU.

16           THE COURT:  WE'LL BE IN RECESS FOR 15 MINUTES.

17   (RECESS FROM 11:53 A.M. UNTIL 12:09 P.M.)

18           THE COURT:  ALL RIGHT.  YOU MAY CONTINUE.

19           MR. MCMANIS:  THANK YOU, YOUR HONOR.

20       IF WE COULD GO BACK TO EXHIBIT 504, CINDY.  POP THAT UP.

21   Q.   NOW, BEFORE THE RECESS WE WERE TALKING ABOUT THIS INCIDENT

22   OVER THE MARGARITAS AND BETH AND MR. WILSON.

23       AND THE ALLEGATION THAT YOU TOLD MR. WILSON THAT BETH IS A

24   LIAR.  AND DID YOU SAY -- DID YOU ADMIT THAT YOU DID CALL HER A

25   LIAR?

1      A.   CORRECT.

2      Q.   NOW, I THINK YOU TESTIFIED ABOUT THIS YESTERDAY.  AND I

3      WANT TO TURN TO PAGE 544 AT LINE 14 FROM YESTERDAY'S TRANSCRIPT

4      AND LINES 14 TO 23, PLEASE.

5           AND YOUR LAWYER YESTERDAY ASKED YOU A QUESTION AT LINE 14:

6           "AND AFTER YOU SENT THIS LETTER TO BAY 101, WHAT

7      HAPPENED?"

8           DO YOU UNDERSTAND THAT THAT WAS YOUR LETTER TO RON WERNER?

9      A.   YES, CORRECT.

10     Q.   "ANSWER:  AT THAT TIME THE INTERVIEWER, AN INVESTIGATOR ON

11     THE PHONE AND SHE SAID THAT SHE WANTED TO SEE ME IN ORDER TO

12     INVESTIGATE WHAT WAS HAPPENING."

13          AND THAT WAS CAROLE EDMAN?

14     A.   CORRECT.

15     Q.   "QUESTION:  YOU'RE TALKING ABOUT MS. EDMAN?

16          "ANSWER:  CORRECT."

17          AND THEN MS. NGUYEN ASKED A QUESTION AT LINE 20:

18          "SO BEFORE WE MOVE ON TO MS. EDMAN, I'D LIKE YOU TO LET US

19     KNOW, AFTER YOU WERE SUSPENDED, DID YOU GO RIGHT BACK TO WORK

20     AFTER THE TWO-DAY SUSPENSION?

21          "ANSWER:  NO."

22          LET'S GET THE LAST TWO LINES OF THAT PAGE.  BLOW THEM UP.

23          "QUESTION:  WHY NOT?

24          "BECAUSE I WAS ILL."

25          AND THE TOP OF PAGE 545, LET'S GO 1 TO 17, PLEASE.

1          "WHAT HAPPENED?

2          "I WAS CRYING AND I WAS SAD.  THIS WAS NOT MY FAULT.  WHY

3     WERE THEY BLAMING ME?  I DIDN'T WANT TO EAT, AND I STAYED IN

4     BED.

5          "QUESTION:  DID YOU GO SEEK SOME TREATMENT AT KAISER?

6          "ANSWER:  I DID."

7          WAS KAISER WHERE YOU GOT YOUR FAMILY DOCTOR?

8     A.   CORRECT.

9     Q.   "AND EVENTUALLY DID YOU GO BACK TO WORK?"

10         AND THEN YOU SAY HERE, "AFTER THE INTERVIEW, AFTER THE

11    INVESTIGATION SHE SAID THAT RON PROMISED WHEN I CAME BACK AND

12    WORKED, I WOULD HAVE TO STAY QUIET AND ALL I SHOULD SAY IS THAT

13    I WAS ILL AND NOW THAT I'M BACK TO WORK AND HE PROMISED THAT

14    NOTHING BAD WOULD HAPPEN TO ME."

15         NOW, WHEN YOU SAID THAT "HE PROMISED THAT NOTHING BAD

16    WOULD HAPPEN TO ME," WAS THAT MR. WERNER?

17    A.   CORRECT.

18    Q.   "AND AFTER THE INTERVIEW, AFTER THE INVESTIGATION SHE SAID

19    THAT RON PROMISED."

20         WAS THAT MS. EDMAN?

21    A.   CORRECT.

22    Q.   "SHE SAID THAT RON PROMISED WHEN I CAME BACK AND WORKED, I

23    WOULD HAVE TO STAY QUIET," AND SO FORTH.

24         AT THE TIME THAT YOU WERE INTERVIEWED BY CAROLE EDMAN, YOU

25    HAD ALREADY BEEN BACK TO WORK FOR SOME TIME, HAD YOU NOT?

1    A.   LET ME THINK.  WENT BACK TO WORK?  I WAS SUSPENDED FOR

2    TWO DAYS.

3    Q.   THAT WAS OCTOBER 8TH?

4    A.   AND THEN AFTER THAT NICK SAID THAT I WOULD HAVE TO GO BACK

5    TO THE KITCHEN AND GO BACK TO THE NIGHTSHIFT.

6         SO I WENT HOME AND DID THE LETTER AND GAVE IT.  I GAVE IT

7    TO RON WERNER.

8         AND THEN LATER, THAT'S WHEN THAT MEETING OCCURRED.

9    Q.   WELL, LET'S JUST GET SOME DATES HERE.  YOU'RE PRETTY

10   CLEAR, I TAKE IT, THAT THE COUNSELLING MEMO GIVING YOU THE

11   SUSPENSION WAS OCTOBER 8TH?

12   A.   CORRECT.

13   Q.   AND DO YOU RECALL TALKING TO MS. EDMAN ON NOVEMBER 3RD AND

14   NOVEMBER 5TH?

15   A.   I DON'T REMEMBER WHICH DATES.  WHEN I WAS SUSPENDED, I

16   STAYED HOME.  I WAS HOME ILL.  AND THEN ABOUT A MONTH LATER I

17   GOT A PHONE CALL AND THE LADY SAID THAT SHE WAS AN INVESTIGATOR

18   FROM BAY 101.  AND SHE CALLED AND SHE SAID SHE WANTED TO

19   INVESTIGATE THE REAL REASON.

20        SO I GAVE HER THE PHONE NUMBER OF MY ATTORNEY AND MY

21   HUSBAND'S AND THEN LATER THAT MEETING OCCURRED.

22   Q.   ALL RIGHT.  LET'S PUT UP PAGE 3 OF MS. EDMAN'S REPORT,

23   PLEASE AND THE INTERVIEW DATES, PLEASE.  THE CENTER PARAGRAPH.

24        NOW, I THINK WE AGREED THAT THE SUSPENSION, THE THREE-DAY

25   SUSPENSION WAS OCTOBER 8, 2009; CORRECT?

1    A.   CORRECT.

2    Q.   AND YOU WERE INTERVIEWED BY MS. EDMAN ON NOVEMBER 3RD AND

3    NOVEMBER 5TH.

4         DO YOU RECALL THAT?

5    A.   I DON'T REMEMBER THE DATES, BUT I KNOW THAT I DID ATTEND.

6    Q.   AND GOING BACK TO YESTERDAY'S TESTIMONY, PAGE 544 --

7    EXCUSE ME, PAGE 545, LINES 8 TO 12.

8         "AFTER THE INTERVIEW, AFTER THE INVESTIGATION SHE SAID

9    THAT RON PROMISED WHEN I CAME BACK AND WORKED, I WOULD HAVE TO

10   STAY QUIET AND ALL I SHOULD SAY IS THAT I WAS ILL AND NOW I'M

11   BACK TO WORK, AND HE PROMISED THAT NOTHING BAD WOULD HAPPEN TO

12   ME.  NO ONE WOULD BOTHER ME."

13        THIS WAS AFTER THE INTERVIEW ON NOVEMBER 3RD AND 5TH, IS

14   THAT WHAT YOU'RE SAYING?

15   A.   YES.

16   Q.   OKAY.  WELL, IN ANY EVENT -- LET'S GO TO THE NEXT LINES 13

17   TO 17.

18        "WHEN YOU WENT BACK TO WORK AT BAY 101 AFTER THE

19   SUSPENSION, DID ANYBODY BOTHER YOU?

20        "ANSWER:  THE NIGHT THAT I FIRST STARTED GOING BACK TO

21   WORK I HAD A PROBLEM WITH BETH IN THE BAR."

22        IS THAT YOUR TESTIMONY?

23   A.   YES, CORRECT.

24   Q.   AND WAS THAT THE ISSUE WITH THE MARGARITA THAT WE TALKED

25   ABOUT?

1      A.   CORRECT.

2      Q.   AND I THINK YOU SAID THAT WHEN MIKE WILSON WAS THERE AND

3      BETH WAS TELLING HER SIDE OF THE STORY, YOU CALLED HER A LIAR?

4      A.   THAT'S RIGHT.  SHE DID NOT TELL WHAT HAPPENED CORRECTLY.

5      Q.   LET'S GO TO PAGE 547 FROM THE TRANSCRIPT OF YESTERDAY,

6      LINES 6 THROUGH 17.

7           THIS IS -- THE QUESTION WAS PUT TO YOU ABOUT OTHER

8      INCIDENTS.  THIS WAS AFTER YOUR TESTIMONY ABOUT BETH AND THE

9      MARGARITA.

10          AT LINE 6, "QUESTION:  OKAY.  AND DID YOU EXPERIENCE ANY

11     OTHER INCIDENTS AFTER YOU CAME BACK TO WORK THAT SEEMED LIKE

12     THEY WERE GIVING YOU A HARD TIME?

13          "ANSWER:  AT THE BEGINNING I DIDN'T THINK THIS WAS

14     HAPPENING.  WHEN I WENT TO ORDER ANOTHER ALCOHOL ORDER, MICHAEL

15     WILSON CAME AND STOOD WHERE I WAS WORKING AND HE SAID FIRST

16     WE'RE FRIENDS.  I SAID, WELL, OF COURSE.

17          "HE TOOK ME OUT TO THE BAR.  AND HE ASKED BETH WHAT

18     HAPPENED.  BETH SAID THAT I TOOK THE WRONG ORDER AND THAT I WAS

19     LOUD.  I WAS ARGUING OR LOUD WITH HER.

20          "QUESTION:  AND WERE YOU SPEAKING IN A LOUD VOICE TO HER?

21          ANSWER:  NO.  I BEGGED HER TO CHANGE BUT SHE WOULDN'T LET

22     ME."

23          THAT'S YOUR TESTIMONY FROM YESTERDAY?

24     A.   CORRECT.

25     Q.   IS THAT CORRECT?

1    A.   YES.

2    Q.   AND I THINK MR. WILSON WAS ASKED ABOUT THIS BY THE

3    INVESTIGATOR.  IF I COULD FIND THAT PAGE 42, PLEASE.

4         AND IF YOU COULD BRING UP THIS PARAGRAPH THAT MR. WILSON

5    BROUGHT UP ANOTHER RECENT INCIDENT.

6         "WHEN HE WAS CALLED TO ADDRESS ANOTHER ISSUE THAT MS. DANG

7    HAD WITH THE BARTENDER, BETH LICONA, MR. WILSON WENT TO

8    MS. DANG WHO HE SAID APPEARED TO BECOME IMMEDIATELY DEFENSIVE.

9         "HE WARNED HER TO," QUOTE, "'KEEP YOUR TONGUE ABOUT YOU,

10   AND NO ARGUMENTS IN FRONT OF THE BAR,'" CLOSED QUOTE.

11        DID MR. WILSON SAY THAT TO YOU?

12   A.   NO.

13   Q.   "PRIOR TO ESCORTING HER TO THE BAR AREA" -- I THINK YOU

14   TESTIFIED YESTERDAY THAT THAT'S WHERE HE TOOK YOU, TO THE BAR

15   AREA?

16   A.   HE TOLD ME TO FOLLOW HIM TO THE BAR.

17   Q.   ALL RIGHT.  HE TOOK YOU TO THE BAR AREA?

18   A.   CORRECT.

19   Q.   AND HE SAYS HERE, "MS. DANG DID NOT FOLLOW HIS INSTRUCTION

20   AND HAD A VERBAL ALTERCATION WITH BETH IN FRONT OF CUSTOMERS,

21   KEN MEAKCHAROON, AND MR. WILSON."

22        NOW, IS THAT AN ACCURATE STATEMENT THAT YOU HAD A LOUD

23   ALTERCATION WITH BETH IN FRONT OF THE CUSTOMERS; KEN, THE COOK;

24   AND MR. WILSON?

25   A.   WE DID NOT ARGUE.

1    Q.   AND DURING WHICH TIME THAT MS. DANG CALLED BETH A LIAR

2    FOUR TIMES.

3         DO YOU SEE THAT?

4    A.   I DON'T THINK IT WAS FOUR TIMES BUT TWICE, YES.

5    Q.   OKAY.  YOUR RECOLLECTION IS THAT IT WASN'T ONCE, IT WASN'T

6    FOUR TIMES, IT WAS TWICE?

7    A.   THAT'S CORRECT.

8    Q.   NOW, IN FAIRNESS TO YOU, MR. WILSON STATES THAT HE FELT

9    THIS WAS UNACCEPTABLE, ESPECIALLY IN FRONT OF CUSTOMERS, AND

10   REQUESTED THAT MS. DANG TO APOLOGIZE TO BETH, WHICH SHE DID.

11        DID YOU APOLOGIZE TO HER?

12   A.   I DID APOLOGIZE.

13   Q.   ALL RIGHT.

14   A.   WE WERE IN THE KITCHEN, AND THERE WERE NO OTHER CUSTOMERS

15   AND THERE WERE JUST COWORKERS.

16   Q.   BUT YOU DID APOLOGIZE?

17   A.   I DID.

18   Q.   GOOD FOR YOU.  DO YOU KNOW A PERSON NAMED JESSICA DOMINGO?

19   A.   YES, I DO.

20   Q.   AND WHAT IS HER JOB AT BAY 101?

21   A.   WHEN I WAS WORKING IN THE KITCHEN SHE WAS SOMEBODY THAT

22   WAS JUST NEW THAT JUST CAME IN.

23   Q.   AND DO YOU RECALL THAT SHE WAS A PORTER?

24   A.   LATER SHE TRANSFERRED TO THAT.  AFTER A MONTH WORKING AT

25   FOOD SERVICE, SHE WAS TRANSFERRED.

1    Q.   AND DO YOU RECALL THAT SHE WAS A PORTER WHILE YOU WERE A

2    SERVER ON THE FLOOR?

3    A.   CORRECT.

4    Q.   LET'S TAKE A LOOK AT EXHIBIT 503 IN EVIDENCE, PLEASE.

5         THIS IS A STATEMENT BY JESSICA DOMINGO DOCUMENTING AN

6    INCIDENT.

7         "I CAN'T REMEMBER THE DATE BUT THE TIME WAS AFTER 1:00

8    A.M. OR 1:25.  I WAS INSIDE OF THE PORTER STATION WHEN CUC, THE

9    SERVER, CALLED MY NAME AND TALKED TO ME, SHOWING ME THE ORDER

10   SHE WANTS ME TO DO.  SHE TOLD ME TO GO TO THE BAR AND BUY HER

11   THE WINE.  WE HAVE A LITTLE ARGUMENT BECAUSE I TOLD HER,"

12   QUOTE, "'WHY ME?  I KNOW NOTHING ABOUT BEING A SERVER,'"

13   UNQUOTE.  "AND SHE TALKED IN A HIGH PITCH VOICE SAYING THAT SHE

14   WOULD NOT BE ABLE TO GET ONE FROM THE BAR?

15        MS. NGUYEN:  OBJECTION, YOUR HONOR.  THE QUESTION?

16   BY MR. MCMANIS:

17   Q.   THE QUESTION IS, IS THAT AN ACCURATE STATEMENT OF THE

18   INCIDENT THAT YOU HAD WITH MS. DOMINGO?

19   A.   IT'S NOT CORRECTLY THAT.

20   Q.   AND IS MS. DOMINGO A UNION EMPLOYEE?

21   A.   MAYBE SO.

22   Q.   BUT THE PORTERS AT BAY 101 ARE MEMBERS OF THE UNION, ARE

23   THEY NOT?

24   A.   I ONLY KNOW WORKING IN THE KITCHEN AND FOOD SERVICE, THEY

25   ARE UNIONIZED, BUT I DON'T KNOW EXACTLY WHETHER OR NOT -- MAYBE

1    SO.

2    Q.   DO YOU THINK SHE WAS MAYBE ONE OF THE UNION EMPLOYEES THAT

3    WAS RETALIATING AGAINST YOU?

4    A.   NO, SHE'S NOT RETALIATING.

5    Q.   ALL RIGHT.  LET'S GO BACK TO THE EARLY MORNING HOURS OF

6    DECEMBER 21, 2009, WHEN NICK CAME AND SAID THAT YOU NEEDED TO

7    GO TO A MEETING AND YOU CALLED YOUR HUSBAND.

8        DO YOU REMEMBER THAT?

9    A.   YES, I REMEMBER THAT.

10   Q.   NOW, IT'S YOUR TESTIMONY THAT YOU DIDN'T THINK THAT THIS

11   MIGHT BE A PROBLEM FOR YOU, THIS MEETING?

12   A.   I DON'T KNOW WHAT HAPPENED.

13   Q.   BUT MY QUESTION IS AT THE TIME THAT YOU WERE ASKED TO GO

14   TO THE MEETING, DID YOU THINK THAT THIS COULD BE TROUBLE FOR

15   YOU?

16   A.   I DIDN'T THINK THAT IT WAS A PROBLEM.

17   Q.   YOU WERE AWARE, WERE YOU NOT, OF THE PROBLEM THAT YOU HAD

18   WITH BETH LICONA?

19   A.   NO.

20   Q.   OKAY.  YOU KNEW ABOUT THIS INCIDENT INVOLVING JESSICA

21   DOMINGO, THE PORTER?

22   A.   I DIDN'T THINK SO.

23   Q.   NOW, YOU DON'T KNOW EXACTLY WHAT YOUR HUSBAND SAID WHEN HE

24   CALLED NICK AFTER YOU SPOKE TO HIM; IS THAT RIGHT?

25   A.   NO.

1    Q.   ALL RIGHT.  SO YOU DON'T KNOW IF HE SAID SHE'S NOT COMING

2    TO ANY MEETING UNLESS I'M THERE?  DO YOU KNOW IF HE SAID THAT

3    OR NOT?

4    A.   I DON'T KNOW THE CONVERSATION BETWEEN THE TWO OF THEM.

5    Q.   YOU DON'T KNOW IF HE SAID THAT HE WAS GOING TO GET A

6    LAWYER?

7    A.   I DIDN'T HEAR AND WHEN I GOT HOME, I DIDN'T HEAR MY

8    HUSBAND SAY ANYTHING ABOUT GETTING AN ATTORNEY.

9    Q.   AT THE TIME ON DECEMBER 21, 2009, WAS STEVEN NGO STILL

10   REPRESENTING YOU?  WAS HE STILL YOUR LAWYER?

11   A.   HE WAS STILL.  HE WAS STILL.

12   Q.   SO HE WAS YOUR LAWYER AT THE TIME OF THE INTERVIEWS OF

13   NOVEMBER 3RD, AND NOVEMBER 5TH, AND HE WAS STILL YOUR LAWYER ON

14   DECEMBER 21, 2009?

15   A.   I DON'T REMEMBER.  AFTER I CAME BACK TO WORK, HE WAS STILL

16   REPRESENTING ME, BUT AFTER THAT HE WAS NOT MY ATTORNEY ANY

17   MORE.

18   Q.   OKAY.  I JUST WANT TO MAKE SURE WE HAVE COVERED ANY OF

19   THESE PROBLEMS THAT WE HAVE DESCRIBED WITH THE EMPLOYEES.  AND

20   I SEEM TO HAVE MISLAID A VERY IMPORTANT DOCUMENT.

21        CAN I HAVE THE QUESTION THAT THE JUROR ASKED THIS MORNING,

22   IF I MAY, PLEASE.  THANK YOU.

23        YOU TESTIFIED, I THINK TODAY, THAT THE MEN IN THE KITCHEN

24   GOT TO EAT STEAKS.  DO YOU REMEMBER THAT?

25   A.   YES.

1     Q.   AND THAT WHEN YOU WANTED TO EAT SOMETHING, YOU STEPPED

2     AWAY AND CAME BACK AND FOUND THAT NICK HAD DONE SOMETHING WITH

3     THE FOOD?

4     A.   CORRECT.

5     Q.   AND WHAT HAD NICK DONE WITH THE FOOD WHILE YOU WERE AWAY?

6     A.   CAN I REPEAT WHERE -- WHEN THAT MAN TOOK THE FOOD?

7     Q.   I'M SIMPLY TRYING TO FIND OUT SOMETHING ABOUT NICK

8     STIRRING YOUR SOUP WITH A STICK.  DID THAT HAVE SOMETHING TO DO

9     WITH YOUR MEAL?

10    A.   WELL, THAT'S THE EMPLOYEE'S FOOD.

11    Q.   ALL RIGHT.  DO YOU RECALL IF THERE WAS EVER A COMPLAINT

12    ABOUT YOUR SOUP NOT THICK ENOUGH?

13    A.   WHAT DO YOU MEAN IT WAS NOT THICK?

14    Q.   WAS THERE EVER A COMPLAINT THAT THE SOUP YOU MADE WAS NOT

15    THICK ENOUGH?

16    A.   I DO NOT UNDERSTAND THE COMPLAINT.  COULD YOU REPEAT IT?

17    Q.   I'LL MOVE ON.  I THINK YOU SAID SOMETHING ABOUT YOUR MEAL

18    AND A PROBLEM WITH NICK.  WHAT WAS THE PROBLEM THAT YOU HAD

19    WITH NICK ABOUT YOUR EMPLOYEE MEAL?

20    A.   WHEN I BROUGHT OUT THE FOOD, I HAD FORGOTTEN TO GET A

21    GLASS OF WATER SO I WENT BACK IN.  I WENT TO THE CAFETERIA AND

22    TOOK A GLASS OF WATER.  I SAW NICK AND HE PICKED UP A FORK, AND

23    HE MIXED UP ALL OF MY FOOD TO LOOK FOR SOMETHING UNDERNEATH THE

24    FOOD.

25         I ASKED WHAT HE WAS DOING.  HE SAID THAT HE WANTED TO MIX

1    IT UP TO SEE WHAT WAS INSIDE OF IT TO SEE IF IT'S GOOD.

2    Q.   AND THIS WAS YOUR EMPLOYEE MEAL THAT HE WAS MIXING UP?

3    A.   CORRECT.

4    Q.   AND SOMETHING THAT YOU WERE GOING TO EAT?

5    A.   CORRECT.

6    Q.   AND HE WAS MIXING IT UP TO SEE IF THERE WAS SOMETHING

7    UNDERNEATH IT.  IS THAT WHAT YOU'RE TELLING US?

8    A.   CORRECT.

9    Q.   ALL RIGHT.  NOW, THERE WAS ANOTHER PIECE OF TESTIMONY THAT

10   YOU GAVE TODAY, SOMETHING ABOUT NICK AND ELIAS AND A CUSTOMER

11   AND A GIRLFRIEND.

12       CAN YOU CLEAR THAT UP FOR US?

13   A.   ONE EVENING I WAS WORKING IN THE OTHER SIDE, THE CALI

14   SIDE.

15   Q.   THAT'S THE CALIFORNIA GAMES SIDE?

16   A.   YEAH, THE CALIFORNIA SIDE.  AND THERE WAS A CUSTOMER THAT

17   CAME AND SAID, LINDA TOLD ME THAT I AM HIS GIRLFRIEND.

18       I SAID I DON'T WANT ANYTHING TO BE MIXED UP.  I'M GOING TO

19   BRING THIS TO NICK.

20       WHEN I CAME IN I SPOKE WITH NICK, AND THEN HE CALLED

21   JENNIFER.  I DON'T KNOW WHAT WAS SAID BETWEEN THE TWO OF THEM.

22   NICK LAUGHED IN A VERY SARCASTIC WAY AND TOLD ME IT'S FINE, NOW

23   LEAVE.

24   Q.   I THINK I UNDERSTAND.  A CUSTOMER ON THE CALIFORNIA GAMES

25   SIDE OF THE FLOOR SAID TO YOU THAT LINDA HAD TOLD HIM THAT HE

1    WAS YOUR GIRLFRIEND -- OR YOU WERE HIS GIRLFRIEND?

2    A.   LINDA TOLD HIM --

3    Q.   YEAH.

4    A.   THIS IS HOW THE STORY IS:  THAT CUSTOMER OFTEN GOES TO

5    PLAY ON THE POKER SIDE.  AND WHEN I WAS WORKING, I WAS

6    WORKING -- ONE DAY I WOULD BE WORKING ON THIS SIDE, AND THE

7    NEXT DAY I WOULD BE WORKING ON THE OTHER SIDE.

8        ONE EVENING LINDA CAME OVER TO TALK TO THE CUSTOMER, WOULD

9    YOU LIKE AN ORDER?

10       THE CUSTOMER SAID THAT I'M GOING TO WAIT FOR CUC DANG.

11       AND SO SHE RESPONDED, YOUR GIRLFRIEND IS NOT WORKING ON

12   THIS SIDE, SHE'S WORKING ON THE OTHER SIDE.  SO DON'T BOTHER

13   WAITING.

14   Q.   ALL RIGHT.  AND WHEN THAT WAS REPORTED TO YOU, YOU

15   REPORTED IT TO NICK?

16   A.   YES.

17   Q.   AND IT'S YOUR BELIEF THAT HE REPORTED IT TO JENNIFER?

18   A.   I DON'T KNOW WHAT THEY SAID.  HE WAS LAUGHING.  HE SAID

19   THAT'S ENOUGH, YOU CAN GET OUT.

20   Q.   OKAY.  FAIR ENOUGH.  NOW, LET'S GET BACK TO THE EARLY

21   MORNING HOURS OF DECEMBER 21, 2009.

22       AND AS I UNDERSTAND IT, NICK CAME TO SEE YOU ABOUT 3:00 OR

23   4:00 O'CLOCK IN THE MORNING?

24   A.   CORRECT.

25   Q.   AND TOLD YOU ABOUT THIS MEETING WHEN YOU GOT OFF SHIFT AT

1    7:00 A.M.?

2    A.   CORRECT.

3    Q.   AND ACCORDING TO YOU, YOU SAID I HAVE TO PICK UP MY

4    DAUGHTER?

5    A.   CORRECT.

6    Q.   AND I HAVE TO DRIVE MY HUSBAND, JASON, TO SURGERY?

7    A.   CORRECT.

8    Q.   YOUR DAUGHTER'S NAME WAS?

9    A.   LISA.

10   Q.   LISA.  WE HAVE HEARD ABOUT CANCER SURGERY.  I'LL ASK ABOUT

11   THAT, BUT WHAT TIME WAS YOUR HUSBAND'S SURGERY APPOINTMENT?

12   A.   I DON'T REMEMBER CLEARLY.  I THINK IT WAS AROUND 1:00,

13   1:00 P.M.

14   Q.   IF I SAID IT WAS AT 2:00 O'CLOCK, WOULD THAT REFRESH YOUR

15   RECOLLECTION?

16   A.   IT'S BEEN A LONG TIME, BUT IT'S PROBABLY AROUND THAT TIME.

17   Q.   ALL RIGHT.  SO WHEN MR. ORTEGA CAME TO YOU AT 3:00 OR 4:00

18   A.M. ABOUT A 7:00 A.M. MEETING, ONE OF THE THINGS YOU SAID IS I

19   HAVE TO DRIVE MY HUSBAND TO SURGERY AND AS BEST YOU CAN RECALL

20   THAT WAS SCHEDULED AT 1:00 P.M.?

21   A.   CORRECT.

22   Q.   AND I THINK YOU DESCRIBED THE SURGERY IN YOUR DEPOSITION

23   AS A SMALL OPERATION?

24   A.   CORRECT.

25   Q.   AND BASICALLY THIS WAS A BASAL CELL ISSUE WITH HIS NOSE?

1     A.   MAYBE SO.

2     Q.   AND THAT WAS WHAT YOU HAD IN MIND WHEN YOU TOLD MR. ORTEGA

3     THAT YOU HAD TO DRIVE YOUR HUSBAND TO SURGERY?

4     A.   CORRECT.

5     Q.   NOW, I WANT TO ASK ABOUT PICKING UP YOUR DAUGHTER LISA.

6          LET'S TAKE A LOOK AT YOUR DEPOSITION, AND PLEASE DON'T PUT

7     IT UP UNTIL COUNSEL HAS HAD A CHANCE TO LOOK AT IT,

8     SPECIFICALLY PAGE 281, LINE 19 TO PAGE 282, LINE 16.

9               MS. NGUYEN:  I'M FINE.

10              MR. MCMANIS:  OKAY.  IF YOU WOULD PUT THAT UP,

11    PLEASE.

12    Q.   ALL RIGHT.  SO THIS IS PAGE 281, LINES 19 TO 25 AT YOUR

13    DEPOSITION.

14         "QUESTION:  AND YOU'VE TESTIFIED THAT NICK CAME IN SOME

15    TIME AFTER 3:00?

16         "ANSWER:  CORRECT.

17         "QUESTION:  SO YOU ASKED NICK -- YOU TOLD NICK THAT YOU

18    NEEDED TO LEAVE EARLY TO PICK UP YOUR DAUGHTER SOME TIME AFTER

19    3:00 IN THE MORNING, CORRECT?

20         "ANSWER:  CORRECT."

21         AND THAT'S THE TESTIMONY YOU GAVE AT YOUR DEPOSITION?

22    A.   CORRECT.

23    Q.   AND YOU SAY THAT'S SOMETHING THAT YOU TOLD NICK THAT

24    MORNING?

25    A.   CORRECT.

1    Q.   AND LET'S GO TO THE NEXT PAGE 282, LINES 1 THROUGH 16.

2         "QUESTION:  AND YOU KNEW WHEN YOU ASKED NICK THAT YOUR

3    DAUGHTER WAS ARRIVING AT 3:30 OR 4:00 O'CLOCK, CORRECT?

4    A.   CORRECT.

5    Q.   ANSWER:  CORRECT.

6         QUESTION:  DID YOU ASK NICK IF YOU COULD LEAVE RIGHT THEN?

7         ANSWER:  NO, I DIDN'T SAY THAT.  I JUST ASKED TO LEAVE

8    EARLY.

9         QUESTION:  OKAY.  DID YOU PICK YOUR DAUGHTER UP?

10        ANSWER:  YES.

11        QUESTION:  WHAT TIME?

12        7:00 O'CLOCK.

13        QUESTION:  HOW OLD WAS YOUR DAUGHTER?

14        ANSWER:  AT THE TIME SHE WAS 18 OR 18 AND A HALF.

15        QUESTION:  AND WHAT WAS THE LOCATION THAT YOU HAD TO PICK

16   HER UP?

17        ANSWER:  NEAR LEE'S SANDWICH BY LIE I DON'T KNOW'S MARKET.

18        QUESTION:  LEE'S SANDWICH?  DID YOU HEAR THAT CORRECT?

19        ANSWER:  CORRECT."

20        IS THAT YOUR TESTIMONY?

21   A.   CORRECT.

22   Q.   AND IS THAT TRUE?

23   A.   WELL, IT'S CORRECT, BUT I DIDN'T GET THE CHANCE TO TELL

24   YOU EVERYTHING.

25   Q.   WELL, WE'LL SEE IF WE CAN HELP YOU WITH THAT.

1          BUT THIS IS WHAT YOU TOLD MS. KIRSCH WHEN YOU GAVE YOUR

2     DEPOSITION?

3     A.   CORRECT.

4     Q.   AND YOU HAD YOUR LAWYER THERE?

5     A.   YES.

6     Q.   AND THE PROFESSIONAL INTERPRETER?

7     A.   YES.

8     Q.   PICKING UP YOUR DAUGHTER AT 7:00 O'CLOCK NEAR LEE'S

9     SANDWICH BY LION'S MARKET.

10         NOW, LEE'S SANDWICH SHOP AND LION'S MARKET ARE NEAR THE

11    INTERSECTION OF TULLY AND KING; IS THAT RIGHT?

12    A.   CORRECT.

13    Q.   ALL RIGHT.  I'M GOING TO ASK WE MARK AN EXHIBIT, AND I

14    GUESS I MARK THOSE MYSELF, AS NEXT IN ORDER 561.

15         AND I'LL SHOW THOSE TO COUNSEL, AND I'LL REPRESENT IT'S A

16    GOOGLE MAP.

17         MAY I APPROACH, YOUR HONOR?

18         (DEFENDANTS' EXHIBIT 561 WAS MARKED FOR IDENTIFICATION.)

19              THE COURT:  ANY OBJECTION?

20              MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

21              THE COURT:  OKAY.  GO AHEAD.

22    BY MR. MCMANIS:

23    Q.   MS. DANG, I'M GOING TO SHOW YOU DEFENDANTS' EXHIBIT 561.

24    AND THIS IS A GOOGLE MAP SHOWING TULLY ROAD, KING ROAD, LEE'S

25    SANDWICH, AND THE LION'S SUPERMARKET.

1          DO YOU RECOGNIZE THAT?

2     A.   YES.

3     Q.   AND IS THAT AN ACCURATE PICTURE?

4     A.   CORRECT.

5               MR. MCMANIS:  MOVE IT IN EVIDENCE, PLEASE.

6               THE COURT:  IT'S RECEIVED.

7          (PLAINTIFF'S EXHIBIT 561 WAS RECEIVED IN EVIDENCE.)

8               MR. MCMANIS:  WOULD YOU PUT THAT ON THE SCREEN,

9     PLEASE.

10              MS. NGUYEN:  WHAT NUMBER AGAIN?

11              MR. MCMANIS:  561.

12              MS. NGUYEN:  THANK YOU.

13    BY MR. MCMANIS:

14    Q.   NOW, I'M GOING TO GO OVER THIS AGAIN SINCE THE JURY HAS

15    NOT SEEN THIS.  THIS AERIAL MAP OF THE AREA, WE HAVE TULLY ROAD

16    ACROSS THE TOP OF THE EXHIBIT; IS THAT RIGHT?

17    A.   CORRECT.

18    Q.   AND THEN WE HAVE KING ROAD RUNNING DOWN THE CENTER OF THE

19    EXHIBIT; IS THAT CORRECT?

20    A.   CORRECT.

21    Q.   AND LEE'S SANDWICH SHOP IS OVER HERE (INDICATING)?

22    A.   CORRECT.

23    Q.   AND LION'S SUPERMARKET IS OVER HERE (INDICATING)?

24    A.   CORRECT.

25    Q.   WOULD YOU PUT THAT LAST DEPOSITION PAGE WE LOOKED AT A

1    MINUTE AGO UP, PLEASE.

2         IT'S PAGE 282.

3         SO WHEN YOU TESTIFIED AT YOUR DEPOSITION THAT YOU WERE

4    PICKING UP YOUR DAUGHTER NEAR LEE'S SANDWICH SHOP NEAR LION'S

5    MARKET, THAT'S THE AREA THAT WE SAW ON THE PICTURE, RIGHT?

6    A.   CORRECT.

7    Q.   AND LET'S GO BACK TO DEFENDANTS' EXHIBIT 561, PLEASE.

8         AND HERE'S THE LION'S SUPERMARKET AND LEE'S SANDWICH.

9    NOW, YOU KNEW ABOUT LEE'S SANDWICH SHOP IN PART BECAUSE THAT'S

10   WHERE YOU MET YOUR HUSBAND JASON, RIGHT?

11   A.   NO.

12   Q.   NO?

13   A.   NOT THERE.

14   Q.   ALL RIGHT.  BUT YOU KNEW ABOUT LEE'S SANDWICH SHOP?

15   A.   YES, I DID KNOW.

16   Q.   AND LEE'S SANDWICH SHOP, UNLESS I'M MISTAKEN, IS OPEN FROM

17   4:30 IN THE MORNING; IS THAT RIGHT?

18   A.   I DON'T GO THERE VERY EARLY TO BUY SO I DON'T KNOW.

19   Q.   LET ME SHOW YOU -- I'M GOING TO MARK THIS AS AN EXHIBIT

20   NEXT IN ORDER D-562, AND I WILL SHOW THIS TO YOU TO SEE IF IT

21   REFRESHES YOUR RECOLLECTION.

22        (DEFENDANTS' EXHIBIT 562 WAS MARKED FOR IDENTIFICATION.)

23   BY MR. MCMANIS:

24   Q.   I'M SHOWING YOU D-562, A COPY OF THE LEE'S WEBSITE, AND

25   ASK YOU, PLEASE, IF YOU WOULD LOOK AT THE BUSINESS HOURS AND

1    TELL ME IF THAT REFRESHES YOUR RECOLLECTION THAT THAT SANDWICH

2    SHOP IS OPEN AT 4:30 IN THE MORNING?

3    A.   THIS IS CORRECT, BUT OUTSIDE AT THE STORE I DON'T KNOW.

4    Q.   BUT THE SANDWICH SHOP IS OPEN AT 4:30?

5    A.   EACH LEE'S SANDWICH HAS DIFFERENT WORK HOURS, AND SINCE I

6    USUALLY DON'T GO THERE EARLY IN THE MORNING TO BUY, I DON'T

7    KNOW.

8    Q.   OKAY.  NOW, DO YOU RECALL THAT YOU WERE ASKED IN THIS CASE

9    TO IDENTIFY THE BUS COMPANY THAT YOUR DAUGHTER TOOK FOR HER

10   TRIP TO SAN JOSE THAT MORNING?

11   A.   YES.

12   Q.   AND I'M GOING TO WRITE THIS DOWN.  AND DO YOU RECALL THAT

13   YOU ANSWERED A QUESTION BY IDENTIFYING THIS BUS COMPANY?

14   A.   YES.

15   Q.   AND IF YOU WOULD BE KIND ENOUGH, HOW DO YOU SAY THAT

16   COMPANY NAME?

17   A.   XE DO HOANG.

18   Q.   XE DO HOANG?

19   A.   XE DO HOANG.

20   Q.   I'M NOT GOING TO TRY THAT AGAIN.  THANK YOU.

21        NOW, YOU LATER LEARNED, DID YOU NOT, THAT THAT BUS COMPANY

22   DID NOT DROP PEOPLE OFF AT LION'S MARKET AT 7:00 O'CLOCK IN THE

23   MORNING?

24   A.   I DON'T KNOW WHERE THAT BUS COMPANY DROPS PEOPLE OFF AT A

25   SMALL TREAT NEAR LEE'S SANDWICH OR AT THE MARKET BUT I KNOW

1    SOME PEOPLE WILL BE DROPPED OFF THERE BUT I NEVER TRIED THAT

2    BUS COMPANY.

3    Q.   WELL, LET'S GO BACK TO PAGE 282 OF YOUR DEPOSITION, LINES

4    1 TO 16.

5         YOU WERE ASKED AT LINE 6:  "DID YOU PICK YOUR DAUGHTER UP?

6         "ANSWER:  YES.

7         "QUESTION:  WHAT TIME?

8         "ANSWER:  7:00.

9         "QUESTION:  AND WHAT WAS THE LOCATION THAT YOU HAD TO PICK

10   HER UP?

11        "NEAR LEE'S SANDWICH BY LION'S MARKET."

12        ARE YOU TESTIFYING THAT YOU, IN FACT, WENT TO THAT

13   LOCATION AND PICKED YOUR DAUGHTER UP?

14   A.   YES.

15   Q.   AND THIS BUS COMPANY THAT YOU FIRST TOLD US ABOUT WAS THIS

16   VIETNAMESE BUS COMPANY; CORRECT?

17   A.   YES, CORRECT.

18   Q.   WOULD YOU PUT EXHIBIT 561 UP, PLEASE.

19        AND IT IS TRUE, IS IT NOT, THAT THAT BUS COMPANY MAKES NO

20   STOPS IN THAT AREA AT THAT TIME?

21   A.   I DON'T KNOW IF THAT BUS COMPANY STOPS THERE OR NOT.  I AM

22   SURE THEY RELEASE PEOPLE FROM LEE'S SANDWICH.  THERE'S A SMALL

23   STREET NEXT TO IT.  THERE'S A TEMPLE NEAR THERE AND THAT'S

24   WHERE THE CLIENTS OR THE CUSTOMERS ARE DROPPED OFF.

25   Q.   DO YOU RECALL THAT WE TOOK THE DEPOSITION OF THE BUS

1    COMPANY IN LOS ANGELES IN THIS CASE?

2    A.   YES.

3    Q.   AND THAT THE TESTIMONY WAS WE DON'T --

4         MS. NGUYEN:  YOUR HONOR, OBJECTION.  HEARSAY.

5         THE COURT:  SUSTAINED.

6         MR. MCMANIS:  ALL RIGHT.

7    Q.   WELL, IN ANY EVENT, LET ME ASK YOU IF LATER YOU CHANGED

8    YOUR ANSWER TO THE INTERROGATORY AND SAID THAT IT MAY HAVE BEEN

9    THE GREYHOUND BUS COMPANY?

10   A.   I DON'T KNOW.  I JUST KNEW THAT I HAD TO PICK UP MY

11   DAUGHTER.  SHE SAID IT WAS -- THOSE WERE THE BUS COMPANY DROPS,

12   AND WHEN I GOT THERE MY DAUGHTER WAS THERE.

13   Q.   COULD YOU PUT UP 561 AGAIN, PLEASE.

14        SO IT'S YOUR TESTIMONY THAT WHEN YOU GOT THERE AT 7:00

15   A.M. THAT MORNING, YOUR DAUGHTER WAS THERE?

16   A.   CORRECT.

17   Q.   AND WAS SHE IN FRONT OF THE LION'S SUPERMARKET OR LEE'S

18   SANDWICH OR SOMEPLACE ELSE?

19   A.   IT'S A SMALL STREET NEAR LEE'S SANDWICH.  IT'S NEAR LEE'S

20   SANDWICH AND A TEMPLE.

21   Q.   OKAY.  IS IT TRUE THAT AFTER WE TOOK THE DEPOSITION OF THE

22   BUS COMPANY IN LOS ANGELES THAT YOU CHANGED YOUR ANSWER TO SAY

23   IT MAY HAVE BEEN THE GREYHOUND BUS COMPANY?

24   A.   I DIDN'T CHANGE.  I JUST KNEW THAT I PICKED UP MY DAUGHTER

25   AT THAT LOCATION.

1          MR. MCMANIS:  I'M GOING TO ASK TO HAVE TWO EXHIBITS

2     MARKED FOR IDENTIFICATION MARKED AS DEFENDANTS' EXHIBIT 563 FOR

3     IDENTIFICATION, PLAINTIFF'S RESPONSE TO DEFENDANTS' SPECIAL

4     INTERROGATORIES SET 1.

5          AN AS DEFENDANTS' 564, PLAINTIFF'S SECOND SUPPLEMENTAL

6     RESPONSE TO DEFENDANTS' SPECIAL INTERROGATORY SET 1.

7          (DEFENDANTS' EXHIBITS 563 AND 563 WERE MARKED FOR

8     IDENTIFICATION.)

9          MS. NGUYEN:  I'M FINE WITH IT, YOUR HONOR.

10          MR. MCMANIS:  MAY I APPROACH, YOUR HONOR?

11          THE COURT:  SURE.

12     BY MR. MCMANIS:

13     Q.  MS. DANG, I'M SHOWING YOU DEFENDANTS' EXHIBIT 563 TITLED

14     PLAINTIFF'S RESPONSE TO DEFENDANTS' SPECIAL INTERROGATORIES SET

15     1.  AND I'LL ASK YOU, FIRST OF ALL, WHAT IS THE DATE ON THAT?

16     A.  NOVEMBER 14TH, 20011.

17     Q.  AND IS THAT YOUR LAWYER'S SIGNATURE?

18     A.  CORRECT.

19     Q.  ALL RIGHT.  AND YOU SIGNED A VERIFICATION.  COULD YOU

20     IDENTIFY THAT AS YOUR SIGNATURE?

21     A.  CORRECT.

22     Q.  NOW, I'M GOING TO SHOW YOU DEFENDANTS' EXHIBIT 564, THE

23     SECOND SUPPLEMENTAL RESPONSE TO DEFENDANTS' SPECIAL

24     INTERROGATORIES.  AND I'LL ASK YOU, PLEASE, LOOKING AT THE DATE

25     OF THAT RESPONSE, WHAT IS THE DATE?

1      A.    AUGUST 3RD, 2012.

2      Q.    AND THAT'S YOUR ATTORNEY'S SIGNATURE?

3      A.    CORRECT.

4      Q.    AND LOOKING AT THE VERIFICATION PAGE, IS THAT THE

5      SIGNATURE WHERE YOU VERIFIED THAT RESPONSE?

6      A.    CORRECT.

7            MR. MCMANIS:  I'LL MOVE DEFENDANTS' 563 AND 564 INTO

8      EVIDENCE, PLEASE.

9            MS. NGUYEN:  NO OBJECTION, YOUR HONOR.  WE WOULD

10     JUST REQUEST THAT AN INSTRUCTION LATER REGARDING THE

11     INTERROGATORIES.

12           THE COURT:  I'LL GIVE IT RIGHT NOW.

13           INTERROGATORIES ARE QUESTIONS THAT ARE SENT BY ONE PARTY

14     TO ANOTHER PARTY BEFORE TRIAL.  THEY HAVE TO BE ANSWERED UNDER

15     OATH AND THEN THEY CAN BE USED IN TRIAL AS EVIDENCE OF THE

16     SUBJECT OF THE INTERROGATORY.

17           (DEFENDANTS' EXHIBITS 563 AND 564 WERE RECEIVED IN

18     EVIDENCE.)

19           MR. MCMANIS:  WOULD YOU PUT 563 ON THE BOARD,

20     PLEASE.  LET'S GET THE COVER SHEET.

21     Q.    NOW, THIS IS TITLED PLAINTIFF'S RESPONSE TO DEFENDANTS'

22     SPECIAL INTERROGATORIES SET 1.  AND THAT'S YOUR LAWYER,

23     MS. NGUYEN, RIGHT?

24     A.    YES, THAT'S CORRECT.

25     Q.    AND LET'S GO TO NUMBER 6.  SPECIAL INTERROGATORY NUMBER 6.

1    "PLEASE IDENTIFY THE BUS COMPANY THAT YOUR DAUGHTER USED FOR

2    HER BUS TRIP FROM SOUTHERN CALIFORNIA TO SAN JOSE AND SCHEDULED

3    TO ARRIVE IN SAN JOSE ON DECEMBER 21, 2009."

4         AND WOULD YOU READ YOUR RESPONSE, PLEASE?

5    A.   COULD YOU READ THAT FOR ME.

6    Q.   WELL, I'D LIKE YOU TO READ YOUR RESPONSE, PLEASE.

7    A.   THAT SAYS XE DO HOANG AND THE PHONE NUMBER.

8    Q.   AND THAT'S THE BUS COMPANY THAT YOU SAID IN YOUR SPECIAL

9    INTERROGATORIES?

10   A.   CORRECT.

11   Q.   NOW, LET'S PUT UP 564, BUT I WANT TO FOCUS IN ON LINE 24

12   TO 28 WHERE WE GET THE SUPPLEMENTAL RESPONSE.

13        NOW, THIS IS THE RESPONSE THAT IS DATED AUGUST 3, 2012,

14   AND YOU WERE ASKED:  "PLEASE IDENTIFY THE BUS COMPANY THAT YOUR

15   DAUGHTER USED FOR HER BUS TRIP FROM SOUTHERN CALIFORNIA TO SAN

16   JOSE AND SCHEDULED TO ARRIVE IN SAN JOSE ON DECEMBER 21, 2009."

17        RESPONSE:  I AM NOT SURE, BUT IT MAY HAVE BEEN THE

18   GREYHOUND BUS INSTEAD OF THE VIETNAMESE COMPANY.

19        DO YOU SEE THAT?

20   A.   THAT'S CORRECT.  I DID NOT SAY IT WAS XE DO HOANG OR

21   GREYHOUND.  I JUST KNEW THAT MY DAUGHTER ASKED ME TO COME TO

22   THAT LOCATION TO PICK HER UP, AND THAT'S WHAT I DID.

23   Q.   AND YOU MADE THAT CHANGE IN YOUR ANSWER FROM THE

24   VIETNAMESE BUS TO THE GREYHOUND BUS AFTER YOU LEARNED THAT THE

25   VIETNAMESE COMPANY DID NOT HAVE A STOP THERE IN THAT -- AT THAT

1    TIME OF DAY; ISN'T THAT RIGHT?

2    A.   NO.

3    Q.   OKAY.  I HAVE A FEW HOUSEKEEPING MATTERS TO MAKE UP WITH

4    YOU, MS. DANG.  I'D LIKE YOU TO LOOK AT EXHIBIT 519, PLEASE.

5         DO YOU HAVE THAT IN FRONT OF YOU?

6    A.   YES.

7    Q.   AND IS THAT YOUR SIGNATURE AT THE END OF THAT DOCUMENT?

8    A.   CORRECT.

9    Q.   AND WHAT IS THE DATE ON THAT?

10   A.   FEBRUARY 18TH, 2009.

11   Q.   OKAY.  COULD WE PUT THAT UP, PLEASE.

12        CAN WE MOVE THAT INTO EVIDENCE?  JUST A SECOND.  MOVE IT

13   IN EVIDENCE?

14            MS. NGUYEN:  NO OBJECTION, YOUR HONOR.

15            THE COURT:  ALL RIGHT.  519 IS RECEIVED.

16        (DEFENDANTS' EXHIBIT 519 WAS RECEIVED IN EVIDENCE.)

17            MR. MCMANIS:  ALL RIGHT.  YOU CAN PUT THAT UP,

18   PLEASE.  MOVE IT UP.

19   Q.   THIS IS TITLED SERVER TRAINING.  DO YOU SEE THAT?

20   A.   I SEE IT.

21   Q.   THIS CHECKLIST ACKNOWLEDGES YOUR AWARENESS OF THE SERVER

22   RESPONSIBILITIES, AND THEN THESE ARE LISTED HERE.  IS THAT

23   TRUE?

24   A.   CORRECT.

25   Q.   AND IT SAYS AT THE BOTTOM, "I HAVE READ AND UNDERSTOOD THE

1    SAID RESPONSIBILITIES."

2         AND THAT'S WHERE YOU SIGNED AND DATED IT; CORRECT?

3    A.   I UNDERSTAND THAT, BUT I DID NOT UNDERSTAND WHAT THEY WERE

4    SAYING.

5    Q.   IS IT YOUR TESTIMONY THAT THIS DOCUMENT THAT YOU SIGNED

6    SAYING THAT YOU HAVE READ AND UNDERSTOOD THOSE DUTIES, YOU DID

7    NOT UNDERSTAND?

8    A.   I DIDN'T UNDERSTAND.

9    Q.   DIDN'T YOU UNDERSTAND THAT ONE OF THE REASONS THAT BAY 101

10   TRIED TO TRAIN YOU WAS TO HELP YOU UNDERSTAND THESE DUTIES?

11   A.   NOW I UNDERSTAND BUT WHEN I WAS READING THIS DOCUMENT, I

12   DID NOT UNDERSTAND.

13   Q.   YOU RECALL THAT ELLIS WAS YOUR TRAINER?

14   A.   CORRECT.

15   Q.   AND THIS DOCUMENT WAS SIGNED AND DATED WHILE YOU WERE

16   TRAINING?

17   A.   CORRECT.

18   Q.   NOW, I WANT TO GO THROUGH SOME OF YOUR TESTIMONY AT YOUR

19   DEPOSITION ABOUT MEAL AND REST BREAKS.  AND I'M GOING TO --

20   FIRST OF ALL, WE'RE GOING TO SHOW YOU, AFTER MY FRIEND HERE HAS

21   HAD A CHANCE TO LOOK AT THE EXCERPT, PAGE 315 OF YOUR

22   DEPOSITION, LINES 1 TO 8.

23        THE COURT:  MR. MCMANIS, IF THIS IS A GOOD POINT, I

24   THINK IT MIGHT BE A GOOD IDEA TO BREAK.  I HAVE RAN THE

25   INTERPRETER FOR LONGER THAN IS FAIR TO HER.

1    MR. MCMANIS:  YOU'RE A HARD TASKMASTER IF I MAY SAY

2    SO, YOUR HONOR.

3    THE COURT:  SO WHY DON'T WE CALL IT FOR TODAY, AND

4    WE'LL SEE YOU TOMORROW MORNING AT 8:30.

5    MR. MCMANIS:  8:30?

6    THE COURT:  YES.

7    MR. MCMANIS:  THANK YOU.

8    (JURY OUT AT 1:15 P.M.)

9    THE COURT:  TWO ISSUES WE WANT TO TAKE UP.  ONE IS

10   WE HAVE ANOTHER QUESTION FROM A JUROR, AND I THINK IT'S PRETTY

11   EASY TO ANSWER, BUT LET ME SHOW IT TO YOU.

12   MR. MCMANIS:  I AGREE WITH YOU AND PERHAPS YOUR

13   HONOR CAN ADDRESS THAT IN THE MORNING.

14   THE COURT:  I WILL.  I JUST WILL SAY IT HAS TO BE

15   INTRODUCED TO BE EVIDENCE.

16   MR. MCMANIS:  ABSOLUTELY.

17   MS. NGUYEN:  RIGHT.

18   THE COURT:  THE OTHER THING IS THAT I TOLD

19   MS. NGUYEN AT THE SIDE-BAR THAT I'D LET HER TRY AND EXPLAIN TO

20   ME HER CONCERN ABOUT THE PASSAGE YOU READ FROM THE DEPOSITION

21   OF MS. DANG.

22   MS. NGUYEN:  YES, YOUR HONOR.  THE QUESTION WAS

23   WHETHER OR NOT SHE WOULD HAVE ANY RELUCTANCE OR DISCOMFORT

24   GOING BACK TO WORK THE SAME SHIFT AS MR. LUCIO SUAREZ.

25   AND MY FEAR IS THAT IT WOULD IMPLY THAT SOMEHOW SHE WASN'T

1    AFRAID OR UNCOMFORTABLE WORKING NEXT TO HIM, BUT THAT, IF TAKEN

2    IN CONTEXT, WAS BECAUSE SHE WAS BEING ASKED WHETHER SHE WOULD

3    CHOOSE IN TERMS OF THE REIN STATEMENT, BECAUSE THAT'S WHAT WE

4    WERE DISCUSSING AT THE TIME, BETWEEN GOING BACK TO WORK THE

5    SAME SHIFT AS MR. SUAREZ OR GOING BACK TO WORK THE SAME SHIFT

6    AS MR. ORTEGA AND LINDA ELIAS.

7         AND SO IF THEY ARE GOING TO BE ALLOWED TO IMPLY THAT

8    SOMEHOW SHE IS AGREEING OR IS NOT UNCOMFORTABLE GOING BACK TO

9    WORK WITH MR. LUCIO SUAREZ, I WOULD LIKE TO BE ABLE TO EXPLAIN

10   THE OTHER PART BUT THAT GOES INTO THE DISCUSSION OF WHY WE WERE

11   TALKING ABOUT REINSTATING HER AND THE ARBITRATION RESULTS.

12            THE COURT:  WHAT PAGE OF THE DEPOSITION WAS THAT?

13            MR. MCMANIS:  PAGE 299, YOUR HONOR, LINES 10 TO 15.

14            MS. NGUYEN:  AND IT STARTS BACK AT PAGES 295, 296

15   WHEN THEY WERE ASKING WHETHER SHE WAS WILLING TO RETURN TO WORK

16   AT THE GRAVEYARD SHIFT AFTER THE ARBITRATOR ORDERED THE

17   REINSTATEMENT.

18            MR. MCMANIS:  I DIDN'T USE ANY OF THOSE PAGES FOR

19   THE OBVIOUS REASONS.  I DID NOT WANT TO GET INTO THAT.

20        THE SALIENT FEATURE OF THIS VERY BRIEF EXCERPT IS THE

21   ANSWER SHE GAVE TO THE FIRST QUESTION, "AFTER THAT LETTER HE

22   DIDN'T DO ANYTHING TO ME."

23        THAT'S THE POINT OF THAT.  IT DOESN'T HAVE -- IMPLICATE

24   ANYTHING IN TERMS OF MEDIATION, ARBITRATION OR ANYTHING OF THE

25   SORT.

1         I KNOW MY FRIEND WOULD LOVE TO GET INTO THAT, BUT I DON'T

2    THINK THAT THAT OPENS THE DOOR ONE INCH.

3         MS. NGUYEN:  YOUR HONOR, THE QUESTION THAT

4    MR. MCMANIS WAS ABLE TO SHOW WAS WOULD YOU COME BACK TO WORK

5    AND WORK THE SAME SHIFT AS LUCIO.  AND THE ANSWER THAT CAME IN

6    IS "IF HE DOESN'T BOTHER ME.  AFTER THAT LETTER, HE DIDN'T DO

7    ANYTHING TO ME."

8      BUT WHETHER OR NOT HE COULD BOTHER HER AND WHETHER OR NOT

9    SHE WOULD FEEL OR WHETHER OR NOT SHE WOULD COME BACK TO THE

10    SAME SHIFT WITH HIM HAD TO DO WITH WHAT HAPPENED AFTER THE

11    ARBITRATION AND HER WINNING THE ARBITRATION, NOT AT THE TIME

12    WHEN SHE WAS STILL WORKING AND BEFORE THE TERMINATION.

13         THE COURT:  I THINK UNDER WHAT WAS READ IT DOESN'T

14    OPEN THE DOOR.

15         MR. MCMANIS:  THANK YOU.

16         MS. NGUYEN:  THANK YOU, YOUR HONOR.

17         THE COURT:  HOW MUCH LONGER DO YOU HAVE?

18         MR. MCMANIS:  PARDON ME?

19         THE COURT:  HOW MUCH LONGER DO YOU HAVE WITH

20    MS. DANG?

21         MR. MCMANIS:  I'LL GO THROUGH MY NOTES, AND I'LL BE

22    ABLE TO GIVE YOU THAT IN THE MORNING.

23      I THINK I'M GETTING PRETTY CLOSE TO THE END.

24         MS. NGUYEN:  WELL, I'M SORRY.  I DO NEED TO KNOW.

25    IF YOU DON'T KNOW, THEN I JUST HAVE TO TAKE ANOTHER WITNESS OUT

1    OF ORDER BECAUSE I HAVE LISA, MS. DANG'S DAUGHTER, COMING IN

2    AND SHE'S COMING DOWN FROM SCHOOL AND THEN SHE HAS TO GO BACK

3    TO SCHOOL AND WORK.

4         SO I HAVE HER SCHEDULED FOR 8:30 TOMORROW MORNING.

5              MR. MCMANIS:  WELL, I OBJECT TO THAT.  I'LL MEET AND

6    CONFER WITH COUNSEL AND MAYBE WE CAN WORK IT OUT.  I MEAN, THIS

7    IS THE PLAINTIFF'S TESTIMONY AND BRINGING IN ANOTHER WITNESS,

8    ESPECIALLY NOT AN EXPERT, I DON'T THINK THAT'S APPROPRIATE.

9              MS. NGUYEN:  YOUR HONOR, IT'S THE ONLY TIME THAT SHE

10   CAN MAKE IT DOWN HERE.  I HAD TO WORK REALLY HARD JUST TO GET

11   HER DOWN HERE.

12             THE COURT:  WELL, WHY DON'T WE SEE HOW MUCH TIME --

13   MR. MCMANIS OBVIOUSLY IS NOT GOING TO TAKE THE WHOLE MORNING

14   WITH MS. DANG.

15             MR. MCMANIS:  THAT'S RIGHT.

16             THE COURT:  SO I WOULD THINK THAT WE COULD FOR SURE

17   GET TO HER.

18             MS. NGUYEN:  I THINK SHE HAS CLASSES TOMORROW AT

19   NOON OR LATER.  I CAN CHECK, BUT I KNOW THAT SHE -- I PROMISED

20   HER THAT SHE WOULD BE OUT OF HERE BY ABOUT 10:30 AT THE LATEST.

21             THE COURT:  WELL, I WOULD THINK THAT WE COULD

22   PROBABLY ACCOMMODATE THAT.

23             MR. MCMANIS:  WELL, I WOULD THINK SO, TOO.  AND, OF

24   COURSE, I DIDN'T PROMISE ANYTHING.

25        AND THIS IS THE FIRST THAT I HEARD ABOUT IT TWO MINUTES

1    AGO.

2         MAY I ASK FROM THE COURT WHERE SHE ATTENDS SCHOOL AND SHE

3    HAS THESE CLASSES?

4              MS. NGUYEN:  BERKELEY.

5              THE COURT:  ALL RIGHT.  WELL, I WILL MAKE SURE THAT

6    SHE GETS TO TESTIFY TOMORROW, BUT I WON'T -- IF YOU CAN'T WORK

7    IT OUT BETWEEN YOU, I'LL LEAVE IT UP TO MR. MCMANIS TO CHOOSE

8    WHEN HE WOULD WANT TO BREAK, IF NECESSARY.

9              MR. MCMANIS:  THANK YOU, YOUR HONOR.  THANK YOU.

10             THE COURT:  OKAY.

11             MS. NGUYEN:  THANK YOU, YOUR HONOR.

12        (COURT CONCLUDED AT 1:22 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16                          _____
                            IRENE RODRIGUEZ, CSR, CRR
                            CERTIFICATE NUMBER 8076
17

18
                            DATED:  MAY 7, 2013
19

20

21

22

23

24

25